## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

STATE OF NEW YORK,
    28 Liberty Street
    New York, NY 10005

STATE OF HAWAII,
    425 Queen Street
    Honolulu, HI 96813

STATE OF NEW JERSEY,
    25 Market Street
    Trenton, NJ 08625

CITY OF NEW YORK,
    100 Church Street
    New York, NY 10007

CITY AND COUNTY OF SAN
FRANCISCO,
    1 Dr. Carlton B. Goodlett Place
    San Francisco, CA 94102

        Plaintiffs,

    v.

DONALD J. TRUMP, *in his official capacity as President of the United States*,
    1600 Pennsylvania Avenue
    Washington, DC 20500

LOUIS DEJOY, *in his official capacity as Postmaster General of the United States*,
    475 L'Enfant Plaza SW, Rm. 4012
    Washington, DC 20260

UNITED STATES POSTAL SERVICE,
    475 L'Enfant Plaza SW, Rm. 4012
    Washington, DC 20260

        Defendants.

Case No.: 20 Civ. 2340

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

1

## INTRODUCTION

1.      The United States Postal Service has been thrown into chaos.  Thanks to a series of sweeping policy changes beleaguered by partisan meddling, the independent agency has become a political football set to undermine a federal election.  At a time when Americans are depending on the mail to secure food, housing, medicine, and more in the middle of a pandemic, these changes are triggering dramatic delays.  Mail is piling up in facilities for days and weeks; delivery trucks are running routes without any mail to deliver; and postal workers are left scrambling to process mail with less equipment, less time, and less staff.  These policy changes are also interfering with the administration of myriad state and local government functions, and, unless vacated or enjoined, will endanger state and local plans for the November election as well.

2.      For fifty years, the U.S. Postal Service has been an independent agency overseen by a board of governors.  But as the COVID-19 pandemic began shutting down cities, counties, and states, the Trump Administration made concerted efforts to interfere with the agency and with states' plans to expand mail-in voting due to the public health crisis.  President Trump repeatedly, emphatically, and openly attempted to undermine mail-in voting efforts and the U.S. Postal Service's ability to ensure the timely delivery of ballots.  At the same time, Trump Administration officials were directing changes in the agency's processes.

3.      Beginning in June 2020, the U.S. Postal Service issued a number of policy changes that overhauled the agency's operations.  The agency eliminated or substantially altered a number of operational policies and practices that were mission-critical to the timely delivery of mail.  Specifically, the U.S. Postal Service removed hundreds of collection boxes and high-speed sorting machines; cut or curtailed overtime; prohibited needed late trips and extra trips; and began a pilot program in almost 400 localities that turned how the agency processes mail on its head.  For the first time in recent memory, the U.S. Postal Service also backed away from its

2

policy of ensuring election mail delivery at the First Class rate speed of one to three days regardless of the rate actually paid.

4.     Immediately, the policy changes produced serious delays across the country despite the fact that letter mail volume had decreased during the pandemic.  With the removal of high-speed sorting machines, readying mail for delivery on the remaining machines ran late. Since late trips were not allowed, however, trucks had to leave for delivery points without mail. Subsequent scheduled trips were overwhelmed, but employees could not get overtime to address the backed-up mail.  Without extra trips to fix the issue, mail sat undelivered overnight.  In some cases, the mail had to be re-sorted in the morning in order to combine the sitting mail with newly-arrived mail into the proper "delivery point sequence"—the delivery order used by mail carriers.  On-time delivery for various regions and postal products continued to get worse over time, dropping by 15 to 20 percent in some areas.

5.     As the delays carried on for weeks, the U.S. Postal Service took no steps to undo its broad policy changes.  Instead, on or around July 31, 2020, the agency sent letters to 46 states warning that the timely delivery of mail-in ballots for the November 3, 2020 election "cannot be guaranteed."  For the majority of states, the U.S. Postal Service claimed that state election laws were "incongruous with the Postal Service's delivery standards."  Due to this alleged "mismatch," the agency recommended that states pay the more expensive First Class rate when mailing ballots to voters in order to ensure faster delivery times.

6.     The sudden reversal of the U.S. Postal Service's decades-old policy alarmed state and local election officials across the country.  The States of New York, Hawaii, and New Jersey, the City of New York, and the City and County of San Francisco (collectively, "Plaintiffs") all have plans to provide voters with safe alternatives to in-person voting in the

middle of the country's unprecedented public health crisis.  Delays disrupt those plans, forcing

voters to risk either disenfranchisement by voting by mail or their health by voting in person.

7.     The agency's delays disrupt Plaintiffs' abilities to carry out a wide variety of

other critical government functions as well.  Plaintiffs rely on the U.S. Postal Service to send

critical correspondence regarding child and family services, food benefits, rental subsidies, and

tax collection.  Without reliable delivery, Plaintiffs will incur significant financial and

administrative costs.

8.     On August 18, 2020, the Postmaster General responded to public outcry over

delays by announcing that he would "suspend" the policy changes until after the November

election.  Within days, however, he had testified before the Senate and House of Representatives

that he had no intention of returning removed collection boxes or sorting equipment, reversing

the prohibition on late trips or extra trips, or offering more overtime.  Nor did he explain how he

could ensure the timely delivery of election mail given that the agency did not plan to undo these

delay-inducing policies.

9.     This lawsuit challenges the U.S. Postal Service's abrupt policy changes as beyond

the agency's authority under both federal law and the Constitution.  Under the comprehensive

statutory scheme governing the agency, the U.S. Postal Service was required to seek an advisory

opinion from the Postal Regulatory Commission prior to undertaking new nationwide policies,

*see* 39 U.S.C. § 3661, and give the highest consideration to the timely, efficient processing and

delivery of important letter mail to the entire population of the United States, *see* 39 U.S.C.

§§ 101, 403.  The agency's actions not only fail on both counts, but, along with the Trump

Administration's conduct, also interfere with states' constitutional duty to administer their own

elections.  *See* U.S. Const. art. I, § 4, cl. 1.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201(a), and 39 U.S.C. § 409.

11.     There is a controversy under 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 1361 and 2201–2202, as well as the Court's equitable powers.

12.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities whose principal places of business are in this District.  A substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the District of Columbia.

## PARTIES

13.     Plaintiff the State of New York, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Letitia James is New York State's chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

14.     Plaintiff the State of Hawaii, represented by and through its Attorney General, is a sovereign state of the United States of America.  Attorney General Clare E. Connors is the chief legal officer of the State of Hawaii and has authority to appear, personally or by deputy, for the State of Hawaii in all courts and in all cases, criminal or civil, in which the State may be a party or be interested.  Haw. Rev. Stat. § 28-1.  The Department of the Attorney General has the authority to represent the State in all civil actions in which the State is a party.  *Id.* § 26-7.  This challenge is brought pursuant to the Attorney General's constitutional, statutory, and common law authority.  *See* Haw. Const. art. V, § 6; Haw. Rev. Stat. Chapter 28; Haw. Rev. Stat. § 26-7.

15.     Plaintiff the State of New Jersey, represented by and through its Attorney

General, is a sovereign state of the United States of America.  Attorney General Gurbir S.

Grewal is the State's chief legal officer and is authorized to bring this action on behalf of the

State of New Jersey.  N.J. Stat. Ann. § 52:17A-4(e), (g).

16.     Plaintiff the City of New York is a municipal corporation organized pursuant to

the laws of the State of New York.  New York City is a political subdivision of the State and

derives its powers through the New York State Constitution, New York State laws, and the New

York City Charter.  New York City is the largest city in the United States by population.

17.     Plaintiff the City and County of San Francisco, represented by and through City

Attorney Dennis J. Herrera, is a municipal corporation organized and existing under the laws of

the State of California, and is a charter city and county.  The City Attorney is charged with

representing San Francisco in any legal proceedings in which it has an interest.  S.F. Charter

§ 6.102.

18.     Plaintiffs are aggrieved by the actions of President Donald J. Trump, Postmaster

General Louis DeJoy, and the U.S. Postal Service (collectively, "Defendants") and have standing

to bring this action because Defendants' actions harm Plaintiffs' sovereign, quasi-sovereign,

economic, and proprietary interests and will continue to cause injury unless and until

Defendants' policies are vacated.

19.     Defendant Donald J. Trump is the President of the United States.  He is sued in

his official capacity.

20.     Defendant Louis DeJoy is the Postmaster General of the United States.  He is

sued in his official capacity.

21.     Defendant the United States Postal Service is an independent agency within the

executive branch of the United States government.  39 U.S.C. § 201.

## ALLEGATIONS

**I.**  **The federal postal service has long been a critical part of American infrastructure.**

22.  The United States's federal mail system predates even the Constitution.[1]  In 1775, the Second Continental Congress appointed Benjamin Franklin as the first Postmaster General, charged with maintaining "a line of posts" from New England to Georgia.  At the time, the postal service played an integral role during the American Revolutionary period, carrying mail from Congress to the American army. [2]

23.  Upon ratification, the Constitution vested Congress with the power "to establish Post Offices and post Roads."  U.S. Const., art. I, § 7.  In 1789, it exercised this power by establishing the first Post Office under the Constitution and making the Postmaster General subject to the President's direction.[3]

24.  Soon after, Congress passed the Act of February 20, 1792.  The first major postal law, the Act professionalized the Post Office by establishing postal roads and giving the postal service a "postal monopoly" prohibiting private carriers from delivering letters.[4]

25.  For more than two hundred years, the federal postal service has provided reliable, vital services to millions of Americans and served to "to bind the Nation together through the personal, educational, literary, and business correspondence of the people."  *See* 39 U.S.C. § 101(a).

26.  Today, the U.S. Postal Service delivers 48 percent of the world's mail—including more packages to homes than any other mail service.[5]  In fiscal year 2019, the agency delivered

---

[1] U.S. Postal Serv., The United States Postal Service: An American History 1 (2020), https://about.usps.com/publications/pub100.pdf.
[2] *Id.* at 2, 4.
[3] *Id.* at 4.
[4] *Id.* at 1, 4.
[5] U.S. Postal Serv., FY2019 Annual Report to Congress 2,

143 billion pieces of mail to 160 million delivery addresses.[6]

27.     The U.S. Postal Service's stated mission is to "provide the American public with trusted, affordable, universal service."[7]  Critical to this mission is the agency's universal service obligation, a legal mandate designed to ensure that all areas of the country receive a minimum level of service at a reasonable price, in light of the agency's unique and integral role as the sole government-provided postal service.[8]

28.     The U.S. Postal Service's operations are essential in particular for the 46 million rural addresses to which it delivers, where post offices may not be financially self-sustaining or where little to no viable alternatives exist for sending and receiving mail.[9]

29.     Despite recent financial difficulties, natural disasters, and other challenges to its operations, the U.S. Postal Service has maintained its commitment to ensuring that all areas of the country are served and that no Americans are unable to access the mail.

30.     One of most critical components of the U.S. Postal Service's commitment is its role in federal, state, and local elections across the country through the delivery of critical election materials, such as ballots, voter registration cards, absentee applications, and polling place notifications.[10]

---

https://about.usps.com/what/financials/annual-reports/fy2019.pdf.

[6] U.S. Postal Serv., Delivers the Facts 1, https://about.usps.com/news/delivers-facts/usps-delivers-the-facts.pdf.

[7] *See* U.S. Postal Serv., USO Executive Summary 1, https://about.usps.com/universal-postal-service/usps-uso-executive-summary.pdf.

[8] Office of Inspector General, *Guiding Principles for a New Universal Service Obligation* 1, U.S. Postal Serv. (Nov. 14, 2014), https://www.uspsoig.gov/sites/default/files/document-library-files/2015/rarc-wp-15-001_0.pdf.

[9] *See* U.S. Postal Serv., Delivers the Facts 1, https://about.usps.com/news/delivers-facts/usps-delivers-the-facts.pdf; U.S. Postal Serv., FY2019 Annual Report to Congress 2, https://about.usps.com/what/financials/annual-reports/fy2019.pdf.

[10] *See* U.S. Postal Serv., Election Mail, https://about.usps.com/gov-services/election-mail (last visited Aug. 18, 2020).

31.     As the country reaches historic levels of mail-in voting due to the COVID-19 pandemic, Boards of Elections across the country, including in Plaintiffs' jurisdictions, are relying heavily on the U.S. Postal Service and its services to administer free and fair elections and preserve voters' access to the franchise.

**II.     Congress created a detailed statutory scheme to govern the U.S. Postal Service.**

32.     Congress passed the Postal Reorganization Act ("PRA") in 1970 to safeguard the postal service's critical role in American life.  *See* 39 U.S.C. § 101 *et seq.*  A primary purpose of the Act was to "convert the Post Office Department into an independent establishment in the Executive Branch of the Government freed from direct political pressures."[11]  Accordingly, the PRA renamed the agency the U.S. Postal Service, restructured its operations, removed it from the Cabinet to ensure its political independence, and required—for the first time—that the Postmaster General be appointed by a newly-established Board of Governors rather than the President.  The PRA also created the Postal Rate Commission, an independent body to oversee postage rate decisions and certain other agency actions.

