**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | Case No. 20 Civ. 2340 |
| v. | |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 5

BACKGROUND ............................................................................................................... 6

I.    Statutory and Regulatory Framework. ..................................................... 6

II.   Factual Background. ................................................................................... 8

      A.   The COVID-19 pandemic has disrupted daily life, increasing reliance on U.S.
           mail. ............................................................................................................. 8

      B.   The U.S. Postal Service abruptly instituted changes with nationwide impact.. 8

      C.   The U.S. Postal Service's abrupt changes have led to dramatic delays.......... 12

      D.   The U.S. Postal Service's changes continue to have a nationwide impact..... 13

LEGAL STANDARD........................................................................................................ 15

ARGUMENT .................................................................................................................... 15

I.    Plaintiffs will likely succeed on their 39 U.S.C. § 3661(b) claim. ........................... 15

      A.   The claim is reviewable. ............................................................................. 16

      B.   The Postal Service failed to comply with the statute. .................................... 17

II.   Absent an injunction, Plaintiffs will suffer immediate, irreparable harm.................. 20

      A.   The Postal Policy Changes impede Plaintiffs' ability to combat the spread of
           COVID-19.................................................................................................... 21

      B.   The Postal Policy Changes are imposing direct, unrecoverable financial
           harms............................................................................................................ 29

      C.   The Postal Policy Delays are interfering with Plaintiffs' ability to administer
           federal, state, and local laws and imposing additional, unnecessary
           administrative burdens. ............................................................................... 30

III.  The balance of the equities and public interest favor Plaintiffs.................................. 33

CONCLUSION.................................................................................................................. 34

# TABLE OF AUTHORITIES

## CASES

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ................................................................. 31

*Abdullah v. Obama,*
    F.3d 193 (D.C. Cir. 2014) .......................................................... 15

*Bowen v. Mich. Acad. of Family Physicians,*
    476 U.S. 667 (1986) ................................................................... 17

*Coronel v. Decker,*
    No. 20 Civ. 2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) ...................... 34

*District of Columbia v. U.S. Dep't of Agric.,*
    444 F. Supp. 3d 1 (D.D.C. 2020) ................................................. 29

*Eagle Trust Fund v. U.S. Postal Service,*
    365 F. Supp. 3d 57 (D.D.C. 2019) ................................................ 17

*Lawrence + Mem'l Hosp. v. Burwell,*
    812 F.3d 257 (2d Cir. 2016) ...................................................... 20

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................... 20, 28, 34

*Leedom v. Kyne,*
    358 U.S. 184 (1958) ................................................................. 17

*Lopez v. Davis,*
    531 U.S. 230 (2001) ................................................................. 20

*Mittleman v. Postal Regulatory Comm'n,*
    757 F.3d 300 (D.C. Cir. 2014) ................................................... 16

*New York v. BB's Corner, Inc.,*
    No. 12 Civ. 1828, 2012 WL 2402624 (S.D.N.Y. June 25, 2012) ...................... 25

*New York v. U.S. Dep't of Homeland Sec.,*
    --- F. Supp. ----, 2020 WL 4457951 (2d Aug. 4, 2020) ............................. 29

*New York v. U.S. Dep't of Homeland Sec.,*
    No. 19 Civ. 7777, 2020 WL 4347264 (S.D.N.Y. July 29, 2020) ...................... 25

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................. 33

*Northern Air Cargo v. U.S. Postal Serv.,*
    674 F.3d 852 (D.C. Cir. 2012) ................................................... 16

*Planned Parenthood Fed'n of Am., Inc. v. Schweiker,*
    559 F. Supp. 658 (D.D.C. 1983) ................................................. 25

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
   844 F.3d 260 (D.C. Cir. 2016) .................................................................. 16

*Shane v. Buck*,
   658 F.Supp. 908 (D. Utah 1985) ............................................................. 19

*Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv*.,
   841 F. Supp. 2d 349 (D.D.C. 2012) ....................................................... 25

*Trump v. Int'l Refugee Assistance Project*,
   137 S. Ct. 2080 (2017) ............................................................................. 33

*Winter v. Natural Res. Defense Council*,
   555 U.S. 7 (2008) ................................................................... 15, 20, 33

*Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................... 20

## STATUTES

39 U.S.C. § 3661(b) ................................................................................. passim

39 U.S.C. § 3661(c) ............................................................................. 5, 8, 16

39 U.S.C. § 502(a) .......................................................................................... 7

P.L. 2020, ch.72  (N.J. August 28, 2020) ......................................... 8, 25, 27

Postal Accountability and Enhancement Act
   Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006)............................ 7

Postal Reorganization Act
   Pub. L. No. 91-375, 84 Stat. 719 (Aug. 12, 1970) ................................. 6

## OTHER AUTHORITIES

H.R. Rep. No. 91-1104 at 1 (1970) (Conf. Rep.), *as reprinted in* 1970 U.S.C.C.A.N. 3649... 6, 15

Hawaii Emergency Proclamations (First through Twelfth)........................... 22

N.J. Exec. Orders 104, 107, 122, 125, 135, 142, 152, 154, 155, 157, 163 (2020)...................... 22

N.Y. Exec. Order No. 202................................................................................ 22

N.Y.C. Emergency Exec. Order No. 98 ......................................................... 22

Proclamation of Local Emergency (Feb. 25, 2020) ...................................... 22

## REGULATIONS

39 C.F.R. § 3020.112................................................................................ 7, 16

## INTRODUCTION

On the eve of an election marred by a public health crisis that has state and local governments depending on the timely and reliable delivery of mail, the U.S. Postal Service has upended its services.  From June to July 2020, the U.S. Postal Service reduced (1) mail processing, by removing high-speed sorting machines from facilities; and (2) mail delivery standards, by altering the policies and practices that enable the agency to ensure mail is delivered on time (collectively, the "Postal Policy Changes").  The consequences of the Postal Policy Changes are as predictable as they are alarming: substantial delays in mail delivery across the country.

By law, however, the U.S. Postal Service must request an "advisory opinion" from the Postal Regulatory Commission prior to making changes that "affect service on a nationwide or substantially nationwide basis."  39 U.S.C. § 3661(b).  Before issuing an opinion, the Commission must also hold hearings on the record to afford the Postal Service, users of the mail, and the general public—via a Commission representative—an opportunity to address any proposed changes.  *Id.* § 3661(c).

The U.S. Postal Service did not make the requisite request.  Instead, the agency abruptly announced the Postal Policy Changes, which are now causing the exact type of irreparable harm that the advisory process is designed to prevent.  The agency's own records show dramatic delays beginning in July 2020, hampering Plaintiffs' governments at a time when they have been faced with impossible choices as they close offices, cut budgets, and pivot to increased reliance on the mail system in response to the COVID-19 pandemic.

Specifically, delays frustrate Plaintiffs' large-scale efforts to mitigate the spread of the virus.  For instance, the mail delays will force voters who either do not timely receive a mailed

ballot or do not want to risk its untimely return to vote in person on Election Day.  Delays likewise require Americans struggling to survive the economic downturn due to COVID-19 to travel to government offices to secure needed benefits in person.  In short, Defendants' unlawful conduct demands more impossible choices: risk the right to vote or risk infection; forfeit the right to crucial benefits in a time of need or undermine the public health.  And Plaintiffs will be forced to expend even more time, money, and resources to fend off unnecessary harms entirely of Defendants' creation.

