1  JEFFREY P. CLARK
   Acting Assistant Attorney General
2  ERIC R. WOMACK
   Assistant Director, Federal Programs Branch
3  JOSEPH E. BORSON (Va. Bar No. 85519)
   ALEXIS ECHOLS
4  Trial Attorneys, Federal Programs Branch
   1100 L Street, NW
5  Washington, D.C. 20005
   (202) 514-1944
6  joseph.borson@usdoj.gov

7  *Attorneys for Defendants*

8

9

10              **UNITED STATES DISTRICT COURT**

11              **EASTERN DISTRICT OF WASHINGTON**

12

13  STATE OF WASHINGTON, *et al.*          NO. 1:20-cv-03127-SAB

14
                      Plaintiffs,
15
        v.                                DEFENDANTS' OBJECTIONS AND
16                                        RESPONSES TO PLAINTIFFS'
                                          FIRST SET OF
17  DONALD J. TRUMP, in his official capacity   INTERROGATORIES AND
    as President of the United States of America,   REQUESTS FOR PRODUCTION OF
18  *et al.*,                             DOCUMENTS

19                      Defendants.
20
21  _____
22
23
24
25
26
27
28
                                    - 1 -
    DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
    INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

In accordance with Rules 26, 33 and 34 of the Federal Rules of Civil Procedure, Defendants DONALD J. TRUMP, in his official capacity as President of the United States of America; the UNITED STATES OF AMERICA; LOUIS DEJOY, in his official capacity as Postmaster General; and the UNITED STATES POSTAL SERVICE, by and through their undersigned counsel, hereby respond to Plaintiffs' First Set of Interrogatories and Requests for Production of Documents to Defendants.

## OBJECTIONS AS TO DEFINITIONS AND INSTRUCTIONS

1.     Defendants object to the Plaintiffs' Definitions 1 and 2 because they define terms not actually used in this set of interrogatories or requests for production.  In responding to the interrogatories and requests for production, Defendants respond on behalf of USPS, based upon information in the agency's possession, custody, or control. Defendants reserve the right to object to such definitions if they are used in future discovery requests.

2.     Defendants object to Instruction 7 to the extent it imposes obligations in excess of those imposed by the Federal Rules, which do not require identification of documents that no longer exist. Such an exercise is likely impossible, but in any event burdensome, disproportionate and not required by the Federal Rules. With respect to each and every request, Defendants respond consistently with the Federal Rules.

3.     Defendants object to Instruction 9 to the extent it imposes obligations in excess of those imposed by the Federal Rules, which do not require a particular form of a privilege log.  Consistent with this objection, and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek privileged information, Defendants will not be producing or logging privileged information.

**OBJECTIONS AND RESPONSES TO FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:** Provide a list or chart of all mail sorting or processing machines that were identified for decommissioning and/or removal at any time on or after May 15, 2020; the location of each machine; each machine's current status, including the date it was decommissioned or removed, if applicable; and the plans for each machine prior to Election Day, i.e., whether the machine will be decommissioned and/or removed prior to Election Day or whether the machine will be reinstalled if it has already been decommissioned and/or removed.

**Objections:** Defendants object to the request as overbroad and unduly burdensome, as USPS does not collect the information in the form requested.  For example, USPS does not maintain — at the headquarters level — a list or chart of the specific individual mail sorting or processing machines identified for removal, as the machine removal process takes place at the local level.  Further, USPS does not track at the headquarters level the date on which a machine was removed.  Consistent with this objection, and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek information at the local level, but only at the national level, Defendants will respond to the extent that such information is maintained in the form of a list or chart at the national level.

Further, Defendants object to the term "decommissioned" which is not defined.  Defendants understand and interpret "decommissioning" to mean the process of "machine removal," where a machine is removed to align with that facilities volume and mix of mail or other reasons, including (but not limited to) obsolescence, facility consolidations, and the need for floor space, rather than, for example, moving a machine from one facility to another or sending it for repair.  In responding to these requests, Defendants will understand "decommissioned" to refer to machine removal as just described.

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

Defendants further object to this request to the extent it calls for confidential commercial information protected from general release pursuant to 39 U.S.C. § 410(c)(2), or information covered by the Trade Secrets Act, 18 U.S.C. § 1905, which may be disclosed only subject to a protective order.

