UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF NEW YORK, *et al.*,

        Plaintiffs,

v.

No. 20-cv-2340(EGS)

DONALD J. TRUMP, *in his official capacity as President of the United States*, *et al.*,

        Defendants.

<u>**MEMORANDUM OPINION**</u>

## I. Introduction

Plaintiffs, the States of New York, Hawaii, and New Jersey; the City of New York; and the City and County of San Francisco filed this lawsuit against Defendants Donald J. Trump, in his official capacity as President of the United States; Louis DeJoy ("Mr. DeJoy"), in his official capacity as Postmaster General of the United States; and the United States Postal Service ("USPS" or ("Postal Service") alleging the following claims: (1) *Ultra Vires* Agency Action—Postal Accountability and Enhancement Act; (2) *Ultra Vires* Agency Action—Postal Reorganization Act; and (3) violation of the Elections Clause of the United States Constitution. Plaintiffs seek a preliminary injunction with regard to their Postal Accountability and Enhancement Act claim. Upon consideration of the Plaintiffs' motion, the response, and

1

reply thereto, the applicable law, and the entire record, the Court **GRANTS** Plaintiffs' motion.

## II. Background

### A.   Statutory and Regulatory Framework

In the Postal Reorganization Act ("PRA"), Public Law 91-375, 84 Stat. 719 (Aug. 12, 1970), Congress replaced the Post Office Department with the United States Postal Service as "an independent establishment of the executive branch of the Government of the United States, under the direction of a Board of Governors, with the Postmaster General as its chief executive officer." 39 C.F.R. § 1.1. The PRA also created an independent oversight body for the USPS, the Postal Rate Commission. 39 U.S.C. § 501. Congress passed the PRA to "[i]nsulate" the management of the USPS "from partisan politics  . . . by having the Postmaster General responsible to the [Postal Rate] Commission, which represents the public interest only, for his conduct of the affairs of the Postal Service." H.R. Rep. No. 91-1104, 3660-61 (1970).

In the Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 et seq.), Congress replaced the Postal Rate Commission with the Postal Regulatory Commission ("PRC" or "Commission") and "strengthened its role." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 340 (D.C. Cir. 2019).

The USPS is responsible for "develop[ing] and promot[ing] adequate and efficient postal services." 39 U.S.C. § 3661(a). "When the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* § 3661(b). This provision was enacted in the PRA, and the only change made in the PAEA was to replace the original "Postal Rate Commission" with the "Postal Regulatory Commission."

Following the submission of a proposal, "[t]he Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under [the Administrative Procedure Act] has been accorded the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." 39 U.S.C. § 3661(c).

**B. Factual Background**

    **1. The COVID-19 Pandemic**

Plaintiffs assert that the COVID-19 pandemic has increased reliance on mail delivered by the USPS. *See* Mem. Supp. Mot. Prelim. Inj. ("Mot."), ECF No. 12-1 at 8.[1] According to Plaintiffs, '"[b]ecause COVID-19 is 'primarily spread through person-to-person contact,' Ku[2] Decl.[, ECF No. 12-13]   ¶ 13, state and local governments, including Plaintiffs here, have undertaken serious efforts to minimize in-person gatherings." *Id.* Plaintiffs further state that "some . . . have transformed their plans for the November 2020 election to facilitate voting by mail." *Id.* (citing  Adinaro[3] Decl., ECF No. 12-4 ¶ 9; Kellner[4] Decl., ECF No. 12-12 ¶¶ 16–17; Ku Decl., ECF No. 12-13 ¶¶ 8–10; P.L. 2020, ch.72 (N.J. August 28, 2020) (providing that New Jersey's November General Election is to be conducted primarily by vote-by-mail in part to reduce the risk of community spread of COVID-19 at polling locations)). Those Plaintiffs that have

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

[2] Leighton Ku is a Professor of Public Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University.

[3] David Adinaro is the Deputy Commissioner for Public Health Services for the New Jersey Department of Health.

[4] Douglas Kellner is the Co-Chair of the New York State Board of Elections.

"mail-based election systems" in place "seek to preserve [them] during a pandemic." *Id*. (citing Henricks[5] Decl. ¶ 3, ECF No. 12-9; Kaohu[6] Decl., ECF No. 12-11 ¶ 3; Takahashi[7] Decl., ECF No. 12-19 ¶ 3.) Plaintiffs state they "have also expended time, money, and resources to educate the public about social distancing, *see* Adinaro Decl., ECF No. 12-4  ¶ 8, and to continue to meet their legal obligations to their residents and to administer public benefits programs by increased reliance on U.S. mail, Banks[8] Decl., ECF No. 12-5 ¶¶ 4-7, 11, 14; Newton[9] Decl., ECF No. 12-15 ¶ 9." *Id*.

### 2.   USPS Postal Policy Changes

In June and July 2020, the USPS announced and implemented four changes (collectively, "Postal Policy Changes") to how it collects, processes and delivers mail. First, on June 17, 2020, the USPS announced that it would be removing 671 high-speed sorting machines nationwide "over the next several months." Pls.' Ex. 17, ECF No. 12-20 at 2-4.

