# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW YORK et al., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, et al, <br><br> Defendants. | Case No.: 20 Civ. 2340 <br><br> **DECLARATION OF STEVEN BANKS, J.D.** |

Pursuant to 28 U.S.C. § 1746(2), I, STEVEN BANKS, J.D., hereby declare as follows:

1. I am the Commissioner of the New York City Department of Social Services ("DSS"), overseeing the Human Resources Administration ("HRA") and the Department of Homeless Services ("DHS"). I make this declaration in my capacity as Commissioner in consultation with my staff. I am familiar with the matters set forth herein, based on my personal knowledge and observations, conversations with DSS staff, and review of documents provided to me.

2. I was appointed Commissioner of the New York City HRA in 2014. In 2016, I was appointed to lead both HRA and DHS under the joint management structure of DSS, with nearly 17,000 employees and an annual operating budget of $12 billion at the time. Prior to my appointment as Commissioner, I was Attorney-in-Chief of The Legal Aid Society for 10 years. I served as an attorney for Legal Aid for 33 years, helping New York City's most vulnerable residents – including seniors, survivors of domestic violence, immigrants, people with HIV/AIDS and other children and adults living in poverty – navigate DSS's programs and

1

services.  I received my law degree from New York University School of Law in 1981 and my B.A. in history from Brown University in 1978.

3. DSS is the largest local social services agency in the country.  The agency is dedicated to fighting poverty and income inequality by assisting over three million New Yorkers annually through the administration of more than twelve major public social service programs in New York City.  These public benefits programs include: the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the Food Stamps program; temporary Cash Assistance programs, such as the Temporary Assistance for Needy Families ("TANF") program and New York State and City-funded benefits under the New York State Safety Net Assistance Program; the Medicaid program; and Homelessness Prevention Services.

4. DSS relies on the United States Postal Service ("USPS") to send and receive a variety of time sensitive documents to and from its clients.  The COVID-19 pandemic has increased such reliance as clients can no longer travel safely to physical DSS offices.

5. For example, clients are entitled to send applications for Cash Assistance and SNAP to DSS by mail.  Benefits will flow from the day the application is registered by DSS, which cannot occur until it is delivered by USPS.  Any delays by USPS in delivering these applications to DSS prolong the time clients are without benefits and reduce the net amount of benefits they receive overall.  Furthermore, SNAP and Cash Assistance benefits stimulate the local economy.  Any loss in the net amount of benefits issued translates to losses for the economy as a whole in the form of reduced spending, lower business revenue, and losses in job creation.  SNAP and Cash Assistance benefits have a "multiplier effect" on gains in the economy.  It is well-documented that the SNAP program has a direct economic multiplier effect: for every dollar in SNAP benefits received, there is an approximately $1.79 in increased

economic activity according to the United States Department of Agriculture ("USDA").[1]  As clients are deprived of SNAP and Cash Assistance benefits due to delays in delivering their applications, New York City in turn suffers a loss in economic activity as a result of the multiplier effect.

6.     If additional information is necessary to process an application, DSS sends that request through the mail.  DSS is required by various state and federal statutes and regulations to make an eligibility determination within a circumscribed period of time.  *See* 7 U.S.C. § 2020(e)(3)); 7 C.F.R. § 273(a), (g)(1); and N.Y. Comp. Codes R. & Regs. Tit. 18, § 387.2(o) (establishing time frames for SNAP).  *See also* 45 C.F.R. § 206.10(a)(3); N.Y. Soc. Serv. Law § 158(4); N.Y. Comp. Codes R. & Regs. Tit. 18, § 351.8(b) (establishing time frames for various Cash Assistance programs).  If delivery of documents necessary to establish eligibility is delayed by USPS, the clients' applications will be denied through no fault of their own.

7.     Furthermore, once clients are approved for SNAP and Cash Assistance benefits, they will receive their Common Benefit Identification Card ("CBIC") in the mail, which provides access to those benefits.  Prior to the COVID-19 pandemic, temporary cards (also known as vault cards) were provided to clients during the in-person application procedure so clients could access their benefits while waiting for the permanent CBIC to arrive in the mail.  However, since March 24, 2020, most interviews are no longer conducted in person in order to protect public health and safety, and thus most clients do not immediately receive a vault card.  Instead, those clients must depend on the USPS for delivery of their CBIC to access their

---

[1] *See*   Kenneth Hanson, U.S. Dep't of Agriculture, The Food Assistance National Input-Output Multiplier (FANIOM) Model and Stimulus Effects of SNAP (Oct. 2010), available at https://perma.cc/7DAU-X9KB.

benefits, and USPS delays in delivering CBICs prevent clients from immediately accessing vital financial assistance.

8. Clients have reported longer than expected mail delivery times for their CBICs. In order to alleviate the harm of being without access to benefits while awaiting mail delivery of their CBIC, clients can obtain a temporary vault card by traveling in person to one of DSS's seven open neighborhood job centers (down from 18 open prior to the pandemic), or a permanent CBIC from the state's contracted vendor at the HRA office in Brooklyn. Consistent with the client reports of mail delays in receiving CBICs, DSS has seen a citywide influx of clients in desperate need of access to their benefits traveling to DSS job centers or the HRA office in Brooklyn to wait on increasingly long lines in order to obtain their temporary vault cards pending the delivery of their CBICs. This is evidenced by the fact that the number of DSS clients issued temporary vault cards has increased dramatically each month from 224 in May 2020 to 701 in June to 1,433 in July to 1,981 in August. This increase in clients showing up in person to receive temporary vault cards while awaiting the delivery their CBICs by mail has occurred despite the fact that the number of applications for cash assistance and SNAP (which, if approved, trigger the mailing of CBICs) actually decreased between May and July 2020.

