# Exhibit 8

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, et al.,<br><br>Defendants. | Case No. 20 Civ. 2340<br><br>DECLARATION OF MICHAEL P. HEIN |

I, MICHAEL P. HEIN, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that:

1.      I serve as the Commissioner of the New York State Office of Temporary and Disability Assistance ("OTDA"), and I have served in that capacity since February 2019.  As the Commissioner of OTDA, I oversee the day-to-day operations of the agency and, pursuant to N.Y. Soc. Serv. Law ("SSL") § 17, am responsible for, among other things, determining the policies and principles upon which certain public benefits are provided by the State of New York and local government units within the State.  I respectfully submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction in the above-captioned matter.  I have compiled the information in the statements set forth below either through personal knowledge or through OTDA personnel who assisted me in gathering this information from this agency.

**Background on OTDA**

2.      OTDA's mission is to help vulnerable New Yorkers meet their essential needs and advance economically by providing opportunities for stable employment, housing, and nutrition.  OTDA maintains supervisory oversight of New York's federally mandated and funded programs including Public Assistance ("PA"), Supplemental Nutrition Assistance Program

1

("SNAP"), and the Home Energy Assistance Program ("HEAP").  Specifically, OTDA

supervises New York State's 58 local social services districts ("districts") with respect to their

provision of PA, SNAP, and HEAP to residents within New York.  *See* SSL §§ 62, 95 and 97.

3.     OTDA also supervises the Child Support Program established pursuant to the

Federal Social Security Act, Title IV, Part D, 42 U.S.C. §§ 651-669b.

4.     OTDA and its clients rely extensively on the U.S. Postal Service to carry out its

mission.  OTDA mails approximately 17.9 million client notices annually to advise clients about

various aspects of their eligibility and benefits.  It also mails approximately 1.8 million Common

Benefit Identification Cards (CBICs), which serve as the benefit access card for recipients of PA,

SNAP, and other programs.

5.     OTDA also relies on the U.S. Postal Service to receive critical mailings from New

Yorkers challenging district determinations regarding their benefits or seeking modifications or

enforcement of child support obligations.

**<u>Fair Hearing Process</u>**

6.     OTDA provides for a fair hearing process upon a request made by an applicant for

or recipient of certain public benefits to determine whether an action taken or failure to act by a

district was correct.  *See* SSL § 22, 18 N.Y.C.R.R. § 358-2.12.

7.     An individual has a limited number of days following a determination, action, or

failure to act to request a fair hearing.  18 N.Y.C.R.R. § 358-3.5.

8.     Over the past few years, the Office of Administrative Hearings ("OAH") has

received and processed approximately 230,000 requests for fair hearings annually.  For each of

these requests, OAH mails an acknowledgement advising the appellant that: (1) the request for a

fair hearing has been received and processed; (2) "aid continuing" was directed when the

2

requestor is entitled to continue receiving benefits pending the issuance of their fair hearing

decisions pursuant to 18 NYCRR § 358-3.6; and (3) a scheduling notice will be forthcoming in

the mail.

9.      Conducting a fair hearing requires a significant amount of agency resources.  In

advance of the hearing, the parties must serve evidence on each other and provide copies to

OAH.  Failure to do so before the hearing often leads to adjournments, which impacts the

districts financially, as they are obligated to continue issuing benefits in many of those cases, and

delays the adjudication of the appellants' claims.  This exchange of evidence by the parties is

almost exclusively by mail, particularly during the ongoing pandemic.

10.      Conducting a fair hearing requires the presence of a hearing officer, the appellant

and/or the appellant's representative, the respondent, any witnesses, and if needed, an interpreter.

Pre-pandemic, hearings were conducted by telephone, video or in-person, at OAH's offices in

New York City and at district offices throughout the rest of the State.  Currently, all hearings are

conducted remotely via telephone.

11.      When an appellant or the appellant's authorized representative does not appear for

the scheduled fair hearing, they abandon their right to that fair hearing.  For certain types of

hearings, OTDA must mail the appellant a letter confirming their intention to abandon their fair

hearing and provide them with 10 days in which to request the rescheduling of that fair hearing.

Additionally, State regulations allow any appellant to request that their abandoned hearing be

rescheduled within one year of being abandoned upon a showing of good cause.  *See*, 18

N.Y.C.R.R. § 358-5.5.  On average, OTDA mails approximately 18,000 post-abandonment

letters to appellants and their representatives annually.

**Mail Delays will Negatively Impact OTDA's Fair Hearing Process**

12.     The inability of appellants to receive fair hearing materials by mail in a timely fashion will result in more adjourned hearings.

13.     Pursuant to State regulations, a party can serve evidence up to the time of the hearing.  *See*, 18 N.Y.C.R.R. §§ 358-3.7, 358-4.2(c), 358-4.3.  However, due to the pandemic, all fair hearings are held remotely via telephone.  As a result, the parties serve their evidence on each other mostly via mail in advance of the scheduled hearing.  This is not expected to change for the foreseeable future. OAH has experienced an increase in its backlog of hearings that need to be rescheduled following an adjournment due to the pandemic.  At least one quarter of the approximately 30,000 hearings awaiting rescheduling were adjourned due to the failure of the parties to exchange evidence prior to the hearing.  As previously noted, this exchange is done almost exclusively via mail, and any delays in delivery will exacerbate this problem and increase OAH's backlog.

