# Exhibit 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW YORK, et al.,<br><br>    Plaintiffs,<br><br>        v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*, et al.,<br><br>    Defendants. | Case No. 20 Civ. 2340 |

**SUPPLEMENTAL DECLARATION OF JUSTIN GRIMMER**

I, Justin Grimmer, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

**I.    Statement of Inquiry**

1. On July 10, 2020 the USPS announced a policy change that limits the number of *Extra* and *Late trips*. I have been asked to provide an assessment of how the policy change has affected the arrival time of first class mail and to determine if staffing shortages at the USPS can explain any declines.

**II.    Qualifications**

2. I am a Professor of Political Science at Stanford University in Stanford California. I also hold the titles of Senior Fellow at the Hoover Institution and Co-Director of the Democracy and Polarization Lab. I first joined the Stanford Faculty in 2010 as an Assistant Professor. I was promoted to Associate Professor in 2015 and I held a courtesy appointment in the department of Computer Science from 2016-2017. From 2017-2018 I was an Associate Professor in the Department of Political Science and

the College at the University of Chicago. I received my Ph.D. in Political Science from Harvard University in 2010.

3. In my scholarly research I develop and apply new statistical methods to study US elections, political communication, the US Congress, and social media. I have taught courses for graduate students on fundamentals for statistical analysis, "Math Camp", along with graduate courses on applying machine learning methods to social science problems "Model Based Inference" and the quantitative analysis of text data in "Text as Data". At the undergraduate level I have taught "Introduction to Machine Learning". My research and writing on quantitative methods have been published in *Political Analysis,* the *Journal of the American Statistical Association, Proceedings of the National Academy of Science,* and *the Proceedings of the Annual Meeting of the Association for Computational Linguistics*.

4. I am being compensated at a rate of $400 per hour.

**III.    The Decline in First Class Arrival Time Performance**

5. To assess how the policy limiting *Extra* and *Late trips* affects service scores, I used the USPS provided first-class mail Service scores. The USPS provided data provides first-class mail service scores at the National, Area, and District level from the week of January 4th, 2020 to the week of October 3rd, 2020. It is my understanding that USPS data reflects service scores for the week beginning on Saturday, through the following Friday. On October 15, 2020, Plaintiffs' counsel received a data set that includes service scores for the week beginning October 3 and ending October 9. I have supplemented this data with a prior declaration from a USPS official, the

*Prokity Declaration*, and a public statement from the USPS in a September 10th press release. I limit my analysis to these data sources.

6. I found delays in first-class mail delivery after the policy limiting the number of *Extra* and *Late trips* policy was announced, on July 10th. I calculated that in the pre-policy period from January 4th to July 4th the average service score was 91.6%. I calculated that after the policy change was announced the average service score was 85.2%. This implies service scores declined 6.4 percentage points. I reached a similar conclusion when I considered a more proximate set of dates before the policy change. I calculated that from June 20th to July 4th the average service score was 91.0%. This implies that on average after the policy was announced the first-class mail Service Score was 5.8 percentage points lower than this average in the pre-policy period.

7. While the policy change limiting the number of *Extra* and *Late trips* was announced on July 10th, Mr. Cintron testified that the new rules were distributed on July 14th. If I extend the pre-policy period to include this additional week when the rules were first distributed, I reach a similar conclusion: the policy limiting *Extra* and *Late trips* decreased Service Scores. From January 4th to July 11th, I calculated that the average Service Score was 91.3%. From July 18th to October 3rd, the average service score was 85.2%. This represents a 6.1 percentage point decrease in the first-class mail Service Score.

8. I found continued delays when focusing on the most recently available data from the USPS. In the September 10th press release the USPS asserted that the August 29th Service Score of 88.04% represented an "uptick in service performance". Yet, the August 29th Service Score represents a decline of 3.46 percentage points from the

pre-policy average Service Score. The September 19th, September 26th, and October 3rd Service Scores were also below the pre-policy average Service Score. The September 19th Service Score was 84.23%, which represents a 7.37 percentage point decline in the first-class mail Service score. The September 26th Service Score was 85.97%, which represents a decline of 5.63 percentage points. And the October 3rd Service Score was 86.15%, which represents a decline of 5.45 percentage points.

9. I also examined how the policy change limiting the number of *Extra* and *Late trips* affected Service Scores across USPS Areas. To make this assessment I continued to rely on the USPS provided data first-class mail Service score data. I calculated the pre-policy average Service Score from January 4th to July 11th. I then compared this average Service Score to the post-policy average Service Score: the average Service Score from July 18th to October 3rd. I also compared the pre-policy average Service Score to the Service Scores from the most recently available weeks: September 19th, September 26th, and October 3rd.

