# Exhibit 26

Page 1

1

2    UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF COLUMBIA

4    ------------------------------------------ x

     STATE OF NEW YORK, et. al.,

5

                              Plaintiffs,

6

          -against-

7

     DONALD J. TRUMP, in his official capacity as

8    President of the United States, et al.,

9                         Defendants.

10   ------------------------------------------ x

11

12

13                   October 14, 2020

                     9:12 a.m.

14

15

16

17

18         VIRTUAL ZOOM DEPOSITION of ANGELA

19   CURTIS, taken pursuant to Notice, held via Zoom

20   before Fran Insley, a Notary Public of the

21   States of New York and New Jersey.

22

23

24

25

Page 2

```
 1
 2   A P P E A R A N C E S:
 3        BURGESS, BERG & ANDROPHY
 4             Attorneys for Plaintiffs in
               Richardson v Trump Case
 5
               120 West 45th Street, 38th Floor
 6             New York, New York 10036
 7        BY:  EMILY BURGESS, ESQ.
               Phone:  (646) 766-0080
 8             eburgess@bafirm.com
 9
10        NJ OFFICE OF THE ATTORNEY GENERAL
11             Attorneys for Defendants
12             P.O. BOX 112
               Trenton, New Jersey 08625-0112
13
          BY:  ESTELLE A. BRONSTEIN, ESQ.
14                  -and-
               MELISSA MEDOWAY, ESQUIRE
15             Phone:  (609) 292-4925
               estelle.bronstein@law.njoag.gov
16
17        STATE OF NEW YORK, OFFICE OF THE
          ATTORNEY GENERAL
18
19             28 Liberty Street
               New York, New York 10028
20
          BY:  MORENIKE FAJANA, ESQ.
21                  -and-
               ALEX FINKELSTEIN, ESQ.
22                  -and-
               MATTHEW COLANGELO, ESQ.
23                  -and-
               DANIELA NOGUERIA, ESQ.
24             Phone:  (212) 453-0786
               morenike.fajana@ag.ny.gov
25
```

Page 3

```
 1
 2    APPEARANCES CONT'D:
 3          ATTORNEY COMMERCIAL AND APPELLATE
            LITIGATION
 4
                    Attorneys for United States
 5                  Postal Service
 6                  475 L'Enfant Plaza, SW
                    Washington, DC 20260
 7
             BY:   WENDY A. HARRIS, ESQ.
 8                       -and-
                   ALICE COVINGTON, ESQ.
 9                 Phone:  (202) 268-8515
                   wendy.a.harris@usps.gov
10
11        COVINGTON & BURLING, LLP
12                  Attorneys for Plaintiffs Vote
                    Forward v. DeJoy
13
                    The New York Times Building
14                  620 Eighth Avenue
                    New York, New York 10018-1405
15
             BY:   JOHN W. FRASER, ESQ.
16                 Phone:  (212) 841-1247
                   JFraser@cov.com
17
18        U.S. DEPARTMENT OF JUSTICE, CIVIL
          DIVISION
19
                    Attorneys for Defendants
20
                    1100 L Street NW
21                  Washington, D.C. 20005
22           BY:   DENA M. ROTH, ESQ.
                   Phone:  (202) 514-5108
23                 Dena.M.Roth@usdoj.gov
24
25
```

Page 4

1

2    APPEARANCES CONT'D:

3    ALSO PRESENT:

4    ALLISON ZIEVE, ESQ., NAACP

5

6

7                        xxxxx

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1
 2    --------------- I N D E X -----------------
 3    WITNESS                EXAMINATION BY      PAGE
 4    ANGELA CURTIS        MS. FAJANA          6, 186
 5                         MS. ROTH            185
 6
 7    -------------E X H I B I T S----------------
 8    CURTIS      DESCRIPTION                    PAGE
 9    Exhibit 1   NOTICE OF DEPOSITION           15
10    Exhibit 2   KEYS TO SUCCESS FOR
                  ELIMINATION OF EXTRAS &
11                LATES                          31
12    Exhibit 3   DOCUMENT                       46
13    Exhibit 4   DOCUMENT BATES STAMPED
14                USPS_EDPA00000426             55
15    Exhibit 5   7/7 AVP Agenda                132
16
17
18
19          (Exhibits retained by Ms. Fajana)
20
21
22
23
24
25
```

