# Exhibit 27

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------

COMMONWEALTH OF PENNSYLVANIA,  :  CIVIL ACTION
et al.,                        :
                               :
    vs.                        :
                               :
LOUIS DeJOY, in his official   :
capacity as United States      :
Postmaster General; et al.,    :
          Defendants.          :  NO. 2:20-cv-4096

------

Tuesday, September 22, 2020

------

     Remote telephonic conference deposition of ROBERT CLINTON, held at Aurora, Illinois, at 10:00 a.m., on the above date, before Jan Singer Brooks, Court Reporter and Notary Public.before Jan Singer Brooks, Court Reporter and Notary Public.

------

Strehlow & Associates, Inc.
54 Friends Lane
Suite 116
Newtown, Pennsylvania 18940
215.504.4622

------

```
                       Robert Cintron
                     September 22, 2020
```

```
                          APPEARANCES


COMMONWEALTH OF PENNSYLVANIA
BY:   MICHAEL J. FISCHER, ESQUIRE
      Chief Deputy Attorney General
BY:   AIMEE D. THOMSON, ESQUIRE
      Deputy Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA  19103
ph: 267.374.2787
mfischer@attorneygeneral.gov
athomson@attorneygeneral.gov
Counsel for Plaintiff Commonwealth of Pennsylvania


DEPARTMENT OF JUSTICE
BY:   KUNTAL CHOLERA, ESQUIRE
BY:   JOSEPH BORSON, ESQUIRE
1100 L. Street NW
Washington, DC 2005
ph: 202.305.8645
kuntal.cholera@ysdoj.gov
joseph.borson@usdoj.gov
Counsel for Defendant



ALSO PRESENT:


Wendy Harris, Postal Service

Alice Covington, Postal Service



                          ------
```

Robert Cintron
September 22, 2020

Page 3

INDEX

WITNESS:  Robert Cintron

EXAMINATION

                                                          PAGE

By Mr. Fischer                                     7, 146

By Mr. Cholera                                       142

------

EXHIBITS

| NO. | DESC. | PAGE |
|---|---|---|
| Exh 1 | Deposition Notice | 9 |
| Exh 2 | Declaration | 25 |
| Exh 3 | Bates 993 | 77 |
| Exh 4 | Bates 1003 | 78 |
| Exh 5 | PMG Expectations & Plan | 85 |
| Exh 6 | Supplemental Declaration | 90 |
| Exh 7 | Bates 814 | 98 |
| Exh 8 | Bates 865 | 101 |
| Exh 9 | Bates 843 | 104 |

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Robert Cintron
September 22, 2020

Page 4

EXHIBITS (Continued)

| NO. | DESC. | PAGE |
|---|---|---|
| Exh 10 | Bates 2838 | 108 |
| Exh 11 | Bates 1006 | 110 |
| Exh 12 | Bates 1008 | 110 |
| Exh 13 | Bates 426 | 119 |
| Exh 14 | Bates 689 | 121 |
| Exh 15 | USPS Annual Report | 123 |
| Exh 16 | Bates 2780 | 123 |
| Exh 17 | Bates 1061 | 136 |

------

Robert Cintron
September 22, 2020

Page 53

1   a late trip.
2       Q.   And the guidelines you prepared would
3   provide direction as to when that was permitted;
4   is that correct?
5       A.   Yes, they were guidelines that would
6   provide that clarity.
7       Q.   When did you begin working on this --
8   on preparing these specific guidelines,
9   approximately?
10      A.   July 10.
11      Q.   July 10 you began working on the
12  guidelines, okay.  And is it accurate to assume
13  that those guidelines did not say anything about
14  letter carriers?
15               Let me withdraw that.  That was
16  unclear.
17               Because letter carriers are not
18  under your purview, you were not providing
19  guidelines as to how they should perform their
20  job; is that correct?
21      A.   That would be correct.
22      Q.   So you said you began working on them
23  July 10.  Could you explain what sort of analysis
24  went into preparing the guideline?

