# Exhibit 28

Page 1

1

2    UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF COLUMBIA

4    ------------------------------------------- x

     STATE OF NEW YORK, et. al.,

5

                          Plaintiffs,

6

          -against-

7

     DONALD J. TRUMP, in his official capacity as

8    President of the United States, et al.,

9                          Defendants.

10   ------------------------------------------- x

11

12

13                   October 15, 2020

                     8:32 a.m.

14

15

16

17

18          VIRTUAL ZOOM DEPOSITION of ROBERT

19   CINTRON, taken pursuant to Notice, held via

20   Zoom before Fran Insley, a Notary Public of the

21   States of New York and New Jersey.

22

23

24

25

```
                                                    Page 2
 1
 2    A P P E A R A N C E S:
 3         BURGESS, BERG & ANDROPHY
 4              Attorneys for Plaintiffs in
                Richardson v Trump Case
 5
                120 West 45th Street, 38th Floor
 6              New York, New York 10036
 7         BY:  EMILY BURGESS, ESQ.
                Phone:  (646) 766-0080
 8              eburgess@bafirm.com
 9
10         NJ OFFICE OF THE ATTORNEY GENERAL
11              Attorneys for Defendants
12              P.O. BOX 112
                Trenton, New Jersey 08625-0112
13
           BY:  ESTELLE A. BRONSTEIN, ESQ.
14                   -and-
                MELISSA MEDOWAY, ESQUIRE
15              Phone:  (609) 292-4925
                estelle.bronstein@law.njoag.gov
16
17         STATE OF NEW YORK, OFFICE OF THE
           ATTORNEY GENERAL
18
19              28 Liberty Street
                New York, New York 10028
20
           BY:  MORENIKE FAJANA, ESQ.
21                   -and-
                ALEX FINKELSTEIN, ESQ.
22                   -and-
                MATTHEW COLANGELO, ESQ.
23                   -and-
                DANIELA NOGUERIA, ESQ.
24              Phone:  (212) 453-0786
                morenike.fajana@ag.ny.gov
25
```

```
                                              Page 3

 1
 2   APPEARANCES CONT'D:
 3          ATTORNEY COMMERCIAL AND APPELLATE
            LITIGATION
 4
                   Attorneys for United States
 5                 Postal Service
 6                 475 L'Enfant Plaza, SW
                   Washington, DC 20260
 7
         BY:    WENDY A. HARRIS, ESQ.
 8                      -and-
                   ALICE COVINGTON, ESQ.
 9                      -and-
                   STEPHAN J. BOARDMAN, ESQ.
10                 Phone:  (202) 268-8515
                   wendy.a.harris@usps.gov
11
12         COVINGTON & BURLING, LLP
13
                   Attorneys for Plaintiffs Vote
14                 Forward v. DeJoy
15
                   The New York Times Building
16                 620 Eighth Avenue
                   New York, New York 10018-1405
17
         BY:    HABIN CHUNG, ESQ.
18                 Phone:  (212) 841-1247
                   hchung@cov.com
19
20         U.S. DEPARTMENT OF JUSTICE, CIVIL
            DIVISION
21
                   Attorneys for Defendants
22
                   1100 L Street NW
23                 Washington, D.C. 20005
24       BY:    ALEXIS J. ECHOLS, ESQ.
                   Phone:  (202) 514-5108
25                 alex.j.echols@usdoj.gov
```

Page 4

1

2   -------------- I N D E X ----------------

3   WITNESS                  EXAMINATION BY        PAGE

4   ROBERT CINTRON     MS. FAJANA              5

5                      MS. CHUNG              161

6   -------------E X H I B I T S----------------

7   CINTRON        DESCRIPTION              PAGE

8   Exhibit 1  PLAINTIFF'S NOTICE OF

              DEPOSITION              12

9

10  Exhibit 2  POSTAL SERVICES JULY 2020

              GUIDANCE ON ADHERING TO

11             TRANSPORTATION SERVICES        44

12  Exhibit 3  COURT DOCUMENT              72

13  Exhibit 4  ORDER                      73

14  Exhibit 5  CLARIFYING OPERATIONAL

              INSTRUCTIONS              77

15

16  Exhibit 6  MANDATORY STANDARD-UPTALK    85

17  Exhibit 7  ADDITIONAL RESOURCES FOR

              ELECTION MAIL              96

18

19  Exhibit 8  NUMBER OF POSTAL LATE TRIPS   119

20  Exhibit 9  NUMBER OF EXTRA TRIPS        124

21  Exhibit 10 SERVICE PERFORMANCE DATASET   129

22  Exhibit 11 EXCEL SHEET              162

23        (Exhibits retained by Ms. Fajana.)

