# Exhibit 59

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STATE OF NEW YORK, et al,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, *et al.*,<br><br>Defendants. | Civil Docket No. 20-cv-2340 (EGS) |

**DEFENDANTS' RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendants DONALD J. TRUMP, in his official capacity as President of the United States of America; LOUIS DEJOY, in his official capacity as Postmaster General; and the UNITED STATES POSTAL SERVICE, by and through their undersigned counsel, hereby respond to Plaintiffs' First Set of Interrogatories to Defendants.

**OBJECTIONS AS TO DEFINITIONS AND INSTRUCTIONS**

1.  Defendants object to Definition 5 ("Defendants") because it defines a term not actually used in this set of interrogatories.  In responding to the interrogatories, Defendants respond on behalf of USPS, based upon information in the agency's possession, custody, or control. Defendants reserve the right to object to such definitions if they are used in future discovery requests.

2.  Defendants object to Definition 10 ("First Class Mail") as incorrect.  For example, service-standards are based on the Postal Service's seven-day week, not business days.  Further, First-Class Mail standards depend on whether mail is presorted and other factors.  In responding

1

to these interrogatories, Defendants will understand the term "First Class Mail" as that product is described in Section 1100 of the Mail Classification Schedule, available at https://www.prc.gov/mail-classification-schedule.

3.   Defendants object to Definition 12 ("Marketing Mail" or "Media Mail") as incorrect.  For example, Marketing Mail is not the same thing as Media Mail. In responding to these interrogatories, Defendants will understand the term "Marketing Mail" as that product is described in Section 1200 of the Mail Classification Schedule, available at https://www.prc.gov/mail-classification-schedule.

4.   Defendants object to Definition 14 ("U.S. Postal Service") as including "employees." The Postal Service employs almost 600,000 people.  It would be impossible to obtain information from all of them in response.  Defendants will construe these requests to be asking for a description of the national practices and policies of the Postal Service.  Defendants will respond on behalf of USPS as described in the objection to Definition 5.

5.   Defendants object to Instruction No. 4 to the extent it exceeds the requirements of Federal Rule of Civil Procedure 26(b)(5)(A)(i)-(ii).

6.   Defendants object to Instruction No. 5 to the extent it exceeds the requirements of Federal Rules of Civil Procedure 26 and 33.

7.   Defendants object to Instruction No. 9 to the extent it exceeds the requirements of Federal Rule of Civil Procedure 26(e).

## <u>RESPONSES AND OBJECTIONS TO INTERROGATORIES</u>

### <u>Interrogatory No. 1:</u>

Identify each person who participated in furnishing any information with respect to these Interrogatories.

**Objections:**  Defendants object to this interrogatory to the extent the term "participated" is vague. Defendants interpret this term to include only those individuals who provided information responsive to these Interrogatories, and to exclude individuals, such as agency counsel or counsel of record, who may have facilitated obtaining information responsive to these Interrogatories. Pursuant to the Court's order, Defendants will provide a response to this request subject to the foregoing objections by October 13, 2020.

**Response**:  Subject to and without waiving the foregoing objections, the following individuals furnished information used to respond to these interrogatories:

- Angela Curtis, *Vice President, Retail and Post Office Operations, Headquarters*
- Robert Cintron, *Vice President, Logistics, Headquarters*
- Jennifer Vo, *Director, City Delivery, Headquarters*
- Kevin Couch, *Director, Maintenance Operations, Headquarters*
- Jason DeChambeau, *Director of Processing Operations, Headquarters*
- Michael Barber, *Vice President, Processing and Maintenance Operations, Headquarters*
- Arslan Saleem, *Manager, Service Performance Measurement, Headquarters*

**Interrogatory No. 2:**

Describe what factors the U.S. Postal Service considered to identify which and how many sorting machines to decommission, dismantle, turn off, tarp, cordon off, or remove from postal facilities in the following years:

a. 2019

b. 2020

**Objections:**  Defendants object to the term "factors" as vague and overbroad.  Defendants object to the terms "decommission, dismantle, turn off, tarp, cordon off, or remove" which are not defined as vague. Defendants understand and interpret "decommissioning" to mean the process of "machine removal," where a machine is removed to align with that facilities volume and mix of mail or other reasons, including (but not limited to) obsolescence, facility consolidations, and the

need for floor space, rather than, for example, moving a machine from one facility to another or sending it for repair. In responding to these requests, Defendants will understand these terms to refer to machine removal as just described.

