**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 20 Civ. 2340 (EGS) |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION .................................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

I.      Plaintiffs depend on the U.S. mail, especially during the COVID-19 pandemic. ............... 2

II.     The Postal Service implemented abrupt changes in June and July 2020 that have
        had a nationwide impact. ............................................................................... 2

III.    The Postal Policy Changes have caused dramatic delays in mail delivery ......................... 5

IV.     Plaintiffs are injured by these mail delays. .......................................................... 7

ARGUMENT ........................................................................................................ 7

I.      Standard of review. ..................................................................................... 7

II.     The Court has subject-matter jurisdiction. ........................................................... 8

        A.      Plaintiffs have standing because the Postal Policy Changes are causing and
                will cause concrete injuries-in-fact that will be redressed by an injunction. ........... 8

                1.      Plaintiffs have suffered concrete injuries-in-fact. ............................... 8

                2.      Plaintiffs' injuries are caused by the Postal Policy Changes and
                        will be redressed by their invalidation. ......................................... 12

        B.      The court has jurisdiction to hear Plaintiffs' 39 U.S.C. § 3661 claim. ................. 13

III.    The Postal Policy Changes violate 39 U.S.C. § 3661. ............................................. 16

        A.      The Postal Service is required to consult with the Postal Regulatory
                Commission before making major changes to its policies or operations ............... 16

        B.      Plaintiffs' section 3661 claim is reviewable under the *ultra vires* doctrine. ......... 18

        C.      The Postal Service failed to comply with section 3661(b). ................................. 20

IV.     The Postal Policy Changes violate nondiscretionary service obligations mandated
        by the Postal Reorganization Act. ..................................................................... 23

        A.      The Court may review the Postal Policy Changes for compliance with
                Postal Reorganization Act mandates at either *Chevron* step one or step
                two. ............................................................................................... 23

        B.      The Postal Reorganization Act requires the Postal Service to comply with
                specific service requirements when planning and providing postal
                services. .......................................................................................... 24

        C.      The Postal Policy Changes violate section 101. ........................................... 27

        D.      The Postal Policy Changes violate section 403. ........................................... 29

i

V.     The Postal Policy Changes violate the Elections Clause. ...................................33

       A.     The Elections Clause reserves to the States the right to regulate
              congressional elections, unless expressly preempted by Congress. .....................33

       B.     A clear statement is required before a court may construe non-election-
              related federal legislation to enable interference with state election
              administration. ........................................................................................35

       C.     Defendants' conduct violates the Constitution by intentionally interfering
              with state election administration. ...........................................................35

VI.    The Court should order injunctive and declaratory relief to remedy Defendants'
       violations of the law and Constitution. .............................................................42

       A.     Plaintiffs are entitled to permanent injunctive relief..............................................42

       B.     Declaratory relief is also warranted. ...................................................44

CONCLUSION...........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Young*,
    920 F.2d 984 (D.C. Cir. 1990) ........................................................................24

*\*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
    321 F.3d 1166 (D.C. Cir. 2003) ................................................................ 18-19

*\*Air Alliance Houston v. EPA*,
    906 F.3d 1049 (D.C. Cir. 2018) ............................................................... 10-11

*Alaska Airlines, Inc. v. Civ. Aeronautics Bd.*,
    257 F.2d 229 (D.C. Cir. 1958) .......................................................................37

*Am. Hosp. Ass'n v. Burwell*,
    812 F.3d 183 (D.C. Cir. 2016) .......................................................................26

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ......................................................................................41

*\*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013) ................................................................................... passim

*Bennett v. Panama Canal Co.*,
    475 F.2d 1280 (D.C. Cir. 1973) ...............................................................14, 27

*Berkley v. Mountain Valley Pipeline, LLC*,
    896 F.3d 624 (4th Cir. 2018) .........................................................................15

*Block v. Cmty. Nutrition Inst.*,
    467 U.S. 340 (1984) ......................................................................................14

*Block v. Meese*,
    793 F.2d 1303 (D.C. Cir. 1986) .....................................................................13

*Bond v. United States*,
    572 U.S. 844 (2014) ......................................................................................35

*Bowen v. Mich. Acad. of Family Physicians*,
    476 U.S. 667 (1986) ......................................................................................19

*\*Buchanan v. U.S. Postal Serv.*,
    508 F.2d (5th Cir. 1975) ........................................................................... 21-22

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ................................................................................................33

*Carlson v. Postal Regulatory Comm'n,*
    938 F.3d 337 (D.C. Cir. 2019) ..............................................................................44

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ..................................................................................................8

*Chamber of Commerce v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996) .......................................................................... 18-19

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
    467 U.S. 837 (1984) ..........................................................................................18, 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ................................................................................................40

*Citizens Awareness Network, Inc. v. United States,*
    391 F.3d 338 (1st Cir. 2004) ..................................................................................17

*Colorado v. DeJoy,*
    No. 20-cv-2768 (WJM), 2020 WL 5513567 (D. Colo. Sept. 14, 2020) ................33

*Combined Commc'ns Corp. v. U.S. Postal Serv.,*
    891 F.2d 1221 (6th Cir. 1989) ..............................................................................29

*\*District of Columbia v. U.S. Dep't of Agric.,*
    444 F. Supp. 3d 1 (D.D.C. 2020) ......................................................13, 23, 28, 30

*Dep't of Commerce v. New York,*
    139 S. Ct. 2551 (2019) ......................................................................................11, 13

*Donald J. Trump for President, Inc. v. Way,*
    No. 20-cv-10753 (MAS), 2020 WL 5912561 (D.N.J. Oct. 6, 2020) ................. 9-10

*Eagle Trust Fund v. U.S. Postal Serv.,*
    365 F. Supp. 3d 57 (D.D.C. 2019) ........................................................................19

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) ................................................................................................42

*Engine Mfrs. Ass'n v. EPA,*
    88 F.3d 1075 (D.C. Cir. 1996) ..............................................................................23

*Foster v. Love,*
    522 U.S. 67 (1997) ..................................................................................................34

*Glob. Tel\*Link v. FCC*,
   866 F.3d 397 (D.C. Cir. 2017) ......................................................................................24, 30

*Goldstein v. SEC*,
   451 F.3d 873 (D.C. Cir. 2006) ..................................................................................................24

*Good Fortune Shipping SA v. Comm'r of Internal Revenue Serv.*,
   897 F.3d 256 (D.C. Cir. 2018) ..................................................................................................24

*Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ..................................................................................................42

*Halbig v. Burwell*,
   758 F.3d 390 (D.C. Cir. 2014) ....................................................................................................9

*Hamilton v. Geithner*,
   666 F.3d 1344 (D.C. Cir. 2012) ................................................................................................40

*Hanes Corp. v. Millard*,
   531 F.2d 585 (D.C. Cir. 1976) ..................................................................................................44

*Ill. Bd. of Elections v. Socialist Workers Party*,
   440 U.S. 173 (1979) ..................................................................................................................33

*Jenness v. Fortson*,
   403 U.S. 431 (1971) ..................................................................................................................39

*Jones v. U.S. Postal Serv.*,
   No. 20-cv-6516 (VM), 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020) ....................................12

*Judulang v. Holder*,
   565 U.S. 42 (2011) ....................................................................................................................24

*Krescholleck v. Southern Stevedoring Co.*,
   78 F.3d 868 (3d Cir. 1996) ........................................................................................................15

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ......................................................................................................43

*Leedom v. Kyne*,
   358 U.S. 184 (1958) ..................................................................................................................19

*Lopez v. Davis*,
   531 U.S. 230 (2001) ..................................................................................................................17

*Louisiana Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ..................................................................................................................36

*Loving v. IRS*,
   742 F.3d 1013 (D.C. Cir. 2014) ...................................................................................23

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .......................................................................................................8

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) .......................................................................................................8

*Massachusetts v. U.S. Dep't of Health & Human Servs.*,
   923 F.3d 209 (1st Cir. 2019) ........................................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .......................................................................................................8

*Munro v. Socialist Workers Party*,
   479 U.S. 189 (1986) ......................................................................................................34

*N. Air Cargo v. U.S. Postal Serv.*,
   674 F.3d 852 (D.C. Cir. 2012) ......................................................................................18

*N.Y. Stock Exch. LLC v. SEC*,
   962 F.3d 541 (D.C. Cir. 2020) ......................................................................................23

*NAACP v. U.S. Postal Serv.*,
   No. 20-cv-2295 (EGS), 2020 WL 5995032 (D.D.C. Oct. 10, 2020) .......................15

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Servs. Impasses Panel*,
   437 F.3d 1256 (D.C. Cir. 2006) ....................................................................................20

*\*New York v. Trump*,
   No. 20-cv-2340 (EGS), 2020 WL 5763775 (D.D.C. Sept. 27, 2020) ............... passim

*New York v. Trump*,
   No. 20-cv-5770, 2020 WL 5422959 (S.D.N.Y. Sept. 10, 2020) (three-judge
   court) ............................................................................................................................45

*New York v. U.S. Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019) ....................................................................11, 44

*New York v. U.S. Dep't of Homeland Sec.*,
   No. 19-cv-7777 (GBD), 2020 WL 4347264 (S.D.N.Y. July 29, 2020) .....................10

*New York v. U.S. Dep't of Labor*,
   363 F. Supp. 3d 109 (D.D.C. 2019) .........................................................................11, 13

*Nuclear Energy Inst., Inc. v. EPA*,
   373 F.3d 1251 (D.C. Cir. 2004) ....................................................................................23

*Osborn v. Visa Inc.*,
   797 F.3d 1057 (D.C. Cir. 2015) ..................................................................11

*Pennsylvania v. DeJoy*,
   No. 20-cv-4096 (GAM), 2020 WL 5763553 (E.D. Pa. Sept. 29, 2020) ....................12, 15, 33

*POM Wonderful LLC v. F.T.C.*,
   894 F. Supp. 2d 40 (D.D.C. 2012) ..............................................................44

*Primas v. District of Columbia*,
   719 F.3d 693 (D.C. Cir 2013) ...................................................................39

*Romer v. Evans*,
   517 U.S. 620 (1996) ..............................................................................40

*Rosewell v. LaSalle Nat'l Bank*,
   450 U.S. 503 (1981) ..............................................................................29

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
   844 F.3d 260 (D.C. Cir. 2016) ..................................................................18

*Smiley v. Holm*,
   285 U.S. 355 (1932) ..............................................................................34

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ..............................................................................33

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .............................................................................8

*Storer v. Brown*,
   415 U.S. 724 (1974) ..............................................................................34

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ................................................................................8

*\*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ...........................................................................14-15

*Trudeau v. FTC*,
   456 F.3d 178 (D.C. Cir. 2006) ..................................................................19

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
   676 F.3d 1105 (D.C. Cir. 2012) .............................................................26, 44

*U.S. Term Limits, Inc. v. Thornton*,
   514 U.S. 779 (1995) ..............................................................................34

*United States v. Bass*,
404 U.S. 336 (1971) .......................................................................................35

*United States v. Students Challenging Regulatory Agency Procedures*,
412 U.S. 669 (1973) .........................................................................................9

*United States v. Windsor*,
570 U.S. 744 (2013) .......................................................................................40

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......................................................................................40

*Vullo v. Office of the Comptroller of the Currency*,
378 F. Supp. 3d 271 (S.D.N.Y. 2019) ...........................................................11

*Washington v. Trump*,
No. 20-cv-3127 (SAB), 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020) ................12, 15, 40

*Wilton v. Seven Falls Co.*,
515 U.S. 277 (1995) .......................................................................................44

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ......................................................................42

**CONSTITUTIONS**

U.S. Const.
Art. I, § 4 ........................................................................................................34
Art. II, § 2 .......................................................................................................35
amend. X .........................................................................................................35
amend. XIV ...............................................................................................33, 35
amend. XIV ...............................................................................................33, 35

**FEDERAL STATUTES**

5 U.S.C.
§§ 556 and 557 ...............................................................................................17

28 U.S.C.
§ 2201(a) .........................................................................................................44

39 U.S.C.
    *§ 101.............................................................................................................. passim
    § 101(a) ..............................................................................................25, 28, 43
    § 101(b) ....................................................................................................26, 28
    § 101(e) ............................................................................................... 26-27, 43
    § 101(f) ......................................................................................................26, 43
    § 402............................................................................................................27
    *§ 403............................................................................................... passim
    § 403(a) ..........................................................................................25-26, 29, 43
    § 403(b) .................................................................................................32, 43
    § 403(c) .................................................................................................27, 41
    § 409(a) ................................................................................................ 13-14
    § 502(a) ................................................................................................ 16-17
    § 3210(a) ...................................................................................................31
    § 3406.........................................................................................................31
    *§ 3661.......................................................................................... passim
    § 3662(a) ...................................................................................................13
    § 3662(b)(1) ..........................................................................................13, 20
    § 3662(c) ...................................................................................................14
    § 5001.........................................................................................................26

