## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | Case No. 20 Civ. 2340 (EGS) |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue**

Pursuant to Local Civil Rule 7(h)(1) and Rule 13(a) of the Standing Order Governing Civil Cases before Judge Emmet G. Sullivan (ECF No. 9), Plaintiffs the States of New York, Hawaii, and New Jersey; the City of New York; and the City and County of San Francisco submit the following statement of material facts as to which there is no genuine issue to be tried.

| I.   Plaintiffs depend on the U.S. mail, especially during the ongoing pandemic. | |
|---|---|
| 1. On January 30, 2020, the World Health Organization designated the coronavirus disease 2019 ("COVID-19") outbreak as a Public Health Emergency of International Concern; and on March 11, the WHO declared COVID-19 a global pandemic.  *See* World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020. | |
| 2. On March 13, 2020, the President declared a national emergency as a result of the outbreak. Proclamation 9994 of Mar. 13, 2020, *Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, 85 Fed. Reg. 15,337 (Mar. 18, 2020). | |

| | |
|---|---|
| 3. The pandemic has since swept across the country, causing an unprecedented crisis with devastating economic and public health consequences.  As of October 19, 2020, over eight million individuals nationwide have confirmed cases of COVID-19 and over 218,000 people have died.  Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): United States COVID-19 Cases and Deaths by State*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last updated Oct. 19, 2020). | |
| 4. COVID-19 is a contagious, potentially fatal respiratory disease primarily spread by person-to-person contact.  Ku[1] Decl. ¶ 13 (Ex. 14).[2] | |
| 5. COVID-19 is the most serious epidemic in over 100 years.  Ku Decl. ¶ 8 (Ex. 14). | |
| 6. To prevent further spread of COVID-19, the Centers for Disease Control and Prevention ("CDC") has issued recommendations and guidelines on social distancing, wearing masks, and washing hands.  Ku Decl. ¶¶ 14–15 (Ex. 14). | |
| 7. The CDC has specifically warned against the risks of gatherings, explaining that the lowest risks occur with virtual gatherings where there is no physical presence and the highest risks occur with large indoor gatherings—particularly if some attending do not observe safety strategies like social distancing or mask wearing.  Ku Decl. ¶ 14 (Ex. 14). | |

---

[1] Dr. Leighton Ku is a Professor of Health Policy and Management and Director of the Center for Health Policy Research at the Milken Institute School of Public Health, George Washington University.

[2] All references in this Statement of Facts to "Ex. __" are to the exhibits to the accompanying Declaration of Daniela Nogueira dated October 19, 2020 (ECF No. 59).  The depositions cited in this Statement of Facts were conducted within the last thirty days, and deponents who requested an opportunity to review and sign the transcript have not had the full period allowed by the rules to do so.  Fed. R. Civ. P. 30(e).  To the extent necessary, Plaintiffs will supplement the exhibits cited in this filing with any errata sheets the deponents submit.

| | |
|---|---|
| 8. Because COVID-19 is primarily spread through person-to-person contact with high risks for indoor gatherings, Plaintiffs have undertaken serious efforts to minimize in-person gatherings.  N.Y. Exec. Order No. 202.8; Hawaii Sixth Supplementary Proclamation Relating to COVID-19; N.J. Exec. Order No. 107; San Francisco Third Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency dated Feb. 25, 2020; N.Y. City Emergency Executive Order No. 100. | |
| 9. Plaintiffs have also expended time, money, and resources to educate the public and facilitate social distancing.  *See* Adinaro Decl. ¶ 8 (Ex. 1); Kellner[3] Decl. ¶ 27 (Ex. 13). | |
| 10. Plaintiffs have also increased reliance on U.S. mail to continue to meet their legal obligations to their residents and to administer public benefits programs.  *See* Banks[4] Decl. ¶¶ 4–7, 11, 14 (Ex. 2); Betts[5] Decl. ¶ 8 (Ex. 3); Newton[6] Decl. ¶ 9 (Ex. 16). | |
| 11. Plaintiffs provide various services and benefits to their residents that rely on U.S. mail, including public assistance to low-income families, healthcare benefits, child support enforcement, and drivers' licenses. Banks Decl. ¶¶ 3–7 (Ex. 2), 14; Betts Decl. ¶ 3 (Ex. 3); DiGiovanni-Abatto[7] Decl. ¶ 3 (Ex. 5); Hein[8] Decl. ¶¶ 2–3 (Ex. 8); Jacobs[9] Decl. ¶¶ 4–10 (Ex. 11); Lau[10] Decl. ¶ 3 (Ex. 15); Poole[11] Decl. ¶ 2 (Ex. 17). | |

---

[3] Douglas Kellner is a Co-Chair and Commissioner of the New York State Board of Elections.
[4] Steven Banks is the Commissioner of the New York City Department of Social Services.
[5] Catherine Betts is the Director of the Hawaii Department of Human Services.
[6] Jack Newton is the Director of the Public Benefits Unit at Bronx Legal Services.
[7] Kimberly DiGiovanni-Abatto is the Deputy Administrator of Agency Operations for the New Jersey Motor Vehicle Commission.
[8] Michael Hein is the Commissioner of the New York State Office of Temporary and Disability Assistance.
[9] Jennifer Langer Jacobs is the Assistant Commissioner of the New Jersey Department of Human Services.
[10] Lynette Lau is the Administrator of the Child Support Enforcement Agency for the State of Hawaii.
[11] Sheila Poole is the Commissioner of the New York State Office of Children and Family Services.

| | |
|---|---|
| 12. These services depend upon the timely delivery and receipt of U.S. mail.  Banks Decl. ¶¶ 4–7, 11, 14 (Ex. 2); Betts Decl. ¶ 6 (Ex. 3); DiGiovanni-Abatto Decl. ¶¶ 3–5 (Ex. 5); Hein Decl. ¶¶ 4–5 (Ex. 8); Jacobs Decl. ¶¶ 5–10 (Ex. 11); Lau Decl. ¶ 5 (Ex. 15); Poole Decl. ¶¶ 3–11 (Ex. 17);. | |

**II. The U.S. Postal Service upended its past policies and practices by implementing abrupt changes in June and July 2020 that have had a nationwide impact.**

| | |
|---|---|
| 13. For decades, the U.S. Postal Service has employed an "every piece, every day" ethos to mail delivery.  Second Cintron[12] Dep. Tr. 118; Goldway[13] Decl. ¶ 28 (Ex. 6); Coradi[14] Decl. ¶ 11 (Ex. 4). | |
| 14. In the past, postal workers have been fired for delaying just one or two pieces of mail. Coradi Decl. ¶ 11 (Ex. 4). | |
| 15. At times, local postmasters have personally delivered pieces of mail to ensure that they do not remain in a delivery unit overnight. Goldway Decl. ¶ 29 (Ex. 6). | |
| 16. Traditionally, the U.S. Postal Service has had a certain amount of operational flexibility to ensure that mail is delivered in accordance with its service standards.  Goldway Decl. ¶ 29 (Ex. 6); Coradi Decl. ¶¶ 13–14 (Ex. 4). | |
| 17. In June and July 2020, the U.S. Postal Service began overhauling how the agency collects, processes, and delivers mail throughout the country.  Curtis[15] Dep. Tr. 137–38 (Ex. 26); Exs. 37, 39–41, 43, 46–48, 50. | |

