**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**State of New York,** *et al.,*

                    Plaintiffs,

        v.                                                    Civil Docket No. 20-cv-2340 (EGS)

**Trump,** *et al.,*

                    Defendants.

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF**
**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Background ................................................................................................................... 4

I.      The United States Postal Service .......................................................................... 4

II.     The Challenged Policies. ..................................................................................... 4

        a.     Alleged Decommissioning of Letter Sorting Machines........................... 5

        b.     Overtime and Unearned Time.................................................................. 6

        c.     Late and Extra Trips................................................................................ 7

        d.     Expedited to Street Pilot Program........................................................... 10

        e.     USPS's Handling of Election Mail .......................................................... 10

Legal Standard ............................................................................................................. 13

Argument ..................................................................................................................... 14

I.      Plaintiffs have not established Article III standing to bring their claims. ......................... 14

II.     Plaintiffs' 39 U.S.C. § 3661 Claim Fails as a Matter of Law ........................................... 17

        A.     The Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' 39 U.S.C.
             § 3661 Claim.......................................................................................... 18

        B.     Plaintiffs Lack a Private Right of Action to Bring Their Section 3661
             Claim, and the *Ultra Vires* Doctrine Does Not Provide an Avenue for
             Judicial Review ...................................................................................... 23

III.    Plaintiffs' 39 U.S.C. §§ 101 and 403 Claims Fail As a Matter of Law ............................. 30

        A.     Plaintiffs Lack a Private Right of Action to Enforce Sections 101 and 403........ 30

        B.     Plaintiffs Cannot Demonstrate Entitlement to Relief Under the *Ultra Vires*
             Doctrine................................................................................................. 31

             1.     Plaintiffs' Section 101 and 403 Claims Are Not Reviewable under
                  the *Ultra Vires* Doctrine.................................................................. 31

             2.     Even If Plaintiffs Claims Were Reviewable Under the *Ultra Vires*
                  Doctrine, They Cannot Establish Entitlement to Relief............................ 33

IV.    Plaintiffs cannot establish an Elections Clause claim..................................................... 38

i

V.      Permanent Injunction and Declaratory Relief.................................................................... 44

Conclusion .................................................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*Bd. of Governors, Fed. Reserve Sys. v. McCorp Fin., Inc.*,
  502 U.S. 32 (1991) .................................................................................................. 29

*Bhd. of Locomotive Eng'rs & Trainmen, a Div. of Rail Conference-Int'l Bhd. of Teamsters
  v. Surface Transp. Bd.*,
  457 F.3d 24 (D.C. Cir. 2006) .............................................................................. 17

*Bovard v. U.S. Post Office*,
  47 F.3d 1178 (10th Cir. 1995) ............................................................................ 19

*Brookens v. Am. Fed'n of Gov't Employees*,
  315 F. Supp. 3d 561 (D.D.C. 2018) .................................................................... 38

*Buchanan v. U.S. Postal Serv.*,
  508 F.2d 259 (5th Cir. 1975) ................................................................ 24, 25, 29

*Carpenters Indus. Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017) ................................................................................ 14

*Cheney v. U.S. Dist. Court for D.C.*,
  542 U.S. 367 (2004) ............................................................................................ 41

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................................ 14

*Contemporary Mission, Inc. v. U.S. Postal Serv.*,
  648 F.2d 97 (2d Cir. 1981) ................................................................................. 30

*Cook v. Gralike*,
  531 U.S. 510 (2001) ...................................................................................... 39, 40

*Cruz v. McAleenan*,
  931 F.3d 1186 (D.C. Cir. 2019) .......................................................................... 14

*Ctr. for Biological Diversity v. EPA*,
  861 F.3d 174 (D.C. Cir. 2017) ............................................................................ 19

*DCH Reg'l Med. Ctr. v. Azar*,
  925 F.3d 503 (D.C. Cir. 2019) ............................................................................ 32

*Durant v. D.C. Gov't*,
  875 F.3d 685 (D.C. Cir. 2017) ............................................................................ 13

*Eagle Tr. Fund v. U.S. Postal Serv.*,
    365 F. Supp. 3d 57 (D.D.C. 2019) ............................................................. 32, 34

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117, 195 L. Ed. 2d 382 (2016) ..................................................... 31

*Foster v. Pitney Bowes Corp.*,
    549 F. App'x 982 (Fed. Cir. 2013) ........................................................... 18, 22

*Foster v. Pitney Bowes Inc.*,
    No. 11-cv-7303 2012 WL 2997810 (E.D. Pa. July 23, 2012) ................................ 22

*Franklin v. Mass.*,
    505 U.S. 788 (1992) ...................................................................................... 46

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ................................................................................ 19, 22

*Griffith v. Fed. Labor Rels. Auth.*,
    842 F.2d 487 (D.C. Cir. 1988) .................................................................. 23, 24

*Hartz Mountain Corp. v. Dotson*,
    727 F.2d 1308 (D.C. Cir. 1984) ...................................................................... 23

*In re Series 7 Broker Qualification Exam Scoring Litig.*,
    548 F.3d 110 (D.C. Cir. 2008) ........................................................................ 20

*Indian Educators Fed'n Local 4524 of Am. Fed'n of Teachers, AFL-CIO v. Kempthorne*,
    590 F. Supp. 2d 15 (D.D.C. 2008) ................................................................... 44

*Jones v. U.S. Postal Serv.*,
    No. 20 CIV. 6516 (VM), 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020) .................... 46

*LeMay v. U.S. Postal Serv.*,
    450 F.3d 797 (8th Cir. 2006) ........................................................ 18, 20, 21, 22

*Maryland People's Counsel v. F.E.R.C.*,
    760 F.2d 318 (D.C. Cir. 1985) ........................................................................ 16

*McClintock v. United States*,
    No. 3:18-CV-01937-SB, 2020 WL 1868264 (D. Or. Mar. 18, 2020) ....................... 19

*McDermott v. Potter*,
    No. C09-0776RSL, 2009 WL 2971585 (W.D. Wash. Sept. 11, 2009) ...................... 19

*Miss. v. Johnson*,
    71 U.S. 475 (1866) ....................................................................................... 46

*Mittleman v. Postal Regul. Comm'n*,
 757 F.3d 300 (D.C. Cir. 2014) .......................................................................... 23, 34

*Murphy v. U.S. Postal Serv.*,
 No. C 14-02156 SI, 2014 WL 4437731 (N.D. Cal. Sept. 9, 2014) ........................... 19

*Nader v. Volpe*,
 466 F.2d 261 (D.C. Cir. 1972) ................................................................................. 20

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
 437 F.3d 1256 (D.C. Cir. 2006) ...................................................................... 23, 24, 29

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
 No. 18-cv-2236-RCL, 2020 WL 4039177 (D.D.C. July 17, 2020) .................................. *passim*

*Nat'l Coal Ass'n v. Marshall*,
 510 F. Supp. 803 (D.D.C. 1981) ............................................................................... 45

*Nat'l Post Office Collaborative v. Donahoe*,
 No. 3:13-cv-1406, 2013 WL 5818901 (D. Conn. Oct. 28, 2013) ............................... 22

*New York v. Trump*,
 No. 20-CV-2340(EGS), 2020 WL 5763775 (D.D.C. Sept. 27, 2020) ............... 19, 20, 22, 23

*Nyunt v. Broad. Bd. of,*
 *Govs.*, 589 F.3d 445 (D.C. Cir. 2009) ................................................................... 23, 24

*Pep-Wku, LLC v. USPS*,
 No. 20-cv-0009-GNS, 2020 WL 2090514 (W.D. Ky. Apr. 30, 2020) ........................ 19

*Powell v. U.S. Postal Serv.*,
 No. CV 15-12913-FDS, 2016 WL 409672 (D. Mass. Feb. 2, 2016) .......................... 19

*Newdow v. Roberts*,
 603 F.3d 1002 (D.C. Cir. 2010) ............................................................................... 46

*Printz v. United States*,
 521 U.S. 898 (1997) ................................................................................................. 41

*Public Util. Comm'r of Or. v. Bonneville Power Admin.*,
 767 F.2d 622 (9th Cir. 1985) ................................................................................... 19

*Rodriguez v. Hemit*,
 No. C16-778 RAJ, 2018 WL 3618260 (W.D. Wash. July 30, 2018) ........................ 19

*Roudebush v. Hartke*,
 405 U.S. 15 (1972) ................................................................................................... 40

*Rucho v. Common Cause*,
     139 S. Ct. 2484 (2019) ............................................................................. 32

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
     134 F. Supp. 3d 365 (D.D.C. 2015) ........................................................... 19

*Sierra Club v. E.P.A.*,
     292 F.3d 895 (D.C. Cir. 2002) .................................................................. 14

*Smiley v. Holm*,
     285 U.S. 355 (1932) .............................................................. 39, 40, 41, 42

*Striley v. U. S. Postal Serv.*,
     No. 16-CV-07233-HRL, 2017 WL 513166 (N.D. Cal. Feb. 8, 2017) .................... 19

*Tedesco v. U.S. Postal Serv.*,
     553 F. Supp. 1387 (W.D. Pa. 1983) ............................................................ 31

*Telecomms. Res. & Action Ctr. v. FCC*,
     750 F.2d 70 (D.C. Cir. 1984) .................................................................... 19

*Thunder Basin Coal Co. v. Reich*,
     510 U.S. 200 (1994) ................................................................................. 18

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
     676 F.3d 1105 (D.C. Cir. 2012) ................................................................. 32

*U.S. Postal Serv., Inc. v. Postal Regul. Comm'n*,
     890 F.3d 1053 (D.C. Cir. 2018) ................................................................. 26

*U.S. Term Limits, Inc. v. Thornton*,
     514 U.S. 779 (1995) ...................................................................... 39, 40, 42

*Washington State Grange v. Washington State Republican Party*,
     552 U.S. 442 (2008) ................................................................................. 40

**STATUTES**

7 U.S.C. § 4510 ............................................................................................. 22

7 U.S.C. § 7419 ............................................................................................. 22

15 U.S.C. § 719i ............................................................................................ 22

15 U.S.C. § 1713 ........................................................................................... 22

15 U.S.C. § 3615 ........................................................................................... 22

15 U.S.C. § 8708 ........................................................................................... 22

28 U.S.C. § 569 ........................................................................................................ 21

29 U.S.C. § 2105 ...................................................................................................... 22

39 U.S.C. § 101 ................................................................................................. 30, 31

39 U.S.C. § 401 ...................................................................................................... 32

39 U.S.C. § 403 ................................................................................................. 30, 36

39 U.S.C. § 404 ...................................................................................................... 32

39 U.S.C. § 1003 .................................................................................................... 31

39 U.S.C. § 1004 .................................................................................................... 31

39 U.S.C. § 3652 .................................................................................................... 28

39 U.S.C. § 3661 ............................................................................................... 17, 18

39 U.S.C. § 3662 ............................................................................................... 18, 19

39 U.S.C. § 3663 ............................................................................................... 18, 21

39 U.S.C. § 3664 .................................................................................................... 18

42 U.S.C. § 5405 .................................................................................................... 22

42 U.S.C. § 33117 .................................................................................................. 22

## OTHER AUTHORITIES

Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, PRC Docket
    No. N 75-1,
    https://www.prc.gov/prcarchive/viewpdf.aspx?docid=508276839 ......................................... 25

Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services,
    Docket No. 2006-1 (Dec. 12, 2006) ......................................................................... 25

Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches,
    Docket No. N2009-1 (Mar. 10, 2010),
    https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf.................................. 26

Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1
    (Mar. 24, 2011)
    https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf.................................. 26

Advisory Opinion on Mail Processing Network Rationalization Service Changes,
    Docket No. N2012-1 (Sept. 28, 2012),
    https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf.......... 25

Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012),
    https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf..................................... 26

Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1
    (Dec. 23, 2011),
    https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf ............................................ 26

Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling,
    Docket No. N2014-1 (Mar 26, 2014),
    https://www.prc.gov/docs/89/89493/Docket%20No.%20N2014-1_Advisory%20
    Opinion.pdf ....................................................................................................................... 25

American Postal Workers Union, PRC Docket No. C2013-10, Order No. 1892,
    https://www.prc.gov/Docs/88/88438/Order_1892.pdf ........................................................... 25

Postal Regulatory Comm'n, Report on Universal Postal Serv. & the Postal Monopoly
    (2008),
    https://go.usa.gov/x7raF ................................................................................................. 32, 33

Postal Regulatory Comm'n, Docket No. N2011-1, Advisory Opinion on Retail Access
    Optimization Initiative (2011),
    https://go.usa.gov/x7rYc ...................................................................................................... 33

Postal Regulatory Comm'n, Docket No. N2010-1, Advisory Opinion on Elimination
    of Saturday Delivery (2011),
    https://go.usa.gov/x7rr6 ....................................................................................................... 33

## INTRODUCTION

Even with the benefit of multiple document productions and interrogatory responses from the United States Postal Service ("USPS"), and multiple depositions of key USPS personnel, Plaintiffs remarkably cannot produce a single piece of concrete evidence that USPS actually adopted the lion's share of the alleged policy changes at issue in this litigation. From the start, Plaintiffs proclaimed that USPS imposed a cap on overtime, yet they refer to no document or testimony confirming that this alleged policy ever took effect, nor do they deny that USPS employees continue to use overtime today. Plaintiffs also assert that USPS prohibited late and extra trips by mail trucks, but instead of citing to a formal written policy imposing this prohibition, Plaintiffs principally rely on an informal guidance document that does precisely the opposite: explaining when late and extra trips *should* be used. And like overtime, USPS employees also continue to use late and extra trips.

But even assuming Plaintiffs could point to factual evidence in support of their legal theories, those theories fail as a matter of law and Defendants are therefore entitled to judgment on all of Plaintiffs' claims. *First*, Plaintiffs do not have standing to bring suit. Plaintiffs' theories of injury all hinge on the assertion that the alleged USPS policy changes at issue contribute to material mail delays. But even though Defendants have responded to multiple preliminary injunctions by issuing guidance to undo any of these purported changes, Plaintiffs stress that mail delays have continued, demonstrating that these alleged policy changes were not the driving cause of prior mail delays. And even if they were, Plaintiffs cannot establish that these future mail delays will be of a sufficient magnitude and duration to impose any material impact on Plaintiffs in particular.

1

*Second*, Plaintiffs fail to establish a claim under section 3661 of the Postal Reorganization Act ("PRA"). As a threshold matter, the PRA divests district courts of jurisdiction over section 3661 claims by channeling those claims to the Postal Regulatory Commission ("PRC"), whose decisions are then subject to review in a federal appellate court. Plaintiffs cannot circumvent this exhaustive statutory procedure by immediately bringing suit in district court. But even if they could, Plaintiffs cannot establish a viable section 3661 claim. No statute creates a cause of action for alleged violations of this provision, and thus Plaintiffs must bring an *ultra vires* claim, which one court has called a "Hail Mary Pass" since it requires a plaintiff to establish a *clear* and *unequivocal* statutory violation. Plaintiffs cannot meet this standard. A violation of section 3661 cannot be "clear" since its terms are broad and ambiguous, requiring USPS to present a proposed policy to the PRC only if the policy represents a "change" to the "nature of postal services" that has "nationwide" effects. Indeed, the USPS's Office of Inspector General recently concluded that USPS was *not* required to seek an advisory opinion for any of the alleged changes. Thus, at the very least, this question is debatable, and so Plaintiffs cannot establish the clear violation necessary for an *ultra vires* claim.

*Third*, Plaintiffs also fail to establish a claim under sections 101 and 403 of the PRA. Neither of those provisions provide Plaintiffs with a cause of action to challenge operational decisions of the Postal Service, and thus Plaintiffs must again rely on the *ultra vires* doctrine. But the broad statements of policy of sections 101 and 403, which leave significant room for agency discretion, are not reviewable under the *ultra vires* doctrine. And even if they were, Plaintiffs again cannot show that USPS violated any clear and unequivocal statutory command.

*Fourth*, Plaintiffs cannot establish an Elections Clause claim. As an initial matter, even if Plaintiffs could demonstrate some injury and legal basis that would entitle them to judgment on

their claims about general mail delays, they certainly cannot demonstrate that a live dispute remains over this claim at this stage of the litigation. The briefing on the cross-motions will conclude the day before the election. If the Court rules on or after Election Day, or orders additional relief that USPS cannot feasibly implement in time to have an appreciable effect on the November 2020 election, the Court cannot provide relief that addresses any of the alleged injuries underlying the Elections Clause claim.

But even if there were a live dispute, Plaintiffs' unprecedented legal theory is meritless.  It assumes that because the Plaintiff States crafted their election laws with the expectation that USPS will provide a certain level of service, they now have a *Constitutional right* to expect that level of service. But this is inconsistent with binding Elections Clause precedent, which makes clear that this provision empowers States to enact procedural rules governing how their citizens may legally vote; it does not shield States from any and all external circumstances that may impact State elections. And Plaintiffs' novel reading of the Elections Clause would produce a number of absurd consequences. For one, in the future, States could challenge *any* delay in USPS performance— regardless of its cause—on the grounds that the delay would impact the next election cycle. Plaintiffs' position would also allow States to challenge any number of government policies that may have some incidental effect on elections. The Court should therefore reject Plaintiffs' expansive reading of the Elections Clause, which finds no support in the provision's text or the relevant case law.

Further, if the Court concludes that Plaintiffs are entitled to judgment on one or more of their claims, Plaintiffs' requested injunction is insufficiently precise to meet F.R.C.P. 65(d) requirements. Plaintiffs ask the Court to issue a multi-part, amorphous injunction prohibiting USPS from implementing certain policies, without specifically identifying what those policies are;

*e.g.*, the proposed injunction would stop USPS from implementing "a new effort to reduce work hours, especially overtime," without identifying the specific "effort" at issue. Accordingly, the Court should deny Plaintiffs' motion for a preliminary injunction, and grant USPS's cross-motion for summary judgment.

**BACKGROUND**

## I.   The United States Postal Service

USPS is a self-supporting, independent establishment of the executive branch, responsible for providing postal services throughout the United States. It is one of the nation's largest and most complex business operations. USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a single day. *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7.

## II.   The Challenged Policies.

Plaintiffs challenge five alleged USPS policy changes. These include "(1) increased reduction of high-speed sorting machines without local input; (2) a new effort to reduce work hours, especially overtime; (3) the first-ever organization-wide policy to eliminate late and extra trips; (4) a new initiative altering letter carrier workflows to reduce work hours; and (5) the decision not to treat all election mail entered as marketing mail on an expedited First Class basis." *See* Pls.' Mem. of Law in Supp. Of Summ. J. ("MSJ") at 3, ECF No. 60.

As explained below, many of the alleged policies that Plaintiffs challenge here and in related cases (such as an alleged elimination of overtime) were never in fact USPS policies, or have been policies since long before Postmaster General DeJoy's tenure began. In any event, USPS

has now issued clarifying instructions addressing all of the purported policies challenged in the Complaint, rendering moot any dispute over whether those policies previously existed.

### a. Alleged Decommissioning of Letter Sorting Machines

USPS regularly identifies mail processing and sorting equipment in approximately 289 mail processing facilities for removal and/or replacement. *See* Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 7; Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Declaration of Robert Cintron ("Cintron Dec.") ¶ 5. Based on its data analyses, USPS has been steadily reducing its letter and flat mail processing equipment for many years. DeChambeau Dec. ¶ 7. It does so for many reasons, including removing and replacing older machines with improved technology, or when such machines are no longer necessary given the significantly reduced volume of mail over the past decade, as well as even larger reduced mail volumes of approximately 20 percent due to COVID-19, that the Postal Service does not expect to return after the pandemic. *Id*; *see also id.* ¶ 8. Maintaining underutilized machines is inefficient and costly, requiring extra and unnecessary staffing and transportation resources. *Id.* ¶¶ 9, 11, 12. And removing unnecessary letter and flat machines frees up space for package processing, the volume of which is increasing substantially. *Id.* ¶ 18.

For years, the Postal Service has reduced the number of machines on an annual basis. *Id.* ¶ 13. This is a model-driven process, where the Postal Service "determine[s] the optimum number of machines required for efficient mail processing at facilities across the nation." *Id.* ¶¶ 15, 16. Consistent with that process, USPS began Phase 6 of its reduction initiative in May 2020, based on its conclusion that the significant decline in letter and flat mail volume that had been accelerated by the COVID-19 pandemic was unlikely to significantly change, and the increase in package volume would continue. *Id.* ¶ 19. Accordingly, USPS reduced a total of 711 machines in Fiscal

Year 2020, more than the average of 388 machines per year over the last five years, *id.* ¶ 13, but less than the highest year, Fiscal Year 2016, where 1,120 machines were removed. *Id.* ¶ 21. And, removal of 711 machines out of a remaining fleet of 8,500 machines in light of a 20 percent decline in volume amounts to a reduction in machines of only approximately 7 percent. Even with those removals, the Postal Service still has ample excess machine capacity; "machine processing utilization at the national level ranges from 35 percent (when mail volume on a given day is low) to 65 percent (when mail volume on a given day is at its highest). In other words, machines have a range from 35 percent to 65 percent unused capacity. Barber Dec. ¶ 6. Furthermore, local facilities may provide input into the machine removal process. *See* DeChambeau Dec. ¶ 14 ("Headquarters tracked the progress of reductions weekly and addressed any area requests for a deviation from the plan, such as delays in removing machines.").

On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election. *See* Ex. 6 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1; DeChambeau Dec. ¶ 22; Couch Dec. ¶¶ 13-15.

**b. Overtime and Unearned Time.**

USPS's overtime practices, where overtime is generally approved by local field managers (not Headquarters personnel), have remained unchanged since Postmaster General DeJoy took office. *See* Declaration of Angela Curtis ("Curtis Dec.") ¶¶ 12, 22-23; Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4.[1] Postmaster General DeJoy clarified that he never banned overtime,

---

[1] Because the issues here are largely the same, and in the interest of efficiency, Defendants also rely here on the declarations filed in support of Defendants' preliminary injunction briefing in *Jones*, No. 1:20-cv-06516 (S.D.N.Y.).

and continues to approve of its appropriate use.[2] *See, e.g.*, Ex. 9 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020)) 14.

The Postal Service has also continued a long-running process to reduce "unearned time," which is the "time that an employee takes to complete those duties over and above the earned time." Curtis Tr: 53:21-23. (Earned time refers to the fact that, pursuant to collective bargaining agreements, the Postal Service assigns specific tasks particular times to complete – "earned" time is the time in which those employees are expected to complete the task. *Id.* 52:11-24). USPS had nearly one million unearned supervisor hours through 2020. *Id.* 68:8-11. In the summer of 2020, USPS began a process to "t[ake] a look at the data again around this particular topic," and have more conversations about more efficiently scheduling employees to reduce unnecessary unearned hours. *Id.* 76-77.

### c. Late and Extra Trips.

For years, the Postal Service has sought to improve compliance with USPS's long-established delivery schedules. *See* Cintron Dec. ¶¶ 1, 11-13, 21; Cintron Dep. Tr. at 22:9-23 ("So has the Postal Service ever issued any guidance about the need to adhere to transportation schedules? . . . I would say over the last two years it's kind of been a focal point of mine in my previous job and now in this position. . . . It's been my area of focus both for lates and extras in the network over the last couple of years."). When Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed the initiative with the Postmaster General and other Postal executives. Cintron Dec. ¶¶ 22-23. Concurrent with these discussions, the USPS Office of Inspector General

---

[2] Further, after the court in *Washington* issued a nationwide injunction on September 17, 2020, USPS issued instructions clarifying that Postal Service Headquarters has not imposed, and will not impose, any nationwide changes of any kind that would ban or newly restrict overtime prior to Election Day. *See* Ex. 3 Clarifying Operational Instructions (Sept. 21, 2020) ("Instructions") ¶ 1. USPS has reiterated this message several times in response to other preliminary injunctions.

