**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | |
| v. | 20 Civ. 2340 (EGS) |
| DONALD J. TRUMP, *in his official capacity as President of the United States*, et al., | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ......................................................................................................... 2

ARGUMENT ............................................................................................................................. 5

I.   The Court has subject-matter jurisdiction, and Plaintiffs' claims are reviewable. .............5

    A.   Plaintiffs have standing. ...............................................................................................5

        1.   Plaintiffs have suffered and will suffer concrete injuries. ..........................6

        2.   Plaintiffs' injuries are traceable to the Postal Policy Changes. .................9

    B.   The Court has jurisdiction to hear Plaintiffs' 39 U.S.C. § 3661 claim. .................14

    C.   Plaintiffs' statutory claims are reviewable under the *ultra vires* doctrine. ............16

II.  The Postal Policy Changes violate 39 U.S.C. § 3661. ...................................................20

III. The Postal Policy Changes violate the Postal Reorganization Act...................................24

    A.   The Postal Policy Changes violate section 101. ......................................................24

    B.   The Postal Policy Changes violate section 403. ......................................................27

IV.  The Postal Policy Changes violate the Elections Clause. .................................................28

V.   Scope of relief. ...............................................................................................................33

CONCLUSION.........................................................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
   321 F.3d 1166 (D.C. Cir. 2003) .................................................................................. passim

*Air All. Houston v. EPA*,
   906 F.3d 1049 (D.C. Cir. 2018) ............................................................................................8

*Arizona State Legislature v. Ariz. Indep. Redistricting Comm'n*,
   576 U.S. 787 (2015)...........................................................................................................30

*Attias v. Carefirst, Inc.*,
   865 F.3d 620 (D.C. Cir. 2017) ...........................................................................................11

*Bennett v. Panama Canal Co.*,
   475 F.2d 1820 (D.C. Cir. 1973) ...................................................................................16, 18

*Bennett v. Solis*,
   729 F. Supp. 2d 54 (D.D.C. 2010) .....................................................................................13

*Bostock v. Clayton Cty.*,
   140 S. Ct. 1731 (2020).......................................................................................................26

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ......................................................................................16-17

*Clinton v. Jones*,
   520 U.S. 681 (1997)...........................................................................................................34

*Coleman v. Court of Appeals of Maryland*,
   566 U.S. 30 (2012).............................................................................................................31

*Colorado v. DeJoy*,
   No. 20-cv-2768 (WJM), 2020 WL 5500028 (D. Colo. Sept. 12, 2020) ................................32

*DCH Reg'l Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ...........................................................................................20

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)...................................................................................................7, 22

*District of Columbia v. U.S. Dep't of Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2020) .........................................................................................9

*District of Columbia v. U.S. Dep't of Agric.*,
  No. 20-cv-00119 (BAH), 2020 WL 6123104 (D.D.C. Oct. 18, 2020) ....................................5

*Eagle Trust Fund v. U.S. Postal Serv.*,
  365 F. Supp. 3d 57 (D.D.C. 2019) ........................................................................................16

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 3848 (2006) ............................................................................................................33

*FEC v. Wisconsin Right to Life, Inc.*,
  551 U.S. 449 (2007) ..............................................................................................................29

*Foster v. Pitney Bowes Corp.*,
  549 F. App'x 982 (Fed. Cir. 2013) .......................................................................................15

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
  528 U.S. 167 (2000)...............................................................................................................29

*Gaffney v. Potter*,
  No. 06-cv-2444, 2007 WL 4189495 (N.D. Ohio Nov. 19, 2007)...........................................18

*Galvin v. Eli Lilly & Co.*,
  488 F.3d 1026 (D.C. Cir. 2007) ...........................................................................................22

*Greene v. Dalton*,
  164 F.3d 671 (D.C. Cir. 1999) .............................................................................................12

*Halbig v. Burwell*,
  758 F.3d 390 (D.C. Cir. 2014) ...............................................................................................6

*Howard v. Gray*,
  291 F.R.D. 6 (D.D.C. 2013)...................................................................................................12

*Indian Educators Fed'n Local 4524 v. Kempthorne*,
  590 F. Supp. 2d 15 (D.D.C. 2008) ........................................................................................34

*Jones v. U.S. Postal Serv.*,
  No. 20-cv-6516 (VM), 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020) .............................3, 11

*King v. U.S. Postal Serv.*,
  No. 86-cv-1975, 1988 WL 38693 (D.D.C. Apr. 12, 1988).....................................................18

*Leedom v. Kyne*,
  358 U.S. 184 (1958)...............................................................................................................16

*Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*,
  478 U.S. 421 (1986)...............................................................................................................35

*N. Air Cargo v. U.S. Postal Serv.*,
674 F.3d 852 ...............................................................................................................16, 25

*NAACP v. U.S. Postal Serv.*,
No. 20-cv-2295 (EGS), 2020 WL 5995032 (D.D.C. Oct. 10, 2020) ...........................3, 10, 16

*NAACP v. U.S. Postal Serv.*,
No. 20-cv-2296 (EGS) (D.D.C. Oct. 27, 2020) ...................................................4-5, 9-10, 34

*Nader v. Volpe*,
466 F.2d 261 (D.C. Cir. 1972) ..................................................................................14

*Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*,
437 F.3d 1256 (D.C. Cir. 2006) ................................................................................17

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
602 F.2d 420 (D.C. Cir. 1979) ..................................................................................19

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*,
No. 19-cv-2236 (RCL), 2020 WL 4039177 (D.D.C. July 17, 2020) ......................................20

*Nat'l Urban League v. DeJoy*,
No. 20-cv-2391 (GLR), ECF No. 76, slip op. (D. Md. Oct. 29, 2020)...................................33

*New York v. Trump*,
No. 20-cv-2340 (EGS), 2020 WL 5763775 (D.D.C. Sept. 27, 2020)............................. passim

*New York v. U.S. Dep't of Commerce*,
351 F. Supp. 3d 502 (S.D.N.Y. 2019), aff'd, 139 S. Ct. 2551................................................11

*New York v. U.S. Dep't of Homeland Sec.*,
No. 19-cv-7777 (GBD), 2020 WL 4347264 (S.D.N.Y. July 29, 2020)....................................8

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)................................................................................................34

*Pennsylvania v. DeJoy*,
No. 20-cv-4096 (GAM), 2020 WL 5763553 (E.D. Pa. Sept. 29, 2020)............................3, 32

*Richardson v. Trump*,
No. 20-cv-2262 (EGS), 2020 WL 5969270 (D.D.C. Oct. 8, 2020)..............................3, 10, 35

*Sears, Roebuck & Co. v. U.S. Postal Serv.*,
844 F.3d 260 (D.C. Cir. 2016) ..................................................................................16

*SEC v. Chenery*,
318 U.S. 80 (1943)................................................................................................25

*SEC v. Yorkville Advisors, LLC,*
  305 F. Supp. 3d 486 (S.D.N.Y. 2018)...................................................................22

*Smiley v. Holm,*
  285 U.S. 355 (1932)...............................................................................................30

*Staub v. Proctor Hosp.,*
  562 U.S. 411 (2011)...............................................................................................12

*Susan B. Anthony List v. Driehaus,*
  573 U.S. 149 (2014)...........................................................................................6-7

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  137 S. Ct. 2012 (2017)..........................................................................................29

*Trudeau v. Fed. Trade Comm'n,*
  456 F.3d 178 (D.C. Cir. 2006) ..............................................................................17

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO,*
  481 U.S. 1301 (1987).............................................................................................18

*United States v. Burr,*
  25 F. Cas. 187 (CC Va. 1807).................................................................................34

*United States v. Nixon,*
  418 U.S. 683 (1974)...............................................................................................34

*United States v. Stanchich,*
  550 F.2d 1294 (2d Cir. 1977).................................................................................22

*United States v. Students Challenging Regulatory Agency Procedures,*
  412 U.S. 669 (1973)..................................................................................................6

*United States v. Yonkers Bd. of Educ.,*
  29 F.3d 40 (2d Cir. 1994).......................................................................................35

*Vote Forward v. DeJoy,*
  No. 20-cv-2405 (EGS), 2020 WL 5763869 (D.D.C. Sept. 28, 2020)...........................3, 10, 32

*Washington v. Trump,*
  No. 20-cv-3127 (SAB), 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020) ......................3, 32

*Webb v. United States,*
  227 Ct. Cl. 777 (1981) ...........................................................................................18

*Youngstown Sheet & Tube Co. v. Sawyer,*
  535 U.S. 579 (1952)...............................................................................................34

*Zuza v. Office of High Representative*,
107 F. Supp. 3d 90 (D.D.C. 2015) ........................................................35

CONSTITUTIONS

U.S. Const. amend. V..............................................................................32

FEDERAL STATUTES

31 U.S.C.
§ 3113.........................................................................................32
§ 3114.........................................................................................32

39 U.S.C.
§ 101(a) .................................................................................18, 26
§ 101(e) .................................................................................18, 24
§ 202(e)(2) .....................................................................................22
§ 403(a) .................................................................................18, 28
§ 403(b)(1)......................................................................................18
§ 3626(j)(1)(B)................................................................................17
*§ 3661.................................................................................. passim
§ 3662(a) ................................................................................17, 19

5 U.S.C. App.
§ 4(a)(1) .........................................................................................22

STATE STATUTES AND REGULATIONS

Cal. Elec. Code
§ 3020(d) (West 2020) ...............................................................15, 29

N.J. Exec. Order No. 177, 52 N.J.R. § 1701(b) (2020) ........................15, 29

N.Y. Elec. Law
§ 8-412 (McKinney 2020) ...........................................................15, 29

RULES

Fed. R. Civ. P. 53(a)(1)(B) ...................................................................35

Fed. R. Civ. P. 56(a) ...........................................................................21

Fed. R. Civ. P. 56(c)(1)(B) ...................................................................12

MISCELLANEOUS AUTHORITIES

*Prompt*, Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/prompt .............................................................26

*Reliable*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reliable ............................................................................27

U.S. Forest Service, Public Wildfire Information Website, https://inciweb.nwcg.gov/ ................................................................................13

**INTRODUCTION**

In the throes of the COVID-19 pandemic, Plaintiffs and their agencies enacted and implemented dozens of new laws and procedures to promote social distancing and protect the public health.  Paramount among these new initiatives were extensive efforts to expand mail-in voting in time for the November 3 general election—an expansion that depends upon the timely delivery of mail.  The United States Postal Service upended Plaintiffs' careful considerations by disrupting the storied reliability of postal operations and turning its back on its age-old maxim of "every piece, every day."