33.     The PRA affirms that the U.S. Postal Service is "a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people."  39 U.S.C. § 101(a).  Its "basic function" is to meet "the obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people."  *Id.*

34.     Consistent with the agency's core function, the PRA directs that the U.S. Postal Service "shall provide prompt, reliable, and efficient services to patrons in all areas and shall

---

[11] H.R. Rep. No. 91-1104, at 1 (1970) (Conf. Rep.), *as reprinted in* 1970 U.S.C.C.A.N. 3649, 3650.

render postal services to all communities."  *Id*.  "The costs of establishing and maintaining the Postal Service shall not be apportioned to impair the overall value of such service to the people." *Id.*

35.     Under the PRA, Congress also directs that the U.S. Postal Service must follow specific statutory commands for agency action at each stage of designing, planning, and providing prompt postal services.  For example, "in determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail."  39 U.S.C. § 101(e).

36.     The PRA further provides that "[i]n selecting modes of transportation, the Postal Service shall give highest consideration to the prompt and economical delivery of all mail. Modern methods of transporting mail by containerization and programs designed to achieve overnight transportation to the destination of important letter mail to all parts of the Nation shall be a primary goal of postal operations."  39 U.S.C. § 101(f).

37.     As reflected in these commands, the U.S. Postal Service is duty-bound to "serve as nearly as practicable the entire population of the United States."  39 U.S.C. § 403(a).  In particular, the agency must "maintain an efficient system of collection, sorting, and delivery of the mail nationwide"; (2) "provide types of mail service to meet the needs of different categories of mail and mail users"; and (3) "establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will . . . have ready access to essential postal services."  39 U.S.C. § 403(b).

38.     For greater oversight of the detailed statutory scheme governing the U.S. Postal Service, Congress passed the Postal Accountability and Enhancement Act ("PAEA") in 2006. Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 *et seq.*).  The

PAEA expanded the former Postal Rate Commission into the Postal Regulatory Commission, increasing the Commission's authority with regard to the agency's execution of its duties and obligations.  By law, the Commission maintains political independence with bipartisan members who are appointed by the President, confirmed by the Senate, and may only be removed for cause.  *See* 39 U.S.C. § 502(a).

39.     The U.S. Postal Service must go through the Commission before making major changes to its policies or operations.  Specifically, "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."  39 U.S.C. § 3661(b).

40.     Following the submission of a proposal, "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public.  The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title."  39 U.S.C. § 3661(c).

### III.    The Trump Administration has interfered with the U.S. Postal Service and states' mail-in voting plans.

41.     Despite Congress's efforts to insulate the U.S. Postal Service from political interloping, the Trump Administration has improperly interfered with this independent agency.  The Trump Administration and the agency have also pressured states to change their plans to conduct the November 3, 2020 election through expanded mail-in voting, with the intent of

impairing the delivery of mailed ballots otherwise authorized by state law.

42.     Following his appointment by President Trump, David Williams served as a vice

chairman of the U.S. Postal Service's Board of Governors from 2018 to 2020 after 13 years as

the agency's Inspector General.[12]  In April 2020, Williams resigned from the Board of

Governors to protest the politicization of the agency.[13]  On August 20, 2020, Williams testified

before Congress that the Secretary of the Treasury Steven Mnuchin had been directly interfering

with the agency's operations in the months prior to Williams's resignation.

43.     Williams testified that "Mnuchin indicated he wanted to have some say over how

the postal service ran."[14]  Specifically, "[t]he Secretary has called over board members to

provide instructions and requests and express his displeasure, which is really striking.  I'm not

sure I've run into that before, where one department is trying to run another department."[15]  As

Williams explained, "[n]ormally you would simply reject the effort and report it to Congress."[16]

Instead, Secretary Mnuchin ordered operational changes at the agency in line with those he had

recommended to the President in a 2018 report.[17]

44.     Upon information and belief, Secretary Mnuchin also continuously sought to

[12] Catie Edmondson, *Who Is David C. Williams? A Postal Service Overseer Who Resigned*, The N.Y. Times (Aug. 20, 2020), https://www.nytimes.com/2020/08/20/us/politics/david-williams-postal-service.html.

[13] *Id.*; *see also* Nicholas Fandos et al., *Former Postal Governor Tells Congress Mnuchin Politicized Postal Service*, The N.Y. Times (Aug. 20, 2020), https://www.nytimes.com/2020/08/20/us/politics/former-postal-governor-tells-congress-mnuchin-politicized-postal-service.html.

[14] *See Progressive Caucus ad hoc hearing on Trump Admin's sabotage of USPS operations*, Cong. Progressive Caucus (Aug. 20, 2020), https://www.pscp.tv/w/1BdxYnvDppzKX (video).

[15] *Id.*

[16] *Id.*

[17] *See* Task Force on the United States Postal System, *United States Postal Service: A Sustainable Path Forward* (Dec. 4, 2018), https://home.treasury.gov/system/files/136/USPS_A_Sustainable_Path_Forward_report_12-04-2018.pdf.

exercise influence over the U.S. Postal Service through the selection of new Governors that were aligned with his vision, and who would select a new Postmaster General that would implement the requested operational changes.[18]  Among other actions, Secretary Mnuchin discussed the issue privately with U.S. Postal Service Governor Robert M. Duncan on several occasions.  He also recommended to President Trump that he appoint John M. Barger to the Board of Governors, who, after being confirmed by the Senate, was tasked with leading the committee to select a new Postmaster General.[19]

45.    According to Williams, Secretary Mnuchin's efforts to intercede continued even after the U.S. Postal Service informed him that his demands on the agency were illegal.[20]

46.    Upon information and belief, following the appointment of Postmaster General DeJoy, Secretary Mnuchin has further used the Treasury's position as a lender to the agency as leverage to obtain further control over its operations.  Secretary Mnuchin sought to condition a loan to the U.S. Postal Service "in exchange for sweeping operational control of the Postal Service, including provisions that would allow the Trump administration to approve senior postal personnel decisions, service contracts with third-party shippers, collective bargaining negotiation strategies and high package prices."[21]

47.    After Congress passed CARES Act relief in March, which authorized the Treasury Department to lend $10 billion to the U.S. Postal Service "upon terms and conditions

---

[18] Kenneth P. Vogel et al. *Mnuchin Paved Way for Postal Service Shake-Up*, The N.Y. Times (Aug. 22, 2020), https://www.nytimes.com/2020/08/22/business/economy/dejoy-postmaster-general-trump-mnuchin.html.
[19] *Id.*
[20] *See Progressive Caucus ad hoc hearing on Trump Admin's sabotage of USPS operations*, Cong. Progressive Caucus (Aug. 20, 2020), https://www.pscp.tv/w/1BdxYnvDppzKX (video).
[21] Jacob Bogage, *Treasury agrees to lend Postal Service $10 billion in trade for rivals' shipping contracts*, Wash. Po. (July 29, 2020), https://www.washingtonpost.com/business/2020/07/29/postal-service-treasury-loan.

mutually agreed upon by [the Treasury Department] and the Postal Service,"[22] the Department and the U.S. Postal Service entered into an agreement on July 28, 2020. Under the agreement, the agency would receive $10 billion in exchange for information regarding the U.S. Postal Service's most valuable business contracts with third-party shippers, as well as various financial reporting requirements.[23] Postmaster General DeJoy testified that he has discussed the loan directly with Secretary Mnuchin, but that they did not discuss operational plans in "grave detail."[24] Rather, he informed the Secretary that he is "working on a plan."[25]

48.     The Treasury Department has repeatedly resisted efforts by Congress and good government groups to obtain information regarding Secretary Mnuchin's role in the U.S. Postal Service's operations and the selection of its leadership.[26]

49.     While Secretary Mnuchin was directly interfering with the independence of the U.S. Postal Service, President Trump began a public campaign against the agency and mail-in voting. As more states began to adopt expanded mail-in voting procedures due to the spread of the COVID-19 virus and associated state and local lockdowns, the President attacked the procedures as encouraging fraud.

50.     At this point, President Trump has expressed his opposition to increased mail-in

---

[22] *See* Letter from Steven T. Mnuchin, Sec'y of Treasury, to the Hon. Louis DeJoy, Postmaster General (July 28, 2020), https://federalnewsnetwork.com/wp-content/uploads/2020/07/2020-07-29-UST-Production-summary-of-terms.pdf.
[23] *Id.*
[24] Kenneth P. Vogel et al. *Mnuchin Paved Way for Postal Service Shake-Up*, The N.Y. Times (Aug. 22, 2020), https://www.nytimes.com/2020/08/22/business/economy/dejoy-postmaster-general-trump-mnuchin.html.
[25] *Id*.
[26] *See* Letter from Sen. Charles Schumer to The Hon. Robert M. Duncan, Chairman of U.S. Postal Serv. Board of Governors (Aug. 19, 2020),
https://www.democrats.senate.gov/imo/media/doc/CES%20to%20USPS%20Board%208.20.pdf;
*Citizens for Responsibility and Ethics in Washington v. U.S. Dept. of Treasury*, No. 20 Civ. 2256 (D.D.C. filed Aug. 17, 2020).

voting no less than 70 times.[27]  Throughout, the President has repeatedly stated that universal mail-in voting would harm Republicans' ability to win elections.  On March 30, 2020, President Trump disparaged a COVID-19 relief bill from House Democrats, arguing that "[t]he things they had in there were crazy.  They had things—levels of voting that, if you ever agreed to it, you'd never have a Republican elected in this country again."[28]

51.     President Trump has reiterated that sentiment again and again.  On April 8, 2020, he tweeted to his more than 85 million Twitter followers that "Republicans should fight very hard when it comes to state wide mail-in voting," noting that, "for whatever reason, [mail-in voting] doesn't work out well for Republicans."[29]  On May 28, 2020, President Trump tweeted that mail-in voting would "LEAD TO THE END OF OUR GREAT REPUBLICAN PARTY."[30] On July 2, 2020, he again tweeted his disdain for mail-in voting, urging that "Republicans, in particular, cannot let this happen!"[31]  On August 3, 2020, the President lambasted Nevada for supposedly hurting Republicans' chances by adopting universal mail-in voting: "In an illegal late night coup, Nevada's clubhouse Governor made it impossible for Republicans to win the state."[32]

---

[27] Amy Gardner and Josh Dawsey, *As Trump leans into attacks on mail voting, GOP officials confront signs of Republican turnout crisis*, Wash. Po. (Aug. 3, 2020), https://www.washingtonpost.com/politics/republicans-race-to-promote-mail-voting-as-trumps-attacks-discourage-his-own-supporters-from-embracing-the-practice/2020/08/03/9dd1d988-d1d9-11ea-9038-af089b63ac21_story.html.

[28] Aaron Blake, *Trump just comes out and says it: The GOP is hurt when it's easier to vote*, Wash. Po. (Mar. 30, 2020), https://www.washingtonpost.com/politics/2020/03/30/trump-voting-republicans.

[29] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 8, 2020, 8:20 a.m.), https://twitter.com/realDonaldTrump/status/1247861952736526336.

[30] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:00 p.m.), https://twitter.com/realDonaldTrump/status/1266172570983940101.

[31] Donald J. Trump (@realDonaldTrump), Twitter (July 2, 2020, 7:41 p.m.), https://twitter.com/realDonaldTrump/status/1278836342609379328.

[32] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 3, 2020, 7:37 a.m.),

52.     Indeed, the President has routinely attacked specific states for increasing access to mail-in voting—including Plaintiffs New York[33] and New Jersey.[34]  Despite fervently opposing mail-in voting in these states, President Trump has, conversely, supported mail-in voting in other states.  On August 4, 2020, the President tweeted: "Whether you call it Vote by Mail or Absentee Voting, in Florida the election system is Safe and Secure, Tried and True. Florida's Voting system has been cleaned up (we defeated Democrats attempts at change), so in Florida I encourage all to request a Ballot & Vote by Mail! #MAGA."[35]

53.     On August 5, 2020, the President again differentiated between states: "Nevada has ZERO infrastructure for Mail-In Voting.  It will be a corrupt disaster if not ended by the Courts. It will take months, or years, to figure out.  Florida has built a great infrastructure, over years, with two great Republican Governors.  Florida, send in your Ballots!"[36]

54.     Beyond opposing mail-in voting, the President has also disparaged *how* states plan to collect mail-in ballots.  On August 17, 2020, he tweeted: "Some states use 'drop boxes' for the collection of Universal Mail-In Ballots.  So who is going to 'collect' the Ballots, and what might be done to them prior to tabulation?  A Rigged Election?  So bad for our Country.  Only

---

https://twitter.com/realDonaldTrump/status/1290250416278532096.
[33] Donald J. Trump (@realDonaldTrump), Twitter (July 29, 2020, 6:28 p.m.), https://twitter.com/realDonaldTrump/status/1288602262567153664.
[34] Donald J. Trump (@realDonaldTrump), Twitter (July 2, 2020, 7:41 p.m.), https://twitter.com/realDonaldTrump/status/1278836342609379328; Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2020, 4:51 p.m.), https://twitter.com/realDonaldTrump/status/1287490820669616128; Donald J. Trump (@realDonaldTrump), Twitter (Aug. 22, 2020, 8:44 a.m.), https://twitter.com/realDonaldTrump/status/1297152619526393856.
[35] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 4, 2020, 12:55 p.m.), https://twitter.com/realDonaldTrump/status/1290692768675901440.
[36] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2020, 7:08 p.m.), https://twitter.com/realDonaldTrump/status/1290967953542909952.