The radical impact of the Postal Policy Changes has prompted Postmaster General Louis DeJoy to provide public statements and sworn testimony about their implementation.  These statements acknowledge the far-reaching nature of the changes and their impact on mail service, purport to suspend some of the changes until after Election Day, and attempt to assure Congress and the public—with a national election at stake—that the U.S. Postal Service will deliver on its obligations.  But in the same breath, Postmaster General DeJoy has refused to reverse the Postal Policy Changes in full and restore postal operations to the pre-June 2020 standards.  For these reasons, Plaintiffs respectfully request that the Court preliminarily enjoin the Postal Policy Changes pending adjudication on the merits.

## BACKGROUND

### I.     Statutory and Regulatory Framework.

Through the Postal Reorganization Act of 1970 ("PRA"), Congress established the modern-day U.S. Postal Service to free the mail system of direct political pressures.  Pub. L. No. 91-375, 84 Stat. 719 (Aug. 12, 1970) (codified at 39 U.S.C. § 101 *et seq*.); H.R. Rep. No. 91-1104 at 1 (1970) (Conf. Rep.), *as reprinted in* 1970 U.S.C.C.A.N. 3649, 3650.  The PRA removed the agency's predecessor from the Cabinet, creating the new U.S. Postal Service as an

independent agency within the executive branch.  Pub. L. No. 91-375, 84 Stat. 720 (codified at

39 U.S.C. § 201). The Act also removed the power to appoint the Postmaster General from the

President and gave that responsibility to a newly-established Board of Governors.  *Id.* at 84 Stat.

720–21 (codified at 39 U.S.C. § 202(a)).  Finally, it created the Postal Rate Commission, an

independent oversight body for the agency.  *Id.* at 84 Stat. 759 (amended 2006, codified at 39

U.S.C. § 501).

In 2006, the Postal Accountability and Enhancement Act ("PAEA") replaced the Postal

Rate Commission with the Postal Regulatory Commission, providing it with broader regulatory

powers over the U.S. Postal Service.  Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006)

(codified at 39 U.S.C. § 3600 *et seq.*).  By law, the Commission maintains political independence

through five bipartisan Commissioners who are appointed by the President, confirmed by the

Senate, and may only be removed for cause.  *See* 39 U.S.C. § 502(a).

The U.S. Postal Service must consult with the Commission before making major changes

to its policies or operations.  Specifically, "[w]hen the Postal Service determines that there

should be a change in the nature of postal services which will generally affect service on a

nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time

prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an

advisory opinion on the change."  39 U.S.C. § 3661(b).  The Commission's Rules of Practice and

Procedure require the U.S. Postal Service to file its request for an advisory opinion "not less than

90 days before the proposed effective date of the change in the nature of postal services

involved."  39 C.F.R. § 3020.112.

Following the submission of a proposal, "[t]he Commission shall not issue its opinion on

any proposal until an opportunity for hearing on the record under [the Administrative Procedure

7

Act] has been accorded the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public.  The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title."  39 U.S.C. § 3661(c).

## II.    Factual Background.

### A.    The COVID-19 pandemic has disrupted daily life, increasing reliance on U.S. mail.

Since early this year, the COVID-19 pandemic has required Plaintiffs and their residents alike to adjust to new realities in order to preserve public health.  Because COVID-19 is "primarily spread through person-to-person contact," Ku Decl. ¶ 13, state and local governments, including Plaintiffs here, have undertaken serious efforts to minimize in-person gatherings.  In particular, some Plaintiffs have transformed their plans for the November 2020 election to facilitate voting by mail.  Adinaro Decl. ¶ 9; Kellner Decl. ¶¶ 16–17; Ku Decl. ¶¶ 8–10; P.L. 2020, ch.72  (N.J. August 28, 2020) (providing that New Jersey's November General Election is to be conducted primarily by vote-by-mail in part to reduce the risk of community spread of COVID-19 at polling locations).  Other Plaintiffs already had mail-based election systems, which of course, they seek to preserve during a pandemic.  Henricks Decl. ¶ 3; Kaohu Decl. ¶ 3; Takahashi Decl. ¶ 3.  Plaintiffs have also expended time, money, and resources to educate the public about social distancing, *see* Adinaro Decl. ¶ 8, and to continue to meet their legal obligations to their residents and to administer public benefits programs by increased reliance on U.S. mail, Banks Decl. ¶¶ 4–7, 11, 14; Newton Decl. ¶ 9.

### B.    The U.S. Postal Service abruptly instituted changes with nationwide impact.

At the same time, in June 2020, the U.S. Postal Service began overhauling how the agency collects, processes, and delivers mail throughout the country via letters and memoranda. Fajana Decl., Exs.[1] 18, 22–23.  Specifically, the U.S. Postal Service made two major operational changes: reducing processing capacity and upending longstanding practices and procedures. Despite the nationwide impact of these changes and the clear obligation under federal law to obtain an advisory opinion before implementation, the U.S. Postal Service never sought an advisory opinion for any of the Postal Policy Changes.

First, the agency hobbled sorting efforts in mail facilities by dismantling and removing high-speed sorting machines.  A June 17, 2020 letter from the U.S. Postal Service informed the President of the American Postal Workers Union that the agency was "planning" to reduce the number of sorting machines at its mail processing facilities, which was "anticipated to take place over the next several months."  Ex. 17.  A spreadsheet attached to the letter showed plans to remove 671 such machines from postal facilities across the country.  *Id.*  All told, the plan amounted to a 10 percent reduction in machine inventory and lost sorting capacity of 21.4 million pieces of paper mail per hour.[2]  By August 2020, the agency had removed over 600 machines—including at least 52 machines in New York State, 27 machines in New Jersey, 7 in San Francisco, and 4 machines in Hawaii.  Ex. 17.

Second, the U.S. Postal Service radically revamped how it processes mail.  On July 10, 2020, the agency announced an "operational pivot" to "make immediate, lasting, and impactful

---

[1] All Exhibits referenced herein are attached to the accompanying Declaration of Morenike Fajana.

[2] Jacob Bogage & Christopher Ingraham, *Here's why the Postal Service wanted to remove hundreds of mail-sorting machines*, Wash. Post (Aug. 20, 2020), https://www.washingtonpost.com/business/2020/08/20/postal-service-mail-sorters-removals.

changes in our operations and in our culture." Ex. 21. These changes included the extraordinary measure of prohibiting the over 750,000 annual "extra" trips and "late" trips that have long been the agency's primary means of ensuring that mail does not languish in postal facilities. *See* Ex. 21 ("All trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted."); *id.* ("Extra trips are no longer authorized or accepted."); *see also* Ex. 29.

For years, late trips and extra trips have been "features of the postal system, not bugs." Coradi Decl. ¶ 14. "Extra" trips are non-scheduled delivery trips, which ensure that the agency can maintain the necessary flexibility to timely deliver mail to 160 million addresses for six days a week. *Id.* ¶¶ 5, 14. Extra trips have long allowed the agency to account for daily fluctuations in mail volume, processing malfunctions or errors, and other disruptions. *Id.* ¶¶ 13-4.[3] Similarly, so-called late trips are necessary to ensure that the mail is on the truck in the event of any delays in processing. *Id.* Without late trips, mail trucks are forced to leave facilities with less or no mail to deliver—sometimes across state lines.[4]

In announcing the changes, the U.S. Postal Service knew that its decisions would delay mail delivery. The agency not only described them as "impactful changes," but also explained that "[o]ne aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or mail on the workroom floor or docks (in P&DCs), which is not typical." Ex. 21. Still, the agency claimed without evidence that, at an unspecified time in the

---

[3] *See also* Jacob Bogage, et al., *Postmaster General eyes aggressive changes at Postal Service after election*, Wash. Post (Aug. 20, 2020), https://www.washingtonpost.com/business/2020/08/20/us-postal-service-louis-dejoy.