Defendants further object to this request as containing multiple subparts.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:** Consistent with the foregoing objections, Defendants have provided the attached tables:

- A PowerPoint presentation entitled "Equipment Reduction," dated May 15, 2020, which details the USPS's plan for reducing the number of Letter Sorting and Flat Sorting machines for the third and fourth quarters of Fiscal Year ("FY") 2020. The tables are broken down by type of machine, and include specific date targets for removal by region, with final targets for the end of FY 2020 by plant/facility.

- Three attached tables showing, by region and name of facility, the total number of Letter Sorting, Flat Sorting, and Package Sorting machines as of the beginning of FY 2020 (i.e., October 1, 2019), and August 18, 2020. These tables show the total number of machines that have been removed during this time period.

Defendants also include the following summary table, which reflects changes in equipment inventory from the beginning of FY 2015 through August 18, 2020.

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

MACHINE COUNTS AT BEGINNING OF FY 2015-FY 2020 & REDUCTIONS PER YEAR

| Fiscal Year | Letter Machines | Flats Machines | Total Machines | Number Reduced |
|---|---|---|---|---|
| FY 2015 10-1-14 | 6,242 | 521 | 6,763 | |
| FY 2016 10-1-15 | 5,145 | 498 | 5,643 | 1,120 |
| FY 2017 10-1-16 | 4,946 | 500 | 5,446 | 197 |
| FY 2018 10-1-17 | 4,625 | 468 | 5,093 | 353 |
| FY 2019 10-1-18 | 4,533 | 459 | 4,992 | 101 |
| FY 2020 10-1-19 | 4,376 | 448 | 4,824 | 168 |
| 8-18-20 | 3,722 | 391 | 4,113 | 711 |

Defendants do not collect, at the Headquarters level, information on the specific date that specific machines were removed, or the specific status of any individual machine.

In addition to the attached charts, USPS responds that during FY2020 approximately 700 letter and flat sorting machines have been disconnected and/or removed. These reductions were pursuant to volume modeling and equipment reduction targets for various mail processing equipment sent to the Area Vice Presidents for review and implementation on May 15, 2020, consistent with long-standing Postal Service practice. These targets are included in the PowerPoint document referenced above. The reduction targets, which were based on the significantly higher volume reductions in letter and flats mail associated with COVID-19 and the significant increase in package volume, were broad targets for reduction, with the final decisions regarding machine removal being determined after discussions between local management and headquarters.

The Postal Service has no plans to make any further reductions before the November election. At the Postmaster General's directive of August 18, 2020, Headquarters suspended all removals of equipment until after the election. An official

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

at Headquarters called coordinators in each mail processing Area to order them to stop all removals.  The Regional Processing Vice-Presidents had calls with their directors to convey the instruction to cease removing machines.

When machines are removed from a facility, they are generally dissembled for their usable parts, with such parts being removed to maintain or enhance other machines.  There is no current plan to return all reduced machines to service, and many such machines cannot physically be returned to service.  Over the past month, a limited number of machines that were disconnected, but not dismantled and removed, have been put back into service.  This occurred on the request of local managers, who then received final approval from the Chief Logistics & Processing Operations Officer and Executive Vice President.  Six of these machines were located in processing facilities in Tacoma and Wenatchee, Washington.  The seventh machine was located in Gainesville, Florida.  USPS Headquarters have received reports that a number of other machines that were disconnected may have been returned to service without going through the approval process described above.  USPS Headquarters cannot currently confirm these reports, as it is still attempting to determine whether they are correct.  In any event, none of these machines will be disconnected or removed before the Election.

**INTERROGATORY NO. 2:** State whether any requests to reinstall removed or decommissioned machines identified in the response to Interrogatory No. 1 have been denied, and if so, state the location of those machines and the dates of the request and the denial.

**Objections:** Defendants object to the term "requests" as vague and overbroad, as this could be understood as including individual customer requests or individual employee requests regarding machine removal.  Defendants will understand "requests" to refer to requests made to Headquarters by local managers and ultimately to the Chief

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

Logistics & Processing Operations Officer and Executive Vice President.  Further, Defendants object to the term "decommissioned," which is not defined. Defendants will understand "decommissioned" as it is defined in the Objection to Interrogatory No. 1.