Second, on July 10, 2020, the USPS announced an "operational pivot" to make "immediate, lasting, and impactful

---

[5] Jon Henricks is the County Clerk for the County of Hawaii.
[6] Kathy Kaohu is the County Clerk for the County of Maui.
[7] Glen Takahashi is the City Clerk for the City and County of Honolulu.
[8] Steven Banks is the Commissioner of the New York City Department of Social Services.
[9] Jack Newton is the Director of the Public Benefits Unit as Bronx Legal Services.

changes in our operations and culture." Pls.' Ex. 21, ECF No.
12-24 at 2. These changes included prohibiting "late trips" and
"extra trips." *Id*. "[I]t has long been typical for postal
drivers to depart for post offices or delivery points a short
period *after* the prescribed time if needed to ensure that all
the mail for that truck would be loaded before departure."
Coradi[10] Decl., ECF No. 12-34 ¶ 13. "Extra" trips are non-
scheduled delivery trips, which ensure that the agency can
maintain the necessary flexibility to timely deliver mail to 160
million addresses for six days a week, *id*. ¶¶ 5, 14; and have
long allowed the agency to account for daily fluctuations in
mail volume, processing malfunctions or errors, and other
disruptions, *id*. ¶¶ 13-4. Late trips and extra trips "are needed
adjustments to adequately administer a system responsible for
delivering over 470 million pieces of mail per day. They are
features of the postal system, not bugs." *Id*. ¶ 14.

The USPS knew that prohibiting these trips would result in
delayed mail delivery: "One aspect of these changes that may be
difficult for employees is that—temporarily—we may see mail left
behind or mail on the workroom floor or docks (in P&DCs), which

---

[10] Peter Coradi has been the National Business Agent "A" for the
Clerk Division, New York Region of the American Postal Workers
Union since November 2001. Clerks in the Clerk Division are
responsible for, among other things, mail processing, bulk mail
entry, retail windows, and call centers.

is not typical." Pls.' Ex. 21, ECF No. 12-24 at 2. By August 13, 2020, the USPS had reduced the number of late trips by 71 percent. Pls.' Ex. 19, ECF No. 12-22 at 2. Defendants have clarified that late or extra trips are not "banned"; however, they acknowledge that they continue "at a reduced level." Suppl. Cintron Decl., ECF No. 39-1 ¶ 4. On September 21, 2020, USPS also issued "Operational Instructions" providing that "transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments." *See* Ex. 1 to Notice Suppl. Material, ECF No. 50-1 at 4.

Third, the USPS announced another "initiative" that prohibited mail carriers in certain cities from spending time in the morning sorting mail so they could "leave for the street earlier." Pls.' Ex. 22, ECF No. 12-25 at 2. This meant that carriers were being ordered to not deliver mail that had arrived overnight, but rather sort it in the afternoon, meaning that it would not be delivered until the next day. *Id*. On August 24, 2020, Mr. DeJoy testified that he stopped this pilot project. *See* House Oversight and Reform Committee Hearing Tr. ("House Committee Hearing"), Aug. 24, 2020, Defs.' Ex. 14, ECF No. 30-3 at 449.

Fourth, on or around July 29, 2020, the USPS General
Counsel informed 46 states and the District of Columbia that if
the states did not pay First Class postage on ballots sent to
voters, there would be a risk that voters would not receive
their ballots in time to return them by mail. *See* U.S. Postal
Service letters to states, Wash. Post (Aug. 17, 2020),
https://context-
cdn.washingtonpost.com/notes/prod/default/documents/d1b752f9-
f8c9-4c18-b548-4eb9668c672a/note/36253644-7029-4dd3-bd1c-
f824054400c2.[11] This was a change to the USPS policy of treating
election mail and political mail mailed as marketing mail on an
expedited First-Class basis. Pls.' Ex. 30, 12-33 at 12.

It is undisputed that the USPS did not seek an advisory
opinion pursuant to Section 3661(b) from the PRC prior to
implementing these changes.

### 3.   USPS Postal Policy Changes Have Led to Nationwide Delays and Continue to Have a Nationwide Impact

USPS records indicate that nationally, on-time delivery of
First-Class Mail began to decline in late June 2020, going from
roughly 90 to 94 percent prior to the implementation of the
Postal Policy changes to 82 percent in early August. Pls.' Ex.
28, ECF No. 12-31 at 11. In the August 13, 2020 email to all

---

[11] The Court takes judicial notice of the letters from the USPS to
46 states and the District of Columbia. Fed. R. Evid. 201(b)(2).

USPS employees, Mr. DeJoy acknowledged that "this transformative initiative has had unintended consequences that impacted our overall service levels." Pls.' Ex. 19, ECF No. 12-22 at 2; *see also* House Committee Hearing, Defs.' Ex. 14, ECF No. 30-3 at 455 (Mr. DeJoy testifying that mitigating late trips and extra trips "was not expected to have the impact it had for the duration of the period that it had").

On August 18, 2020, Mr. DeJoy issued a statement that the USPS would be suspending "some longstanding operational initiatives—efforts that predate my arrival at the Postal Service—that have been raised as areas of concern as the nation prepares to hold an election in the midst of a devastating pandemic." Pls.' Ex. 20, ECF No. 12-23 at 2. Specifically, Mr. DeJoy stated that: (1) "[r]etail hours at Post Offices will not change"; (2) "[m]ail processing equipment and blue collection boxes will remain where they are"; (3) "[n]o mail processing facilities will be closed"; (4) "overtime has, and will continue to be, approved as needed." *Id.*; *see also* House Committee Hearing, ECF No. 30-3 at 484 (Mr. DeJoy testifying that he halted the pilot program, the removal of collection boxes, reducing hours at postal retail centers, and the removal of flat and mail sorting machines).

Except for "mail processing equipment," the suspension did not apply to the rest of the Postal Policy Changes at issue

9

here. *See also* Senate Homeland Security and Government Affairs Committee Hearing ("Senate Committee Hearing"), Aug. 21, 2020, Defs.' Ex. 5, ECF No. 30-2 at 107 (Mr. DeJoy stating that the policy of mitigating extra trips would not be suspended); *id.* at 108 (Mr. DeJoy stating that none of the mail processors that had been removed would be brought back).