9. The influx of clients seeking in-person assistance has heightened the risk of contracting and spreading COVID-19 and undermines public health. Clients, who are already part of a population living in areas of New York City disproportionately affected by COVID-19, are at increased risk exposure by traveling to local centers to obtain temporary relief, often using public transportation. Additionally, families with childcare issues exacerbated by school and daycare closures are forced to bring young children with them. As noted above, upon arrival, they are met with increasingly longer lines with similarly situated clients seeking in-person

assistance. By pushing clients to travel to job centers, mail delays will cause an increased concentration of clients in an office setting and undermine New York City's efforts to combat the spread of COVID-19.

10. Once benefits are approved, many clients are required to recertify every six months. DSS mails notices, forms, and other correspondence vital to the recertification process to many of its clients. If responses are not received timely, DSS must close cases and terminate benefits as required by N.Y. Comp. Codes R. & Regs. Tit. 18, §§ 351.21 and 387.17.

11. Notices of Intent to terminate or reduce benefits are also sent out by mail. Clients have ten days from the date of such notice to request a hearing if they wish for their benefits to continue during its pendency. If notices are delayed by the USPS, clients may miss the 10-day window in which they have to request a hearing, resulting in the termination of their benefits. As noted above, an increase in office traffic associated with this process risks the health of our clients and that of our staff and undermines New York City's substantial efforts to preserve public health by decreasing the spread of COVID-19.

12. Mail delays increase the burden on DSS's administration of these benefit programs as individual cases may be closed due to USPS service delays and interruptions. This will then result in an increase in requests for fair hearings and in the administrative resources that such hearings require. Each fair hearing requires a considerable amount of resources from both the City and State. The request for a fair hearing is called into the New York State Office of Temporary and Disability Assistance-Office of Administrative Hearings. The intake worker takes the information from the client, processes the case and schedules a hearing. Once a hearing is called into the State, a DSS fair hearing representative is required to review each fair hearing request, determine the issue that will be heard at the hearing, prepare the documents needed to

present the case at the hearing and prepare a copy of the documents for both the client and the hearing officer.  A DSS representative is then assigned to appear on the scheduled hearing date. The case is then heard by a State Administrative Hearing Officer who presides over the issues and ultimately is required to render a written decision on the matter. This process takes a considerable amount of time and resources and costs the State and the City a significant amount of money.  This is not to even mention the significant amount of time and frustration that a client must endure in order to deal with this matter — and the irreparable harm of losing subsistence benefits pending the hearing process if a hearing cannot be requested within the 10-day window due to USPS mail delivery delays.

13.     Furthermore, apart from the fair hearing issues, mail delays result in the direct loss of or delay in providing SNAP and Cash Assistance benefits for New York's most vulnerable families and individuals.  The loss of these benefits for any period of time will lead to increased financial deprivation and risk of food insecurity.

14.     The New York City Department of Homeless Services ("DHS"), an administrative agency of DSS, runs the City's shelter system, which provides temporary housing for approximately 55,000 individuals on any given night.  One of DHS's primary goals is to assist shelter residents in securing permanent housing to move out of the shelter system, including through various rental subsidy programs.  When an individual or family in a shelter obtains a rental subsidy and finds permanent housing, DHS would—prior to COVID-19—hand-deliver the initial rental subsidy to the new landlord at the time the shelter resident was to take possession of the apartment.  Because of COVID-19 and limitations on in-person gatherings, DHS now sends these rental subsidies to landlords by USPS.  On average, 463 DHS clients exit shelter per month with a rental subsidy.  USPS delays have led to new landlords waiting weeks

before receiving initial rental payments, which is evident from landlord and broker complaints of delays verified by DSS mailing receipts.  Typically, landlords refuse to allow the shelter residents to move into the apartment until payments are received, thereby impeding the ability of families and individuals to move out of shelters and requiring New York City to bear the costs of providing additional days or weeks of shelter. The average daily cost of shelter for a single adult is $124.38. The average daily cost of shelter for a family is $196.23.  These daily averages are more than twice the average daily amount spent on rental subsidies for single adults and families, respectively.

15. Missing checks require the agency to cancel checks with the bank and then reissue checks to the landlords.  DSS must then wait for the landlords to receive the reissued rental checks via the USPS.  This iterative and protracted process harms clients by forcing them to remain in the shelter system, costs the City additional funds while clients must remain in shelter, and consumes a disproportionate amount of staff time.

16. Furthermore, many residents of the New York City shelter system receive vital medications through the mail.  Delivery delays causing a lapse in treatment can have life-threatening consequences and force vulnerable individuals to seek emergency health care.

I declare under penalty that the foregoing is true and correct and of my own personal knowledge. DATED this 31st day of August, 2020 at New York, New York.

                                                    */s/ Steven Banks*
                                                STEVEN BANKS, J.D.
                                                Commissioner
                                                New York City Department of Social Services