14.     This results in wasted staff time (*i.e.,* time of support staff who need to schedule the hearing more than once, hearing officers, respondent representatives and, when needed interpreters who need to attend a second hearing date) and resources (*i.e.*, additional benefits that the districts and the State must pay during the pendency of many of these hearings), as well as avoidable delays for other appellants waiting to have their hearing scheduled.

15.     OAH also operates pursuant to several extant court orders concerning the timely administration of fair hearings and promulgation of fair hearing decisions. *See e.g., Shakhnes ex rel. Shakhnes v. Eggleston,* 689 F.3d 244 (2d. Cir. 2012).  Depending upon the program, OTDA has a specific period of time in which to accept, schedule, hold, and issue a decision after a fair hearing.  Mail delays caused by the U.S. Postal Service's operational changes will compromise

OAH's ability to comply with those requirements since the delays caused by the parties' inability to timely serve evidence will not change OAH's deadlines, and thereby subject OTDA to liability and undermining its ability to fulfill its organizational mission.

**Mail Delays Harm OTDA's Operations**

16.     OTDA mails an exceedingly large volume of notices and correspondence to applicants for and recipients of PA, SNAP, HEAP, and other programs, as well as to payees or designated representatives for such programs.  OTDA mails approximately 17.9 million client notices annually advising about various aspects of eligibility and benefits.  Individuals who do not receive these notices and correspondence on a timely basis may be unable to comply with various statutory and regulatory deadlines, which could jeopardize their participation in these programs and could ultimately result in increased litigation costs to OTDA and the State of New York.  For example, if a PA or SNAP recipients fail to timely submit their renewal for those programs, they can ask for a fair hearing challenging the district's failure to recertify. Depending upon the timing of the fair hearing request, the appellant may or may not receive the benefit during the pendency of the fair hearing.  In addition, these individuals are likely to generate an increased volume of calls, emails and other correspondence to OTDA, which will unnecessarily create administrative burdens and associated staffing costs.

17.     As noted above, each year OTDA mails approximately 1.8 million Common Benefit Identification Cards (CBICs), which serve as the benefit access card for recipients of PA, SNAP, and other programs.  Delays in the receipt of CBICs will result in critical hardships to needy individuals and families facing evictions, utility shut-offs, and a lack of food in the home if they do not receive benefits in a timely manner.  OTDA will incur additional costs when

individuals unnecessarily order duplicate CBICs because they have not received their benefit cards.

18.     In regard to the Child Support Program that OTDA supervises in accordance with the Federal Social Security Act, Title IV, Part D, 42 U.S.C. §§ 651-669b, the districts send millions of notices annually in their provision of services to children and families, in establishing of paternity, and in establishing, modifying, and enforcing support orders.

19.     Mail delays may result in delays in obtaining support for children, modifying child support orders, enforcing child support orders, and additional unnecessary costs in commencing proceedings.  This will result in additional administrative burdens, costs, and potentially decreased performance of the districts' statutory duties.

20.     On the enforcement side, districts send petitions to parties accused of violating child support orders to appear at a hearing.  U.S. Postal Service delays could result in respondents failing to appear at such hearings and the issuance of bench warrants pursuant to N.Y. Fam. Ct. Act. § 153.  When a noncustodial parent ("NCP") fails to appear for a violation petition and a bench warrant is issued, local law enforcement must pick up and transport the NCP from wherever they were detained.  The NCP is brought to court and given notice, then usually released to return on another date when the custodial parent and other parties (including the Support Collection Unit of the district) will also appear.  The multiple appearances and law enforcement involvement would unnecessarily create administrative burdens and costs where a noncustodial parent had not received notice of the proceeding.

21.     Similarly, delays or loss of notices may prevent an NCP from responding to violation petitions and either paying the arrears or presenting a defense to the action.  If the NCP is denied the right to respond appropriately, the administrative process will result in delays, court challenges, and other inefficiencies.

22.     The delays and inefficiencies caused by the recent changes to U.S. Postal Service mail delivery policies will have a negative impact on the ability of the districts to establish, modify, and enforce support orders.  Since states are required to meet federally established performance standards in each of these areas in order to receive federal funds, the postal service changes also can lead to a reduction in federal funding for the Child Support Program.

23.     For the foregoing reasons, I respectfully submit that the implemented changes to U.S. Postal Service's mail delivery policies would significantly impair OTDA's oversight of the public benefits programs within its control, and could result in undue hardships to needy individuals and families, increased operating costs, as well as the reduction of federal funding and the imposition of fiscal penalties due to non-compliance with federal program requirements.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2020.  28 U.S.C. § 1746.

MICHAEL P. HEIN