10. I find that the policy limiting the number of *Extra* and *Late trips* resulted in first-class mail delays across all postal service Areas. In Table 1 below I found that after the *Extra* and *Late trip* policy was implemented the average Service Score in the post-policy period (Column 3) was lower than the average Service Score in the pre-policy period (Column 2) in each postal service area. I also found continued delays in all Areas using the most recently available data. The Service Score from September 19th (Column 4), September 26th (Column 5), and 10/3 (Column 6) was lower than the pre-policy average Service Score in each postal area.

| Area | Pre-Policy Average | Post-Policy Average | 9/19 | 9/26 | 10/3 |
|---|---|---|---|---|---|
| Capital Metro | 91.6 | 83.2 | 78.70 | 82.65 | 82.47 |
| Eastern | 92.3 | 83.6 | 82.98 | 84.81 | 83.72 |
| Great Lakes | 89.8 | 82.8 | 78.16 | 81.14 | 83.53 |
| Northeast | 89.5 | 86.5 | 85.24 | 88.55 | 88.25 |
| Pacific | 91.9 | 87.3 | 90.70 | 90.77 | 90.10 |
| Southern | 91.8 | 85.9 | 85.15 | 86.61 | 86.16 |
| Western | 91.8 | 86.9 | 87.66 | 87.70 | 88.38 |

11. I also examined the delay in mail from the policy limiting the number of *Extra* or *Late Trips* at the USPS district level. I continued to use the most recent available data on USPS Service Scores. I computed the pre-policy average Service Score in each district as the average Service Score from January 4th to July 11th. I compared this average Service Score to the average post-policy Service Score calculated as the average Service Score from July 18th to October 3rd. I also compared the pre-policy

average Service Score to the most recently available Service Score for each district, the week of October 3rd.

12. I found that the policy limiting *Extra* and *Late trips* increased delays in mail delivery in almost all postal districts. I found that the district-level Service Score is lower than this pre-policy average in 97.0% of USPS districts. If I compare the pre-policy average Service Score to the 10/3 service score I reach a similar conclusion: 92.5% of the districts had lower service scores on 10/3 than their pre-policy average Service Score.

13. The decline in Service Scores has persisted even after the USPS has suspended all other initiatives other than the policy limiting the number of Extra or Late Trips. Mr. Cintron testified in deposition that the guidelines on *Extra* and *Late trips* have not been rescinded. Therefore, the observed declines in Service Scores are not attributable to other initiatives at the USPS.

14. The Prokity Declaration asserts that staffing levels confound inferences about the effect of the policy limiting the number of *Extra* or *Late Trips* on mail delay. The Prokity Declaration failed to provide numerical details on the weekly number of additional employee absences. Rather, the Prokity Declaration stated that there were increased employee absences in March and April, a decrease in absences in May and June, and then a surge in absences beginning July 11th. The Prokity Declaration asserted that these employee absences hampered the ability of the USPS to effectively process mail.

15. To assess whether there is evidence that staffing shortages affected mail delays, I assessed whether the month-to-month variation in the pre-policy Service Scores

corresponds to the staffing variation that Prokity describes. I used the nation-wide Service Scores provided in the USPS data and computed monthly average first-class mail Service Scores. As a baseline for comparison I calculated the average Service Score from January to February 2020. This period is a useful baseline because the Prokity Declaration does not mention any staff shortages during this period. If staffing shortages explain the decrease in Service Scores, I expect Service Scores to decrease more when staffing shortages are more substantial. Specifically, the Prokity Declaration implies there will be a larger decrease in Service Scores in March and April than in May and June.

16. I failed to find evidence that the pattern of staffing shortages that Prokity documented in his letter is found in the Service Score data. I found that the average Service score was 92.2% from January 4th to February 29th. In March I found that the average score increased to 92.47%. In April, I found a decrease in service score to 91.10%, but even lower service scores in May 90.68% and June 91.0%. This variation is inconsistent with the staffing shortages Prokity describes explaining the variation in Service Scores

IV. **Conclusion**

17. Using the data provided by the USPS on first-class Service Scores, I find the policy limiting the number of *Extra* and *Late trips* continued to delay mail as recently as October 3rd. I also found that the changes in staffing levels cannot explain the decrease in Service Scores that correspond with the policy change.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this __18th___ day of _____October_____, 2020

_____
Justin Grimmer