```
 1                       Curtis
 2    comes to mind.  There were certain contractors
 3    that we had issues with repetitively, be it a
 4    certain route or certain day of the week or
 5    just overall, and we had a process for
 6    addressing those.  So we would, you know, start
 7    with a conversation and move to a more formal
 8    letter and eventually take the contract if they
 9    could not provide service for it.
10         Q.    So going back to what you've called
11    as a fluid conversation about the need to
12    adhere to transportation schedules, would local
13    offices and local plants collaborate with
14    higher-level management as part of those
15    conversations or, you know, what does that flow
16    of information look like?
17         A.    So, when you say "local offices," I
18    want to make sure we are talking about the same
19    thing.  What do you define as a "local office"?
20    I don't --
21         Q.    Yeah, perhaps at a plant level,
22    perhaps even at, you know, an even localized
23    level.
24         A.    So, occasionally, sometimes more
25    frequently, depending on the need you would
```

```
                                        Page 30
 1                      Curtis
 2   have joint collaboration between a plant and
 3   offices, again, to discuss late arrivals or
 4   late departures depending on which way the mail
 5   was traveling to talk about did they need to
 6   adjust the trip, what needed to happen, did
 7   they need an additional trip in between.  Say,
 8   an early and a late -- for example, if an
 9   office was booking out consistently with mail
10   at the end of the day, did we need to add in
11   something earlier that afternoon so that we
12   didn't always have to send an extra back every
13   night to pick up mail.  If we were having late
14   couriers that perhaps missed the last truck,
15   did we need to adjust that last trip in to the
16   plant.  So there was -- there was collaboration
17   at many, many levels depending on what the need
18   was.
19        Q.   Is this something that was happening
20   in the real time that you would have these
21   discussions about how to adjust transportation
22   schedules?
23        A.   Yes, that happened in real time.
24   Now, it didn't mean that the change happened
25   overnight, because depending on how the
```

```
                                          Page 31
 1                      Curtis
 2    adjustment was made, if it was internal or with
 3    a contractor, you are talking about a different
 4    time frame to put a change in place.  I just
 5    wanted to clarify that.
 6         Q.    Understood.  Just to confirm, when
 7    we are talking about these conversations about
 8    transportation schedules, are we talking about
 9    just late trips, or are we talking about late
10    trips and extra trips?
11         A.    So late trips and extra trips.
12         Q.    Could you please define "late
13    trips"?
14         A.    So late trips would be any trip that
15    departed after the scheduled departure time.
16         Q.    Can you please define "extra trips"?
17         A.    An extra trip is the trip that is
18    not part of the regularly daily schedule.
19              MS. FAJANA:  Alex, can you please
20         display Tab 2, and we will mark this as
21         Exhibit 2 for the record.  Alex, can you
22         please slowly scroll through so that Ms.
23         Curtis can review Exhibit 2.
24              (Whereupon document was marked
25         Exhibit 2 for identification as of this
```