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

Robert Cintron
September 22, 2020

Page 54

1  A.  Analysis?  I'm not sure it's analysis.
2  This would have been more about situations that
3  could arise that would justify running extra or
4  late service.  I'm not sure if it's analysis.
5  Q.  Was the modeling and analytics group
6  that you oversee involved in the guidelines at
7  all?
8  A.  The executive there might have provided
9  some feedback, not the team itself had made any
10 analytics around this.
11 Q.  So there was no report prepared by that
12 group; is that correct?
13 A.  A report?  No report.
14 Q.  Did you estimate, did you or anyone on
15 your team estimate whether there would be either
16 additional cost or cost savings as a result of
17 these guidelines?
18 A.  No.
19 Q.  As you prepared the guidelines did you
20 take into account the Postal Service's current
21 record of compliance with its performance goals?
22      MR. CHOLERA:  Objection; vague.
23 A.  This would not -- I'm not sure what
24 you're asking.

Robert Cintron
September 22, 2020

Page 55

```
 1   BY MR. FISCHER:
 2        Q.   You said we discussed performance goals
 3   earlier.  Do you remember that?
 4        A.   Mm-hmm, yes.
 5        Q.   And I believe one example of performance
 6   goals related to meeting the service standards
 7   that are set forth for first class mail, for
 8   instance; is that correct?
 9        A.   That's correct.
10        Q.   So as you prepared these guidelines, was
11   one of the factors you considered whether the
12   Postal Service was currently meeting its
13   performance goals with respect to mail delivery?
14             MR. CHOLERA:  Same objection.
15   BY MR. FISCHER:
16        Q.   Sir, do you understand the question?
17        A.   Yes.  That's not -- I guess I'm not
18   totally clear on what you're asking.  I mean I
19   didn't relate it directly to my service
20   performance goals.  This was about, again,
21   adhering, you know, to schedules and that, for
22   sure.
23        Q.   You did not --
24        A.   And if we were capable of making
```

1  service, right.  You might, as an example, have an
2  aircraft that is going to land four hours late and
3  it may not make sense that in four hours you have
4  any capability to process that mail and running
5  extra service to collect that mail would have no
6  value to the organization as none of it is going
7  to be worked and we might have a truck two hours
8  later that would be running on normal mode of
9  transportation that could collect that same mail.
10 Some things just are not possible because of
11 capability.
12      Q.   Understood.  Is it fair to say, though,
13 that you did not estimate the effect of these
14 guidelines on performance goals going forward?
15           MR. CHOLERA:  Objection.
16 BY MR. FISCHER:
17      Q.   Do you understand the question?
18      A.   The guidelines were in place to make
19 sure that, again, you, you know, provided clarity
20 for them to be able to utilize the service which
21 they do every day today, you know, which would
22 indirectly obviously improve -- you know, would
23 help improve service, right.
24      Q.   I'm sorry, can you repeat that, that

1   last sentence?
2        A.   So, again, you know, these guidelines
3   were set to have clarity around the use of this
4   extra service and directly it would improve
5   service, right.
6        Q.   So it was your expectation that
7   implementing these guidelines would improve the
8   Postal Service's compliance with its service
9   standards?
10       A.   That's what made sure that, again, we
11  were in compliance with schedules and clarity
12  around the utilization of extra service.
13       Q.   Okay.  But I'm asking specifically about
14  service standards.  Was it your expectation that
15  implementing these guidelines would improve the
16  Postal Service compliance with service standards?
17       A.   They would ensure that again compliance
18  with the guidelines where we could absolutely
19  maintain service could be done.  As I said, a
20  plane that comes in late that we could fit into an
21  operating plan that we find extra service or hold
22  a truck would result in our ability to maintain
23  service.
24       Q.   And just so I'm clear, at the time you

1   prepared these guidelines did you have an
2   expectation as to what their impact would be on
3   compliance with -- let's take, for instance, the
4   two to five day standard that we discussed for
5   first class single piece mail.  Did you have any
6   expectation as to the effect of these guidelines
7   on the Postal Service's compliance with that
8   particular service standard?
9       A.   Did not expect it if you're -- did not
10  expect -- did I anticipate -- just repeat the
11  question.
12      Q.   Did you anticipate that implementing
13  these guidelines would have an effect on the
14  Postal Service's compliance with the two- to
15  five-day service standard that we have discussed?
16      A.   The only thing I anticipated was that
17  there was clarity that running those again, you
18  know, would line up again with the capability and
19  clearance of -- you know, meeting those operating
20  plans in these places.  That's why we created the
21  guidelines to authorize them to run extra service.
22  So I didn't anticipate it or tie it directly to
23  any one particular service standard.
24      Q.   Did you have a general expectation of

Robert Cintron
September 22, 2020

Page 61

1   pandemic?