24

25

```
                                              Page 20
 1                    Cintron - Fajana
 2        A.     Yeah, it would be based on who it is
 3    impacting.  So when we make changes, there is
 4    usually a lot of communication that could
 5    happen via a variety of ways.  Prior to what we
 6    have done here, normally, we would have areas
 7    that we would have communication with those
 8    areas and then with the districts that report
 9    underneath them, so it could be done via
10    verbal.  It would be done in writing.  They
11    would participate today the way that we're set
12    up.
13             You know, we have these divisions.
14    So a little bit of change that we went through
15    over the last couple of months.  Same kind of
16    concept.  We would -- we would be interacting
17    with the divisions and the local transportation
18    folks, operational folks on whatever change we
19    might be making.  So it's done verbally, in
20    writing, Webinars.  There'd be a variety of
21    ways we would do it.
22        Q.    And there is typically some back and
23    forth between your area of responsibility and
24    whatever department you are making a
25    transportation schedule for?
```

```
                                         Page 21
 1                   Cintron - Fajana
 2        A.     Yes, absolutely.
 3        Q.     And when you say prior to the
 4   changes in the last couple of months, are you
 5   talking about changes to the late trip and
 6   extra policy -- late trip and extra trip
 7   policy, rather?
 8        A.     Well, that would be different.
 9   Those aren't -- that is adhering to schedules,
10   so that would be different.  You know, we made
11   some changes in the last month around
12   optimizing long-haul transportation schedules.
13   So those -- it's like a year in the making
14   where we've been developing how to optimize
15   routes.
16           So today, you know, as an example,
17   we might have mail going from point A to point
18   B and we changed the routing to make it more
19   efficient from service or cost perspective.  It
20   may not be taking the same routes that we've
21   optimized.
22           So we -- normally, again, if we are
23   making those type of changes or you asked about
24   late and extra service, those are not really
25   schedule changes.  That -- that would be
```

```
                                            Page 32
 1                  Cintron - Fajana
 2   anybody had to then or beyond that necessarily
 3   get approval.  You're kind of referencing these
 4   guidelines.  You know, I put them out as an
 5   idea that you -- you know, you're not calling
 6   people.  We gave you the guidelines for what
 7   you should be doing and why you do them.
 8        Q.    Well, let's put questions about the
 9   guidelines specifically on hold and talk about
10   how late trips and extra trips were run before
11   the guidelines were issued.
12             So you said that people could
13   approve late trips.  Are these managers or who
14   is responsible for that approval?
15        A.    Front Line Managers in facilities.
16        Q.    Was it ever possible for a
17   nonmanagerial employee to decide on their own
18   that a late trip was necessary?
19        A.    It's possible.  I mean, you've got
20   289 buildings, 31,000 post offices, so, yeah.
21        Q.    Well, I guess my question is whether
22   it was required for nonmanagerial employees to
23   seek any sort of approval before running a late
24   trip?
25        A.    Yeah.  I would say for craft
```

```
                                        Page 34
 1                  Cintron - Fajana
 2    work for managers.  I've run five plants.  When
 3    somebody was making a decision to hold a truck,
 4    that was being done by -- by a manager, manager
 5    or supervisor was making those decisions.
 6         Q.    Okay.  When --
 7         A.    The clerk is the person who actually
 8    does the activities, so they may be the person
 9    who was going to call the extra or they're the
10    ones that are going to tell the driver, but
11    usually that direction is coming from a manager
12    who is running the operation.
13         Q.    And you mentioned managers and
14    supervisors, and is there a distinction between
15    those two positions?
16         A.    There are.  Yes, we have supervisors
17    who are directly responsible maybe for 25
18    people in a mail processing facility.  A
19    manager overseas all of the supervisors.  So it
20    could be --
21         Q.    Okay.  Go ahead.  Sorry?
22         A.    Yep.  So that manager is overseeing
23    the Supervisors, you know.
24         Q.    So in this instance, are you saying
25    that the approval could only happen at the
```

1                    Cintron - Fajana

2    level of say a Plant Manager or a District

3    Manager or any Supervisor?

4         A.    Yeah.  A supervisor could make that

5    decision.  If you -- you got to think about how

6    we operate.  We operate 24/7.  There is not

7    always a manager in a building, so a lot of

8    times it's left up to a supervisor and then,

9    you know, they could make that decision.