Defendants further object to this interrogatory as duplicative of discovery requests and responses provided in *Washington v. Trump*, No. 20-cv-3127 (E.D. Wash.), and which was produced to Plaintiffs, specifically, USPS's response to the State of Washington's Interrogatory 1, and in the declarations of Jason DeChambeau, Kevin Couch, and Robert Cintron submitted in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction.

Defendants further object to this interrogatory as overbroad because it seeks information from 2019 and 2020.  In granting Plaintiffs' motion for expedited discovery, the Court noted that Plaintiffs' requests were "limited to a three month period of time."  *See* 10/2/2020 Minute Order.

Pursuant to the Court's order, Defendants will provide a response to this request subject to the foregoing objections by October 13, 2020.

**Response**:

a.  In 2019, as in prior years, the Postal Service considered the volume and type of mail and nationwide processing needs to identify targets for reduction of the Postal Service's inventory of mail processing and sorting machines.  Each machine is capable of processing a specific volume of mail when it is operating at maximum capacity.  Postal Service Headquarters Processing Operations continually monitors real-time data on machine utilization, performance, and excess capacity at processing plants throughout the nation.  If there were a sufficient volume of mail in a plant to keep the machines running and processing at the machines' maximum capacity, then the

plants' machine utilization would be 100 percent.  If a machine is only operating at, for example, 60 percent capacity, it is capable of processing much more mail.  When data indicates each of two letter sorting machines in one facility is handling less than the capacity of one machine, for example, one of the machines is redundant. Unnecessarily keeping underutilized machines in certain locations is inefficient and costly, and, consequently, removing machines is an essential part of the Postal Service's ongoing efforts to manage its human resources and costs while still striving to deliver mail as expeditiously as possible throughout the nation. Running unnecessary machines leads to numerous additional costs.  First, when letter and flat mail volume declines significantly and fewer machines within a facility are needed to process the volume of mail, leaving all machines in place in all locations requires the use of unnecessary work hours, because a facility needs fewer employees to run one machine than two and addition work time is also required for running each machine that is used. In addition, removal of unnecessary machines reduces utility and maintenance costs.  Use of the correct number of mail processing machines contributes to cost-effectiveness in the transportation of mail, as well, because one machine functioning at capacity requires the use of fewer mail trays and processes a higher volume of mail per tray. Accordingly, when the appropriate number and type of equipment needed is utilized, each plane or truck may hold a higher volume of mail moved on efficiently packed trays.  Cost savings are achieved when the Postal Service requires fewer trucks or less space on a plane to transport mail.

In the years preceding 2019 and continuing throughout, due primarily to the large decline in mail volume over the past decade, the Postal Service had more machines

than were needed to process the mail.  Beginning in 2017, as part of a reduction initiative, the Postal Service used a computer model developed by the Headquarters Operations Research group to determine the optimum number of machines required for efficient mail processing at facilities across the nation.  The model considers the variation in volume by using the 95th percentile of heaviest daily volume excluding December (a month with especially high mail volume), machine capacity, and processing windows. Postal Operations ran the model several times from 2017 through 2019 to identify the optimum number of machines required for efficient processing of current mail flow and, applying any adjustments in tracking methodology, set targets for reduction.  In June 2019, in phase 5 of the initiative, the Postal Service ran the model using the prior 12 months of data, excluding December.  As in prior years, letter and flat mail volume declined and fewer machines were needed.

b.  In 2020, the Postal Service considered the same factors that it had in previous years — type and volume of mail and processing needs nationwide.  Beginning in March 2020, the COVID-19 pandemic significantly accelerated the decline in the volume of mail, primarily letter and flat mail.  At the same time, package volume increased significantly.  As the pandemic period continued to affect the nation, this decline in letter and flat mail continued, and package volume continued to increase significantly. The fluctuation in types of mail was a major factor in the reduction analysis and had a significant effect on the Postal Service's mail processing equipment needs.

By May 2020, Headquarters Operations concluded based on ongoing data monitoring and analyses that the letter and flat mail volume was highly unlikely to return to the significantly higher pre-March level, and that the increased package volume would

likely continue.  Letter and flat mail processing machines in various facilities were operating far below the optimal capacity.  To operate more efficiently, the Postal Service needed fewer letter and flat sorting machines and more package machines and/or more workroom floor space for nonautomated package processing.  Where a smaller number of letter or flat mail sorting machines are needed in facilities to efficiently process the volume of such mail, removing unnecessary machines frees up space for other package-processing machines, which may be staffed with employees who are no longer needed for running additional letter or flat mail sorting machines. Even where sorting machines are not yet available, floor space is necessary to accommodate the increased volume of packages.