52 U.S.C.
    § 20503.......................................................................................................37

Act of July 18, 1916, 39 Stat. 412, 423..........................................................25

Pub. L. No. 91-375, 84 Stat. 719 (Aug. 12, 1970)....................................16, 24

Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) ....................................16

**STATE STATUTES**

Haw. Rev. Stat.
    § 11-101 ......................................................................................................9
    § 11-104(c)(1) ..........................................................................................38
    § 11-107 ....................................................................................................38

N.Y. Elec. Law
    § 8-400(2)(c) ............................................................................................39

P.L. 2020, ch.72 (N.J. Aug. 28, 2020) .........................................................39

**FEDERAL REGULATIONS**

39 C.F.R.
    § 3020.111(a) ............................................................................................17
    § 3020.112..................................................................................................17

**RULES**

Fed. R. Civ. P. 56(a) ..............................................................................................7

Fed. R. Civ. P. 56(e) ..............................................................................................8

Fed. R. Civ. P. 57 ..................................................................................................45

Local Civil Rule 7(h)(1) .........................................................................................2

**MISCELLANEOUS AUTHORITIES**

*Efficient*, Merriam-Webster Dictionary, https://www.merriam-
  webster.com/dictionary/efficient (last visited Oct. 19, 2020)................................29

Emily Badger, Quoctrung Bui, & Margot Sanger-Katz, *Our Tracker Says the Mail
  is Still Slow,* N.Y. Times, Oct. 14, 2020 (last visited Oct. 19, 2020) .......................6

H.R. Doc. No. 91-121 ............................................................................................30

H.R. Doc. No. 91-313 ............................................................................................24

*H.R. Rep. No. 91-1104 (1970)....................................................15-16, 24-25, 30, 36

S. Hrg., July 22, 1968 ...........................................................................................31

S. Hrg., July 23, 1968 ...........................................................................................30

S. Rep. No. 91-912.................................................................................................25

Webster's New Collegiate Dictionary 14, 1156 (1980).............................................30

**INTRODUCTION**

The Postal Service instituted a series of sweeping changes from June 2020 to July 2020 that upended postal operations and caused dramatic delays in the on-time delivery of mail nationwide. *New York v. Trump*, No. 20-cv-2340 (EGS), 2020 WL 5763775, at *2-4 (D.D.C. Sept. 27, 2020). The evidence produced in expedited discovery now shows conclusively that the Postal Service drastically changed its postal operations without any meaningful consideration of the impact that these changes would have on the public's ability to use and rely upon postal services. In so doing, the Postal Service's operational changes represent a sharp and unjustified departure from prior practice. There is no material dispute that these changes undermine Plaintiffs' social distancing and COVID-19 mitigation policies, inflict burdensome costs on Plaintiffs' agencies, and jeopardize Plaintiffs' election regulations for the November 2020 general election. Plaintiffs are therefore entitled to summary judgment on each of their claims.

*First*, the Postal Service's operational changes violate 39 U.S.C. § 3661. It is undisputed that the Postal Service failed to seek an advisory opinion from the Postal Regulatory Commission, which the agency is required to do before implementing changes that have a nationwide impact on postal services.

*Second*, the Postal Service's operational changes violate 39 U.S.C. §§ 101 and 403, which require the Postal Service to carefully consider its ability to process and deliver mail when designing postal policies. The Postal Service failed to conduct *any* analysis on the impact its operational changes would have on cost, service performance, or the ability of Plaintiffs and their residents to timely send and receive critical mail, including election mail. The Postal Service offers little explanation for its ill-advised operational changes, which have caused the exact harms to mail delivery that Congress intended to prevent.

*Third*, the Postal Service's operational changes violate the Elections Clause of the United

1

States Constitution by impairing Plaintiffs' administration of elections in their states.  Not only

has the Postal Service attempted to dictate when Plaintiffs' residents must send their ballots to

Plaintiffs' election officials, but the Postal Service's unjustifiable mail delays also directly

undermine Plaintiffs' policy decisions to expand access to mail-in ballots in order to safeguard

the public health during a once-in-a-century pandemic.

## STATEMENT OF FACTS

### I.     Plaintiffs depend on the U.S. mail, especially during the COVID-19 pandemic.

As city, county, and state governments charged with administering public benefits

programs, Plaintiffs rely on the timely delivery of U.S. mail.  *See* Pls.' Stmt. of Facts ¶¶ 10-12.[1]

That reliance has only increased due to COVID-19, which is a contagious, potentially fatal

respiratory disease primarily spread by person-to-person contact.  *Id.* ¶ 5.  Consistent with the

recommendations of the Centers for Disease Control and Prevention, *id.* ¶¶ 6-7, Plaintiffs have

undertaken serious efforts to minimize in-person gatherings and promote social distancing in

order to mitigate the spread of COVID-19, *id.* ¶¶ 8-9.  As a result, Plaintiffs have had to rely

more heavily on U.S. mail to provide benefits and services likes public assistance to low-income

families, healthcare assistance, child support enforcement, and drivers' licenses.  *Id.* ¶¶ 10-12.

### II.    The Postal Service implemented abrupt changes in June and July 2020 that have had a nationwide impact.

Before 2020, the Postal Service prided itself on timely delivery.  *Id.* ¶¶ 13-15.  For

decades, the Postal Service pursued an "every piece, every day" ethos to mail delivery.  *Id.* ¶ 13.

In fact, postal workers were fired for delaying just one or two pieces of mail.  *Id.* ¶ 14.  Local

---

[1] Citations in this Memorandum of Law to "Pls.' Stmt. of Facts" are to Plaintiffs' Statement of Material Facts as to Which There is no Genuine Issue (ECF No. 60-1), filed pursuant to Local Civil Rule 7(h)(1).

postmasters personally delivered mail to ensure that it did not stay in a delivery unit overnight. *Id.* ¶ 15.  Perhaps most importantly, the Postal Service operated with the flexibility required to adequately administer a system responsible for delivering 470 million pieces of mail to 160 million addresses six days a week.  *Id.* ¶ 16.

In June and July 2020, however, the Postal Service began overhauling how the agency collects, processes, and delivers mail throughout the country.  *Id.* ¶ 17.  The Postal Service made five operational changes (the "Postal Policy Changes"): (1) increased reduction of high-speed sorting machines without local input; (2) a new effort to reduce work hours, especially overtime; (3) the first-ever organization-wide policy to eliminate late and extra trips; (4) a new initiative altering letter carrier workflows to reduce work hours; and (5) the decision not to treat all election mail entered as marketing mail on an expedited First Class basis.[2]  *Id.* ¶¶ 17-18.

First, the Postal Service dramatically reduced the number of high-speed sorting machines used to process mail at postal facilities across the country.  *Id.* ¶ 19.  Although the agency had not reduced its sorting fleet by more than 6.5 percent since FY2016, *id.* ¶¶ 23-24, the Postal Service suddenly more than doubled its reduction rate to 14.7 percent for FY2020—a total of 711 machines, *id.* ¶ 21.  Of these 711 machines, the reduction of over 600 were abruptly announced through a letter to the President of the American Postal Workers Union on June 17, 2020.  *Id.* ¶ 22.

The abrupt announcement of this massive machine reduction was a stark departure from prior practice, where local managers were typically afforded the opportunity to negotiate if,

---

[2] Plaintiffs did not include the second change listed here (the effort to reduce overtime hours) as among the practices they sought to enjoin in their motion for a preliminary injunction, but did challenge all five of these operational changes in their Complaint, and likewise challenge all five operational changes in this motion for summary judgment.  *See* Compl. ¶¶ 58-80, 189-206 (ECF No. 1); Pls.' Mem. Supp. Prelim. Inj. 9-12 (ECF No. 12-1).

when, and how a sorting machine would be reduced.  *Id.* ¶¶ 26-28.  Often, the Postal Service would first turn off machines on a trial basis to test whether the machine would still be necessary for operations.  *Id.* ¶ 27.  Even when mail volume was down, the Postal Service often decided to keep a machine as a backup or to ensure sufficient capacity for busy seasons.  *Id.* ¶ 25.

Second, in June and July 2020, the Postal Service began new efforts to reduce unearned overtime.  *Id.* ¶ 29.  Specifically, on June 26, 2020, the Postal Service held a teleconference with what were then known as "Area Vice Presidents," or AVPs, the postal officials responsible for what were then one of the agency's seven service regions.  *Id.* ¶ 35.  At the teleconference, AVPs were asked to go "all in" on strategies to reduce "unearned overtime"—*i.e.*, when a postal employee takes longer than the allotted time to complete their workload, as is sometimes necessary, *id.* ¶ 34, if the time extends beyond the maximum permitted for a regular work day or week, *id.* ¶¶ 30-34.  As part of these new efforts, the Postal Service launched a "Caseless" pilot that required letter carriers to "case"—or sort—mail into delivery point sequence without any casing equipment and, at times, sort mail while already out on their delivery routes.  *Id.* ¶¶ 37-40.

Third, in July 2020, the Postal Service established an organization-wide policy on the use of late and extra trips for the first time ever, without conducting any analysis of the impact on cost, service performance, or election mail.  *Id.* ¶¶ 41, 116-24.  At an AVP teleconference on July 10, 2020, Chief Operating Officer David Williams presented the new policy for eliminating late and extra trips with a Powerpoint presentation, which included a slide stating simply "NO EXTRA TRANSPORTATION" and "NO LATE TRANSPORTATION," and slides requiring much higher levels of approval for such trips.  *Id.* ¶¶ 53-57.  Following that teleconference and presentation, AVPs and their staff began circulating instructions that late and extra trips were "no longer authorized or accepted."  *Id*. ¶¶ 58-64.  Four days later, Vice President of Logistics Robert

Cintron circulated a document entitled "Keys to Success for Elimination of Extras and Lates" that laid out when late and extra trips were "Acceptable" and "Not Acceptable" (hereinafter, the "Cintron Guidelines"). *Id.* ¶ 67-69. In his cover email, Vice President Cintron explained that the "focus is to eliminate unplanned extra transportation," "[d]eviations to the extent possible should be utilized to eliminate extras," and "[t]rips must depart on time." *Id.* ¶ 68. Immediately, the number of late and extra trips dropped significantly and, as the Cintron Guidelines have never been rescinded, have remained low into October. *Id.* ¶¶ 70-75.

Fourth, as part of its efforts to reduce work hours, the Postal Service began a pilot initiative in July 2020 entitled "Expedited to Street/Afternoon Sortation" (or "ESAS") at 384 facilities, including in Plaintiffs' jurisdictions. *Id.* ¶¶ 76-77. Under ESAS, city carriers do not sort any mail during the morning in order to "reduce[] morning office time." *Id.* ¶¶ 78-79. Instead, they must leave for the routes straight away, sort First Class flats into delivery sequence *while already on their delivery routes*, and then return in the afternoon to sort mail that could have gone out that morning for next day. *Id.* ¶¶ 80-83.

Fifth, the Postal Service changed its prior practice of delivering election mail at First Class speeds regardless of the paid class of service. *Id.* ¶¶ 84-86, 88. The agency indicated this change by letter to state officials on or around July 29, 2020, including to Plaintiffs here, informing them that failure to pay the First Class rate would risk ballots not being delivered on time and, consequently, the disenfranchisement of large swaths of voters. *Id.* ¶ 87.

### III.    The Postal Policy Changes have caused dramatic delays in mail delivery.

The Postal Policy Changes' negative impact on mail processing and delivery was immediately noticeable. *Id.* ¶¶ 95, 105, 108-10. On-time delivery of First Class mail dropped from a consistent range between 90 to 94 percent in the preceding six months to 85.26 percent in the week that the Cintron Guidelines were circulated—representing millions of pieces of delayed

mail. *Id.* ¶¶ 96-97.  By the second week of August, that number had dropped to 81.47 percent, or approximately 85 million *more* late deliveries for that week than under pre-July delivery rates, *id.* ¶¶ 98-99.  At the same time, on-time delivery for marketing mail dropped first to 82.94, then further down to 79.76 the next week, *id.* ¶ 101-02.  Although every single one of the agency's 67 districts saw declines, certain regions were especially hard hit.  *Id.* ¶¶ 103-04.  After acknowledging that the Postal Policy Changes had led to service delays, *id.* ¶ 131, Postmaster General DeJoy "suspend[ed]" the reduction of sorting machines, the ESAS pilot, and the new election mail policy on August 18, 2020—but not the Cintron Guidelines, *id.* ¶¶ 132-42.  By that point, the Postal Service had already reduced 711 machines, *id.* ¶¶ 19-22, which would not be returned to service, *id.* ¶ 140.