[12] Robert Cintron is the Vice President for Logistics for the U.S. Postal Service.
[13] Ruth Goldway is the former Chairwoman of the U.S. Postal Regulatory Commission.
[14] Peter Coradi is a National Business Agent for the American Postal Workers Union.
[15] Angela Curtis is the Vice President of Retail and Post Office Operations at the U.S. Postal Service.

| | |
|---|---|
| 18. Specifically, the U.S. Postal Service made five operational changes challenged in this case: (1) increased reduction of high-speed sorting machines without local input; (2) a new effort to reduce work hours, especially overtime; (3) the first-ever organization-wide policy to eliminate late and extra trips; (4) a new initiative altering letter carrier workflows; and (5) the decision not to treat all election mail mailed as Marketing Mail on an expedited First Class basis. Exs. 37, 39–41, 43–50. | |
| Policy Change 1: Reduced sorting machines. | |
| 19. For FY 2020, the agency reduced 711 high-speed sorting machines by mid-August 2020.  DeChambeau[16] Decl. ¶ 21 (ECF No. 30-2); Ex. 37. | |
| 20. This figure includes the reduction of 52 machines in New York State, 27 machines in New Jersey, 9 in San Francisco, and 4 machines in Hawaii.  Ex. 37. | |
| 21. All told, the reduction of these 711 machines constitutes an approximately 14.7 percent reduction in the number of machines across the country.  DeChambeau Decl. ¶ 21 (ECF No. 30-2). | |
| 22. Of the 711 sorting machines reductions, over 600 were abruptly announced on June 17, 2020 to start taking place "over the next several months."  Ex. 37. | |
| 23. Prior to 2020, the U.S. Postal Service had been reducing sorting machines at significantly low rates since FY2016.  DeChambeau Decl. ¶ 21 (ECF No. 30-2). | |
| 24. The agency reduced its fleet of sorting machines by about 3.3 percent in FY2020, 1.9 percent in FY2019, 6.5 percent in FY2018, 3.5 percent in FY2017, and 0 percent in FY2015. DeChambeau Decl. ¶ 21 (ECF No. 30-2). Only FY2016 had a reduction rate above 10 percent.  DeChambeau Decl. ¶ 21 (ECF No. 30-2). | |

---

[16] Jason DeChambeau is Headquarters Director of Processing Operations for the U.S. Postal Service.

| | |
|---|---|
| 25. Even when mail volume was down prior to 2020, the U.S. Postal Service often did not reduce or remove machines in case other machines malfunctioned or—as is typical during election and holiday seasons—mail volume increased again.  Coradi Decl. ¶ 15 (Ex. 4). | |
| 26. When the U.S. Postal Service did reduce sorting machines prior to 2020, managers at processing facilities typically negotiated if, when, and how a sorting machine would be reduced through an iterative process.  Coradi Decl. ¶ 15 (Ex. 4). | |
| 27. Often, the U.S. Postal Service would first just turn off sorting machines on a trial basis to test whether the machine would still be necessary for operations going forward. Coradi Decl. ¶ 15 (Ex. 4). | |
| 28. Unlike prior years, facility managers were not given the opportunity to weigh in on if, when, or how to reduce sorting machines. Coradi Decl. ¶ 15 (Ex. 4); Ex. 37. | |
| Policy Change 2: Reduced unearned overtime. | |
| 29. In June and July 2020, the U.S. Postal Service began new efforts to reduce unearned overtime.  Exs. 39–40; Curtis Dep. Tr. 75–76 (Ex. 26). | |
| 30. Under collective bargaining agreements, U.S. Postal Service employees are expected to complete a certain number of tasks in order to "earn" time.  Curtis Dep. Tr. 51–53 (Ex. 26). | |
| 31. For example, for every 18 letters that a city-based letter carrier puts into a case, they earn one minute. Curtis Dep. Tr. 52 (Ex. 26). | |
| 32. "Unearned" time is the "time that an employee takes to complete those duties over and above the earned time."  Curtis Dep. Tr. 53 (Ex. 26). | |
| 33. If the number of tasks completed earn time of eight hours and 15 minutes, but the carrier takes 8 hours and 45 minutes to complete those tasks, that would result in 30 minutes of "unearned overtime."  Curtis Dep. Tr. 54 (Ex. 26). | |

| | |
|---|---|
| 34. "Unearned overtime" is sometimes necessary for the U.S. Postal Service to achieve its mission for a given day.  Curtis Dep. Tr. 54 (Ex. 26). | |
| 35. On June 26, 2020, the U.S. Postal Service held a teleconference with Area Vice Presidents on strategies to reduce work hours, especially unearned overtime.  Ex. 39. | |
| 36. Participating Area Vice Presidents were asked to go "all in" on these strategies.  Curtis Dep. Tr. 60–61 (Ex. 26); Ex. 39 (slide 6). | |
| 37. As part of its new efforts to reduce work hours, the U.S. Postal Service launched a "Caseless" pilot at 60 different sites to require letter carriers to case mail without any casing equipment.  Ex. 39; Curtis Dep. Tr. 95 (Ex. 26). | |
| 38. "Casing" means sorting letter mail and flats into walk sequence or delivery point sequence, i.e. the sequence necessary for carriers to deliver mail door-to-door.  Curtis Dep. Tr. 82 (Ex. 26). | |
| 39. In the "Caseless" pilot, carriers must case letters and flats manually in the office or while out on their routes.  Curtis Dep. Tr. 82 (Ex. 26). | |
| 40. On July 7, 2020, the U.S. Postal Service reiterated its efforts to reduce work hours in a teleconference.  Ex. 40; Curtis Dep. Tr. 132–33 (Ex. 26). | |
| Policy Change 3: Reduced late trips and extra trips. | |
| 41. In July 2020, the U.S. Postal Service established an organization-wide policy on the use of late and extra trips for the first time ever.  Second Cintron Dep. Tr. 50 (Ex. 28). | |
| 42. Late trips are trips that depart after their scheduled departure time.  Curtis Dep. Tr. 31 (Ex. 26); Coradi Decl. ¶¶ 13–14 (Ex. 4). | |
| 43. Extra trips are additional trips that were not originally scheduled to occur.  Curtis Dep. Tr. 31 (Ex. 26); Coradi Decl. ¶¶ 13–14 (Ex. 4). | |
| 44. For FY2019, 20 percent of total transportation trips were late.  Ex. 54. | |
| 45. Four percent of total transportation trips were considered "extra."  Ex. 54. | |