(OIG) published a report addressing "late deliveries . . . late dispatch, extra trips, and all the time and costs" that those issues caused. *See* Ex. 13 (Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections) at 10. In that report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency." Ex. 14 (USPS OIG Audit Report No. 19XG013NO00O-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. In particular, "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." *Id.* at 2. Among interrelated problems, "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." *Id.* Soon after joining USPS, Postmaster General DeJoy reemphasized the need to adhere to USPS's existing operational plans, including transportation schedules. Cintron Dec. ¶ 23.

A locally-prepared memorandum titled "Mandatory Stand-Up Talk: All Employees" was produced on July 10, 2020, and suggested, incorrectly, that late and extra trips were not permitted. *See* Cintron Dec. ¶ 24 n.1. Although the July 10 memorandum drew from a teleconference discussion conducted between regional and Headquarters officials, it was not created, reviewed, or approved by USPS Headquarters, and did not reflect USPS policy. *See* Supplemental Declaration of Robert Cintron ("Supp. Cintron Dec.") ¶¶ 3-4. Thus, "[s]tarting on July 11, 2020, in light of some confusion in the field about the scope of USPS policy, members of Headquarters begin to issue clarifications of USPS policy, including with [Area Vice Presidents] making clear that certain statements in the July 10, 2020 [memorandum] were not accurate statements of USPS policy." *Id.* This included clarifying the circumstances where extra trips were permissible. *Id.* ¶ 4.

Late and extra trips were not (and are not) banned, and USPS employees continue to use both today. *See*, *e,g.*, *Pennsylvania v. DeJoy*, 20-cv-04096, ECF No. 76-2 (E.D. Pa. Oct. 16, 2020) (on October 13, 2020 alone, 2298 late trips and 935 extra trips were utilized by USPS employees).

Mr. Cintron and his team then developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. *See* Cintron Dec. ¶ 24 & Ex. 2. On July 14, 2020, the guidelines were distributed to area executives, advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips. *Id.* ¶ 25. Importantly, these guidelines did not ban or set a firm limit on late and extra trips. *See* Cintron Dep. 60–61 (explaining guidelines); *id.* 63:25-65:9 ("We didn't ban extras and lates. These guidelines were purposefully put in place to make sure that we didn't have any disruption in service. Extras and lates are going to run every single day in this network. There is no way that we are going to be able to eliminate them. It's too large a network. So there is going to be a failure somewhere, and so extras and lates are put in place to mitigate."); *id.* at 89:13–20 (guidelines are guidance "to tell you . . . you should be using the lates and extras); Second Declaration of Joshua Colin ("Second Colin Dec.") ¶ 17 & Exs. 1, 2 (clarifying that the Cintron guidelines did not ban late/extra trips, and that USPS employees should follow updated, October 16, 2020 guidance). Indeed, the purpose was not even to minimize such trips, but rather to avoid "occurrences where it doesn't make any sense" to have extra or late trips, because such a trip would not actually advance the mail any faster than simply following the schedule. *Id.* 65:2-10. Late and extra trips may often contribute to mail delays, and thus the guidelines aimed to increase overall service performance scores. *See* Third Declaration of Robert Cintron ("Third Cintron Dec.") ¶¶ 3-4.

Moreover, although USPS witnessed a decline in service standards in mid-July 2020, there is no indication that this was attributable to a decrease in late and extra trips alone. Rather, the decline in service was likely caused by the initial failure of other mail processing network components to adjust to the decline in unnecessary late and extra trips. *See* Cintron Dec. ¶ 26. Soon after, USPS "began efforts to correct the decline through focusing on meeting mail processing and delivery schedules, conducting a root cause analysis of why some mail was not timely being loaded on trucks, and identifying corrective measures to improve these issues." *Id.* ¶ 276.

Additionally, after the *Washington* court issued the nationwide injunction, USPS issued instructions further clarifying that the "Postmaster General has not banned the use of late or extra trips; when operationally required, late or extra trips are permitted." Ex. 12, Clarifying Operational Instructions (Sept. 21, 2020) ¶ 5. The Instructions expressly provide that mail should not "be left behind," and "transportation, in the form of late or extra trips that are reasonably necessary to compete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet [USPS] service commitments." *Id.*

### d.  Expedited to Street Pilot Program.

Plaintiffs note that USPS adopted a limited pilot program called "Expedited to Street/Afternoon Sortation" ("ESAS"), which sought to reduce morning activities to allow carriers to begin their routes earlier. The ESAS program, however, was planned before Postmaster General DeJoy took office, and it has since been suspended. *See* Colin Dec. ¶ 11. The pilot was scheduled for 30 days at 384 delivery units (out of approximately 18, 755 delivery units), *see id.* ¶ 7, and there is no evidence that it had any impact on service performance scores, *see id.* ¶ 11

e. **USPS's Handling of Election Mail**

"Election Mail" is defined by USPS as any item mailed to or from authorized election officials that enables citizens to participate in the voting process. *See* Declaration of Robert Glass ("Glass Dec.") ¶ 3. This includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications). *Id.* USPS regards Election Mail as having special importance.

Notwithstanding USPS's longstanding commitment to the timely delivery of Election Mail, election officials and voters also bear significant responsibility in the successful utilization of postal services for the Election. State and local election officials must choose whether to send Election Mail to voters via either First-Class Mail, which is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days. *Id.* ¶ 4. Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a premium service with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 19 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R-20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 1. USPS had not altered, nor had it planned to alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election. *See, e.g.*, Ex. 13 at 18.

Moreover, for many years, USPS has taken special measures for handling Election Mail. First, USPS personnel have long made special efforts to physically identify and track the progress of Election Mail through USPS facilities, to ensure that Election Mail is not delayed or lost in processing or delivery. When a mail bin identifiable as Election Mail enters the system, USPS

personnel log that container at every step of processing, so that it can be easily located if necessary. Glass Dec. ¶ 19. USPS facilities also deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day). *Id.*

Additionally, and contrary to Plaintiffs' assertion, USPS has never classified *all* Election Mail as "First-Class Mail." Glass Dec. ¶ 18. Although Election Mail sent by individual voters has traditionally been (and currently is)  First-Class Mail, the Postal Service generally handles Election Mail sent by election officials as Marketing Mail according to established standards for that class of mail. *See id.* ¶¶ 17-18. However, USPS has several longstanding practices to expeditiously process and deliver of Election Mail entered as Marketing Mail, particularly ballots sent by election officials. *See id.* ¶ 20. USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail. *See id.* ¶ 21. As a result, delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. *See id.* And, when identifiable, USPS prioritizes placing ballots on outgoing trucks, whether sent using First-Class Mail or Marketing Mail. *See id.* ¶ 22.

USPS will continue these longstanding practices in support of mail-in voting for the Election. *See G*lass Dec. ¶ 28. USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots. *See id.* ¶¶ 1, 27.

In anticipation of the additional mail volume associated with the Election, USPS has issued multiple memoranda reiterating its dedication to the timely processing and delivery of Election

Mail. For example, on September 21, 2020, USPS issued instructions clarifying that it will prioritize Election Mail that is entered as Marketing Mail, regardless of the paid class. *See* Instructions ¶ 7. This includes using standardized log sheets to track Election Mail through processing; conducting daily "all clears" to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly; advancing Election Mail entered as Marketing Mail ahead of all other Marketing Mail and processing it expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail Delivery standards; expanding processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed the same day; and prioritizing Election Mail when loading trucks. *See id.*

And as recently as October 20, 2020, USPS issued yet another guidance document—the Extraordinary Measures Memorandum—further emphasizing the additional resources USPS will commit to Election Mail. USPS formed a special Command Center to address Election Mail-related issues, and reiterated that it would employ special measures, such as "expedited handling, extra deliveries, and special pickups . . . to connect blank ballots entered by election officials to voters, or completed ballots returned by voters entered close to or on Election Day to their intended destination." Ex. 20, Extraordinary Resources Memo., at 1-2.

## LEGAL STANDARD

"Summary judgment may be granted only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Durant v. D.C. Gov't*, 875 F.3d 685, 693 (D.C. Cir. 2017). "When assessing a motion for summary judgment, we view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in his favor." *Id.* "A dispute about a material fact is 'genuine'" if "the evidence is such that a reasonable

jury could" side with the nonmoving party. *Cruz v. McAleenan*, 931 F.3d 1186, 1191 (D.C. Cir. 2019).

<strong><small>ARGUMENT</small></strong>

**I.    Plaintiffs have not established Article III standing to bring their claims.**

"To establish Article III standing, a plaintiff must allege (i) a concrete and particularized injury that is actual or imminent; (ii) that the injury is caused by the challenged conduct of the defendant; and (iii) that the requested relief is likely to redress the injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).[3] When a plaintiff seeks prospective relief, the "threatened injury must be certainly impending to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "[A] plaintiff moving for summary judgment in the district court . . . must support each element of its claim to standing by affidavit or other evidence." *Sierra Club v. E.P.A.*, 292 F.3d 895, 899 (D.C. Cir. 2002). Furthermore, "[w]here, as here, a plaintiff alleges that it will suffer future . . . harm as the result of a government action, the complaint and declarations must together demonstrate a *substantial probability* of injury-in-fact, causation, and redressability." *Zinke*, 854 F.3d at 5 (emphasis added).

Here, Plaintiffs fail to establish that there is a "substantial probability" that any of their alleged injuries have been (and will continue to be) caused by the alleged USPS policy changes at issue. Plaintiffs' alleged injuries—*e.g.*, delayed State tax collections and interference with State agency operations—all hinge on current and future mail delays. But Plaintiffs fail to show that the alleged USPS policy changes at issue are materially responsible for current mail delays, and will continue to cause material mail delays. Indeed, the lack of a causal relationship is shown by the numerous injunctions that have been issued against the Postal Service in this and related cases.

---

[3] Internal quotation marks are omitted throughout this brief, unless otherwise stated.

Critically, in response to these preliminary injunctions,[4] USPS adopted measures targeting the precise alleged policy changes at issue in Plaintiffs' summary judgment motion. *See, e.g.*, Clarifying Operational Instructions, at 3 ("transportation, in the form of late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited."); *id.* at 1 ("Overtime use has not been banned, nor have any caps been placed on overtime hours."). Yet Plaintiffs continue to assert that they are witnessing material mail delays. Plaintiffs themselves note: "The decline in Service Scores has persisted even after the Postal Service . . . suspended" most of the USPS "initiatives" at issue, and "[t]herefore, the observed declines in Service Scores are not attributable" to these initiatives. Pls.' Stmt. of Facts ¶ 106. Although Plaintiffs contend that USPS did not suspend the policy "limiting the number of Extra or Late Trips," *id.*, as explained above, USPS never prohibited or set a firm limit on late and extra trips, and has sent multiple guidance documents making clear that extra and late trips are permitted.[5] *See, e.g.*, Clarifying Operational Instructions, at 3; Ex. 25, October 13, 2020 Supplemental Guidance Memorandum, at 3-4; Ex. 26, October 16, 2020 Mandatory Stand-Up Talk, at 3.