The central facts underlying Plaintiffs' claims are not in dispute.  On the eve of an election marred by a public health crisis, the Postal Service implemented a series of wide-ranging, unprecedented changes that depressed service performance and caused nationwide mail delays.  Plaintiffs have standing to challenge the Postal Service's ill-advised policy changes because the undisputed factual record on summary judgment shows that Plaintiffs suffer ongoing, concrete injuries due to these delays.

Defendants attempt to disavow their policy changes and wave away the resulting chaos, but the factual record refutes their down-is-up approach—the Postal Service drastically changed postal operations without the due consideration required by the governing statutory scheme.  Tellingly, Defendants offer no written analysis, advisory opinion, or *any* contemporaneous documentation evaluating the impact of their radical policy changes.  Plaintiffs' *ultra vires* claims are thus properly before this Court, and should be decided in Plaintiffs' favor, because the Postal Service's actions clearly flout the unequivocal mandates of its governing statutes.  Plaintiffs are also entitled to relief under the Elections Clause based on the ample undisputed evidence that Defendants' policy changes were intended to, and do, impair Plaintiffs' administration of elections in their States.

1

Accordingly, Plaintiffs' motion for summary judgment should be granted, the Postal Policy Changes[1] should be permanently enjoined, and the Court should grant such additional relief—including appointment of a special master—as is necessary to assurance compliance with its orders.

## STATEMENT OF FACTS

Despite the great weight of evidence to the contrary, Defendants continue to assert that the Postal Policy Changes are not changes at all, but, rather, part of the regular process of addressing ongoing operational issues.  *See* Defs.' Mem. Opp. Summ. J. 4-13 (ECF No. 67) ("Defs.' Mem.").  That assertion is belied by the U.S. Postal Service's own Office of the Inspector General ("OIG") investigation, agency records, and witness testimony—all of which show the agency adopted "transformative" changes that have led to unprecedented mail delays for months on end.

The record establishes that Postmaster General Louis DeJoy and other operations executives launched the Postal Policy Changes to "transform" the U.S. Postal Service following DeJoy's swearing-in on June 15, 2020.  Pls.' Stmt. of Facts ¶¶ 130-31 (ECF No. 60-1); Pls.' Counter-Stmt. of Facts ¶¶ 65-69 (ECF No. 71-2).  As the OIG concluded, in "June and July 2020," the U.S. Postal Service "initiated various significant cost reduction strategies on top of three initiatives the Postmaster General launched."  *Id.* ¶ 65 (citing Office of Inspector General, U.S. Postal Service, Report No. 20-292-R21, *Operational Changes to Mail Delivery* (Oct. 19,

---

[1] "Postal Policy Changes" refers to the five operational changes described in Plaintiffs' opening memorandum and challenged in this motion for summary judgment: (1) increased reduction of high-speed sorting machines without local input; (2) a new effort to reduce work hours, especially overtime; (3) the first-ever organization-wide policy to eliminate late and extra trips; (4) a new initiative altering letter carrier workflows to reduce work hours; and (5) the decision not to treat all election mail entered as marketing mail on an expedited First Class basis.  Pls.' Mem. Supp. Summ. J. 3 (ECF No. 60).

2020) (ECF No. 70-1) (the "October 19 OIG Report")). These initiatives and strategies included each of five the Postal Policy Changes challenged here, *id.* ¶¶ 68-69, none of which were adopted with any sort of analysis on how they could impact service performance, *id.* ¶ 70. "[G]iven the challenges resulting from the COVID-19 pandemic, including reduced employee availability, increased package volume, and a heightened focus on voting by mail, these operational initiatives should have been analyzed and evaluated ahead of deployment to fully understand the impact of implementation." *Id.* ¶ 71.

Instead, Defendants plowed ahead with their initiatives and "transformational changes" without regard for service performance. *Id.* ¶¶ 67, 70-71. Predictably, and immediately, "mail service performance significantly dropped beginning in July 2020, directly corresponding to implementation of the operational changes and initiatives." *Id.* ¶ 74; *see also* Pls.' Mem. Supp. Summ. J. 5-7 (ECF No. 60) ("Pls.' Mem."). Indeed, on-time delivery of First Class mail dropped from a consistent range between 90 to 94 percent in the preceding six months to 85.26 percent in mid-July 2020—the same week that the policy limiting late and extra trips was circulated. Pls.' Stmt. of Facts ¶ 97; *see also* Pls.' Mem. 5.

Even after the impact on service became clear, Defendants dug in, continuing to carry out the Postal Policy Changes. Pls.' Stmt. of Facts ¶ 131. Indeed, Defendants failed to fully rescind or reverse many of the challenged Postal Policy Changes despite multiple district court injunctions to return mail processing and delivery to the status quo ante.[2] As relevant here,

---

[2] *See NAACP v. U.S. Postal Serv.*, No. 20-cv-2295 (EGS), 2020 WL 5995032 (D.D.C. Oct. 10, 2020); *Richardson v. Trump*, No. 20-cv-2262 (EGS), 2020 WL 5969270 (D.D.C. Oct. 8, 2020); *Pennsylvania v. DeJoy*, No. 20-cv-4096 (GAM), 2020 WL 5763553 (E.D. Pa. Sept. 29, 2020); *Vote Forward v. DeJoy*, No. 20-cv-2405 (EGS), 2020 WL 5763869 (D.D.C. Sept. 28, 2020); *New York v. Trump*, No. 20-cv-2340 (EGS), 2020 WL 5763775 (D.D.C. Sept. 27, 2020); *Jones v. U.S. Postal Serv.*, No. 20-cv-6516 (VM), 2020 WL 5627002 (S.D.N.Y. Sept. 21, 2020); *Washington v. Trump*, No. 20-cv-3127 (SAB), 2020 WL 5568557 (E.D. Wash. Sept. 17, 2020).

Defendants disregarded part of the preliminary injunction this Court issued against four of the five Postal Policy Changes on September 27, 2020, *id.* ¶¶ 70-72, issuing several vague documents that purported to offer updated guidance instead, *see generally* ECF No. 64.  On October 23, Defendants filed a Status Report cataloguing these documents and the steps the agency had taken to date to comply with injunctions of this Court and other courts.  ECF No. 64.  These steps were insufficient, as this Court has already held.[3]  *See* Minute Order Granting Emergency Mot. to Enforce and Monitor Compliance With Prelim. Inj., *NAACP v. U.S. Postal Serv.*, No. 20-cv-2296 (EGS) (D.D.C. Oct. 27, 2020) (the "*NAACP* Minute Order").

Specifically, Defendants failed to remedy the unlawful reduction on late trips and extra trips, *see* Pls.' Stmt. of Facts ¶¶ 70-72, until the Court separately ordered them to do so on October 27, *see NAACP* Minute Order. At the same time, some postal facilities have not been able to make up the capacity lost by the removal of sorting machines.  Pls.' Stmt. of Facts ¶ 113 (Coradi Suppl. Decl. ¶ 10).  And many of Defendants' strategies to reduce overtime also remain ongoing.  Pls.' Counter-Stmt. of Facts ¶ 69.  As a result, service delays have persisted.  *See id.* ¶¶ 84-89; Pls.' Stmt. of Facts ¶¶ 105-07.

Today, the Postal Service's service performance remains severely depressed.  Pls.' Counter-Stmt. of Facts ¶¶ 84-89; Pls.' Stmt. of Facts ¶¶ 105-07.  The most recent available data shows that the weekly average for on-time delivery of First Class mail also declined by 5.5 points—from 88.76 percent for the week of October 3, 2020 to 83.26 for the week of October 17, 2020.  Pls.' Counter-Stmt. of Facts ¶ 86.  In other words, the most recent data shows that service performance for First Class mail *is still even lower* than it was following the sudden drop to

---

[3] For the reasons explained *infra* Parts I.A and V, Defendants' intervening steps to come into partial compliance with this Court's orders do not defeat Plaintiffs' standing or undermine any of Plaintiffs' requested relief.

85.26 percent in mid-July 2020.  *Id.*; Pls.' Stmt. of Facts ¶ 97.

These ongoing delays continue to harm Plaintiffs, who are in the process of administering an election for President, Vice President, and other federal and state offices, that is relying heavily on mail-in ballots.  Pls.' Stmt. of Facts ¶¶ 143-54, 156.  Voters have reported going *weeks* without receiving their absentee ballots, despite receiving notices from the Postal Service that their ballots would be arriving soon.  Pls.' Counter-Stmt. of Facts ¶¶ 78-80.  And because Defendants have suspended some of the Postal Policy Changes only until the election, if at all, *see* Pls.' Counter-Stmt. of Facts ¶¶ 13, 43, the risk that mail delays will *worsen* immediately after the election—during a crucial period while returning ballots are still being delivered in Plaintiffs' jurisdictions, *see infra* Part IV—is high.

## ARGUMENT

**I.    The Court has subject-matter jurisdiction, and Plaintiffs' claims are reviewable.**

   **A.    Plaintiffs have standing.**

Plaintiffs identified specific facts in their opening memorandum demonstrating that they have standing at the summary judgment stage.  *See* Pls.' Mem. 8-13; Pls.' Stmt. of Facts ¶¶ 4-12, 65, 95-115, 130-31, 136, 143, 145-51, 156-57, 159, 163, 166-69, 173-78.  Notwithstanding that this comprehensive factual showing is largely *admitted*,[4] Defendants argue that Plaintiffs have

--------

[4] Defendants admit 37 of the 56 factual statements cited above.  *See* Defs.' Counter-Stmt. of Facts ¶¶ 4-12, 96-105, 108-10, 112, 114-15, 131, 145-51, 157, 173-75 (ECF No. 67-1).  To the limited extent Defendants deny or dispute Plaintiffs' statements of fact, Defendants respond that nine of the cited paragraphs assert legal conclusions and not matters of fact, *see id.* ¶¶ 159, 163, 166-69, 176-78; and that three of the assertions of fact are not "material to the outcome of this suit" because of post-injunction guidance documents issued to USPS employees, *id.* ¶¶ 65, 130, 136.  Neither of these disagreements presents a genuine dispute of material fact that can defeat summary judgment; as a matter of law, steps that the agency took to comply with a preliminary injunction *in this very lawsuit* cannot defeat standing.  *See District of Columbia v. U.S. Dep't of Agric.*, No. 20-cv-00119 (BAH), 2020 WL 6123104, at *5 n.10 (D.D.C. Oct. 18, 2020).  The

not established sufficient future injury caused by the Postal Policy Changes.[5]  These arguments misstate the law, mischaracterize the factual record, and should be rejected.