Absentee Ballots acceptable!"[37]

55.     Consistent with President Trump's position, his campaign has sued Nevada,[38] New Jersey,[39] Pennsylvania,[40] and "two Democratic-leaning Iowa counties"[41] over their mail-in ballot policies.  In New Jersey and Nevada, the campaign has opposed plans to mail ballots to voters.  In Pennsylvania, the campaign has taken action against the state's use of drop-off boxes for ballots.

56.     At the same time, President Trump has opposed emergency funds and supplemental election-related funds for the U.S. Postal Service because of his opposition to expanded mail-in voting.[42]  On August 13, 2020, President Trump stated in a Fox Business interview that "[i]f we don't make a deal [on U.S. Postal Service funding], that means they don't get the money.  That means they can't have universal mail-in voting.  They just can't have it."[43]

57.     As recently as yesterday, on August 24, 2020, President Trump tweeted that

---

[37] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 17, 2020, 11:40 a.m.), https://twitter.com/realDonaldTrump/status/1295385113862090753.

[38] Joseph Ax, *Trump campaign sues Nevada over mail-in ballots, asserting 'inevitable' fraud*, Reuters (Aug. 5, 2020), https://www.reuters.com/article/us-usa-election-nevada/trump-campaign-sues-nevada-over-mail-in-ballots-asserting-inevitable-fraud-idUSKCN2512CZ.

[39] Kanishka Singh, *Trump campaign sues New Jersey after its decision to mail ballots in November election*, Reuters (Aug. 19, 2020), https://www.reuters.com/article/us-usa-election-new-jersey-lawsuit/trump-campaign-sues-new-jersey-after-its-decision-to-mail-ballots-in-november-election-idUSKCN25F0B4.

[40] Jonathan Lai, *The Trump campaign is suing Pennsylvania over how to run the 2020 election*, The Phil. Inquirer (June 29, 2020), https://www.inquirer.com/politics/election/trump-campaign-lawsuit-pennsylvania-mail-ballots-20200629.html.

[41] Ryan J. Foley, *Trump campaign sues key Iowa counties over absentee mailings* (Aug. 13, 2020), https://apnews.com/22e6d33f1a2eeadde8e193a9330cde16.

[42] *Remarks by President Trump in Press Briefing*, The White House (Aug. 13, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-081320.

[43] Megan Henney, *Trump rips Dems for holding up coronavirus stimulus deal with demand for post office aid*, FOX Bus. (Aug. 13, 2020), https://www.foxbusiness.com/politics/trump-rips-dems-for-holding-up-coronavirus-stimulus-deal-with-demand-for-post-office-aid.

"[r]epresentatives of the Post Office have repeatedly stated that they DO NOT NEED MONEY,"

claiming that recent pushes for funding are "all another HOAX by the Democrats to give 25

Billion unneeded dollars for political purposes, without talking about the Universal Mail-In

Ballot Scam." [44]  The President encouraged his readers to "fight the []51 million unasked for

Ballots."[45]

## IV.   Without regard to Congress's commands, the U.S. Postal Service abruptly instituted changes with nationwide impact.

58.     While President Trump and his administration have been orchestrating a

campaign against mail-in voting and funding for the U.S. Postal Service, the agency has

instituted a series of new measures to overhaul operations in ways that align with the President's

campaign against mail-in voting.

59.     On May 6, 2020, the U.S. Postal Service's Board of Governors announced that

Louis DeJoy would become the 75th Postmaster General of the United States and the agency's

Chief Executive Officer.[46]  Within days of starting his tenure, DeJoy and agency leadership

began an "operational pivot" to overhaul how the U.S. Postal Service collects, processes, and

delivers mail throughout the country.

60.     In June and July 2020, the agency adopted its new policies (the "Postal Policy

Changes") without seeking an advisory opinion from the Postal Regulatory Commission or

adequately accounting for its obligation to maintain timely, efficient postal service and facilities

---

[44] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 22, 2020, 4:51 p.m.),
https://twitter.com/realDonaldTrump/status/1297275235432005632.
[45] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 22, 2020, 4:51 p.m.),
https://twitter.com/realDonaldTrump/status/1297275241203458048.
[46] *Board of Governors Announces Selection of Louis DeJoy to Serve as Nation's 75th Postmaster General*, U.S. Postal Serv. (May 6, 2020), https://about.usps.com/newsroom/national-releases/2020/0506-bog-announces-selection-of-louis-dejoy-to-serve-as-nations-75th-postmaster-general.htm.

for the entire population of the United States.  Rather, the Postal Policy Changes were issued by

fiat without any consideration or direction as to how to offset negative impacts on workflows and

delivery outcomes.  These Postal Policy Changes have:

61.     *Reduced access to postal services*.  The U.S. Postal Service has reduced the

number of collection mailboxes available to the public.  The agency has removed hundreds of

mailboxes in Montana, New Jersey, New York, Oregon, and Pennsylvania, among other states.

For example, U.S. Postal Service mailboxes were removed in multiple locations in New York

City on or about August 15, 2020, including in West Harlem and the Bronx.  While the U.S.

Postal Service has stated that the mailboxes removed in New Jersey will be replaced, it has not

explained why the mailboxes were removed at this time, or indicated when they will be replaced.

62.     According to former Postal Governor Williams, Secretary Mnuchin ordered the

removal of the collection boxes.  "The blue boxes were maybe the most interesting of all.  Those

were not part of ongoing plans," Williams testified.[47]  "To my knowledge, as a matter of fact,

Secretary Mnuchin wanted that done.  His study of the Postal Service asked that it be done."[48]

63.     *Reduced processing capacity.*  The U.S. Postal Service has removed, dismantled,

destroyed, or sold hundreds of major mail-sorting machines responsible for processing millions

of letter mail and flat mail each day.  By the date of today's filing, the U.S. Postal Service was

scheduled to have reduced its processing capacity by over 600 machines.[49]  By the end of

September, the U.S. Postal Service planned to have reduced the number of total sorting machines

---

[47] *See Progressive Caucus ad hoc hearing on Trump Admin's sabotage of USPS operations*,
Cong. Progressive Caucus (Aug. 20, 2020), https://www.pscp.tv/w/1BdxYnvDppzKX (video).
[48] *Id.*
[49] Letter from Rickey R. Dean, Manager, Contract Administrator, U.S. Postal Serv., to Mark
Dimondstein, President, Am. Postal Workers Union (June 17, 2020),
https://www.21cpw.com/wp-content/uploads/2020/06/mail-processing-equipment-reduction_6-
17-2020.pdf.

across the country by 10 percent—or roughly 670 machines.  Together, these machines process 21.4 million pieces of paper mail per hour.[50]

64.     These major mail-sorting machines include Automated Facer-Canceler Systems, Delivery Bar Code Sorters, Automated Flat Sorting Machines, and Flat Sequencing Systems.  All told, several cities, including Plaintiff New York City, are seeing sorting capacity reductions of over 300,000 pieces of mail per hour.[51]  This decreased sorting capacity requires postal facilities to redistribute mail to its remaining machines for sorting or sort the mail manually.  In some cases, mail left sitting overnight also must be re-sorted in the morning in order to combine the sitting mail with newly-arrived mail into the proper "delivery point sequence"—the delivery order used by mail carriers.  In turn, re-sorting old mail lengthens processing times.

65.     Postal technicians estimate that it would take "30 employees over their entire shift" to replicate the work of a single mail-sorting machine.[52]  In this way, increased manual sorting of letter mail and flat mail diverts resources from the processing of package mail—a serious problem given increased package volume during the pandemic.

66.     Given the critical role of sorting machines to the effective processing of *all* mail, managers at postal facilities typically have the opportunity to negotiate if, when, and how a sorting machine is removed or decommissioned.  Often, facility managers simply turn off sorting machines on a trial basis to test whether the machine will still be necessary for operations

---

[50] Jacob Bogage and Christopher Ingraham, *Here's why the Postal Service wanted to remove hundreds of mail-sorting machines*, Wash. Po. (Aug. 20, 2020), https://www.washingtonpost.com/business/2020/08/20/postal-service-mail-sorters-removals.
[51] Erin Cox, Elise Viebeck, Jacob Bogage & Christopher Ingraham, *Postal Service warns 46 states their voters could be disenfranchised by delayed mail-in ballots*, Wash. Post (Aug. 14, 2020), https://wapo.st/2FsD0Il.
[52] Curt Devine, Bob Ortega & Paul P. Murphy, *Postal Service Removes Some Mail-sorting Machines, Sparking Concerns Ahead of Election*, CNN (Aug. 13, 2020, 9:17 PM), https://www.cnn.com/2020/08/13/politics/postal-service-sorting-machines/index.html.

following shifts in mail volume.

67.     Typically, the agency has several reasons for not removing or destroying machines due to temporary volume fluctuations.  First, "you don't save money by breaking down machines and putting them away and storing them, you spend money."[53]  Second, the agency relies on high-speed sorting machines to be flexible and redirect mail following major events—as in the case of elections, the COVID-19 pandemic, Hurricane Katrina, or September 11th.[54] Upon information and belief, however, postal facility managers were not given any opportunity to contest or negotiate the reduction of the roughly 670 machines ordered removed across the country.  Nor was there any trial period during which managers could evaluate the impact on service before decommissioning machines permanently.

68.     *Cut or curtailed overtime*.  Despite strains on labor due to substantially reduced sorting capacity throughout the country, the U.S. Postal Service has also failed to provide the overtime needed to provide sufficient time for postal workers and carriers to meet basic processing and delivery requirements.

69.     For years, overtime has been built into the agency's operational model.  Since the PAEA requires the U.S. Postal Service to pre-fund retiree health benefits,[55] the agency has generally chosen to increase overtime rather than hire new employees in order to cut costs.  As a result, nearly 20 percent of all work by mail handlers, city carriers, and postal drivers is typically done through overtime.[56]  In recent months, the need for overtime has only increased as 40,000

---

[53] *See Progressive Caucus ad hoc hearing on Trump Admin's sabotage of USPS operations*, Cong. Progressive Caucus (Aug. 20, 2020), https://www.pscp.tv/w/1BdxYnvDppzKX (video).
[54] *Id.*
[55] U.S. Postal Serv., Retiree Health Benefits Prefunding (2010), https://about.usps.com/who-we-are/financials/annual-reports/fy2010/ar2010_4_002.htm.
[56] Nicole Goodkind, *Trump-backed postmaster general plans to slow mail delivery*, Fortune (July 24, 2020), https://fortune.com/2020/07/24/usps-mail-delivery-postmaster-general-louis-dejoy-us-

U.S. Postal Service employees have needed to quarantine due to COVID-19 exposure and as 83 employees have lost their lives to the virus.[57]

70.     At the same time, the U.S. Postal Service has no plans in place to account for the compounding labor shortages triggered by its new policies—including both the loss of operationally necessary overtime and the reduction of processing capacity due to machine removals.  The agency does not plan to hire more employees.[58]

71.     *Prohibited extra trips*.  Like overtime, the U.S. Postal Service relies on "extra" trips to ensure the timely delivery of mail.  These non-scheduled trips ensure that the U.S. Postal Service can timely deliver mail that comes into a facility after letter carriers have left for their shifts.  Extra trips also allow the agency to account for daily fluctuations in mail volume, processing malfunctions or errors, and other disruptions.

72.     Even as mail volume has decreased over the past several decades, the U.S. Postal Service has continued to rely on extra trips.  For example, the agency reported 176,940 extra trips from processing facilities to delivery units in the latter half of 2019.[59]

73.     With reduced capacity and less time to work, postal workers need to be flexible in order to deliver the mail in a timely manner.  As part of its "operational pivot,"[60] however, the

---

postal-service.

[57] *Id.*; *see also Postmaster General Louis DeJoy Testifies on Postal Service Operations & Mail-In Voting*, C-SPAN (Aug. 24, 2020), https://www.c-span.org/video/?474917-1/postmaster-general-louis-dejoy-testifies-postal-service-operations-mail-voting (video).

[58] Nicole Goodkind, *Trump-backed postmaster general plans to slow mail delivery*, Fortune (July 24, 2020), https://fortune.com/2020/07/24/usps-mail-delivery-postmaster-general-louis-dejoy-us-postal-service.

[59] Office of the Inspector General, *Late and Extra Trips at the Philadelphia, PA, Processing and Distribution Center*, U.S. Postal Serv. (May 13, 2020),
https://www.uspsoig.gov/sites/default/files/document-library-files/2020/20-164-R20.pdf.