[4] Daniel Villareal, *Empty USPS Trucks Are Driving Across Country Without Mail*, Newsweek (Aug. 24, 2020), https://www.newsweek.com/empty-usps-trucks-are-driving-across-country-without-mail-1527297.

future, "operations will begin to run more efficiently and that delayed mail volumes will soon shrink significantly." *Id.*

During the same month, the U.S. Postal Service announced yet another "initiative" to further institutionalize delays in mail processing. Under the Expedited to Street/Afternoon Sortation ("ESAS") initiative, postal workers at 384 facilities are prohibited from sorting "any mail during the morning operation," save for any "unsorted First Class flats" that would be "routed in delivery sequence while on the street." Ex. 22. The 384 facilities include those located in the jurisdictions of Plaintiffs here—New Jersey, New York State, New York City, and San Francisco. Ex. 23. Although the purported goal of the ESAS initiative is to "allow carriers to leave for the street earlier," *id.*, it does so by ordering carriers to ignore mail that is already sitting in postal facilities. By permitting carriers only to sort mail in the afternoon to be delivered the next day, the ESAS initiative essentially guarantees a further delay in mail delivery.

Finally, the U.S. Postal Service also disavowed its prior practice of delivering election mail at First Class speeds of one to three days[5] regardless of the paid class of service. *See* Ex. 30, at 12 ("The Postal Service often prioritizes Election and Political Mail mailed as Marketing Mail and treats it as First-Class Mail."); *see also* Coradi Decl. ¶ 17. On or around July 29, 2020, the U.S. Postal Service's general counsel informed 46 states and the District of Columbia that failure to pay the First Class rate will risk ballots not being delivered on time and, consequently, the disenfranchisement of large swaths of voters.[6] As purchasing First Class postage will nearly

---

[5] U.S. Postal Serv., USPS Mail Guide, https://www.stamps.com/usps/mail-class-guide (last visited Sept. 1, 2020) (table listing First Class letter, flat, and package delivery speeds as "1–3 days" and Media Mail speeds as "2–9 days").

[6] *U.S. Postal Service letters to states*, Wash. Post (Aug. 17, 2020), https://www.washingtonpost.com/context/u-s-postal-service-letters-to-states/b50799f2-25ad-40ed-ba1e-9d648b1814ad/?itid=lk_interstitial_manual_6 (uploaded documents).

*triple* the price per piece of election mail from 20 cents to 55 cents,[7] it will cost states, counties, and cities millions of dollars to ensure a fair and safe election.[8]

### C. The U.S. Postal Service's abrupt changes have led to dramatic delays.

The Postal Policy Changes' cumulative impact on service was immediately obvious. With fewer machines to sort mail, mail could not be processed as quickly. *See* Coradi Decl. ¶¶ 7, 15. With postal drivers forbidden from waiting past a scheduled trip for more mail to be loaded onto trucks, or from making an unscheduled "extra" trip, mail that would have otherwise been delivered sat in facilities overnight. *See id.* ¶¶ 5, 16. As a result, significant, widespread delays ensued.

Indeed, the U.S. Postal Service's own records show that on-time delivery of First Class and flat mail significantly declined in mid-July, following the implementation of the Postal Policy Changes. Exs. 25, at 2; 26, at 26; 28, at 8. Nationally, on-time delivery for First Class mail declined from roughly 90 to 94 percent in the months preceding the Postal Policy Changes to a low of 82 percent in early August. Ex. 28, at 8. Regionally, although on-time delivery of First Class mail in the agency's Eastern service area had hovered between 91 and 95 percent in the preceding five months, on-time delivery dropped for three weeks straight in July—down to 79 percent the week of July 19. Ex. 25, at 2. On-time delivery of both First Class and Marketing Mail dropped to year-lows in both the Eastern and Pacific regions. Exs. 25–26, 28. And the

---

[7] *See* Jacob Bogage, *Trump says Postal Service needs money for mail-in voting, but he'll keep blocking funding*, Wash Po. (Aug. 12, 2020), https://www.washingtonpost.com/business/2020/08/12/postal-service-ballots-dejoy.

[8] As discussed, *infra*, Postmaster General DeJoy later testified that election mail would be treated consistently with the agency's prior practices. Nevertheless, DeJoy did not explain how election mail would be timely delivered if the other Postal Policy Changes triggering delay would not be reversed.

agency's internal processing performance scores for across mail categories dropped between 8.1 percent and 9.57 below baseline.  Ex. 27.

### D.    The U.S. Postal Service's changes continue to have a nationwide impact.

Faced with the sudden slowdown in mail processing and delivery, Postmaster General DeJoy acknowledged internally on August 13, 2020 that the agency's "transformative initiative has had unintended consequences that impacted our overall service levels."  Ex. 19.  Soon after, the Postmaster General attempted public gestures of reassurance while doing little to reverse the changes or adequately explain why reversal is unnecessary in light of the serious service impacts.

Specifically, on August 18, 2020, Postmaster General DeJoy issued a statement that the U.S. Postal Service would be "suspending" certain Postal Policy Changes.  Ex. 20.  DeJoy stated that "[m]ail processing equipment and blue collection boxes will remain where they are" and that overtime would be approved "as needed."  *Id.*  However, Postmaster General DeJoy did not address the hundreds of sorting machines already removed, and was virtually silent on all other changes.  *Id.*

Three days later, on August 21, 2020, Postmaster General DeJoy testified before the Senate Homeland Security and Governmental Affairs Committee.[9]  In his testimony, DeJoy acknowledged the delays caused by the Postal Policy Changes, and noted that "[w]e all feel, you know, bad about, you know, what the dip in our service level has been."[10]  DeJoy also stated that

---

[9] *See Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video).

[10]  *Id.*

the Postal Policy Changes did not "align" the separate systems for sorting, transporting, and delivering mail.[11]

Nevertheless, the Postmaster General refused to return the U.S. Postal Service's policies to the status quo ante.[12]  He testified that he would not reinstall the hundreds of removed sorting machines to facilities or reverse his policy eliminating extra trips.[13]  Although DeJoy verbally committed to delivering election mail at the First Class rate speed, he failed to account for how this commitment would play out in practical terms given that he was not rescinding the policies that were slowing mail delivery.[14]

DeJoy's testimony before the House of Representatives Committee on Oversight and Reform on August 24, 2020 doubled down on his refusal to replace sorting machines unless Congress provided $1 billion in funding, which he stated Congress had "no way" of doing.[15] DeJoy also remained staunch in his refusal to lift the prohibition on late trips or extra trips.[16]  On election mail, DeJoy testified that the agency would act "in a manner consistent with the proven processes and procedures that we have relied upon for years," while maintaining that "it would be best if the State election boards follow the recommendations" from the U.S. Postal Service's general counsel.[17]

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *See Postmaster General Louis DeJoy Testifies on Postal Service Operations & Mail-In Voting*, C- SPAN (Aug. 24, 2020), https://www.c-span.org/video/?474917-1/postmaster-general-louis-dejoy-testifies-postal-service-operations-mail-voting (video).

[16] *Id.*

[17] *Id.*

On August 31, 2020, DeJoy submitted updated records to the House Oversight Committee reflecting the status of service and on-time delivery through August 26, 2020.  Ex. 28.  For both First Class mail and periodicals, on-time delivery rates remain worse than before the Postal Policy Changes.  *Id.* at 8.  First Class mail is timely slightly more than 85 percent of the time, down from more than 90 percent before the changes.  *Id.*  To date, however, the agency has not announced any intention of reversing the Postal Policy Changes.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Defense Council*, 555 U.S. 7, 20 (2008).  The movant bears the burden to show that "all four factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (internal quotation marks and citation omitted).