Defendants further object to this request as containing multiple subparts.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:**  As described in the response to the Interrogatory No. 1, as of the date of this response, Headquarters has approved seven requests from local managers to reconnect disconnected machines.  Headquarters has not denied any other requests, although it has received additional requests it has not yet acted upon. Consistent with its obligations under the Federal Rules, Defendants will supplement its response as appropriate.

**INTERROGATORY NO. 3:**  Provide a list or chart of all processing and distribution centers and other USPS facilities that were identified for full or partial capacity reduction (e.g., ceasing functions such as processing outgoing mail) at any time after May 15, 2020; each facility's current status; and the plans for each facility prior to Election Day, i.e., whether the facility will remain open and whether any operations will be discontinued.

**Objections:**  Defendants object to the terms "full or partial capacity reduction, (e.g., ceasing functions such as processing outgoing mail)" as vague. Consistent with this objection, and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek information at the local level, but only at the national level, Defendants will understand these terms to refer to closing or consolidation of facilities

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

at the direction of Postal Service Headquarters, which is the only way that facilities would no longer be permanently handling functions such as processing outgoing mail. *See* USPS Handbook PO-408.[1]   Defendants do not interpret "capacity reduction" to mean a facility in which mail processing equipment has been removed, as those facilities are detailed in the response to Interrogatory No. 1.

Defendants further object to this request as containing multiple subparts.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:** The Postal Service has not scheduled any facility closings or consolidations for any time during fiscal year 2020 or for the first quarter of fiscal year 2021 (October 1, 2020 – December 31, 2020). The Postal Service has not closed any facilities or planned any consolidations since May 15, 2020, and will not establish and finalize any plans for facility closings or consolidations prior to the November election.  In addition, the Postal Service will not, at the national level, reduce or stop the processing of incoming or outgoing mail at any time before the November election. There will be no alterations at the national level from the August 18, 2020 status of those facilities with respect to operating hours, placement of mail processing equipment, or overtime policies, except as may be directed to increase the delivery time of election mail pursuant to the Postmaster General's announcement that additional resources will be deployed starting October 1, 2020.  Please also note that there may be circumstances in which temporary changes to facility operating hours are necessary due to unforeseen or uncontrollable circumstances such as hurricanes or other natural disasters, or circumstances that reduce employee availability or create

_____

[1] *See* USPS Handbook PO-408, *Area Mail Processing Guidelines*, available at https://about.usps.com/handbooks/po408.pdf

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

an unsafe environment for employees, such as an increase in COVID-19 cases within a facility.

**INTERROGATORY NO. 4:** State whether blue collection mailboxes that were removed after June 16, 2020, will be reinstalled, and whether any further removals of mailboxes will occur prior to Election Day; if so, identify the location of each mailbox to be reinstalled or removed.

**Objections:** Defendants object to this Interrogatory to the extent that it is construed as seeking information that is only available at the local or area level.

Defendants further object to this request as containing multiple subparts.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response**: Postal Service Headquarters has no plans to reinstall collection boxes that were removed after June 16, 2020. However, pursuant to the Postmaster General's August 18, 2020 directive, the Postal Service has postponed the removal of any additional collection boxes until after the November election. The Postal Service has no plans to remove any more collection boxes prior to the election, with the possible exception of any collection boxes that are physically damaged or destroyed, and which therefore must be removed in accordance with Postal Operations Manual ("POM") § 315.3, or collection boxes that may be removed temporarily for safety reasons.

Over the last seven years, the Postal Service has removed an average of 3,100 collection boxes per year. The Postal Service has removed approximately 1,500 boxes thus far in 2020. Consistent with long standing policy, decisions regarding removal of collection boxes have been made by the Postal Service's field facilities in

accordance with POM §§ 314-315. Field facilities determine the need for and location of collection boxes by conducting annual assessments of collection box density, i.e., volume of mail per box.

Defendants further aver that using electronic scanners, and pursuant to established policies, the Postal Service identifies seldom used collection boxes, i.e., collection boxes averaging less than 25 pieces of mail per day, for potential removal or relocation. *See also* POM § 313.13. It then determines whether boxes may be relocated to areas with higher mail volume and selects mail boxes with low density for removal. It posts 30-day notices on those boxes that it plans to remove to provide the public with an opportunity to comment. Local management seeks approval from the Area management before removal. Headquarters does not direct or approve decisions regarding collection box removal.