With regard to election mail, Mr. DeJoy testified before the Senate Committee that states would not have to use First-Class Mail for election mail. *Id.* at 110. However, in his testimony before the House Committee, he testified that states and election boards should follow the recommendation in letters from the USPS General Counsel to the states and the District of Columbia that election officials use First-Class Mail to mail ballots to voters. House Committee Hearing, Defs.' Ex. 14, ECF No. 30-3 at 433; see also *id.* at 394 (Mr. DeJoy testifying that the USPS "will try to fulfill" "objectives" for "normal processing procedures plus enhanced procedures" to ensure the ballots get delivered in time).

USPS records indicate that nationally, on-time delivery of First-Class Mail as of August 22, 2020 was slightly above 85 percent. Pls.' Ex. 28, ECF No. 12-31 at 11.

**B.  Procedural Background**

Plaintiffs filed this lawsuit on August 25, 2020. On September 2, 2020, they filed a motion for a preliminary

injunction, which requests that the Court enjoin the defendants from enforcing the Postal Policy Changes. *See* Mot., ECF No. 12-1. The defendants filed their opposition on September 11, 2020. *See* Defs.' Opp'n Mot. Prelim. Inj. ("Defs.' Opp'n"), ECF No. 30. The Plaintiffs filed their reply brief on September 16, 2020. *See* Pls.' Reply ("Reply"), ECF No. 40. The motion is ripe for the Court's consideration.

## III. Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that [they are] likely to succeed on the merits, [2] that [they are] likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alteration in original) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011)). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch,*

11

451 U.S. 390, 395 (1981). In this Circuit, the four factors have typically been evaluated on a "sliding scale," such that if "the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.,* 571 F.3d 1288, 1291-92 (D.C. Cir. 2009).

In the wake of the Supreme Court's decision in *Winter v. Natural Resources Defense Council,* 555 U.S. 7 (2008), "the D.C. Circuit has suggested that a positive showing on all four preliminary injunction factors may be required." *Holmes v. FEC,* 71 F. Supp. 3d 178, 183 n.4 (D.D.C. 2014); *see also Sherley,* 644 F.3d at 393 ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.") (quotation marks omitted). Nonetheless, "the Circuit has had no occasion to decide this question because it has not yet encountered a post-*Winter* case where a preliminary injunction motion survived the less rigorous sliding-scale analysis." *ConverDyn v. Moniz,* 68 F. Supp. 3d 34, 46 n.2 (D.D.C. 2014).

## IV. Analysis

Plaintiffs argue that they are likely to succeed on the merits of their Section 3661 claim because the USPS "failed to submit the Postal Policy Changes to the Postal Regulatory Commission in advance for an advisory opinion as required under

39 U.S.C. § 3661(b) (and the Commission's rules), despite their significant effect on postal service nationwide," Mot., ECF No. 12-1 at 16; and that this Court has the authority to review the Postal Policy changes as *ultra vires* agency action, *id*.

Defendants respond that Plaintiffs lack Article III standing, that district courts lack subject matter jurisdiction over Section 3661 claims, and that Plaintiffs' claim does not satisfy the requirements for *ultra vires* review. Defs.' Opp'n, ECF No. 30 at 32, 35, 39.

### A. Plaintiffs Are Likely To Succeed On The Merits Of Their 39 U.S.C. § 3661(b) Claim

#### 1. Plaintiffs Likely Have Standing To Bring This Challenge

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "Standing to seek . . . forward-looking injunctive relief requires [Plaintiff] to show [that it] is suffering an ongoing injury or faces immediate injury. For a future injury, that means submitting evidence showing that there is a substantial risk that the harm will recur." *Narragansett Indian Tribal Historic Preservation Office v. FERC*, 949 F.3d 8,

13 (D.C. Cir. 2020) (internal quotation marks, citations, and alterations in original omitted).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id*.

Defendants contend that Plaintiffs lack standing for two reasons.[12] First, they cannot show a causal connection because they have "produce[d] no evidence that any delay in mail delivery will come from the reduction in capacity of mail processing machines," noting that the "mail processing machines are still only being utilized at a sixty-five percent rate . . . which means that there is ample extra capacity."  Defs.' Opp'n, ECF No. 30 at 33. However, Plaintiffs have provided evidence that the elimination of the machines has and will continue to

---

[12] Defendants also argue that plaintiffs lack standing because they allege an injury by the "expedited to Street/Afternoon Sortation" initiative, which has been suspended. Defs. Opp'n, ECF No. 30 at 26. Plaintiffs respond—and the Court agrees—that defendants "may not defeat [p]laintiffs' standing by voluntarily suspending just one of several offending policies, especially where there is no prohibition on that policy's resumption." Reply, ECF No. 40 at 13.

cause delayed mail. *See* Coradi Decl., ECF No. 12-31 ¶ 9
("[E]mployees report astonishing amounts of delayed mail in
facilities that I have visited multiple times . . . I have never
heard anything like it in my 36 years serving the U.S. Postal
Service and its employees."); *id.* ¶ 16 ("With fewer sorting
machines for letter mail and flat mail, Postal employees must
adapt the remaining machines to accommodate more volume or sort
letter and flat mail manually.").