```
                                        Page 41
  1                         Curtis
  2    hours.  We talked about opportunity and terms
  3    of earned work load.  I'm sure there were other
  4    topics but these are -- these are topics we
  5    discussed typically at the end of each year and
  6    how we did and think about how we can do better
  7    in terms of continuous improvement.
  8         Q.    Following this presentation, were
  9    there any action items regarding late trips and
 10    extra trips?
 11         A.    My understanding when I left was
 12    that I needed to work on making our operating
 13    plan, launching trips on time, eliminating
 14    extras.
 15         Q.    Was that action item given to just
 16    you, or was it given to other people who
 17    attended that meeting as well?
 18         A.    I mean, that expectation I think was
 19    clear for us that this was going to be an area
 20    of focus and energy for us in my perception.
 21         Q.    Just stepping backwards a little
 22    bit, why do employees make late trips?
 23         A.    Some of the reasons that we found
 24    when we got into root cause, it's very easy to
 25    make a mistake on the scanner, on the surface
```

Page 42

                        Curtis

1          visibility scanner.  If they don't -- if they,

2          for example, scanned containers on a trailer

3          and they don't launch that trailer and they

4          move to the next trailer, that will cause the

5          departure time to show late when it's actually

6          not.

7                   Sometimes you will have multiple

8          trips launching at the same time and not enough

9          employees scanning those trips out so, in fact,

10         they are waiting to launch but not scanned and

11         so they don't leave on time.  Sometimes you

12         will have an employee that is waiting on a

13         container of mail and launches the trip late.

14         Sometimes the contractor is late.  There are a

15         multiple number of reasons for a trip to be

16         late as the document displays.  The in-surface

17         visibility each time a late is in there, an

18         employee identifies the reason for that late

19         trip.

20              Q.   So based on some of the reasons that

21         you -- let me rephrase.

22                   So how common are those different

23         explanations or reasons that you just gave for

24         why employees run late trips?


Page 43

Curtis

1          A.    Contractor late is fairly common we
2   found in our root cause analysis, employee
3   error on scanners is -- depending on the
4   facility and the expertise and training of the
5   employee.  If we have a lot of new employees in
6   a facility, it is possible that we may need to
7   do additional training.  So it might be more
8   frequent there than other places.
9          For waiting on a container of mail,
10  that is not as frequent but it -- we did find
11  that in the root cause that could happen.  I
12  think you really have to look at each
13  individual side and not do a one size fits all
14  for that.
15         Q.    For why late trips are run?
16         A.    If we really want to fix the problem
17  at each side, that was our approach.  We had to
18  look at each plan or each post office and
19  determine, you know, why trips were late
20  leaving from those facilities.
21         Q.    When you reference this root cause
22  analysis, what is a root cause analysis?
23         A.    Continuing to ask why until we get
24  to a point where you can't ask why anymore.  So

```
                                              Page 51
 1                          Curtis
 2        Q.     Okay.  Thank you.  So I would like
 3    to move to another topic right now.
 4               So how do you define overtime at the
 5    Postal Service?
 6        A.     And I'm still as a fact witness
 7    right now?  I just want to be clear.
 8        Q.     Yes.
 9        A.     Sorry.
10        Q.     Yes.
11        A.     So overtime at the Postal Service is
12    time that is paid at a higher rate.  It's
13    anything over eight hours in a given day or 40
14    hours in a week depending on the bargaining
15    unit contract, and it's utilized to perform
16    work for a variety of reasons.  It can be due
17    to employee availability issues, it can be due
18    to mail volume issues, any number of issues.
19        Q.     Are there any other -- actually, let
20    me rephrase that.
21               What is earned time?
22        A.     Earned time is -- so every -- every
23    position, a bargaining unit position that we
24    have, we evaluate workload based on time earned
25    for each transaction.  So if it's on the
```

```
                                        Page 52
 1                     Curtis
 2   window, it -- we know how much time we earn to
 3   sell a stamp or to do a money order.  If it's
 4   in the carrier craft, we know how much time we
 5   earn to do a package scan.  So when we say
 6   "earned time," that is how many work hours we
 7   earn based on our workload.
 8        Q.    I'm having trouble following what
 9   "earn" means here.  So what does it mean to
10   earn an hour of work, let's say?
11        A.    So for -- let's just take one
12   operation, the city carrier operation, and they
13   are earning office time in the morning at a
14   rate of 18, 8 and 70.  So for every eight slabs
15   that they get a minute.  For every 18 letters
16   that they have to put in a case, they get a
17   minute.  For every total 70 pieces that they
18   have to pull down, they get a minute.  For
19   every piece of mail that they markup, whether
20   it's, let's say, they write deceased on it,
21   there is a time factor for that.  So everything
22   that they do in the morning has an earned time
23   factor and that's how they would earn an hour
24   in the office in the morning.
25        Q.    So essentially, looking at different
```