2       A.   I'm not sure what you mean by that.

3       Q.   Well, certainly the Covid-19 pandemic

4   has impacted the Postal Service in many ways,

5   correct?

6       A.   Correct.

7       Q.   Including through increased absences, a

8   shift from letter mail to parcels. Is that all --

9   is that accurate?

10      A.   Correct.

11      Q.   So as you were preparing the guidelines

12   did you consider the fact that they would be

13   implemented while the nation was experiencing the

14   Covid-19 pandemic?

15      A.   Only from the perspective that I mean it

16   wasn't part of the planning. But obviously the

17   thought around, at least from my thought, would

18   have been around, to your point, there were places

19   that were struggling with staffing so keeping to a

20   schedule actually helped us, you know, helped us

21   maintain that service, right. So, only from that

22   perspective. I mean if you are already short and

23   then on top of it you're waiting and there's less

24   people to distribute mail, right, make it worse by

STREHLOW & ASSOCIATES, INC.
(215) 504-4622

1  holding on to it now creates bigger problems.
2      Q.   As you were developing the guidelines
3  did you consider the fact that there is an
4  election coming up in November in which people
5  would vote by mail?
6      A.   I mean people vote by mail, we have
7  elections year-round.  So it's -- you didn't
8  mention what you mean by consider.  It's certainly
9  something that we plan for and work at.  We plan
10 for it on a regular basis, so. . .
11     Q.   Do you recall having any discussions
12 with anyone else as to whether the guidelines
13 would have an impact on voting by mail in the
14 November election?
15     A.   Did not have conversations with anybody
16 about that.
17     Q.   Did you discuss the guidelines with
18 Mr. Glass?
19     A.   With Mr. Glass?  Not that I recollect.
20 He may have been presented by I don't have any
21 recollection of personally meeting with him.
22     Q.   Other than yourself, who was involved in
23 preparing the guidelines?
24     A.   I prepared them.  Again, I had someone

Robert Cintron
September 22, 2020

1  that others -- other functional groups.  I'm not
2  responsible for every functional group.  I'm
3  saying it's not just one thing that necessarily
4  branded the event.
5      Q.  But are you aware of any other
6  initiatives that were being implemented around
7  this time?
8      A.  I'm aware of everybody, you know,
9  focusing on operating plan compliant.
10     Q.  And that increased in July of 2020?
11     A.  I would say it increased.
12     Q.  You would say it increased.
13         Okay.  Thank you.  I have no
14 further questions.
15            MR. CHOLERA:  Nothing from me.
16            Obviously thank you for your time,
17     Mr. Cintron.
18            I do want to represent for the
19     record that we will be designating as
20     privileged the components talking about the
21     treatment of guidelines following the
22     preliminary injunction.  As I said before on
23     the record, that was subject to discussions
24     with counsel about how to not only treat the

1    guidelines but how to implement the
2    injunction broadly.  All of that is subject
3    to attorney-client discussions, again, with
4    respect to interpreting the injunctions and
5    implementing the injunctions, and all of that
6    is still an evolving matter.
7              MR. FISCHER:  Thank you, Mr.
8    Cintron for your time.  We appreciate it.
9              MR. CHOLERA:  We will want to order
10   a copy of that transcript, too.
11             (The deposition was concluded at
12   3:01 p.m.)
13
14
15                   ------
16
17
18
19
20
21
22
23
24

Page 153

2              CERTIFICATION

4                 ------

6          I hereby certify that the
7     testimony and the proceedings in the
8     aforegoing matter are contained fully and
9     accurately in the stenographic notes taken
10    by me, and that the copy is a true and
11    correct transcript of the same.

                    _____
13                  JAN SINGER BROOKS
                    Professional Court Reporter

16          The foregoing certification does
17    not apply to any reproduction of the same by
18    any means unless under the direct control
19    and/or supervision of the certifying
20    shorthand reporter.
21                 ------