10        Q.    And before the new guidelines about

11   the adherence to the transportation schedules,

12   what would a Supervisor consider before making

13   that decision to approve a late trip?

14        A.    They would be considering, you know,

15   again, how late -- how late an operation is

16   running, right.  So the decision could be, as

17   it relates, like maybe to going to a delivery

18   unit in the morning.  They would be working

19   with the people inside the operations, right,

20   so a Supervisor in transportation would have

21   the trucks.  It could be that the -- the --

22   inside the building, they are running 20

23   minutes late, 30 minutes late.  They would make

24   a decision based on that time frame, whether it

25   was reasonable to either hold the truck or just

```
                                              Page 46
 1                    Cintron - Fajana
 2    bit of confusion from the telecon with --
 3    during that telecon with the Area Vice
 4    President around the elimination of extras and
 5    lates.  It was never the intent -- I mean,
 6    aspirationally, the idea is get rid of lates
 7    and extras, but we knew then and, you know, had
 8    some questions around what it meant
 9    specifically, because we have a lot of reasons
10    in the network why we absolutely do run lates
11    and extras, and so the document was created to
12    clear up any confusion around that idea.  You
13    know, so the idea is you are going to run lates
14    and extras every day.  There are reasons why we
15    do it.
16         Q.    And this was to clear up confusion
17    among Area Vice Presidents based off of the
18    conference that you had had with Area Vice
19    Presidents on July 10th, 2020?
20         A.    That's correct.
21         Q.    And what was discussed at that
22    conference?
23         A.    It was about again, eliminating
24    lates and extras in the network.  We had been
25    talking about it for a very long time,
```

Page 47

```
 1                    Cintron - Fajana
 2   adherence to the operating plan.  There were
 3   other initiatives talked about during that
 4   call, and so the idea here was, you know,
 5   again, because I got some phone calls, people
 6   had questions, you know, we created these --
 7   this document to clarify that they're -- we
 8   were not eliminating lates and extras in the
 9   network.
10        Q.    And who did you receive telephone
11   calls from?
12        A.    I would have talked to a couple of
13   people.  Mike Barber, who is the MOS in the
14   southern area had called me.  I think Mike
15   Melendrez in the Great Lakes area might have
16   called me, I believe.  Larry Munoz, I may have
17   spoken to, M-U-N-O-Z, Sean Mossman.  So I
18   think -- it's like -- to the best of my
19   recollection, those would have been some of the
20   people that I would have received calls from.
21        Q.    And are all of those individuals
22   Area Vice Presidents?
23        A.    No.
24        Q.    And what are there respective roles?
25        A.    So there would have been -- a couple
```

```
                                        Page 50

 1                Cintron - Fajana
 2   It also impacts costs, right, if we don't
 3   adhere to the operating plan and we run, you
 4   know, unnecessary extra service behind it
 5   becomes costly.
 6        Q.    Just to confirm, what date was the
 7   Cintron guidance document issued?
 8        A.    I believe I issued a preliminary one
 9   on the 11th, and then I had a final version
10   that went out on the 14th.
11        Q.    Is that final version what we are
12   looking at right now?
13        A.    I would say that's the final
14   version.  They are pretty similar, but I
15   believe that's the final version, the one you
16   have in front of you.
17        Q.    Okay.  So you mentioned that prior
18   to the issuance of the Cintron guidelines, that
19   there was not formal written guidance about the
20   need to adhere to transportation schedules; is
21   that correct?
22        A.    Formal written guidance, no.
23        Q.    And were there any trainings that
24   were given to management about the need to
25   adhere to transportation schedules and
```

1                  Cintron - Fajana

2        A.     I wouldn't say -- not confusion over

3    whether employees could run.  Again, I'm just

4    to clarify that employees don't necessarily

5    make those -- not craft, if you are talking

6    employees.  Decisions about running

7    transportation are usually being done again by

8    a supervisor or manager in the organization

9    prior to and today.