In May 2020, in Phase 6 of the reduction initiative, the model was rerun to identify targets for reduction based on the significantly higher volume reductions in letter and flat mail and the increase in package mail.  On May 15, 2020, Headquarters Processing Operations sent volume modeling and equipment reduction targets for various mail processing equipment to the area Vice Presidents for review and implementation. As in prior years, many machines were scheduled for removal during the summer months preceding August when mail volume is historically lower. Excess machines were either disassembled and physically removed, turned off and disconnected from the network, or temporarily tarped.

At the Postmaster General's direction on August 18, 2020, Headquarters directed that no further reductions would be implemented until after the November election.  At the present time, the Postal Service has substantial under capacity with respect to its letter and flat mail processing machines.  At this time, on low volume days, processing

machines are used only about 35% to 40% of the time and on high volume days they are used only about 65% to 70% of the time.

**Interrogatory No. 3:**

Describe what factors the U.S. Postal Service considered to identify which and how many collection boxes to move to a new location or take out of use in the following years:

     a. 2019

     b. 2020

**Objections:**  Defendants object to the term "factors" as vague and overbroad.  Defendants further object to this interrogatory as duplicative of discovery requests and responses provided in *Washington v. Trump*, No. 20-cv-3127 (E.D. Wash.), and which was produced to Plaintiffs, specifically, USPS's response to the State of Washington's Interrogatory 4, and in the Declaration of Jennifer Vo, submitted in support of Defendants' Opposition to Plaintiffs' Motion for a Preliminary Injunction.

Defendants further object to this interrogatory as overbroad because it seeks information from 2019 and 2020.  In granting Plaintiffs' motion for expedited discovery, the Court noted that Plaintiffs' requests were "limited to a three month period of time."  *See* 10/2/2020 Minute Order.

Pursuant to the Court's order, Defendants will provide a response to this request subject to the foregoing objections by October 13, 2020.

**Response**:

a.  In 2019, as in prior years, the Postal Service reviewed the need for and location of collection boxes applying the factors and procedures set forth in the U.S. Postal Service Postal Operations Manual ("POM") Sections 314 and 315.  ECF No. 30-2. (Vo

Declaration, Ex. 1).  The factors that guide the process are:

- Volume of mail the box receives:  Each year the Postal Service conducts annual assessments of collection box density, i.e., volume of mail per box.  Local facilities conduct the test for a two-week period (usually in September, when the Postal Service anticipates relatively high mail volumes), using scanners to record the data.  In 2019 the tests were conducted in September.  Based on the data gathered during the two-week test, which identifies seldom used collection boxes, i.e., collection boxes averaging less than 25 pieces of mail per day, local officials identify collection boxes for potential relocation or removal.  Declining volumes of First-Class Mail in 2019, as in prior years, led to more underutilized collection boxes.

- Customer needs:  When a collection box has low density, local customers' needs for collection can be adequately served by the carriers when delivering along their regular route assignment.  The Postal Service will leave boxes with fewer than 25 pieces per day in place in certain locations to optimize the customer experience (for example, boxes adjacent to senior citizen housing, hospitals, municipal and judicial buildings, and other public facilities).  The Postal Service also evaluates the need for multiple collection boxes adjacent to one another at one location.  If the total volume of mail collected from adjacent boxes could be accomplished by fewer boxes, the Postal Service could potentially determine that the redundant boxes be removed. Before the collection box relocation or removal decision is made, the Postal Service places notices of removal on identified boxes for 30 days to give customers an opportunity to comment by contacting their local post office.

- <u>Damage, tampering, and other circumstances</u>:  Apart from annual density studies, the Postal Service promptly removes mailboxes that have been vandalized or tampered with, and on a sporadic basis removes boxes that have been damaged or are in poor condition.  The Postal Service on occasion removes collection boxes for safety reasons on a temporary basis, for example, during civil unrest.

b.  In 2020, removal or relocation of collection boxes proceeded in accordance with the density studies and local decisions made during 2019, in accordance with POM 314 and 315, until August 18, 2020.  Density studies were conducted in June 2020.  On August 18, 2020, Headquarters ordered that the usual process of removing collection boxes be paused until after the November 2020 election.