On August 25, 2020, Plaintiffs filed this lawsuit to challenge the Postal Policy Changes. *See* Compl. ¶¶ 58-80, 189-206 (ECF No. 1).  A week later, Plaintiffs filed a motion for a preliminary injunction. Pls.' Mot. for Prelim. Inj. (ECF No. 12).  The Court granted Plaintiffs' motion on September 27, 2020, issuing "a targeted preliminary injunction that prohibits Defendants from continuing to implement" those changes.  *See New York v. Trump*, No. 20-cv-2340 (EGS), 2020 WL 5763775, at *2-3, *13 (D.D.C. Sept. 27, 2020).

In the intervening weeks, however, service performance has not rebounded.  *See* Pls.' Stmt. of Facts ¶¶ 113-14.  The latest data provided to Plaintiffs on October 15, 2020, shows that on-time delivery for First Class mail is at 86.15 percent—only 0.89 points higher than the week following the implementation of the Cintron Guidelines in mid-July.[3]  *Id.* ¶ 114.  As service

---

[3] *See also* Emily Badger, Quoctrung Bui, & Margot Sanger-Katz, *Our Tracker Says the Mail is Still Slow,* N.Y. Times, Oct. 14, 2020, https://www.nytimes.com/interactive/2020/09/14/upshot/is-the-mail-getting-slower-tracker.html (last visited Oct. 19, 2020).

performance has continued to suffer despite the Court's injunction, expert analysis concludes that the Cintron Guidelines—and not any staffing issues or other initiatives—continue to contribute to delivery delays.  *Id.* ¶¶ 105-07.

## IV.   Plaintiffs are injured by these mail delays.

Plaintiffs have suffered and will continue to suffer extensive injury caused by these mail delays.  *Id.* ¶¶ 143-49.  Mail delays have increased and risk further increasing in-person governmental interactions so residents can access these services and programs, which has frustrated Plaintiffs' ability to mitigate the spread of COVID-19.  *Id.* ¶ 143.  Mail delays have also impaired Plaintiffs' ability to perform legally mandated tasks, including provide health coverage and prescription medications, ensure that families receive court-ordered financial and medical support, and send applications benefits to eligible residents.  *Id.* ¶ 148.  Plaintiffs have had to expend time and resources to address these disruptions.  *Id.* ¶¶ 146, 149.

Mail delays also undermine Plaintiffs' administration of the November 2020 general election, which will include an estimated 80 million ballots sent by mail due to the pandemic.  *Id.* ¶¶ 152-53, 158.  Plaintiffs have devoted significant resources to facilitate or preserve their mail-in voting procedures, *id.* ¶¶ 150-51, 157, 159, 163, 166-69, 173-78, but mail delays threaten the timely delivery of an estimated 7 million ballots, *id.* ¶¶ 154-56.  President Trump has also made a number of public comments disparaging vote-by-mail regimes that likewise interfere with Plaintiffs' administration of their election procedures.  *Id.* ¶¶ 179-87, 191-94.  The President's campaign has followed through with litigation opposing mail-in voting.  *Id.* ¶¶ 188-90.

## ARGUMENT

## I.   Standard of review.

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party

seeking summary judgment bears the initial burden of demonstrating the absence of genuine

issues of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must

view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986).

## II.     The Court has subject-matter jurisdiction.

### A.     Plaintiffs have standing because the Postal Policy Changes are causing and will cause concrete injuries-in-fact that will be redressed by an injunction.

To show standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a

favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  "States are

not normal litigants for the purposes of invoking federal jurisdiction" and are entitled to "special

solicitude" when evaluating standing.  *Massachusetts v. EPA*, 549 U.S. 497, 518, 520 (2007).

This Court previously held in granting Plaintiffs' motion for a preliminary injunction that

Plaintiffs likely had standing to bring this challenge.  *See New York v. Trump*, 2020 WL

5763775, at *5-6.  To establish standing for summary judgment purposes, Plaintiffs "must 'set

forth' by affidavit or other evidence 'specific facts' which for purposes of the summary judgment

motion will be taken to be true."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quoting

Fed. R. Civ. P. 56(e)).  There is no genuine dispute that Plaintiffs are injured by the Postal Policy

Changes, and that those injuries will be redressed by a favorable judicial decision.

### 1.     Plaintiffs have suffered concrete injuries-in-fact.

A plaintiff may show injury-in-fact by showing either actual or imminent harm or a

"concrete" risk of harm.  *Spokeo*, 136 S. Ct. at 1548.  Future injuries will suffice to support

standing "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the

harm will occur."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  The injury

need not be large: "even an 'identifiable trifle' of harm may establish standing." *Halbig v. Burwell*, 758 F.3d 390, 396 (D.C. Cir. 2014) (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)).

Here, Plaintiffs have established three injuries traceable to the Postal Policy Changes and redressable by the requested relief: (1) the changes impair Plaintiffs' ability to combat the spread of COVID-19 and provide safe alternatives to in-person voting; (2) the changes impose direct and unrecoverable financial costs on Plaintiffs' agencies; and (3) the changes disrupt Plaintiffs' administration of federal, state, and local laws and impose additional administrative burdens.

*First*, the Postal Policy Changes directly hinder Plaintiffs' public health efforts in response to the coronavirus pandemic.  Plaintiffs provide a wide range of critical services to their residents, including providing public assistance to low-income families, securing access to healthcare, enforcing child support orders, and providing drivers' licenses.  *See* Pls.' Stmt. of Facts ¶ 10-12.  All of these services depend upon the timely delivery and receipt of U.S. mail. *See id.*  Mail delays stemming from the Postal Policy Changes have injured Plaintiffs by increasing in-person governmental interactions to permit access to these services and programs, frustrating Plaintiffs' ability to mitigate the spread of COVID-19.  *See id.* ¶¶ 4-8, 143.

In addition, widespread mail delays threaten Plaintiffs' ability to mitigate viral spread by providing safe and efficient alternatives to in-person voting.  Plaintiffs have devoted significant resources to overhauling their election processes to expand absentee and mail voting and otherwise to minimize in-person voting.  *See id.* ¶¶ 150-51, 157, 159, 163, 166-69, 173-78; *see also* Haw. Rev. Stat. § 11-101; P.L. 2020, ch.72 (N.J. Aug. 28, 2020); *Donald J. Trump for President, Inc. v. Way*, No. 20-cv-10753 (MAS), 2020 WL 5912561, at *14 (D.N.J. Oct. 6, 2020).  Mail delays threaten timely delivery of ballots, which in turn encourages or forces voters

to travel to in-person polling stations when they would not otherwise need to do so.  *See* Pls.'
Stmt. of Facts ¶ 156; *see also Way*, 2020 WL 5912561, at *15.  In response, Plaintiffs have
committed resources to public education campaigns and installing additional ballot drop-boxes in
order to counteract delays caused by the Postal Policy Changes while still minimizing in-person
voting.  *See* Pls.' Stmt. of Facts ¶ 157; *Way*, 2020 WL 5912561, at *4, *14 (describing New
Jersey's public education and other efforts to "ensure[] that registered voters' efforts to vote are
not impacted by delays in the postal service") (citation omitted).

   These public health risks pose direct proprietary injuries.  *See Air Alliance Houston v.
EPA*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) (states had standing based on injury to their
proprietary interests in avoiding future accidental chemical releases); *see also New York*, 2020
WL 5763775, at *11-12 (holding for preliminary injunction purposes that mail delays caused by
the Postal Policy Changes will cause "immediate and irreparable harm to [Plaintiffs'] ability to
combat the spread of COVID-19 and to provide safe alternatives to in-person voting"); *New York
v. U.S. Dep't of Homeland Sec.*, No. 19-cv-7777 (GBD), 2020 WL 4347264, at *10 (S.D.N.Y.
July 29, 2020), *stayed on other grounds*, No. 20-2537, 2020 WL 5495530 (2d Cir. Sept. 11,
2020).  And the economic costs that Plaintiffs have already incurred to mitigate these risks
support standing as well.  *Air Alliance Houston*, 906 F.3d at 1059-60 ("Monetary expenditures to
mitigate and recover from harms that could have been prevented absent the [challenged agency
action] are precisely the kind of 'pocketbook' injury that is incurred by the state itself.").

   *Second*, the Postal Policy Changes injure Plaintiffs because state and local agencies have
had to implement changes to their practices to accommodate mail delays, and have thereby
suffered, and will suffer, unrecoverable economic injuries.  New York City's Department of
Social Services has seen its rent payments to landlords delayed in the mail, which has forced

shelter residents to spend additional days or weeks in City-operated shelters.  *See* Pls.' Stmt. of

Facts ¶ 145.  Child Support Services for the City and County of San Francisco has expended or

redirected resources and time setting up telephone lines, reassigning staff, and answering client

questions about child support payments delayed in the mail.  *See id.* ¶ 146.  And the San

Francisco Treasurer's Office expects to lose operational funds from delayed or missed tax

payments and interest the Treasurer's Office would have earned by earlier investment of those

funds.  *See id.* ¶ 147.  These injuries—both from direct expenses and from the loss of future

revenue—also establish standing.  *See Air Alliance Houston*, 906 F.3d at 1059-60; *Osborn v.*

*Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015); *see also Vullo v. Office of the Comptroller of*

*the Currency*, 378 F. Supp. 3d 271, 286-87 (S.D.N.Y. 2019).

     *Third*, the Postal Policy Changes injure Plaintiffs by disrupting their administration of

federal, state, and local laws and imposing additional administrative burdens.  There is no

dispute that mail delays from the Postal Policy Changes have impaired Plaintiffs' ability to

accomplish a long list of legally mandated tasks, including providing health coverage and

prescription medications, distributing court-ordered financial and medical support, and sending

benefits applications.  *See* Pls.' Stmt. of Facts ¶ 148.  This interference with state and local laws

establishes injury-in-fact.  *See New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 622

(S.D.N.Y. 2019) (states and local governments had standing where the challenged action

impaired their "sovereign interest in the making and enforcement of their own laws"), *aff'd in*

*part, rev'd in part on other grounds, & remanded sub nom. Dep't of Commerce v. New York*, 139

S. Ct. 2551 (2019).  There is likewise no dispute of fact that Plaintiffs have expended resources

in an effort to address these disruptions.  *See* Pls.' Stmt. of Facts ¶ 149.  These injuries further

support standing.  *See, e.g.*, *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109, 126 (D.D.C.

2019) (states had standing based on "costs in hiring staff and designating staff time to regulation and enforcement of state and federal laws because of" the challenged agency action).

> ### 2.   Plaintiffs' injuries are caused by the Postal Policy Changes and will be redressed by their invalidation.

Plaintiffs' injuries are traceable to the challenged provisions, and a favorable decision would redress those injuries. This Court already held that "Plaintiffs have provided evidence that the elimination of the [sorting] machines has and will continue to cause delayed mail," and that "reducing extra or late trips will necessarily cause delays in the delivery of mail." *New York*, 2020 WL 5763775, at *5-6. There is no genuine dispute of material fact that these conclusions are correct. *See* Pls.' Stmt. of Facts ¶¶ 95-115, 125-29; *see also Pennsylvania v. DeJoy*, No. 20-cv-4096 (GAM), 2020 WL 5763553, at *4-7, *11-12 (E.D. Pa. Sept. 29, 2020); *Jones v. U.S. Postal Serv.*, No. 20-cv-6516 (VM), 2020 WL 5627002, at *4-7, *9-10 (S.D.N.Y. Sept. 21, 2020); *Washington v. Trump*, No. 20-cv-3127 (SAB), 2020 WL 5568557, at *4-5 (E.D. Wash. Sept. 17, 2020). And, the Court's observation that "USPS's own data shows declines in on-time delivery of First-Class Mail continuing into August," *New York*, 2020 WL 5763775, at *6, remains correct: those declines have persisted into October. *See* Pls.' Stmt. of Facts ¶¶ 105-07, 113-15. Indeed, the most recent service performance data show a direct connection between Defendants' restrictions on late and extra trips and the persistent declines in on-time delivery for First Class mail.[4] *See id.* ¶¶ 105-07. This evidence easily satisfies Plaintiffs' burden to show

---

[4] Notwithstanding this Court's Order preliminarily enjoining the restrictions on late trips and extra trips that the Postal Service imposed in July, *see New York*, 2020 WL 5763775, at *2, *13, Plaintiffs learned during expedited discovery in this action that Defendants did *not* immediately rescind that guidance, instead leaving it in effect for weeks after the Court's order. *See* Pls.' Stmt. of Facts ¶¶ 70-75. Plaintiffs immediately advised Defendants of their intent to file a motion for civil contempt to enforce this Court's preliminary injunction, and following the parties' meet-and-confer on that intended motion, Defendants issued further clarifying

traceability, which "requires no more than *de facto* causality." *Dep't of Commerce*, 139 S. Ct. at 2566 (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986)).