| | |
|---|---|
| 46. Together, these late and extra trips cost the U.S. Postal Service about $280 million out of $80.1 billion in total expenses for the year—or about 0.35 percent.  Exs. 43, 54–55. | |
| 47. Prior to July 2020, U.S. Postal Service employees typically utilized late trips or extra trips when necessary to account for fluctuations in mail volume, machine malfunctions, truck breakdowns, inclement weather, health and safety concerns, or the like.  Coradi Decl. ¶ 13 (Ex. 4); Curtis Dep. Tr. 41–43 (Ex. 26). | |
| 48. Prior to July 2020, frontline supervisors and managers could authorize late or extra trips.  Second Cintron Dep. Tr. 32, 34–35, 53 (Ex. 28). | |
| 49. Prior to July 2020, approval was not required from middle managers, plant managers, or Area Vice Presidents.  Second Cintron Dep. Tr. 32 (Ex. 28). | |
| 50. Prior to July 2020, when Area Vice Presidents or U.S. Postal Service Headquarters identified a particular plant or route that appeared to be using higher than usual numbers of late or extra trips, they would work with that particular plant or postal office to determine the root cause and tailor an appropriate solution through an iterative process.  Second Cintron Dep. Tr. 20–21 (Ex. 28); Curtis Dep. Tr. 29–31 (Ex. 26). | |
| 51. Prior to July 2020, there was no organization-wide policy from U.S. Postal Service Headquarters dictating when late trips or extra trips were not acceptable.  Second Cintron Dep. Tr. 50 (Ex. 28). | |
| 52. Prior to July 2020, there was no organization-wide policy from U.S. Postal Service Headquarters requiring plant manager or Area Vice President approval for late or extra trips.  Second Cintron Dep. Tr. 50 (Ex. 28). | |

| | |
|---|---|
| 53. On July 10, 2020, U.S. Postal Service Chief Operating Officer Dave Williams held a teleconference with what were then known as Area Vice Presidents.  Second Cintron Dep. Tr. 69–70 (Ex. 28); Cintron Suppl. Decl. ¶ 3 (ECF No. 39-1). | |
| 54. During the July 10, 2020, teleconference, Mr. Williams gave a presentation on the elimination of late trips and extra trips. Second Cintron Dep. Tr. 70–71 (Ex. 28). | |
| 55. Mr. Williams supported his July 10, 2020 presentation with slides, including a slide stating "NO EXTRA TRANSPORTATION" and "NO LATE TRANSPORTATION."  Ex. 41 (USPS_EDPA00000843, at slide 9). | |
| 56. Another slide stated: "Effective July 13 all extra trips and Postal caused late trips are unauthorized contractual commitments."  Ex. 41 (USPS_EDPA00000843, at slide 10). | |
| 57. A third slide further stated that "Management Instruction MI SP-G4-2006-2" should be followed for "unauthorized extra trips and late trips."  Ex. 41 (USPS_EDPA00000843, at slide 11).  The slide further stated that the "Area Vice President is the ratifying official and must ratify and submit to COO" and the "Area Vice President will call COO daily if extra trips or late trips occur the prior day to discuss next steps."  Ex. 41 (USPS_EDPA00000843, at slide 11). | |
| 58. Following the teleconference, Area Vice Presidents turned to implementing the new policy.  Curtis Dep. Tr. 41 (Ex. 26). | |
| 59. Some U.S. Postal Service employees distributed instructions that same day.  Ex. 42 (USPS_EDPA00003038) ("[T]here is no more waiting on mail and there is no coming back for parcels.  The excuses of why people can't get done with their routes is gone. We NEED to start capturing the downtime."). | |

| | |
|---|---|
| 60. One Area Vice President's team prepared and distributed a "Mandatory Stand-Up Talk: All Employees," with contents "draw[n] from" and "reflected" in the teleconference held that same day.  Ex. 43 (the "July 10 Stand-Up Talk"); Cintron Suppl. Decl. ¶ 3 (ECF No. 39-1). | |
| 61. At the U.S. Postal Service, a "Stand-Up Talk" is a document with talking points that local postal managers use to relay information to U.S. Postal Service employees.  Curtis Dep. Tr. 176–77 (Ex. 26). | |
| 62. The July 10 Stand-Up Talk stated: "Right now, we are at a critical juncture in our organization and must make immediate, lasting, and impactful changes in our operations and in our culture," and asserted that "[t]his operational pivot is long overdue." Ex. 43. | |
| 63. The July 10 Stand-Up Talk document further stated: "The initial step in our pivot is targeted on transportation and the soaring costs we incur, due to late trips and extra trips, which costs the organization somewhere around $200 million in added expenses."  Ex. 43. | |

| | |
|---|---|
| 64. The July 10 Stand-Up Talk listed the following "examples of transportation changes being implemented immediately (today)."<br><br>a. "All operations must meet our 24-hour clock commitment"<br>b. "All trips will depart on time (Network, Plant and Delivery); late trips are no longer authorized or accepted"<br>c. "Extra trips are no longer authorized or accepted"<br>d. "There must be proper annotation in the scanner, if a Contractor Failure occurs"<br>e. "All PVS/HCR drivers must be notified that trips depart on time."<br>f. "Function 4 must start on time and end on time and we must make scheduled DUTV Carriers must begin on time, leave for the street on time, and return on time"<br>g. "Carriers must make the final dispatch of value; no additional transportation will be authorized to dispatch mail to the Plant after the intended dispatch"<br>h. "The right mail must go on the right truck - every time"<br>i. "ALL EMPLOYEES have an essential role with trips departing on time."<br><br>Ex. 43. | |
| 65. The July 10 Stand-Up Talk acknowledged that the new policy could result in mail being left behind in postal facilities.  The document states: "One aspect of these changes that may be difficult for employees is that— temporarily—we may see mail left behind or mail on the workroom floor or docks (in P&DCs), which is not typical." Ex. 43. | |
| 66. Following the July 10, 2020 teleconference and the distribution of the July 10 Stand-Up Talk, some U.S. Postal Service managers contacted Vice President of Logistics Robert Cintron to get clarification regarding the new policy.  Suppl. Cintron Decl. ¶ 3 (ECF No. 39-1); Second Cintron Dep. Tr. 46–47 (Ex. 28). | |

| | |
|---|---|
| 67. On July 11, 2020, Vice President Cintron began drafting a document to explain the policy presented in the July 10, 2020 teleconference.  Cintron Suppl. Decl. ¶ 4 (ECF No. 39-1); Second Cintron Dep. Tr. 65 (Ex. 28). | |
| 68. On July 14, 2020, Vice President Cintron finalized a document entitled "Keys to Success for Elimination of Extras and Lates."  Ex. 46 (the "Cintron Guidelines"); Cintron Suppl. Decl. ¶ 4 (ECF No. 39-1). | |
| 68. On July 14, 2020, Vice President Cintron distributed the "Keys to Success for Elimination of Extras and Lates" via email, stating that the "focus is to eliminate unplanned extra transportation," "[d]eviations to the extent possible should be utilized to eliminate extras," and "[t]rips must depart on time."  Ex. 45. | |
| 69. The Cintron Guidelines listed when a late or extra trip was "Acceptable" or "Not Acceptable."  Ex. 46. | |
| 70. The Cintron Guidelines remain operative today.  Second Cintron Dep. Tr. 76–77 (Ex. 28). | |
| 71. On October 14, 2020, Vice President Cintron testified that the Cintron Guidelines had never been rescinded.  Second Cintron Dep. Tr. 91 (Ex. 28). | |
| 72. In late September and into October, the U.S. Postal Service sent various guidance documents to either postal managers or all employees that explained late and extra trips were permitted, but did not explicitly rescind the Cintron Guidelines.  Colin Decl. ¶ 17 & Exs. 1–5 (Ex. 60). | |
| 73. As a result of the new organization-wide policy announced in July 2020, the number of late and extra trips fell "significantly."  Second Cintron Dep. Tr. 123–24 (Ex. 28); Grimmer Decl. ¶ 19 (Ex. 7); Exs. 32–33, 53, 59. | |