---

[4] *See Washington v. Trump*, No. 20-cv-3127 (E.D. Wash.) (nationwide preliminary injunction entered on September 17, 2020; clarifying order entered October 2, 2020); *Jones v. U.S. Postal Service*, No. 20-cv-6516 (S.D.N.Y.) (nationwide preliminary injunction entered September 25, 2020; clarifying order entered September 29, 2020); *Pennsylvania v. DeJoy*, No. 20-cv-4096 (E.D. Pa.) (nationwide preliminary injunction entered September 28, 2020; clarifying order entered October 13, 2020); *New York v. Trump*, No. 20-cv-2340 (D.D.C.) (nationwide preliminary injunction entered September 28, 2020); *Vote Forward v. DeJoy*, No. 20-cv-2405 (nationwide preliminary injunction entered on September 28, 2020); *Richardson v. Trump*, No. 20-cv-2262 (D.D.C.) (nationwide preliminary injunction entered October 8, 2020); and *NAACP v. U.S. Postal Service*, No. 20-cv-2295 (D.D.C.) (nationwide preliminary injunction entered October 10, 2020).

[5] Plaintiffs stress the Cintron Guidelines which did not prohibit late and extra trips. Again, these guidelines simply identify when late and extra trips may improve overall efficiency.

To demonstrate that the alleged USPS policy changes at issue are responsible for mail delays, Plaintiffs largely rely on evidence indicating that USPS service performance levels are lower now than they were previously. But this does not demonstrate that the drop in service performance levels was *caused* by the alleged USPS policy changes. As the Southern District of New York observed, a "variety of issues—such as the COVID-19 pandemic, wildfires on the west coast, and inclement weather— . . . [could] contribute to . . . delays and are outside of USPS's control." *Jones v. USPS*, 20-cv-6516, ECF No. 82, at 6 (S.D.N.Y. Oct. 9, 2020); *see also* Declaration of Linda Crawford ¶¶ 3-12 (other factors have contributed to delays); Declaration of Lisse Garrett ¶¶ 9-11 (natural disaster can cause mail delays).

But even if Plaintiffs could establish that the alleged USPS policy changes may cause mail delays, they cannot establish that these policy changes will cause *material* mail delays in the future that will harm *Plaintiffs* in particular. Plaintiffs' theories require them to show that the mail delays will affect a sufficient amount of mail in the Plaintiff States in particular and will be of sufficient duration. For example, Plaintiffs argue that they may receive delayed tax payments. *See* MSJ, at 11. But obviously, this injury will only materialize if the mail delays will be of a material length and affect a sufficient number of mail-pieces containing tax payments. Plaintiffs make little attempt to submit evidence showing that there is a "substantial probability" that this scenario will occur in support of their motion for summary judgment.

Perhaps recognizing that they cannot establish causation, or future injury, with a sufficient degree of certainty, Plaintiffs focus on a number of alleged injuries inflicted upon their citizens, such as health risks and delayed housing assistance. *See* MSJ, at 9-11. But even though "a state's so-called 'quasi-sovereign' interest" in protecting its citizens is often "sufficient to confer standing upon the state as parens patriae . . . [a] State does not have standing as parens patriae to bring an

action against the Federal Government." *Maryland People's Counsel v. F.E.R.C.*, 760 F.2d 318, 320 (D.C. Cir. 1985). Plaintiffs also try to manufacture an injury by claiming that they elected to spend funds in response to mail delays. *See* MSJ, at 9-10. But as explained above, there is no indication that material mail delays are being caused by the alleged USPS policy changes, and thus Plaintiffs' expenditures were "not in any meaningful way 'caused' by" these policies. *Bhd. of Locomotive Eng'rs & Trainmen, a Div. of Rail Conference-Int'l Bhd. of Teamsters v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006). In any event, these expenditures were *voluntary*; they were "entirely self-inflicted and therefore insufficient to confer standing." *Id.*

## II.      Plaintiffs' 39 U.S.C. § 3661 Claim Fails as a Matter of Law

Even if Plaintiffs could establish standing, their legal claims fail as a matter of law. Plaintiffs first contend that they are entitled to summary judgment on their claim that the alleged Postal Policy Changes violate 39 U.S.C. § 3661(b). *See* MSJ, at 13–23. That section provides that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," it must first submit a proposal to the PRC requesting an advisory opinion. 39 U.S.C. § 3661(b).

Plaintiffs' section 3661 claim fails as a matter of law for multiple, independent reasons. First, this Court does not have jurisdiction to hear the claim, which Congress has channeled to the PRC. Second, on the merits, Plaintiffs have not met their burden to demonstrate as a matter of law that Defendants are violating a "clear and mandatory" statutory provision that "has only one unambiguous interpretation," as they must to succeed where, as here, Plaintiffs are pursuing their claim under the *ultra vires* doctrine. *Nat'l Ass'n of Postal Supervisors ("NAPS") v. U.S. Postal Serv.*, No. 18-cv-2236-RCL, 2020 WL 4039177, at *3 (D.D.C. July 17, 2020). Indeed, after this Court issued its preliminary injunction order, the Postal Service's Office of Inspector General issued a report concluding that the Postal Service was *not* required to consult with the PRC before

17

implementing the alleged changes. *See* Ex. 14 at 3 ("Based on our review of the applicable legal requirements for consulting the PRC at the time the Postal Service was making its determination, the Postal Service was in compliance with policies and legal requirements."); *id.* at 18–19. This decision was consistent with longstanding PRC precedent that section 3661 comes into play only where the Postal Service knowingly and intentionally acts to degrade service.  Plaintiffs do not come close to making that showing here.

A.      **The Court Lacks Subject-Matter Jurisdiction Over Plaintiffs' 39 U.S.C. § 3661 Claim**

As a threshold matter, Defendants maintain that this Court lacks subject-matter jurisdiction over Plaintiffs' section 3661 claim. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994). In section 3662 of Title 39, Congress specified that any person "who believes the Postal Service is not operating in conformance with the requirements of various provisions, including "*this chapter* [*i.e.*, Chapter 36 of Title 39, which includes 39 U.S.C. § 3661] (or any regulations promulgated under any of those provisions) may lodge a complaint with the Postal Regulatory Commission." 39 U.S.C. § 3662(a) (emphasis added). If that person is dissatisfied with the PRC's ruling, she may petition for review in the D.C. Circuit. *Id.* § 3663. And if she is satisfied with the PRC's ruling, she may *then* move to enforce the PRC's decision in district court. *Id.* § 3664.

As Defendants explained in their opposition to Plaintiffs' motion for a preliminary injunction, numerous courts of appeals have held that 39 U.S.C. §§ 3662 through 3664 constitute the exclusive jurisdictional remedy for complaints about postal services that fall within the statutory provisions identified in section 3662, which includes a claim that the Postal Service is not complying with section 3661. *See, e.g.*, *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed. Cir. 2013) (PRC has "exclusive jurisdiction . . . over claims enumerated in § 3662"); *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799-800 (8th Cir. 2006) ("In this case, Congress removed the

18

district courts' jurisdiction over claims regarding postal rates and services. It did so by enacting 39 U.S.C. § 3662."); *see also Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir. 1995). These courts of appeals have been joined by "countless decisions" of lower courts. *Pep-Wku, LLC v. USPS*, No. 20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky. Apr. 30, 2020).[6]

In its order granting Plaintiffs' motion for a preliminary injunction, the Court observed that these cases are not "mandatory authority." *New York v. Trump*, No. 20-CV-2340(EGS), 2020 WL 5763775, at *6 (D.D.C. Sept. 27, 2020). But the rationale behind this long, unbroken line of precedent is, at a minimum, persuasive and undisputed. "Generally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 589 (2010). "It is well settled that even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' . . . a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." *Telecomms. Res. & Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984); *see also Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 186 (D.C. Cir. 2017); *Public Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 627 (9th Cir. 1985). A number of considerations militate against allowing courts to short-circuit an established administrative review process, including respect for Congress's conferral of administrative autonomy; administrative expertise and discretion as to specialized, complex

---

[6] *See, e.g.*, *McClintock v. United States*, No. 3:18-CV-01937-SB, 2020 WL 1868264, at *2 (D. Or. Mar. 18, 2020); *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018); *Striley v. U. S. Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017); *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 134 F. Supp. 3d 365, 382 (D.D.C. 2015); *Murphy v. U.S. Postal Serv.*, No. C 14-02156 SI, 2014 WL 4437731, at *3 (N.D. Cal. Sept. 9, 2014); *Powell v. U.S. Postal Serv.*, No. CV 15-12913-FDS, 2016 WL 409672, at *1–2 (D. Mass. Feb. 2, 2016).

problems; development of an initial factual record; conservation of judicial resources; and avoidance of conflicting litigation. *Nader v. Volpe*, 466 F.2d 261, 265-68 (D.C. Cir. 1972). This principle applies particularly in situations where there are multiple layers of review, *i.e.*, review first by an agency, and then by the federal courts. *See In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008). Here, Congress has created just such a channeling scheme: complaints within the ambit of section 3662 go first to the Commission, an agency with deep expertise in postal matters, and then to the D.C. Circuit and the district courts. This scheme serves all of the interests identified in *Nader*, including the avoidance of conflicting precedent that could arise if multiple federal courts exercised jurisdiction in parallel with the PRC and D.C. Circuit. Under such circumstances, this court lacks subject matter jurisdiction.

In concluding otherwise in its preliminary injunction order, the Court focused primarily on Congress's use of the permissive "may" in section 3662, instead of the mandatory "shall." *New York*, 2020 WL 5763775, at *7. Plaintiffs argue that Congress's use of the permissive "may" suggests that Congress did not intend sections 3662(a) and 3663 to be the exclusive avenue for bringing a challenge to USPS's failure to comply with section 3661. But the most natural reading of this provision is simply that the permissive language suggests that one who "believes the Postal Service is not operating in conformance with" statutory requirements *may* lodge a complaint with the PRC, but may also choose to take no action at all. Including the word "shall" would have created the odd outcome that *anyone* with a grievance against the Postal Service would arguably be obligated to file a complaint with the PRC. To read the provision as Plaintiffs do would create the very types of "external intrusions on the Postal Service's managerial experience" that motivated Congress to create the administrative review scheme in the first place. *LeMay*, 450 F.3d at 800.

20

Indeed, statutes channeling review in a particular court or agency commonly use the phrase "may appeal," without any suggestion that such a channel is optional or that an applicant could appeal via a separate path. *See, e.g.*, 28 U.S.C. § 569(a) ("An individual denied reemployment under this section in a position because the individual is not qualified for that position may appeal that denial to the Merit Systems Protection Board under section 7701 of title 5."); 30 U.S.C. § 823(d)(2)(A)(i) ("Any person adversely affected or aggrieved by a decision of an administrative law judge, may file and serve a petition for discretionary review by the Commission of such decision within 30 days after the issuance of such decision. Review by the Commission shall not be a matter of right but of the sound discretion of the Commission."). Even elsewhere in Title 39, it is clear that "may" means that a party has discretion over whether or not to file, but not over whether to file in a forum other than the one that Congress specified. *See* 39 U.S.C. § 3663 (aggrieved parties "may" petition D.C. Circuit for judicial review of a PRC). The instances of "shall" in Sections 3662(c) and 3663 refer to action by the PRC and appellate court once a complaint or petition for review has been filed. As such, they do not shed any contrasting light on the meaning of "may" in Sections 3662(a); rather, they form part of a harmonious statutory scheme whereby parties are entitled, but not obligated, to file a complaint or seek appellate review.

Courts have repeatedly rejected exactly this type of textual argument that hinges on Congress's use of the permissive "may." In *LeMay*, reviewing a challenge to the earlier version of section 3662 – but which included the same "may" phrasing – the Eighth Circuit acknowledged that "as a general rule of statutory construction, 'may' is permissive, whereas 'shall' is mandatory." *LeMay*, 450 F.3d at 799. It noted, however, that "this general rule does not close the inquiry," as "Courts will infer foreclosure of judicial review where congressional intent to preclude judicial review is 'fairly discernable' in the details of the particular legislative scheme." *Id.* at 799-800.