       1.       **Plaintiffs have suffered and will suffer concrete injuries.**

The Court previously held that Plaintiffs' motion for preliminary injunction presented sufficient proof of "on-going non-speculative harms."  *New York v. Trump*, No. 20-cv-2340 (EGS), 2020 WL 5763775, at *6 (D.D.C. Sept. 27, 2020).  Defendants do not genuinely dispute that the Postal Policy Changes injure Plaintiffs.  As noted, Defendants *admit* most of these injuries, yet contend that Plaintiffs must meet a newly-crafted test to show "*material* mail delays in the future . . . of a material length."  Defs.' Mem. 16.  This argument is wrong.

First, the well-established injury-in-fact standard contains no such requirements. Defendants conspicuously cite no authority in support of their new test, nor could they.  A plaintiff must only show a "concrete and particularized" injury to help "ensure that the plaintiff has a personal stake in the outcome of the controversy."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted); *see also Halbig v. Burwell*, 758 F.3d 390, 396 (D.C. Cir. 2014) ("[E]ven an 'identifiable trifle' of harm may establish standing.") (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)).  Here, the undisputed facts establish Plaintiffs' direct injuries—including disruptions to Plaintiffs' plans to combat coronavirus transmission and provide safe alternatives to in-person voting; the imposition of direct financial costs to state and local agencies; and

---

remaining seven disputed statements of fact all go to whether the Postal Policy Changes caused Plaintiffs' injuries, *see* Defs.' Counter-Stmt. of Facts ¶¶ 95, 106-07, 111, 113, 143, 156; a question that cannot be genuinely disputed for the reasons stated *infra* Part I.A.2.

[5] Defendants only contest the first two elements of the standing inquiry—injury and causation— and do not dispute that a favorable decision by this Court would redress Plaintiffs' injuries.  *See* Defs.' Mem. 14-17.

administrative burdens newly imposed on state and local agencies.  These injuries more than

adequately demonstrate Plaintiffs' stake in this action.  *See* Pls.' Mem. 8-12; *New York*, 2020

WL 5763775, at *12.

Second, the precise future injury Plaintiffs predicted would occur is in fact occurring—

Plaintiffs' residents are choosing to vote in-person due to Postal Service failures to timely deliver

their absentee ballots.  *See* Pls.' Counter-Stmt. of Facts ¶¶ 78, 80 (the New York State Office of

the Attorney General "has received over 25 complaints from voters as of October 27 who did not

receive their absentee ballots in the mail in a timely manner"; and at least one complainant

intended to vote in person because of mail delays in receiving their ballot); *id.* ¶ 81 (the New

York State Office of the Attorney General has "also received over 20 complaints about

incredibly long lines at voting sites," with multiple voters waiting over five hours to cast their

vote at early voting locations); *id.* ¶ 83 (testimony from Douglas Kellner, Co-Chair and

Commissioner of the New York State Board of Elections, that "many of the issues we saw in the

June primary and anticipated for the November general election are occurring").  Article III does

not require Plaintiffs to suffer even greater injuries—for the Postal Service to delay or fail to

deliver even more absentee ballots, or for even more of Plaintiffs' residents to risk COVID-19

exposure by voting in person—in order to show standing.  *See Dep't of Commerce v. New York*,

139 S. Ct. 2551, 2565 (2019) (states had standing based on future risk that "as little as 2%" of

noncitizen households would not respond to the decennial census); *Susan B. Anthony List*, 573

U.S. at 158 (future injuries support standing "if the threatened injury is certainly impending, or

there is a substantial risk that the harm will occur") (internal quotation marks omitted).

Defendants argue that Plaintiffs are asserting public health injuries of their residents in

their role as *parens patriae*.  *See* Defs.' Mem. 16-17.  The Court already rejected this argument,

*New York*, 2020 WL 5763775, at *11, and for good reason: The undisputed facts show that Plaintiffs' efforts to mitigate the spread of coronavirus are aimed at protecting the public health of their jurisdictions as a whole, *see* Defs.' Counter-Stmt. of Facts ¶¶ 4-9, 143, 150-51, 158-59 (ECF No. 67-1), and the law is clear that these public health risks and Plaintiffs' efforts to respond to them pose direct proprietary injuries to governmental plaintiffs, *see Air All. Houston v. EPA*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018); *New York v. U.S. Dep't of Homeland Sec.*, No. 19-cv-7777 (GBD), 2020 WL 4347264, at *10 (S.D.N.Y. July 29, 2020), *stayed on other grounds*, 974 F.3d 210 (2d Cir. 2020).

Defendants also argue that Plaintiffs' financial and administrative injuries are "self-inflicted" to "try to manufacture injury." Defs.' Mem. 17. This astonishing contention—that Plaintiffs expended significant resources to modify state and local agency operations to counteract mail delays *not* to effectively serve their residents who rely on public assistance, healthcare benefits, child support enforcement, and other services, but instead so they could "manufacture injury" for litigation purposes—is unsupported, categorically false, and counter to Defendants' own admissions.[6] Plaintiffs responded to unprecedented mail delays by expending resources to ensure that their residents could safely exercise their right to vote and by altering agency practices to assure the continued effectiveness of agency programs in compliance with federal, state, and local law. Pls.' Mem. 9-10; *see, e.g.*, Defs.' Counter-Stmt. of Facts ¶¶ 10-11,

---

[6] Defendants' counter-statement of facts *admits* every single one of Plaintiffs' assertions of fact on this score, including that "[m]ail delays have impaired Plaintiffs' ability to perform legally mandated tasks, including provide health coverage and prescription medications, ensure that children and families receive court-ordered financial and medical support, and send applications for SNAP and other benefits to eligible residents," and that "Plaintiffs have expended resources in an effort to address these disruptions." *See* Defs.' Counter-Stmt. of Facts ¶¶ 10-11, 145-49.

145-49.  Plaintiffs could not otherwise avoid these injuries absent the relief sought through this litigation.  The doctrine that a plaintiff may not manufacture its own standing therefore has no application here.[7]  *See District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 35 (D.D.C. 2020) (rejecting agency's argument that states' injuries in response to challenged regulation were self-inflicted).

> **2.      Plaintiffs' injuries are traceable to the Postal Policy Changes.**

The Court also previously held that Plaintiffs' motion for preliminary injunction presented sufficient proof that their injuries were "fairly traceable" to the Postal Policy Changes, *New York*, 2020 WL 5763775, at *5-6, and there is no genuine dispute of material fact that the Court's conclusion was correct.

*First*, in June and July 2020, the Postal Service "announced and implemented" a number of operational changes "to how it collects, processes and delivers mail."  *Id.* at *2; Pls.' Mem. 2-5; *see also* Pls.' Counter-Stmt. of Facts ¶¶ 65-69 (citing October 19 OIG Report 1-2, 10). *Second*, the collective implementation of all of these operational changes led to nationwide mail delays.  *New York*, 2020 WL 5763775, at *3; Pls.' Mem. 5-7; Pls.' Counter-Stmt. of Facts ¶¶ 74-75 (citing October 19 OIG Report 3, 14-15).  The implementation of the Cintron Guidelines, specifically, greatly reduced the number of late and extra trips.  *See* Pls.' Mem. 5; Pls.' Stmt. of Facts ¶¶ 70-75.  *Third*, although some of these operational changes were suspended in August or September 2020, the agency's restrictions on late and extra trips were operational until this Court granted emergency motions to enforce in related cases on October 27, 2020.  *See NAACP* Minute

---

[7] In any event, Defendants only argue that Plaintiffs' financial and administrative injuries are "self-inflicted"; they do not contend the same regarding injuries caused by the impairment to Plaintiffs' efforts to protect the public health and provide safe alternatives to in-person voting. Defs.' Mem. 17.  These public health injuries alone support standing, as explained *supra*.

Order; Pls.' Mem. 5; Pls.' Stmt. of Facts ¶¶ 70-75.  *Fourth*, the Postal Service's service

performance scores, and the number of late trips and extra trips, remain well below the pre-July

2020 rates.  *See* Pls.' Mem. 5-7; Defs.' Counter-Stmt. of Facts ¶¶ 105, 115; Pls.' Counter-Stmt.

of Facts ¶¶ 84-90 (citing late October 2020 data).  These unrebutted facts show that "the on-

going non-speculative harms" Plaintiffs suffered "are 'fairly traceable' to the Postal Policy

Changes."  *New York*, 2020 WL 5763775, at *6; *see* Pls.' Stmt. of Facts ¶¶ 106-07.

Defendants contest causation on several grounds, all of which are unpersuasive.  First,

Defendants contend that the persistence of mail delays following the Court's preliminary

injunction establishes that the enjoined practices cannot be causing current delays.  *See* Defs.'

Mem. 13-14.  But as Plaintiffs' opening memorandum explained, Defendants never fully

complied with the Court's orders—in particular by failing until *just two days ago* to rescind the

Cintron Guidelines that restricted late trips and extra trips.  *See* Pls.' Mem. 5, 12-13 n.4; *see also*

Pls.' Stmt. of Facts ¶¶ 70-75; Pls.' Counter-Stmt. of Facts ¶ 91.  Indeed, in response to the

emergency motions to enforce filed in *NAACP v. U.S. Postal Service*, No. 20-cv-2295 (EGS),

*Vote Forward v. DeJoy*, No. 20-cv-2405 (EGS), and *Richardson v. Trump*, No. 20-cv-2262

(EGS), this Court agreed that Defendants had not complied with the preliminary injunctions and

ordered immediate relief and daily monitoring to assure that "USPS personnel . . . perform late

and extra trips to the maximum extent necessary to increase on-time mail deliveries, particularly

for Election Mail," and to direct that "late and extra trips should be performed to the same or

greater degree than they were performed prior to July 2020 when doing so would increase on-

time mail deliveries."  *NAACP* Minute Order.

Second, Defendants argue that a "variety of issues" contribute to mail delays, including the coronavirus pandemic, wildfires, and bad weather.[8]  Defs.' Mem. 16.  But the Court already rejected Defendants' attempt to create a causal connection to the coronavirus pandemic, noting that "the sharp decline in on-time deliveries occurred in July and August 2020, months after COVID-19 infections began to spike in the United States in March 2020."  *New York*, 2020 WL 5763775, at *6 (citing Pls.' Reply Supp. Prelim. Inj. 6 (ECF No. 40)).  That Defendants plowed ahead with the Postal Policy Changes in the midst of a once-in-a-century pandemic is no excuse for them to avoid review.