[60] *Mandatory Stand Up Talk for All Employees: Pivoting for Our Future*, U.S. Postal Serv. (July 10, 2020), https://www.washingtonpost.com/context/internal-usps-document-tells-employees-to-leave-mail-at-distribution-centers/175dd1ae-e202-4777-877c-

U.S. Postal Service has prohibited postal workers from making the extra trips necessary to ensure that no mail is left sitting in postal facilities at the end of the day.

74.     The agency acknowledged that it "may be difficult for employees" because they "may see mail left behind or mail on the workroom floor . . . which is not typical," but nevertheless instituted its ban on extra trips.[61]  By August 13, 2020, the U.S. Postal Service had "reduced extra trips by 71 percent."[62]  Postmaster General DeJoy testified that this reduction amounts to 5,000 fewer extra trips per day.[63]

75.     *Prohibited late trips.*  At the same time, the U.S. Postal Service has prohibited network, plant, and delivery workers from making late trips—i.e., from embarking on their trip any later than the scheduled time.[64]  As with overtime and extra trips, however, late trips are necessary to the agency's operations.  In fact, the U.S. Postal Service reported 591,140 late trips from processing facilities to delivery units during six months in 2019.[65]  Postmaster General DeJoy testified that the agency has now reduced late trips from 3,500 per day to 600 per day.[66]

---

33442338d1cc/?itid=lk_interstitial_manual_14&itid=lk_inline_manual_35 (uploaded document); *see also* Jory Heckman, *USPS Warns Staff of Temporary Mail Delays as it Cuts 'Soaring' Delivery Costs*, Federal News Network (July 15, 2020), https://federalnewsnetwork.com/management/2020/07/usps-warns-staff-of-temporary-mail-delays-as-it-cuts-soaring-delivery-costs.

[61] *Id.*

[62] *Path Forward: PMG Addresses Restructuring*, U.S. Postal Serv. LINK (Aug. 13, 2020), https://link.usps.com/2020/08/13/path-forward-2.

[63] *See Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video).

[64] *Mandatory Stand Up Talk for All Employees: Pivoting for Our Future*, U.S. Postal Serv. (July 10, 2020), https://www.washingtonpost.com/context/internal-usps-document-tells-employees-to-leave-mail-at-distribution-centers/175dd1ae-e202-4777-877c-33442338d1cc/?itid=lk_interstitial_manual_14&itid=lk_inline_manual_35 (uploaded document).

[65] Office of the Inspector General, *Late and Extra Trips at the Philadelphia, PA, Processing and Distribution Center*, U.S. Postal Serv. (May 13, 2020), https://www.uspsoig.gov/sites/default/files/document-library-files/2020/20-164-R20.pdf.

[66] *See Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video).

76.     Combined with the agency's other operational changes, the impact of eliminating late trips cannot be overstated.  For example, fewer sorting machines in a facility may require the remaining machines to process thousands more pieces of mail.  As there is a limit to how much the processing capacity of the remaining machines can be increased, the mail may run late on the machine.  Because a postal driver may not leave for their delivery route behind schedule, the driver is forced to embark on their delivery route even if there is no mail ready for delivery.[67] Later drivers therefore have exponentially more mail to deliver, but not more time due to insufficient overtime.  Nor do delivery trucks have more space to account for all the extra mail. With no extra trips to make up the shortfall, mail is left sitting in postal facilities or delivery bays overnight.

77.     *Built in delays.*  In fact, the U.S. Postal Service is moving to institutionalize delayed mail processing and sorting.  Under the new "Expedited to Street/Afternoon Sortation (ESAS)" initiative, postal workers at 384 facilities are prohibited from sorting "any mail during the morning operation" in an effort to "allow carriers to leave for the street earlier."[68]  The 384 facilities include those located in the jurisdictions of Plaintiffs here—New Jersey, New York, New York City, and San Francisco.[69]

---

[67] Michael Sainato, *Postmaster General's Changes Causing Mail Delays, USPS Workers Say*, The Guardian (Aug. 16, 2020), https://www.theguardian.com/business/2020/aug/16/usps-mail-delays-postmaster-general-changes-workers ("A carrier outside of Chicago claimed their station has experienced occurrences where mail trucks failed to deliver post to the USPS station on time, forcing carriers to go out on routes with practically no mail.").

[68] *Stand-Up Talk Expedited to Street/Afternoon Sortation (ESAS) City Carrier*, U.S. Postal Serv. (July 16, 2020), https://www.nrlca.org/Documents/WebContent/EditorDocuments/ESAS%20F2%20Stand%20Up%20Talk%207.16.20.pdf; *see also* Jory Heckman, *USPS Reduces Morning Office Time for Letter Carriers for 'More Consistent Delivery'*, Federal News Network (July 24, 2020), https://federalnewsnetwork.com/management/2020/07/usps-reduces-morning-office-time-for-letter-carriers-for-more-consistent-delivery.

[69] *Expedited to Street Afternoon Sortation (ESAS) Test Sites*, Nat'l Assoc. of Letter Carriers,

78.     As a result, these carriers may now only deliver mail that was sorted the previous

day, save for any "unsorted First Class flats" that would be "routed in delivery sequence while

on the street."[70]  After returning from the street in the afternoon, carriers sort the mail sitting at

the postal office for delivery the next day.[71]  In other words, mail delivery is typically at least

one day late.

79.     *Altered election mail standards.* The impact of these changes is especially

perilous given that the U.S. Postal Service abandoned its practice of treating all election mail as

First Class mail.  During prior elections, the U.S. Postal Service strived to process and deliver

election mail at First Class speeds of one to three days without regard to the paid class of

service.[72]  As a result, even ballots classified as Nonprofit Marketing Mail with delivery speeds

of three to ten days were delivered on First Class timeframes.  For example, the agency's

inspector general found that 95.6 percent of election and political mail was delivered within First

Class mail speed standards.[73]

80.     Reversing course on its longstanding policy, the U.S. Postal Service's general

counsel sent letters to 46 states and the District of Columbia on or around July 31, 2020

informing them that they should alter their election plans or pay First Class postage rates in order

to mail their ballots in a timely fashion prior to the November election.[74]  For states, purchasing

---

https://www.nalc.org/news/nalc-updates/body/ESAS-Test-Sites-7-13.pdf.
[70] *Id.*
[71] *Id.*
[72] Office of the Inspector General, *Service Performance of Election and Political Mail During the 2018 Midterm and Special Elections*, U.S. Postal Serv., (Nov. 4, 2019), https://www.uspsoig.gov/sites/default/files/document-library-files/2019/19XG010NO000.pdf.
[73] *Id*.
[74] *U.S. Postal Service letters to states*, Wash. Po. (Aug. 17, 2020), https://www.washingtonpost.com/context/u-s-postal-service-letters-to-states/b50799f2-25ad-40ed-ba1e-9d648b1814ad/?itid=lk_interstitial_manual_6 (uploaded documents).

First Class postage would raise the price per piece of election mail from 20 cents to 55 cents.  As a result, states, counties, and cities will lose tens of millions of dollars at a time with state and local budgets already suffering due to COIVD-19 impacts.

**V.     The U.S. Postal Service's changes continue to have nationwide impact**.

81.     On August 18, 2020, DeJoy issued a statement that the U.S. Postal Service would be "suspending" certain of the Postal Policy Changes.[75]  Although DeJoy stated that "[m]ail processing equipment and blue collection boxes will remain where they are" and that overtime would be approved "as needed," he did not indicate whether the hundreds of removed sorting machines and boxes would be returned.  Nor did DeJoy explain if the U.S. Postal Service would be lifting the prohibitions on late trips or extra trips, halting ESAS, or committing to treating election mail as First Class mail.

82.     Within days, on August 20, 2020, the U.S. Postal Service's director of maintenance operations had clarified that sorting machines would not be returned to postal facilities.  He instructed the agency's maintenance managers "not to reconnect/reinstall machines that have previously been disconnected without approval from HQ Maintenance, no matter what direction they are getting from their plant manager."[76]

83.     On August 21, 2020, Postmaster General DeJoy testified before the Senate Homeland Security and Governmental Affairs Committee.  He recognized that "transportation changes have led to delays," testifying that "[w]e all feel, you know, bad about what the dip in

---

[75] Postmaster General Louis DeJoy Statement, U.S. Postal Serv. (Aug. 18, 2020), https://about.usps.com/newsroom/national-releases/2020/0818-postmaster-general-louis-dejoy-statement.htm.
[76] Jacob Bogage and Christopher Ingraham, *Here's why the Postal Service wanted to remove hundreds of mail-sorting machines*, Wash. Po. (Aug. 20, 2020), https://www.washingtonpost.com/business/2020/08/20/postal-service-mail-sorters-removals.

our service level has been."[77]  Specifically, DeJoy testified that the Postal Policy Changes did

not "align" the separate systems for sorting, transporting, and delivering mail.[78]

84.     Despite these acknowledgements, DeJoy refused to return the U.S. Postal

Service's policies to the status quo ante.  He testified that he would not reinstall removed sorting

machines to facilities or reverse his policy eliminating extra trips.[79]  Although DeJoy verbally

committed to delivering election mail at the First Class rate speed, he failed to account for how

this commitment would play out in practical terms given that he was not rescinding the policies

that were delaying delivery.[80]

85.     On August 24, 2020, Postmaster General DeJoy testified before the House of

Representatives Committee on Oversight and Reform.[81]  DeJoy reiterated that he would not

reverse any of the Postal Policy Changes, despite again acknowledging impacts on service.[82]  He

testified that the agency would not replace sorting machines unless Congress provided $1 billion

in funding for machines, which he stated Congress had "no way" of doing.[83]  DeJoy further

testified that he would not lift the prohibition of late trips or extra trips, claiming "I would not

know how to reverse that now."[84]  On election mail, DeJoy testified that the agency would act

"in a manner consistent with the proven processes and procedures that we have relied upon for

years," while maintaining that "it would be best if the State election boards follow the

---

[77] *See Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video).
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Postmaster General Louis DeJoy Testifies on Postal Service Operations & Mail-In Voting*, C-SPAN (Aug. 24, 2020), https://www.c-span.org/video/?474917-1/postmaster-general-louis-dejoy-testifies-postal-service-operations-mail-voting (video).
[82] *Id.*
[83] *Id.*
[84] *Id.*

recommendations" from the U.S. Postal Service's general counsel.[85]

## VI.     The U.S. Postal Service's abrupt changes have triggered dramatic delays.

86.     As former Postal Governor Williams testified, the Postal Policy Changes constitute "infrastructure cuts that are destroying the Postal Service's commitment to service delivery standards."[86]  Even though letter and flat mail volume is down during the COVID-19 pandemic, the mail is moving much more slowly.  These drop-offs have caused widespread delays and service gaps in the delivery of mail of all types, including in Plaintiffs' jurisdictions.

87.     The U.S. Postal Service's own records show that on-time delivery of First Class and flat mail significantly dropped off in mid-July, following the implementation of the Postal Policy Changes.[87]  Although on-time delivery in the agency's Eastern service area had hovered between 91 and 95 percent in the preceding five months, on-time delivery dropped for three weeks straight in July—down to 79 percent the week of July 19.[88]  Nationally, on-time delivery was down to 84 percent.[89]

---

[85] *Id.*

[86] *See Progressive Caucus ad hoc hearing on Trump Admin's sabotage of USPS operations*, Cong. Progressive Caucus (Aug. 20, 2020), https://www.pscp.tv/w/1BdxYnvDppzKX (video).

[87] U.S. Postal Serv., Eastern Area AIM Meeting - Service Update (Aug. 4, 2020), https://postalpro.usps.com/node/8407 (including Figures 1 and 2).  For Figures 1 to 4, "SPYL" refers to "same period last year."  Additionally, FY2020 started on October 1, 2019 for the U.S. Postal Service.  Accordingly, Week 41 corresponds to the week of July 5.

[88] *Id*.

[89] *Id.*

Fig. 1



88.     The U.S. Postal Service's records show that on-time delivery of Marketing Mail—which includes election mail in many states—dropped even lower, from about 91 to 94 percent in the preceding months down to almost 73 percent in mid-July.[90]  That number had rebounded only to about 79 percent by the last week of July, a full 16 percent drop compared to the same period last year.[91]

Fig. 2



---

[90] *Id.*

[91] *Id.*

89.     In the Pacific region, First Class and flat mail on-time delivery likewise began to dip sharply in early July, exceeding service impacts typically experienced during the U.S. Postal Service's busy holiday season.[92]  That number had rebounded somewhat by the start of August, but only matching holiday service levels and still 10 percent below the same period last year.[93]

Fig. 3



90.     For Marketing Mail, drop-offs in the Pacific region were even more pronounced. On-time delivery began to dip below target levels in late June, taking a complete nose dive starting in the beginning of July.[94]  Levels had dropped from roughly 94 percent to about 83 by mid-July, only to drop down further by the first week of August.[95]

---

[92] U.S. Postal Serv., Pacific Area AIM Meeting Presentation (Aug. 13, 2020), https://postalpro.usps.com/node/8472 (including Figures 3 and 4).
[93] *Id.*
[94] *Id.*
[95] *Id.*

Fig. 4



91.     Other U.S. Postal Service records show that processing delays following the

Postal Policy Changes contributed to the impact on on-time delivery.  An August 12, 2020

presentation shows performance drops in both processing and delivery.[96]

Fig. 5



[96] U.S. Postal Serv., Service Performance Measurement: PMG Briefing (Aug. 12, 2020),
*available at*
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/PMG%20Briefi
ng_Service%20Performance%20Management_08_12_2020.pdf (Figures 5 to 7).