## ARGUMENT

**I.      Plaintiffs will likely succeed on their 39 U.S.C. § 3661(b) claim.**

One of Congress's primary purposes in enacting the PRA was to "convert the Post Office Department into an independent establishment . . . freed from direct political pressures."  H.R. Rep. No. 91-1104 at 1 (1970) (Conf. Rep.), *as reprinted in* 1970 U.S.C.C.A.N. 3649, 3650.  Accordingly, Congress created and later expanded what is now the present-day Postal Regulatory Commission to provide independent oversight of the agency.

Before the Postal Service may implement a "nationwide or substantially nationwide" service change, "it must submit a proposal, *within a reasonable time prior to the effective date of such proposal*, to the Postal Regulatory Commission requesting an advisory opinion on the

change."  39 U.S.C. § 3661(b) (emphasis added); *see* 39 C.F.R. § 3020.112 (under Postal

Regulatory Commission rules, the Postal Service must file a request for an advisory opinion "not

less than 90 days before the proposed effective date of the change in the nature of postal services

involved").  The Postal Regulatory Commission shall issue such an opinion only after according

"users of the mail"—among others—an opportunity for a full evidentiary hearing.  *See* 39 U.S.C.

§ 3661(c).

        Here, the U.S. Postal Service has failed to submit the Postal Policy Changes to the Postal

Regulatory Commission in advance for an advisory opinion as required under 39 U.S.C.

§ 3661(b) (and the Commission's rules), despite their significant effect on postal service

nationwide.  As such, the Postal Service has acted in dereliction of its statutory duty and the

Postal Policy Changes must be preliminarily enjoined.

        **A.      The claim is reviewable.**

        As an initial matter, the Postal Policy Changes are clearly reviewable as *ultra vires*

agency action.  While the Postal Service is generally exempt from review under the

Administrative Procedure Act ("APA"), "its actions are reviewable to determine whether it has

acted in excess of its statutory authority."  *Northern Air Cargo v. U.S. Postal Service*, 674 F.3d

852, 858 (D.C. Cir. 2012); *see Sears, Roebuck & Co. v. U.S. Postal Service*, 844 F.3d 260, 265

(D.C. Cir. 2016) (non-APA review of Postal Service decisions is available where the agency

exceeds its statutory mandate); *Mittleman v. Postal Regulatory Comm'n*, 757 F.3d 300, 307

(D.C. Cir. 2014) (same).  As another judge in this District has observed, "[an] *ultra vires* claim

derives from the contention that an agency has acted without the authority to do so, and it is

based on the inherent power of the federal courts to reestablish the limits on [executive] authority

through judicial review."  *Eagle Trust Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C.

2019) (internal quotation marks, citations, and emphasis omitted), *aff'd* 811 F. App'x 669 (D.C. Cir. 2020); *see also Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986) (recognizing that there is a "strong presumption that Congress intends judicial review of administrative action").

Here, the gravamen of Plaintiffs' section 3661 claim is that the Postal Service implemented the Postal Policy Changes before and without seeking an advisory ruling from the Postal Regulatory Commission, in violation of the statute.  Because the Postal Service "acted 'in excess of its delegated powers and *contrary to a specific [statutory] prohibition*,'" the Postal Policy Changes are subject to judicial review on an *ultra vires* theory.  *Eagle Trust Fund*, 365 F. Supp. 3d at 67 (emphasis added) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)).

**B.    The Postal Service failed to comply with the statute.**

Section 3661(b) imposes clear and mandatory obligations on the Postal Service that must be followed before the agency may implement changes with a nationwide impact:

> When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.

39 U.S.C. § 3661(b).  By any measure, the Postal Policy Changes satisfy this test.

First, and as discussed above, the Postal Policy Changes constitute a "change in the nature of postal services."  The agency itself described these measures as "impactful changes," Ex. 21, and the Postmaster General characterized the changes as part of a "transformative initiative," Ex. 19.  Indeed, the Postal Policy Changes have prohibited extra trip and late trips, which are central "features of the postal system, not bugs," Coradi Decl. ¶ 14, and removed

enough machines to reduce sorting capacity by nearly 21 million pieces of mail *per hour*.[18]
Where the entire purpose of the Postal Policy Changes was to "change . . . the nature of postal
services," 39 U.S.C. § 3661(b), it cannot be disputed that the first part of the statutory test is met.

Second, these changes have "generally affect[ed] service on a nationwide or substantially
nationwide basis." *Id.* The Postmaster General admits that this "transformative initiative has
had unintended consequences." Ex. 19. The agency's Office of the Inspector General has
likewise acknowledged "the significant increases in delayed mail at delivery units experienced
this summer." Ex. 30, at 1.

Indeed, the Postal Policy Changes have measurably reduced the Service's on-time
delivery percentage around the country and across multiple categories of mail. According to the
Postal Service's own records, the national on-time delivery rate for First Class mail began to fall
dramatically the week of July 11, 2020, after staying above 90 percent for almost all of 2020.
*See* Ex. 28, at 8. It dropped to 83 percent in mid-July, then climbed a couple points before
falling to a low of approximately 82 percent—14 points below the U.S. Postal Service's 96
percent target rate. *See id.*; *see also* Ex. 25, at 2. Given that the agency processes and delivers
an average of 181.9 million pieces of First Class mail per day,[19] that decline in on-time delivery
translates to between 15 and 25 million pieces of First Class mail being delayed *each day*.

Certain regions have been hit harder than others. The on-time delivery rate for First
Class letter and flat mail declined in the agency's Eastern service region from between 91 and 95
percent over the previous five months to 79 percent in July. *See* Ex. 25, at 2. That figure also
represents a 15 percentage point drop from the same period the year before. *Id.* For marketing

---

[18] Bogage and Ingraham, *supra* note 2.

[19] U.S. Postal Serv., One Day in the Life of the U.S. Postal Service, https://facts.usps.com/one-day (last visited Sept. 1, 2020).

mail, the on-time delivery rate in the Eastern region declined from a more typical 91 to 94 percent to a low of 73 percent in mid-July.  *See id.* at 4.  Similar declines in on-time delivery rates occurred in other service regions.  *See* Ex. 26.

At this point, Postmaster General DeJoy has candidly admitted in multiple forums that the Postal Policy Changes "impacted [the U.S. Postal Service's] overall service levels."  Ex. 19. And Former Postal Governor David Williams has described the Postal Policy Changes as "infrastructure cuts that are destroying the Postal Service's commitment to service delivery standards."[20]  Reports from all across the country echo these sentiments, detailing the Postal Policy Changes' dramatic impact on service.[21]

In view of the foregoing, these changes are "of sufficient magnitude to impact the general public's postal services."  *Shane v. Buck*, 658 F.Supp. 908, 911 (D. Utah 1985), *aff'd* 817 F.2d 87 (10th Cir. 1987).  What's more, the U.S. Postal Service's public assurances with regard to the handling of election mail do not address how the ongoing delays will affect mail-in ballots and other critical election mail during the upcoming election season.  Accordingly, by the plain text of the statute, the Postal Policy Changes are subject to 39 U.S.C. § 3661(b).

There is no dispute that the U.S. Postal Service did not seek an advisory opinion *before* implementing the Postal Policy Changes, as the statute requires.  Section 3661(b) provides that

---

[20] *See Progressive Caucus ad hoc hearing on Trump Admin's sabotage of USPS operations*, Cong. Progressive Caucus (Aug. 20, 2020), https://www.pscp.tv/w/1BdxYnvDppzKX (video).