Apart from the process described above, the Postal Service promptly removes mailboxes that have been vandalized or tampered with and on a sporadic basis removes boxes that have been damaged or are in poor condition. *See* POM §§ 314-15. Collection boxes are also removed temporarily for safety reasons on occasion, but are reinstalled once the safety concerns are resolved.

**INTERROGATORY NO. 5:** State whether USPS will treat ballots in particular and other election mail in general as First Class mail, regardless of the paid class of postage, for the November 2020 election; if not, describe any relevant policies, guidance, or practices regarding the treatment of ballots in particular and other election mail in general applicable to the November 2020 election.

**Objections:** Defendants object to the terms "treat" and "treatment" as vague. Consistent with this objection, and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek information at the local level, but only at the national level, Defendants will understand this request to be asking for a description

- 10 -

of the national practices and policies of the Postal Service in processing ballots and election mail.

Defendants likewise object to the term "election mail" as vague, and will understand the term to mean any item mailed to or from authorized election officials that enables citizens to participate in the voting process. This definition includes ballots, voter registration forms, absentee ballot applications, polling place notifications, and similar materials.  It excludes "political mail," which is sent by political candidates, political action committees, and similar organizations in order to engage in issue advocacy or to advocate for candidates or other things, such as initiatives, that may appear on a ballot.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:** Subject to the foregoing objections, Defendants respond as follows: Except where the voter or election official pays to use one of the Postal Service's premium services (e.g., Priority Mail, Priority Mail Express), completed ballots mailed by a domestic voter to an election official, like other single-piece mail, are First-Class Mail. This is true whether the postage is prepaid by State or local election officials (e.g., business reply mail) or is mailed with a stamp affixed by the voter. These completed ballots must be delivered as First-Class Mail, even if they are mailed without sufficient postage, and will not be detained or held for postage payment.  This approach is a long-standing policy of Postal Service.  *See* POM § 171.3; Publication 632, *State and Local Election Mail User's Guide* (Jan. 2020), at 7.  Defendants aver that the delivery timeframe for Single Piece First-Class Mail is typically two to five days.

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

State and local election officials generally have discretion as to the class of mail in which they send ballots and other election mail to voters.  They may send such materials by either First-Class Mail or Marketing Mail (which is a different service class, available for certain bulk mailings that meet a minimum volume requirement). Defendants aver that the delivery timeframe for Marketing Mail is typically three to ten days.  As has been true for many years, if election officials choose to send election mail to voters as Marketing Mail, then it is not reclassified as First-Class Mail.  The Postal Service does not unilaterally reclassify Marketing Mail as First-Class Mail, and never has, as these services are subject to different criteria (*i.e.*, First-Class Mail is sealed against inspection, while Marketing Mail is not, and First-Class Mail is automatically forwarded, while Marketing Mail is not).

Nonetheless, while the Postal Service does not classify Marketing Mail sent by state election officials as First-Class Mail, it recognizes that all election mail, and ballots in particular, are both important and time-sensitive. Accordingly, while there is no formal policy, the Postal Service has several longstanding practices to prioritize the expeditious processing and delivery of election mail, particularly ballots, which will be continued for the upcoming election.  Those practices include:

- Conducting significant outreach to state and local officials in order to disseminate information about the Postal Service's election mailing options and capabilities, offering technical assistance, and providing the Post Office's recommendations as to best practices associated with election mail.  This year, the Postal Service anticipates conducting approximately 42,000 total touchpoints with election officials to help facilitate the smooth and orderly conduct of the 2020 election.
- Recommending that State and local election officials use methods to distinguish election mail from other mailpieces, which helps the Postal Service identify election mail flowing through the postal system so that it can be appropriately

- 12 -
DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

treated and expedited.  These include (1) the use of the Postal Service's official election mail logo, which allows postal employees to identify election mail; (2) the use of Green Tag 191, which election officials can use to mark ballot mailings they send to voters; and (3) identifying election mail by checking a box on the postage statement that may be used when tendering a mailing to the Postal Service.

- Using log sheets to account and track Election Mail through processing.  For example, if a county election board enters a container of election mail into the postal system on a particular day, that container is logged by Postal employees at each step along the way – in the business mail entry unit, processing facility, and delivery unit, for example, so it can be tracked.