Second, Defendants concede that the policy change regarding
extra and late trips resulted in delayed mail in the past, but
argue that "Plaintiffs cannot show that USPS's activities are
harming Plaintiffs *now and in the future*," stating that "while
there 'was a temporary decline in meeting service standards' in
mid-July" that decline was addressed and "'service performance
is rapidly returning to early July levels.'" Defs.' Opp'n, ECF
No. 30 at 33. Defendants also argue that Plaintiffs' complaint
about election mail delays are entirely speculative, noting "the
enormous efforts that USPS has put into place (and will continue
or supplement through the Election) to ensure that ballots are
timely delivered." *Id*. at 34. Defendants also argue that
Plaintiffs have not established that the decline was due to
reducing unnecessary trips rather than staffing shortages due to
COVID-19. *Id*. at 34.

However, Plaintiffs have provided evidence that reducing extra or late trips will necessarily cause delays in the delivery of mail. *See* Grimmer[13] Decl., ECF No. 40-3 ¶ 10 (decrease in the number of extra or late trips will delay the delivery of letters); Goldway[14] Decl., ECF No. 40-5 ¶ 31 ("It is my opinion, based on my two decades of experience reviewing Postal Service operations, that eliminating local flexibility and requiring rigid adherence to transportation scheduled would negatively impact service performance."). Moreover, Plaintiffs have provided proof that delays, both locally and nationally, have continued. *See* Failure to Deliver, U.S. Senate Committee on Homeland Security and Governmental Affairs, Minority Staff Report, ECF No. 40-9 at 3 (finding that nationwide during the second week of August, "85 million more deliveries were late in a single week compared to what the late deliveries would have been that week under on-time delivery rates before the changes"); *id.* (finding that "[s]ome parts of the country saw on-time delivery drop by 15-20 percentage points in the weeks following Mr. DeJoy's July 2020 changes"). USPS's own data shows

---

[13] Justin Grimmer, a Professor of Political Science at Stanford University, made a preliminary assessment of the impact of the policy change limiting the number of extra and late trips based on the USPS August 31, 2020 powerpoint.
[14] Ruth Goldway served on the U.S. Postal Regulatory Commission from 1998 to 2015, having been appointed and reappointed by Presidents Clinton, George W. Bush, and Obama.

declines in on-time delivery of First-Class Mail continuing into August. Ex. 37, ECF No. 40-8. Moreover, in an August 13, 2020 email to all USPS employees, Mr. DeJoy acknowledged that "this transformative initiative has had unintended consequences that impacted our overall service levels." Pls.' Ex. 19, ECF No. 12-22 at 2. Finally, Plaintiffs have rebutted Defendants' argument that the decline was due to reducing unnecessary trips rather than staffing shortages due to COVID-19 by pointing out that the sharp decline in on-time deliveries occurred in July and August 2020, months after COVID-19 infections began to spike in the United States in March 2020. Reply, ECF No. 40 at 11.

Accordingly, Plaintiffs have shown that there is a substantial likelihood that the on-going non-speculative harms they allege caused by mail delays are "fairly traceable" to the Postal Policy Changes. *Lujan*, 504 U.S. at 560.

## 2.   **This Court Likely Has Subject Matter Jurisdiction Over The Section 3661 Claim**

Defendants contend that this Court lacks subject matter jurisdiction over "complaints regarding" Section 3661 because such complaints must first be made to the PRC and then appealed to the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"). Defs.' Opp'n, ECF No. 30 at 35. The statutory scheme provides as follows. 39 U.S.C. § 409(a) provides that "[e]xcept as otherwise provided in this title, the

United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." One of the exceptions to this original jurisdiction is 39 U.S.C. § 3662, which provides that "[a]ny interested person . . . who believe[s] the Postal Service is not operating in conformance with the requirements of a provision of . . . this chapter (or regulations promulgated under any of these provisions) may lodge a complaint with the Postal Regulatory Commission . . . ." Section 3662(b) requires the PRC to respond to the complaint within 90 days and that if a complaint is not timely responded to, a petition for review may be filed with the D.C. Circuit, which also has jurisdiction to review final orders or decisions of the PRC.

Plaintiffs' complaint alleges a procedural violation—that USPS failed to comply with the requirement that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory commission requesting an advisory opinion on the change." 39 U.S.C. § 3661. Section 3661(c) requires that the opinion shall not be issued until there is opportunity for notice and comment under applicable provisions of the Administrative Procedure Act.

Defendants contend that "[c]ourts have repeatedly held that 19 U.S.C. §§ 3662 and 3663 constitute the exclusive jurisdictional remedy for complaints about postal services that fall within the statutory provisions specifically identified in section 3662." Defs.' Opp'n, ECF No. 30 at 36. However, Defendants have provided no mandatory authority to support their assertion that Sections 3662 and 3663 constitute the exclusive jurisdictional remedy for a claim that the USPS has failed to comply with the procedural requirements of Section 3661.

"Whether a statute is intended to preclude initial judicial review is determined by the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 307 (1994) (internal citation omitted). The language of the statute is broad:  "[a]ny interested person . . . who believe[s] the Postal Service is not operating in conformance with the requirements of a provision of  . . . this chapter (or regulations promulgated under any of these provisions) may lodge a complaint with the Postal Regulatory Commission . . . ." 39 U.S.C. § 3662. This could certainly be read to mean that the failure of the USPS to comply with the procedural requirement set for in Section 3661 would be encompassed by Section 3662. Plaintiff argues that the use of the permissive "may" in Section 3662 coupled with the mandatory