```
                                      Page 53
 1                  Curtis
 2   types of operations there is -- I don't know if
 3   it's a chart or if there is some sort of metric
 4   that says, if you have, as you said, eight
 5   flats, you earn one minute because the Postal
 6   Service believes that it should only take you
 7   one minute to sort eight flats; is that
 8   correct?
 9       A.    That's actually in our Bargaining
10   Unit Agreement, those -- those times.  So it's
11   not what we think, it's what we've agreed on
12   with our Bargaining Unit, our unions.
13       Q.    So then you have that earned time
14   based off of just, you know, whether it's the
15   volume of mail or maybe it's the number of
16   trips that you have to run or how much you need
17   to sort, there is a certain amount of earned
18   time?
19       A.    Correct.
20       Q.    And then what is unearned time?
21       A.    Unearned time would be time that an
22   employee takes to complete those duties over
23   and above the earned time.
24       Q.    And how does unearned time relate to
25   overtime?
```

1                          Curtis
2          A.      In some cases if an employee --
3     again, I'll stay with -- I'll stay with the
4     city carrier because that's where we started.
5     So if, for the day, that carrier's time is
6     eight hours and 15 minutes based on their work
7     load and they take eight hours and 45 minutes,
8     that would be 30 minutes of unearned overtime.
9          Q.      Is their earned overtime as well
10    since Ms. Curtis was just describing what
11    unearned overtime is?
12         A.      Yes, so based on mail volume, a
13    route could earn eight hours and 15 minutes,
14    nine hours even, and so in that case, that is
15    the earned workload for the day and that would
16    include the overtime that was earned as a part
17    of that workload.
18         Q.      So what purpose does overtime serve
19    for postal service operations?
20         A.      Sometimes it is necessary to
21    complete our mission for the day depending on
22    the reason it was called.  You know, if it's
23    employee availability, if it's workload driven,
24    it's sometimes necessary.
25         Q.      When you say the mission for the

```
                                            Page 60
 1                      Curtis
 2   showing?
 3        A.    No, not specifically.  I would have
 4   to go back and look at notes on it.
 5        Q.    So you weren't involved in preparing
 6   this slide then?
 7        A.    I don't recall being involved in
 8   this, no.
 9              MS. FAJANA:  Alex, can you please
10        turn to slide 6?
11        Q.    Are you familiar with this slide?
12        A.    I am.
13        Q.    Did you help prepare this slide in
14   any way?
15        A.    No.
16        Q.    What does -- do you know who did
17   prepare this slide?
18        A.    I don't.
19        Q.    What does "all in" mean?
20        A.    "All in," my perception during the
21   meeting of "all in" meant that I would support
22   the things that we talked about during the
23   meeting going back and working on those things,
24   that I would give my very best effort to that.
25        Q.    What does "opt in" mean?
```

```
                                                Page 61

                              Curtis
 1

 2        A.     To me, it meant I would give my very

 3   best effort rather than try to pick and choose

 4   what portions I supported that I would support

 5   our business plan going forward.

 6                MS. FAJANA:   Alex, can you please

 7        turn to slide 8?

 8        Q.     Are you familiar with this slide?

 9        A.     Yes.

10        Q.     Did you help prepare this slide?

11        A.     No.

12        Q.     Do you know who did prepare this

13   slide?

14        A.     Not specifically.

15        Q.     Are you familiar with the contents

16   of this slide?