10       Q.     And so at that time, do you recall

11   receiving questions about whether lates or

12   extras should be run by supervisors or

13   managers?  This is before the issuance of the

14   July 2020 Cintron guidelines.

15       A.     I mean, the biggest one -- you know,

16   there would be questions around customer

17   pickups, whether or not we should be running

18   extras.  You know, some customer pickups we

19   would be doing back even today, and we put

20   guidelines around that too.  It could be to run

21   a whole tractor trailer to go pick up a

22   container of mail.  Does that make logical

23   sense for us to do that.  You know, there would

24   be questions like that.  Those would certainly

25   be questions we would have.  You know, during

Page 59

1                    Cintron - Fajana

2      the system and see exactly what his lates and

3      extras are in his area of responsibility.  It

4      could be that a manager that runs that facility

5      could distribute -- you know, generate a report

6      and distribute it to those folks.  It could be

7      back then areas that would do that or today

8      divisions.  So it's not like a regular format

9      that we are sending these out on a regular

10     basis to the field because we have -- you know,

11     we've invested a significant amount of money in

12     these systems for people to readily be able to

13     see that data.

14           Q.     Okay.  So beyond data about the

15     number of lates and extra trips, what other

16     information did you and your team have as you

17     were developing the Cintron guidelines?

18           A.     There wouldn't have been any other

19     questions or data.  The guidelines were built

20     around scenarios that could occur.  So it

21     wasn't about data as much as it was there is a

22     scenario that could result in late or extra and

23     then what would be the guidance around that --

24     that situation.