**Interrogatory No. 4:**

On August 18, 2020, Postmaster General DeJoy issued a statement that he was "suspending these initiatives until after the election is concluded," attached as Exhibit 4 to Plaintiffs' Requests for Admission. Describe the following:

    a. What "these initiatives" refers to.

    b. When the suspension took effect.

    c. What steps, if any, Postmaster General DeJoy, the Executive Leadership Team, or their direct reports have taken to ensure that all employees have "suspended" these initiatives.

    d. What steps, if any, Postmaster General DeJoy, the Executive Leadership Team, or their direct reports have taken to ensure that employees are not following the July 10, 2020 "Mandatory Stand-Up Talk: All Employees" memorandum, attached as Exhibit 5 to Plaintiffs' Requests for Admission, or the July 14, 2020 "PMGs expectations and

plan" memorandum, attached as Exhibit 15 to Plaintiffs' Requests for Admission.

**Objections:**  Defendants object to this request as containing multiple subparts.  Defendants further object to this interrogatory as duplicative of discovery requests and responses provided in *Pennsylvania v. DeJoy*, No. 20-cv-4096 (E.D. Pa.), and which was produced to Plaintiffs, specifically, USPS's response to the State of Pennsylvania's Interrogatory 3.

Pursuant to the Court's order, Defendants will provide a response to this request subject to the foregoing objections by October 13, 2020**.**

<u>**Response**</u>:

a.  In the August 18, 2020, statement, Postmaster General DeJoy stated that ". . . there are some longstanding initiatives – efforts that predate my arrival at the Postal Service – that have been raised as areas of concern as the nation prepares to hold an election in the midst of a devastating pandemic.  To avoid even the appearance of any impact on election mail, I am suspending these initiatives until after the election is concluded."  In the latter sentence, "these initiatives" refers to long-standing initiatives that were part of the Postal Service's ongoing operations, including the annual review and removal of unnecessary collection boxes (described in response to Interrogatory 3) and the periodic removal of sorting and processing machines that are no longer needed to process the mail efficiently and timely (as described in response to Interrogatory 2).  In addition, the Postmaster explained that certain events that may have been alleged to be occurring (but were not), such as changes in retail hours at Post Offices, strict restrictions on overtime usage, and closing of mail processing facilities, would not occur before the November election and that, effective October 1, 2020, the Postal Service would utilize additional

11

resources in all areas of operations, including transportation, to satisfy any unforeseen demand through the election.

b.   The suspension took effect on August 18, 2020.

c.   The Postmaster General and the Executive Management Team met with Headquarters leadership prior to the announcement on August 18, 2020 and informed them of the decision to suspend initiatives and other activities that some members of the public believed were occurring (but were not) through the November elections.  On August 18, 2020, the Postmaster General's statement was sent to all Postal Service managers and EAS employees.  Since that time, Headquarters Logistics and Processing Operations has reiterated to managers nationwide during meetings, telephone calls, and/or by email that the August 18, 2020 orders for cessation must be followed; specifically, Headquarters has explained that that there are no new restrictions on overtime, that no further removal of collection boxes or machines may take place throughout the nation until after the November election, that retail hours at Post Offices are not to be changed, that mail processing equipment and blue collection boxes must remain whether they are, that no mail processing facilities will be closed, that overtime has, and will continue to be approved as needed, and that additional resources are to be used as necessary to effect timely delivery of Election Mail.

In addition, the Postal Service reiterated these directions and provided further detailed guidance in Clarifying Operational Instructions issued September 21, 2020 issued to all Executive and Administrative ("EAS") and above employees, the Additional Resources memo issued September 25, 2020 to all EAS and above employees, and a Stand-Up Talk issued September 24, 2020 to be relayed to all employees.  The Clarifying Operational

Instructions encompassed the directives from the Postmaster General's August 18 announcement, as well as further guidance that was required for compliance with preliminary injunctive relief ordered by the U.S. District Court in the Eastern District of Washington, which was issued prior to the instructions being distributed. The September 24, 2020 Stand Up Talk reinforced the messages from the Clarifying Operational Instructions. The September 25, 2020 Additional Resources memo provided additional detail regarding implementation of the Postmaster General's commitment made in August to engage standby resources in all areas of operations beginning Oct. 1, 2020. These communications explained that extra and late trips are not banned and may be utilized as reasonably necessary to effect timely mail delivery.

d. The July 10, 2020 document titled "Mandatory Stand-Up Talk: All Employees" ("July 10 SUT"), attached as Exhibit 5 to Plaintiffs' Requests for Admission and the July 14, 2020 "PMGs expectations and plan" PowerPoint presentation ("Expectations Presentation"), attached as Exhibit 15 to Plaintiffs' Requests for Admission, were not issued or authorized by Postal Service Headquarters.