Indeed, Defendants have *conceded* that the Postal Policy Changes were both expected to—and did—result in delayed mail. *See* Pls.' Stmt. of Facts ¶¶ 65, 130-31, 136. These concessions alone establish standing. *See, e.g.*, *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 37 (D.D.C. 2020) (states had standing where agency's own analysis identified injuries caused by the challenged action) (quoting *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 923 F.3d 209, 224-25 (1st Cir. 2019)); *New York*, 363 F. Supp. 3d at 127.

## B.     The court has jurisdiction to hear Plaintiffs' 39 U.S.C. § 3661 claim.

In addition, the Court has subject-matter jurisdiction to review Plaintiffs' section 3661(b) claim. "Except as otherwise provided in [title 39]," 39 U.S.C. § 409(a) vests in the district courts "original but not exclusive jurisdiction over all actions brought by or against the Postal Service." Under section 3662, entitled "Rate and service complaints," "[a]ny interested person . . . who believes the Postal Service is not operating in conformance with the requirements of" certain enumerated statutory provisions (including chapter 36) "*may* lodge a complaint with the Postal Regulatory Commission." 39 U.S.C. § 3662(a) (emphasis added). Where such a complaint is lodged, the PRC may take up to ninety days to either "begin proceedings" or "issue an order dismissing the complaint." *Id.* § 3662(b)(1). Under section 3663, an "adversely affected or aggrieved" person may challenge a final order or decision by petition for review filed directly in

---

instructions to Postal Service managers on October 16, 2020 regarding the use of late trips and extra trips to comply with orders of this Court and other district courts. *See id.* ¶ 72. For present purposes, Defendants' failure to rescind the mid-July restrictions on late and extra trips immediately following this Court's preliminary injunction establishes even more clearly that those restrictions are tied to the persistent declines in on-time delivery that have continued even through the most recent week's service performance data.

the U.S. Court of Appeals for the District of Columbia Circuit.

Defendants argued in opposition to Plaintiffs' motion for a preliminary injunction that the statute provides for *exclusive* review of section 3661(b) complaints in the D.C. Circuit. *See* Defs.' Mem. Opp. Prelim. Inj. 27-31 (ECF No. 30). This argument is incorrect, as the Court previously recognized. *See New York*, 2020 WL 5763775, at *6-8; *see also* Pls.' Reply Supp. Prelim. Inj. 7-11 (ECF No. 40).

"Whether a statute is intended to preclude initial judicial review is determined by the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)). Starting with the text of the statute, section 3662's use of the permissive "may" makes clear that Congress intended to create an *alternative*—not an exclusive—avenue for PRC review of certain claims involving postal rates or services. *See Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1282 (D.C. Cir. 1973) ("Ordinarily 'may' is a permissive not a mandatory term."). This interpretation is strengthened by Congress's choice to use the mandatory term "shall" elsewhere in the same statute, *see, e.g.*, 39 U.S.C. § 3662(c), "a contrast which is generally significant," *Bennett*, 475 F.2d at 1282. That the statute also expressly provides that this Court has original jurisdiction over "all actions brought by or against the Postal Service" unless "otherwise provided in [title 39]," *see* 39 U.S.C. § 409(a), further supports this Court's earlier conclusion that "Sections 3662(a) and 3663 were not intended to be the exclusive avenue for bringing a procedural challenge to the USPS's failure to comply with Section 3661." *New York*, 2020 WL 5763775, at *7.

The legislative history of the Postal Reorganization Act supports this conclusion as well. *See id.* (noting that the House Committee Report discussing "procedures for changes in postal

14

service" states that "[t]he postal service is—first, last, and always—a public service") (quoting H.R. Rep. No. 91-1104, at 3668).

In addition, district court review is appropriate because no other meaningful and adequate avenue for judicial review exists. *Thunder Basin*, 510 U.S. at 207. Courts have long recognized that, even despite a "fairly discernible" statutory scheme conferring jurisdiction on an administrative agency, *id.*, the district courts retain jurisdiction where channeling a claim to an administrative agency would prevent meaningful judicial review. *See, e.g.*, *Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 630 (4th Cir. 2018). Here, requiring Plaintiffs to go through the PRC process would deny them meaningful review of time-sensitive claims that the USPS made dramatic operational changes in June and July 2020; that those changes impacted on-time delivery of the mail; and that those impacts have undermined—and are continuing to undermine—Plaintiffs' ability to protect the public health, safely administer the general election, provide services to their residents, and administer their own laws and regulations. *See supra* Part II.A; *New York*, 2020 WL 5763775 at *8 (citing *Krescholleck v. Southern Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996)). Nor is agency expertise necessary to the resolution of Plaintiffs' claim. *See Berkley*, 896 F.3d at 630. As discussed *infra* Part III.C, Plaintiffs' section 3661(b) claim is grounded on a straightforward allegation of non-compliance with a statutory provision designed to ensure public notice and participation. *See New York*, 2020 WL 5763775 at *8.

Indeed, *every* court to consider this question in response to recent challenges to the Postal Policy Changes has concluded that plaintiffs may properly seek judicial review of those changes. *See NAACP v. U.S. Postal Serv.*, No. 20-cv-2295 (EGS), 2020 WL 5995032, at *7-9 (D.D.C. Oct. 10, 2020); *Pennsylvania*, 2020 WL 5763553, at *22; *New York*, 2020 WL 5763775, at *6-8; *Washington*, 2020 WL 5568557, at *3 & n.1.

15

III.     **The Postal Policy Changes violate 39 U.S.C. § 3661.**

There is no genuine dispute of material fact that Defendants implemented sweeping

changes in postal services with a significant nationwide effect without first seeking an advisory

opinion on those changes from the Postal Regulatory Commission.  The Court should

accordingly grant summary judgment for Plaintiffs on their section 3661(b) claim.

A.     **The Postal Service is required to consult with the Postal Regulatory Commission before making major changes to its policies or operations.**

Through the Postal Reorganization Act of 1970 ("PRA"), Congress established the

modern-day Postal Service to free the mail system of direct political pressures.  Pub. L. No. 91-

375, 84 Stat. 719 (Aug. 12, 1970) (codified at 39 U.S.C. § 101 *et seq*.); H.R. Rep. No. 91-1104,

at 1 (1970) (Conf. Rep.), *as reprinted in* 1970 U.S.C.C.A.N. 3649, 3650.  The PRA removed the

agency's predecessor from the Cabinet, creating the new Postal Service as an independent

agency within the executive branch.  Pub. L. No. 91-375, § 201, 84 Stat. at 720 (codified at 39

U.S.C. § 201).  The Act also removed the power to appoint the Postmaster General from the

President and gave that responsibility to a newly-established Board of Governors.  *Id.* § 202, 84

Stat. at 720-21 (codified at 39 U.S.C. § 202).  Finally, it created the Postal Rate Commission, an

independent oversight body.  *Id.* § 3601, 84 Stat. at 749.

In 2006, the Postal Accountability and Enhancement Act ("PAEA") replaced the Postal

Rate Commission with the Postal Regulatory Commission ("PRC"), providing it with broader

regulatory powers over the Postal Service.  Pub. L. No. 109-435, § 601, 120 Stat. 3198, 3238-39

(Dec. 20, 2006) (codified at 39 U.S.C. §§ 501-505).  The Commission maintains political

independence through five bipartisan Commissioners who are appointed by the President,

confirmed by the Senate, and may only be removed for cause.  *See* 39 U.S.C. § 502(a).

The Postal Service is barred from implementing changes "which will generally affect

service on a nationwide or substantially nationwide basis" unless it has first submitted a proposal

to the PRC, which must conduct a formal hearing on the record on the matter.  *Id.* § 3661(b), (c).

Specifically, whenever "the Postal Service determines that there should be a change" of that

nature, "it *shall* submit a proposal, within a reasonable time prior to the effective date of such

proposal."  *Id.* (emphasis added).  The word "shall" is classic statutory language connoting a

mandatory duty—not an option that can be ignored.  *Lopez v. Davis*, 531 U.S. 230, 231 (2001).

The Postal Service's proposal to the PRC must also "request[] an advisory opinion on the

change."  39 U.S.C. § 3661(b).  The Commission's regulations then require the Commission to

issue its opinion "not less than 90 days before the proposed effective date of the change in the

nature of postal services involved."[5]  39 C.F.R. § 3020.112.

The statute further prohibits the PRC from issuing such an opinion unless the heightened

formal-hearing requirements of the Administrative Procedure Act ("APA") have been satisfied:

"[t]he Commission *shall not* issue its opinion on any proposal until an opportunity for hearing on

the record under sections 556 and 557 of title 5 has been accorded to the Postal Service, users of

the mail, and an officer of the Commission who shall be required to represent the interests of the

general public."  39 U.S.C. § 3661(c) (emphasis added); *see also Citizens Awareness Network,*

*Inc. v. United States*, 391 F.3d 338, 356 (1st Cir. 2004) (describing the requirements of 5 U.S.C.

---

[5] The PRC's regulations set forth a specific process for the statutory hearing to occur and for all
interested parties to be heard.  One regulation requires—even before the Postal Service files its
request to the Commission—that "one or more pre-filing conference(s) with interested persons"
occur, and that the Postal Service "shall make a good faith effort to address the concerns of such
persons."  39 C.F.R. § 3020.111(a).  The purpose of that requirement, the regulation explains, is
to "inform[] interested persons of the Postal Service's proposal," to provide them "an
opportunity . . . to give feedback . . . that can be used by the Postal Service to modify or refine its
proposal before it is filed at the Commission," and to "identify[] relevant issues and information
needed to address those issues during proceedings at the Commission."  *Id.* § 3020.111(b); *see*
*also id.* § 3020.111(c) (requirement to provide "a representative capable of discussing the policy
rationale behind the Postal Service's proposal with interested persons" at pre-filing conference).

§§ 556 and 557 for a hearing "on the record").  Confirming Congress's desire for enhanced procedural protections and that all service changes must adhere to policies expressed in the PRA (*see infra* Part IV, describing sections 101 and 403), section 3661 states that the Commission's "opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title." 39 U.S.C. § 3661(c).

### B.   Plaintiffs' section 3661 claim is reviewable under the *ultra vires* doctrine.

Plaintiffs' section 3661 claim is reviewable as *ultra vires* agency action.  *See New York*, 2020 WL 5763775, at *8.  Although the Postal Service is generally exempt from review under the APA, "judicial review is available when an agency acts *ultra vires*."  *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003) (applying principle to the Postal Service).  The D.C. Circuit has repeatedly held that a nonstatutory cause of action will lie where an agency acts outside the boundaries of its statutory authority.  *See, e.g.*, *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012).  The D.C. Circuit has likewise applied both *Chevron* steps to *ultra vires* review of an action by the Postal Service, explaining that "it does not matter whether the unlawful action arises because the disputed regulation defies the plain language of the statute or because the agency's interpretation is utterly unreasonable and thus impermissible."  *See Aid Ass'n for Lutherans*, 321 F.3d at 1174-75 (rejecting as "entirely untenable" the Postal Service's argument that *ultra vires* review was limited to *Chevron* step one) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)).

The rationale for this conclusion is straightforward: because the courts will "ordinarily presume that Congress intends the executive to obey its statutory commands," courts will "grant relief when," as here, "an executive agency violates such a command."  *Chamber of Commerce*

*v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 681 (1986)).

Here, the Postal Service implemented the Postal Policy Changes before and without seeking an advisory ruling from the Postal Regulatory Commission, in violation of the section 3661.  Moreover, the Postal Service implemented the Postal Policy Changes in a manner that denied all interested members of the public (including Plaintiffs) the heightened procedural protections required by section 3661(c)—including the requirements that there be a specific proposal from the Postal Service, that there be a hearing on the record with all protections provided for formal hearings under the APA, and that all procedural protections provided by PRC regulations be observed as well.  *See supra* Part III.A.  Enacting changes in service of the magnitude at issue here, while keeping Plaintiffs and other key stakeholders in the dark as to the existence of and reasons for those changes, flouts the specific procedural sunshine Congress required to illuminate this process.  Because the Postal Service "acted 'in excess of its delegated powers and contrary to a specific [statutory] prohibition,'" the Postal Policy Changes are subject to judicial review on an *ultra vires* theory.  *Eagle Trust Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)).