| | |
|---|---|
| 74. While the number of late trips fluctuated between 2,500 and 6,413 from January 1, 2020 through July 10, 2020 on all but 16 days, late trips have remained below 1,600 on all but nine days since July 15, 2020 (clustered around the Labor Day and Columbus Day holidays).  Ex. 32. | |
| 75. While the number of extra trips fluctuated between 1,028 and 3,725 from January 1, 2020 through July 11, 2020, extra trips have remained below 800 on all but six days since July 15, 2020 (clustered around the Labor Day and Columbus Day holidays).  Ex. 33. | |
| Policy Change 4: Reduced morning sortation. | |
| 76. As part of its efforts to reduce work hours, the U.S. Postal Service began an initiative in July 2020 entitled "Expedited to Street/Afternoon Sortation" (or "ESAS") at 384 facilities.  Exs. 39, 47. | |
| 77. The 384 facilities that are part of the ESAS initiative include those located in the jurisdictions of Plaintiffs here—New Jersey, New York State, New York City, and San Francisco.  Ex. 48. | |
| 78.  ESAS "reduces morning office time," requiring "carriers to leave for the street earlier." Ex. 47. | |
| 79. Specifically, in facilities participating in ESAS, "[c]ity carriers will not sort any mail during the morning operation." Ex. 47. | |
| 80. Instead, under ESAS, "[a]ny unsorted First Class flats will go directly to the street with the carrier and will be routed in delivery sequence while on the street." Ex. 47. | |
| 81. After completing their routes, city carriers return to the office and "[s]tage [mail] for [d]elivery the [n]ext [s]cheduled [d]ay," meaning that certain mail that had already been in the office that morning will necessarily go out on the next scheduled day instead of that day. Ex. 47. | |
| 82. Consistent with the Cintron Guidelines, instructions on how ESAS works direct that "[a]ll [m]orning [t]rips [m]ust be on [t]ime" and "[n]o [e]xtras [a]fter [s]cheduled DOV [t]rip" are permitted. Ex. 47. | |

| | |
|---|---|
| 83. The expectation for ESAS was that it would "[r]educe [c]ity [c]arrier [o]vertime." Ex. 22. | |
| Policy Change 5: Reduced delivery speed for election mail. ||
| 84. The U.S. Postal Service changed its prior practice of delivering election mail at First Class speeds regardless of the paid class of service.  Glass Dep. Tr. 107 (Ex. 29); Exs. 35 (slide 8, "Election Mail sent as Marketing Mail is not upgraded to First Class service."), 49, 56 (at 12). | |
| 85. Prior to 2020, the U.S. Postal Service also processed and delivered election mail at First Class rate speeds—or better—regardless of the actual postage class.  Coradi Decl. ¶ 11 (Ex. 4); Ex. 56 (at 12). | |
| 86. For example, the U.S. Postal Service's green tags to identify trays and sacks of ballot mail in order to improve visibility of ballots as they travel through the mail stream is an "important component" of processing election mail.  Ex. 61; Coradi Decl. ¶ 17 (Ex. 4); Second Glass Dep. Tr. 57–58 (Ex. 30). | |
| 87. On or around July 30, 2020, the U.S. Postal Service's General Counsel informed 46 states—including Plaintiffs New York and New Jersey—and the District of Columbia that failure to pay the First Class rate would risk ballots not being delivered on time and, consequently, the disenfranchisement of large swaths of voters.  Second Glass Dep. Tr. 64-65 (Ex. 30); Ex. 49. | |
| 88. Other U.S. Postal Service officials indicated that states should mail election mail as First Class Mail, not Marketing Mail.  Ex. 38 (USPS_EDPA00000396 to USPS_EDPA00000398). | |
| **III. The changes the U.S. Postal Service began to implement in June and July 2020 caused dramatic delays in mail delivery across the country.** ||
| 89. The U.S. Postal Service establishes formal "service standards" that set the delivery speed of each class of mail, which are codified in regulations.  Ex. 36. | |
| 90. First Class Mail has delivery standards of one to five days, depending on the subclass.  Ex. 36. | |

| | |
|---|---|
| 91. On its website, the U.S. Postal Service lists a service standard of one to three days for the delivery of First Class Mail.  First-Class Mail, U.S. Postal Service, https://www.usps.com/ship /first-class-mail.htm (last visited Oct. 19, 2020). | |
| 92. The U.S. Postal Service has delivery standards of three to 10 days for Marketing Mail, which is a class available for bulk mailings sent by business or non-profit customers.  Delayed mail and packages?, U.S. Postal Service, https://faq.usps.com/s/article /Delayed-Mail-and-Packages (last visited Oct. 19, 2020). | |
| 93. Typically, the U.S. Postal Service sets targets for the on-time delivery of First Class and Marketing Mail.  For FY2020, the U.S. Postal Service set targets between 95.25 and 96.8 on-time delivery for First Class Mail and a target of 91.80[17] on-time delivery for Marketing Mail.  Ex. 54 (at 20). | |
| 94. Although the numbers vary year to year, the U.S. Postal Service targets for on-time delivery are usually around 95 percent.  Goldway Decl. ¶ 14 (Ex. 6). | |
| 95. The impacts of the U.S. Postal Service's five operational policy changes in June and July 2020 on meeting service standards were immediately noticeable.  Exs. 31, 34–35, 44, 56 (at 1). | |
| 96. Nationally, on-time delivery for First Class Mail had fluctuated between 89.52 and 93.88 percent between the first week of 2020 and the week of July 4, 2020.  Ex. 31. | |
| 97. For the week of July 11, 2020, on-time delivery for First Class Mail dropped to 85.26 percent.  Ex. 31. | |
| 98. During the week of August 8, 2020, on-time delivery for First Class Mail dropped to a year-low of 81.47 percent.  Ex. 31. | |

---

[17] This is a composite target with both Marketing Mail and Periodicals.

| | |
|---|---|
| 99. The drop in on-time delivery during the week of August 8, 2020 meant that approximately 85 million more deliveries were late that week than they would have been prior to the challenged changes. Ex. 57 (at 3). | |
| 100. Nationally, on-time delivery for Marketing Mail had fluctuated between 87.39 and 93.69 percent between the first week of 2020 and the week of July 4, 2020. Ex. 31. | |
| 101. For the week of July 11, 2020, on-time delivery for Marketing Mail dropped to 82.94 percent. Ex. 31. | |
| 102. The following week, that figure dropped to 79.76 percent. Ex. 31. | |
| 103. Although every single one of the U.S. Postal Service's 67 districts saw a decline in on-time delivery in mid-July, the on-time delivery rate was even lower in certain regions. Exs. 34–35, 57 (at 3). | |
| 104. Although on-time delivery of First Class and flat mail in the agency's Eastern service area had hovered between roughly 91 and 95 percent in the preceding five months, on-time delivery in that region dropped for three weeks straight in July—down to 79 percent the week of July 19. Exs. 34–35. | |
| 105. From July 18th to October 3rd, the average on-time delivery service score for First Class Mail was 85.2%. This represents a 6.1 percentage point decrease as compared to the average score from January 4, 2020 to July 11, 2020. Grimmer Suppl. Decl. ¶ 7 (Ex. 23). | |
| 106. The decline in Service Scores has persisted even after the Postal Service has suspended all other new initiatives other than the policy limiting the number of Extra or Late Trips. Therefore, the observed declines in Service Scores are not attributable to other initiatives at the Postal Service. Grimmer Suppl. Decl. 13 (Ex. 23). | |