The Court went on to conclude that "Congress intended to afford postal management 'the unfettered authority and freedom that has been denied for years to maintain and operate an efficient service,'" *id.* at 800, and that review by the Postal Regulatory Commission was the way that "Congress gave meaning to this intention," *id.* The Federal Circuit reached the same conclusion regarding the now-operative 2006 amendments to section 3662. *See Foster*, 549 F. App'x at 986 ("There is nothing in the statutory text or legislative history to suggest that the [2006 Postal Accountability and Enhancement Act ("PAEA")] eliminated the exclusive jurisdiction conferred to the [PRC] over claims enumerated in § 3662"); *see also*, *Nat'l Post Office Collaborative v. Donahoe*, No. 3:13-cv-1406, 2013 WL 5818901, at *4 (D. Conn. Oct. 28, 2013); *Foster v. Pitney Bowes Inc.*, No. 11-cv-7303 2012 WL 2997810, at *5 (E.D. Pa. July 23, 2012). Indeed, were Plaintiffs' construction correct, decades of case law concluding that the PRC had exclusive jurisdiction over claims brought within the ambit of section 3662 would be wrong, and the district courts could be flooded with the precise type of complaints that Congress intended to channel to the PRC. If Congress intended to preserve a judicial remedy alongside the statutory complaint process, it presumably would have said so, as it has in other statutes. *See, e.g.*, 7 U.S.C. §§ 4510(c), 7419(g); 15 U.S.C. §§ 719i(a), 1713, 3615, 8708(d); 29 U.S.C. § 2105; 42 U.S.C. §§ 5405(a)(6), 33117.

In its order granting a preliminary injunction, the Court also found that it had jurisdiction on the ground that (1) "a finding of preclusion could foreclose all meaningful judicial review", (2) Plaintiffs' claim was "wholly collateral to [the] statute's review provisions", and (3) Plaintiffs' claim was "outside the agency's expertise." *New York*, 2020 WL 5763775, at *7 (quoting *Free Enter. Fund.*, 561 U.S. at 489–90). But even if Plaintiffs could have established these elements when they moved for a preliminary injunction, they certainly cannot do so now. The Court's basis

for holding that it had jurisdiction was that there was no other meaningful or adequate avenue for judicial review because the PRC's "90-day window . . . to respond to a complaint" meant that the PRC may not be able to remedy Plaintiffs' election-related injuries before November 3. *New York*, 2020 WL 5763775, at *7. But any alleged election-related injuries will be moot at or immediately after the time the Court issues a decision on Plaintiffs' motion for summary judgment, and Plaintiffs identify no reason why the PRC could not provide meaningful relief as to any non-election injuries that Plaintiffs allege are ongoing. Accordingly, even if Plaintiffs could have relied on the lack of review when they sought a preliminary injunction, they cannot do so now.

### B.    Plaintiffs Lack a Private Right of Action to Bring Their Section 3661 Claim, and the *Ultra Vires* Doctrine Does Not Provide an Avenue for Judicial Review

Because the Court lacks subject-matter jurisdiction over Plaintiffs' section 3661 claim, it is subject to the standards of the *ultra vires* review doctrine, which Plaintiffs cannot satisfy. But even if the Court had subject-matter jurisdiction over Plaintiffs' section 3661 claim, it would still fail as a matter of law. There is no dispute that section 3661 does not provide Plaintiffs with a private right of action to bring their claim. And because the Postal Service "is exempt from review under the Administrative Procedure Act," *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 305 (D.C. Cir. 2014), Plaintiffs acknowledge that the only potential avenue for relief is the *ultra vires* review doctrine. Review under this doctrine, however, "is quite narrow," *id.* 307, and "is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds." *Nyunt v. Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009); *see Griffith v. Fed. Labor Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) (doctrine has "extremely limited scope"); *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1312 (D.C. Cir. 1984) (doctrine is "extraordinarily narrow). To justify relief under the doctrine, a plaintiff must show, "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim;

23

and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019).

Plaintiffs have not demonstrated that they can meet these requirements.  First, as discussed above, section 3662 expressly precludes judicial review.

Second, Plaintiffs have not demonstrated that the Postal Service is acting "in excess of its delegated powers and contrary to a specific prohibition." *DCH Reg'l Med. Ctr.*, 925 F.3d at 509. To meet this requirement, Plaintiffs must show that the Postal Service is violating a "clear and mandatory" statutory provision that "has only one unambiguous interpretation." *NAPS*, 2020 WL 4039177, at *3.  The agency's error must be "so extreme that one may view it as jurisdictional or nearly so." *Nyunt*, 589 F.3d at 449 (quoting *Griffith*, 842 F.2d at 493)).

Section 3661(b) does not unambiguously require the Postal Service to request an advisory opinion before implementing the alleged Postal Policy Changes. MSJ, at 18–23. Section 3661(b) states that the Postal Service must seek an advisory opinion when it "determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis." But as the leading case on this issue explains, this provision must be read within the context of the PRA's overall statutory scheme, which is designed to give the Postal Service "broad authority in postal management" to ensure that management is not "unjustly hampered in its efforts to administer the Department in a businesslike way." *Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 262–63 (5th Cir. 1975). As the *Buchanan* court explained, "[t]he language of the statute, the legislative history, and the existence of alternative remedies indicate that Congress intended 3661 to apply to *only a specified class of decisions*." *Id.* (emphasis added). Congress left postal management with "with broad decision-making power, subject to 3661's

requirements for specified decisions." *Id.* at 262. To ensure that the extensive on-the-record hearing procedures required by section 3661 align with Congress's intent that the Postal Service has the ability to manage postal operations in a business-like way, section 3661(b) comes into play only if (i) there is a change that has a "meaningful impact on service," (ii) the change is "in the nature of postal service," and (iii) the change affects service "on a nationwide or substantially nationwide basis." *Id.* at 262-63.

Applying these principles, the PRC has interpreted section 3661 to require the Postal Service to seek an advisory opinion from the PRC only if the complainant can show (1) "that the Postal Service has already, or plants to implement, new service standards" or (2) "that the Postal Service is knowingly and/or intentionally denigrating service."[7] Because it is a *before-the-fact* procedure, section 3661 applies only when a Postal Service action or program "has *as its goal*, or will have as a *reasonably foreseeable* effect, an appreciable alteration in the accessibility of postal services to the public or in the type and quality of postal services offered to the public which is substantial and extends over a broad geographic area.[8] For example, the PRC has interpreted section 3661 to require the Postal Service to request an advisory opinion before formally changing the service standards for certain pieces of mail,[9] changing the hours of operations at tens of

---

[7] American Postal Workers Union, PRC Docket No. C2013-10, Order No. 1892, at 13 https://www.prc.gov/Docs/88/88438/Order_1892.pdf; *see also* Ex. # at 18 (Oct. 19, 2020 OIG Report).

[8] *See* Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, PRC Docket No. N 75-1, at 10, https://www.prc.gov/prcarchive/viewpdf.aspx?docid=508276839 (emphasis added).

[9] Advisory Opinion on Service Changes Associated With Standard Mail Load Levelling, Docket No. N2014-1 (Mar 26, 2014), at 1, 10, https://www.prc.gov/docs/89/89493/ Docket%20No.%20N2014-1_Advisory%20Opinion.pdf; Advisory Opinion on Mail Processing Network Rationalization Service Changes, Docket No. N2012-1 (Sept. 28, 2012), at 1 https://www.prc.gov/docs/85/85269/Advisory_Opinion_%20PDF%20_09282012.pdf; Advisory Opinion Concerning a Proposed Change in the Nature of Postal Services, Docket No. 2006-1 (Dec. 12, 2006), at 7.

thousands of post offices or retail operations,[10] or eliminating an entire day of mail delivery.[11] All of these proposals constitute formal changes in published service standards or which customer-facing operations are open—not the basic, managerial operational changes of the type at issue here. These PRC interpretations of section 3661 are entitled to *Chevron* deference. *See United Parcel Serv., Inc. v. Postal Regul. Comm'n*, 890 F.3d 1053, 1062 (D.C. Cir. 2018) (PRC's reasonable interpretation of ambiguous provision of PAEA entitled to *Chevron* deference).

None of the five alleged "changes" that Plaintiffs identify meets these standards. Rather, as explained above, the so-called "Postal Policy Changes" were either (i) never in fact made or (ii) were not "changes," but were instead longstanding USPS policies:

- **Alleged decommissioning of sorting machines.** The Postal Service has been removing excess machines for years, and has followed the same model-driven process as it has done since 2017. *See* DeChambeau Dec. ¶¶ 13-21. Indeed, the May 2020 equipment reduction plan of which Plaintiffs complain was "Phase 6 of the reduction initiative." *Id.* ¶ 109. There was thus no "change," and certainly no change intentionally designed to degrade service. *See id.* ¶¶ 9, 11, 12, 18 (explaining that removing underutilized machines improves efficiency and lowers costs); Barber Dec. ¶ 6.

- **Overtime**. As noted above, USPS never made changes to its overtime policy (including banning overtime). *See* Curtis Dec. ¶¶ 12, 22–23, 32–35; Colin Dec. ¶ 3; Curtis Dep. Tr. 53:21–23; Defs.' Resp. to Pls.' Stmt. of Facts ¶ 29 (disputing Plaintiffs' assertion that USPS began new efforts to reduce overtime in June and July 2020).

- **Alleged Ban on Late and Extra Trips**. USPS never prohibited extra or late trips. *See* Cintron Dec. ¶¶ 23-24. While USPS developed written guidance clarifying the circumstances under which late and extra trips were acceptable, *id.*, that is not a "change" within the meaning of section 3661. *See, e.g.*, Second Declaration of Joshua Colin ("Second Colin Dec.") ¶ 17 & Exs. 1, 2 (clarifying that the Cintron guidelines did not ban late/extra trips, and that USPS employees should follow updated, October 16, 2020 guidance). Rather, this is precisely the type of management direction to which

---

[10] Advisory Opinion on Post Office Structure Plan, Docket No. N2012-2 (Aug. 23, 2012), at 1, 3, https://www.prc.gov/docs/85/85013/N2012-2_Adv_Op_082312.pdf; Advisory Opinion on Retail Access Optimization Initiative, Docket No. N2011-1 (Dec. 23, 2011), at 1, https://www.prc.gov/docs/78/78971/N2011-1_AdvisoryOP.pdf; Advisory Opinion Concerning the Process for Evaluating Closing Stations and Branches, Docket No. N2009-1 (Mar. 10, 2010), https://www.prc.gov/docs/67/67174/Advisory_Opinion_031010.pdf.

[11] Advisory Opinion on Elimination of Saturday Delivery, Docket No. N2010-1 (Mar. 24, 2011), at 1, https://www.prc.gov/docs/72/72327/Advisory_Opinion_032411.pdf.

section 3661 does not apply.

- **ESAS Pilot Program**. This limited pilot program was not in effect when Plaintiffs filed their Complaint, and in any event, involved only "384 delivery units (out of a total of approximately 18,755 delivery units)," Colin Dec. ¶ 7; it can hardly be considered "national."

- **Election Mail**. As explained, USPS has not changed Election Mail policies and practices, except to enhance them. As it has for many years, it puts in place numerous practices to expedite Election Mail so that even mail that is entered at the lower class of service is often given delivery *speeds* comparable to First-Class Mail. *See* Glass Dec. ¶ 21. Nothing has changed.

Plaintiffs have not met their burden of demonstrating that there is a genuine factual dispute on these issues.