Additionally, Defendants' attempt to blame wildfires and bad weather fails.  As a matter of law—and even assuming, arguendo, that wildfires and bad weather could be blamed for the sharp drops in on-time performance that happen to coincide with implementation of the Postal Policy Changes—traceability "does not require that the [challenged action] be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries."  *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017); *see also New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 622 (S.D.N.Y. 2019) ("Even in a dry season, it is fair to trace the fire to the arsonist."), *aff'd*, 139 S. Ct. 2551.  Even when a statute imposes liability based on proximate causation principles, it is typical that a plaintiff can prevail when an injury has multiple causes; as the

---

[8] Defendants misleadingly cite a district court order from the *Jones v. U.S. Postal Service* litigation which observed that a "variety of issues . . . contribute to the delays and are outside of USPS's control."  Order, *Jones v. U.S. Postal Serv.*, No. 20-cv-6516 (VM), ECF No. 82, at 6 (S.D.N.Y. Oct. 9, 2020) (quoted at Defs.' Mem. 16).  That observation was in the context of the district court's decision not to appoint an independent monitor in that case, and had nothing to do with standing.  *See id.* at 4-6.  In fact, as Defendants fail to note, when the district court in *Jones* did address standing—in granting the plaintiffs' motion for a preliminary injunction in that case—the court expressly rejected Defendants' causation arguments and held that the evidence "makes clear that the challenged mail procedures have slowed mail service and are thus a de facto cause of Plaintiffs' claimed injuries."  *Jones v. U.S. Postal Serv.*, No. 20-cv-6516 (VM), 2020 WL 5627002, at *13 (S.D.N.Y. Sept. 21, 2020).

Supreme Court has explained, it is entirely "common for injuries to have multiple proximate causes." *Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011).  Article III imposes no greater limit.

On the facts, Defendants' evidence falls far short of establishing that any factors other than the Postal Policy Changes caused mail delays.  Under Rule 56, Defendants may only rely on factual material that can "be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(1)(B).  Defendants' proffered testimony is inadmissible because it is conclusory and speculative.  For example, the factual allegations set forth in the Crawford Declaration (ECF No. 66-25, Defs.' Ex. 21)—that some portion of service delays in some localities on certain days were caused by snowstorms or wildfires—are entirely conclusory.  Defendants do not describe the basis for this conclusion, explain their methodology for cherry-picking the particular dates in question, or specify any indicia of reliability.[9]  *See id.*; *cf. Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (recognizing that "some statements are so conclusory" as to be disregarded on summary judgment).  Defendants' other declarations suffer from similar defects.  *See* Garrett Suppl. Decl. ¶ 3 (ECF No. 66-37, Defs.' Ex. 33) (listing the number of Postal Service offices that were "impacted" by hurricanes, but making no effort to describe the length or extent of those

---

[9] This testimony should be disregarded for the separate reason that it relies on information that Defendants failed to produce in discovery.  The Crawford Declaration proffers the witness's testimony based on the "Change Suspension Discontinuance Center," described as a system that collects local reports of delivery issues to purportedly allow management to "determine the root causes of failures in delivery performance on a daily basis."  Crawford Decl. ¶ 2 (ECF No. 66-25, Defs.' Ex. 21).  Plaintiffs' requests for expedited discovery sought, with the Court's leave, "all documents" and "data relating to service performance of mail transportation, processing, or delivery, or any other metric of service performance."  *See* Pls.' First Request for Production of Documents to Defs., at Request No. 5 (ECF No. 38-9).  Data from the "Change Suspension Discontinuance Center," as summarized in the Crawford Declaration, is plainly responsive to this discovery request, but Defendants failed to produce or even acknowledge the existence of this information, first referencing it only in their summary judgment opposition.  Having "offered no explanation to justify [their] failure to produce this [data] during discovery," they should be precluded from relying on this evidence.  *Howard v. Gray*, 291 F.R.D. 6, 10 (D.D.C. 2013).

purported impacts); Dearing Decl. ¶ 13 (ECF No. 66-36, Defs.' Ex. 32) (conceding that the declarant did not undertake a "comprehensive" or "complete" review of factors impacting service).

Indeed, Defendants' new evidence consists of little more than the unremarkable observation that natural disasters and similar events *may* impact mail delivery.  *See* Garrett Decl. ¶ 10 (ECF No. 66-26, Defs.' Ex. 22) (hurricanes "may" effect mail processing plants); Dearing Decl. ¶¶ 6, 9 (factors like "weather events, natural disasters and civic unrest" "may be affecting service performance since the beginning of the pandemic").  But a party's "mere speculations are insufficient to create a genuine issue of material fact."  *Bennett v. Solis*, 729 F. Supp. 2d 54, 67 (D.D.C. 2010) (internal quotation marks omitted).  And Defendants' evidence nowhere suggests that weather events and other similar occurrences—which presumably impact mail delivery every year, not just in 2020—are the sole cause of the dramatic nationwide service degradation that began after Defendants instituted the Postal Policy Changes.  To the contrary, Defendants' most recent data reflects that regions experiencing wildfires, for example, are *not* experiencing delays as significant as other regions with no fires.  *See* Pls.' Counter-Stmt. of Facts ¶ 90 (on October 28, 2020, reflecting on-time delivery of 88.87% of first class mail around Sacramento, but 81.86% in Southern New Jersey and 61.57% in the Philadelphia metropolitan region); *see also* U.S. Forest Service, Public Wildfire Information Website, https://inciweb.nwcg.gov/ (showing wildfires near Sacramento but not near Southern New Jersey or metropolitan Philadelphia) (last visited Oct. 29, 2020).

The Court should accordingly conclude that Plaintiffs have met their burden to establish standing, and that Defendants' evidence is insufficient to create any material dispute of fact.

**B.      The Court has jurisdiction to hear Plaintiffs' 39 U.S.C. § 3661 claim.**

As the Court previously concluded for preliminary injunction purposes, the Court has

subject-matter jurisdiction over Plaintiffs' section 3661 claim.  *See New York*, 2020 WL

5763775, at *8.  Defendants' cross-motion presents no reason for the Court to change this

conclusion.

First, Defendants concede that they have not presented any mandatory authority to

support the proposition that section 3662 "removed the district courts' jurisdiction over claims

regarding postal rates and services."  Defs.' Mem. 18-19.  Instead, Defendants ask this Court to

divest itself of jurisdiction over Plaintiffs' section 3661 claim based on a series of

"considerations" described in *Nader v. Volpe*, 466 F.2d 261 (D.C. Cir. 1972).  But that decision

*supports* Plaintiffs' position: the D.C. Circuit there explained that "when Congress has specified

a procedure for judicial review of administrative action, courts will not make nonstatutory

remedies available *without a showing of patent violation of agency authority or manifest*

*infringement of substantial rights irremediable by the statutorily-prescribed method of review*."

*Id.* at 266 (emphasis added).  Plaintiffs' *ultra vires* claim involves the very type of "violation of

agency authority" contemplated by the court in *Nader.  See infra* Part I.C.

Second, Defendants contort the plain meaning of section 3662 in arguing that the word

"may" means that affected parties "may lodge a complaint with the PRC, but may also choose to

take no action at all."  Defs.' Mem. 20.  Nothing indicates that Congress enacted this statute for

the purpose of letting aggrieved parties know that they had the option *not* to challenge unlawful

agency conduct, and Defendants' creative contention is inconsistent with the maxim that courts

"presume that Congress intend[s] to give [a] term its ordinary meaning" when legislating.  *Aid*

*Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1176 (D.C. Cir. 2003).[10]  As Plaintiffs previously explained—and this Court agreed—"the permissive 'may' coupled with the use of the mandatory 'shall' suggests that Sections 3662(a) and 3663 were not intended to be the exclusive avenue for bringing a procedural challenge to the USPS's failure to comply with Section 3661." *New York*, 2020 WL 5763775, at *7.

Finally, Defendants argue that even if the *Free Enterprise* factors mitigated in favor of finding subject-matter jurisdiction at the preliminary injunction stage, jurisdiction is improper now because Plaintiffs' "election-related injuries will be moot at or immediately after the time the Court issues a decision on Plaintiffs' motion for summary judgment."  Defs.' Mem. 23.  This argument ignores that under California law, a ballot postmarked by Election Day will be counted if received by November 20, and under New Jersey and New York law, a ballot postmarked by Election Day will be counted if received by November 10, so mail delays will continue to impose election-related injuries on Plaintiffs New Jersey, New York, New York City, and San Francisco for several weeks.  *See* Cal. Elec. Code § 3020(d) (West 2020); N.J. Exec. Order No. 177, 52 N.J.R. § 1701(b) (2020); N.Y. Elec. Law § 8-412 (McKinney 2020).  And *all* Plaintiffs have suffered and will continue to suffer unrefuted financial and proprietary injuries entirely unrelated to the timing of the general election, which will not become moot after Election Day. Defs.' Counter-Stmt. of Facts ¶¶ 10-11, 145-49.  There is no basis for the Court to abdicate its authority to exercise jurisdiction over Plaintiffs' claims.

---

[10] Defendants' attempted reliance on *Foster* is inapposite as that case concerned allegations of "fraud, conversion, unjust enrichment, and misappropriation of trade secrets," in contrast to the purely legal questions at issue in Plaintiffs' section 3661 claim.  *Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 984 (Fed. Cir. 2013).

**C.      Plaintiffs' statutory claims are reviewable under the *ultra vires* doctrine.**

Defendants' contrary claims notwithstanding, "the case law in this circuit is clear that judicial review is available whe[re]," as here, "an agency acts *ultra vires*."  *Aid Ass'n for Lutherans*, 321 F.3d at 1173.  Because the "courts will ordinarily presume that Congress intends the executive to obey its statutory commands," *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (internal quotation marks and citation omitted), the D.C. Circuit has repeatedly held that an *ultra vires* cause of action will lie *against the Postal Service* where the agency acts outside the boundaries of its statutory authority.  *See, e.g.*, *Sears, Roebuck & Co. v. U.S. Postal Serv.*, 844 F.3d 260, 265 (D.C. Cir. 2016); *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 858 (D.C. Cir. 2012; *Aid Ass'n for Lutherans*, 321 F.3d at 1172-73.