Fig. 6



Fig. 7



92.    Beginning in June 2020, Plaintiffs have felt the acute effects of the U.S. Postal

Service's order to remove hundreds of mail-sorting machines across the country.  In Plaintiffs'

jurisdictions, the U.S. Postal Service ordered the removal of:

        i.   Fifty-two machines in New York, including (1) five Delivery Bar Code

            Sorters out of 20 from one Buffalo, NY postal processing facility alone, (2)

four out of 15 machines from the Taft Road facility in Syracuse, NY,[97] (3)

and 15 machines across the New York City area.

    ii.   Twenty Delivery Bar Code Sorters from Kearny, NJ, Teterboro, NJ,

Bellmawr, NJ, Hamilton, NJ, and New Castle, DE, each of which are major

distribution centers servicing New Jersey.  The agency has also removed or is

removing four Advanced Facer Canceler Systems from Kearny, NJ,

Bellmawr, NJ, and New Castle, DE, and three Automated Flat Sorting

Machines from Kearny, Teterboro, and Bellmawr.

    iii.   Four machines in Hawaii.[98]  Sorting capacity for Honolulu has reportedly

been reduced by approximately 100,000 to 200,000 pieces of mail per hour.[99]

    iv.   Nine sorting machines in San Francisco.

93.    These machines have played a critical role in the U.S. Postal Service's operations

for over twenty years.  For example, one Advanced Facer Canceller System positions letter mail

and postmarks stamps at 36,000 pieces per hour.  A single Delivery Bar Code Sorter

electronically sorts an average of 30,000 individual pieces of mail per hour and places them into

---

[97] Mark Weiner, *Central New York mail delivery slows as sorting machines are tossed, unions say*, The Post-Standard (Aug. 19, 2020), https://www.syracuse.com/politics/cny/2020/08/central-new-york-mail-delivery-slows-as-sorting-machines-are-tossed-unions-say.html.

[98] *See* Ari Berman, *DeJoy Says USPS Won't Reinstall More Than 600 Removed Mail Sorting Machines*, Mother Jones, Aug. 21, 2020, https://www.motherjones.com/politics/2020/08/dejoy-says-usps-wont-reinstall-more-than-600-removed-mail-sorting-machines (document attached to article); *see also* Letter from Rickey R. Dean, Manager, Contract Administrator, U.S. Postal Serv., to Mark Dimondstein, President, Am. Postal Workers Union (June 17, 2020), https://www.21cpw.com/wp-content/uploads/2020/06/mail-processing-equipment-reduction_6-17-2020.pdf.

[99] *See* Erin Cox, Elise Viebeck, Jacob Bogage, Christopher Ingraham, *Postal Service warns 46 states their voters could be disenfranchised by delayed mail-in ballots*, Washington Post, Aug. 14, 2020, https://www.washingtonpost.com/local/md-politics/usps-states-delayed-mail-in-ballots/2020/08/14/64bf3c3c-dcc7-11ea-8051-d5f887d73381_story.html (map included in article).

walk sequence bins that are ready for immediate delivery by letter carriers. The Automated Flat Sorting Machine sorts flat mail at 17,000 pieces per hour.[100]

94.    The removal of electronic sorting machines directly affects postal operations by reducing sorting capacity, adding strain to both the remaining machines in use and the available labor force. Because of the prohibitions on late trips and extra trips, mail will be left behind if postal workers are unable to sort the day's mail before scheduled leave times.

95.    Whereas ordinarily letter carriers would use overtime allowances to deliver mail following the conclusion of their shift, the U.S. Postal Service has instituted significant roadblocks for the approval of overtime—even going so far as to outright ban overtime in certain offices in Plaintiffs' jurisdictions.

96.    Prior to the implementation of these dramatic changes, letter mail left behind in postal facilities overnight was exceedingly rare. By contrast, the combination of the removal of sorting machines, the prohibition on late and extra trips, and the severe impediments to overtime all lead to a startling reality: Every day, tens of thousands of pieces of mail in Plaintiffs' jurisdictions are going undelivered.

97.    In central New York State, for example, the combined effects of machine removals and other Postal Policy Changes at the Syracuse facility has led to delivery delays of one to three days.[101]  Certain categories of mail have been delayed for up to seven days.[102]  Prior to the Postal Policy Changes, the Syracuse facility was a top-three Northeast-based processing

---

[100] U.S. Postal Serv., Postal Facts: Innovation in the Mail, https://facts.usps.com/innovation (last visited Aug. 24, 2020).
[101] Mark Weiner, *Central New York mail delivery slows as sorting machines are tossed, unions say*, The Post-Standard (Aug. 19, 2020), https://www.syracuse.com/politics/cny/2020/08/central-new-york-mail-delivery-slows-as-sorting-machines-are-tossed-unions-say.html.
[102] *Id.*

plant for timely delivery of First Class mail.[103]

98.     Delivery issues tend to impact the same communities repeatedly.  Because mail is typically sorted by locality and in the same order each day, localities who are "last in line" for sorting are more likely to have their mail delayed for multiple days in a row.

99.     In New York, the impact on delivery can be seen on an almost daily basis throughout the state:

     i.   On July 11, 2020, no letter mail was delivered in the hamlets of Bowmansville, DePew, or the town of Lancaster.  On a typical day, these localities collectively receive approximately 80,000 pieces of mail;

    ii.   On July 25, 2020, no letter mail was delivered in the hamlets of Stow, Weston Mills, and Maple Springs;

   iii.   In late July 2020, no letter mail was delivered in the hamlet of DePew or in the town of Lancaster;

   iv.   On July 10, 2020, July 25, 2020 and August 3, 2020, no letter mail was delivered in Centreville, New York;

    v.   On July 18, 2020, July 25, 2020 and August 1, 2020, no letter mail was delivered in the localities of Stow and Greenhurst;

   vi.   Between August 10–12, 2020, 173 Express Mail parcels were not delivered to customers in the Buffalo region.  Due to Express Mail warranty requirements, customers may seek a refund for late delivery.  At a minimum rate of $26 per Express Mail parcel, this amounts to approximately $4,400.00 owed to customers for those days alone;

---

[103] *Id.*

    vii.   On August 11, 2020, approximately 36,000 pieces of letter mail were not delivered in the town of East Amherst;

    viii.   On August 14, 2020, several boxes of mail that were scheduled to be delivered on August 7, 2020 were still sitting undelivered in the Baychester, NY postal facility; and

    ix.   On August 16, 2020, several tubs of mail at the Planetarium Station processing facility in New York City were staged for delayed next-day delivery, rather than going out the same day.

100.    Delivery in New Jersey has experienced similar impacts:

    i.   On August 16, 2020, Marketing Mail packages scheduled for delivery on July 18, 2020 were still sitting in the New Jersey International/National Distribution Center in Jersey City, NJ, tagged with "Delayed" stickers;

    ii.   On August 16, 2020, Marketing Mail packages scheduled for delivery on August 4, 2020 were still sitting in the New Jersey International/National Distribution Center in Jersey City, NJ, tagged with "Delayed" stickers; and

    iii.   On August 16, 2020, multiple carts of package mail were sitting in the New Jersey International/National Distribution Center in Jersey City, NJ, some tagged with "Delayed" stickers.

101.    Upon information and belief, the U.S. Postal Service has still not sought an advisory opinion from the Postal Regulatory Commission for the Postal Policy Changes.

102.    Upon information and belief, the U.S. Postal Service implemented its far-reaching Postal Policy Changes without due consideration for their deleterious nationwide effects and impact on postal operations, including but not limited to the collection, transportation, and

36

delivery of important letter mail.

103.   Upon information and belief, due to the implementation of the Postal Policy Changes, the U.S. Postal Service has failed to provide prompt, reliable and efficient services to customers in Plaintiffs' jurisdictions.

104.   Upon information and belief, due to the implementation of the Postal Policy Changes, the U.S. Postal Service has failed to maintain postal facilities of such character and in such locations necessary to ensure ready access to essential postal services.

105.   Upon information and belief, due to the implementation of the Postal Policy Changes, the U.S. Postal Service has failed to provide a maximum degree of effective and regular postal services to all customers and communities in Plaintiffs' jurisdictions.

**VII.   The U.S. Postal Service's delays harm Plaintiffs' election plans.**

106.   Due to the effects of COVID-19, experts estimate that roughly 80 million Americans will vote by mail in November.[104]  Plaintiffs also anticipate their residents will vote by mail in record numbers.  Because Plaintiffs' residents must submit their ballots via the U.S. Postal Service, Plaintiffs will be forced to expend substantial economic and administrative resources in order to ensure that all ballots sent through the U.S. Postal Service are counted.

107.   Given the documented delays in mail delivery, the U.S. Postal Service's equivocation on how it will ensure election mail is timely delivered, and the Trump Administration's campaign to undermine both the agency and mail-in voting, Defendants' actions are interfering with Plaintiffs' administration of state electoral schemes, undermining Plaintiffs' ability to perform core governmental functions, and imposing added costs and

---

[104] Juliette Love, Matt Stevens, and Lazaro Gamio, *Where Americans Can Vote by Mail in the 2020 Elections*, The N.Y. Times (Aug. 11, 2020), https://www.nytimes.com/interactive/2020/08/11/us/politics/vote-by-mail-us-states.html.

administrative burdens.

### A. New York.

108.    For years, Plaintiff the State of New York has permitted voters to cast an absentee ballot if they satisfy a justification set forth in the State's Election Law.[105]

109.    In advance of the November general election, the Legislature has expanded absentee ballot access to all New Yorkers, by permitting voters to cite the risk of illness, including COVID-19, as a basis to apply for an absentee ballot.[106]

110.    Governor Cuomo issued an Executive Order to provide for similar access in advance of the June primary election,[107] resulting in a greater than six-fold increase of the number of voters voting by absentee ballots, as compared to the June 2016 primary election. The number of absentee ballots cast in the 2020 general election could exceed ten times the number cast in the 2016 general election.[108] The increased reliance on mail voting at the November 3, 2020 election increases the exposure of New York's voting process to any problems with mail delivery.[109]

111.    To prepare for the substantial increase in absentee voting, the Legislature has permitted voters to request absentee ballots immediately, earlier than the thirty-day window

---

[105] In New York, absentee ballots are available to voters who: will be absent from their county of residence, or for New York City residents absent from New York City, on Election Day; have a temporary or permanent illness or disability; are the primary caregiver of an individual who has a temporary or permanent illness or disability; are patients at a Veterans' Administration Hospital; or are detained in jail awaiting a Grand Jury action, or confined in prison for conviction on an offense other than a felony. N.Y. Elec. Law § 8-400 (McKinney).
[106] S.8015-D/A.10833.
[107] Exec. Order No. 202.15 (Apr. 9, 2020).
[108] Decl. of Robert A. Brehm at ¶9, *Gallagher v. NYSBOE*, No. 20 Civ. 05504 (S.D.N.Y. Jul. 22, 2020), ECF No. 18.
[109] *Id*.

previously provided in the Election Law for certain requests.[110]  New York's city and county

boards of Elections will begin mailing out absentee ballots on or about September 18,[111] and

voters can apply by mail for absentee ballots up to seven days prior to Election Day, or can apply

in person no later than the day before Election Day.[112]

112.    An absentee ballot either must be postmarked by Election Day and received

within seven days after Election Day to be counted, or, if it lacks a postmark, be received by the

day after Election Day.[113]

113.    Voters may also take completed absentee ballots to: an early voting polling place

during New York's early voting period (October 24 through November 1), their local Board of

Elections office, or a polling place on Election Day.[114]

114.    With 70 days to Election Day, New York's State Board of Elections has been

working quickly to prepare for an election with historic administrative challenges.  New Yorkers

will be selecting the President, all New York members of the United States House of

Representatives, the State Senate, State Assembly and a host of judicial and local contests—

amidst a global pandemic.[115]  New York's absentee voting system, designed to accommodate

approximately 4% to 10% of New York's participating voters, is likely to account for 40% or

---

[110] S. 8783a/A. 10807.
[111] New York State Board of Elections, *Absentee Voting*,
https://www.elections.ny.gov/votingabsentee.html (last visited Aug. 20, 2020).
[112] N.Y. Election Law § 8-400(2)(c).
[113] N.Y. Elec. Law § 8-412 (McKinney); S. 8799/A. 10808.
[114] New York State Board of Elections, *Absentee Voting*,
https://www.elections.ny.gov/votingabsentee.html (last visited Aug. 20, 2020).
[115] New York Board of Elections Testimony to N.Y. Senate Standing Committee on Elections,
Senate Standing Committee on Local Government, Assembly Standing Committee on Election
Law, Assembly Standing Committee on Local Governments, *Elections in a Pandemic: A Review
of the 2020 Primaries* (Aug. 11, 2020).

more of the total votes cast in the November election.[116]  Mail delays may require New York

election officials to take other measures to avoid disenfranchisement of New York voters.