[21] The Postal Policy Changes prompted days of front-page headlines in newspapers all over the country, immediate congressional hearings, and new federal legislation.  *See, e.g.*, Bogage et al., *supra* notes 2–3; Villareal, *supra* note 4; Catie Edmondson, *DeJoy Defends Postal Changes as Trump Continues to Attack Voting by Mail*, The N.Y. Times (Aug. 24, 2020), https://www.nytimes.com/2020/08/24/us/politics/louis-dejoy-post-office-hearing.html; Nicholas Fandos and Emily Cochrane, *House Votes to Block Postal Changes and Allocate Funds for Mail*, The N.Y. Times (Aug. 22, 2020), https://www.nytimes.com/2020/08/22/us/politics/usps-bill-congress-vote.html.

where the agency wishes to implement changes in postal service with a nationwide or substantially nationwide impact, the agency "shall" submit a proposal to the Commission and request an advisory opinion. The word "shall" is classic statutory language connoting a mandatory duty—not an option that can be ignored. *Lopez v. Davis*, 531 U.S. 230, 231 (2001) (the "mandatory 'shall' . . . impose[s] discretionless obligations"); *Ass'n of Am. Railroads v. Costle*, 562 F.2d 1310, 1312 (D.C. Cir. 1977) ("The word 'shall' is the language of command in a statute").

Instead, the U.S. Postal Service ignored its statutory obligations to abruptly implement these changes in June and July 2020 without seeking an advisory opinion from the Postal Regulatory Commission and without affording the public a meaningful opportunity to comment. Plaintiffs are therefore likely to succeed on the merits of their section 3661 claim.

## II.    Absent an injunction, Plaintiffs will suffer immediate, irreparable harm.

"Plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). Irreparable injury is an imminent injury that is "certain and great," "actual and not theoretical," and for which legal remedies are inadequate. *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (internal quotation marks omitted). The movant must also show that "the alleged harm will directly result from the action . . . the movant seeks to enjoin." *See Wisconsin Gas Co. v. Federal Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Here, the irreparable harm to Plaintiffs cannot be overstated. Plaintiffs rely on the U.S. Postal Service to carry out a vast array of governmental functions, including the administration of elections, provision of public assistance to low-income families, and distribution of life-saving medications. The need to limit in-person interactions and services in light of the COVID-19

pandemic has further increased Plaintiffs' reliance on the mail to perform these core

governmental functions.  The Postal Policy Changes thus irreparably harm Plaintiffs by

interfering with Plaintiffs' efforts to mitigate the spread of COVID-19; imposing direct economic

costs on Plaintiffs' jurisdictions which cannot be recouped; and impeding Plaintiffs' ability to

safely and efficiently carry out their obligations under federal, state, and local law.

### A.  The Postal Policy Changes impede Plaintiffs' ability to combat the spread of COVID-19.

The COVID-19 crisis has exacted a tremendous toll on the nation.  As of August 27,

2020, over 5 million Americans had been infected and nearly 180,000 had died.  Ku Decl. ¶ 8.

New York State is one of the current epicenters of the pandemic in the United States—434,100

people have confirmed cases of COVID-19, and at least 25,327 people have died from the

disease.[22]  Like most respiratory illnesses, COVID-19 spreads when infected persons come into

close contact with healthy persons.  Ku Decl. ¶ 13.[23]  The Centers for Disease Control and

Prevention ("CDC") have identified several factors that contribute to COVID-19 acceleration,

including "large gatherings" and "crowding and high population density."[24]

In light of the apparent dangers of COVID-19, Plaintiffs have devoted significant

resources towards COVID-19 response and mitigation efforts.  Guided by prevailing public

health guidance, each of the Plaintiffs declared a state of emergency.[25]  Plaintiffs also

---

[22] N.Y. Dep't of Health, COVID-19 Tracker, https://covid19tracker.health.ny.gov (last accessed August 31, 2020).

[23] *See also* Ctr. for Disease Control & Prevention, *Public Health Response to the Initiation and Spread of Pandemic COVID-19 in the United States, February 24–April 21, 2020* (May 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e2.htm.

[24] *See id.*

[25] *See generally* Hawaii Emergency Proclamations for COVID-19 (First through Twelfth); N.J. Exec. Orders 104, 107, 122, 125, 135, 142, 152, 154, 155, 157, 163 (2020), *available at*

promulgated new laws and policies to promote mask-wearing, social distancing, hand washing, and minimizing in-person gatherings.  Adinaro Decl. ¶¶ 7–9; Kellner Decl. ¶¶ 16–17; Ku Decl. ¶¶ 8–10.

The provision of public benefits, including Supplemental Nutrition Assistance Program ("SNAP"), unemployment benefits, and Medicaid also constitutes an integral part of Plaintiffs' COVID-19 response efforts.  Betts ¶ 11; Ku ¶¶ 34-38; Roye ¶¶ 4, 6.  Any deprivation of these basic needs can create conditions, such as food and housing insecurity, which make people more vulnerable to COVID-19.  *See* Ku ¶ 35.

The Postal Policy Changes directly hinder Plaintiffs' COVID-19 and related efforts to ensure public health because (1) the U.S. Postal Service's failure to timely deliver the mail forces Plaintiffs and their residents to conduct more governmental interactions in-person, thus risking exposure to the virus; and (2) the degradation in the U.S. Postal Service's service standards, and resulting confusion regarding how election mail will be handled in the November 2020 general election, undermine Plaintiffs' ability to provide safe alternatives to in-person voting.

1. *The Postal Policy Changes necessitate more in-person governmental interactions, frustrating Plaintiffs' efforts to mitigate the spread of COVID-19.*

Plaintiffs provide a wide range of critical services to their residents, including providing public assistance to low-income families, securing access to healthcare, enforcing child support orders, and providing drivers' licenses.  Banks Decl. ¶¶ 3–7, 14; Betts Decl. ¶ 3; Hein Decl. ¶¶ 2–3; Lau Decl. ¶ 3; Jacobs Decl. ¶¶ 4–10; Poole Decl. ¶ 2; DiGiovanni-Abatto Decl. ¶ 3.  All of

---

https://nj.gov/infobank/eo/056murphy; N.Y. Exec. Order No. 202; N.Y.C. Emergency Exec. Order No. 98; Proclamation of Local Emergency (Feb. 25, 2020), *available at* https://sfmayor.org/sites/default/files/Proclamation%20of%20Local%20Emergency%20re.%20COVID-19%202.25.2020.pdf.

these services depend upon the timely delivery and receipt of U.S. mail.  Banks Decl. ¶¶ 4–7, 11,

14; Betts Decl. ¶ 6; Hein Decl. ¶¶ 4–5; Lau Decl. ¶ 5; Jacobs Decl. ¶¶ 5–10; Poole Decl. ¶¶ 3–11;

DiGiovanni-Abatto Decl. ¶¶ 3–5.

The New York City Department of Social Services ("DSS"), for example, administers

public benefits programs that collectively provide assistance to over three million New York

City residents, and relies on the Postal Service for the delivery of a variety of time-sensitive

documents.  Banks Decl. ¶ 4.  These documents include common benefit identification cards

("CBICs"), also known as electronic benefits transfer ("EBT") cards, which allow newly

approved SNAP and/or Cash Assistance program beneficiaries to access their benefits.  *See id.*

¶ 7.