- Using daily "all clears," to ensure that all election mail is accounted for within the system.  The all clear process involves plant personnel using a checklist to confirm that election mail scheduled or "committed" to go out that day has gone out, and anything committed for the next day is at the front of the line.

In terms of delivery speed, the Postal Service recognizes that all election mail, and ballots in particular, are time-sensitive. Accordingly, while there is no formal policy, the Postal Service has several longstanding practices of prioritizing the expeditious processing and delivery of election mail, particularly ballots, which will be continued for the upcoming election.  Those practices include:

- Devoting excess First-Class Mail processing capacity to election mail.  A plant can process a finite amount of mail per day within First-Class Mail standards. Where there is not enough First-Class Mail to fill that capacity, the Postal Service fills it with other mail such as Marketing Mail. This is called "advancing."  Election mail volume entered as Marketing Mail is advanced ahead of other mail volume entered as Marketing Mail.

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

- Ensuring that election mail, including ballots, are not left behind.  If a truck leaving a facility is going to be 100 percent full, the Postal Service prioritizes placing election mail, including ballots, on the truck.  Indicia that a mailpiece is election mail help the Postal Service identify such mailings and prioritize them.

As a result of these practices, the delivery timeframes for election mail entered as Marketing Mail typically resemble those of election mail entered as First-Class Mail.

In addition to these described practices, Postal Service employees also often undertake extraordinary efforts to accelerate the delivery of ballots that have been mailed by election officials or voters very close to or on Election Day, such as sending those ballots via Priority Mail Express, scheduling extra direct transportation trips to election offices to ensure outgoing ballots are picked up, making extra deliveries during the day, and making deliveries on Sundays.  The Postal Service generally bears the cost of these efforts.  While there is no formal Postal Service policy discussing these practices, it is part of the Postal Service culture to deliver ballots expeditiously, and it again will be for the upcoming election.

Finally, it has been and is the Postal Service's policy for several years to "cancel" or "postmark" all ballots returned by voters (even if they would not ordinarily be cancelled or postmarked).  A postmark or cancellation is an official Postal Service imprint applied to the address side of a stamped mailpiece, which indicates the location and date the Postal Service accepted custody of a mailpiece, and which cancels affixed postage so that it may not be reused (thereby providing some revenue assurance for the Postal Service.)  The policy to cancel or postmark all ballots returned by voters is in recognition of the importance that many states place on a ballot's postmark.  In doing so, the Postal Service has modified its regular processes to maximize the likelihood that a ballot is cancelled, including making extra efforts to hand cancel ballots that are rejected by automatic cancelling machines and training Postal Service employees to recognize ballots using the official election mail logo to

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

make sure that they are cancelled.  This year, the Postal Service has also begun utilizing ballot monitors in every processing facility to monitor the postmarking process and ensure all processes are being adhered to properly with a goal to minimize any missed postmarks on ballots.

The Postal Service has not changed these practices from previous elections, with the exception of introducing additional measures, such as adding ballot monitors, and will continue these practices for the November 2020 election.

**INTERROGATORY NO. 6:** The USPS Areas Receiving Mail Pacific Area Virtual Meeting Presentation, dated August 13, 2020 and attached as Exhibit 1 to these discovery requests, states on Page 8, under the heading "Election Mail Delivery Standards," that "Election Mail sent as Marketing Mail is not upgraded to First Class service." State whether this statement is an accurate reflection of USPS policy with regard to the November 3, 2020 election.

**Objections:** Defendants object to the term "election mail" as vague, and will understand the term to mean any item mailed to or from authorized election officials that enables citizens to vote in an official election. This definition includes ballots, voter registration forms, absentee ballot applications, polling place notifications, and similar materials.  It excludes "political mail," which is sent by political candidates, political action committees, and similar organizations in order to engage in issue advocacy or to advocate for candidates or other things, such as initiatives, that may appear on a ballot.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

**Response:** Subject to and without waiving the foregoing objections, Defendants responds as follows:

The statement identified in this Interrogatory 6 is an accurate statement. As discussed in Defendants' response to Interrogatory 5, election mail sent by state and local election officials to voters as Marketing Mail is not upgraded to or reclassified as First-Class Mail. First-Class Mail is a specific class of mail service defined by Section 1101.1 of the Mail Classification Schedule, a regulation of the Postal Regulatory Commission, and by Sections 133 and 233 of the Domestic Mail Manual (DMM), a regulation of the Postal Service. Except where a premium service (such as Priority Mail Express) is purchased, all election mail sent by voters to their election officials is First-Class Mail. Election officials may generally choose to purchase either Marketing Mail or First-Class Mail service to send election mail to voters. Where Marketing Mail is chosen, the Postal Service has never reclassified such mail as First-Class Mail.