phrasing "shall" in Section 3662(c) shows Congress did not intend to limit jurisdiction over Section 3661 claims. Reply, ECF No. 40 at 14. The statute consistently uses the word "may" when setting forth the procedure for filing complaints and for seeking appellate review of the PRC's determination (or failure to make a determination): any interested person "may" lodge a complaint with the PRC, and if the interested person is unsatisfied with the response or does not receive a timely response, they "may" file a petition with the D.C. Circuit. 39 U.S.C. §§ 3662(a), 3663. The use of the permissive "may" coupled with the use of the mandatory "shall" suggests that Sections 3662(a) and 3663 were not intended to be the exclusive avenue for bringing a procedural challenge to the USPS's failure to comply with Section 3661. *See Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1828 (D.C. Cir. 1973) ("[T]he permissive interpretation is conclusively proven to be correct [together with the particular legislative history] by the fact that when in the same statute Congress intended a mandatory direction it used the auxiliary 'shall' not 'may'-a contrast which is generally significant . . . ."). This interpretation is strengthened because the statute expressly provides that this Court has original jurisdiction "over all actions brought by or against the Postal Service" unless "otherwise provided in [title 39]." 39 U.S.C. § 409(a).

The availability of judicial review for the USPS's failure
to comply with the procedural requirements in Section 3661 is
consistent with the legislative history of the PRA. In the
discussion of the section of the PRA that established the
"procedures for changes in postal service," the House Committee
Report states the "[t]he postal service is—first, last, and
always—a public service" and that the PRA "require[s] [Postal
Services management] to seek out the needs and desires of its
present and potential customers—the American public." H.R. Rep.
No. 91-1104 at 3668. The Committee Report describes provisions
in the act that "contain[] specific provisions requiring
justification and review of changes in service." *Id.*; *see also*
*Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 263 n.6 (5th Cir.
1975) ("[T]he procedures mandated by [Section] 3661 are
sufficiently elaborate to amount to a significant impediment in
the path of the decision-making process of the Postal
Service.").

The Court must also consider whether the claim may be
reviewed because there is no other meaningful or adequate avenue
for judicial review. *See Thunder Basin Coal Co.*, 510 U.S. at
307. District court jurisdiction may not be implicitly precluded
based on consideration of the following factors: (1) if "'a
finding of preclusion could foreclose all meaningful judicial
review'"; (2) if the claim is "'wholly collateral to a statute's

review provisions'"; and (3) if the claims are "'outside the agency's expertise'" to discern "whether the particular claims at issue fall outside an overarching congressional design."[15] *Jaresky v. SEC*, 803 F.3d 9, 17 (D.D.C. 2015) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489-90 (2010). Mindful of the fact that the 90-day window for the PRC to respond to a complaint brought pursuant to Section 3661, Defendants contend that it does not matter that the PRC cannot provide immediate relief because eventual relief is sufficient as a matter of law. Defs.' Opp'n, ECF No. 30 at 39 n.11. However, the authority upon which Defendants rely, *American Federation of Government Employees, AFL-CIO v. Trump*, 929 F.3d 748 (D.D.C. 2019), is inapposite. There, the court held that meaningful judicial review was not foreclosed because Plaintiffs were unable to obtain "'pre-implementation' review of executive orders or immediate relief barring all agencies from implementing the executive orders,'" *id.* at 755-56, because there the parties agreed to consolidate their preliminary injunction requests with the merits, *see* Scheduling Order, Civil Action No. 18-1261, ECF No. 16 at 1.

With regard to the first consideration—whether Plaintiffs would be denied meaningful review—it is clear that they would.

---

[15] Defendants' assertion that the three factors must be met is incorrect. *See* Jaresky v. SEC, 803 F.3d at 17.

Plaintiffs have shown that the USPS implemented dramatic
operational changes that have resulted in delayed mail that
"have negatively affected and will continue to negatively affect
Plaintiffs' ability not only to provide necessary services to
residents in need and administer their own laws and regulations,
but also to protect public health by providing safe and
effective means to vote by mail in the upcoming general
election." Reply, ECF No. 40 at 16. Accordingly, even if there
was a "fairly discernible" intent in the statutory scheme to
preclude district court jurisdiction, requiring Plaintiffs to go
through the PRC process would deny them meaningful review. *See
Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th
Cir. 2018) (noting that "plaintiffs are denied meaningful review
when they are subject to some additional and irremediable harm
beyond the burdens associated with the dispute resolution
process") (internal quotation marks and citations omitted));
*Krescholleck v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir.
1996) (noting that the plaintiff had "alleged a sufficiently
serious irreparable injury to lead us to conclude that the
administrative review process is insufficient to afford him full
relief"). And persuasive authority holds that this factor is the
"most important." *Berkley*, 896 F.3d at 630. Accordingly, this
first factor weighs in favor of finding Congress intended
district courts to have jurisdiction over claims such as this

one brought by Plaintiffs. The second consideration—whether the claim is wholly collateral to the statutory scheme—is "'related' to whether 'meaningful judicial review' is available, and the two considerations are analyzed together." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 758 (D.C. Cir. 2019) (quoting *Jarskey*, 803 F.3d at 22). The question to ask is "whether the plaintiffs 'aimed to obtain the same relief they could seek in the agency proceeding.'" *Id.* at 758-60 (quoting *Jarskey*, 803 F.3d at 23). Here, the relief Plaintiffs seek cannot be meaningfully redressed through filing a Section 3662 complaint.

The third consideration is whether the claim is "beyond the expertise" of the PRC. Plaintiffs' procedural claim does not require the "agency expertise" the statutory procedures contemplate. *Berkley*, 896 F.3d at 630. Accordingly, precluding district court jurisdiction here would completely deny plaintiff meaningful review given the timing of the implementation of the Postal Policy Changes.