17        A.     Yes.

18        Q.     So starting at the top "City

19   Delivery-F2B," does that mean the same thing

20   that you described at the beginning with

21   respect to employees who are a part of the

22   National Association of Letter Carriers

23   Bargaining Unit?

24        A.     Yes.

25        Q.     So "work hour reduction target,"
```

Page 75

                          Curtis

1    the business, and so we thought that we needed

2    to take a closer look at that.

3        Q.    Before this telepresence was -- for

4    example, the first suggested strategy,

5    scheduled supervisor to SWCS earned, was that

6    something that was already in effect, or was

7    that a strategy that was already being

8    utilized?

9        A.    All these -- you know, that was

10   certainly -- that was always the expectation.

11   I think this -- this was to bring it back to

12   surface that we need to look at those schedules

13   to determine if they were effective.

14       Q.    When you say "bring it back to

15   surface," what do you mean?

16       A.    I mean, we just took a look at the

17   data again round this particular topic and had

18   more conversation around the schedule for

19   supervisors and if we were effectively

20   scheduling them and if we were updating our

21   earned as we needed to and that we needed to

22   take a closer look, because clearly, we were

23   998,000 hours over earned.  So we had not paid

24   as much attention to that as we should have,

Page 76

1                          Curtis
2    even though that has always been an
3    expectation.
4         Q.    So when you say that you didn't as
5    much attention to it as you should have, do you
6    mean that following this telepresence you had
7    more conversations with carrier supervisors
8    about really only working at earned?
9         A.    I think we had more conversations
10   about why some particular units had supervisors
11   consistently working over earned and what we
12   needed to do to remedy that situation.
13        Q.    So, were these strategies
14   communicated to postal employees who were not
15   present at the telepresence on June 26, 2020?
16        A.    I shared with my team the things we
17   talk about at every meeting, so I'm sure we
18   covered it.
19        Q.    Prior to this telepresence though,
20   would it be fair to say that all of these
21   actions were being practiced at different
22   offices across the country?
23        A.    I would say these are not new.
24   These are things that we have discussed.  These
25   are things that have been around for a long

```
                                            Page 82
 1                        Curtis
 2   leave to deliver the mail or what does tour
 3   mean?
 4        A.    Tour means -- tour is generally
 5   their schedule for the day.  So if they're are
 6   scheduled to come in at 7:30, anything prior to
 7   7:30 would be pre-tour.
 8        Q.    Why would carriers come in pre-tour?
 9        A.    We shouldn't be scheduling them to
10   come in pre-tour.  Sometimes they might come in
11   pre-tour, they just come and clock in early.
12   Sometimes they are coming in to case another
13   route that might be open, but in most cases,
14   that work can be done on under time in the
15   office.
16        Q.    What does "casing" mean?
17        A.    Casing means putting letters and
18   flats in the case in delivery order.
19        Q.    Is that happening before or after
20   mail has been sorted?
21        A.    Simultaneously.  So you have
22   clerks -- yeah, you have clerks that are
23   distributing mail that comes from mail
24   processing and then carriers take that mail and
25   put it in the case in delivery order.
```

```
                          Curtis
1
2   from earlier slides.  So this description here
3   is the Postal Service's projection of what the
4   Postal Service would be of this strategy?
5       A.    Correct.  We -- we had not launched
6   the pilot, really had no idea at that time how
7   effective it would be or what we would run into
8   with that.
9       Q.    What about the next one, "Caseless"?
10      A.    So "Caseless," another pilot that we
11  were working with our union partners on was to
12  allow carriers to -- because the cased mail
13  volume had dropped so significantly, rather
14  than casing mail into a case, they would merge
15  that raw volume into delivery point sequenced
16  mail that came from the plant without all of
17  that equipment to determine if that was more
18  efficient in the office.  Again, to be piloted
19  in a few sites and evaluate it.
20      Q.    So what does "Square Footage
21  Savings" here mean?
22      A.    So if -- for example, if you have a
23  building that is 50,000 square feet and you say
24  10,000 square feet because you're able to
25  reduce casing equipment, if you can go to a
```