25           Q.     So when you say "scenarios," are you

```
                                           Page 60

  1                    Cintron - Fajana
  2     talking about hypotheticals or how did these --
  3     how did you decide which scenarios to consider?
  4          A.    Thirty-five years of experience of
  5     looking at all the reasons why it has to
  6     happen.  So, you know, what we did is, we
  7     did -- you know, again, we walked through.  If
  8     you looked at the Cintron guidelines, as you
  9     call them, late FedEx happens every day in the
 10     network.
 11               Somewhere out of all the planes, out
 12     of the 600 planes that operate, one of them is
 13     going to be late.  So we know that -- that
 14     event could occur.
 15               Extra flights due to mitigation.  We
 16     already know in advance that there is going to
 17     be another flight.  Too much mail went into the
 18     cargo carrier.  The only way to get it out is
 19     because they now need another plane.  Known,
 20     happens every day.
 21               Our terminal handling service.  You
 22     know, I could go through every one of these.
 23     These are things that occur in the network on a
 24     regular basis and would absolutely justify
 25     lates and extras to occur, did then and do
```

```
 1                  Cintron - Fajana
 2   today.  So there is no data to really gather
 3   other than, you know, what we see every day as
 4   failure points in the network potentially.
 5        Q.    Okay.  Was there any other type of
 6   analysis done of what the impact of the Cintron
 7   guidelines would be?
 8        A.    I wouldn't say there is any other
 9   analysis, again, other than the experience and
10   service analysis, I keep going back to, you
11   know, yesterday.  You know, three trailers
12   arrived to an air stop late.  The impact is
13   that if you leave late, then we absolutely know
14   that mail is coming back.  That's a fact.
15        Q.    And what was the service analysis?
16        A.    Service analysis would have been --
17   has been for two years, we got a variety of
18   different things.  There is -- the last couple
19   of years has -- has developed.  I would -- I
20   would say that the data flow has become far
21   more robust.  You know, one of the items we do
22   is what we call a grid analysis that tells you
23   why mail failed.  Then that grid analysis you
24   would see the scans.  You know, you could see
25   where a truck departed late, arrived late, and
```

```
                                            Page 63

 1                    Cintron - Fajana

 2         A.     No, because again, as I said, the

 3    guidelines were met to approve what was already

 4    known, situations that could occur that would

 5    require extras and there was no analysis

 6    necessary.  These were the reasons why you

 7    would be running lates and extras in the

 8    network.

 9         Q.     So there was no need to do an

10    analysis on service performance or the impact

11    that these guidelines could have on other parts

12    of postal operations?

13         A.     No, because the impact that we were

14    seeing was we were impacting other parts of the

15    operation.  You know, you were bringing a truck

16    to a facility outside of a window where it was

17    not able to process that mail, that was an

18    impact.  We go the to cargo carriers and mail

19    was coming back.

20              If you failed to do some of this,

21    you were leaving mail, right?  Again, the focus

22    here was directing you how to be able to run

23    that, you know, why you would be running that

24    service, and so that -- you know, often I keep

25    hearing that we ban.  We didn't ban extras and
```

```
                                        Page 65
 1                    Cintron - Fajana
 2            We -- you know, the contractor will
 3   not be able to unload that aircraft.  We will
 4   not be able to process that mail until the
 5   following day, so running extra service to pick
 6   it up today would not be a good use of extra
 7   transportation because there's no benefit to
 8   running it, because two hours later we might
 9   have a truck that's scheduled already to drop
10   mail off that's going to bring that mail back.
11            So what we didn't want to do --
12   right, this was clarified.  Again, there are
13   reasons why you would not run, but there are
14   100 reasons why you absolutely do need to run
15   every day and we do, several hundred.
16       Q.    Right.  And just to be clear, the
17   guidelines were meant to clarify the confusion
18   that was caused by the July 10th
19   teleconference?
20       A.    That's correct.
21       Q.    And just to also be clear about some
22   of your prior testimony, different managers,
23   whether they were AVPs or MOSs asked you
24   whether late trips and extra trips were, in
25   fact, eliminated and wanted guidance about
```

```
                                          Page 69

 1                    Cintron - Fajana

 2        minute break.  So we will be back at 9:57.

 3                (Time noted: 9:47 a.m.)

 4                (Back on the record.  Time noted:

 5        10:00 a.m.)

 6        Q.    Let's go back on the record.

 7                So Mr. Cintron, I just wanted to ask

 8   you a few follow-up questions about this

 9   July 10th teleconference again.  So what

10   precipitated the decision to make a

11   presentation about needing to adhere to

12   transportation schedules?

13        A.    Again, telecon was held or I won't

14   say again.  I didn't state that.  So this was

15   held by Dave Williams, Chief Operating Officer

16   at the time with the AVPs.  So I think it's

17   just -- you know, many items were in the deck.

18   This would have just been one of them, just an

19   ongoing issue with lates and extras and

20   adhering to the operating plan in general.  I

21   believe the presentation was around all of

22   that, not just transportation but operating

23   plans in general and people adhering to the

24   operating plan.

25        Q.    Your specific presentation or other
```

```
                                      Page 70
 1               Cintron - Fajana
 2   presentations that took place at a
 3   teleconference were about the need to adhere to
 4   operating plans?
 5        A.     July 10th is not my presentation.
 6        Q.     So let me -- let's step back then,
 7   because based on your prior testimony, you said
 8   that there was a July 10th teleconference --
 9        A.     Yes.
10        Q.     -- where a presentation was made
11   about needing to adhere to transportation
12   schedules as it pertains to lates and extras?
13        A.     That was part of the presentation on
14   July 10th.
15        Q.     So who delivered that presentation?
16        A.     Chief Operating Officer at the time,
17   Dave Williams.
18        Q.     I see.  And so what else was a part
19   of that presentation beyond lates and extras?
20        A.     I would have to go back and look.
21   There were other slides.  I can't recollect 100
22   percent, but we could easily go back and look.
23        Q.     Did Dave Williams also present on
24   operating plan?
25        A.     Yes, whatever the topics were,
```

```
                                    Page 71
```

1                      Cintron - Fajana

2    Dave -- Dave presented at this meeting, and it

3    would have been -- it would have been more than

4    just lates.  There was more than just lates and

5    extras.  I just don't remember what every slide

6    was.

7          Q.    And then following the meeting,

8    AVPs, MOSs and others were asking you about the

9    late trip/extra trip piece of that

10   presentation; is that correct?

11         A.    That's correct.  I would have -- I

12   received some calls from the people we

13   discussed earlier that were asking for

14   clarification.

15         Q.    Okay.  And so when you say there was

16   a presentation, was this just -- was this just

17   done orally or was there a PowerPoint?

18         A.    Yeah, there was -- there was a

19   PowerPoint.

20         Q.    And do you remember what the

21   PowerPoint said about late and extra trips?

22         A.    Yeah, they said about eliminating

23   them.