SUT:  The July 10 SUT was prepared by a then-Area Vice President ("AVP") for what was then the Southern Area. The then-Southern AVP did not work at Postal Service Headquarters at that time, and Headquarters did not review the July 10 SUT prior to its distribution throughout what was then the Southern Area. It was not distributed to all Postal Service employees.

After Headquarters Operations and Logistics conducted a meeting with Area Vice Presidents on July 10, 2020, the Headquarters offices became aware of some confusion in the field about the communications regarding late and extra trips. The July 10 SUT, for

example, included some statements that have been incorrectly interpreted as imposing a complete ban on extra and late trips, *e.g.*, "Extra trips are no longer authorized or accepted," "no additional transportation will be authorized to dispatch mail to the Plant after then intended dispatch," and "temporarily – we may see mail left behind or mail on the workroom floor or docks."

Starting on July 11, 2020, in communications with field managers, including with AVPs, Headquarters sought to clarify that there was no ban on reasonably necessary extra and late trips.  In order to clarify for the field when extra and late trips were appropriate, Headquarters developed written guidelines regarding the circumstances under which the scheduling of extra transportation trips would be appropriate or inappropriate, intended to assist field management in determining when late and extra trips are acceptable.  On July 14, 2020, the final guidelines were distributed to Postal Service Area Vice Presidents, advising them of the Postal Service Operations' renewed effort on mitigating the number of unplanned, unnecessary trips and advising them that, to the extent possible, to use under-utilized trips, such as by adding volume to trucks leaving on schedule but only half full, to eliminate extra trips.  The guidelines were intended to clarify that extra trips remained authorized, and that late and extra trips were not banned.  Late and extra trips continued after those guidelines were provided, and continue to this day, albeit at a reduced level.  In addition, the Postal Service reiterated these directions and provided further detailed guidance in the September 21, 2020, Clarifying Operational Instructions; the September 25 Additional Resources memo, and the Stand Up Talk issued September 24, 2020.  (See Response to Interrogatory 4.c.).

14

<u>Expectations Presentation</u>:  Leadership at Postal Service Headquarters did not become aware of this presentation until after it was posted online on July 11, 2020.  After the presentation gained media attention, Headquarters learned that the memorandum was drafted by a Manager of Post Office Operations ("POOM") in the Northern Ohio District and presented to the managers that reported to him.  The presentation was not reviewed by Area management or Headquarters prior to its dissemination.  The document reflects a number of misunderstandings, including that it reflects the Postmaster General's expectation, and it includes blatantly incorrect statements of Postal Service policy, such as that overtime would be eliminated, that mail would be kept at the facility rather than being delivered that day, and that no routes could have more than four park points.  The Postmaster General and Headquarters did not and could not issue any such directions, as they are contrary to longstanding Postal Service policies and practices, that continue to be in effect to this day.

The Postal Service's collective bargaining agreements and various memoranda of understanding apply to the provision of overtime and neither those agreements nor any other policy prohibits overtime hours.  In addition, assessment of park points per route are guided by established long-term procedures that have not been changed.  It has long been understood throughout Postal Service operations that the goal is never to leave mail that must be delivered that day behind.

To the extent statements in the presentation may have led to confusion regarding postal policy, the Postal Service's actions from August 18, 2020, and thereafter (as described in response to Interrogatory No. 4.c) have corrected any remaining reasonable misunderstanding among Postal Service managers and employees. Headquarters has

explained that mail must not be left behind,  and that overtime will be used as reasonably necessary to effect timely mail delivery and is authorized for use during the current Election season to expedite the delivery of Election Mail.  As explained in response to Interrogatory No. 4.c, the Postal Service has provided further detailed guidance in the Clarifying Operational Instructions, the Additional Resources memo, and a Stand Up Talk in late September 2020.