Nor is there any bar to *ultra vires* review.  In *Aid Association for Lutherans*, for example, the D.C. Circuit concluded that *ultra vires* review was available despite the principle that the Postal Service's actions are generally not reviewable under the APA.  321 F.3d at 1172-73.  That result is consistent with numerous other decisions establishing the availability of *ultra vires* review notwithstanding the availability of other potential avenues for relief.  *See, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 188-90 (D.C. Cir. 2006) (considering an *ultra vires* cause of action even though the plaintiff also alleged APA and constitutional claims); *Chamber of Commerce*, 74 F.3d

at 1326-27 (considering a nonstatutory cause of action despite the availability of an APA claim).

In any event, and notwithstanding the administrative review process in sections 3662 and 3663, judicial review on a nonstatutory theory is necessary to avoid depriving Plaintiffs of a "meaningful and adequate means of vindicating [their] statutory rights." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Servs. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006). Under section 3662, the PRC may take up to ninety days to act on a complaint. *See* 39 U.S.C. § 3662(b)(1). Here, the USPS began implementing the Postal Policy Changes in June and July 2020. Plaintiffs filed their complaint in August 2020, alleging, among other things, that the agency's policy changes were likely to undermine Plaintiffs' attempts to protect public health and ensure eligible voters' right to vote by providing safe and effective means to vote by mail in the upcoming general election. Compl. ¶¶ 106-46. It cannot be correct that the Postal Service can disregard substantive and procedural protections designed to ensure full public airing and scrutiny of significant service cutbacks—all in the run-up to a national election—but entirely escape judicial scrutiny until after the Postal Service's stratagem has had its (potentially) intended effect and deprived Plaintiffs and the public of critical statutory, participatory, and democratic rights.

### C.   The Postal Service failed to comply with section 3661(b).

There is no dispute of fact that the Postal Service failed to submit the Postal Policy Changes to the Postal Regulatory Commission in advance for an advisory opinion as required under section 3661(b) (and the Commission's rules), despite the significant effect of those changes on postal service nationwide. In failing to do so, the Postal Service acted *ultra vires*.

Section 3661(b) imposes clear and mandatory obligations on the Postal Service that must be followed before the agency may implement changes with a nationwide impact:

When the Postal Service determines that there should be a change in the nature of

20

> postal services which will generally affect service on a nationwide or substantially
> nationwide basis, it shall submit a proposal, within a reasonable time prior to the
> effective date of such proposal, to the Postal Regulatory Commission requesting
> an advisory opinion on the change.

39 U.S.C. § 3661(b).  This provision applies where three factors coexist: "First, there must be a

change. . . .  Second, the change must be in the nature of postal services. . . .  Third, the change

must affect service on a nationwide or substantially nationwide basis."  *New York*, 2020 WL

5763775, at *9 (quoting *Buchanan v. U.S. Postal Serv.*, 508 F.2d at 259, 263 (5th Cir. 1975))

(internal quotation marks omitted).

    The Postal Policy Changes plainly violate this provision.  First, the challenged

practices—eliminating sorting machines, reducing overtime, restricting late trips and extra trips,

prohibiting mail carriers in certain locations from spending time sorting mail in the morning, and

refusing to treat all election mail mailed as marketing mail on an expedited First-Class basis—

are unquestionably "changes."  *See* Pls.' Stmt. of Facts ¶¶ 13-88; *see also New York*, 2020 WL

5763775, at *9-10.  The challenged policies had a quantitatively identifiable impact on services:

the restrictions on late and extra trips caused nationwide delays; the elimination of sorting

machines reduced capacity by nearly 21 million pieces of mail *per hour*; and the combination of

the challenged changes put timely delivery of election mail at risk.  *See* Pls.' Stmt. of Facts

¶¶ 96-99, 111-15, 155; *Buchanan*, 508 F.2d at 263.  The agency itself described these measures

as "impactful changes," and the Postmaster General characterized the new policies as part of an

effort "to transform," which would require "a number of significant changes."  *See* Pls.' Stmt. of

Facts ¶¶ 62, 130-31.  Where USPS's own statements acknowledge that these policies constituted

a change from the status quo, Defendants cannot now contend in litigation that section 3661(b)

does not apply.  *See New York*, 2020 WL 5763775, at *10.

    Second, these changes were "in the nature of postal services," 39 U.S.C. § 3661(b),

because they had a qualitative impact on users of postal services in addition to the quantitative impacts described above. *See Buchanan*, 508 F.2d at 263. The changes caused nationwide delays in mail delivery, which in turn caused extensive harms to Plaintiffs and their residents. *See supra* Part II.A; *see also New York*, 2020 WL 5763775, at *10.

Third, these changes affected service "on a nationwide or substantially nationwide basis." 39 U.S.C. § 3661(b). The Postal Policy Changes measurably reduced the on-time delivery percentage around the country and across multiple categories of mail. *See* Pls.' Stmt. of Facts ¶¶ 95-110. The national on-time delivery rate for First Class mail began to fall dramatically the week of July 11, 2020, falling to a year-low of 81.47 percent by early August—far below the Postal Service's target rate. *See id.* ¶¶ 93-94, 97-98. These declines in on-time delivery translate to tens of millions of pieces of mail delayed each week. *See id.* ¶ 99. Given the "broad geographical area . . . involved," *Buchanan*, 508 F.2d at 263, there is no dispute of fact that the challenged policies affected service on a nationwide basis.

These changes were implemented in violation of section 3661's requirements. *See supra* Part III.A (describing procedural mandates of section 3661(b) and (c)). The Postal Service submitted no "proposal" to the PRC, depriving the Commission and interested parties of a specific proposal to evaluate. 39 U.S.C. § 3661(b). Nor did the Postal Service seek an opinion from the PRC before implementing the Postal Policy Changes, as the statute requires. *Id.* As a result, users of the mail and an officer of the Commission representing the interests of the general public were deprived of their statutory rights to a formal hearing on the record regarding the Postal Policy Changes, as well as a written opinion from the Commission regarding whether those changes complied with the PRA's postal policy mandates. *Id.* § 3661(c); *see also infra* Part IV (describing policy mandates of sections 101 and 403).

There is no dispute that in the run-up to a national election that will rely on mail-in voting more than ever before—and during a public health crisis that has required Plaintiffs and others to changes their practices as much as possible to reduce in-person interaction—the Postal Service flouted statutory mandates designed to ensure that the public interest is served when the agency changes postal practices.  Summary judgment is appropriate on Plaintiffs' section 3661 claim.

## IV.   The Postal Policy Changes violate nondiscretionary service obligations mandated by the Postal Reorganization Act.

The Postal Policy Changes likewise violate clear congressional directives in 39 U.S.C. §§ 101 and 403 regarding how the Postal Service is to provide service to the American people.

### A.   The Court may review the Postal Policy Changes for compliance with Postal Reorganization Act mandates at either Chevron step one or step two.

As noted *supra* Part III.B, the D.C. Circuit has held that the *ultra vires* doctrine permits judicial review of Postal Service actions under both steps of the *Chevron* analysis.

In conducting a *Chevron* step one analysis, all traditional tools of statutory construction must be employed: text, structure, purpose, and history.  *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1269 (D.C. Cir. 2004); *Loving v. IRS*, 742 F.3d 1013, 1016 (D.C. Cir. 2014).  The Court asks whether those tools demonstrate that Congress's intent is clear on the question at issue.  *Chevron*, 467 U.S. at 843 n.9.  Even if a statute's express language does not reveal Congress's intent, those tools may supply a clear answer for *Chevron* step one purposes.  If a statute "clearly requires a particular outcome, then the mere fact that it does so implicitly rather than expressly does not mean that it is 'silent' in the *Chevron* sense."  *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996) (citation omitted); *see also N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 557 (D.C. Cir. 2020).

An agency's construction is unreasonable under *Chevron* step two if it rests on a construction of the statute that is "arbitrary and capricious in substance," *see District of*

*Columbia*, 444 F. Supp. 3d at 24-25 & n.13 (quoting *Judulang v. Holder*, 565 U.S. 42, 52 n.7

(2011)), considering the statute's language and purpose, *see Good Fortune Shipping SA v.*

*Comm'r of Internal Revenue Serv.*, 897 F.3d 256, 261-62 (D.C. Cir. 2018).  "*Chevron*'s second

step can and should be a meaningful limitation on the ability of administrative agencies to

exploit statutory ambiguities, assert farfetched interpretations, and usurp undelegated

policymaking discretion."  *Glob. Tel*Link v. FCC*, 866 F.3d 397, 418 (D.C. Cir. 2017)

(Silberman, J., concurring)[6]; *see also Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006)

("The reasonableness of an agency's construction depends, in part, on the construction's fit with

the statutory language, as well as its conformity to statutory purposes.") (quoting *Abbott Labs. v.*

*Young*, 920 F.2d 984, 988 (D.C. Cir. 1990)) (internal quotation marks omitted).

> **B.      The Postal Reorganization Act requires the Postal Service to comply with
> specific service requirements when planning and providing postal services.**

Sections 101 and 403 contain critical mandates Congress designed to ensure and preserve

the public-service character of the Postal Service.  As the Court has observed, the PRA was a sea

change in the history of mail administration and established the Postal Service as an independent

agency.  *New York*, 2020 WL 5763775, at *1 (quoting H.R. Rep. No. 91-1104, at 3660-61

(1970)).  Despite those substantial changes in postal governance,[7] Congress enacted and

maintained statutory requirements to preserve the Postal Service's character as a public service

---

[6] The panel majority adopted Judge Silberman's concurring position in a clarification and
amendment of the majority opinion.  *Glob. Tel*Link*, 866 F.3d at 417.

[7] At the time, Congress and the Executive were concerned about financial problems at the Post
Office Department (as the Postal Service then was known), labor strife, and "[d]elays,
breakdowns, errors, damage, and other inconvenience to the public."  H.R. Rep. No. 91-1104, at
3652; *see also* H.R. Doc. No. 91-313, at VI-VII (Message from President Nixon, Apr. 16, 1970,
transmitting postal reform recommendation).  Congress addressed those issues by making the
Postal Service an independent agency able to finance itself (including through debt financing),
and adopting specific compromises on wage increases and other labor matters.  *See, e.g.*, Pub. L.
No. 91-375, §§ 201-202, 1201-1209, 2005, 84 Stat. at 720-21, 733-37, 740-41.

that effectively serves all communities in the United States.  Referring to sections 101 and 403, the House Report explained that "[t]he Postal Service is required to develop and provide adequate and efficient postal service at fair and reasonable rates and to serve as nearly as practicable the entire population of the United States," that "the existing concept of universality of postal service is explicitly carried forward in the [Act]," and that "effective postal service is to be assured to residents of rural, as well as urban, communities."  H.R. Rep. No. 91-1104, at 3657.[8]  The Senate Report likewise explained "that postal managers should follow, quite literally, the policy section of the bill," referring to section 101.  S. Rep. No. 91-912, at 3.[9]

Sections 101 and 403 contain several textual commands mandating effective, nationwide service.  Section 101 provides that the "Postal Service *shall be operated* as a basic and fundamental service provided to the people by the Government of the United States, authorized by the Constitution, created by Act of Congress, and supported by the people."  39 U.S.C. § 101(a) (emphasis added).  In furtherance of that duty, the Postal Service "*shall provide* prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities."  *Id.* (emphasis added).  Section 101 likewise states that the "Postal Service *shall provide* a maximum degree of effective and regular postal services to rural areas, communities, and small towns where post offices are not self-sustaining," noting the "specific intent of the

_____

[8] Since 1916, the Post Office Department had been required "to serve, as nearly as practicable, the entire *rural* population of the United States."  *See* Act of July 18, 1916, 39 Stat. 412, 423. The 1970 Act eliminated the word "rural" from this phrase, *see* 39 U.S.C. § 403(a), making clear Congress's intent that this directive apply to both rural and urban communities.  *See* H.R. Rep. No. 91-1104, at 3657.

[9] Referencing a directive in section 101(a) of the PRA, the Senate Report likewise stated that an "indispensable component[]" of the bill was that "the post office, however restructured, must be, first of all, responsive to the historic public need for, and reliance upon, a secure, swift, dependable and inexpensive communications system." S. Rep. No. 91-912, at 2.