| | |
|---|---|
| 107. The policy limiting the number of Extra and Late trips continued to delay mail as recently as October 3rd. Changes in staffing levels due to COVID-19 cannot explain the decrease in Service Scores that correspond with the policy change.  Grimmer Suppl. Decl. ¶¶ 17 (Ex. 23). | |
| 108. In mid-July 2020, processing performance also dropped.  Ex. 51. | |
| 109. In mid-July 2020, the U.S. Postal Service's overall processing performance score for First Class Mail dropped 8.1 percent below baseline.  Ex. 51. | |
| 110. In mid-July 2020, the U.S. Postal Service's overall processing performance score for Marketing Mail dropped 8.42 percent below baseline.  Ex. 51. | |
| 111. Due to these delays, mail began to pile up in postal facilities.  Coradi Decl. ¶ 9 (Ex. 4) | |
| 112. In some facilities, mail and packages were delayed for days and weeks.  Coradi Decl. ¶ 9 (Ex. 4). | |
| 113. Delayed mail continues to exist at certain facilities.  Coradi Suppl. Decl. ¶¶ 5, 10–11(Ex. 22). | |
| 114. By early October, on-time delivery for First Class Mail had still not rebounded to pre-July 2020 levels.  Ex. 31; Second Cintron Dep. Tr. 167 (Ex. 28). | |
| 115. By early October, late trips and extra trips were still running at significantly reduced levels.  Ex. 32–33, 59; Second Cintron Dep. Tr. 122 (Ex. 28). | |
| **IV. The U.S. Postal Service failed to consider or account for the negative impact that the June and July 2020 changes would have on important letter mail, even after delays became apparent.** | |
| 116. The U.S. Postal Service did not seek advice or guidance from the Postal Regulatory Commission prior to implementing any of the five operational changes.  Ex. 58. | |
| 117. Typically, the U.S. Postal Service conducts written analysis before implementing or adopting nationwide policies.  Goldway Decl. ¶¶ 17–25 (Ex. 6). | |

| | |
|---|---|
| 118. Prior to implementation, U.S. Postal Service Headquarters did not consider the impact that its new organization-wide policy on late trips and extra trips would have on the timely and efficient delivery of mail.  First Cintron Dep. Tr. 53–58 (Ex. 27). | |
| 119. Prior to drafting the Cintron Guidelines, Vice President Cintron did not conduct any written analysis.  First Cintron Dep. Tr. 53–54 (Ex. 27); Second Cintron Dep. Tr. 59–61, 63 (Ex. 28). | |
| 120. Prior to drafting the Cintron Guidelines, the modeling and analytics team that Vice President Cintron oversees did not "ma[k]e any analytics around this" or prepare any report.  First Cintron Dep. Tr. 54 (Ex. 27). | |
| 121. Prior to drafting the Cintron Guidelines, neither Vice President Cintron nor anyone on his team estimated whether the Cintron Guidelines would result in any cost savings.  First Cintron Dep. Tr. 54 (Ex. 27). | |
| 122. Prior to drafting the Cintron Guidelines, Vice President Cintron did not conduct any analysis or have any conversations with other U.S. Postal Service Headquarters officials about the Cintron Guidelines' potential impact on election mail.  First Cintron Dep. Tr. 61 (Ex. 27). | |
| 123. Prior to drafting the Cintron Guidelines, Vice President Cintron did not conduct any analysis or have any conversations with other U.S. Postal Service Headquarters officials about how the Cintron Guidelines would be implemented in light of the COVID-19 pandemic.  First Cintron Dep. Tr. 62 (Ex. 27). | |
| 124. Prior to drafting the Cintron Guidelines, Vice President Cintron did not consider the potential impact the Cintron Guidelines might have on meeting the U.S. Postal Service's service standards.  First Cintron Dep. Tr. 58 (Ex. 27). | |

| | |
|---|---|
| 125. Even without any analysis, the negative impact of the new initiatives on reducing sorting machines, reducing work hours, and eliminating late and extra trips on service performance was predictable.  Goldway Decl. ¶ 31 (Ex. 6); Coradi Decl. ¶ 16 (Ex. 4). | |
| 126. With fewer sorting machines for letter and flat mail, postal employees must adapt the remaining machines to accommodate more volume or sort letter and flat mail manually.  Coradi Decl. ¶ 16 (Ex. 4). | |
| 127. These efforts take resources away from sorting other mail, such as packages.  Coradi Decl. ¶ 16 (Ex. 4). | |
| 128. If postal drivers are no longer allowed to make adjustments for processing delays and must leave at their prescribed time, then mail that would otherwise have been sorted gets left behind at the processing facility.  Coradi Decl. ¶ 16 (Ex. 4). | |
| 129. If postal employees are also prevented from making extra trips throughout the day, then postal employees cannot begin to reduce the backlog.  Coradi Decl. ¶ 16 (Ex. 4). | |
| 130. The Postmaster General recognized the new June and July 2020 policies as part of an effort "to transform," which would require "a number of significant changes."  Ex. 52. | |
| 131. On August 13, 2020, Postmaster General DeJoy acknowledged sent out a message to employees acknowledging that the agency's "transformative initiative has had unintended consequences that impacted our overall service levels," but still did not reverse any of the changes.  Ex. 52. | |
| 132. On August 18, 2020, Postmaster General DeJoy issued a statement that the U.S. Postal Service would be "suspending" certain of the changes.  Ex. 53. | |
| 133. In his August 18, 2020 statement, DeJoy stated that "[m]ail processing equipment and blue collection boxes will remain where they are" and that overtime would be approved "as needed."  Ex. 53. | |

| | |
|---|---|
| 134. The August 18, 2020 statement from DeJoy did not address whether he would be returning the over 600 reduced sorting machines to service or suspend the new organization-wide policy on late and extra trips.  Ex. 53. | |
| 135. Three days later, on August 21, 2020, Postmaster General DeJoy testified before the Senate Homeland Security and Governmental Affairs Committee.  *Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video). | |
| 136. In his testimony, DeJoy provided testimony acknowledging the delays caused by the operational changes.  He testified that "[w]e all feel, you know, bad about, you know, what the dip in our service level has been." *Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video). | |
| 137. DeJoy testified that the changes did not "align" the separate systems for sorting, transporting, and delivering mail.  *Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video). | |
| 138. DeJoy testified that he would not reinstall the hundreds of reduced sorting machines to postal facilities or reverse his policy eliminating extra trips.  *Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video). | |
| 139. DeJoy committed to delivering election mail at the First Class rate speed, but did not address how this commitment would play out in practical terms given that he was not rescinding the challenged policies.  *Senate Hearing on U.S. Postal Service*, C-SPAN (Aug. 21, 2020), https://www.c-span.org/video/?474940-1/senate-hearing-us-postal-service (video). | |