The Postal Service's own Office of Inspector General agrees that the Postal Service was *not* required to request an advisory opinion as to any of the alleged changes. *See* Ex. 14 at 3, 18–19. After the Court issues its preliminary injunction, the OIG issued a report explaining that the advisory opinion requirement is triggered only when "the Postal Service determines that there should be change," and thus the statute "leaves much to Postal Service determination and intent." *Id.* at 18. "If the Postal Service does not conceptualize its actions, instructions, and directives as a change in the nature of postal services, those actions likely fall outside the scope of [the section 3661] requirement." *Id.* Unsurprisingly, there have been only four challenges to Postal Service actions on the ground that a PRC advisory opinion was not requested, and the PRC has "dismissed them all." *Id.* Rather, as noted, the PRC has held that failure to meet service standards will not trigger the section 3661 requirement unless plaintiffs can show "(1) implementation or planned implementation of a new standard or (2) knowing and intentional degradation of service." *Id.*

Applying those standards, the OIG concluded that "[b]ased on [its] review of the applicable legal requirements for consulting the PRC at the time the Postal Service was making its determination, the Postal Service was in compliance with policies and legal requirements." *Id.* at 3. "In the absence of evidence that these initiatives were intended to disrupt service, the Postal

27

Service was not required by then existing precedent to request an advisory opinion," as "the PRC's authority to evaluate service degradation is effectively limited to an after-the-fact evaluation, as part of the annual compliance determination process." *Id.* As part of that process, the Postal Service must file an annual report that includes service performance data for each market-dominant product. 39 U.S.C. § 3652(a)(1), (a)(2)(B). The PRC then issues a determination as to whether service standards are met, and if they are not, the PRC has broad remedial powers. *Id.* § 3653. As the OIG report explains, it is *this* process—not the advisory opinion process contemplated in section 3661—through which the PRC assesses service degradation. Ex. 14 at 18–19.

Plaintiffs have come forward with no evidence suggesting that the OIG's conclusion is incorrect and that the Postal Service has implemented new service standards or knowingly and intentionally degraded service. To the contrary, to the extent that the Postal Service implemented any changes, its intent was to *improve* service. *See, e.g.*, Cintron Dep. Tr. 56:12–57:5; 57:13–23 (adherence to transportation schedule would maintain service standards and "directly . . . improve service"). For example, the Postal Service's efforts to improve compliance with its long-established delivery schedules were partly in response to the PRC's conclusion, in its March 25, 2020 annual compliance determination ("ACD"), that late trips were a significant cause of First-Class Mail service issues. *See* Ex. 24, ACD Report, FY 2019 (Mar. 25, 2020), at 109–23. Specifically, in discussing the Postal Service's plans to remediate First-Class Mail service performance in 2020, the top "improvement initiative" was "ensur[ing] on time departures," and specific actions for improvement include driving "adherence to operating plan targets to avoid holding trips for departure," and reviewing "late trips on a daily basis." *Id.* at 110. The PRC further required the Postal Service to provide a "transit evaluation" to "explain how the progress made in FY2020 (or lack thereof) toward ensuring on-time departures, ensuring timely tender to air transit

suppliers, and minimizing *en route* delays affected on-time service performance for First-Class Mail in FY2020 (which the Postal Service did in June). *Id.* at 119. To disregard this evidence and hold that the Postal Service must seek an advisory opinion for any action that happens to result in delayed mail would cripple the Postal Service's ability to operate on a daily basis.

Importantly, if there were any doubt as to whether these "changes" are covered by section 3661, that doubt would be an insufficient basis for Plaintiffs' *ultra vires* claim. Plaintiffs' claim emerges at the intersection of two lines of doctrine: the requirement that section 3661 be narrowly interpreted, in order to preserve USPS's "broad management power," *see Buchanan*, 508 F.2d at 263-64, and the *ultra vires* doctrine, which requires that any error be clear and unambiguous. The basic, operational activities that Plaintiffs seek to challenge here cannot meet this set of unequivocal requirements, as the recent OIG report indicates. Indeed, were it otherwise, the *ultra vires* doctrine would swallow Congress's preclusion of judicial review of these types of claims in district court. Almost any sort of operational or management initiatives that could have an impact on Postal Service operations would fall within the ambit of section 3661 – and require extensive hearings – exactly the sort of ossification Congress intended to avoid. *See id*.

And even if Plaintiffs could show that Defendants expressly violated a specific command, Plaintiffs' *ultra vires* claim would also fail because they cannot show that "there is no alternative procedure for review of the statutory claim." *DCH Reg'l Med. Ctr.*, 925 F.3d at 509. *Ultra vires* review is available *only* where there is no other potential remedy. But here, Plaintiffs have a "meaningful and adequate means of vindicating [their] statutory rights," *Bd. of Governors, Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991) – Plaintiffs can file a complaint to the Postal Regulatory Commission, with judicial review in the D.C. Circuit if Plaintiffs remain

unsatisfied. Plaintiffs' failure to even attempt to pursue the remedy provided by Congress yet another reason why it cannot succeed on its section 3661 claim.

## III.   Plaintiffs' 39 U.S.C. §§ 101 and 403 Claims Fail As a Matter of Law

Plaintiffs also contend that the Postal Service's alleged changes violate two other statutory provisions: 39 U.S.C. §§ 101 and 403. Section 101 broadly provides, among other things, that the Postal Service "shall be operated as a basic and fundamental service provided to the people by the Government of the United States," *id.* § 101(a), that it "shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities," *id.*, that it "shall provide a maximum degree of effective and regular postal services to rural areas, communities, and small towns where post offices are not self-sustaining," *id.* § 101(b), and that it "shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of importation letter mail," *id.* § 101(e). Similarly, section 403 provides that the Postal Service "shall receive, transmit, and deliver throughout the United States . . . written and printed matter, parcels and like materials" and "shall serve as nearly as practicable the entire population of the United States." *Id.* § 403(a).  These claims fail as a matter of law for several reasons.

### A.   Plaintiffs Lack a Private Right of Action to Enforce Sections 101 and 403

As an initial matter, neither section 101 nor section 403 provides Plaintiffs with a private right of action to seek relief against the Postal Service. *See NAPS*, 2020 WL 4039177, at *4 ("Of the few courts to review cases brought under § 101 or § 1003, all determined that the provisions do not provide private causes of action. . . .  This Court agrees."); *Contemporary Mission, Inc. v. U.S. Postal Serv.*, 648 F.2d 97, 103 n.7 (2d Cir. 1981) (sections 101(a) and 403(c) do not provide a private right of action); *Tedesco v. U.S. Postal Serv.*, 553 F. Supp. 1387, 1389 (W.D. Pa. 1983) (no private right of action under §§ 101, 403(b)(3), and 404(a)(3)). Nor can Plaintiffs rely on the APA. *NAPS*, 2020 WL 4039177, at *4. Plaintiffs must therefore rely on the "Hail Mary" pass of

*ultra vires* review. As explained below, however, Plaintiffs cannot rely on the doctrine of *ultra vires* review to seek enforcement of the broad, general provisions of sections 101 or 403.[12]

**B.    Plaintiffs Cannot Demonstrate Entitlement to Relief Under the *Ultra Vires* Doctrine**

**1.    Plaintiffs' Section 101 and 403 Claims Are Not Reviewable under the *Ultra Vires* Doctrine**

Recognizing that they lack a cause of action under the PRA or APA, Plaintiffs attempt to shoehorn their claims under the *ultra vires* doctrine. *See* MSJ, at 23, 29, 32. In *NAPS*, this Court held that such review is available only in the narrow circumstance where a statute provides a "clear and mandatory" directive that "has only one unambiguous interpretation." *NAPS*, 2020 WL 4039177, at *3. *Ultra vires* review is *not* available where a statute leaves an agency with discretion in how to comply with broadly articulated aims or goals. *See id.* at *3, *5–6. Thus, in *NAPS*, the court held that 39 U.S.C. §§ 101(c), 1003(a), and 1004 were not susceptible to *ultra vires* review, as those provisions "leave[] significant room for agency discretion and provide[] specific procedures other than judicial review to challenge agency action." *Id.* at *6.

The statutory provisions on which Plaintiffs rely here are even broader—and leave more room for agency discretion—than the provisions at issue in *NAPS*. Among the statutory provisions that Plaintiffs contend that the Postal Service is expressly violating are requirements that the Postal Service "be operated as a basic and fundamental service provided to the people," that it provide "prompt, reliable, and efficient services," and that it "give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter

---

[12] Plaintiffs (at 23–24) include an extended discussion of *Chevron*'s two-step framework, under which courts will defer to an agency's reasonable interpretation of an ambiguous statute. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124, 195 L. Ed. 2d 382 (2016). But Plaintiffs do not explain how *Chevron* supports their claims, which do not involve a challenge to an agency interpretation of a statute it administers, but rather involves a claim that an agency has acted *ultra vires* in violation of a clear statutory command.

mail." 39 U.S.C. §§ 101(a), (e). These general provisions are anything but "clear and mandatory"; nor do they create "judicially manageable standards of review."[13] *See NAPS*, 2020 WL 4039177, at *4; *cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019) (claim is non-justiciable where "there are no discernible and manageable standards for deciding whether there has been a violation"). Rather, these are statements of broad policies that the Postal Service strives toward in exercising its "significant" discretion that the PRA gives the Postal Service over its operations pertaining to the handling, collection, transportation, and delivery of mail. *NAPS*, 2020 WL 4039177, at *6; *see also DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 510 (D.C. Cir. 2019) (no *ultra vires* review where statute required agency to choose "appropriate data"; such an "open-ended" provision was "worlds apart" from a clear statutory command); *Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019) (*ultra vires* review available only where there is a "specific prohibition in an Act"); *see* 39 U.S.C. §§ 401, 404(a).

Indeed, after Congress charged the PRC with interpreting sections 101 and 403, the PRC in an exhaustive report emphasized repeatedly that the "broad formulations" of sections 101 and 403 are "subject to differing interpretations," flexible," and "indefinite" in scope.[14] The PRC concluded that the "general parameters" of Sections 101 and 403 "provide[] the Postal Service with *considerable latitude to exercise discretion*" over such operational matters as the location of facilities and the manner of delivery. PRC Report at 26-27, 29 (emphasis added). Because "what

---

[13] Plaintiffs cite *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 676 F.3d 1105 (D.C. Cir. 2012), for the proposition that section 101 includes "statutory mandates," Br. 26, but the court used that term in passing simply to distinguish the "mandates" of section 101 (which apply to all Postal Service production) from those of other provisions that apply only where a product is market-dominant or a "competitive product." *Id.* at 1107. Nothing in the court's opinion addresses or suggests that section 101's provisions are "clear and mandatory" such that they would be judicially reviewable under the *ultra vires* doctrine.

[14] *See* Postal Regulatory Comm'n, Report on Universal Postal Serv. & the Postal Monopoly ("PRC Report") 22, 25-27 (2008), https://go.usa.gov/x7raF.

is necessary to bind the Nation together changes over time," the "overlapping requirements" of sections 101 and 403 give the Postal Service a range of options for how to meet the public's evolving needs. *Id.* at 25-26. And the PRC has reiterated this understanding of sections 101 and 403 in advisory opinions concerning claims similar to those Plaintiffs seek to assert here.[15] Thus, under the standard set forth in *NAPS*, the broad statements of sections 101 and 403 are not susceptible to judicial review under the *ultra vires* doctrine. But even if that was not the correct standard, as explained below, Plaintiffs would still not be entitled to relief on their section 101 and 403 claims.