Here, Plaintiffs' section 3661 claim "'clearly admits of judicial review.'"  *New York*, 2020 WL 5763775, at *8 (quoting *Aid Ass'n for Lutherans*, 321 F.3d at 1173); *accord NAACP*, 2020 WL 5995032, at *10.  The gravamen of Plaintiffs' claim under 39 U.S.C. § 3661(b) is that the Postal Service "acted 'in excess of its delegated powers and contrary to a specific [statutory] prohibition,'" *Eagle Trust Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)), when it implemented the Postal Policy Changes before and without seeking an advisory ruling from the Postal Regulatory Commission as section 3661(b) requires, *see infra* Part II.  Accordingly, Plaintiffs' claim is amenable to *ultra vires* review.[11]  *New York*, 2020 WL 5763775, at *8.

---

[11] There is no merit to Defendants' contention that section 3661(b) is somehow ambiguous.  *See* Defs.' Mem. 24.  Where, as here, the Postal Service resolves to make a "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis," the statute requires that it "*shall submit* a proposal" to the Postal Regulatory Commission "prior to the effective date of such proposal."  39 U.S.C. § 3661(b) (emphasis added).  The term "shall" connotes an obligation or requirement.  *Bennett v. Panama Canal Co.*, 475 F.2d 1820,

*Aid Association for Lutherans* is squarely on point.  In that case, a non-profit organization challenged a Postal Service regulation broadly defining a statutory term to effect an exclusion of the non-profit from a reduced postage rate for insurance mailings.  321 F.3d at 1166.  The statutory provision at issue there (39 U.S.C. § 3626(j)(1)(B)) is in the same chapter of Title 39 (Chapter 36) that governs rates and service, and thus is covered by section 3661's procedural protections.  It follows from *Aid Association for Lutherans* that *ultra vires* review is available for total disregard of those statutory protections.  Defendants erroneously claim that *ultra vires* review is unavailable because Plaintiffs may seek administrative review before the Postal Regulatory Commission.  *See* Defs.' Mem. 29-30.  But, again, the same would have been true in *Aid Association for Lutherans*: section 3626(j)(1)(B), as just pointed out, governs rates.  And section 3662's complaint provision provides for complaints alleging violations of "this chapter," a term that includes the section at issue in *Aid Association for Lutherans*.  39 U.S.C. § 3662(a); *id.* ch. 36 (containing §§ 3626 and 3661).  And yet, the D.C. Circuit in that case squarely held *ultra vires* review applied and nullified the agency's action—so it must apply here too.

More generally, D.C. Circuit authority supports the proposition that *ultra vires* review is available despite the availability of other potential avenues for relief.  *See, e.g.*, *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 188-90 (D.C. Cir. 2006); *Chamber of Commerce*, 74 F.3d at 1326-27.  And in any case, *ultra vires* review is appropriate where, as here, plaintiffs would otherwise "have no meaningful and adequate means of vindicating [their] statutory rights." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1258 (D.C. Cir. 2006) (internal quotation marks omitted).  As the Court has noted, forcing Plaintiffs to raise

---

1828 (D.C. Cir. 1973).  Whether the Postal Policy Changes meet the substantive test set forth in *Buchanan* is a merits question, not a reviewability question.

their claims administratively would, in view of the nature of the claims alleged and the

impending general election, effectively "deny them meaningful review."  *New York*, 2020 WL

5763775, at *8.

      *Ultra vires* review is likewise available for Plaintiffs' section 101 and section 403 claims.

Defendants argue that section 101 and section 403 are not susceptible to judicial review under

the *ultra vires* doctrine because they are merely "statements of broad policies that the Postal

Service strives toward."  Defs.' Mem. 32.  That characterization of the statute is absurd and only

confirms the agency has flouted Congress's clear commands.  *See* Pls.' Mem. 25-26.  Far from

mere precatory statements, these provisions—incorporating the mandatory term "shall," *see*

*Bennett*, 475 F.2d at 1828—constitute at the very least a set of baseline service obligations with

which the Postal Service must comply.[12]  When it created the Postal Service, Congress included

these directives to ensure that the agency would continue to serve an important public function

by timely delivering mail without partisan intrusion.  Pls.' Mem. 24-26.  Sections 101 and 403

are central mandates of the agency's enabling statute, not mere hopes and dreams, and are

enforceable under the statute's own terms either by the Postal Regulatory Commission or by

---

[12] In the context of employment disputes where a Postal Service employee has been fired for
failing to timely deliver the mail or for unexcused absences, the courts have repeatedly
recognized the statutory mandates imposed by sections 101 and 403.  *U.S. Postal Serv. v. Nat'l
Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1302 (1987) (the Postal Service "operates
under a statutory mandate to ensure prompt delivery of the mails"); *King v. U.S. Postal Serv.*,
No. 86-cv-1975, 1988 WL 38693, at *2 (D.D.C. Apr. 12, 1988) ("The statutorily mandated
function of USPS is to transport millions and millions of pieces of mail and valuable property in
extremely tight time schedules throughout the United States in the most efficient manner.")
(citing 39 U.S.C. §§ 101(a), 403(a)) (internal citations omitted); *Gaffney v. Potter*, No. 06-cv-
2444, 2007 WL 4189495, at *6 (N.D. Ohio Nov. 19, 2007) ("[T]he very mission of the USPS is
to provide 'prompt, reliable and efficient services to patrons,' and its statutory mandate is to
'give the highest consideration to the requirement for the most expeditious collection,
transportation and delivery' of mail.") (quoting 39 U.S.C. §§ 101(a), (e), 403(b)(1)); *Webb v.
United States*, 227 Ct. Cl. 777, 780 (1981) (the Postal Service "has a statutory mandate to
provide 'prompt, reliable and efficient services to patrons'") (quoting 39 U.S.C. § 101(a)).

administrative complaint and judicial review.  *See, e.g.*, 39 U.S.C. § 3661(c) (opinion regarding

rate or service change must include a certification by each commissioner that opinion "confirms

to the policies established under this title"); *id.* § 3662(a) (complaint provision); *id.* § 3652

(requiring annual assessment, with public comment, regarding whether rates and quality of

service "complied with all applicable requirements of this title").

Defendants further argue that *ultra vires* review is prohibited because sections 101 and

403 provide the agency with significant discretion over its operations.  Defs.' Mem. 31-32.  That

an agency may have discretion over its operations does not mean that its decisions are entirely

insulated from judicial review.  "Courts can defer to the exercise of administrative discretion on

internal management matters, but they cannot abdicate their responsibility to insure compliance

with congressional directives setting the limits on that discretion."  *Nat'l Ass'n of Postal*

*Supervisors v. U.S. Postal Serv.*, 602 F.2d 420, 432 (D.C. Cir. 1979).[13]  The statute at issue in

*Aid Association for Lutherans*, for example, would have set the rate for non-profit insurance

mailings depending on whether a policy was "primarily promoted" to certain people, and

whether the coverage was "not generally otherwise commercially available"—phrasing that

undoubtedly connotes discretion for the agency.  321 F.3d at 1168. And yet, in light of the

statute's text, purpose, and legislative history, the court concluded that the agency's view was

*ultra vires* because it was contrary to, and an unreasonable interpretation of, the statute's terms.

*Id.* at 1174.[14]

---

[13] For like reason, Defendants' reliance on the *Eagle Trust Fund* case is misplaced.  *See* Defs.'
Mem. 32, 34.  The Postal Service acts *ultra vires* where, as here, it implements its organic act in
so unreasonable a manner as to constitute dereliction of its statutory obligations.  *See infra* Part
III; *Aid Ass'n for Lutherans*, 321 F.3d at 1178.

[14] As *Aid Association for Lutherans* makes clear, and contrary to Defendants' argument, *see*

So too here: even if the Postal Service may exercise some degree of flexibility in accomplishing statutory mandates, it acts *ultra vires* where, as here, its actions flout the statute's plain terms and unreasonably apply the statutes' commands.  *See infra* Part III; *Aid Ass'n for Lutherans*, 321 F.3d at 1178 (holding that the Postal Service acted without authority where, assuming statutory ambiguity, its interpretation was unreasonable in view of the language of the statute).

## II.      The Postal Policy Changes violate 39 U.S.C. § 3661.

Plaintiffs' opening memorandum explained that the Postal Policy Changes violate section 3661 and should be enjoined because Defendants implemented sweeping changes in postal services with significant nationwide effects without first seeking an advisory opinion on those changes from the Postal Regulatory Commission.  *See* Pls.' Mem. 20-23; Pls.' Stmt. of Facts ¶¶ 13-88, 93-115, 130-31, 155.  Defendants' opposition does not respond on the merits or argue that the agency complied with section 3661; instead, Defendants contest only jurisdiction and reviewability.  *See* Defs.' Mem. 17-30.  Because the Court has subject-matter jurisdiction and the section 3661 claim is reviewable under the *ultra vires* doctrine for the reasons stated *supra* Parts I.B and I.C, Plaintiffs' motion for summary judgment on this claim should be granted.

_____

Defs.' Mem. 31, sections 101 and 403 need not be so unambiguous as to prohibit the Postal Service from exercising any discretion in implementing their mandates.  The *Lutherans* court in fact rejected a similar argument, holding instead that the Postal Service acted in excess of its statutory authority by unreasonably exercising its discretion to interpret the statutory language at issue.  *See Aid Ass'n for Lutherans*, 321 F.3d at 1173-74, 1178.  To the extent the decision in *National Association of Postal Supervisors* appears to impose a no-ambiguity standard that is directly contrary to the binding *Lutherans* analysis, the Court should follow the D.C. Circuit's decision in *Lutherans*.  *See Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.*, No. 19-cv-2236 (RCL), 2020 WL 4039177, at *3 (D.D.C. July 17, 2020).  And needless to say, sections 101 and 403 are far more specific in their commands than the nebulous "based on appropriate data" provision at issue in *DCH*.  *See DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 504, 509-10 (D.C. Cir. 2019).

In opposing *ultra vires* review, Defendants do contend that the Postal Service did not commit extreme error that violates a clear, mandatory, and unambiguous statutory obligation. *See* Defs.' Mem. 24-30. Setting aside that this is a not a statement of the standard on summary judgment—under which Plaintiffs must show that there is no genuine dispute of material fact, and Plaintiff is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a)—should the Court choose to construe Defendants' arguments as an opposition on the merits, those arguments should be rejected.