**B.  Hawaii.**

115.    On July 1, 2019, Act 136 went into effect for the State of Hawaii.  *See* 2019 Haw.

Sess. Laws Act 136, §§ 2 & 63 at 475-79, 499 (codified at Haw. Rev. Stat. Chapter 11, Part

VIIA).  Act 136 adopted a system of virtually universal voting by mail for Hawaii, starting with

the 2020 Primary Election.  Haw. Rev. Stat. § 11-101.

116.    Pursuant to Act 136, county clerks are directed, to the extent possible, to mail

ballot packages to all registered voters so that they will receive the ballot package approximately

18 days before an election.  *Id.* § 11-102.  Voters are then allowed to return a completed ballot in

one of three ways:  (1) by mail so that it is received by the clerk by closing time on the date of

the election; (2) by personal delivery at a designated place of deposit no later than 7:00 pm on

the date of the election; and (3) by personal delivery to a voter service center no later than

closing time on the date of the election.  *Id.* § 11-102.  Voters, particularly disabled voters, may

also register and vote in person at voter service centers, which are open 10 business days before

and through the date of the election.  *Id.* §§ 11-1, 11-15.2, 11-109.

117.    Voting by mail is extremely popular in Hawaii.  In the 2020 primary election,

99% of the votes cast were delivered by mail ballot rather than in person.[117]

118.    Because Hawaii's election system is now almost entirely a vote by mail system

(with a few exceptions), any actions by the U.S. Postal Service that reduce the efficiency of or

---

[116] *Id.*

[117] Dan Nakaso, *Record primary election sees 99% of votes cast by mail-in ballots*, Honolulu
Star-Advertiser (Aug. 11, 2020), https://www.staradvertiser.com/2020/08/11/hawaii-
news/record-primary-election-sees-99-of-votes-cast-by-mail-in-
ballots/?HSA=82d1c031c503128f38f06cadd46fbca425c92d81.

delay mail delivery will have a detrimental effect on Hawaii's election system.

119.   Changes in U.S. Postal Service practices and procedures, such as reductions in overtime, refusal to allow extra or late mail delivery trips, delays built into procedures, removal of mail sorting machines, and removal of mailboxes, threaten to delay mail delivery.

120.   If postal workers are forced to miss work due to infection or quarantine as a result of COVID-19, that will create staffing shortages and make the impact of the U.S. Postal Service's new practices and procedures even worse.  Since August 2020, Hawaii has been experiencing a major spike in coronavirus cases.[118]

121.   Furthermore, voter turnout for the November 2020 election is likely to be very high.  The 2020 primary election turnout was 406,425, which represents an increase from 38.6% in 2018 to 51.1% in 2020.[119]  And general elections usually have higher turnout than primary elections.[120]  In the last presidential election year, the 2016 primary election had a turnout of 252,725 while the 2016 general election had a turnout of 437,664.[121]  The fact that the upcoming election will be the very first general election to be held under the new mail-in ballot standard means that unexpected circumstances may arise, which may magnify the detrimental impact of the Postal Policy Changes.

122.   Under Hawaii law, the chief election officer of the State Office of Elections supervises all state elections.  Haw. Rev. Stat. § 11-2.  However, for elections by mail involving

---

[118] *See* State of Hawaii – Department of Health, *Disease Outbreak Control Division -- COVID-19*, https://health.hawaii.gov/coronavirusdisease2019/what-you-should-know/current-situation-in-hawaii/ (last visited Aug. 18, 2020).
[119] State of Hawaii – Office of Elections, *Registration and Turnout Statistics*, https://elections.hawaii.gov/resources/registration-voter-turnout-statistics/ (last visited Aug. 18, 2020).
[120] *Id.*
[121] *Id.*

both state and county offices, or involving both federal and county offices, the counties are responsible for the mailing and receipt of ballots. *Id.* § 11-110(b)(1)(A). Therefore, for the upcoming election, the county clerks are responsible for actually sending the mail ballots to the registered voters in their respective counties and for receiving them when they are returned.

123.    The county clerks in the majority of Hawaii's counties are concerned that the Postal Policy Changes threaten to delay mail delivery and harm Hawaii's election system.

124.    The City and County of Honolulu has the largest population of Hawaii's counties and, therefore, the volume of mail involved would be greater.[122] The Counties of Maui, Hawaii, and Kauai are more rural than Honolulu, postal workers have greater distances to cover, and mail may have to be processed in Honolulu as well.

125.    Furthermore, Honolulu generally mails its ballots at the Marketing Mail rate, but the U.S. Postal Service's past practice had been to deliver the ballots within the same time frame as First-Class Mail, rather than within the longer Marketing Mail time frame. If the U.S. Postal Service changes this practice and Honolulu continues to use the Marketing Mail rate, mail ballots for Honolulu may be delayed. If Honolulu instead pays the First-Class Mail rate to ensure delivery on time, it will dramatically increase Honolulu's costs. Maui, Hawaii, and Kauai Counties generally mail their ballots using First-Class Mail.

126.    The counties may have to expend time and resources informing the public that they need to mail in their ballots earlier than previously expected. The counties may also have to obtain and install more places of deposit (i.e., drop boxes) to help ensure that people have

---

[122] *See* Department of Business, Economic Development & Tourism, *Census – Annual Estimates of the Resident Population for Counties in Hawaii: April 1, 2010 to July 1, 2019*, https://census.hawaii.gov/wp-content/uploads/2020/03/co-est2019-annres-15.pdf (last visited Aug. 18, 2020).

additional means of returning their ballots that do not rely on the mail.

127.    In letters sent to 46 states, the U.S. Postal Service warned states that mail-in ballots may not arrive in time to be counted, *see supra*.  The letter sent to Hawaii warned that "certain deadlines concerning absentee ballots appear to be incongruous with the Postal Service's delivery standards. This mismatch creates a risk that some ballots will not be returned by mail in time to be counted under your laws as we understand them."[123]

128.    The State Office of Elections previously recommended that voters mail in their ballots three to five days before the election.[124]  However, in the letters sent to the states, the U.S. Postal Service is now telling states to have their voters mail in their ballots a week before the election.[125]

129.    Furthermore, under Hawaii law, if someone does not receive a mail ballot five days before the election (or otherwise needs a replacement ballot within five days of the election), Act 136 authorizes voters to request that a replacement ballot be sent to them electronically.  Haw. Rev. Stat. § 11-107.  However, Hawaii law also expressly provides that those ballots, when completed, may be returned by mail (in addition to three other methods).  *Id.* § 11-107(b)(2).  But if that ballot is sent by mail, it may not arrive in time, since it will

---

[123] *See U.S. Postal Service letters to states*, Wash. Po. (Aug. 17, 2020), https://www.washingtonpost.com/context/u-s-postal-service-letters-to-states/b50799f2-25ad-40ed-ba1e-9d648b1814ad/?itid=lk_interstitial_manual_6 (uploaded document).
[124] *See* State of Hawaii – Office of Elections, *Hawaii Votes by Mail*, https://elections.hawaii.gov/hawaii-votes-by-mail/ (last visited Aug. 18, 2020).
[125] *See U.S. Postal Service letters to states*, Wash. Po. (Aug. 17, 2020), https://www.washingtonpost.com/context/u-s-postal-service-letters-to-states/b50799f2-25ad-40ed-ba1e-9d648b1814ad/?itid=lk_interstitial_manual_6 (uploaded document) ("To allow enough time for ballots to be returned to election officials, domestic voters should generally mail their completed ballots at least one week before the state's due date. So, if state law requires ballots to be returned by Election Day, voters should mail their ballots no later than Tuesday, October 27.").

necessarily be mailed less than a week before the election.  Consequently, the new U.S. Postal

Service estimates, which are based on the new practices and procedures, are inconsistent with

express provisions of Act 136.

130.    Therefore, the Postal Policy Changes threaten to delay delivery of the mail and

could affect whether some Hawaii mail ballots are counted.

131.    The Postal Policy Changes threaten to undermine Hawaii's election laws on

voting by mail and harm Hawaii's sovereign interest in enforcing its own laws.

132.    The Postal Policy Changes may require expenditure of additional time and

resources, thereby harming Hawaii's proprietary interests.

133.    Finally, by interfering with the right to vote of Hawaii residents, the Postal Policy

Changes threaten Hawaii's quasi-sovereign interests.

**C. New Jersey.**

134.    For over a decade, New Jersey has allowed any qualified voter to vote by mail

without being required to demonstrate a reason why the voter cannot appear at the polling

location on Election Day. N.J. Stat. Ann. § 19:63-3.  Paragraphs 135 to 139 below describe

certain statutory procedures and requirements for mail-in voting in New Jersey, and Paragraphs

140 to 146 describe certain changes to those procedures and requirements made by Executive

Orders issued by Governor Philip D. Murphy with respect to the primary election held on July 7,

2020, and the general election that will be held on November 3, 2020, due to the impact of

COVID-19 on New Jersey.  *See* N.J. Exec. Order 144 (May 15, 2020) ("NJ EO 144")

(concerning the primary election); N.J. Exec. Order 177 (August 14, 2020) ("NJ EO 177")

(concerning the general election).

135.    Under New Jersey statutes, each of the State's county clerks starts delivering

mail-in ballots no later than 45 days before an election to all voters who have already applied for a mail-in ballot.  N.J. Stat. Ann. § 19:63-9(a).  Thereafter, county clerks deliver mail-in ballots on a rolling basis to voters whose applications are approved at a later date.  *Id.*

136.    Under New Jersey statutes, a voter may apply for a mail-in ballot by mail up to 7 days before an election, or may apply in-person up to 3 p.m. the day before the election.  N.J. Stat. Ann. § 19:63-3(b), (d).  In addition, certain municipalities with populations of 500 or less can conduct elections entirely by mail, and voters in those jurisdictions automatically receive mail-in ballots.  N.J. Stat. Ann. §§ 19:62-1 to -2.

137.    County clerks are required to deliver the mail-in ballots by first-class mail or hand delivery.  N.J. Stat. Ann. § 19:63-9(a).

138.    New Jersey's mail-in voting materials are designed to protect the secrecy of each voter's ballot and to ensure that each ballot is cast by the voter entitled to cast it.  Each mail-in voter receives two envelopes—an inner envelope and an outer envelope—to return to the county board of elections.  N.J. Stat. Ann. § 19:63-12 to -13.  After marking the ballot, which itself includes no information identifying the voter, the voter places it in the inner envelope, which is then sealed. On the margin of the flap on the inner envelope is a certificate, to be signed by the voter and any person assisting the voter, attesting to their identity(ies) and address(es).  N.J. Stat. Ann. § 19:63-13.  The voter then seals the inner envelope and attached certificate in the outer envelope, which is addressed to the appropriate county board of elections. N.J. Stat. Ann. § 19:63-12.  At the discretion of the county clerk, the outer envelope may be a postage paid return envelope.  *Id.*  No one other than the voter may mail or transport the ballot unless the envelope is sealed and the bearer's name, address, and signature appear on the outer envelope.  *Id.*

139.    Under New Jersey statutes, mail-in ballots that are received up to 48 hours after

the close of the polls may be valid if they are postmarked no later than the day of the election. N.J. Stat. Ann. § 19:63-22.  The county boards of elections canvas the valid mail-in ballots before counting and certifying the results.  *Id.*  Canvassing is the process used to determine if a mail-in ballot is valid, which involves comparing the signature on the ballot to the signature recorded on the voter rolls and confirming compliance with the requirements of applicable statutes.  Once a mail-in ballot is determined to be valid, the board of elections strips the certificate from the inner envelope and stores the sealed inner envelope containing the marked ballot, which is to be opened on Election Day.  *Id.* § 19:63-22.  This preserves the secrecy of the ballot, once its validity has been confirmed, since removing the certificate affixed to the inner envelope leaves the inner envelope and ballot without any identifying information.

140.    On May 15, 2020, Governor Murphy issued NJ EO 144, to protect public health in connection with the primary election held on July 7, 2020, including by providing that the primary election be conducted primarily via vote-by-mail to reduce overcrowding at polling locations and minimize the risk of community spread of COVID-19.

141.    Among other things, NJ EO 144 provided that mail-in ballots be sent to all "active" registered Democratic and Republican voters without the need for an application; that all "active" voters registered as "Unaffiliated" and all "inactive" registered voters receive vote-by-mail applications; that the deadline for submitting a vote-by-mail application be suspended; that all vote-by-mail return envelopes and vote-by-mail applications have prepaid postage; that a schedule adopted by the Secretary of State would displace the statutory deadlines for delivery of mail-in ballots; and that each county, to the extent possible, procure at least five secure ballot drop boxes and place them in locations readily accessible to the registered voters within the county.  *See* NJ EO ¶¶ 1-3, 6, 12.