Before the COVID-19 pandemic, DSS was able to mitigate the effects of any delay in

receiving a CBIC or EBT card by providing a temporary or "vault" card as part of the in-person

application procedure.  *See id.* ¶ 7.  The vault card allowed benefits recipients to access their

benefits while they waited for a permanent card to arrive in the mail.  *See id.*  Since the COVID-

19 crisis hit New York in March, however, most application interviews have not been conducted

in person in order to protect public health.  *See id.*  Accordingly, approved recipients must either

forego access to their benefits while awaiting the mailed CBIC or travel to a DSS office to

retrieve a benefits card in person.  *See id.*

Since the agency implemented the Postal Policy Changes, widespread mail delays are

ensnaring New York City residents' CBICs, forcing those in desperate need to increasingly risk

their health (and the health of others) to wait in ever-longer lines at DSS borough facilities to

obtain a vault card.  *See* Banks Decl. ¶ 8; Newton Decl. ¶ 13.  The number of DSS clients issued

in-person temporary vault cards has increased dramatically since the Postal Policy Changes,

from 224 in May 2020 to 701 in June to 1,433 in July to 1,981 in August.  Banks Decl. ¶ 8.

Public benefits advocates have explained how their clients in the Bronx, who are "desperate for assistance and unable to wait for delivery of an EBT card," travel from the Bronx to the DSS office at 227 Schermerhorn Street, Brooklyn, NY 11201—a two-hour journey by public transit, each way—in order to obtain EBT cards printed at this special center, which is the only location in New York City that can issue permanent EBT cards.  Newton Decl. ¶ 14.  Public advocates have also requested EBT cards to be re-issued by mail, but continuing mail service disruptions have prevented requests from always being successful.  Newton Decl. ¶ 16.  Consequently, New York's most vulnerable residents continue to risk exposure to COVID-19 to obtain temporary vault cards or permanent EBT cards.  Banks Decl. ¶¶ 8–9; Newton Decl. ¶¶ 14–16.

Public benefits agencies across Plaintiffs' jurisdictions are similarly injured by mail delays.  The Child Support Services ("CSS") for the City and County of San Francisco had closed its physical offices as part of its COVID-19 mitigation efforts, thus limiting its in-person services.  Due to the Postal Policy Changes, however, CSS's clients fear that they can no longer rely on the timely delivery of mail to and from the agency.  As a result, the agency is and will continue to experience an increase in walk-in clients.  Roye Decl. ¶¶ 11–12.  These increased in-person transactions will necessitate more staffing and risk exposing CSS employees, clients, and the greater community to COVID-19.  *Id.* ¶ 12.

As such, delivery delays and failures engendered by the Postal Policy Changes are undermining Plaintiffs' attempts to protect public health by *encouraging,* rather than discouraging, in-person interactions.  Kellner Decl. ¶¶ 27–28; Ku Decl. ¶¶ 7, 12, 21.  Furthermore, undermining voting by mail *encourages* voting in person (which is still an option

even in mail-based election systems), thereby threatening public health.  Henricks Decl. ¶ 3;
Kaohu Decl. ¶ 3; Takahashi Decl. ¶ 3.

This "potential impact on public health" is "itself sufficient irreparable harm to support
preliminary injunctive relief."  *New York v. BB's Corner, Inc.,* No. 12 Civ. 1828, 2012 WL
2402624, at *3 n.3 (S.D.N.Y. June 25, 2012); *see also New York v. U.S. Dep't of Homeland Sec.*,
No. 19 Civ. 7777, 2020 WL 4347264, at *10 (S.D.N.Y. July 29, 2020) (federal agency action
that "impedes public efforts in the Governmental Plaintiffs' jurisdictions to stem the spread of
the disease" causes irreparable harm); *Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv*.,
841 F. Supp. 2d 349, 358 (D.D.C. 2012) (recognizing increased emissions of pollutants that
"endanger human health" as irreparable harm); *Planned Parenthood Fed'n of Am., Inc. v.
Schweiker*, 559 F. Supp. 658, 666 (D.D.C. 1983) (recognizing increased risk of teenage
pregnancy as irreparable harm), *aff'd sub nom. Planned Parenthood Fed'n of Am., Inc. v.
Heckler*, 712 F.2d 650 (D.C. Cir. 1983).

> 2. *The Postal Policy Changes frustrate Plaintiffs' efforts to mitigate the spread of
>    disease on Election Day.*

As the coming autumn will bring a return of influenza in addition to COVID-19, experts
warn that "this could be the worst fall, from a public health perspective, we've ever had."  Ku
Decl. ¶ 13 (quoting CDC Director Robert Redfield).  In order to promote the utmost safety for
voters during the upcoming November 2020 general election, some Plaintiffs have overhauled
their election laws to encourage as many residents as possible to vote absentee.  Adinaro Decl.
¶ 9; Kellner Decl. ¶¶ 16–17; Ku Decl. ¶¶ 8–10.  New York, for example, expanded absentee
ballot access for the November 2020 general election to all New Yorkers by permitting voters to
cite the risk of illness, including COVID-19, as a basis to apply for an absentee ballot.  Kellner
Decl. ¶¶ 11, 17.  Based on voter behavior during the June 2020 primary elections, state election

officials expect nearly half of all eligible voters will seek to cast absentee ballots in the

November 2020 general election—a dramatic increase over prior elections.  *See* Kellner Decl.

¶ 19.

In New Jersey, the general election will primarily be conducted by vote-by-mail ballots

because, among other things, "requiring voters to vote in-person during the COVID-19 pandemic

would pose health risks for voters and poll workers and would risk discouraging voting by

certain voters, including elderly and immuno-compromised voters."  Adinaro Decl. ¶ 9; *see also*

P.L. 2020, ch.72 (N.J. Aug. 28, 2020).  And Hawaii has adopted a system of virtually universal

voting by mail, starting with the 2020 primary election.  Henricks Decl. ¶ 3; Kaohu Decl. ¶ 3;

Takahashi Decl. ¶ 3; Haw. Rev. Stat. § 11-101.

Widespread mail delays flowing from the Postal Policy Changes threaten Plaintiffs'

ability to mitigate viral spread by providing safe and efficient alternatives to in-person voting in

a number of ways.  Because Plaintiffs (and their residents) plan to rely more heavily on mail-in

balloting during the November elections than ever before, mail delays threaten timely delivery of

ballots, which in turn encourages (or forces) voters to travel to in-person polling stations when

they would not otherwise have need to do so.  Kellner Decl. ¶¶ 13–14, 27.  New York election

officials are "gravely concerned" that such unnecessary in-person voting will lead to

overcrowding at polling places, which in turn will cause longer lines and longer wait times to

cast a vote.  *Id.* ¶ 28.  This scenario plainly undermines the substantial efforts New York State

and New York City have made to discourage in-person gatherings in order to slow or stop the

spread of the novel coronavirus.  *See id.*

These election mail concerns are more than mere speculation: During the June primary in

New York, the State's concerted efforts to protect public health by facilitating absentee voting

resulted in a six-fold increase in the number of absentee ballots cast. *See* Kellner Decl. ¶ 11 (noting that nearly 40 percent of ballots cast in the June primary election were absentee). In Brooklyn, however, the Postal Service failed to postmark some 4,800 absentee ballots, causing those ballots to be initially rejected by election officials. *See id.* ¶ 13. And voters who reportedly requested absentee ballots but did not receive them by Election Day were forced to either forfeit the franchise or venture out into public to vote in person, notwithstanding the risks associated with in-person, indoor gatherings. *See id.* ¶¶ 13–14.[26]

Other primary examples demonstrate that permitting increased in-person voting contributes to the spread of COVID-19. In Wisconsin, a last-minute court ruling enjoining the State's plans to delay the primary election from April 2020 to June 2020 prompted many voters to vote in person, as they had insufficient time to submit absentee ballots. Ku Decl. ¶ 17. Following the April 2020 primary, a study "found a significant increase in COVID-19 cases in areas with more in-person voting and fewer absentee ballots. A 10 percent increase in crowding (the number of in-person votes per polling place) led to a 17.7 percent increase in the positive test rate (the percent of people found infected by COVID-19 among those tested) two or three weeks later, which corresponds to a typical period for the virus to become symptomatic." *Id.* ¶ 18.