However, as also explained in Defendants' response to Interrogatory 5, although the Postal Service does not officially upgrade election mail sent as Marketing Mail to First-Class Mail, the Postal Service implements a number of policies and practices designed to move such mail as expeditiously as possible. These include (1) prioritizing Election Mail sent as Marketing Mail over other Marketing Mail (with the effect being that Election Mail ends up with a delivery speed similar to First-Class Mail even if entered as Marketing Mail) and (2) prioritizing *all ballots*, regardless of class, in the period immediately before the election (with the effect that some Election Mail, regardless of class, sometimes receives a delivery speed better than even First-Class Mail).

**INTERROGATORY NO. 7:** State whether USPS is currently implementing or

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

enforcing any restrictions on transportation, including but not limited to late trips, extra trips and/or final dispatches; if so, describe any relevant policies, guidance, or practices concerning the timing of mail processing or delivery.

**Objections:** Defendants object to the term "restrictions" as vague and ambiguous. Defendants further object to this request as overboard.  Consistent with this objection, and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek information at the local level, but only at the national level, Defendants will understand this request to be asking for a description of the national practices and policies of the Postal Service concerning the timing of mail processing or delivery.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:** The Postal Service has not prohibited extra trips, late trips, or final dispatches.  Adherence to transportation schedules has long been a priority of the Postal Service.

For the past two years, because noncompliance with transportation schedules was ongoing and causing late deliveries and unnecessary costs, Headquarters Network Operations worked on an initiative to improve compliance with the Postal Service's long-established delivery schedules throughout the network.  The goal was to consistently adhere to the Postal Service's operating plan to meet existing service standards, with a focus on adhering to the transportation schedules. Headquarters had biweekly meetings with all executives in the field, including Area Vice Presidents, district managers, and plant managers, to discuss operating issues and address any noncompliance with transportation schedules.  There were also weekly meetings between Headquarters and Area managers to discuss the reasons for noncompliance

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

with transportation schedules and how to improve compliance. These meetings have continued through 2020.

The transportation network is an essential part of the Postal Service's operating plan. It connects the movement of incoming and outgoing mail among all delivery units and processing and distribution centers. Noncompliance with any leg of the transportation schedule presents a risk of delay in the next leg of the schedule.

After Postmaster General DeJoy took office, he reemphasized the need to ensure that the Postal Service's trucks run on time and on schedule, with the goal of mitigating unnecessary late and extra trips. Neither he nor Headquarters banned the use of late or extra trips or ordered that late and extra trips would be prohibited.

In July 2020, Headquarters developed written guidance regarding circumstances under which extra trips were acceptable. On July 14, 2020, the guidelines were provided to Postal Service Area Vice Presidents and they were advised of Postal Service Operation's renewed focus on mitigating the number of unplanned, unnecessary trips and to the extent possible to use under-utilized-trips, such as by adding volume to trucks leaving on schedule but only half full, to eliminate extra trips. On August 18, 2020, the Postmaster General also committed to extra transportation as needed from October 1, 2020, through the November election.

**INTERROGATORY NO. 8:** State whether USPS has made or will make prior to Election Day any changes of any kind to its overtime policies and practices as they existed on June 15, 2020; if so, describe any relevant policies, guidance, or practices concerning overtime.

**Objections:** Defendants object to the term "changes of any kind" as overbroad and vague. Consistent with this objection, and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek information at the local level, but only at the national level, Defendants will understand the request to seek information

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

regarding changes coming from national headquarters and having a nationwide effect. Additionally, Defendants object to this request to the extent it seeks predecisional and deliberative information and material.  Consistent with this objection, and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek privileged information, Defendants will not be producing predecisional and deliberative material.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:** Postal Service Headquarters has not made and does not plan to make any nationwide changes of any kind to its overtime policies as they existed on June 15, 2020, prior to Election Day.  Moreover, the Postmaster General stated that overtime has been, and will continue to be, approved as needed, and has committed to engaging standby resources as necessary, beginning on October 1, 2020, to handle whatever volume of election mail it receives this fall, including overtime hours.