### 3. Plaintiffs' Section 3661(b) Claim Is Likely Reviewable Pursuant To The *Ultra Vires* Doctrine

While as a general matter "the Postal Service is exempt from review under the Administrative Procedure Act, . . . its actions are reviewable to determine whether it has acted in excess of its statutory authority." *N. Air Cargo v. U.S. Postal*

*Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012). "The scope of Non-APA review is narrow . . . [and] is available only to determine whether the agency has acted *ultra vires*—that is whether it has exceeded its statutory authority." *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016) (quotation marks and citations omitted).

Defendants contend that *ultra vires* review is unavailable because: (1) Plaintiffs cannot show that USPS acted "in excess of its delegated powers and contrary to a specific prohibition" because they cannot show that USPS violated Section 3661(b); and (2) Plaintiffs have a "meaningful and adequate means of vindicating [their] statutory rights" because they can file a complaint with the PRC pursuant to Section 3662. Defs.' Opp'n, ECF No. 30 at 40 (citing *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1258 (D.C. Cir. 2006) (internal quotation marks and citations omitted)).

The Court is persuaded that Plaintiffs claim is reviewable:

> "Even where Congress is understood generally
> to have precluded review, the Supreme Court
> has found an implicit but narrow exception,
> closely paralleling the historic origins of
> judicial review for agency actions in excess
> of jurisdiction." *Griffith v. FLRA,* 842 F.2d
> 487, 492 (D.C. Cir. 1988) (citing the leading
> case, *Leedom v. Kyne,* 358 U.S. 184, 188, 79
> S.Ct. 180, 183-84, 3 L.Ed.2d 210 (1958)
> (finding judicial review proper despite
> statutory preclusion of judicial review, where
> the NLRB acted "in excess of its delegated

25

powers and contrary to a specific prohibition"
in the NLRA)).

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 116,
1172-73 (D.C. Cir. 2003). Plaintiffs claim here is that the USPS
failed to comply with the requirement Congress set forth in
Section 3661. Accordingly, Plaintiffs' claims "clearly admit of
judicial review." *Id*. at 1173.

### 4.  USPS Likely Failed To Comply With Section 3661(b)

The scope of non-APA review includes, among other things,
"a straightforward question of statutory interpretation." *Nat'l
Ass'n of Postal Sup'rs v. U.S. Postal Serv.*, 602 F.2d 420, 432
(D.C. Cir. 1979). In conducting this review, "[t]he judicial
role is to determine the extent of the agency's delegated
authority and then determine whether the agency has acted within
that authority. In this as in other settings, courts owe a
measure of deference to the agency's own construction of its
organic statute, but the ultimate responsibility for determining
the bounds of administrative discretion is judicial." *Id*. at
432-33 (internal citations omitted).

Section 3661(b) provides that "[w]hen the Postal Service
determines that there should be a change in the nature of postal
services which will generally affect service on a nationwide or
substantially nationwide basis, it shall submit a proposal,
within a reasonable time prior to the effective date of such

proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change."

Persuasive authority has construed Section 3661(b) as follows:

> The language of the statute . . . indicates that three factors must coexist before 3661 applies. First, there must be a 'change.' This implies that a quantitative determination is necessary. There must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661. Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered. Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved. These three factors combine to demonstrate that Congress intended the safeguards of 3661 to apply only when changes of significance were contemplated.

*Buchanan*, 508 F.2d at 263.

There is no dispute that the USPS did not comply with Section 3661(b) prior to implementing the Postal Policy Changes at issue in this case. Defendants argue that the Postal Policy Changes do not implicate Section 3661(b) because: (1) there has been no "meaningful impact on service;" (2) postal services available to the user have not been altered; and (3) the changes have not affected service in a broad geographical area. Defs.' Opp'n, ECF No. 30 at 42 (quoting and citing *Buchanan* 508 F.2d at 263). In support, Defendants argue that sorting machines are

being removed pursuant to a long-existing policy; not a change,
noting that the USPS is in Phase 6 of this initiative. *Id.*
Second, there is no change with regard to election mail because
it is being treated the same as it has in the past. *Id.* at 43.
Third, the ESAS pilot program, which has been suspended, was not
national in scope. *Id.* Fourth, USPS has not prohibited extra or
late trips, but rather has "renewed its emphasis on adhering to
its published schedule." *Id.* Defendants conclude that this
latter change is "precisely the type of management direction to
which [S]ection 3661 does not apply." *Id.* Finally, Defendants
contend that pursuant to past practice, the types of "nationwide
changes that trigger [Section] 3661's review are general changes
to postal facility hours or service standards for mail
delivery." *Id.* at 44.

The Court is persuaded that Plaintiffs are likely to
succeed on their claim that Defendants violated Section 3661(b)
by failing to submit the new transportation policy to the PRC.
First, the new transportation policy was a "change" because it
has had a "meaningful impact on service." *Buchanan*, 508 F.2d at
263. Plaintiffs have provided evidence showing that the
reduction in extra and late trips has had a meaningful impact on
service because it has resulted in nationwide delays. *See supra*
at 7-8. Second, Plaintiffs have demonstrated that the reduction
in sorting machines was dramatically accelerated beginning in

28

January 2020 as compared with the prior fiscal year. DeChambeau[16]
Decl., ECF No. 30-2 ¶ 21. Specifically, while 101 machines were
removed in FY 2019, 711 machines were removed in FY 2020 as of
August 18, 2020, resulting in a nearly 15 percent reduction in
capacity. *Id.* Defendants have provided no explanation for the
sudden acceleration of the removal of the sorting machines.