```
 1                       Curtis
 2        and we will mark this as Exhibit 5.
 3                 (Whereupon document was marked
 4        Exhibit 5 for identification as of this
 5        date.)
 6   BY MS. FAJANA:
 7        Q.    Ms. Curtis, are you familiar with
 8   this document?
 9        A.    I am.
10        Q.    What is this document?
11        A.    This is the agenda for an AVP
12   meeting on July 7th.
13        Q.    When was the last time that you saw
14   this document?
15        A.    Probably July 7th.  I don't think I
16   looked at it since then.
17        Q.    Is an AVP meeting the same thing as
18   an AVP telepresence?
19        A.    Yes.
20        Q.    What was the objective of this
21   telepresence?
22        A.    It was just, you know, a
23   continuation of our prior meeting to continue
24   talking about our end of the year projections,
25   how we thought we would end and what we would
```

```
                                        Page 133
 1                      Curtis
 2    do differently for the new year.
 3         Q.    Who was in attendance at this AVP
 4    meeting?
 5         A.    That would be the area vice
 6    president, the vice presidents from
 7    headquarters and the chief operating officer
 8    and Postmaster DeJoy was at this meeting.
 9         Q.    Can you look at this agenda, please,
10    and let me know if there are any topics that
11    you did not, in fact, discuss at the meeting?
12         A.    I believe we discussed these, yes.
13    I would have to see the individual slides, but
14    I believe we discussed all these.
15         Q.    Were you present for this entire
16    meeting?
17         A.    Yes.
18         Q.    So looking at retail business plan
19    at 310, did you prepare that presentation that
20    corresponds to the retail business plan?
21         A.    I did not prepare the presentation.
22         Q.    Did you give that presentation?
23         A.    I did participate in giving,
24    actually led that discussion.
25         Q.    Who prepared the slide associated
```

                         Curtis

1    beginning of the new fiscal year.  So we wanted

2    to spend the next couple of weeks ramping up,

3    getting ready, communicating.

4         Q.    So you would start that process of

5    trying to meet all your earned at the beginning

6    of the new fiscal year?

7         A.    Trying to work to earn, yes.

8               MS. FAJANA:  Alex, can you please

9         turn to slide 6?

10        Q.    Are you familiar with this slide?

11        A.    I am.

12        Q.    What does efficient, affordable and

13   reliable service mean here?

14        A.    That just means we want to operate

15   at an optimum level so we are efficient, we are

16   not spending exorbitant costs to deliver

17   reliable consistent service to the customer.

18        Q.    What does costly and heroic service

19   mean here?

20        A.    That would indicate that we are

21   taking measures that are rescue missions to

22   provide service rather than efficient

23   affordable and reliable.  We are rescuing

24   service.

```
 1                        Curtis
 2        Q.    What does that mean exactly?
 3        A.    So an example might be that if we
 4   didn't finish processing all of our packages on
 5   time in the morning and that we got some of
 6   those, we got some of those packages out to the
 7   delivery unit at say noon, that we would turn
 8   carriers back around to go deliver those rather
 9   than trying to finish timely in the morning so
10   that they could deliver them over the course of
11   the day while they are out on their route.
12              MS. FAJANA:  Alex, can you please
13         turn to slide 10.
14        Q.    Are you familiar with this slide,
15   Ms. Curtis?
16        A.    Yes.
17        Q.    Could you take a minute to review
18   it, please?
19        A.    (Witness reviewing document).  Okay.
20        Q.    Based on your review is this slide
21   substantially similar to the F2B city delivery
22   slide we discussed as part of the June 26, 2020
23   presentation?
24        A.    It appears to be similar.
25        Q.    Do you note any differences between
```