24         Q.    It said what about eliminating them?

25         A.    I think no more late trips, and

```
 1                   Cintron - Fajana
 2         Q.    When -- you said you made that clear
 3   that late trips and extra trips were not
 4   banned, and how did you make that clear to
 5   employees or how was that made clear?
 6         A.    Yeah.  Memos have come out that, you
 7   know, that say that, that we have not -- not
 8   banned the use of extras and lates.
 9         Q.    Do you recall the date that any
10   particular memo was released?
11         A.    You could produce them.  I don't --
12   I mean, right off the top, I don't know -- I
13   wouldn't know the dates.
14         Q.    Do you know the substance of any
15   particular memo that was issued regarding the
16   ability of postal employees to continue running
17   lates and extras?
18         A.    Again, I think what we've said in
19   different documents again that we have not
20   banned the use of lates and extra service.
21   Those decisions again, made at the front-line
22   level when appropriate to do so.
23         Q.    So it's fair to say then that the
24   Cintron guidelines remain in effect at the
25   Postal Service?
```

```
                                      Page 77

 1                  Cintron - Fajana

 2        A.    They do.

 3              MS. ECHOLS:  Objection, vague.  Go

 4        ahead.  You can answer.

 5        A.    They do.  They are in effect.

 6        Q.    Okay.

 7              MS. FAJANA:  Alex, could you please

 8        display Tab 7.  Let's mark this as

 9        Exhibit 5.  Can you please scroll through

10        for the witness?

11              (Whereupon document was marked

12        Exhibit 5 for identification as of this

13        date.)

14        A.    (Witness reviewing document.)

15        Q.    Mr. Cintron, are you familiar with

16   this document?

17        A.    Yes, it looks familiar.

18        Q.    Have you seen it before?

19        A.    I have.

20        Q.    And when is the last time that you

21   saw this document?

22        A.    I don't recollect the last time I

23   looked at it.  It came out in September.  I'm

24   not sure the last time I would have looked at

25   it.
```

Page 91

1                    Cintron - Fajana
2    got them running very large facilities and
3    operations in the field and I think that they
4    understand -- they would understand what this
5    is telling them.
6            I think that's why it starts out
7    with the idea that we have not banned them.  So
8    we are not telling them we're not -- we're not
9    telling you don't run them.  We are.  But it's
10   got to be reasonable to able to make timely
11   delivery.  There's just some decisions you --
12   you're just not going to make and we count on
13   those people having some business acumen that
14   allows them to understand the difference of
15   when you do and don't do that.
16       Q.   So if managers and supervisors, you
17   know, rely on their individual experience and
18   expertise to determine whether late trips or
19   extra trips are necessary, then why were the
20   Cintron guidelines issued?
21       A.   Because in some cases people made
22   decisions that were not -- that did not make
23   sense, right.  So that's why I said we have not
24   rescinded the guidelines.  There are reasons
25   why you would not run an extra.  There are many