**Interrogatory No. 5:**

Identify all weeks, if any, between July 1, 2015 and July 1, 2020, that on-time service performance for First Class Mail fell below 82% in a given week.

**Objections:**  Defendants object to this interrogatory as overbroad because it seeks information going back to July 1, 2015.  In granting Plaintiffs' motion for expedited discovery, the Court noted that Plaintiffs' requests were "limited to a three month period of time."  *See* 10/2/2020 Minute Order.

Pursuant to the Court's order, Defendants will provide a response to this request subject to the foregoing objections by October 13, 2020.

**Response**:  Attached is a list of all weeks between July 1, 2015 and July 1, 2020, that on-time service performance for First-Class Mail fell below 82% in a given week.  (The weeks are identified in the chart by the first day of the Postal Service 7-day work week, Saturday – Friday.).

**Interrogatory No. 6:**

Identify all weeks, if any, between July 1, 2015 and July 1, 2020, that on-time service performance for Marketing Mail fell below 80% in a given week.

**Objections:**  Defendants object to this interrogatory as overbroad because it seeks

information going back to July 1, 2015.  In granting Plaintiffs' motion for expedited discovery, the Court noted that Plaintiffs' requests were "limited to a three month period of time."  *See* 10/2/2020 Minute Order.

Pursuant to the Court's order, Defendants will provide a response to this request subject to the foregoing objections by October 13, 2020.

**Response**:

Between July 1, 2015 and July 1, 2020, service performance for Marketing Mail fell below 80% in the weeks beginning 11-18-2017, 1-13-2018, and 7-18-2020.

State of New York, et al. v. Donald Trump, et al., No. 20-cv-2340
Interrogatory No. 9 Response
Weeks FCM On-Time Service Performance fell below 82%

|  | B | C | D | E | F |
|---|---|---|---|---|---|
| 2 | Single Piece First-Class Two-Day | Single Piece First-Class Three-To-Five Day | Presort First-Class Overnight | Presort First-Class Two-Day | Presort First-Class Three-To-Five Day |
| 3 | NA | 7/4/2015 | NA | NA | 1/23/2016 |
| 4 |  | 7/11/2015 |  |  | 7/18/2020 |
| 5 |  | 7/18/2015 |  |  |  |
| 6 |  | 8/8/2015 |  |  |  |
| 7 |  | 9/12/2015 |  |  |  |
| 8 |  | 9/19/2015 |  |  |  |
| 9 |  | 9/26/2015 |  |  |  |
| 10 |  | 10/3/2015 |  |  |  |
| 11 |  | 10/17/2015 |  |  |  |
| 12 |  | 10/31/2015 |  |  |  |
| 13 |  | 11/7/2015 |  |  |  |
| 14 |  | 11/14/2015 |  |  |  |
| 15 |  | 11/21/2015 |  |  |  |
| 16 |  | 11/28/2015 |  |  |  |
| 17 |  | 12/5/2015 |  |  |  |
| 18 |  | 12/12/2015 |  |  |  |
| 19 |  | 12/19/2015 |  |  |  |
| 20 |  | 12/26/2015 |  |  |  |
| 21 |  | 1/2/2016 |  |  |  |
| 22 |  | 1/9/2016 |  |  |  |
| 23 |  | 1/16/2016 |  |  |  |
| 24 |  | 1/23/2016 |  |  |  |
| 25 |  | 1/30/2016 |  |  |  |
| 26 |  | 2/6/2016 |  |  |  |
| 27 |  | 10/15/2016 |  |  |  |
| 28 |  | 11/26/2016 |  |  |  |
| 29 |  | 12/3/2016 |  |  |  |
| 30 |  | 12/10/2016 |  |  |  |
| 31 |  | 12/17/2016 |  |  |  |
| 32 |  | 12/24/2016 |  |  |  |
| 33 |  | 1/7/2017 |  |  |  |
| 34 |  | 9/9/2017 |  |  |  |
| 35 |  | 10/14/2017 |  |  |  |
| 36 |  | 11/11/2017 |  |  |  |
| 37 |  | 11/18/2017 |  |  |  |
| 38 |  | 11/25/2017 |  |  |  |
| 39 |  | 12/2/2017 |  |  |  |
| 40 |  | 12/9/2017 |  |  |  |
| 41 |  | 12/16/2017 |  |  |  |
| 42 |  | 12/23/2017 |  |  |  |
| 43 |  | 1/1/2018 |  |  |  |
| 44 |  | 1/6/2018 |  |  |  |