Congress that effective postal services be insured to residents of both urban and rural communities." *Id.* § 101(b).  Indeed, the statute directs that when "determining all policies for postal services," the agency "*shall give the highest consideration* to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." *Id.* § 101(e).[10]  All of these commands are prefaced with the "typically mandatory 'shall,'" *see Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016), and the D.C. Circuit has described them as "statutory mandates [that] apply generally to all of the Postal Service's products," *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 676 F.3d 1105, 1107 (D.C. Cir. 2012) (referring to all of section 101); *see id.* at 1106 (describing "mandate" of section 101(d) regarding rates).

Section 403 likewise contains a clear set of mandatory obligations prefaced either with the mandatory term "shall," or with the equally mandatory phrase, "[i]t shall be the responsibility of the Postal Service."  For example, the Postal Service "*shall receive, transmit, and deliver* throughout the United States . . . written and printed matter, parcels and like materials." 39 U.S.C. § 403(a) (emphasis added).  In connection with that directive, "[t]he Postal Service *shall serve* as nearly as practicable the *entire population of the United States*." *Id.* (emphasis added). The statute likewise states that "[i]t shall be the responsibility of the Postal Service . . . to maintain an efficient system of collection, sorting and delivery of the mail nationwide," and that it is the Postal Service's "responsibility . . . to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have *ready access to essential postal services*." *Id.* § 403(b) (emphasis added).  Section 403 further provides that "the Postal Service *shall not* . . .

---

[10] The Postal Service also "shall provide for the transportation of mail in accordance with the policies established under section 101(e) and (f) of this title."  39 U.S.C. § 5001.

make any undue or unreasonable discrimination among users of the mails" in any decision by the Postal Service "[i]n providing services and in establishing classifications, rates, and fees under this title," except as specifically authorized elsewhere in Title 39.[11] *Id.* § 403(c) (emphasis added).

### C.    The Postal Policy Changes violate section 101.

By failing to provide "prompt, reliable, and efficient services," and by failing to give the "highest consideration" to the provision of those services, Defendants' implementation of the Postal Policy Changes violates the clear commands of section 101.

First, the Postal Policy Changes violate the requirement that the Postal Service "give highest consideration to the requirement for the most expeditious . . . delivery of important letter mail" when determining policies for postal services.  39 U.S.C § 101(e).  In enacting the changes, there is no indication the Postal Service gave *any* consideration, let alone *highest* consideration, to the expeditious delivery of important letter mail.  *See* Pls.' Stmt. of Facts ¶¶ 116-29.  To the contrary, the Postal Policy Changes caused dramatic delays in the delivery of mail across the United States.  *See, e.g.*, *id.* ¶¶ 95-116.  By removing hundreds of sorting machines in Plaintiffs' jurisdictions, prohibiting or drastically curtailing late and extra trips, and preventing postal workers at nearly 400 facilities from sorting any mail in the morning before leaving to deliver the mail, Defendants enacted a series of policies that failed in their purpose and effect to give the "highest consideration" to the expeditious delivery of mail.  *See id.* ¶¶ 19-28, 119-29.  Indeed, the Postal Service acted in the face of its own awareness that these "transformative" changes undermined the Postal Service's obligation to prioritize mail delivery,

---

[11] As discussed *supra* Part II.B, that the PRA elsewhere uses the permissive "may," *see, e.g.*, 39 U.S.C. § 402, further confirms that Congress's choice of the term "shall" in these sections is intended to establish mandatory obligations.  *See Bennett*, 475 F.2d at 1282

and maintained the changes despite obvious and substantial damage to mail service.  *See id.*
¶¶ 70-75, 130-42.  These changes violate Congress's directives in enacting section 101 of the
PRA.  *See District of Columbia*, 444 F. Supp. 3d at 25-26 (holding that agency's near-total
reliance on a particular factor, despite statutory indications that such dependence on that factor
was not intended by Congress, was "arbitrary or capricious" in substance at *Chevron* step two).

For similar reasons, the Postal Policy Changes violate the requirement that the Postal
Service "shall provide prompt, reliable, and efficient services to patrons in all areas and shall
render postal services to all communities."  39 U.S.C. § 101(a).  There is no genuine dispute that
the Postal Policy Changes caused substantial delays in mail delivery—as agency leaders
themselves acknowledged.  *See* Pls.' Stmt. of Facts ¶¶ 65, 130-31, 136.  Degrading service by
requiring manual sorting, removing sorting machines, and eliminating commonsense measures to
alleviate backlogs—leading to mail languishing on the floor at postal facilities, and with no
regard for the impact of these changes on service performance—is the opposite of ensuring
prompt and reliable service to patrons in all areas, and thus violates (or unreasonably interprets)
Congress's directive.  *See District of Columbia*, 444 F. Supp. 3d at 25-26.

Likewise, the Postal Policy Changes flout Congress's directive to provide a "maximum
degree of effective and regular postal services" to any community where a post office is not
"self-sustaining," and Congress's "specific intent . . . that effective postal services be insured to
residents of both urban and rural communities."  39 U.S.C. § 101(b).  Unexplained reductions in
service and removals of equipment, and the imposition of oddly technical roadblocks to efficient
services not previously in place—all implemented at the same time—necessarily are less than the
"*maximum* degree of effective and regular postal services." *Id.* (emphasis added).

Accordingly, there is no genuine dispute of material fact that the Postal Service ignored

its statutory obligation under PRA section 101 to deliver the mail promptly and expeditiously.[12]

By enacting policies that caused dramatic, nationwide delays in mail delivery, the Postal Service

acted *ultra vires*.  *See Combined Commc'ns Corp. v. U.S. Postal Serv.*, 891 F.2d 1221, 1229 (6th

Cir. 1989) (finding an act of the Postal Service *ultra vires* "because it exceeded the powers

granted to the Postal Service under the Postal Reorganization Act").

> **D.    The Postal Policy Changes violate section 403.**

The Postal Policy Changes violate section 403 for similar reasons.  Section 403(a)

requires, for example, that the Postal Service provide "adequate and efficient postal services,"

"receive, transmit, and deliver [mail] throughout the United States," and "serve as nearly as

practicable the entire population of the United States."

The Postal Policy Changes conflict with these clear directives.  Efficiency is a matter of

the ratio of effective results to effort expended: as results drop, or as effort increases, efficiency

drops.  Webster's Dictionary explains that "efficient most often describes what is capable of

producing desired results without wasting materials, time, or energy."  *Efficient*, Merriam-

Webster Dictionary, https://www.merriam-webster.com/dictionary/efficient (last visited Oct. 19,

2020); *see also id.* ("The focus of the word is on how little is wasted or lost while the desired

results are produced.").  On the rare occasion the Supreme Court has had to construe the word,

the Court has construed it to include those concepts.  *See Rosewell v. LaSalle Nat'l Bank*, 450

U.S. 503, 517-18 (1981) (stating that party failed to show remedy was "not 'efficient'" for

---

[12] These clear violations of section 101 compound the significance of the Postal Service's
violations of section 3661 and heighten the need for permanent injunctive relief here.  As noted
*supra* Part III.A, the section 3661 process is designed to ensure that a concrete proposal is
submitted to the Commission, and subjected to a full hearing on the record, *before* changes such
as those implemented here may become effective.  In that process, each Commissioner must
assess for herself or himself whether the proposal "conforms to the policies established under
this title," 39 U.S.C. § 3661(c), including (at a minimum) those contained in section 101.

purposes of Tax Injunction Act when it "impose[d] no unusual hardship . . . requiring ineffectual activity or an unnecessary expenditure of time or energy").

The Postal Policy Changes fail this basic test of efficiency.  By removing sorting machines and thus requiring unnecessary manual labor, and by restricting or banning policies that enabled faster processing and delivery of mail, the Postal Policy Changes both increase the amount of effort expended by postal workers *and* reduce the Postal Service's output—as the undisputed facts show.  *See* Pls.' Stmt. of Facts ¶¶ 95-115, 126-29.  At a minimum, such changes unreasonably implement the statute by disregarding Congress's purposes.  *See District of Columbia*, 444 F. Supp. 3d at 25-26.

Nor are the Postal Policy Changes reflective of an effort to provide "adequate postal services"—under any reasonable interpretation of that phrase.  *See id.*  "Adequate" means, at a minimum, that which is *necessary* to provide the postal services envisioned by the PRA.  *Glob. Tel*Link*, 866 F.3d at 420-21 (Pillard, J., concurring in the judgment) (noting that "adequate" means "sufficient for a specific requirement" and "sufficient" means "enough to meet the needs of a situation or a proposed end") (quoting Webster's New Collegiate Dictionary 14, 1156 (1980)).  One of Congress's purposes in enacting the PRA was to address a circumstance in which "important mail" was arriving too late to be of use—and thus was "often no better than lost mail."  H.R. Doc. No. 91-121, at 3 (message from President Nixon proposing postal reform); *see also* H.R. Rep. No. 91-1104, at 4.[13]  Congress understood at the time of the PRA's enactment

---

[13] As the Chairman of the Senate Committee on Post Office and Civil Service explained, "This doesn't only hit the banker, who finds the clearance of checks that he would expect to be delivered the following morning may be delivered 3 days later on some of these matters that run into the millions of dollars."  S. Hrg., July 23, 1968, at 86.  For those who are "on relief," the Chairman explained, "who barely can stretch out a social security check, or a State relief check

that election years see spikes in usage of the mail; an Assistant Postmaster General testified

before the Senate Committee on the Post Office and Civil Service in 1968, for example, that "we

anticipate heavy election mail because of the national election and elections at all levels

throughout the country." S. Hrg., July 22, 1968, at 19. Thus, Congress in the PRA and

elsewhere has expressly recognized the importance of expeditious delivery of election-related

matters[14]—a priority that the Postal Service (until recently) has long adhered to.

The Postal Policy Changes undermine the adequacy of critical postal services. There is

no genuine dispute of fact that the mail delays caused by the Postal Policy Changes threaten the

timely delivery and return of ballots in Plaintiffs' jurisdictions, and disrupt Plaintiffs' carefully-

crafted plans to administer the general election while protecting both the democratic process and

public health. *See* Pls.' Stmt. of Facts ¶¶ 150-78.

Exacerbating the inadequacy of the Postal Policy Changes is the Postal Service's

disavowal—until preliminarily enjoined—of its prior practice of delivering election mail at First

Class speeds regardless of the paid class of service. *See* Pls.' Stmt. of Facts ¶¶ 84-88. By

changing the rules so close to the general election, the Postal Service's policy changes threaten

the timely delivery and return of ballots and other election-related materials—rendering at least

partially inadequate a core function of the Postal Service during election season. In addition, the

---

to meet their daily expenses, they would have a day or two of delay in that, which would be
rather catastrophic if they were out of money and had no credit at the grocery store or other
things like this." *Id.* Moreover, the Chairman explained, "a family paying on a mortgage can
very easily find themselves in default, if they find themselves without prompt delivery of that
check. If it is 2, 3, or 4 days late from the jam up . . . you are going to have difficulty explaining
to the creditors why their credit rating is not one of being prompt, but of being late." *Id.*

[14] *See, e.g.*, 39 U.S.C. §§ 3406 (balloting materials for servicemembers and overseas citizens);
3210(a)(1), (a)(3)(H) (purpose of franking mail is to "expedite" official business, and frankable
mail includes "mail matter which consists of voter registration or election information or
assistance prepared and mailed in a nonpartisan manner"); 3629 (reduced rates for voter
registration materials).

Postal Policy Changes have caused public benefits mail to be delayed or lost, impeding the "ready access to essential postal services" mandated by section 403(b)(3).  Mail delays deny families timely access to vital public benefits, forcing families to go hungry, suffer economic hardship, and experience adverse health outcomes.  *See* Pls.' Stmt. of Facts ¶¶ 143-49.

The Postal Policy Changes also violate the duties imposed by Congress under section 403 "to maintain an efficient system of collection, sorting, and delivery of the mail nationwide," to "provide types of mail service to meet the needs of different categories of mail and mail users," and to maintain postal facilities to provide patrons nationwide with "ready access to essential postal services."  39 U.S.C. § 403(b)(1)-(3).  The Postal Policy Changes purposely introduce inefficiency into the "sorting" and "delivery" of mail—thus violating section 403(b)(1).  *See* Pls.' Stmt. of Facts ¶¶ 13-83, 95-115, 125-31.  Those actions are the opposite of maintaining an efficient system, which is what the statute requires.  39 U.S.C. § 403(b)(1).  Moreover, just as the Postal Policy Changes are not "adequate" to meet the PRA's objectives, they also do not "meet the needs of different categories of mail and mail users," specifically regarding vital public-benefits mail, election-related mail, and also regarding the state and local agencies that are "mail users" for purposes of those categories of mail.  *Id.* § 403(b)(2).  And, by introducing inefficiency, delay, and inadequate service into Postal Service facilities during election season, the Postal Policy Changes deprive both the Plaintiffs and their residents who wish to vote with "ready access" to that "essential postal service," in violation of section 403(b)(3).