| | |
|---|---|
| 140. On August 24, 2020, DeJoy testified before the House of Representatives Committee on Oversight and Reform that he would not replace sorting machines unless Congress provided $1 billion in funding, which he stated Congress had "no way" of doing. *Postmaster General Louis DeJoy Testifies on Postal Service Operations & Mail-In Voting*, C- SPAN (Aug. 24, 2020), https://www.c-span.org/video/?474917-1/postmaster-general-louis-dejoy-testifies-postal-service-operations-mail-voting (video). | |
| 141. DeJoy again testified that he would not lift the prohibition on late trips or extra trips. *Postmaster General Louis DeJoy Testifies on Postal Service Operations & Mail-In Voting*, C- SPAN (Aug. 24, 2020), https://www.c-span.org/video/?474917-1/postmaster-general-louis-dejoy-testifies-postal-service-operations-mail-voting (video). | |
| 142. On election mail, DeJoy testified that the U.S. Postal Service would act "in a manner consistent with the proven processes and procedures that we have relied upon for years," while maintaining that "it would be best if the State election boards follow the recommendations" from the U.S. Postal Service's general counsel. *Postmaster General Louis DeJoy Testifies on Postal Service Operations & Mail-In Voting*, C-SPAN (Aug. 24, 2020), https://www.c-span.org/video/?474917-1/postmaster-general-louis-dejoy-testifies-postal-service-operations-mail-voting (video). | |
| **V.      The June and July 2020 changes' impact on mail delivery injures Plaintiffs.** | |

| | |
|---|---|
| 143. Mail delays have increased and risk further increasing in-person governmental interactions so residents can access these services and programs, which has frustrated Plaintiffs' ability to mitigate the spread of COVID-19—a disease that is spread through person-to-person contact. Banks Decl. ¶¶ 7–9 (Ex. 2); Newton Decl. ¶¶ 13–16 (Ex. 16); Roye[18] Decl. ¶¶ 11–12 (Ex. 18); Roye Suppl. Decl. ¶ 13 (Ex. 24); Ku Decl. ¶ 13 (Ex. 14). | |
| 144. State and local agencies in Plaintiffs' jurisdictions have implemented changes to their practices to accommodate mail delays. | |
| 145. New York City's Department of Social Services has seen its rent payments to landlords delayed in the mail, which has forced shelter residents to spend additional days or weeks in City-operated shelters. Banks Decl. ¶ 14 (Ex. 2). | |
| 146. Child Support Services for the City and County of San Francisco has expended resources and time setting up telephone lines, reassigning staff, and answering client questions about child support payments delayed in the mail. Roye Decl. ¶¶ 5, 12–13 (Ex. 18); Roye Suppl. Decl. ¶¶ 18–20 (Ex. 24). | |
| 147. The San Francisco Treasurer's Office expects to lose operational funds from delayed or missed tax payments and interest the Treasurer's Office would have earned by earlier investment of those funds. Shah[19] Decl. ¶¶ 3, 6, 8 (Ex. 19); Shah Suppl. Decl. ¶¶ 8–10, 15 (Ex. 25). | |

---

[18] Karen Roye is the Executive Director of the Department of Child Support Services for the City and County of San Francisco.

[19] Tajel Shah is the Chief Assistant Treasurer of the Office of the Treasurer and Tax Collector for the City and County of San Francisco.

| | |
|---|---|
| 148. Mail delays have impaired Plaintiffs' ability to perform legally mandated tasks, including provide health coverage and prescription medications, ensure that children and families receive court-ordered financial and medical support, and send applications for SNAP and other benefits to eligible residents. Adinaro Decl. ¶ 12 (Ex. 1); Banks Decl. ¶¶ 3–5, 10–12 (Ex. 2); Betts Decl. ¶¶ 7–15 (Ex. 3); DiGiovanni-Abatto Decl. ¶¶ 3–5 (Ex. 5); Hein Decl. ¶¶ 2–3, 8, 13, 15 (Ex. 8); Jacobs Decl. ¶¶ 4–10 (Ex. 11); Lau Decl. ¶¶ 3, 5–9 (Ex. 15); Poole Decl. ¶¶ 2, 6–11 (Ex. 17); Roye Decl. ¶ 4 (Ex. 18). | |
| 149. Plaintiffs have expended resources in an effort to address these disruptions.  Banks Decl. ¶ 8 (Ex. 2); Roye Decl. ¶¶ 5, 12–13 (Ex. 18); Roye Suppl. Decl. ¶¶ 18–20 (Ex. 24); Shah Decl. ¶¶ 3, 5–6, 10 (Ex. 19). | |
| **VI. The Postal Policy Changes, and President Trump's statements and conduct, severely undermine Plaintiffs' electoral schemes, which rely substantially on mail-in voting.** | |
| 150. Due to the COVID-19 pandemic, Plaintiffs have devoted resources to overhauling their election processes to expand absentee and mail voting and otherwise to minimize in-person voting.  Adinaro Decl. ¶ 9 (Ex. 1); Kellner Decl. ¶¶ 11, 16–17, 19 (Ex. 13); Ku Decl. ¶¶ 8–10 (Ex. 14). | |
| 151. Other Plaintiffs already had mail-based election systems, which they seek to preserve during the pandemic.  *See* Henricks[20] Decl. ¶ 3 (Ex. 9); Kaohu[21] Decl. ¶ 3 (Ex. 12); Takahashi[22] Decl. ¶ 3 (Ex. 20); Haw. Rev. Stat. § 11-101; P.L. 2020, ch.72 (N.J. Aug. 28, 2020). | |
| 152. Approximately 150 million ballots are expected to be cast in the November 2020 election.  Hersh[23] Decl. ¶ 10 (Ex. 10). | |

---

[20] Jon Henricks is the County Clerk for the County of Hawaii.
[21] Kathy Kaohu is the County Clerk for the County of Maui.
[22] Glen Takahashi is the City Clerk for the City and County of Honolulu.
[23] Dr. Eitan Hersh is an associate professor of political science at Tufts University.

| | |
|---|---|
| 153. Because of COVID-19, which has both resulted in new state laws that make mail balloting easier and has increased voters' preference to avoid in-person interactions, a conservative estimate of 53 percent of all voters in the November 2020 election may cast mail-in ballots—amounting to approximately 80 million mail-in ballots nationwide.  Hersh Decl. ¶¶ 11–14 (Ex. 10). | |
| 154. An estimated 9 percent of Americans who will cast mail-in ballots in 2020— approximately 7 million voters—are expected to submit those ballots on the Saturday right before Election Day.  Hersh Decl. ¶¶ 1, 24 (Ex. 10). | |
| 155. Before the Postal Service's policy changes, ballots mailed on the Saturday before Election Day would be received by election offices on time, but delays caused by the policy changes put a significant number of ballots at risk of not being counted.  Hersh Decl. ¶ 24 (Ex. 10). | |
| 156. Mail delays threaten timely delivery of ballots, which in turn encourages or forces voters to travel to in-person polling stations when they would not otherwise have need to do so.  Kellner Decl. ¶¶ 13–14, 27–28 (Ex. 13); Ku Decl. ¶¶ 17–18, 21 (Ex. 14). | |
| 157. Plaintiffs have committed resources to public education campaigns and installing additional ballot drop-boxes in response to mail delays.  Henricks Decl. ¶¶ 13–14 (Ex. 9); Kaohu Decl. ¶ 10 (Ex. 12); Takahashi Decl. ¶¶ 13–14 (Ex. 20). | |
| 158. Evidence, theory, and public health principles indicate that greater use of in-person voting could lead to higher COVID-19 infections.  Ku Decl. ¶¶ 16–21 (Ex. 14); Adinaro Suppl. Decl. ¶ 7 (Ex. 21). | |