### 2. Even If Plaintiffs' Claims Were Reviewable Under the *Ultra Vires* Doctrine, They Cannot Establish Entitlement to Relief

Even if sections 101 and 403 were subject to *ultra vires* review (they are not), Plaintiffs have not adequately alleged—let alone demonstrated as a matter of law—violations of those provisions. *First*, as noted above, most of the alleged Postal Policy Changes were never in fact USPS policies. USPS never made changes to its overtime policy. Curtis Dec. ¶¶ 12, 22–23, 32–35; Colin Dec. ¶ 3. Nor did it ever ban late or extra trips, Cintron Dec. ¶¶ 23–24, or change its Election Mail policies and practices, Glass Dec. ¶ 21. It has not changed its longstanding policy on decommissioning underutilized sorting machines. DeChambeau Dec. ¶¶ 9, 11, 12 18. And the

---

[15] *See, e.g.*, Postal Regulatory Comm'n, Docket No. N2011-1, Advisory Opinion on Retail Access Optimization Initiative 7-9 (2011), https://go.usa.gov/x7rYc ("Many of the terms used to delineate the Postal Service's obligations [under Sections 101 and 403] are not defined in title 39. . . . The Postal Service is afforded a significant amount of authority under the statute, and has reasonable discretion to interpret the ambiguous terms delineating its powers and obligations."); Postal Regulatory Comm'n, Docket No. N2010-1, Advisory Opinion on Elimination of Saturday Delivery 11-13 (2011), https://go.usa.gov/x7rr6 ("The Postal Service is afforded a significant amount of flexibility in determining how to" fulfill Sections 101 and 403, which "set[ ] out general postal policies[.]")

ESAS pilot program was not in effect when Plaintiffs' filed their complaint. Colin Dec. ¶ 7. This alone is reason enough to deny Plaintiffs' motion and enter summary judgment for Defendants.

*Second*, even if Plaintiffs could show that a change took place and remains in effect, Plaintiffs cannot show that the Postal Service "expressly violated" a "clear and mandatory" directive. *NAPS*, 2020 WL 4039177, at *7. "[A] claim that an agency acted *ultra vires* is a claim that the agency acted in excess of its delegated powers and contrary to a *specific prohibition* in an Act, not that an agency's authorized action was imprudent or that, in validly exercising its judgment the agency reached the wrong result." *Eagle Trust Fund*, 365 F. Supp. 3d at 67 (emphasis added). Plaintiffs' argument—that the Postal Service acted without properly weighing "efficiency" and "adequacy" considerations—may be appropriate under the APA (a statute from which the Postal Service is expressly exempt), but it is not the type of argument that supports a claim of *ultra vires* review. *Id.* at 65 (claim that a decision is not "reasoned" or is arbitrary and capricious is "unmistakably" rooted in the APA and not available against the Postal Service); *see also Mittleman*, 757 F.3d at 305. If it were, any plaintiff could sue in federal court to enjoin Postal Service operations whenever they believed that an operational decision was "inefficient" or "inadequate." Such interference with Postal Service operations would be unprecedented, and inconsistent with the significant discretion that Congress vested in the Postal Service to manage its own operations under the PRA. *NAPS*, 2020 WL 4039177, at *3.

*Third*, Plaintiffs make no serious attempt in either their complaint or their brief to tie each of the five alleged Postal Policy Changes to any specific violation of sections 101 and 403. Rather, Plaintiffs simply lump the alleged changes together and then assert that the "Postal Policy Changes" violate sections 101 and 403. *See, e.g.*, MSJ, at 28 ("the Postal Policy Changes violate . . . 39 U.S.C. § 101(a)"); *id.* at 29 ("The Postal Policy Changes violate section 403 . . . .").

For example, Plaintiffs do not even mention the alleged change on overtime in the section of their brief concerning sections 101 and 403. *See* MSJ, at 27–32. They refer to the ESAS pilot program only in passing, asserting, without any explanation, that the program "failed in [its] purpose and effect to give the 'highest consideration' to the expeditious delivery of mail." *Id.* at 27. Their treatment of the other alleged changes is similarly conclusory. Without showing how each alleged change violates a specific provision of section 101 or 403, Plaintiffs cannot meet their burden to demonstrate that they are entitled to judgment as a matter of law.

*Fourth*, in the few instances where Plaintiffs do cite evidence to support their claims, they cherry-pick the facts that and ignore Defendants' contrary evidence. For example, in contending that the Postal Service violated section 101, Plaintiffs assert that the Postal Service gave *no* consideration to the expeditious delivery of important letter mail, citing paragraphs 116–29 of their statement of facts. Again, Plaintiffs do not articulate with any specificity which alleged changes they believe were made without "any consideration." MSJ, at 27. And contrary to Plaintiffs' general assertion, the record evidence demonstrates that the Postal Service has always given the highest consideration to the expeditious delivery of the mail in all of its decisions. *See, e.g.*, DeChambeau Dec. ¶¶ 7–9, 11, 12, 18–19 (consideration given to removing unnecessary processing machines); Barber Dec. ¶ 6 (even with removals, Postal Service has ample excess machine capacity); Curtis Dep. Tr. 76–77 (consideration given to efficiently scheduling employees to reduce unnecessary unearned hours); Ex. 14 at 1 (late and extra trips hurt service); Cintron Dep. Tr. 56:12–57:5; 57:13–23 (providing clarity on the appropriate use of late and extra trips would directly improve service); Cintron Dep. Tr. 49:13–50:5 (same); *see generally* Glass Dec. (outlining considerations given to special measures Postal Service would take to process and deliver Election Mail)

Plaintiffs also assert that the "Postal Policy Changes" (again, no specific change is identified) caused dramatic delays in the delivery of mail across the United States," citing paragraphs 95–116, but, again, the record evidence belies Plaintiffs' assertion. *See, e.g.*, Defs.' Resp. to Pls.' Stmt. of Facts ¶ 95 (denying Plaintiffs' assertion that that impacts of the Postal Service's alleged operational policy changes were immediately noticeable); *id.* ¶ 107 (denying Plaintiffs' assertion that alleged policy limiting number of late and extra trips continued to delay mail as recently as October 3rd and citing evidence that the relative decrease in Service Scores throughout 2020 began with the onset of the COVID-19 pandemic in March); Ex. 31 (Dearing Dec.). Nor does the evidence support Plaintiffs' assertion that USPS removed sorting machines and prohibited late and extra trips without giving effect to the expeditious delivery of mail, Defs.' Resp. to Pls.' Stmt. of Facts ¶¶ 19–28, 119–29, or their assertion that agency leaders acknowledged that the alleged changes caused substantial delays, *id.* ¶¶ 130–31, 136.

Plaintiffs' argument that the Postal Service is violating section 403 fares no better. Relying on the dictionary definitions of "efficient" and "adequate," *see* MSJ, at 29–30, Plaintiffs assert that the Postal Service is violating section 403's requirement that the Postal Service "plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees." 39 U.S.C. § 403(a). But Plaintiffs mention only two alleged changes—the alleged removal of sorting machines and alleged ban on late and extra trips. MSJ, at 30. As to these changes, Plaintiffs contend that the changes fail an amorphous "efficiency" test because they "increase the amount of effort expended by postal workers and reduce the Postal Service's output." MSJ, at 30. But again, even if an "efficiency" claim were reviewable, the evidence does not support Plaintiffs' claim that any changes were "inefficient." *See, e.g.*, Defs.' Resp. to Pls.' Stmt. Of Facts ¶ 118 (Postal Service considered effect of changes on service and efficiency); DeChambeau Dec. ¶¶ 9, 11, 12, 18, 19

(removing underused sorting machines improves); Curtis Dep. Tr. 76-77 (reducing "unearned time" improves efficiency); Cintron Dep. Tr. 56:12–57:5; 57:13–23 (adherence to transportation schedules improves efficiency).

Plaintiffs likewise cannot show that the alleged Postal Policy Changes "undermine the adequacy of critical postal services." MSJ, at 31. Plaintiffs assert that the alleged changes "threaten the timely delivery and return of ballots in Plaintiffs' jurisdictions" and "disrupt Plaintiffs' carefully-crafted plans to administer the general election," *id.*, but, again, the evidence is to the contrary. *See, e.g.*, Defs.' Resp. to Pls.' Stmt. of Facts ¶¶ 150–78; Glass Dec. ¶¶ 27–29 (detailing steps Postal Service is taking to ensure timely delivery of return ballots); Ex. 20 (Extraordinary Measures Memorandum). Nor did the Postal Service "disavow[] . . . its prior practice of delivering election mail at First Class speeds regardless of the paid class of service." Defs.' Resp. to Pls.' Stmt. of Facts ¶¶ 84–88 (noting that Postal Service is continuing its longstanding practices of prioritizing the expeditious processing and delivery of Election Mail); DeChambeau Dec. ¶ 23. Accordingly, the Court should enter summary judgment in favor of Defendants.

## II.   Plaintiffs cannot establish an Elections Clause claim.

Plaintiffs, at bottom, claim that the Elections Clause grants them a constitutional right to expect a certain level of service from USPS. Plaintiffs have allowed their citizens to cast ballots by mail. Although USPS has not interfered with Plaintiffs' actual election laws—their citizens are legally allowed to vote by mail regardless of what USPS does—Plaintiffs contend that because USPS's business decisions may have produced mailing delays, Plaintiffs' election laws may not produce the precise results anticipated by Plaintiffs. Plaintiffs thus argue that USPS must have somehow violated Plaintiffs' right to regulate the "times, places and manner of holding elections."

As a threshold matter, this claim is now moot because the Court can no longer provide effective relief before the November 2020 election. "A claim becomes moot if, among other things, it is no longer likely to be redressed by a favorable judicial decision." *Brookens v. Am. Fed'n of Gov't Employees*, 315 F. Supp. 3d 561, 568 (D.D.C. 2018). Here, the alleged injury underlying the Elections Clause claim is that the alleged USPS policy changes at issue will interfere with Plaintiffs' procedures for the November 2020 election. *See* MSJ, at 9-10. But briefing for the cross-motions for summary judgment will complete on November 2, 2020, *the day before the November 2020 election*. *See* October 20, 2020 Minute Order. The Court will likely decide the motion on or after election day, and if the Court does somehow decide it beforehand, it is unclear how USPS could implement any additional, meaningful relief in time for it to have a material impact on the election. Accordingly, the Court likely cannot redress any of the alleged harms underlying the Elections Clause claim, and the claim is therefore moot.

Regardless, Plaintiffs' Elections Clause theory—that this provision creates ancillary rights against any government action that may indirectly affect State elections—is unprecedented and without merit. The Elections Clause states that "[t]he times, places and manner of holding elections for" congresspersons "shall be prescribed in each state by the legislature thereof," but Congress may generally "make or alter such regulations" by law. *Smiley v. Holm*, 285 U.S. 355, 363 (1932). The Elections Clause thus allows State legislatures "to prescribe the procedural mechanisms for holding congressional elections." *Cook v. Gralike*, 531 U.S. 510, 523 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 832 (1995) ("The Framers intended the Elections Clause to grant States authority to create procedural regulations."). The "function contemplated by [the Elections Clause] is that of making laws." *Smiley*, 285 U.S. at 366.

Here, USPS has not violated the right of Plaintiffs' legislatures under the Elections Clause. First and foremost, there is no support whatsoever for Plaintiffs' novel theory that the Elections Clause not only confers upon State legislatures the authority to pass laws governing how their citizens may vote, but also restricts federal activity which may have an incidental impact on the effects of these State regulations. The Elections Clause, by its terms, empowers Plaintiffs' legislatures to enact laws governing "the times, places, and manner" in which their citizens may vote, and USPS has done nothing to limit that authority. Plaintiffs have all enacted laws allowing some or all of their citizens to cast their ballots by mail, and those laws remain operative today. Even if Plaintiffs purportedly based these laws on an expectation of a certain level of performance by USPS in delivering the mail, that subjective expectation does not mean the Elections Clause now grants Plaintiffs a concomitant Constitutional right to have this Court oversee USPS operations to ensure that their expectations are met.