First, Defendants argue that section 3661 only applies when the Postal Service *intends* to alter postal services, which could not have happened here because the Postal Policy Changes are not actually changes. *See* Defs.' Mem. 25-27. But the facts as presented on summary judgment defeat this argument. The record establishes that in June and July 2020, the Postal Service implemented five operational changes to overhaul how the agency collects, processes, and delivers mail throughout the country; that those changes had both quantitative and qualitative impacts on postal services, including by causing dramatic delays in mail delivery; that those impacts were substantially nationwide in scope; and that Postal Service officials themselves acknowledged each of these points. *See* Pls.' Mem. 21-22; Pls.' Stmt. of Facts ¶¶ 13-115, 130-31; Pls.' Counter-Stmt. of Facts ¶¶ 65-69, 72-75.

To be sure, Defendants dispute Plaintiffs' statement of facts on this score, contending that the Postal Policy Changes were never made or are not changes. Defs.' Mem. 26. But the Court already rejected Defendants' argument that there is nothing to see here, not least because that argument is contradicted by "USPS's own statements" acknowledging that the Postal Policy Changes in fact constitute "a significant number of changes." *New York*, 2020 WL 5763775, at *2-4, *8-10. Merely reciting, for example, that late trips and extra trips were "never prohibited,"

Defs.' Mem. 26-27, cannot defeat summary judgment because a party cannot create a triable

issue of fact by misstating the record, *see SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486,

516-17 (S.D.N.Y. 2018), or by citing affidavits made for litigation that contradict sworn

testimony and documentary evidence, *see Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C.

Cir. 2007).  The Court simply need not credit Defendants' bare assertions that the operational

changes amply supported by the record—and recognized by every single court to consider this

question—never really happened.  *Dep't of Commerce*, 139 S. Ct. at 2575 ("Our review is

deferential, but we are 'not required to exhibit a naiveté from which ordinary citizens are

free.'") (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977)).

Second, Defendants argue that the Postal Service's OIG does not believe the Postal

Service was required to request an advisory opinion from the PRC before implementing these

changes.  Defs.' Mem. 27-28.  Although it is correct that a recent OIG Report concluded that

"the Postal Service was not required by then-existing precedent to request an advisory opinion,"

October 19 OIG Report 3 (ECF No. 70-1), that conclusion should carry no weight here.  The

OIG, of course, is not a federal court whose role is to draw legal conclusions; instead, the OIG's

mandate is to conduct independent audits and investigations, including to prevent and detect

fraud, waste, and misconduct.  *See* Inspector General Act of 1978, 5 U.S.C. App. § 4(a)(1)

(noting duty to conduct audits and investigations); 39 U.S.C. § 202(e)(2) (noting appointment of

the Inspector General by the Postal Service Board of Governors "without regard to political

affiliation" and "solely on the basis of integrity and demonstrated ability in accounting, auditing,

financial analysis, law, management analysis, public administration, or investigation").  In any

event, the OIG's observation about the application of section 3661 expressly reserves judgment

regarding the "the cumulative effects of multiple, broadscale changes" and notes that a judicial

conclusion to the contrary would control: "At the time of this report's publication, many of the Postal Service's actions (including declining to seek a PRC advisory opinion) have been challenged in multiple federal jurisdictions . . . .  None of these cases has yet reached a final disposition.  A final decision in one or more of these cases could require a reconsideration of this issue."  October 19 OIG Report 18 n.12, 19.

More importantly, the very same OIG report contradicts *all* of the factual assertions Defendants rely on in opposing summary judgment.  The OIG concluded that in June and July 2020 the Postal Service implemented all of the operational changes at issue in this litigation, and that the agency (1) "did not complete a study or analysis of the impact the changes would make on mail service prior to implementation," but should have; (2) implemented the changes "quickly" and "communicated primarily orally, which resulted in confusion and inconsistent application across the country"; (3) executed the changes with higher "velocity and consistency" than it did with prior year initiatives; (4) "negatively impacted the quality and timeliness of mail delivery nationally" by adopting the changes, and that "mail service performance significantly dropped beginning in July 2020, directly corresponding to implementation of the operational changes and initiatives"; and (5) as a result, "[d]elayed mail in post offices, stations, and other facilities, was higher than [prior year] values and even exceeded the average of peak values."  *Id.* at 2-3, 7-8, 13-14, 24.  Every single one of those conclusions—which *do* result from the OIG's performance of its core function to investigate and audit the performance of Postal Service operations—*supports* Plaintiffs' claim that Defendants violated section 3661 by failing to seek an advisory opinion before implementing these changes.

Summary judgment is therefore warranted on Plaintiffs' claim that Defendants violated section 3661.

III.     **The Postal Policy Changes violate the Postal Reorganization Act.**

A.       **The Postal Policy Changes violate section 101.**

Defendants argue that Plaintiffs' section 101(e) claim fails to specify the changes that the agency made without any consideration for the expeditious delivery of mail.  Defs.' Mem. 35. On the contrary, Plaintiffs cite specific evidence showing how the agency failed to consider the effect of each Postal Policy Change on the expeditious delivery of the mail.  With regard to the reduction of mail sorting machines, the agency more than doubled its reduction rate in FY2020 and removed machines entirely rather than turning them off on a trial basis to test whether the machine would still be necessary for operations going forward.  Pls.' Stmt. of Facts ¶¶ 19-28. The agency also failed to give facility managers the opportunity to weigh in on if, when, or how to reduce the sorting machines.  *Id.*; *see also* Pls.' Counter-Stmt. of Facts ¶¶ 70-71.  With regard to the elimination of late and extra trips, the agency did not consider the impact that its changes would have on the timely delivery of mail, did not conduct any written analyses, and did not analyze available data.  Pls.' Stmt. of Facts ¶¶ 50-52, 118-24; Pls.' Counter-Stmt. of Facts ¶¶ 70-71.  Nonetheless, the agency was aware that delayed mail could result.  Pls.' Stmt. of Facts ¶ 65. Moreover, the Postal Service did not seek advice or guidance from the Postal Regulatory Commission on how any of the Postal Policy Changes—including the elimination of overtime, reduced morning sortation, and reduced delivery speed for election mail—could impact timely mail delivery.  *Id.* ¶ 116; Pls.' Counter-Stmt. of Facts ¶¶ 70-71.  These failures show that the Postal Service did not give the "highest consideration" to the expeditious delivery of mail when enacting the Postal Policy Changes—as the statute's plain language requires.  39 U.S.C. § 101(e).

The Postal Service counters that it "has always given the highest consideration to the expeditious delivery of the mail in all of its decisions," Defs.' Mem. 35, but it admits that it did

not consult with the PRC on any of the changes, including any effect they might have on expeditious mail delivery.  Defs.' Counter-Stmt. of Facts ¶ 116; *see also* Pls.' Stmt. of Facts ¶¶ 117, 125.  With regard to the elimination of late and extra trips, the only support the Postal Service provides is Robert Cintron's statement that he considered the issue and concluded that his guidelines on late and extra trips would result in maintaining service standards and directly improving service.  Defs.' Counter-Stmt. of Facts ¶¶ 118-19.  The agency provides no written analysis of these changes, and no contemporaneous documentation of these considerations.  Even on *ultra vires* review of Postal Service action, such *post hoc* rationalizations—particularly when unsupported by any contemporaneous documentation—cannot support the agency's action.  *N. Air Cargo*, 674 F.3d at 860 (citing *SEC v. Chenery*, 318 U.S. 80 (1943), and noting that *Chenery* was decided long before enactment of the APA).

The Postal Service also argues that the record does not support Plaintiffs' claim that the Postal Policy Changes violated section 101(a)'s mandate for prompt service by causing dramatic delays in the delivery of mail across the United States.  Defs.' Mem. 36.  But the facts show how each Postal Policy Change contributed to nationwide mail delays—as the agency's own OIG has now agreed.  Pls.' Counter-Stmt. of Facts ¶¶ 74-75 (citing October 19 OIG Report 1, 3, 14-15).  First, the removal of the mail sorting machines slowed the processing of mail.  Pls.' Stmt. of Facts ¶¶ 126-27.  Second, the reduction in extra and late trips has caused mail to languish in postal facilities and prevented postal employees from addressing backlogs.  *Id.* ¶¶ 111, 128-29.  Third, the reduced morning sortation policy built in a delay whereby mail that arrived at a facility in the morning would not be delivered until the next day at the earliest.  *Id.* ¶¶ 76-83.  Plaintiffs also provided evidence of the ongoing delays that have resulted from the Postal Policy Changes.  *Id.* ¶¶ 65, 94-115, 130-31, 136; Pls.' Counter-Stmt. of Facts ¶¶ 74-75, 84-90.

The Postal Service admits that its targets for on-time delivery are usually around 95 percent and that on-time delivery dropped to a year-low of 81.47 percent on August 8, 2020. Defs.' Counter-Stmt. of Facts ¶¶ 94, 98.  Furthermore, it admits that Postmaster General DeJoy acknowledged that the agency's "transformative initiative has had unintended consequences that impacted our overall service levels."  Defs.' Counter-Stmt. of Facts ¶ 131.  Nonetheless, the Postal Service argues that a variety of issues such as the COVID-19 pandemic contributed to these delays, rather than the Postal Policy Changes.  *Id.* ¶ 107.  But Plaintiffs' evidence shows that changes in staffing levels due to COVID-19 cannot explain the decreases in on-time delivery.  Pls.' Stmt. of Facts ¶ 107.  Accordingly, there is no genuine dispute of material fact that the Postal Service acted *ultra vires* in violation of its statutory mandate under section 101 by failing to consider whether its policies would interfere with the expeditious delivery of mail and by enacting policies that prevented prompt mail delivery.

The same is true with respect to Defendants' violations of other subsections of section 101.  Section 101(a), for example, requires the provision of "prompt, reliable, and efficient services to patrons in all areas," and Section 101(b) notes Congress's specific intent to secure "effective postal services."  It may be so that these phrases are not the equivalent of the Constitution's requirement that a person be thirty-five years old to be President of the United States.  Yet statutory terms have ordinary meaning.  *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020).  And the ordinary meaning of these terms is not hard to discern: prompt means ready to act as occasion demands (or, in other words, quick),[15] reliable means

---

[15] *Prompt*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/prompt (adjectival definition including listed synonyms) (last visited Oct. 29, 2020).

dependable,[16] and efficient means producing desired results without wasting effort.  *See* Pls.'
Mem. at 29; *see also infra* Part III.B.  Whatever the bounds of Defendants' authority to
administer the Postal Service, actions that are intended to, and do, make the Postal Service
during an election *less* prompt, *less* reliable, and *less* efficient for no apparent purpose flout or
unreasonably apply the commands of sections 101(a) and 101(b).