142. To account for the increase in vote-by-mail ballots and ensure that registered voters' efforts to vote were not impacted by U.S. Postal Service delays, NJ EO 144 suspended the ballot-return deadline of 48 hours after the close of polls, for ballots postmarked on or before the date of the election, so that every vote-by-mail ballot postmarked on or before the day of the election and received by July 14, 2020, at 8:00 p.m. would be considered valid and canvassed. *Id.* ¶ 14.

143. NJ EO 144 further provided for in-person voting by provisional ballot, subject to health and safety standards. *Id.* ¶¶ 7-10, 16-17. Moreover, NJ EO 144 directed the Secretary of State to establish standards to ensure that all eligible voters, including but not limited to those with disabilities, were able to exercise their right to vote, and directed the Secretary and county election officials to coordinate with the Postal Service to facilitate proper delivery of ballots. *Id.* ¶¶ 19-20.

144. On August 14, 2020, Governor Murphy issued NJ EO 177, to protect public health in connection with the general election to be held on November 3, 2020, including by providing that the general election be conducted primarily via vote-by-mail to reduce overcrowding at polling locations and minimize the risk of community spread of COVID-19. Through NJ EO 177, Governor Murphy effected similar modifications to the otherwise applicable statutory procedures and requirements as in NJ EO 144. NJ EO 177 was issued after the Secretary of State received correspondence from the U.S. Postal Service identifying potential impacts of mail delivery processes on the November 3 general election.

145. Pursuant to NJ EO 177, all active registered voters will automatically be sent a mail-in ballot for the election, without the need to apply for one, at least 29 days before the election and in a manner to ensure the ballot's timely receipt and return; whenever a county clerk

47

forwards a mail-in ballot by mail to a voter between the 29th day and the 13th day before the election, it shall be transmitted within three business days of receipt of the application and in a manner to ensure the ballot's timely receipt and return; all vote-by-mail return envelopes will have prepaid First-Class postage; the deadline to apply for a mail-in ballot by mail will be October 23, 2020; the deadline for returning a vote-by-mail application in person is suspended; and each county, to the extent possible, will have at least ten secure ballot drop boxes placed in locations readily accessible to the registered voters within the county.  NJ EO 177, ¶¶ 1-2, 4, 11-12.  In addition, to account for the increase in vote-by-mail ballots and to help ensure that registered voters' efforts to vote are not impacted by delays in the postal service, the ballot-return deadline of 48 hours after the close of polls, for ballots postmarked by the date of the election, is suspended, so that every vote-by-mail ballot postmarked on or before the day of the election and received by November 10, 2020, at 8:00 p.m. will be considered valid and canvassed, assuming the ballot meets all other statutory requirements.  *Id.* ¶ 14.  Additionally, every ballot without a postmark, and every ballot mismarked and confirmed by the post office to have been received by the post office on or before election day, that is received by the county board of elections from the Postal Service within 48 hours of the closing of the polls shall be considered valid and canvassed, assuming the ballot meets all other statutory requirements.  *Id.*

146.    NJ EO 177 further provides for in-person voting by provisional ballot, subject to health and safety standards, and requires public schools to close on election day to facilitate in-person voting.  *Id.* ¶¶ 5-10, 18-19.  In contrast to NJ EO 144, which governed the primary election, NJ EO 177 allows voters to return mail-in ballots at polling places for the general election. *Compare* NJ EO 144 ¶ 11, *with* NJ EO 177 ¶¶ 8-9.

**VIII.   The U.S. Postal Service's delays harm Plaintiffs' sovereign functions.**

147.    Plaintiffs depend upon the U.S. Postal Service to perform a wide range of critical functions, including the administration of elections, the provision of medical care, and the delivery of notices affecting residents' legal obligations and rights.  All of these functions are disrupted by the delivery delays caused by Defendants' ill-conceived operational changes to the U.S. Postal Service.

148.    For example, New York State's Office of Children and Family Services ("OCFS"), and Office of Temporary and Disability Assistance ("OTDA"), which provide programs, benefits, and services to support New York's most vulnerable populations, both rely heavily on U.S. Postal Service mail to deliver critical benefits and correspondence to New Yorkers, including notices to hearings at which they may challenge administrative actions.  *See* N.Y. SSL 390, 18 NYCRR 413.3, 413.5 (OCFS fair hearing to challenge termination of day care operator license); 45 CFR § 205.10(4)(i)(A) (OTDA hearing notices must be mailed at least ten days prior to final agency action).  Delays in mail risk widespread defaults on such rights that agencies will be forced to either expend resources to restore, or have the communities they serve forfeit.

149.    In New York City, the Department of Finance ("DOF") collects the revenues that make every city service possible, including public education, police and fire protection, hospitals and healthcare facilities, and parks and recreation centers.  DOF relies heavily on timely delivery of mail by the U.S. Postal Service.

150.    Each year, DOF receives billions of dollars in essential revenue by the mail.  For example, in the fiscal year ending June 30, 2020, DOF received by mail approximately $7 billion in revenue for fiscal year 2020, comprised of approximately 900,000 property tax payments by mail, containing $4.2 billion in city revenue; approximately 220,000 business tax payments by

mail containing $2.8 billion in city revenue; and approximately 1.2 million parking fine payments by mail containing $80 million in city revenue.

151.   Money received by mail is immediately deposited into an interest-bearing account and subsequently transferred to income-earning investments.  Based on the $7 billion in property taxes, business taxes, and parking fines received by mail in fiscal year 2020, a postal delay of just one day on average over the course of the year would cost the city millions of dollars in lost income.

152.   In addition, mail delays would likely lead DOF to send significantly greater numbers of delinquency notices (or notices with out-of-date balances), causing confusion and the need to devote extra staff resources to resolving the issues.

153.   Further, postal delays would have significant consequences for the recipients of delinquency notices, even if the balance due is accurate, because the mailing of the notices triggers deadlines for payment of overdue amounts.  For example, a taxpayer has 30 days to pay certain overdue business income and excise taxes, running from the mailing of a Notice of Tax Due, in order to avoid the Notice and Demand—a statutory notice.  And if overdue taxes are not paid within 10 days after the mailing of a Notice and Demand, a tax warrant can be docketed.

154.   Delays impact New York City's other governmental functions as well.  The New York City Department of Social Services ("DSS") is the largest local social services agency in the country.  It is comprised of two subsidiary administrative agencies: the Human Resources Agency ("HRA") and the Department of Homeless Services ("DHS").  DSS is dedicated to fighting poverty and income inequality by assisting over three million New Yorkers through the administration of more than twelve major public social service programs in New York City. These public benefits programs include: the Supplemental Nutrition Assistance Program

("SNAP," formerly known as the Food Stamps program); temporary Cash Assistance programs, such as the Temporary Assistance for Needy Families ("TANF") program and New York State and City-funded benefits under the New York State Safety Net Assistance Program; the Medicaid program; and homelessness prevention services.

155.    DSS relies on the U.S Postal Service to send and receive a variety of time sensitive documents to and from its clients.  The COVID-19 pandemic has increased such reliance as clients can no longer travel safely to physical locations.

156.    For example, clients are entitled to send applications for Cash Assistance and SNAP to DSS by mail.  Benefits will flow from the day the application is registered by DSS, which cannot occur until it is delivered by the U.S. Postal Service.  Any delays by the U.S. Postal Service in delivering these applications to DSS prolong the time clients are without benefits and reduce the net amount of benefits they receive overall.

157.    If additional information is necessary to process an application, DSS sends that request through the mail.  DSS is required by various state and federal statutes and regulations to make an eligibility determination within a circumscribed period of time.  *See* 7 U.S.C. § 2020(e)(3)); 7 C.F.R. § 273(a), (g)(1); and N.Y. Comp. Codes R. & Regs. Tit. 18, § 387.2(o) (establishing time frames for SNAP).  *See also* 45 C.F.R. § 206.10(a)(3); N.Y. Soc. Serv. Law § 158(4); N.Y. Comp. Codes R. & Regs. Tit. 18, § 351.8(b) (establishing time frames for various Cash Assistance programs).  If delivery of documents necessary to establish eligibility is delayed by the U.S. Postal Service, client's applications will be rejected through no fault of their own.

158.    Furthermore, once clients are approved for SNAP and Cash Assistance benefits, they will receive their Common Benefit Identification Card ("CBIC") in the mail, which provides access to those benefits.  Prior to the COVID-19 pandemic, temporary cards (also

51

known as vault cards) were provided to clients during the in-person application procedure so clients could access their benefits while waiting for the permanent CBIC to arrive in the mail.

159.    Since the pandemic, most interviews are no longer conducted in person in order to protect public health and safety.  Now clients must depend on the U.S Postal Service for delivery of their CBIC.  Delays in delivery prevent clients from immediately accessing vital financial assistance, unless they travel to one of HRA's open borough-based offices to obtain a temporary vault card or to the state's contracted vendor in Brooklyn to obtain a permanent CBIC, jeopardizing public health during the pandemic.

160.    Postal delays in delivering CBIC cards place already vulnerable clients in even greater jeopardy of food insecurity.  Over the last two months, DSS has received reports that clients are experiencing lengthy delays in receiving CBIC cards by mail.  Those delays have resulted in an influx of clients in desperate need of access to their benefits to travel to a DSS office and wait on increasingly longer lines in order to obtain temporary relief pending the delivery of their CBIC card.

161.    Once benefits are approved, many clients are required to recertify every six months.  DSS mails notices, forms, and other correspondence vital to the recertification process to some of its clients.  If responses are not received timely, DSS must close cases and terminate benefits as required by N.Y. Comp. Codes R. & Regs. Tit. 18, §§ 351.21 and 387.17.

162.    Notices of Intent to terminate or reduce benefits are also sent out by mail.  Clients have ten days from the receipt of such notice to request a hearing if they wish for their benefits to continue during its pendency.  If notices are delayed by the U.S Postal Service, clients may miss the window in which they have to request a hearing, resulting in the termination of their benefits.  Increased terminations may lead to an increase in new applications, as well as increased foot

traffic in the centers that remain open during the COVID-19 pandemic which, in turn, jeopardizes public health and safety.

163.    The U.S. Postal Service's delays will increase the burden on DSS's administration of these benefit programs as individual cases may be closed due to the delays and interruptions. This will result in an increase in requests for fair hearings and in the administrative resources that such hearings require.

164.    Furthermore, mail delays will result in the loss of or delay in providing SNAP and Cash Assistance benefits among New York's most vulnerable families and individuals.  The loss of these benefits for any period of time will lead to increased financial hardship and risk of food insecurity.

165.    DHS operates the City of New York's shelter system, which provides temporary housing for approximately 55,000 individuals.  One of DHS's primary goals is to assist shelter residents in securing permanent housing, including through various rental subsidy programs. Prior to the COVID-19 pandemic, DHS would hand-deliver initial rental subsidies to new landlords at the time shelter residents were to take possession of an apartment.  Because of COVID-19 and limitations on in-person gatherings, DHS now sends these rental subsidies to landlords by the U.S Postal Service.  The U.S. Postal Service's delays have led to new landlords waiting weeks before receiving initial rental payments, and many have refused to allow the shelter residents to move into the apartment until payments were received, thereby impeding the ability of families and individuals to move out of shelters and requiring New York City to bear the costs of providing continued shelter for days or weeks.

166.    Furthermore, many residents of the New York City shelter system receive vital medications through the mail.  Delivery delays causing a lapse in treatment can have life

threatening consequences and force vulnerable individuals to seek emergency health care.

167.  Hawaii agencies also rely on the U.S. Postal Service to facilitate the performance of important governmental functions.  State courts, and the parties and attorneys appearing in state courts, often use the U.S. mail to serve notices and documents relating to court cases.  *See* Haw. R. Civ. P. 5(b)(1)(b).

168.  Hawaii administrative agencies often send important notifications or decisions to individuals using U.S. mail.  People can miss important deadlines if the mail is delayed and can thereby suffer severe consequences, including loss of benefits or appeal rights (subject to COVID-19 suspensions).  For example, the Hawaii Department of Taxation sends state tax notices via U.S. mail.  *See* Haw. Rev. Stat. § 231-17.  If taxpayers do not receive those notice and respond to them in a timely manner, they could be assessed penalties and interest.  *See id.* §§ 231-34 to 231-41.  The Hawaii Department of Human Services sends notices via U.S. mail, and important rights regarding public benefits may be lost if claimants do not receive those notices and respond in time.  *See* Haw. Admin. R. §§ 17-649-3, 17-602.1-6.  The Hawaii Department of Labor and Industrial Relations sends important notices regarding unemployment benefits or workers compensation benefits via U.S. mail, which also need to be received and responded to in time.  *See* Haw. Rev. Stat. §§ 383-36, 383-38, 386-86, 386-87, 386-88; Haw. Admin. R. §§ 12-5-89, 12-10-72.  The Hawaii Child Support Enforcement Agency also sends notices regarding child support cases, arrearages, hearings, and decisions using U.S. mail, which have to be received and responded to in time.  *See* Haw. Rev. Stat. §§ 576E-4, 576E-5, 576E-6 576E-11, 576E-12, 576E-13.