Ultimately, "evidence, theory and public health principles indicate that greater use of in-person voting could lead to higher COVID-19 infections and probably influenza infections too." *Id.* ¶ 21. The threats are actionable now, and establish irreparable injury now, notwithstanding

---

[26] On August 11, 2020, concerned New York State Board of Elections officials sent a letter to the U.S. Postal Service official asking how the agency planned to prevent further failures in the postmarking, delivery, and collection of absentee ballots. Kellner Decl. ¶¶ 25–26. To date, they had received no response. *Id.* ¶ 26.

that mail voting (and in-person voting) in Plaintiffs' jurisdictions does not commence for several weeks.  Notably, in New Jersey, because mail-in ballots are required to be mailed to all active registered voters at least 29 days before the election, the impact on vote-by-mail voting will commence long before the election date.  *See* P.L. 2020, ch.72, §2(j) (N.J. August 28, 2020).

Moreover, "[a]s a preliminary injunction requires only a *likelihood* of irreparable injury, Damocles's sword does not have to actually fall on all [Plaintiffs] before the court will issue an injunction." *League of Women Voters*, 838 F.3d at 8–9 (emphasis added) (internal citation omitted).  Evidence from public health experts and election administrators with decades of experience, *see* Kellner Decl. ¶ 2, Ku Decl. ¶ 3, attests to the grave public health consequences that will follow if the agency's mail service changes are not enjoined now in order to restore unimpeded delivery of election mail and minimize in-person voting.  Waiting to abate these harms until after they have already occurred would be too late.

In any event, certain of Plaintiffs' jurisdictions have already suffered irreparable injury in trying to adapt their election administration processes to the mail delays caused by Defendants' unlawful service changes.  In Hawaii, election officials are expending resources right now to try to address the service degradation and delays caused by the Postal Policy Changes, and ensure that Hawaii residents can safely vote absentee.  For example, election officials are spending resources to fund public education campaigns to encourage all voters to return their ballots earlier than previously expected (at least a week before the election rather than 3-5 days) in order to counteract the delays caused by the Postal Policy Changes.  Henricks Decl. ¶ 13; Kaohu Decl. ¶ 10; Takahashi Decl. ¶ 13.  Election officials also plan to purchase and install more places of deposit (i.e., drop boxes) to help ensure that people have additional means of returning their ballots that do not rely on the delivery of USPS mail.  Henricks Decl. ¶ 14; Kaohu Decl. ¶ 10;

Takahashi Decl. ¶ 14.  These expenses constitute irreparable injury because they cannot be recovered.  *See District of Columbia v. U.S. Dep't of Agric. ("USDA")*, 444 F. Supp. 3d 1, 34 (D.D.C. 2020) (explaining that "economic loss caused by federal agency action is an exception" to the "general rule" that "economic harm does not constitute irreparable injury" because "economic injury caused by federal agency action is unrecoverable").

**B.      The Postal Policy Changes are imposing direct, unrecoverable financial harms.**

The Postal Policy Changes are also likely to irreparably injure Plaintiffs because state and local agencies have had to implement changes to their practices to accommodate mail delays, and have thereby suffered, and will suffer, economic injury that cannot be recovered.  *See New York v. U.S. Dep't of Homeland Sec.*, --- F. Supp. ----, 2020 WL 4457951, at *10-11, *30 (2d Cir. Aug. 4, 2020); *USDA*, 444 F. Supp. 3d at 34.

For example, New York City's DSS must expend resources due to U.S. Postal Service delays caused by the Postal Policy Changes.  Because mail delays have caused landlords to wait weeks before receiving DSS initial rent payments on behalf of current shelter residents, shelter residents are forced to spend additional weeks in City-operated shelters.  Banks Decl. ¶ 14.  In addition to having potentially negative effects on shelter residents, this scenario forces DSS to spend extra funds to provide additional days or weeks of shelter.  *See id.*  The daily average cost to keep individuals and families in a shelter is more than twice the average daily amount spent on rental subsidies for single adults and families, respectively.  *Id.*

In San Francisco, the tax and other payments the Treasurer's Office receives comprise a large portion of the City's and County's operating budget.  *See* Shah Decl. ¶ 3.  Because mail delays will lead to delayed or missed payments, *see id.* ¶ 6, the Postal Policy Changes will deprive San Francisco not only of needed operational funds, but of the interest the Treasurer's

Office would have earned by investing those monies, *see id.* ¶¶ 6, 8.  Even assuming a very conservative interest rate, San Francisco can realize a gain of $26 over 10 days for every $100,000 deposited.  *Id.* ¶ 8.  In the last fiscal year, the City earned approximately $250 million in such interest.  *Id.*  Every day that a payment to the Treasurer's Office is delayed equates to actual money lost (and unrecoverable) for San Francisco.

CSS, the agency that facilitates child support payments in San Francisco, has been forced to bear additional burdens and costs as a direct result of the Postal Policy Changes as well.  Because of mail delays, CSS now spends considerable staff time answering client questions, resolving confusion, and ensuring compliant parents are not penalized for mail delays beyond the parents' control.  *See Roye* Decl. ¶ 5.  As a result, CSS is setting up additional telephone lines, reassigning staff to deal with the ramifications of delayed documents and correspondence, and preparing communications about how better to interact with the agency in the current postal climate.  *See id.* ¶¶ 12–13.

Because Postal Policy Change-related delivery delays will likely undermine certain Plaintiffs' attempts to disburse key benefits to residents in need, *see* Banks Decl. ¶ 5; Roye Decl. ¶ 6, Hein Decl. ¶¶ 16–17, these interruptions will cause Plaintiffs economic harm in other ways as well.  SNAP benefits, Cash Assistance benefits, and child support payments all allow recipients to purchase needed goods and services, thus supporting local business and preventing further job losses.  Loss of the "multiplier effect" of these benefits would therefore harm Plaintiffs' economies, depriving them of tax revenue at a time when they can ill afford to lose additional revenue.  *See* Banks Decl. ¶ 5; Roye Decl. ¶ 6.

**C.**    **The Postal Policy Delays are interfering with Plaintiffs' ability to administer federal, state, and local laws and imposing additional, unnecessary administrative burdens.**

The mail delivery delays engendered by the Postal Policy Changes also irreparably injure Plaintiffs by interfering with their ability to carry out critical, legally mandated governmental functions for the benefit of their residents, thus placing additional, unnecessary administrative burdens on already-overtaxed public entities.  This interference with state and local laws constitutes an irreparable harm warranting preliminary relief.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (explaining that a State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State").

Plaintiffs and their agencies rely heavily on the Postal Service to accomplish a variety of legally mandated tasks.  *See* Adinaro Decl. ¶ 12; Banks Decl. ¶¶ 3–4; Betts Decl. ¶¶ 7–15; Hein Decl. ¶¶ 8, 13, 15; Lau Decl. ¶¶ 5–9; Jacobs Decl. ¶¶ 5–10; Roye Decl. ¶ 4; Poole Decl. ¶¶ 6–11; DiGiovanni-Abatto Decl. ¶¶ 3–5.  Delivery delays flowing from the Postal Policy Changes make these tasks more difficult to accomplish.  In New Jersey, members of NJ FamilyCare—which provides health coverage to low- and moderate-income children, pregnant women, adults, and people with disabilities—can receive prescription medications or medical supplies through the mail, and delayed mail delivery may prevent these individuals from timely receiving critical medications and thus negatively impact public health.  Jacobs Decl. ¶¶ 4–6.