**INTERROGATORY NO. 9:** State whether USPS has made or will make prior to Election Day any changes of any kind to Post Office retail operating hours as they existed on June 15, 2020; if so, describe any relevant policies, guidance, or practices concerning operating hours.

**Objections:** Defendants object to the term "changes of any kind" as overbroad and vague. Consistent with this objection, and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek information at the local level, but only at the national level, Defendants will understand the request to seek information regarding changes coming from national headquarters and having a nationwide effect. Additionally, Defendants object to this request to the extent it seeks predecisional and

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

deliberative material.  Consistent with this objection and counsel for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek privileged information, Defendants will not be producing predecisional and deliberative material.

Nothing contained in the following responses shall be construed as a waiver of any applicable objection or privilege as to any Interrogatory or as a waiver of any objection or privilege generally. Inadvertent disclosure of information subject to a claim of privilege shall not be deemed a waiver of such privilege.

**Response:** Postal Service Headquarters has not made and does not plan to make any changes of any kind to any Post Office retail operating hours, as they existed on June 15, 2020, prior to Election Day.  On August 18, 2020, Postmaster General DeJoy issued a public statement announcing that retail hours at post offices will not change until after the November general election.   Moreover, local managers are not permitted to significantly reduce retail hours without review and approval by the Area and Headquarters managers.  POM § 126.42.  However, there may be circumstances in which temporary changes to retail operating hours are necessary due to unforeseen or uncontrollable circumstances such as hurricanes or other natural disasters, or circumstances that reduce employee availability or create an unsafe environment for employees, such as an increase in COVID-19 cases within a facility.

**INTERROGATORY NO. 10:** At an August 21, 2020, hearing before the Senate Homeland Security and Governmental Affairs Committee, Senator Kyrsten Sinema asked: "Will local postal mangers be authorized to make decisions and have postal employees make extra trips or late trips, [or] work overtime in order to deliver ballots to ensure that plants and post offices don't fall behind in processing election mail?" In response, Postmaster General DeJoy said: "Yes, ma'am. Effective October 1st, we will have redundant resources and liberalization and aggressive

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

1  efforts to make sure everything is moving and flowing timely." Describe any planned

2  or implemented policies, guidance, or practices Mr. DeJoy referred to in his testimony

3  or that otherwise respond to Senator Sinema's question.

4  **Objections:** Defendants object to this request to the extent it seeks predecisional and

5  deliberative information and material.  For example, the request seeks "planned," but

6  not final, policies, guidance, or practices. Consistent with this objection, and counsel

7  for Plaintiffs' statement at the August 27, 2020 hearing that Plaintiffs do not seek

8  privileged information, Defendants will not be searching for predecisional and

9  deliberative information.

10  Nothing contained in the following responses shall be construed as a waiver of

11  any applicable objection or privilege as to any Interrogatory or as a waiver of any

12  objection or privilege generally. Inadvertent disclosure of information subject to a

13  claim of privilege shall not be deemed a waiver of such privilege.

14  **Response:** The Postmaster General announced a commitment to "engage standby

15  resources in all areas of our operations, including transportation, to satisfy any

16  unforeseen demand" regarding election mail, starting October 1, 2020.  *See*

17  Postmaster General Statement (Aug. 18, 2020), at 1-2.  These "standby resources"

18  will include, as needed, additional staffing, additional transportation, and expanded

19  mail processing, among other potential resources.  With respect to expanded mail

20  processing, the Postal Service's mail processing machines generally have, across the

21  board, unused additional capacity (*e.g.*, idle windows of time in which facilities do

22  not use mail processing machines) that can be utilized as needed to ensure the timely

23  processing of election mail.  Operations executives throughout the Postal Service will

24  deploy standby resources as needed.