Plaintiffs have also demonstrated that the combination of
the reduction of late trips, extra trips and reduced sorting
capacity puts the timely delivery of election mail at risk.
Coradi Decl., ECF No. 12-34 ¶ 17 ("If postal employees are not
able to make the necessary daily adjustments via late trips,
extra trips, and the full fleet of sorting machines for the 2020
election season, I am deeply concerned about whether the U.S.
Postal Service will be able to deliver election mail as quickly
as it has in the past. Since I began as a letter carrier in
1984, it has been standard practice to treat election mail as
First Class mail with delivery times of one to three days—or
better—regardless of whether it was marked as Marketing Mail,
which has a delivery time of three to 10 days."); *id.* ¶ 18
("Given the recent U.S. Postal Service policy changes which have
reduced sorting capacity and limitations on late trips and extra
trips, I fear that the dedicated employees of the U.S. Postal

---

[16] Jason Chambeau is the Headquarter Director of Processing
Operations for the United States Postal Service.

Service will be prevented from making the necessary adjustment to accommodate potential influxes of election mail. Election mail includes ballots, voter registration cards, absentee voting applications, and poling place notifications. If delivery is being significantly delated in August, which, in my experience is when mail volume it typically lower, the risk of even more dramatic delays beginning in the fall is high.").

Plaintiffs have also demonstrated that Defendants' position in this litigation that the Postal Policy Changes are not "changes" is not supported based on USPS's own statements. *See* Email from Mr. DeJoy to All Employees, August 13, 2020, ECF No. 12-22 at 2 ("In order to transform . . . we must make a significant number of changes that will not be easy . . . ."); *id*. ("Unfortunately, this transformative initiative has had unintended consequences that impacted our overall service levels. However, recent changes are not the only contributing factors."); *id*. at 3 ("I ask that you bear with me while we work through these changes to transform for the better . . . .").

Second, the change was "in the nature of postal services," 39 U.S.C. § 3661(b), because it qualitatively altered "the manner in which postal services [are] available to the user," *Buchanan*, 508 F.2d at 263. As stated above, Plaintiffs point to evidence showing that the reduction in extra and late trips

combined with the reduction in sorting machines resulted in
nationwide delays.

Third, the change affected service "on a nationwide or
substantially nationwide basis," 39 U.S.C. § 3661(b), because
"[a] broad geographical area [was] involved," *Buchanan*, 508 F.2d
at 263. Plaintiffs have submitted evidence that the Postal
Policy Changes have resulted in delays on a nationwide basis.
*See supra* at 16-17.

While it is clear that Congress did not intend for the
courts to micromanage the operations of the USPS, requiring the
USPS to comply with the statutory requirement that it obtain an
advisory opinion from the PRC and provide for notice and comment
prior to implementing "a change in the nature of postal services
which will generally affect service on a nationwide or
substantially nationwide basis" is not micro-managing; it is
requiring the USPS to act within its statutory authority.
Furthermore, Congress clearly intended Section 3661 to require
an opportunity for public participation and for independent
review before the USPS implements service changes that will have
a broad effect. The broad scope of the Postal Policy Changes
demonstrates on its face that it is precisely the kind of change
that is to be the subject of the public-participation and
independent review safeguards provided by Section 3661.

Finally, defendants argue that because Plaintiffs have a "meaningful and adequate means of vindicating their statutory rights" by filing a complaint with the PRC and then seek judicial review in the D.C. Circuit if unsatisfied, they cannot establish *ultra vires* jurisdiction. Defs.' Opp'n, ECF No. 30 at 41. Plaintiffs respond—and the Court agrees as explained above—that they lack a "meaningful and adequate means of vindicating their statutory rights" since "section 3662 would not afford [them] judicial review of an adverse PRC ruling within a timeframe that would allow for the meaningful vindication of their right to notice and opportunity to participate as required under 39 U.S.C. § 3661(b)." Reply, ECF No. 40 at 19.

### B.  Plaintiffs Face Irreparable Harm

"In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury." *ConverDyn*, 68 F. Supp. 3d at 46 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). The movant must demonstrate that it faces an injury that is "both certain and great; it must be actual and not theoretical," and of a nature "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quotation marks and emphasis omitted).

Plaintiffs argue that the Postal Policy Changes impede their ability to combat the spread of COVID-19 because the failure to timely deliver mail and other reductions in service standards results in more in-person interactions with government officials and adversely affects their "ability to provide safe alternatives to in person voting." Mot., ECF No. 12-1 at 21-22. Defendants counter that Plaintiffs have failed to meet their burden of establishing "that mail delays were necessarily the result of the challenged policies, or that future delays, if there are any, would be the result of" the Postal Policy Changes. Defs.' Opp'n, ECF No. 30 at 46-47. However, the Court has already determined that Plaintiffs have shown that there is a substantial likelihood that the on-going non-speculative harms they allege caused by mail delays are "fairly traceable" to the Postal Policy Changes. *See supra* at 14-17.