```
                                    Page 176
 1                    Curtis
 2      Q.    So all postal employees?
 3      A.    That's correct.
 4      Q.    So going back to the September 21st
 5   guidance, was that distributed to employees?
 6      A.    Yes, that was distributed across the
 7   nation.
 8      Q.    That was distributed to all Postal
 9   Service employees?
10      A.    Yes.
11      Q.    Do you know how it was distributed
12   to them?
13      A.    I know the hard copy went out and
14   then there was a stand up talk created from
15   that.
16      Q.    What is a stand up talk?
17      A.    Those are just talking points for
18   relaying that information.
19      Q.    Who typically creates stand up talks
20   at the Postal Service?
21      A.    Stand up talks can be created by
22   anyone.  Sometimes they are done locally.
23   Occasionally they are done by a district or an
24   area.  Occasionally done by headquarters.
25   Corporate coms will sometimes assist with the
```

```
                                    Page 177
 1                    Curtis
 2   stand up talks.
 3        Q.    For this September 24th stand up
 4   talk, who prepared it?
 5        A.    I'm not certain.
 6        Q.    Do you know who was meant to give
 7   the stand up talk, the September 24th stand up
 8   talk to employees?
 9        A.    So, as we saturate that throughout
10   the organization, it is the EAS or managerial
11   responsibility to share that information.
12        Q.    What is EAS?
13        A.    Yes, that is managerial employees.
14        Q.    How do you ensure that these
15   employees do, in fact, issue the stand up talks
16   that they are supposed to?
17        A.    Sometimes they enter them in a tool
18   kit.  Sometimes they do a manual certification.
19   Sometimes those are done online.
20        Q.    Do you know whether certifications
21   were done for this particular stand up talk,
22   the September 24th stand up talk?
23        A.    The clarifying operations from the
24   21st, I don't know how that was certified now.
25        Q.    So you have mentioned the clarifying
```

1                    Curtis

2       A.    I mean they received it.  They

3   received both of those, all executive and

4   administrative employees.

5       Q.    Were they responsible for

6   communicating that information to the people

7   that they supervised?

8       A.    They would have been responsible for

9   communicating the stand up talk information and

10  that stand up talk did talk about the

11  information that was distributed on

12  September 21st about the clarifying operational

13  guidance.

14      Q.    Understood.  Thank you.

15           MS. FAJANA:  And I did want to ask

16      whether any other plaintiff's counsel

17      present right now had any additional

18      questions that they want to ask?

19           (No response)

20           MS. FAJANA:  I will take that as a

21      no and that concludes my examination.

22           Ms. Curtis, thank you very much for

23      your time today.

24           THE WITNESS:  Thank you.

25           MS. ROTH:  Counsel, before we go off

Page 188

1                         Curtis

2          the record, I just want to reserve the

3          right to review and sign the transcript.

4                MS. FAJANA:   That's fine.

5                (Time noted:   3:19 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 189

1

2            A C K N O W L E D G M E N T

3

4    STATE OF              :

                           :ss

5    COUNTY OF             :

6

7            I, ANGELA CURTIS, hereby certify that

8    I have read the transcript of my testimony

9    taken under oath in my deposition on the 14th

10   day of October, 2020; that the transcript is a

11   true, complete record of my testimony and that

12   the answers on the record as given by me are

13   true and correct.

14

15                      ------------------------

                           ANGELA CURTIS

16

17   Signed and subscribed to before

     me this                  day of

18                         , 2020.

19

20   -------------------------------------

     Notary Public of the State of

21

22

23

24

25

Page 190

1

2

3                    C E R T I F I C A T E

4         I, FRAN INSLEY, hereby certify that the

5    Deposition of ANGELA CURTIS was held before me

6    on the 14th day of October, 2020; that said

7    witness was duly sworn before the commencement

8    of testimony; that the testimony was taken

9    stenographically by myself and then transcribed

10   by myself; that the party was represented by

11   counsel as appears herein;

12         That the within transcript is a true

13   record of the Deposition of said witness;

14         That I am not connected by blood or

15   marriage with any of the parties; that I am not

16   interested directly or indirectly in the

17   outcome of this matter; that I am not in the

18   employ of any of the counsel.

19         IN WITNESS WHEREOF, I have hereunto set

20   my hand this 15th day of October, 2020.

21

22

23       - - - - - - - - - - - -

24                 FRAN INSLEY

25