Page 118

1                    Cintron - Fajana
2     a schedule.  What our focus has been is we
3     would much rather that we take the failure
4     there, the 10 percent, at that point in time,
5     than to try -- again, these are heroic efforts.
6               The people at the Postal Service,
7     they are very focused.  Again, and this has
8     been a long-aged issue with our people, right.
9     They are trying to get every piece every day.
10    So they want to get every piece on the truck
11    and don't always understand that the truck,
12    when it gets to its destination where it's
13    going, may not making it there timely and now
14    you're bringing the mail back.  That is why we
15    need to run on a plan.  The truck would have
16    left at 90 percent.  It would have made the air
17    stop.  And yeah, we would have had some delayed
18    mail.  We would have had some.  It would have
19    been a small pile sitting in the plant.  We
20    held it a little too long and then it got
21    refused.  Those are real scenarios that have
22    been happening every day for a very long time.
23    So our focus is to reduce that from happening.
24               MS. FAJANA:  Fran, can we take a ten
25         minute break, please.  We will be back at

```
                                          Page 123
 1                    Cintron - Fajana
 2        A.     It appears to be 48, 4,900.
 3        Q.     So since there is some variation,
 4   would it be fair to say that it's between 3 to
 5   5,000 as well in early July?
 6        A.     Sure.
 7        Q.     Is it also correct that there are
 8   fewer late trips per day now in October as
 9   compared to early July?
10        A.     Yes.
11        Q.     So now, let's look at -- starting
12   July 11th and look at the next couple of weeks.
13   So for the remainder of July.  So if we could
14   scroll through and also look up until
15   July 31st.
16               So how would you characterize the
17   number of late trips happening at this time
18   from July 11th through July 31st?
19        A.     1,000 to 1,800.
20        Q.     Is it correct to say that that is
21   around the same rate as of right now in
22   mid-October?
23        A.     I believe it was.
24        Q.     Is it fair to say that the rate of
25   late trips is significantly lower than it was
```

```
                                      Page 124
 1                  Cintron - Fajana
 2   before July 11, 2020?
 3        A.     Absolutely.
 4              MS. FAJANA:  Alex, can we please
 5        look at tab 11 and we will mark this as
 6        Exhibit 9.
 7              (Whereupon document was marked
 8        Exhibit 9 for identification as of this
 9        date.)
10        Q.    Mr. Cintron, are you familiar with
11   this document?
12        A.    Yes, that would be extras.
13        Q.    Have you seen this document before?
14        A.    I have.
15        Q.    When did you last see it?
16        A.    I would say in the last few days,
17   maybe Monday.
18              MS. FAJANA:  Alex, can we please
19        scroll through to the bottom.
20        Q.    So looking at this time period
21   again, the data that we have from October, so
22   that's October 1st through October 11, 2020, on
23   average how many extra trips were being made
24   during this time period?
25        A.    October looks like 500 to 1,700.
```

```
1                    Cintron - Fajana
2    communications, do they apply to election mail
3    as well?
4         A.    Yes, they would.  They would, right,
5    because the mail is all together, so it's not
6    like we have election mail that is separate
7    from everything, so basically it's applying to
8    all which includes election mail.
9         Q.    That is the end of my questions.
10   Thank you again for your time.
11              MS. FAJANA:  So Alexis, did you want
12         to do a redirect or --
13              MS. ECHOLS:  Let's take a break and
14         then I will be able to figure out whether
15         or not we will need to do a redirect.  And
16         we will proceed with that when we come
17         back from the break.  Let's take ten
18         minutes and then if we need more, we will
19         come back and say it, but I don't think we
20         will.  Let's come back at 1:30.
21              MS. FAJANA:  Okay.  So Fran, can we
22         go off the record, please.
23              (Time noted:  1:19 p.m.)
24              (Brief recess taken.)
25              (Time noted:  1:33 p.m.)
```

Page 172

1                    Cintron - Fajana

2          MS. ECHOLS:  We do not have any

3      redirect for Mr. Cintron.  We ask that he

4      be able to read and sign the transcript.

5          MS. FAJANA:  Is there anything else?

6          MS. ECHOLS:  Not from us.

7          MS. FAJANA:  Well, thank you again,

8      Fran, for your hard work these past few

9      days.  I know it's been some early

10     mornings and we really appreciate it and

11     thank you again to Mr. Cintron for your

12     time today.

13          (Time noted:  1:34 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 173

1

2                  A C K N O W L E D G M E N T

3

4    STATE OF                  :

                               :ss

5    COUNTY OF                 :

6

7            I, ROBERT CINTRON, hereby certify that

8    I have read the transcript of my testimony

9    taken under oath in my deposition on the 15th

10   day of October, 2020; that the transcript is a

11   true, complete record of my testimony and that

12   the answers on the record as given by me are

13   true and correct.

14

15                     ------------------------

                               ROBERT CINTRON

16

17   Signed and subscribed to before

     me this                    day of

18                              , 2020.

19

20   --------------------------------------

     Notary Public of the State of

21

22

23

24

25

Page 174

1

2

3                C E R T I F I C A T E

4            I, FRAN INSLEY, hereby certify that the

5    Deposition of ROBERT CINTRON was held before me

6    on the 15th day of October, 2020; that said

7    witness was duly sworn before the commencement

8    of testimony; that the testimony was taken

9    stenographically by myself and then transcribed

10   by myself; that the party was represented by

11   counsel as appears herein;

12            That the within transcript is a true

13   record of the Deposition of said witness;

14            That I am not connected by blood or

15   marriage with any of the parties; that I am not

16   interested directly or indirectly in the

17   outcome of this matter; that I am not in the

18   employ of any of the counsel.

19            IN WITNESS WHEREOF, I have hereunto set

20   my hand this 16th day of October, 2020.

21

22

23

24       - - - - - - - - - - - -

25            FRAN INSLEY