State of New York, et al. v. Donald Trump, et al., No. 20-cv-2340
Interrogatory No. 9 Response
Weeks FCM On-Time Service Performance fell below 82%

|   | B | C | D | E | F |
|---|---|---|---|---|---|
| 45 |  | 1/13/2018 |  |  |  |
| 46 |  | 1/20/2018 |  |  |  |
| 47 |  | 1/27/2018 |  |  |  |
| 48 |  | 2/3/2018 |  |  |  |
| 49 |  | 2/10/2018 |  |  |  |
| 50 |  | 2/24/2018 |  |  |  |
| 51 |  | 3/3/2018 |  |  |  |
| 52 |  | 3/10/2018 |  |  |  |
| 53 |  | 3/17/2018 |  |  |  |
| 54 |  | 3/24/2018 |  |  |  |
| 55 |  | 7/7/2018 |  |  |  |
| 56 |  | 10/13/2018 |  |  |  |
| 57 |  | 11/3/2018 |  |  |  |
| 58 |  | 11/17/2018 |  |  |  |
| 59 |  | 11/24/2018 |  |  |  |
| 60 |  | 12/1/2018 |  |  |  |
| 61 |  | 12/8/2018 |  |  |  |
| 62 |  | 12/15/2018 |  |  |  |
| 63 |  | 12/22/2018 |  |  |  |
| 64 |  | 12/29/2018 |  |  |  |
| 65 |  | 1/1/2019 |  |  |  |
| 66 |  | 1/5/2019 |  |  |  |
| 67 |  | 1/12/2019 |  |  |  |
| 68 |  | 1/19/2019 |  |  |  |
| 69 |  | 1/26/2019 |  |  |  |
| 70 |  | 2/2/2019 |  |  |  |
| 71 |  | 2/9/2019 |  |  |  |
| 72 |  | 2/23/2019 |  |  |  |
| 73 |  | 3/9/2019 |  |  |  |
| 74 |  | 10/19/2019 |  |  |  |
| 75 |  | 11/16/2019 |  |  |  |
| 76 |  | 11/30/2019 |  |  |  |
| 77 |  | 12/7/2019 |  |  |  |
| 78 |  | 12/14/2019 |  |  |  |
| 79 |  | 12/21/2019 |  |  |  |
| 80 |  | 12/28/2019 |  |  |  |
| 81 |  | 1/1/2020 |  |  |  |
| 82 |  | 1/4/2020 |  |  |  |
| 83 |  | 1/11/2020 |  |  |  |
| 84 |  | 1/25/2020 |  |  |  |
| 85 |  | 2/1/2020 |  |  |  |
| 86 |  | 4/11/2020 |  |  |  |
| 87 |  | 4/25/2020 |  |  |  |
| 88 |  | 5/2/2020 |  |  |  |
| 89 |  | 5/9/2020 |  |  |  |
| 90 |  | 5/30/2020 |  |  |  |

State of New York, et al. v. Donald Trump, et al., No. 20-cv-2340
Interrogatory No. 9 Response
Weeks FCM On-Time Service Performance fell below 82%

| | B | C | D | E | F |
|---|---|---|---|---|---|
| 91 | | 6/6/2020 | | | |
| 92 | | 6/20/2020 | | | |
| 93 | | 6/27/2020 | | | |
| 94 | | 7/4/2020 | | | |
| 95 | | 7/11/2020 | | | |
| 96 | | 7/18/2020 | | | |
| 97 | | 7/25/2020 | | | |

VERIFICATION

I, Angela Curtis, an authorized representative of the United States Postal Service in the above-entitled matter, state that I have reviewed the responses and, in accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the responses are true and accurate to the best of my knowledge, information, and belief.

DATE:  October 13, 2020            SIGNATURE: _____
                                               ANGELA CURTIS

1

For the objections:


Dated:  October 13, 2020                    Respectfully submitted,

                                            JEFFREY BOSSERT CLARK
                                            Acting Assistant Attorney General

                                            ERIC R. WOMACK
                                            Assistant Director, Federal Programs Branch

                                            */s/ Joseph E. Borson*
                                            JOSEPH E. BORSON (Va. Bar No. 85519)
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L. Street, NW
                                            Washington D.C. 20005
                                            (202) 514-1944
                                            Joseph.Borson@usdoj.gov

                                            *Attorneys for Defendants*