By enacting policies that threaten the adequacy and efficiency of mail services, the Postal Service has acted *ultra vires* in violation of sections 101 and 403.[15]

---

[15] The Court should also conclude that the Postal Policy Changes violate sections 101 and 403

## V.     The Postal Policy Changes violate the Elections Clause.

Finally, there is no genuine dispute of material fact that the Postal Policy Changes violate

the Elections Clause of the United States Constitution because they impair—and were *intended*

to impair—Plaintiffs' administration of the elections process in their states.[16]  As one court

recently explained, "[a]lthough the Constitution allows *Congress* to override a State's authority

regarding its elections, it does not extend the same authority to the Postal Service—an agency of

the federal executive branch."[17]  *Colorado v. DeJoy*, No. 20-cv-2768 (WJM), 2020 WL

5513567, at *2 (D. Colo. Sept. 14, 2020).

### A.     The Elections Clause reserves to the States the right to regulate congressional elections, unless expressly preempted by Congress.

"It is beyond cavil that 'voting is of the most fundamental significance under our

constitutional structure.'"  *Burdick v. Takushi*, 504 U.S. 428, 433-34 (1992) (quoting *Ill. Bd. of*

---

for the same reasons identified in Plaintiffs' claim under section 3661.  *See Pennsylvania*, 2020 WL 5763553, at *41 n.43 (noting that although the plaintiffs did not move for a preliminary injunction on their claim "that the changes implemented by the Postal Service violate sections 101(e), 403(a) and 403(b) of the PRA," "[m]uch of the same evidence advanced in support of [the plaintiffs' claim under section 3661] would appear to establish a probability of success on the merits as to" their claims under sections 101 and 403).

[16] This claim for relief is brought only on behalf of Plaintiffs New York, Hawaii, and New Jersey.  *See* Compl. ¶¶ 200-06.

[17] Of course, Congress may properly delegate authority to the executive branch to regulate elections pursuant to the Elections Clause, *see, e.g.*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 4-5 (2013) (noting that the National Voter Registration Act assigns authority to a federa agency, the Election Assistance Commission, to develop a uniform federal form that states must use to register voters for federal elections); or pursuant to Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment, *see, e.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301, 319-20, 324-29 (1966) (preclearance requirement in Section 5 of the Voting Rights Act of 1965, which prohibited enforcement of any change in voting procedure in covered jurisdictions absent preapproval by the United States Attorney General or a three-judge court, was a constitutional exercise of Congress's enforcement authority under the Fifteenth Amendment).  But the PRA is not Elections Clause legislation and does not enforce the Reconstruction Amendments, and Congress has not delegated any authority to the Postal Service to regulate state elections for congressional office.

*Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).  That structural imperative finds

roots in, among other sources of authority, the Elections Clause, which commits to the states the

power to set the "times, places and manner of holding Elections for Senators and

Representatives."  U.S. Const. art. I, § 4.  That broad state power embraces the "authority to

provide a complete code for congressional elections."  *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

Accordingly, the Supreme Court has recognized that states may act pursuant to their Elections

Clause authority to effectuate a wide variety of interests, including "protect[ing] the integrity and

regularity of the election process," *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 780-81

(1995); avoiding "voter confusion," *Munro v. Socialist Workers Party*, 479 U.S. 189, 194-95

(1986); "maintaining the integrity of the various routes to the ballot," *U.S. Term Limits, Inc.*, 514

U.S. at 834; and ensuring that "some sort of order, rather than chaos, is to accompany the

democratic processes," *Storer v. Brown*, 415 U.S. 724, 730 (1974).

   In contrast, Congress's role in legislating for congressional elections is a narrow one as a

practical matter.  The Elections Clause provides that Congress may "make" its own regulations

or "alter" those established by the states.  U.S. Const. art. I, § 4.  In other words, "[t]he Clause is

a default provision" that "invests the States with responsibility for the mechanics of

congressional elections."  *Foster v. Love*, 522 U.S. 67, 69 (1997).  Congress may, pursuant to its

power, "pre-empt state legislative choices" with regard to congressional elections.  *Id.*  Thus, for

example, where Congress has mandated that states "accept and use" a particular voter

registration form or provide a voter registration opportunity in connection with a DMV

transaction, the congressional command controls.  *Arizona v. Inter Tribal Council of Ariz., Inc.*,

570 U.S. 1, 12-14 (2013).  But, in our system, except to the extent preempted by the Congress,

the states play the central role in administering congressional elections.

Moreover, apart from the Elections Clause power respecting elections to the Senate and House of Representatives, state authority over elections is reflected in two other structural provisions of the Constitution.  The power to appoint presidential electors is reserved to the states.  U.S. Const., art. II, § 2.  Similarly, the Tenth Amendment reserves to the states the powers to conduct elections for state and local office.  U.S. Const., amend. X.  That power, of course, is subject to constitutional guarantees—and associated grants of power to Congress to enforce those guarantees.  *See, e.g.*, U.S. Const. amends. XIV, XV.

**B.     A clear statement is required before a court may construe non-election-related federal legislation to enable interference with state election administration.**

Given the centrality of state election administration in this constitutional structure, a court cannot lightly infer that Congress empowered the Postal Service to take *any* action for the purpose, and with the effect, of interfering with the core state power of election administration.

"Among the background principles of construction that our cases have recognized," the Supreme Court has explained, "are those grounded in the relationship between the Federal Government and the States under our Constitution."  *Bond v. United States*, 572 U.S. 844, 857-58 (2014).  As a general matter a court "start[s] with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Arizona*, 570 U.S. at 13.  Thus, "when legislation affects the federal balance, the requirement of a clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision."  *Bond*, 572 U.S. at 858 (quoting *United States v. Bass*, 404 U.S. 336, 350 (1971) (opinion of Marshall, J.)).

**C.     Defendants' conduct violates the Constitution by intentionally interfering with state election administration.**

In light of these basic constitutional and statutory principles, it violates the Elections

Clause (and other sources of state authority over presidential, as well as state and local, elections, *see supra* Part V.A) for the Postal Service to take actions that are intended to, and do, have the effect of hampering state election administration.

An agency has "no power to act . . . unless and until Congress confers powers upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Congress conferred no power to interfere with elections to the Postal Service.  Nothing in the governing statutes provide any textual support, let alone a *clear statement*, that Congress intended to confer on the Postal Service the power to take actions that interfere with elections.  *All* of the policy goals of the PRA, and many of the express provisions of the PRA, show that Congress wanted a system that effectively and efficiently delivered the mail on time—including election mail.  *See supra* Part IV.B.  Indeed, Congress designed the Postal Service as it did to insulate it—to the greatest extent possible—from political influence.  As President Nixon explained, enactment of the PRA would "mean[] that the Post Office would serve the public interest of all Americans and not the political interest of any individual or group of individuals."  Committee Print, 91-313, H.R. 17070, Recommendations of the President of the United States, at VI; *see also* H.R. Rep. No. 91-1104, at 1 (noting agreement with President Nixon and that the PRA's purpose was to create a Postal Service "freed from direct political pressures"); *id.* at 13 (noting that PRA was designed to achieve "insulation from partisan politics").

Moreover, when Congress acts pursuant to the Elections Clause to regulate congressional elections, it says so expressly—including in provisions regarding use of the mail to effectuate voter registration.  *See, e.g.*, *Arizona*, 570 U.S. at 5-6 (describing provision requiring states to "establish procedures for registering to vote in federal elections 'by mail application,'" and to

"'accept and use' a standard federal registration form")[18]; *see also* 52 U.S.C. § 20503 (referred to as "motor voter" provision).  That reality makes it all the more implausible that Congress intended the PRA or other organic statutes of the Postal Service to grant power to intentionally interfere with election administration.  *Alaska Airlines, Inc. v. Civ. Aeronautics Bd.*, 257 F.2d 229, 230 (D.C. Cir. 1958) (noting, in light of grants of power in other statutes, that "when Congress wishes to confer such authority, it says so").

Yet the Postal Policy Changes are hampering state election administration, just as evidence indicates they were intended to do.

In the wake of COVID-19, Plaintiffs Hawaii, New Jersey, and New York have exercised the duty assigned to them under the Constitution to regulate the "times, places and manner" of their elections in a way that protects both the public health and the right to vote.  Given the obvious and well-documented concerns posed by in-person voting during the pandemic, election schemes in all three States rely substantially on access to mail-in ballots—and consequently, the timely delivery of mail—in order to accommodate what are expected to be historically high levels of absentee and mail voting.  *See* Pls.' Stmt. of Facts ¶¶ 150-54, 157, 159-78.  Defendants' conduct has impaired these carefully crafted efforts to protect the public health and the right to vote—threatening to disfranchise untold numbers of voters (harming the right to vote), encourage unnecessary in-person voting (harming the public health), and undermine public confidence in the election.  *See id.* ¶¶ 155-56, 158, 179-94.

_____

[18] In *Arizona*, the Court considered a statute expressly prescribing acceptance and usage of a particular federal voter registration form.  570 U.S. at 12-14.  The Court explained that the presumption against preemption does not apply in that circumstance because whenever Congress enacts "Elections Clause legislation" it is necessarily acting pursuant to a power designed *only* to preempt.  *Id.* at 14.  As noted *supra* n.17, nobody would suggest that the PRA is "Elections Clause" legislation.

For example, the State Office of Elections for Hawaii adopted a virtually universal mail-in voting system that took effect for the June 2020 primary and was utilized by 99% of voters. That Office had previously recommended that, for the November general election, voters mail ballots three to five days before Election Day. *See id.* ¶ 171. Indeed, Hawaii law provides voters who do not receive a mail ballot by the fifth day before an election with the right to request a ballot electronically even at that time, and provides the option to return it by mail. Haw. Rev. Stat. § 11-107. To cast a valid ballot by mail, Hawaii law requires that the ballot be received at the office of the clerk no later than Election Day. *See id.* ¶ 11-104(c)(1).

The Postal Service's July 2020 letter informing Hawaii that its voters must mail their ballots a full week before the election—in an abrupt departure from the Postal Service's prior practice of delivering election mail at First Class speeds—is a direct interference with Hawaii's sovereign choice to enable its voters to vote by mail closer to the election. *See* Pls.' Stmt. of Facts ¶ 172. This inconsistency risks confusion and disenfranchisement among Hawaii voters, who received conflicting information and must determine the correct deadline to mail their completed ballots so that they are not received after Election Day and rejected as untimely. *See* Haw. Rev. Stat. § 11-104(c)(1). To prevent this confusion from jeopardizing access to the ballot, election officials in Hawaii—already under enormous constraints—have had to expend resources educating voters on returning their ballots earlier than previously advised, including through print and radio media campaigns. *See* Pls.' Stmt. of Facts ¶ 173. Officials have further had to design and implement alternative means for voters to return mail ballots. *See id.* ¶¶ 174-75.[19] The Postal Policy Changes, including the Postal Service's treatment of election mail, therefore

---

[19] Although such efforts are coordinated at the local level, local officials have received or expect to receive funds from the state of Hawaii for these purposes. *See* Pls.' Stmt. of Facts ¶ 175.

clearly impinge upon states' constitutional interest in "avoiding confusion" and "frustration of the democratic process at the general election." *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

Delays in the delivery and receipt of absentee ballots have already disrupted New York's electoral process.  New York law provides that voters may request an absentee ballot up to seven days before Election Day.  N.Y. Elec. Law § 8-400(2)(c).  During the June primary, State election officials were informed of complaints by voters who had not received their absentee ballots by Election Day, and who would have missed the opportunity to vote early because they were waiting for their absentee ballot in the mail.  *See* Pls.' Stmt. of Facts ¶ 161.  Accordingly, the only way for them to exercise their right to vote was to cast their ballot in person, adding to significant crowds and delays at certain poll sites, and further exacerbating the risk of spreading COVID-19.  *Id.* ¶ 162.  Nearly 40% of ballots cast in the June primary were absentee, a number that is expected to rise to nearly half of all votes in New York for the November general election.  *Id.* ¶ 160.  Voters who therefore request an absentee ballot within the time allotted under State law may nevertheless fail to receive their ballot in time due to the Postal Policy Changes, forcing them to vote in person or forfeit their right to the franchise.  Such consequences directly interfere with the State's sovereign prerogative to expand access to mail-in ballots in order to safeguard the public health and fundamental right to vote during a once-in-a-century pandemic.