| | |
|---|---|
| 159. States, including Plaintiffs, have adopted or maintained electoral schemes to provide increased access to mail-in ballots.  On April 9, 2020, Governor Cuomo issued an Executive Order to provide for expanded absentee ballot access for New York voters, by permitting voters to cite the risk of COVID-19 as a basis to apply for an absentee ballot.  N.Y. Exec. Order No. 202.15 (Apr. 9, 2020), https://www.governor.ny.gov/news/no-20215-continuing-temporary-suspension-and-modification-laws-relating-disaster-emergency. | |
| 160. Nearly 40% of ballots cast in New York's June 2020 primary election were absentee, a number that is expected to rise to half of all votes in New York for the November general election.  Kellner Decl. ¶¶ 11, 19 (Ex. 13). | |
| 161. During the New York June 2020 primary, State election officials were informed of complaints by voters who had not received their absentee ballots by Election Day, and who would have missed the opportunity to vote early because they were waiting for their absentee ballot in the mail.  Kellner Decl. ¶ 13 (Ex. 13). | |
| 162. The only way for such New York primary voters to vote would have been to cast their ballot in person, adding to significant crowds and delays at certain poll sites.  Kellner Decl. ¶¶ 13–15 (Ex. 13). | |
| 163. New York enacted legislation providing for similar expanded absentee access for the November 2020 general election.  N.Y. Elec. Law § 8-400 (McKinney 2020). | |
| 164. In New York, voters are entitled under State law to request an absentee ballot up to seven days before Election Day.  N.Y. Elec. Law § 8-400(2)(c) (McKinney 2020). | |
| 165. An absentee ballot either must be postmarked by Election Day and received within seven days after Election Day to be counted, or, if it lacks a postmark, be received by the day after Election Day.  N.Y. Elec. Law § 8-412 (McKinney 2020). | |

| | |
|---|---|
| 166. On July 1, 2019, Act 136 went into effect for the State of Hawaii.  *See* 2019 Haw. Sess. Laws Act 136, §§ 2 & 63 at 475-79, 499 (codified at Haw. Rev. Stat. Chapter 11, Part VIIA).  Act 136 adopted a system of virtually universal voting by mail for Hawaii, starting with the 2020 Primary Election.  Haw. Rev. Stat. § 11-101. | |
| 167. Act 136 provides that Hawaii voters who do not receive a mail ballot within five days of the election still have a right to request a ballot electronically and return it by mail.  Haw. Rev. Stat. § 11-107. | |
| 168. Under Hawaii law, if someone does not receive a mail ballot five days before the election (or otherwise needs a replacement ballot within five days of the election), Act 136 authorizes voters to request that a replacement ballot be sent to them electronically. Haw. Rev. Stat. § 11-107. | |
| 169. Hawaii law also provides that those ballots, when completed, may be returned by mail (in addition to three other methods).  Haw. Rev. Stat. § 11-107(b)(2). | |
| 170. Mail in ballots were utilized by 99% of Hawaii voters in the 2020 primary election.  Dan Nakaso, *Record primary election sees 99% of votes cast by mail-in ballots*, Honolulu Star-Advertiser (Aug. 11, 2020), https://www.staradvertiser.com/2020/08/11/hawaii- news/record-primary-election-sees-99- of-votes-cast-by-mail-in- ballots. | |
| 171. Hawaii's State Office of Elections previously recommended that for the November general election, voters mail ballots three to five days before Election Day.  Compl. ¶ 128. | |
| 172. In a July 29, 2020 letter, the U.S. Postal Services informed Hawaii that its voters must mail their ballots a full week before the election.  Ex. 49. | |
| 173. Election officials in Hawaii have expended resources educating voters on returning their ballots earlier than previously advised, including through print and radio media campaigns.  Henricks Decl. ¶ 13 (Ex. 9). | |

| | |
|---|---|
| 174. Hawaii officials have designed and implemented alternative means for voters to return mail ballots, including through installation of drop boxes.  Henricks Decl. ¶ 14 (Ex. 9); Takahashi Decl. ¶ 13 (Ex. 20). | |
| 175. Although such efforts are coordinated at the local level, local officials have, or intend to, receive funds from the state of Hawaii for these purposes.  Henricks Decl. ¶¶ 13–14 (Ex. 9); Takahashi Decl. ¶¶ 13–14 (Ex. 20). | |
| 176. On May 15, 2020, New Jersey Governor Murphy issued NJ EO 144, which provided that the New Jersey 2020 primary election be conducted primarily via vote-by-mail to reduce overcrowding at polling locations and minimize the risk of community spread of COVID-19.  Exec. Order No. 144, 52 N.J.R. § 1238(a) (2020). | |
| 177. On August 14, 2020, Governor Murphy issued a similar Executive Order, NJ EO 177, which provides that "in light of the dangers posed by Coronavirus disease 2019," New Jersey's 2020 general election will be conducted primarily via vote-by-mail to reduce overcrowding at polling locations and minimize the risk of community spread of COVID-19.  Exec. Order No. 177, 52 N.J.R. § 1701(b) (2020). | |

| | |
|---|---|
| 178. Pursuant to NJ EO 177, all active registered voters were automatically sent a mail-in ballot for the election, without the need to apply for one, at least 29 days before the election and in a manner to ensure the ballot's timely receipt and return; whenever a county clerk forwards a mail-in ballot by mail to a voter between the 29th day and the 13th day before the election, it shall be transmitted within three business days of receipt of the application and in a manner to ensure the ballot's timely receipt and return; all vote-by-mail return envelopes will have prepaid First-Class postage; the deadline to apply for a mail-in ballot by mail will be October 23, 2020; the deadline for returning a vote-by-mail application in person is suspended; and each county, to the extent possible, will have at least ten secure ballot drop boxes placed in locations readily accessible to the registered voters within the county.  Exec. Order No. 177, 52 N.J.R. § 1701(b) (2020). | |
| 179. President Trump has made a number of public comments disparaging vote-by-mail regimes.  On March 30, 2020, President Trump disparaged a congressional proposal in coronavirus relief legislation, arguing that "[t]he things they had in there were crazy. They had things—levels of voting that, if you ever agreed to it, you'd never have a Republican elected in this country again." Aaron Blake, *Trump just comes out and says it: The GOP is hurt when it's easier to vote*, Wash. Post (Mar. 30, 2020), https://washingtonpost.com/politics/2020/03/30/trump-voting-republicans/. | |
| 180. On April 8, 2020, President Trump tweeted that "Republicans should fight very hard when it comes to state wide mail-in voting," noting that, "for whatever reason, [mail-in voting] doesn't work out well for Republicans."  Donald J. Trump (@realDonaldTrump), Twitter (Apr. 8, 2020, 8:20 a.m.), https://twitter.com/realDonaldTrump/status/1247861952736526336. | |