Unsurprisingly, Plaintiffs do not cite to a single Elections Clause case that has recognized the validity of such a theory, and Defendants are aware of none. The overwhelming majority of Elections Clause cases concern whether State legislatures have enacted elections laws permissible under the Elections Clause, not whether other actors have interfered with powers granted to the States therein.[16] And to the limited extent there is case law concerning whether third parties (other than the federal government) have violated the right of State legislatures under this provision, that

---

[16] *See*, *e.g.*, *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 831-35(1995) (an Arkansas law that functionally created congressional term limits could not be justified under the Elections Clause); *Roudebush v. Hartke*, 405 U.S. 15, 26 (1972) (Indiana Senate election vote recount was consistent with the Elections Clause); *Cook v. Gralike*, 531 U.S. 510, 525 (2001) (Missouri law which required that ballots must identify a candidate's position on term limits could be justified under the Elections Clause); *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 459 (2008) (Washington State blanket primary was permissible exercise of Elections Clause power).

case law undermines Plaintiffs' theory. In *Smiley v. Holm*, for example, the Supreme Court found that the Elections Clause does not protect State legislatures from the inherent limitations of legislative activity, including circumstances external to a legislature which may affect the consequences of (or even undo) relevant election laws. 285 U.S. 355 (1932). There, the Minnesota legislature enacted an election law, which the governor vetoed. The State nevertheless sought to implement the law, arguing that the governor could not constitutionally veto a law passed pursuant to the Elections Clause, because that provision confers the relevant authority upon the "legislature" alone. *Id.* at 362-63. The Supreme Court rejected this argument, noting that the "subject-matter" of the Elections Clause "involves lawmaking in its essential features," and that "limitation[s]" to lawmaking—including the prospect of a veto—are not "incongruous with the grant of legislative authority to regulate congressional elections." *Id.* at 366, 368. If the Elections Clause does not shield a State legislature from an event which entirely negates an election law, it certainly does not give States a constitutional right against any external event which may incidentally impact an election.

Furthermore, Plaintiffs' theory, if accepted, would effectively allow States to wield the Elections Clause as a means to commandeer federal agencies. Here, for example, Plaintiffs effectively claim the right to force USPS to adopt policy changes whenever service performance levels drop, all because Plaintiffs chose to use USPS for mail-in voting. In any and all future elections, States could challenge *any* USPS delays—including those caused by events beyond USPS's control—and secure a federal judgment directing the content of USPS's business operations or forcing USPS to incur additional costs. And these claims would not be limited to USPS. For example, a State could challenge the decisions of federal agencies not to allow their employees the day off to vote on election days, or the decision of a federal health and safety agency

40

to condemn a building (or otherwise ensure safe conditions) in a facility that has been selected as a polling place. Federal agencies would "be impressed into service for the execution of state laws," undermining "the independence and autonomy of the United States." *Printz v. United States*, 521 U.S. 898, 928 (1997). Federal courts would be drawn in to serve as overseers of federal agencies, presenting significant separation of powers concerns and risking a "confrontation between the two branches" that "should be avoided whenever possible." *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 389–90 (2004).

This result is, of course, not the one that the Framers intended in crafting the narrow scope of the Elections Clause. Indeed, far from establishing the primacy of State interests, the Elections Clause, if anything, reflects a principle of "federal supremacy over the procedural aspects of determining the times, places, and manner of elections." *U.S. Term Limits, Inc.* 514 U.S. at 810 (describing Congress's authority to preempt State election laws). The Court should therefore conclude that the Elections Clause means what it says: States can issue procedural rules concerning the times, places, and manner of their elections, but the federal government need not contort its programs and policies to best accommodate any given State's election law.

Plaintiffs' arguments in support of creating this new cause of action lack merit. To start, Plaintiffs assert that the Elections Clause grants Congress the authority to pass laws which "make or alter" State "regulations" enacted under the Elections Clause, and Congress did not expressly delegate this authority to USPS in the PRA. But USPS is not exercising any authority reserved for Congress under the Elections Clause, and so no delegation is necessary. The Elections Clause allows Congress to "supplement" or "substitute" relevant State laws; it can dictate when, where, and how States' citizens are allowed to vote in Congressional elections. *Smiley*, 285 U.S. at 366-67. Congress thus "has a general supervisory power over the whole subject." *Id.* at 367. USPS has

not exercised this authority. It has not even attempted to prescribe how a State's citizens are allowed to vote, nor has it preempted a State law on the subject.[17] Thus, no express Congressional delegation of this pre-emptive authority is necessary.

Plaintiffs also argue that USPS violated the Elections Clause because the "purpose" of the alleged USPS policy changes at issue was to interfere with mail-in voting. But there is no evidence, or even well-pled allegation, to support this assertion. For months now, USPS has reaffirmed its commitment to process and deliver Election Mail consistent with its historical practices. USPS has now even committed additional resources towards Election Mail. In a recent memorandum, USPS noted: "To help support the timely delivery of Election Mail, and consistent with our practices in past election cycles, the use of extraordinary measures beyond our normal course of operations is authorized and expected to be executed . . . between October 26 and November 24, to accelerate the delivery of ballots," and "[t]hese extraordinary measures include, but are not limited to, expedited handling, extra deliveries, and special pickups as used in past elections." Extraordinary Measures Memorandum, at 2. All of these measures are inconsistent with a purported attempt to somehow delay Election Mail.

To demonstrate improper intent, Plaintiffs largely rely on the timing of the alleged policy changes, and the process leading up to their adoption. *See* MSJ, at 39-40. But again, this

---

[17] In their brief, Plaintiffs frame this argument more broadly, arguing that Congress has not expressly granted USPS the authority to "interfere" with State election laws. To the extent Plaintiffs are arguing that USPS cannot exercise its rulemaking authority in a manner that indirectly affects State elections unless Congress *specifically* allows it, there is no basis for this assertion. The Elections Clause does not support this requirement since, once more, that provision does not protect against any and all indirect "interferences" with State election laws. It grants States the right to enact procedural election rules, and grants Congress the authority to "make or alter" State procedural election rules. USPS does not dispute that it cannot "make or alter" a State election law without express Congressional authorization, but USPS is not making or altering any State election laws.

circumstantial evidence is not probative in light of the specific measures adopted by USPS to facilitate Election Mail delivery in particular. Even assuming the Court were persuaded that the alleged USPS policy changes have resulted in general mail delays, there is no evidence that these delays are materially affecting Election Mail in particular in light of the special measures adopted by USPS. Plaintiffs also refer to certain comments from the President. But they submit no evidence connecting these statements to the alleged USPS policy changes at issue. Indeed, they do not cite to a single piece of evidence in the record suggesting that any of these alleged policy changes took place at the behest of the President. To the contrary, the evidence in the record indicates only that relevant policy statements and determinations originated from certain long-serving, professional USPS officers in an attempt to enhance postal efficiency, and long before the tenure of the Postmaster General. *See, e.g.*, Cintron Dec. ¶¶ 2, 19-20.

Furthermore, it is unclear how an abstract "purpose" has any bearing on the relevant Elections Clause analysis. As explained earlier, USPS has not inhibited States from issuing laws governing how their citizens are allowed to vote in Congressional elections, and so USPS has not violated the right of State legislatures under the Elections Clause. And the States remain free to alter their policies to account for any fears over the performance of USPS. It is unclear how subjective "motivation" could change this conclusion. Accordingly, USPS is entitled to judgment on the Elections Clause claim.

## III.   Permanent Injunction and Declaratory Relief.

"Any injunctive relief is considered an extraordinary and drastic remedy." *Indian Educators Fed'n Local 4524 of Am. Fed'n of Teachers, AFL-CIO v. Kempthorne*, 590 F. Supp. 2d 15, 17 (D.D.C. 2008). An injunction must "state its terms specifically and describe in reasonable

detail—and not by referring to the complaint or other document—the act or acts restrained or required," and must provide an "operative command capable of enforcement." *Id.* at 20.

Here, Plaintiffs' requested injunction is too vague to satisfy this standard. Plaintiffs ask the Court to enjoin USPS "from enforcing the Postal Policy Changes," ECF No. 58-1, which Plaintiffs define to include five separate "policies," none of which are identified with any level of specificity (despite Plaintiffs having the benefit now of expedited discovery):

1. *"[I]ncreased reduction of high-speed sorting machines without local input."* Plaintiffs do not identify what new initiative or policy has "increased" the rate of reduction of high-speed sorting machines—a process which Plaintiffs acknowledge had begun before Postmaster General DeJoy began his tenure. Nor do they specifically describe what it means to enjoin this "increased reduction" when it lacks sufficient "local input." They note that, in the past, "local managers were typically afforded the opportunity to negotiate" before a sorting machine was removed, but it is unclear whether the requested injunction would require this precise type of negotiation in all circumstances.

2. *"[A] new effort to reduce work hours, especially overtime."* Again, Plaintiffs fail to specifically identify the "new effort" to reduce overtime. Although they refer to documents which generally speak to a *goal* of reducing overtime hours, *see* MSJ, at 4, Plaintiffs do not claim that any of these documents actually lay out a precise policy by which overtime is capped or limited.

3. *"[T]he first-ever organization-wide policy to eliminate late and extra trips."* As noted above, however, USPS never "eliminate[d]" late and extra trips, and thus it is unclear what policy this provision would enjoin. To establish that USPS did adopt a prohibition on late/extra trips, Plaintiffs rely on certain comments made during a telephone conference, certain documents informal documents, and then a set of guidelines that Robert Cintron circulated which identify certain criteria for when late/extra trips may be helpful. But USPS has since made clear that it has not eliminated these trips, and that any prior statement to that effect does not represent company policy.

4. *"[A] new initiative altering letter carrier workflows to reduce work hours."* In their brief, Plaintiffs clarify that the "new initiative" they refer to is the "ESAS" program, *see* MSJ, at 5, which USPS has already suspended, and which affected a relatively tiny number of delivery units for one month. Plaintiffs do not identify any other initiative this provision is intended to prohibit.

5. *"[T]he decision not to treat all election mail entered as marketing mail on an expedited First Class basis."* It is unclear whether this provision would require USPS to classify all Election Mail as First Class Mail—inconsistent with historical USPS practice, or require USPS to prioritize Election Mail entered as Marketing Mail so that it may be delivered

consistent with First Class Mail standards. If the latter, then this provision simply mirrors longstanding as well as current USPS policy.

Thus, Plaintiffs' proposed injunction, as written, fails to satisfy the applicable specificity requirement.[18] Indeed, Plaintiffs' requested preliminary injunction, which the Court granted, used similar language and thus included similar deficiencies, ultimately requiring a motion for clarification. *See* ECF No. 54.

Finally, the Court lacks jurisdiction to enter the requested injunctive relief against the President, whom Plaintiff has named as a Defendant in this action. The Supreme Court has repeatedly held that, in general, the federal courts may not enter injunctive relief against the President in the context of his official, non-ministerial duties. *See Miss. v. Johnson*, 71 U.S. 475, 498-99 (1866). The same rule applies to declaratory relief. *See Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010).

## CONCLUSION

The Court should deny Plaintiffs' Motion for Summary Judgment, and grant Defendants' Cross-Motion for Summary Judgment.

---

[18] These concerns apply equally to Plaintiffs' request for declaratory relief. *See Nat'l Coal Ass'n v. Marshall*, 510 F. Supp. 803, 806 (D.D.C. 1981) ("declaratory and injunctive relief must be drawn with sufficient specificity to remedy the harm done.").

Dated:  October 26, 2020          Respectfully submitted,

                                  JEFFREY BOSSERT CLARK
                                  Acting Assistant Attorney General

                                  ERIC R. WOMACK
                                  Assistant Director, Federal Programs Branch

                                  /s/ John Robinson_____
                                  JOSEPH E. BORSON
                                  KUNTAL CHOLERA
                                  ALEXIS ECHOLS
                                  DENA M. ROTH
                                  JOHN J. ROBINSON (D.C. Bar No. 1044072)
                                  Trial Attorneys
                                  U.S. Department of Justice
                                  Civil Division, Federal Programs Branch
                                  1100 L. Street, NW
                                  Washington D.C. 20005
                                  (202) 616-8489
                                  john.j.robinson@usdoj.gov

                                  *Attorneys for Defendants*