### B.    The Postal Policy Changes violate section 403.

The Postal Policy Changes violate section 403(a)'s statutory mandate to provide efficient
postal services.  Efficient essentially means producing desired results without wasting effort.
Pls.' Mem. at 29.  Yet the removal of sorting machines increased inefficiency by forcing postal
employees to waste time sorting mail by hand.  Pls.' Stmt. of Facts ¶¶ 126-27.  The restrictions
on late and extra trips also increased inefficiency by forcing postal employees to leave for the
street before all the mail was ready for delivery and by preventing postal employees from taking
steps to decrease the mail backlog.  *Id.* ¶¶ 128-29.  These sorts of senseless actions, taken with
no apparent legitimate purpose except to *increase* time wasted and *decrease* results produced, are
the hallmark of inefficiency.

The Postal Service argues that this evidence does not show that the Postal Policy Changes
were inefficient because removing underutilized sorting machines and preventing late and extra
trips may increase efficiency.  Defs.' Mem. 36-37.  But this *post hoc* argument of counsel is
belied by the *increases* in mail processing time that followed these changes, showing that
efficiency *decreased*.  Pls.' Stmt. of Facts ¶¶ 108-10; Defs.' Counter-Stmt. of Facts ¶¶ 108-10
(admitting Plaintiffs' assertions of fact).  Defendants' argument is also contradicted by evidence

---

[16] *Reliable*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reliable
(last visited Oct. 29, 2020).

that at least one facility, which lost 20 percent of its machine sorting capacity, can no longer

handle the volume of mail that it is receiving.  Pls.' Stmt. of Facts ¶ 113.

The Postal Policy Changes also violate section 403(a)'s statutory mandate to provide

adequate postal services.  Again, "adequate" means that which is sufficient to produce a desired

outcome, and, here, what must be "adequate" are the "postal services" required to be provided

under the PRA.  39 U.S.C. § 403(a).  One essential postal service is the expeditious delivery of

election-related mail, yet the delays caused by the Postal Policy Changes threaten the timely

delivery and return of ballots and impair Plaintiffs' ability to administer the general election.

Pls.' Stmt. of Facts ¶¶ 150-78.  Moreover, the Postal Service's disavowal of its practice of

delivering election mail at First Class speeds regardless of the paid class of service further

undermines the adequacy of the election-related postal services.  *Id*.  Simply put, Defendants'

actions risk making the Postal Service *insufficient*, and thus *inadequate*, to meet an important

Postal Service objective on which the voters and the States have long depended.

The Postal Service responds that it is taking steps to ensure the timely delivery of ballots.

Defs.' Mem. 37.  Yet, evidence from the field refutes this claim.  For example, the agency

recently directed postal employees to cease the long-standing practice of providing a cautionary

notice to business customers regarding political and election mail.  Pls.' Counter-Stmt. of Facts

¶ 76.  In addition, postal clerks were directed by management not to prioritize election ballots

received by mail.  *Id*. ¶ 77.  Accordingly, there is no genuine dispute of material fact that the

Postal Service has acted *ultra vires* in violation of section 403 by enacting changes that cause

inefficient and inadequate postal services.

## IV.     The Postal Policy Changes violate the Elections Clause.

Defendants' response on Plaintiffs' Elections Clause claim fails on many fronts.  To start,

this claim is not moot.  It is undisputed that Plaintiffs here rely on the appropriate administration

of the mails to conduct their electoral processes for federal, state, and local elections—both this

year and in future elections.  The ongoing harm to these processes occasioned by Defendants'

unlawful conduct continues, with no evidence suggesting that the passage of Election Day will

moot that harm.  Indeed, mail-in ballots postmarked on or before Election Day will be accepted

for canvassing if received by November 10 in New Jersey and New York, and by November 20

in California.  *See* Cal. Elec. Code § 3020(d) (West 2020); N.J. Exec. Order No. 177, 52 N.J.R.

§ 1701(b) (2020); N.Y. Elec. Law § 8-412 (McKinney 2020).  Moreover, it is well established

that a defendant's voluntary cessation of challenged conduct does not moot a challenge to that

conduct—unless the defendant carries the "heavy burden" of "mak[ing] it absolutely clear that

the allegedly wrongful behavior could not reasonably be expected to recur."  *Trinity Lutheran*

*Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 n.1 (2017) (quoting *Friends of the*

*Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)).  But Defendants'

actions here "fit comfortably within the established exception to mootness for disputes capable

of repetition, yet evading review."  *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 462-63

(2007) (rejecting argument that occurrence of election mooted challenge when, among other

things, it would have been "entirely unreasonable . . . to expect that [the complaining party]

could have obtained complete judicial review of its claims in time").

On the merits, Defendants' response erects a straw man and then jousts with it rather than

engaging in the merits of Plaintiffs' arguments—and leaves a host of legal points undisputed.

There is no dispute that the Elections Clause, unless Congress says otherwise, confers power on

the States to administer congressional elections.  Nor is it disputed that the States have power to

administer presidential, state, and local elections.  *See* Pls.' Mem. 33-35.  Nor do Defendants

resist that a clear-statement rule applies whenever Congress upsets the state-federal balance, and

that Congress does in fact speak clearly when it wishes to legislate on the matters of congressional and presidential elections.  *Id.* at 35.  Defendants also do not appear to dispute that the Postal Service's enabling legislation cannot be construed—under a clear-statement rule or otherwise—to confer the power to take actions that are intended to, and do, hamper state election administration.  *Id.* at 36-37; *see also id.* at 42 n.17 ("USPS does not dispute that it cannot 'make or alter' a State election law without express Congressional authorization . . . .").

None of Defendants' attempts to defeat this claim is persuasive.  First, Defendants argue that because a gubernatorial veto "entirely negates" an election law proposed by a state legislature, it follows that the Postal Service's actions here (which they imply do less than negate state election law) do not violate the Elections Clause.  Defs.' Mem. 40 (citing *Smiley v. Holm*, 285 U.S. 355 (1932)).  But the reason a gubernatorial veto is acceptable under the Elections Clause is that the clause uses the word "legislature," and that word as used in the clause refers to "the method which the state has prescribed for legislative enactments."  *Smiley*, 285 U.S. at 367; *see also Arizona State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 813-14 (2015) ("legislature" means "[t]he power that makes laws" in a state).  So when a state constitution (like the federal constitution) includes a veto by the executive as a component of the legislative process, the exercise of that veto power is consistent with the Elections Clause and not in derogation of state power.  Defendants' reliance on *Smiley* is empty because, unlike a governor, the Postal Service is not part of any state's lawmaking process.

Second, Defendants raise the specter of "effectively allow[ing] States to wield the Elections Clause as a means to commandeer federal agencies."  Defs.' Mem. 40.  But Plaintiffs' claim is a narrow one: it targets Defendants' abrupt and egregious (and unprecedented) actions, occurring in the run-up to a presidential election that depends as never before on mail-in ballots,

and intentionally designed to interfere with election administration.  There is no indication *any* agency has ever done (or even *could ever do*) anything like what Defendants have done here. More generally, judicial review of the actions of a federal agency under a statute construed with certain core constitutional principles in mind is not unusual; there is no dearth of clear-statement requirements in Supreme Court precedent.  *See, e.g.*, *Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 35 (2012) (sovereign immunity).  There is nothing unusual about applying those principles in an *ultra vires* action challenging federal agency action.

Third, Defendants attack Plaintiffs' argument as contending that the Elections Clause "restricts federal activity which may have an incidental impact on" state election regulations. Defs. Mem. at 39.  But that is not Plaintiffs' argument.  As set forth above, and in Plaintiffs' prior papers, Plaintiffs' contention (which Defendants do not appear to dispute) is that Elections Clause principles impose a clear-statement rule that governs the question whether Congress has authorized the Postal Service to take actions that are intended to, and do, interfere with state election administration.  Defendants do not purport to find any such authorization in the Postal Service's enabling statute.

Defendants next contend that "USPS is not exercising any authority reserved for Congress under the Elections Clause, and so no delegation is necessary."  Defs.' Mem. 41; s*ee also id.* at 42 n.17 ("USPS is not making or altering state election laws").  The problem for Defendants is that the Elections Clause embraces the power to fully regulate congressional elections.  Pls.' Mem. 34 (quoting, inter alia, *Smiley*).  If a State opted to establish the use of state-financed couriers to transmit to and receive from voters their registration applications and mail-in ballots for congressional elections; to build depots for those materials to be sorted, sent, and received; and to set timelines for delivery, nobody would doubt that the State would be

doing so under its Elections Clause power. That being so, if a State operating such a system

opted to delay delivery of election materials, or to send fewer couriers or build fewer depots in

certain portions of the State, that too would be an exercise of Elections Clause power. And of

course, if Congress displaced that state system with its own set of election-material couriers, that

too would be an exercise of Congress's preemptive power under the Elections Clause.

Defendants offer no reason why their conduct, pursued under the Postal Service's enabling

statutes but adopted with the purpose and effect of interfering with an election, is any different;[17]

indeed, this Court and other courts already have held that Defendants' actions threatened

irreparable harm to the states' conduct of elections, and one has held that related conduct likely

violated the Elections Clause.[18]  Without Congress's "express authorization," which Defendants

concede they need (*see* Defs.' Mem. 42 n.17), such conduct violates the Elections Clause.

---

[17] Defendants point to a decision "of a federal health and safety agency to condemn a building (or otherwise ensure safe conditions) in a facility that has been selected as a polling place" (Defs.' Mem. 40-41) as a reason that a ruling for them on this claim is warranted.  The power of health-and-safety condemnations is, like election regulation, largely a state and local matter. Defendants do not point to any statutory authority for their condemnation example—but federal condemnation generally would be subject to judicial-review procedures and constitutional challenge under (at minimum) the Fifth Amendment wherein the "public use" asserted for the condemnation would be subject to scrutiny—first at the Department of Justice and then in court. *See* 31 U.S.C. §§ 3113, 3114; U.S. Const. amend. V.  If a federal agency sought to use that eminent-domain power to condemn a series of properties used for election administration, with the purpose and effect of interfering with the election, it is hard to see how that action would or should escape judicial scrutiny.

[18] *See New York*, 2020 WL 5763775, at *12 ("[M]ail delays are impeding Plaintiffs' ability to combat the spread of a highly contagious and deadly disease and are impeding their ability to provide safe alternatives to in-person voting."); *Vote Forward*, 2020 WL 5763869, at *10-12 (similar as to individual voters); *Washington*, 2020 WL 5568557, at *5 (finding irreparable harm to election administration); *Pennsylvania*, 2020 WL 5763553, at *40 ("This resonates with particular concern as to Election Mail, because the defendants have testified that Election Mail was delayed during primaries in July and August could be impacted in the future by the operational changes."); *see also Colorado v. DeJoy*, No. 20-cv-2768 (WJM), 2020 WL 5500028, at *1 (D. Colo. Sept. 12, 2020).