169.  To the extent that payments from Hawaii agencies are still being made by check, they would be affected by delays in the mail.  *See, e.g.*, Haw. Admin. R. § 17-681-9.  Even

payments now made by debit card would be affected in that initial delivery of the debit cards would still have to come by mail.  *See id.* §§ 17-681-50 to 17-681-57.  *See also* Haw. Rev. Stat. 576D-10(c).

170.    Many New Jersey state agencies also rely on U.S. mail to carry out essential government functions.  In particular, state and municipal courts and law enforcement officers commonly use regular U.S. mail to serve important court notices.  For instance, preliminary notices of an intent to foreclose that precede an eventual judgment of foreclosure may be served by regular mail, as will service of process in civil cases when personal service is unsuccessful, *see* N.J. Court Rule 4:4-4.

171.    Likewise, certain agencies with civil enforcement powers, such as the Department of Environmental Protection, deliver Notices of Violations to violators via U.S. mail.  The Motor Vehicle Commission also delivers renewal driver's licenses to New Jersey individuals via U.S. mail when a person renews their license online, and delivers reminders and the forms to renew a driver's license or vehicle registration to residents via U.S. mail.

172.    Further, New Jersey's state agencies rely on U.S. mail to transmit certain public benefits payments to New Jersey residents.  Specifically, benefits such as family leave and disability insurance payments are paid to residents by transferring funds to pre-loaded debit cards that are sent to beneficiaries via U.S. mail.  New Jersey residents rely on some of these benefits payments to provide for essential needs like food, housing, medications, and utility services.

173.    In San Francisco, the Department of Child Support Services ("CSS") is heavily reliant on the U.S. Postal Service to successfully discharge its duties.  For example, child support summons, complaints, orders, and modification requests must be in writing and transmitted through mail.  Instructions about how to properly submit support are also announced via mail.

Orders and notices that are not provided in writing could be legally ineffective.

174.     Furthermore, timely delivery of mail is critical due to statutory or court deadlines. For example, the failure to respond to summonses and complaints could lead to issuance of a bench warrant, and penalties and interest could be imposed on noncustodial parents for support payments that are timely mailed but delivered late.  Delivery delays will further result in the diversion of resources to answer client questions, resolve confusion, and ensure that repercussions for late filings or support payments are not wrongly imposed.

175.     In addition, child support payments to needy children and families could be delayed if the mail is not punctual.  If a child or family does not timely receive the support to which they are entitled, CSS will be burdened with attempting to resolve the matter and enforcing the support order.  Such delays can have detrimental effects on the populations that CSS serves, which are predominantly lower income and people of color.

176.     The COVID-19 pandemic has created huge burdens for CSS and has made it even more reliant on mail.  Due to the economic downturn, CSS is seeing a massive increase in the number of support modification requests.  Because CSS's physical office is currently closed, all of its operations (including serving approximately 500 walk-in clients per year) now, must be conducted entirely by mail.

177.     CSS is taking concrete steps to mitigate the harmful effects of mail delays on CSS.  CSS will need to increase or redirect staff hours to address problems created by the delays, including setting up additional phone lines to provide case status updates or confirmations regarding the receipt and processing of critical legal documents to clients.

178.     CSS is also planning an informational outreach campaign via postcards to inform clients about potential mail delays and to advise them of the need to plan ahead when mailing

materials.  CSS has also engaged a vendor to generate automated telephone calls and text messages to advise clients to mail all documents earlier than usual and to expect delays.

179.    CSS anticipates that it will need three additional fulltime caseworkers to handle the additional work that will result from delays in the mail, including answering client inquiries about the status of cases and receipt of documents or resolving disputes regarding the timeliness of support payments.

180.    CSS anticipates it will need to spend or redirect approximately $500,000 to implement the foregoing measures—steps that are being taken directly in response to the U.S. Postal Service delays that are ongoing and anticipated.

181.    The San Francisco Office of the Treasurer and Tax Collector ("the Treasurer's Office" or "the Office") also informs taxpayers of certain tax obligations by mail.  Because the consequences for failing to pay taxes on time include significant penalties and interest, it is critical that bills sent by the Office are delivered in a timely fashion to taxpayers so that they are on notice regarding what they owe and have sufficient opportunity to pay on time.  If tax notices are not timely received due to mail delays, that could lead to confusion or disagreement with the taxpayer about the amount owed, which would require time and resources from the Office to resolve.  Furthermore, delayed notices lead to delayed payments, which deprive the City of funds needed for its operations, as well as money that could have grown by being invested.

182.    Before the COVID-19 pandemic occurred, the Treasurer's Office already relied on the U.S. Postal Service to send out approximately 1.7 million tax notices.  Since the pandemic, the Treasurer's Office has become even more reliant on the U.S. Postal Service because the Office has had to increase its mailings leading up to significant tax deadlines because the Office is closed for in-person operations.  For example, a county tax that will soon

be due will require that notices be sent to approximately 20,000 taxpayers that collectively owe approximately $200 million.  Delayed receipt of notices of obligation may lead to late payments and associated penalties and fees or, worse, no payment, which then requires collection action. Loss of this revenue undermines San Francisco's mission to safeguard its funds and to serve the City's residents.

183.    Similarly, the Treasurer's Office depends on the U.S. Postal Service to expeditiously transmit mail addressed to it, most of which are tax payments.  Indeed, most tax payments are sent to us by mail.  The Treasurer's Office is obligated to immediately deposit payments remitted to it:  nearly 99 percent of payments are deposited on the same day they are received.  This is so that San Francisco can accrue interest on the overnight funds, which generates a significant amount of income for the City.  Even assuming a very conservative interest rate, San Francisco can realize a gain of $26 for every $100,000 deposited.  Thus, every day that a payment to our office is delayed by mail equates to money lost.

184.    Employees in the Office have reported increasing instances of mail delays and problems at the U.S. Postal Service.  For example, the Office tracks mail that has been sent and returned to it.  It has noticed that more mail returned to the Office is increasingly delayed, frequently by more than five days, thus hindering it from timely notifying taxpayers about what they owe and resulting in delayed payments.

185.    In addition, delayed notices to taxpayers could result in late tax payments, which incur penalties and interest, which in turn lead those taxpayers to protest the penalties and interest, which requires additional staff hours and resources to process and adjudicate.  To compound the cost of mail delays, as explained earlier, the failure to timely receive tax payments results in significant investment losses.

186.     The Postal Policy Changes and the resulting delays are significantly concerning for the Treasurer's Office due to negative effects on the Office's operations, including the need to divert or expend additional resources to counteract the consequences of the delays.  These include sending out guidance to encourage taxpayers to submit their payments early to avoid incurring penalties and interest.  The Office may also need to invest in enhancing means for payments to be made online, including informational and educational campaigns to promote online payment.  Again, late mail will also require more staff hours to address taxpayer concerns, adjudicate waiver claims for late fees, and audits of postmarks.

187.     Mail remains the primary method by which the Treasurer's Office and taxpayers communicate with each other due to the stark divide between those who have digital access and those who do not.  A significant proportion of people who rely on mail to receive information from the Office and pay their tax bills are people of color, low income, and/or elderly.  These are people who especially cannot afford to have penalties and interest imposed on them following delays in the mail.

188.     The Treasurer's Office is particularly concerned about an upcoming property tax collection period which begins in October 2020 and ends December 2020, a period which overlaps with the 2020 November election.  If mail is delayed due to the election, the Office and San Francisco will incur significant losses due to the unrealized interest the Office could have otherwise obtained.  Furthermore, staffing may have to increase to examine postmarks, address customer complaints, and evaluate tax waivers.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (*Ultra Vires* Agency Action—Postal Accountability and Enhancement Act)

189.     Plaintiffs incorporate by reference the allegations set forth in each of the

preceding paragraphs of this Complaint.

190.    The PAEA requires the U.S. Postal Service to seek an advisory opinion from the

Postal Regulatory Commission at a reasonable time prior to implementing substantially

nationwide changes in service.  39 U.S.C. § 3661.

191.    Despite the law's clear command, the U.S. Postal Service has implemented

nationwide changes without seeking an advisory opinion.

192.    The U.S. Postal Service's abrupt actions are therefore *ultra vires*.  The agency's

changes to its operations should therefore be declared unlawful and enjoined.

193.    Defendants' violation causes ongoing harm to Plaintiff States and their residents.

## SECOND CLAIM FOR RELIEF

### (*Ultra Vires* Agency Action—Postal Reorganization Act)

194.    Plaintiffs incorporate by reference the allegations set forth in each of the

preceding paragraphs of this Complaint.

195.    The PRA requires the U.S. Postal Service to comply with specific service

requirements when designing, planning, and providing postal services in accordance with the

agency's central obligations.  39 U.S.C. § 101.

196.    By ignoring its obligation to give the highest consideration to the convenience and

efficiency of processing, transporting, and delivering important letter mail, the U.S. Postal

Service has acted *ultra vires*.

197.    The PRA also requires the U.S. Postal Service to provide ready access to postal

services to the entire population of the United States.  39 U.S.C. § 403.

198.    By eliminating ready access to postal services to certain populations, the U.S.

Postal Service has acted *ultra vires*.

199.    Defendants' violation causes ongoing harm to Plaintiff States and their residents.

### THIRD CLAIM FOR RELIEF

### (U.S. Constitution article I, section 4, clause 1)

200.    Plaintiffs incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

201.    The Elections Clause of the Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators."  U.S. Const. art. I, § 4, cl. 1.

202.    The Elections Clause grants to the States "broad power" to regulate the procedural mechanisms for congressional elections. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986).

203.    The State Plaintiffs have exercised that power by establishing procedures for the transmission and return of ballots by mail for primary and general congressional elections, including the general election on November 3, 2020.

204.    The President has repeatedly and publicly opposed mail-in voting and has expressly stated his opposition to providing additional resources to the U.S. Postal Service, with the intent of impairing the delivery of mailed ballots otherwise authorized by state law.

205.    Defendants' actions will hinder the delivery of mail ballots and ballot applications, and thereby undermine the States' constitutionally-delegated role to regulate congressional elections in violation of the Elections Clause.

206.    Defendants' violation causes ongoing harm to the State Plaintiffs and their residents.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court:

1.      Issue an order holding unlawful, vacating, and setting aside the Postal Policy Changes;

2.      Declare that the Postal Policy Changes are *ultra vires* because they are not authorized by and conflict with Congress's clear statutory mandates to the U.S. Postal Service;

3.      Declare that the Postal Policy Changes are unconstitutional;

4.      Enjoin Defendants and all their officers, employees, and agents, and anyone acting in concert with them, from implementing, applying, or taking any action whatsoever to further the Postal Policy Changes;

5.      Enjoin Defendants from implementing any substantially nationwide changes in service without first seeking an advisory opinion from the Postal Regulatory Commission;

6.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

7.      Grant such other and further relief as the Court deems just and proper.


DATED:  August 25, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo (D.C. Bar No. 997893)
  *Chief Counsel for Federal Initiatives*
Daniela Nogueira,* *Assistant Attorney General*
Morenike Fajana,* *Special Counsel*
Lindsay McKenzie,*
*Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

*Attorneys for the State of New York*

CLARE E. CONNORS
*Attorney General of the State of Hawaii*

By: */s/ Lori N. Tanigawa*
Lori N. Tanigawa*
  *Deputy Attorney General*
Department of the Attorney General
State of Hawaii
425 Queen Street
Honolulu, HI 96813
(808) 586-0618
lori.n.tanigawa@hawaii.gov

*Attorneys for the State of Hawaii*

GURBIR S. GREWAL
*Attorney General of New Jersey*

MAYUR P. SAXENA
Assistant Attorney General

By: */s/ Tim Sheehan*
TIM SHEEHAN*
Deputy Attorney General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625
(609) 815-2604
Tim.Sheehan@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

By: */s/ Aaron Bloom*
Aaron Bloom*
Joseph Pepe
Tonya Jenerette
100 Church Street
New York, NY 10007
abloom@law.nyc.gov
Tel. (212) 356-2274

*Attorneys for Plaintiff City of New York*

DENNIS J. HERRERA
*City Attorney for the City and County of San Francisco*

By: */s/ Dennis J. Herrera*
Dennis J. Herrera,* City Attorney
Jesse C. Smith, Chief Assistant City Attorney
Ronald P. Flynn, Chief Deputy City Attorney
Yvonne R. Meré, Chief of Complex and Affirmative Litigation
Sara J. Eisenberg, Deputy City Attorney
Kevin Yeh,* Deputy City Attorney
San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Kevin.Yeh@sfcityatty.org
Tel. (415) 554-3856
Fax (415) 437-4644

*Attorneys for Plaintiff City and County of San Francisco*

*\* Registration or pro hac vice forthcoming.*