CSS in San Francisco, OCFS and OTDA in New York, and DHS and CSEA in Hawaii are responsible, among other things, for ensuring that children and families receive court-ordered and administratively awarded financial and medical support.  *See* Betts Decl. ¶ 3; Lau Decl. ¶ 3; Hein Decl. ¶¶ 2–3; Poole Decl. ¶ 2; Roye Decl. ¶ 3.  To successfully perform their duties, these agencies must mail legal documents such as summonses and complaints for payment of child support, child support orders, and support modification requests, or administrative notices, statements, and decisions for welfare benefits.  *See* Betts Decl. ¶¶ 7, 8, 12–14; Hein Decl. ¶ 4;

Poole Decl. ¶ 3; Roye ¶ 4.  Because these documents are often subject to statutory or court-imposed deadlines, timely delivery is critical.  Betts Decl. ¶ 7; Hein Decl. ¶¶ 4, 16; Poole Decl. ¶ 6; Roye ¶ 5.  Conversely, delayed receipt of the support payments these welfare agencies send has a detrimental effect on the agency's often vulnerable client families.  Betts Decl. ¶¶ 9–11, 16; Hein Decl. ¶¶ 16–17; Poole Decl. ¶ 24; Roye ¶¶ 4, 6.

New York City's DSS, the largest social services agency in the country, similarly relies on the mail to perform a wide variety of mandatory, time-sensitive tasks.  *See* Banks Decl. ¶¶ 3–4.  Clients are entitled to send applications for SNAP and Cash Assistance benefits to DSS by mail, and benefits flow from the date DSS registers the applications; delayed receipt reduces the net benefit the agency's clients can receive.  *See* Banks Decl. ¶ 5.  Because federal and state statutes and regulations require that eligibility determinations be made within certain timeframes, delays in the delivery of DSS's information requests or in the receipt of its clients' responses could force the agency to deny otherwise approvable applications.  *See id.*  DSS also sends requests for information, as well as recertification, termination, and hearing notices and forms through the mail.  *See id.* ¶¶ 10–11.  Cases closed due to mail delays could lead to requests for hearings—a time-consuming and resource-intensive process.  *See id.* ¶ 12.

The San Francisco Treasurer's Office also relies heavily on the Postal Service to perform its governmental duties.  *See* Shah Decl. ¶ 5.  The Treasurer's Office collects a large portion of San Francisco's revenue—in the form of taxes, citations, water bills, and the like—and for investing that revenue for the City and County's benefit.  *See id.* ¶ 3.  Because the Treasurer's Office sends tax and other bills by the mail and because delayed payment often results in the imposition of significant penalties and interest, delayed delivery (either of the initial bills or of the taxpayers' payments) can cause considerable confusion and disagreement that require staff

time and resources to resolve.  *See id.* ¶ 6.  To lessen the likelihood that such disputes will occur, the Treasurer's Office will send out guidance encouraging taxpayers to submit payments early to avoid incurring penalties and interest.  *See id.* ¶ 10.  The Treasurer's Office is also investing in enhancing its online payment infrastructure.  *See id.*

Finally, as noted above, the Postal Policy Changes will hamper Plaintiffs' efforts to promote safe alternatives to in-person voting during the current election cycle.  Because New York, for example, expects to rely more heavily on mail-in balloting than ever before, delays in the delivery of election mail threaten the State's ability to execute its election laws and plan effectively for what could be an influx of in-person voters.  *See* Kellner Decl. ¶¶ 12–13, 20–22, 24, 27–28.

### III.     The balance of the equities and public interest favor Plaintiffs.

Given the Postal Policy Changes' substantial harms to public health, the balance of the equities and the public interest weigh heavily in favor of issuing an injunction.  The purpose of interim equitable relief is "but to balance the equities as the litigation moves forward," bearing in mind "'the overall public interest.'"  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (quoting *Winter*, 555 U.S. at 26).  When the federal government is a party, these factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As detailed above, Plaintiffs and the nation are struggling to contain the public health and economic threats posed by COVID-19, efforts that are materially hindered by the continued implementation of the Postal Policy Changes.  The public's interest in mitigating the spread of disease and saving lives weighs strongly and inexorably in favor of new, targeted injunctive relief.  By contrast, the harm to Defendants of temporarily halting implementation of the Postal Policy Changes, is "far outweighed by the public interest" in mitigating the spread of disease and

other harms "in light of the rapidly-evolving public health crisis engendered by the spread of COVID-19."  *Coronel v. Decker*, No. 20 Civ. 2472, 2020 WL 1487274, at *8 (S.D.N.Y. Mar. 27, 2020).

Indeed, the balance necessarily tips in Plaintiffs' favor because there is "generally no public interest in the perpetuation of an unlawful agency action."  *League of Women Voters*, 838 F.3d at 12 (citation and internal quotations omitted).  As such, a preliminary injunction only furthers the public interest in "having governmental agencies abide by the federal laws that govern their existence and operations."  *Id*.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enjoin implementation of the Postal Policy Changes.

DATED:  September 2, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

Matthew Colangelo
*Chief Counsel for Federal Initiatives*

Elena Goldstein
*Deputy Chief, Civil Rights Bureau*

By: */s/ Morenike Fajana*
Morenike Fajana, *Special Counsel*
Daniela Nogueira, *Assistant Attorney General*
Lindsay McKenzie, *Assistant Attorney General*
Laura Mirman-Heslin, *Assistant Attorney General*
Joshua Tallent, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6134
Morenike.Fajana@ag.ny.gov

*Attorneys for the State of New York*

CLARE E. CONNORS
*Attorney General of the State of Hawaii*

By: */s/ Lori N. Tanigawa*
Lori N. Tanigawa*
   *Deputy Attorney General*
Department of the Attorney General
State of Hawaii
425 Queen Street
Honolulu, HI 96813
(808) 586-0618
lori.n.tanigawa@hawaii.gov

*Attorneys for the State of Hawaii*

GURBIR S. GREWAL
*Attorney General of New Jersey*

MAYUR P. SAXENA
Assistant Attorney General


By: /s/ *Tim Sheehan*
TIM SHEEHAN
Deputy Attorney General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625
(609) 815-2604
Tim.Sheehan@law.njoag.gov


*Attorneys for Plaintiff State of New Jersey*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*


By: /s/ *Aaron Bloom*
Aaron Bloom*
Joseph Pepe
Tonya Jenerette
100 Church Street
New York, NY 10007
abloom@law.nyc.gov
Tel. (212) 356-2274


*Attorneys for Plaintiff City of New York*


DENNIS J. HERRERA
*City Attorney for the City and County of San Francisco*

By: /s/ *Dennis J. Herrera*
Dennis J. Herrera,* City Attorney
Jesse C. Smith, Chief Assistant City Attorney
Ronald P. Flynn, Chief Deputy City Attorney
Yvonne R. Meré, Chief of Complex and Affirmative Litigation
Sara J. Eisenberg, Deputy City Attorney
Kevin Yeh,* Deputy City Attorney
San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Kevin.Yeh@sfcityatty.org
Tel. (415) 554-3856
Fax (415) 437-4644

*Attorneys for Plaintiff City and County of San Francisco*


* *Registration or pro hac vice forthcoming.*