25  Furthermore, to help ensure the organization is prepared to fulfill its role in the

26  electoral process and to continue to educate election officials who may be dealing

27  with a high volume of mail-in ballots for the first time, the Postal Service has

28

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

expanded its current leadership taskforce on Election Mail.  Leaders of the postal unions and management associations have joined this taskforce to ensure strong coordination throughout the Postal Service, with state and local election officials, and to make sure any concerns can be raised and resolved at the highest levels of the organization.  In addition, the Postal Service Board of Governors has established a bipartisan Election Mail Committee to actively oversee the Postal Service's processes in support of mail-in voting. The Committee will use its oversight role to reinforce the Postal Service's strong commitment to fulfilling the important role of the Postal Service in the democratic process.  Any additional specific guidance developed by these groups will be provided when finalized and this answer will be supplemented consistent with Defendants' obligations under the Federal Rules.

## OBJECTIONS AND RESPONSES TO FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1**: Produce any policies, guidance, or written practices identified in the answers to Interrogatories Nos. 5, 7, 8, 9, and 10.

**Objections:** Defendants object to this request to the extent it calls for confidential commercial information protected from general release pursuant to 39 U.S.C. § 410(c)(2), or information covered by the Trade Secrets Act, 18 U.S.C. § 1905, which may be disclosed only subject to a protective order.

**Response:** Subject to and without waiving the foregoing objections, Defendants will produce any non-privileged policies, guidance, or written practices identified in the answers to Interrogatories Nos. 5, 7, 8, 9, and 10.

**REQUEST FOR PRODUCTION NO. 2**: Produce all documents provided to the U.S. Congress, including any congressional committee or member of any such committee, related to any of the topics covered in the foregoing Interrogatories.

**Objections:** Defendants object to this request to the extent that it calls for "all documents provided to the U.S. Congress," as "documents" is undefined.  Defendants do not understand "documents" to include all "communications" (*i.e.*, all e-mails between Congressional staff and Postal Service employees) but instead understand "documents provided to the U.S. Congress" to include documents such as policies, procedures, numerical data, formal letters, and other similar documents that are produced in response to Congressional requests.

Defendants object to this request to the extent it calls for confidential commercial information protected from general release pursuant to 39 U.S.C. § 410(c)(2), or information covered by the Trade Secrets Act, 18 U.S.C. § 1905, which may be disclosed only subject to a protective order.

**Response:** Subject to and without waiving the foregoing objections, Defendants will produce any non-privileged documents provided to the U.S. Congress related to any of the topics covered in the foregoing Interrogatories as of this date.

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

1   For the objections:

2   The undersigned counsel certifies that he has reviewed Plaintiff's First Set of

3   Interrogatories and Requests for Production of Documents, and that the objections

4   thereto comply with the Court Rules, including Fed. R. Civ. P. 26(g), the Local Rules,

5   and the Court's order limiting the scope of discovery.

6

7   Dated:  September 6, 2020            Respectfully submitted,

8                                        JEFFREY B. CLARK
                                         Acting Assistant Attorney General
9
                                         ERIC R. WOMACK
10                                       Assistant Director, Federal Programs Branch

11                                       */s/ Joseph E. Borson*
                                         JOSEPH E. BORSON (Va. Bar No. 85519)
12                                       ALEXIS ECHOLS
                                         Trial Attorneys
13                                       U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
14                                       1100 L. Street, NW
                                         Washington D.C. 20005
15                                       (202) 514-1944
                                         Joseph.Borson@usdoj.gov
16

17

18

19

20

21

22

23

24

25

26

27

28
                                      - 24 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION BY PARTY

For Interrogatories Nos. 1-4, and 7-9, I, Angela Curtis, an authorized representative of the United States Postal Service in the above-entitled matter, state that I have reviewed those responses and, in accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the responses are true and accurate to the best of my knowledge, information, and belief.

DATE: 9/6/2020

*Angela H. Curtis*

Angela Curtis

United States Postal Service

DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.

## VERIFICATION BY PARTY

For Interrogatories Nos. 5-6, and 10, I, Robert Justin Glass, an authorized representative of the United States Postal Service in the above-entitled matter, state that I have reviewed those responses and, in accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the responses are true and accurate to the best of my knowledge, information, and belief.


DATE: 09-06-2020

Robert Justin Glass

United States Postal Service

- 26 -
DEFS.' OBJECTIONS AND RESPONSES TO PLS.' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.