Defendants further counter that this alleged harm is to the citizens of the states and that States cannot bring *parens patriae* claims against the federal government, and that even if they could, Plaintiffs' injury is entirely speculative. Defs.' Opp'n, ECF No. 30 at 48-49. However, Plaintiffs have provided evidence that the efforts to mitigate the spread of COVID-19 is aimed at protecting the public health of their respective jurisdictions as a whole. *See* Adinaro Decl. ECF No. 12-4 ¶¶ 7-8 (describing the efforts of the New Jersey Department of Health

to mitigate the spread of COVID-19); Ku Decl. (describing the
efforts of New York, New Jersey, and Hawaii to institute
absentee or mail voting to mitigate the spread of COVID-19).
Impeding these mitigation efforts results in harm to government
Plaintiffs as well as the residents of the states. *New York v.
U.S. Dep't of Homeland Sec.*, No. 19 Civ. 7777, 2020 WL 4347264,
at *10 (S.D.N.Y. July 29, 2020) (finding that the state
plaintiffs adequately demonstrated irreparable harm where the
Governmental "Plaintiffs provide[d] ample evidence that the
[challenged conduct] deters immigrants from seeking testing and
treatment for COVID-19, which in turn impedes public efforts in
the Governmental Plaintiffs jurisdictions to stem the spread of
the disease."), *stayed on other grounds*, No. 20-2537, 2020 WL
5495530 (2d Cir. Sept. 11, 2020).

Defendants also argue that Plaintiffs' argument that their
efforts to curb the spread of COVID-19 will be undermined by
mail delays because more residents will opt to vote in person as
speculative. Defs.' Opp'n, ECF No. 30 at 25. At this juncture,
Plaintiffs need only demonstrate the likelihood of an increased
risk of injury. *Winter*, 555 U.S. at 22 ("Our frequently
reiterated standard requires plaintiffs seeking preliminary
relief to demonstrate that irreparable injury is likely in the
absence of an injunction."). Plaintiffs have provided ample
evidence that mail delays are likely to cause more residents to

vote in person which in turn is likely to impede the spread of the virus. *See* Kellner Decl., ECF No. 12-12 ¶ 14 ("Due to [voters not receiving their ballots on time], additional voters went to polling places who would not have otherwise needed to, adding to significant crowds and delays at certain polling sites for in-person voting. Longer wait times at polling sites is of particular concern to election officials as this increases the risk of exposure to COVID-19, thereby threatening the health and safety of voters, voting officials, and the larger community."); Ku Decl., ECF No. 12-13 ¶¶ 17-18 (describing empirical evidence demonstrating that "voting in crowded polling places increases the risk of infection"); *id.* ¶ 12 (describing polls indicating fewer people intend to vote by mail due to concerns about mail delays).

Finally, Defendants argue that all residents need to do is "mail their ballots a reasonable time before the election (which is approximately two months away)." Defs.' Opp'n, ECF No. 30 at 39. However, as Plaintiffs point out, the ability of the residents of New York, Hawaii, and New Jersey to mail their ballots is not entirely within the residents' control since ballots are not mailed to the residents two months before the election.

Plaintiffs' harm is "both certain and great . . . actual and not theoretical" because mail delays are impeding

Plaintiffs' ability to combat the spread of a highly contagious and deadly disease and are impeding their ability to provide safe alternatives to in-person voting. As of September 27, 2020, 204,607 Americans have died from the disease and over seven million people have been infected with it. *See* Coronavirus Resource Center, https://coronavirus.jhu.edu/map.html. Plaintiffs' harm is also "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm" because Election Day is November 3, 2020.

Because Plaintiffs have demonstrated that absent an injunction they will suffer immediate and irreparable harm to their ability to combat the spread of COVID-19 and to provide safe alternatives to in-person voting, the Court need not reach whether Plaintiffs have also demonstrated the Postal Policy Changes have resulted in direct, unrecoverable financial harms nor whether Plaintiffs have demonstrated that the Postal Policy changes disrupt Plaintiffs' administration of federal, state, and local laws and impose additional, unnecessary administrative burdens.

## C.  The Balance Of Equities And Public Interest Favor An Injunction

The balance-of-equities factor directs the Court to "'balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the

requested relief.'" *ConverDyn*, 68 F. Supp. 3d at 52 (quoting *Winter*, 555 U.S. at 24). "When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief." *Id.*; *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). By contrast, the balance of equities may favor a preliminary injunction that serves only "'to preserve the relative positions of the parties until a trial on the merits can be held.'" *Rufer v. FEC*, 64 F. Supp. 3d 195, 205 (D.D.C. 2014) (quoting *Camenisch*, 451 U.S. at 395). "The purpose of . . . interim relief is not to conclusively determine the rights of the parties, *University of Tex. V. Camenisch*, 451 U.S. 390, 395 (1981), but to balance the equities as the litigation moves forward. In awarding a preliminary injunction a court must also 'conside[r] . . . the overall public interest,' *Winter*, 555 U.S. at 26." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).

Defendants fail to identify any equities in their favor and do not contest the equities in the Plaintiffs' favor. Defendants' only arguments are that they are "undertaking extensive efforts to facilitate the timely delivery of Election Mail," that the two of the four postal policies are not changes— "one has been stopped, and the fourth has been mischaracterized"—and that ensuring compliance with the

injunction "could require the Court to act as an overseer of the agency's day-to-day activities." Defs.' Opp'n, ECF No. 30 at 50.

Here, the balance of the equities and the public interest favor an injunction. It is clearly in the public interest to mitigate the spread of COVID-19, to ensure safe alternatives to in-person voting, and to require that the USPS comply with the law. The equities balance in favor of Plaintiffs because the relief sought is a targeted preliminary injunction that prohibits Defendants from continuing to implement the Postal Service Policies with respect to which an advisory opinion from the PRC should have been obtained prior to implementation. Furthermore, the proposed injunction does not contemplate the Court becoming involved in overseeing the day-to-day operations of the USPS.

## V. Conclusion

For the foregoing reasons, the Court **GRANTS** the Plaintiffs' motion for a preliminary injunction. Any request to stay this decision pending appeal will be denied for substantially the same reasons as those articulated in this Opinion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:**      **Emmet G. Sullivan**
             **United States District Judge**
             **September 27, 2020**