And apart from their *effect*, the Postal Policy Changes have all the hallmarks of actions *intended* to interfere with election administration.  Their timing—in an election year, in the run-up to an election—is one factor.  *Primas v. District of Columbia*, 719 F.3d 693, 697 (D.C. Cir 2013) (timing can indicate improper motive).  The long history of the Postal Service treating election mail as First Class mail no matter how it is marked, and the Postal Policy Changes' unexplained repudiation of that treatment and effectuation of substantial delays, are further

indication of illicit motive.  *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429

U.S. 252, 267 (1977) ("Substantive departures too may be relevant, particularly if the factors

usually considered important by the decisionmaker strongly favor a decision contrary to the one

reached."); *United States v. Windsor*, 570 U.S. 744, 768 (2013) ("depart[ure] from history and

tradition" can suggest a "'[d]iscriminations of an unusual character'") (quoting *Romer v. Evans*,

517 U.S. 620, 633 (1996)).  Moreover, the irregularity of the entire process that led to the Postal

Policy Changes also suggests an improper motive.  *See Arlington Heights*, 429 U.S. at 267;

*Hamilton v. Geithner*, 666 F.3d 1344, 1356 (D.C. Cir. 2012). These irregularities include the lack

of any written analysis before implementing such consequential changes; the failure to analyze

the impact of these changes on election mail or the Postal Service's ability to meet its service

standards; the failure to submit any proposal to the PRC, hold the required public hearing, or

solicit public views; and the total disregard for other statutory and procedural requirements and

timelines.  *See supra* Parts III.C, IV.C, IV.D; *see also* Pls.' Stmt. of Facts ¶¶ 116-24.

    Finally, the repeated statements of the President himself strongly suggest an improper

motive behind actions carried out by Postmaster General DeJoy.  *See Church of the Lukumi*

*Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993).  As one court has explained, "at

the heart of DeJoy's and the Postal Service's actions is voter disenfranchisement," as "is evident

in President Trump's highly partisan words and tweets, [and] the actual impact of the changes on

primary elections that resulted in uncounted ballots."  *See Washington*, 2020 WL 5568557, at *4.

Indeed, President Trump has repeatedly attempted to sow doubt in the integrity of mail-in

ballots.  Pls.' Stmt. of Facts ¶¶ 179-87.  For the better part of 2020, President Trump has lashed

out at numerous states and cast needless suspicion on their electoral programs.  The President has

alleged without basis that New York's mail-in voting scheme is in a "disastrous state," and

falsely suggested that New York supports a "[r]igged [e]lection." *Id.* ¶ 184.  President Trump has even castigated use of mail-in ballot "drop boxes" like those set up in Hawaii and New Jersey.  *Id.* ¶ 187 (tweeting: "Some states use 'drop boxes' for the collection of Universal Mail-In Ballots. So who is going to 'collect' the Ballots, and what might be done to them prior to tabulation? A Rigged Election? So bad for our Country.").[20]

Indeed, President Trump has been explicit about the partisan political motivations behind his views, including his opposition to providing additional resources to the Postal Service.  *See id.* ¶¶ 179-83.  On March 30, 2020, President Trump disparaged provisions in a congressional coronavirus relief proposal that would have provided support to the Postal Service for mail voting, arguing that "[t]he things they had in there were crazy. They had things—levels of voting that, if you ever agreed to it, you'd never have a Republican elected in this country again." *Id.* ¶ 179.  And on August 13, 2020, President Trump stated that "[i]f we don't make a deal [on Postal Service funding], that means they don't get the money.  That means they can't have universal mail-in voting.  They just can't have it." *Id.* ¶ 192.

Simply put, the Elections Clause requires congressional action for the federal government to intentionally interfere with state administration of federal elections.  There is no indication— clear, express, or implied—from the governing statutes that Congress conferred such power on the Postal Service.  Because the Postal Service has nevertheless taken such actions, those actions

---

[20] To be sure, the President's criticism of mail-in ballots has not applied equally to all states. President Trump has praised Florida's electoral scheme, tweeting that it is "Safe and Secure, Tried and True.  Florida's Voting system has been cleaned up (we defeated Democrats attempts at change), so in Florida I encourage all to request a Ballot & Vote by Mail! #MAGA."  *See* Pls.' Stmt. of Facts ¶ 185.  The President's effort to target only *some* states' election schemes is far from the "generally-applicable and evenhanded restrictions" the Supreme Court has recognized as legitimate under the Elections Clause.  *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983); *see also* 39 U.S.C. § 403(c) (prohibiting "any undue or unreasonable discrimination among users of the mails," and "any undue or unreasonable preferences to any such user").

violate the Elections Clause and associated reservations of power to the states.

**VI.    The Court should order injunctive and declaratory relief to remedy Defendants' violations of the law and Constitution.**

    **A.    Plaintiffs are entitled to permanent injunctive relief.**

Plaintiffs "seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  Plaintiffs must demonstrate: (1) that they have suffered an irreparable injury; (2) that remedies available at law are inadequate to compensate for that injury; (3) that the balance of hardships weighs in favor of injunctive relief; and (4) that the public interest would not be disserved by a permanent injunction.  *See id.*  When the federal government is a party, the last two factors merge because "the government's interest *is* the public interest."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  These factors strongly weigh in favor of permanent injunctive relief.

The delays caused by the Postal Policy Changes directly and irreparably harm Plaintiffs.  First, as the uncontroverted evidence reflects, the changes undermine Plaintiffs' efforts to mitigate the spread of COVID-19.  Mail delays encourage in-person interactions, as individuals are forced to travel to state agencies to obtain much-needed public assistance benefits and resort to in-person voting rather than socially-distanced vote by mail.  *See supra* Part II.A.1; *see also* Pls.' Mem. Supp. Prelim. Inj. 20-29 (ECF No. 12-1).  As the Court held in granting preliminary relief, "Plaintiffs' harm is 'both certain and great,'" because "mail delays are impeding Plaintiffs' ability to combat the spread of a highly contagious and deadly disease and are impeding their ability to provide safe alternatives to in-person voting."  *New York*, 2020 WL 5763775, at *12 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Second, the Postal Policy Changes impose direct, unrecoverable financial harms on Plaintiffs, who have been forced to absorb financial costs engendered by those delays.  *See supra* Part II.A.1; Pls.'

Mem. Supp. Prelim. Inj. 29-30.  Finally, given Plaintiffs' reliance on the Postal Service to

accomplish a wide-range of legally-mandated tasks, mail delays interfere with Plaintiffs' ability

to administer their laws and further burden already-overtaxed public entities.  *See supra* Part

II.A.1; Pls.' Mem. Supp. Prelim. Inj. 30-33.

Moreover, the balance of the equities and the public interest weigh decisively in favor of

injunctive relief: "It is clearly in the public interest to mitigate the spread of COVID-19, to

ensure safe alternatives to in-person voting, and to require that the USPS comply with the law."

*New York*, 2020 WL 5763775 at *13; *see also, e.g.*, *League of Women Voters v. Newby*, 838 F.3d

1, 12 (D.C. Cir. 2016).

Accordingly, Plaintiffs request targeted injunctive relief to redress the serious harms

imposed by the Postal Policy Changes.  First, because there is no genuine dispute of material fact

that Defendants were required to seek an advisory opinion from the PRC prior to implementing

the Postal Policy Changes, *see supra* Part III, the Court should permanently enjoin Defendants

from implementing or continuing to implement those changes without first seeking an advisory

opinion from the PRC.  *See* 39 U.S.C. § 3661(b); *New York*, 2020 WL 5763775, at *13.

Second, the Court should vacate and remand Defendants' decision to enact the Postal

Policy Changes.  As detailed *supra* Part IV, the Postal Policy Changes violate Defendants'

obligations under sections 101 and 403 to provide "prompt, reliable, and efficient services," that

provide "ready access to essential postal services" across the country.  39 U.S.C. §§ 101(a),

403(a), (b).  And in enacting the Postal Policy Changes, Defendants failed to give the "highest

consideration" to the relevant statutory factors as required by 39 U.S.C. § 101(e), (f).

Accordingly, an injunction will ensure the effectiveness of the Court's decision by preventing

Defendants "from arriving at the same decision *without* curing the problems identified" in this

litigation.  *New York*, 351 F. Supp. 3d at 676; *cf. Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 340 (D.C. Cir. 2019) (vacating decision where agency failed to analyze all of the "relevant statutory objectives and factors" and "failed to provide an adequate explanation" for agency action); *U.S. Postal Serv.*, 676 F.3d at 1109 (remanding for further explanation where the agency failed to offer sufficient explanation for its action).

This relief—an injunction against Defendants' *ultra vires* and unconstitutional service changes, as well as vacatur and remand for the agency to consider all statutory factors before implementing future service changes—is consistent with the Court's earlier observation that the Court need not "becom[e] involved in overseeing the day-to-day operations of the USPS."  *New York*, 2020 WL 5763775, at *13.  The relief Plaintiffs seek would simply "requir[e] the USPS to act within its statutory authority," which "is not micromanaging."  *Id.* at *10.

## B.     Declaratory relief is also warranted.

The Court should also enter a declaratory judgment that the Postal Service has violated its governing statutes and the United States Constitution.  The Declaratory Judgment Act vests federal courts with discretion to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a); *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).  In exercising that discretion, courts in this circuit consider "whether [declaratory relief] would finally settle the controversy between the parties; whether other remedies are available or other proceedings pending; the convenience of the parties; the equity of the conduct of the declaratory judgment plaintiff; prevention of 'procedural fencing'; the state of the record; the degree of adverseness between the parties; and the public importance of the question to be decided."  *POM Wonderful LLC v. F.T.C.*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012) (quoting *Hanes Corp. v. Millard*, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976)).  "The existence of another adequate remedy does not preclude a

declaratory judgment that is otherwise appropriate."  Fed. R. Civ. P. 57.

Declaratory relief is warranted and necessary here.  The mail delays engendered by the Postal Policy Changes cause individuals to resort to in-person contact for voting and accessing vital government services.  *See* Pls.' Stmt. of Facts ¶¶ 143, 156, 158; *see New York*, 2020 WL 5763775, at *11.  A declaration that the Postal Policy Changes are unlawful would assuage public fears regarding mail delays and support Plaintiffs' efforts to encourage social distancing to mitigate the spread of disease.  *See New York v. Trump*, No. 20-cv-5770 (RCW, PWH, JMF), 2020 WL 5422959, at *35 (S.D.N.Y. Sept. 10, 2020) (three-judge court) (issuing declaratory judgment where "an unambiguous judicial declaration" would help restore public confidence in the census and mitigate the plaintiffs' harms).

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for summary judgment and enter the requested injunctive and declaratory relief.

DATED:  October 19, 2020                    Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Matthew Colangelo*
Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Morenike Fajana, *Special Counsel*
Elena Goldstein, *Deputy Chief, Civil Rights Bureau*
Lindsay McKenzie, *Assistant Attorney General*
Laura Mirman-Heslin, *Assistant Attorney General*
Daniela L. Nogueira, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

Joshua Tallent, *Assistant Attorney General*
Office of the New York State Attorney General
The Capitol
Albany, NY 12224

*Attorneys for the State of New York*

CLARE E. CONNORS
*Attorney General of the State of Hawaii*

By: */s/ Lori N. Tanigawa*
Lori N. Tanigawa
  *Deputy Attorney General*
Department of the Attorney General
State of Hawaii
425 Queen Street
Honolulu, HI 96813
Phone: (808) 586-0618
lori.n.tanigawa@hawaii.gov

*Attorneys for the State of Hawaii*

GURBIR S. GREWAL
*Attorney General of New Jersey*

MAYUR P. SAXENA
Assistant Attorney General

By: */s/ Tim Sheehan*
Tim Sheehan, *Deputy Attorney General*
Estelle Bronstein, *Deputy Attorney General*
Melissa Medoway, *Deputy Attorney General*
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625
Phone: (609) 815-2604
Tim.Sheehan@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

By: */s/ Aaron Bloom*
Aaron Bloom
Joseph Pepe
Tonya Jenerette
100 Church Street
New York, NY 10007
Phone: (212) 356-2274
abloom@law.nyc.gov

*Attorneys for the City of New York*

DENNIS J. HERRERA
*City Attorney for the City and County of San Francisco*

By: */s/ Dennis J. Herrera*
Dennis J. Herrera, *City Attorney*
Kevin Yeh, *Deputy City Attorney*
San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Phone: (415) 554-3856
Kevin.Yeh@sfcityatty.org

*Attorneys for the City and County of San Francisco*