| | |
|---|---|
| 181. On May 28, 2020, President Trump tweeted that mail-in voting would "LEAD TO THE END OF OUR GREAT REPUBLICAN PARTY."  Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:00 p.m.), https://twitter.com/realDonaldTrump/status/1266172570983940101. | |
| 182. On July 2, 2020, President Trump tweeted about mail-in voting, urging that "Republicans, in particular, cannot let this happen!"  Donald J. Trump (@realDonaldTrump), Twitter (July 2, 2020, 7:41 p.m.), https://twitter.com/realDonaldTrump/status/1278836342609379328. | |
| 183. On August 3, 2020, President Trump tweeted in response to expanded mail-in voting in Nevada: "In an illegal late night coup, Nevada's clubhouse Governor made it impossible for Republicans to win the state." Donald J. Trump (@realDonaldTrump), Twitter (Aug. 3, 2020, 7:37 a.m.), https://twitter.com/realDonaldTrump/status/1290250416278532096. | |
| 184. President Trump has criticized specific states for increasing access to mail-in voting—including Plaintiffs New York and New Jersey.  Donald J. Trump (@realDonaldTrump), Twitter (July 29, 2020, 6:28 p.m.) ("New York Mail-In voting is in a disastrous state of condition. . . .  Rigged Election."), https://twitter.com/realDonaldTrump/status/1288602262567153664; Donald J. Trump (@realDonaldTrump), Twitter (July 26, 2020, 4:51 p.m.), https://twitter.com/realDonaldTrump/status/1287490820669616128; Donald J. Trump (@realDonaldTrump), Twitter (July 2, 2020, 7:41 p.m.), https://twitter.com/realDonaldTrump/status/1278836342609379328. | |

| | |
|---|---|
| 185. President Trump has supported mail-in voting in certain other states.  On August 4, 2020, the President tweeted: "Whether you call it Vote by Mail or Absentee Voting, in Florida the election system is Safe and Secure, Tried and True. Florida's Voting system has been cleaned up (we defeated Democrats attempts at change), so in Florida I encourage all to request a Ballot & Vote by Mail! #MAGA." Donald J. Trump (@realDonaldTrump), Twitter (Aug. 4, 2020, 12:55 p.m.), https://twitter.com/realDonaldTrump/status/ 1290692768675901440. | |
| 186. On August 5, 2020, the President again differentiated between states, tweeting: "Nevada has ZERO infrastructure for Mail-In Voting. It will be a corrupt disaster if not ended by the Courts. It will take months, or years, to figure out. Florida has built a great infrastructure, over years, with two great Republican Governors. Florida, send in your Ballots!" Donald J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2020, 7:08 p.m.), https://twitter.com/realDonaldTrump /status/1290967953542909952. | |
| 187. On August 17, 2020, President Trump tweeted: "Some states use 'drop boxes' for the collection of Universal Mail-In Ballots. So who is going to 'collect' the Ballots, and what might be done to them prior to tabulation? A Rigged Election? So bad for our Country. Only Absentee Ballots acceptable!" Donald J. Trump (@realDonaldTrump), Twitter (Aug. 17, 2020, 11:40 a.m.), https://twitter.com/realDonaldTrump/status/ 1295385113862090753. | |
| 188. Consistent with President Trump's position, his campaign has sued Nevada, New Jersey, Pennsylvania, and "two Democratic-leaning Iowa counties" over their mail-in ballot policies.  Ryan J. Foley, *Trump campaign sues key Iowa counties over absentee mailings* (Aug. 13, 2020), https://apnews.com/22e6d33f1a2eeadde8e193a 9330cde16. | |

| | |
|---|---|
| 189. In New Jersey and Nevada, President Trump's campaign has opposed plans to mail ballots to voters. *See* Complaint, *Donald J. Trump for President, Inc. v. Murphy*, No. 320-CV-10753 (D.N.J. filed Aug. 18, 2020); Complaint, *Donald J. Trump for President, Inc. v. Cegavske*, No. 20-CV-1445, 2020 WL 5626974 (D. Nev. filed Aug. 4, 2020). | |
| 190. In Pennsylvania, President Trump's campaign sued to challenge the state's use of drop-off boxes for ballots.  *See* Complaint, *Trump for President, Inc. v. Boockvar*, No. 20-CV-966 (W.D. Pa. filed June 29, 2020). | |
| 191. President Trump has opposed emergency funds and supplemental election-related funds for the U.S. Postal Service, citing his opposition to expanded mail-in voting. *Remarks by President Trump in Press Briefing*, The White House (Aug. 13, 2020), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-august-13-2020. | |
| 192. On August 13, 2020, President Trump stated in a Fox Business interview that "[i]f we don't make a deal [on U.S. Postal Service funding], that means they don't get the money. That means they can't have universal mail-in voting. They just can't have it."  Megan Henney, *Trump rips Dems for holding up coronavirus stimulus deal with demand for post office aid*, Fox Bus. (Aug. 13, 2020), https://www.foxbusiness.com/politics/trump-rips-dems-for-holding-up-coronavirus-stimulus-deal-with-demand-for-post-office-aid. | |

| | |
|---|---|
| 193. On August 22, 2020, President Trump tweeted that "[r]epresentatives of the Post Office have repeatedly stated that they DO NOT NEED MONEY," claiming that recent pushes for funding are "all another HOAX by the Democrats to give 25 Billion unneeded dollars for political purposes, without talking about the Universal Mail-In Ballot Scam." Donald J. Trump (@realDonaldTrump), Twitter (Aug. 22, 2020, 4:51 p.m.), https://twitter.com/realDonaldTrump/status/ 1297275235432005632. | |
| 194. On August 22, 2020, the President encouraged his readers to "fight the []51 million unasked for Ballots."  Donald J. Trump (@realDonaldTrump), Twitter (Aug. 22, 2020, 4:51 p.m.), https://twitter.com/realDonaldTrump/ status/1297275241203458048. | |

DATED:  October 19, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Daniela L. Nogueira*
Daniela L. Nogueira, *Assistant Attorney General*
Matthew Colangelo
  *Chief Counsel for Federal Initiatives*
Morenike Fajana, *Special Counsel*
Elena Goldstein, *Deputy Chief, Civil Rights Bureau*
Lindsay McKenzie, *Assistant Attorney General*
Laura Mirman-Heslin, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6544
Daniela.Nogueira@ag.ny.gov

Joshua Tallent, *Assistant Attorney General*
Office of the New York State Attorney General
The Capitol
Albany, NY 12224

*Attorneys for the State of New York*

CLARE E. CONNORS
*Attorney General of the State of Hawaii*

By: */s/ Lori N. Tanigawa*
Lori N. Tanigawa
  *Deputy Attorney General*
Department of the Attorney General
State of Hawaii
425 Queen Street
Honolulu, HI 96813
Phone: (808) 586-0618
lori.n.tanigawa@hawaii.gov

*Attorneys for the State of Hawaii*

GURBIR S. GREWAL
*Attorney General of New Jersey*

MAYUR P. SAXENA
Assistant Attorney General

By: */s/ Tim Sheehan*
Tim Sheehan, *Deputy Attorney General*
Estelle Bronstein, *Deputy Attorney General*
Melissa Medoway, *Deputy Attorney General*
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625
Phone: (609) 815-2604
Tim.Sheehan@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

By: */s/ Aaron Bloom*
Aaron Bloom
Joseph Pepe
Tonya Jenerette
100 Church Street
New York, NY 10007
Phone: (212) 356-2274
abloom@law.nyc.gov

*Attorneys for the City of New York*

DENNIS J. HERRERA
*City Attorney for the City and County of San Francisco*

By: */s/ Dennis J. Herrera*
Dennis J. Herrera, *City Attorney*
Kevin Yeh, *Deputy City Attorney*
San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Phone: (415) 554-3856
Kevin.Yeh@sfcityatty.org

*Attorneys for the City and County of San Francisco*