Lastly, Defendants argue there is no evidence from which to conclude they acted with the improper intent to interfere with state election administration.  Defs.' Mem. 42-43.  Not so. There is ample, undisputed evidence on this record from which to conclude Defendants had just such an improper intent: the timing of the Postal Policy Changes; unexplained departures from longstanding policies; procedural irregularity (indeed, total disregard of procedural guardrails); and the statements of the President himself.  Pls.' Mem. 39-40.  All of this is undisputed, powerful evidence of improper motive under precedents cited by Plaintiffs.  *Id.*  Indeed, just today, the District of Maryland concluded that similar facts were compelling evidence that *these Defendants* engaged in viewpoint discrimination by implementing the Postal Policy Changes to target a particular political party during *this election*.  *Nat'l Urban League v. DeJoy*, No. 20-cv-2391 (GLR), ECF No. 76, slip op. at 16 (D. Md. Oct. 29, 2020).[19]  It follows from that holding— essentially, that Defendants acted with the purpose to manipulate the postal system to advantage one political party—that they also acted with the equally improper intent to interfere with state election administration itself.

## V.    Scope of relief.

Defendants do not dispute that Plaintiffs satisfy the well-established test for issuing permanent injunctive and declaratory relief.  *See*, *e.g.*, *eBay Inc. v. MercExchange, LLC*, 547

---

[19] That court explained that "(1) DeJoy's prolific support of the Republican party; (2) President Trump's tweets concerning the detrimental impact of large quantities of mail-in voting on the Republican party, along with the objective data supporting that conclusion; and (3) the temporal proximity between DeJoy becoming Postmaster General and implementing policies that would tend to interfere with mail-in voting," were "compelling circumstantial evidence that the DeJoy Policy Changes were intended to suppress mail-in voting based on hostility toward the Democratic party."  *Nat'l Urban League v. DeJoy*, No. 20-cv-2391 (GLR), ECF No. 76, slip op. at 16 (D. Md. Oct. 29, 2020).

U.S. 3848, 391 (2006) (setting forth factors); *see also* Pls.' Mem. 42-45.  Instead, Defendants

contend that the relief Plaintiffs request is "too vague" to be "capable of enforcement."  Defs.'

Mem. 44.[20]  But Plaintiffs' proposed permanent relief declares the Postal Policy Changes

unlawful and enjoins Defendants from enforcing them.  Such an injunction is not incapable of

enforcement.  To the contrary, on October 27, the Court did just that.  In several related cases,

the Court granted the plaintiffs' motions to enforce similar preliminary injunctions, ordering

Defendants to take additional steps to ensure that the Postal Policy Changes are effectively

rescinded, and requiring Defendants to produce additional daily data to allow the Court to

monitor compliance going forward.[21]  *See, e.g.*, *NAACP* Minute Order.

In any event, the relief that Plaintiffs seek—that Defendants cease enforcing the unlawful

policies that have delayed the mail and caused irreparable harm—is sufficiently specific.  *See*

Proposed Order (ECF No. 71-1).  In addition, recent evidence reflects that Defendants failed in

---

[20] Although Defendants also contend that the Court lacks jurisdiction to order relief against
Defendant Trump, *see* Defs.' Mem. 45, "[i]t is settled law that the separation-of-powers doctrine
does not bar every exercise of jurisdiction over the President of the United States."  *Clinton v.
Jones*, 520 U.S. 681, 705 (1997) (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 753-54 (1982)); *see
also, e.g., United States v. Nixon*, 418 U.S. 683, 706 (1974) (affirming subpoena requiring
President Nixon to turn over tapes of his conversations with White House aides); *Youngstown
Sheet & Tube Co. v. Sawyer*, 535 U.S. 579, 582, 584, 587-88 (1952) (enjoining President
Truman's order directing the seizure of privately owned steel mills); *United States v. Burr*, 25 F.
Cas. 187, 191, 196 (No. 14,694) (CC Va. 1807) (affirming issuance of subpoena requiring
President Jefferson to turn over confidential correspondence).  In any event, Plaintiffs seek relief
that directly binds the actions of the Postal Service, not the President.  *See* Proposed Order (ECF
No. 71-1).

[21] The sole case Defendants cite for the proposition that injunctive relief is unavailable as against
the agency defendants that relied upon by Defendants is not to the contrary, *Indian Educators
Fed'n Local 4524 v. Kempthorne*, 590 F. Supp. 2d 15 (D.D.C. 2008), is inapt.  The district court
in that case issued declaratory relief and held that a preliminary injunction was premature
because it was unclear how the employment program adopted by the defendants would apply to
particular jobs.  *Id.* at 20.  Here, by contrast, injunctive relief in this case is *not* premature, but
rather necessary to address the serious harms caused by the Postal Policy Changes.

meaningful ways to comply with the Court's preliminary injunction.  Defendants failed to timely and effectively rescind the Postal Policy Changes, *see supra* Part I.A.2, and mail service continues to lag far below pre-Postal Policy Change levels, *see* Pls.' Counter-Stmt. of Facts ¶¶ 84-90.

Accordingly, given Defendants' ongoing failure to comply with the Court's preliminary injunction, Plaintiffs respectfully request that the Court appoint an independent monitor to oversee Defendants' compliance with the Court's order.[22]  "[T]he power of federal courts to appoint special masters to monitor compliance with their remedial orders is well established." *United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir. 1994) (collecting cases); *see* Fed. R. Civ. P. 53(a)(1)(B).  Here, given Defendants' failure to comply with the Court's preliminary injunction, and the ongoing need to review Defendants' data and assess compliance, "exceptional condition[s]" warrant the appointment of a special master.[23]  Fed. R. Civ. P. 53(a)(1)(B); *see also*, *e.g.*, *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 482 (1986) (appointment of administrator was appropriate under Rule 53 given prior failures to comply with court orders and "difficulties inherent in monitoring compliance" with those orders).

---

[22] Plaintiffs did not request an independent monitor in their initial memorandum on summary judgment.  This request is not waived, however, for two reasons.  First, Plaintiffs' request for a monitor is based in part on data that was unavailable when Plaintiffs filed their opening memorandum.  *See, e.g.*, Pls.' Counter-Stmt. of Facts ¶¶ 84-90.  Second, because Defendants cross-moved for summary judgment and will have an opportunity to address this request in their reply, Defendants will suffer no prejudice from Plaintiffs' request.  *Zuza v. Office of High Representative*, 107 F. Supp. 3d 90, 95 n. 5 (D.D.C. 2015) (finding no prejudice or waiver where litigant had an opportunity to address new arguments raised in opposing party's reply brief).

[23] Although the Court previously rejected a request to appoint a monitor in a related case, *see Richardson v. Trump*, No. 20-cv-2262 (EGS), 2020 WL 5969270, at *16 (D.D.C. Oct. 8, 2020), recent evidence of Defendants' ongoing failure to comply now amply justifies such an appointment.

Nor does the imminence of the election lessen the need for a monitor.  As noted *supra* Parts I.B and IV, based on the ballot receipt deadlines under state law, any delays in election mail will injure Plaintiffs through mid- and late November.  And mail delays more broadly injure all Plaintiffs beyond their specific injuries related to the election, including by impairing the critical and legally-mandated work of state and local agencies.  *See* Pls.' Stmt. of Facts ¶¶ 4-12, 143-49; Pls.' Mem. 7, 9-12; *see also supra* Part I.A.1.  An independent monitor could review ongoing data from the Postal Service, receive and investigate anonymous complaints alleging non-compliance, issue findings and non-binding guidance, and give local Postal Service managers an opportunity to rectify non-compliance with the Court's order.  If warranted, a monitor could report material non-compliance to the Court.  In light of Defendants' ongoing failure to restore mail service to prior levels of service, such relief would assist the Court in ensuring that Defendants comply with the Court's order in an area of grave public concern.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for summary judgment, deny Defendants' cross-motion for summary judgment, and enter the requested injunctive and declaratory relief.


DATED:  October 29, 2020                          Respectfully submitted,

                                                  LETITIA JAMES
                                                  *Attorney General of the State of New York*

                                                  By: */s/ Matthew Colangelo*
                                                  Matthew Colangelo
                                                    *Chief Counsel for Federal Initiatives*
                                                  Morenike Fajana, *Special Counsel*
                                                  Elena Goldstein, *Deputy Chief, Civil Rights Bureau*
                                                  Eric R. Haren, *Special Counsel*
                                                  Lindsay McKenzie, *Assistant Attorney General*
                                                  Laura Mirman-Heslin, *Assistant Attorney General*

Daniela L. Nogueira, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6057
Matthew.Colangelo@ag.ny.gov

Joshua Tallent, *Assistant Attorney General*
Office of the New York State Attorney General
The Capitol
Albany, NY 12224

*Attorneys for the State of New York*

CLARE E. CONNORS
*Attorney General of the State of Hawaii*

GURBIR S. GREWAL
*Attorney General of New Jersey*

By: */s/ Lori N. Tanigawa*
Lori N. Tanigawa
  *Deputy Attorney General*
Department of the Attorney General
State of Hawaii
425 Queen Street
Honolulu, HI 96813
Phone: (808) 586-0618
lori.n.tanigawa@hawaii.gov

MAYUR P. SAXENA
Assistant Attorney General

By: */s/ Tim Sheehan*
Tim Sheehan, *Deputy Attorney General*
Estelle Bronstein, *Deputy Attorney General*
Melissa Medoway, *Deputy Attorney General*
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625
Phone: (609) 815-2604
Tim.Sheehan@law.njoag.gov

*Attorneys for the State of Hawaii*

*Attorneys for Plaintiff State of New Jersey*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

By: */s/ Aaron Bloom*
Aaron Bloom
Joseph Pepe
Tonya Jenerette
100 Church Street
New York, NY 10007
Phone: (212) 356-2274
abloom@law.nyc.gov

*Attorneys for the City of New York*

DENNIS J. HERRERA
*City Attorney for the City and County of San Francisco*

By: */s/ Dennis J. Herrera*
Dennis J. Herrera, *City Attorney*
Kevin Yeh, *Deputy City Attorney*
San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Phone: (415) 554-3856
Kevin.Yeh@sfcityatty.org

*Attorneys for the City and County of San Francisco*