## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF NEW YORK, et al., | |
| Plaintiffs, | Case No. 20 Civ. 2340 (EGS) |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

## PLAINTIFFS' COUNTER-STATEMENT OF DISPUTED FACTS

Pursuant to Local Rule 7(h)(1) and Rule 13 of the Standing Order Governing Civil Cases before Judge Emmet G. Sullivan, *see* ECF No. 9, Plaintiffs respectfully submit the following counter-statement of disputed facts.

| | |
|---|---|
| 1.   USPS employs more than 630,000 employees; operates more than 31,000 Post Offices; utilizes more than 204,000 delivery vehicles and 8,500 pieces of automated processing equipment; and typically processes and delivers more than 450 million mailpieces to nearly 160 million delivery points in a single day. *See* Ex. 1 (USPS FY2019 Annual Report to Congress) at 2, 7. | Admit. |
| **Mail processing and Sorting Equipment** | |
| 2.   USPS regularly identifies mail processing and sorting equipment in approximately 289 mail processing facilities for removal and/or replacement. *See* Ex. 2 Declaration of Jason DeChambeau ("DeChambeau Dec.") ¶ 7; Ex. 3 Declaration of Kevin Couch ("Couch Dec.") ¶ 3; Ex. 4 Declaration of Robert Cintron ("Cintron Dec.") ¶ 5. | Admit. |

| | |
|---|---|
| 3.    Based on its data analyses, USPS has been steadily reducing its letter and flat mail processing equipment for many years. Ex. 2 DeChambeau Dec. ¶ 7. | Deny to the extent that the cited exhibit does not support the characterization of reduction occurring "steadily" or over "many years," as data prior to 2015 is not provided.  *See* Defs.' Ex. 2.[1]  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 4.    USPS may reduce its letter and flat mail processing equipment for many reasons, including removing and replacing older machines with improved technology, or when such machines are no longer necessary given the significantly reduced volume of mail over the past decade, as well as even larger reduced mail volumes of approximately 20 percent due to COVID-19, that the Postal Service does not expect to return after the pandemic. Ex. 2 DeChambeau Dec. ¶¶ 7-8. | Admit. |
| 5.    Maintaining underutilized machines is inefficient and costly, requiring extra and unnecessary staffing and transportation resources. Ex. 2 DeChambeau Dec. ¶¶ 9, 11, 12. | Deny to the extent the cited exhibit does not provide a basis to admit the asserted fact.  *See* Defs.' Ex. 2.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 6.    Removing unnecessary letter and flat machines frees up space for package processing, the volume of which is increasing substantially. Ex. 2 DeChambeau Dec. ¶ 18. | Deny to the extent the cited exhibit does not provide a basis to admit the asserted fact.  *See* Defs.' Ex. 2.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 7.    For years, the Postal Service has reduced the number of machines on an annual basis. Ex. 2 DeChambeau Dec. ¶ 13. | Admit. |

[1] In the interest of clarity, Plaintiffs' responses in the right column to Defendants' statements of fact will cite Defendants' exhibits as "Defs.' Ex. __."  Plaintiffs will cite their own exhibits as "ECF No. __-__," referencing the location where those exhibits were filed on the docket of this action.

| | |
|---|---|
| 8.  Reducing the number of processing machines a model-driven process, where the Postal Service "determine[s] the optimum number of machines required for efficient mail processing at facilities across the nation." Ex. 2 DeChambeau Dec. ¶¶ 15, 16. | Deny to the extent the cited exhibit does not provide a basis to admit the asserted fact.  *See* Defs.' Ex. 2.  Deny and object to the extent that the cited exhibit relies upon analyses that Defendants should have but did not produce in discovery. *See* ECF No. 38-9 (Pls.' First Request for Production of Documents to Defs.) at Request 5 (requesting production of all documents, data, and analyses "relating to service performance of mail transportation, processing, or delivery, or any other metric of service performance").<br><br>However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 9.  USPS began Phase 6 of its reduction initiative in May 2020, based on its conclusion that the significant decline in letter and flat mail volume that had been accelerated by the COVID-19 pandemic was unlikely to significantly change, and the increase in package volume would continue. Ex. 2 DeChambeau Dec. ¶ 19. | Deny to the extent the cited exhibit does not provide a basis to admit the asserted fact.  *See* Defs.' Ex. 2.  Deny and object to the extent that the cited exhibit relies upon analyses that Defendants should have but did not produce in discovery. *See* ECF No. 38-9 (Pls.' First Request for Production of Documents to Defs.) at Request No. 5 (requesting production of all documents, data, and analyses "relating to service performance of mail transportation, processing, or delivery, or any other metric of service performance").<br><br>However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 10.  USPS reduced a total of 711 machines in Fiscal Year 2020, more than the average of 388 machines per year over the last five years, *id.* ¶ 13, but less than the highest year, Fiscal Year 2016, where 1,120 machines were removed. Ex. 2 DeChambeau Dec. ¶ 21. | Admit. |

3

| | |
|---|---|
| 11.  Machine processing utilization at the national level ranges from 35 percent (when mail volume on a given day is low) to 65 percent (when mail volume on a given day is at its highest). Ex. 5 Barber Dec. ¶ 6. | Admit. |
| 12.  Local facilities may provide input into the machine removal process. *See* Ex. 2 DeChambeau Dec. ¶ 14 | Admit. |
| 13.  On August 18, 2020, Postmaster General DeJoy ordered that all removals of equipment be suspended until after the Election. *See* Ex. 6 (Statement of Postmaster General Louis DeJoy (Aug. 18, 2020)) at 1; Ex. 2 DeChambeau Dec. ¶ 22; Ex. 3 Couch Dec. ¶¶ 13-15. | Deny to the extent the first cited exhibit is to be considered the Postmaster General's "order" to employees, rather than a public announcement.  *See* Defs.' Ex. 6.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| **Overtime and Unearned Time** | |
| 14.  USPS's overtime practices, where overtime is generally approved by local field managers (not Headquarters personnel), have remained unchanged since Postmaster General DeJoy took office. *See* Ex. 7 Declaration of Angela Curtis ("Curtis Dec.") ¶¶ 12, 22-23; Ex. 8 Declaration of Joshua Colin, Ph.D. ("Colin Dec.") ¶¶ 3-4. | Deny.  The U.S. Postal Service's own records show that it deployed a series of "Do It Now FY Strategies" beginning in June 2020 to reduce various types of overtime.  *See* Defs.' Ex. 23; ECF No. 59-39 (Pls.' Ex. 39); ECF No. 59-40 (Pls.' Ex. 40). |
| 15.  Postmaster General DeJoy clarified that he never banned overtime, and continues to approve of its appropriate use. *See*, *e.g.*, Ex. 9 (Transcript of House Oversight and Reform Committee on Postal Service Operational Changes Hearing (Aug. 24, 2020)) 14. | Deny to the extent that "appropriate use" is not defined.  The U.S. Postal Service adopted several strategies to reduce overtime, many of which are still ongoing.  *See* Defs.' Ex. 23.<br><br>Otherwise, admit. |
| 16.  The Postal Service has also continued a long-running process to reduce "unearned time," which is the "time that an employee takes to complete those duties over and above the earned time." Ex. 10 Curtis Tr. 53:21-23. | Deny to the extent that cited exhibit does not support the assertion that the U.S. Postal Service has "continued a long-running process."  *See* Defs.' Ex. 10.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |

| | |
|---|---|
| 17.  Earned time refers to the fact that, pursuant to collective bargaining agreements, the Postal Service assigns specific tasks particular times to complete – "earned" time is the time in which those employees are expected to complete the task. Ex. 10 Curtis Tr. 52:11-24. | Admit. |
| 18.  USPS had nearly one million unearned supervisor hours through 2020. Ex. 10 Curtis Tr.  68:8-11. | Admit. |
| 19.  In the summer of 2020, USPS began a process to "t[ake] a look at the data again round" the topic of reducing unearned time, and have more conversations about more efficiently scheduling employees to reduce unnecessary unearned hours. Ex. 10 Curtis Tr: 76-77. | Admit. |
| **Late and Extra Trips** | |
| 20.  For years, the Postal Service has sought to improve compliance with USPS's long-established delivery schedules. *See* Ex. 4 Cintron Dec. ¶¶ 1, 11-13, 21; Ex. 11 Cintron Dep. Tr. at 22:9-23 ("So has the Postal Service ever issued any guidance about the need to adhere to transportation schedules? . . . I would say over the last two years it's kind of been a focal point of mine in my previous job and now in this position. . . . It's been my area of focus both for lates and extras in the network over the last couple of years."). | Admit to the extent that this statement of fact is intended to characterize the U.S. Postal Service's activities over the last two years. |
| 21.  When Postmaster General DeJoy took office in June 2020, Mr. Cintron discussed the initiative with the Postmaster General and other Postal executives. Ex. 4 Cintron Dec. ¶¶ 22-23. | Admit. |

| | |
|---|---|
| 22.  Concurrent with these discussions, the USPS Office of Inspector General (OIG) published a report addressing "late deliveries . . . late dispatch, extra trips, and all the time and costs" that those issues caused. *See* Ex. 13 (Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections) at 10. | Deny that the cited exhibit shows that the report referenced was published "[c]oncurrent with these discussions." Rather, Postmaster General DeJoy testified that he received a report the day he was sworn in.  *See* Defs.' Ex. 13. However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 23.  In a June 16, 2020 report, OIG found that "generally, the Postal Service's processing network is not operating at optimal efficiency." Ex. 14 (USPS OIG Audit Report No. 19XG013NO00O-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 1. | Admit. |
| 24.  The June 16, 2020 OIG report stated that "mail processing operations were not completed on time and mail missed its last scheduled transportation trip. In response, management used overtime . . . and either delayed the scheduled transportation trip or called for an extra trip." Ex. 14 (USPS OIG Audit Report No. 19XG013NO00O-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020))at 2. | Admit. |
| 25.  The June 16, 2020 OIG report stated that "[a]bout 20 percent of total transportation trips (or four million trips) left mail processing facilities late." Ex. 14 (USPS OIG Audit Report No. 19XG013NO00O-R20, "U.S. Postal Service's Processing Network Optimization and Service Impacts" (June 16, 2020)) at 2. | Admit. |
| 26.  Soon after joining USPS, Postmaster General DeJoy reemphasized the need to adhere to USPS's existing operational plans, including transportation schedules. Ex. 4 Cintron Dec. ¶ 23. | Deny to the extent that the cited exhibit states "emphasized," not "reemphasized." *See* Defs.' Ex. 4.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |

| | |
|---|---|
| 27.  A locally-prepared memorandum titled "Mandatory Stand-Up Talk: All Employees" was produced on July 10, 2020, and suggested, incorrectly, that late and extra trips were not permitted. *See* Ex. 4 Cintron Dec. ¶ 24 n.1. | Deny to the extent that the cited exhibit "suggested" rather than directed U.S. Postal Service employees to act accordingly.  *See* Defs.' Ex. 4. Also deny that the "Mandatory Stand-Up Talk: All Employees" did not accurately reflect Defendants' position on late and extra trips at the time.<br><br>However, this dispute does not create a genuine issue of fact because Defendants cannot defeat summary judgment by mischaracterizing the factual record. *See Fay v. Perles*, 59 F. Supp. 3d 128, 132 (D.D.C. 2014).<br><br>Otherwise, admit. |
| 28.  Although the July 10 memorandum drew from a teleconference discussion conducted between regional and Headquarters officials, it was not created, reviewed, or approved by USPS Headquarters, and did not reflect USPS policy. *See* 15 Supplemental Declaration of Robert Cintron ("Supp. Cintron Dec.") ¶¶ 3-4. | Deny.  The cited exhibit cannot both "draw" from a policy discussion with U.S. Postal Service leadership and at the same time not "reflect" U.S. Postal Service policy.  *See* Defs.' Ex. 15 ("During that teleconference, members of Headquarters made statements reflected, in part, in the July 10, 2020 SUT.").<br><br>However, this dispute does not create a genuine issue of fact because Defendants cannot defeat summary judgment by mischaracterizing the factual record.  *See Fay v. Perles*, 59 F. Supp. 3d 128, 132 (D.D.C. 2014). |
| 29.  "Starting on July 11, 2020, in light of some confusion in the field about the scope of USPS policy, members of Headquarters begin to issue clarifications of USPS policy, including with [Area Vice Presidents] making clear that certain statements in the July 10, 2020 [memorandum] were not accurate statements of USPS policy." *See* Ex. 15 Supplemental Declaration of Robert Cintron ("Supp. Cintron Dec.") ¶¶ 3-4. | Deny to the extent the cited exhibit does not provide a basis to admit the asserted fact.  *See* Defs.' Ex. 15.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |

7

| | |
|---|---|
| 30.  USPS clarified the circumstances where extra trips were permissible. *See* Ex. 15 Supplemental Declaration of Robert Cintron ("Supp. Cintron Dec.") ¶ 4. | Deny to the extent "clarified" is not defined and the cited exhibit does not support the proposition that the U.S. Postal Service achieved clarity.  *See* Defs.' Ex. 15.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 31.  USPS clarified that late and extra trips were not (and are not) banned, and USPS employees continue to use both today. *See, e,g*., *Pennsylvania v. DeJoy*, 20-cv-04096, ECF No. 76-2 (E.D. Pa. Oct. 16, 2020) (on October 13, 2020 alone, 2298 late trips and 935 extra trips were utilized by USPS employees). | Deny to the extent that the cited exhibit (a spreadsheet of late and extra trips) does not support the assertion that the U.S. Postal Service "clarified" that late and extra trips were not banned.  *See* Defs.' Ex. 23, at 2; *Pennsylvania v. DeJoy*, 20-cv-04096, ECF No. 76-2 (E.D. Pa. Oct. 16, 2020).  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit that U.S. Postal Service continues to use late and extra trips at a "reduced" level.  *See* ECF No. 59-59 (Pls.' Ex. 59). |
| 32.  In July 2020, Mr. Cintron and his team developed written guidelines (generally consistent with past practices) regarding the circumstances where the scheduling of extra transportation trips is appropriate. *See* Ex. 4 Cintron Dec. ¶ 24 & Ex. 2. | Deny.  Neither cited exhibit supports the assertion that the written guidelines were "generally consistent with past practices." *See* Defs.' Ex. 2; Defs.' Ex. 4; *see also* Defs.' Ex. 17 ("To the best of my knowledge, prior to July 14, 2020, Postal Service Headquarters had no written policy or guidelines concerning the use of late and extra trips.").<br><br>However, this dispute is not material to Plaintiffs' entitlement to summary judgment. |

| | |
|---|---|
| 33.  On July 14, 2020, the Cintron guidelines were distributed to area executives, advising them of USPS's renewed effort to limit unplanned extra and under-utilized trips. Ex. 4 Cintron Dec. ¶ 25. | Deny to the extent that the email message referenced in the cited exhibit does not refer to a "renewed effort," but states: "Our focus is to eliminate unplanned extra transportation and fully utilize our assets."  *See* ECF No. 59-45 (Pls.' Ex. 45).  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 34.  The Cintron guidelines did not ban or set a firm limit on late and extra trips. *See* Ex. 11 Cintron Dep. 63:25-65:9 ("We didn't ban extras and lates. These guidelines were purposefully put in place to make sure that we didn't have any disruption in service. Extras and lates are going to run every single day in this network. There is no way that we are going to be able to eliminate them. It's too large a network. So there is going to be a failure somewhere, and so extras and lates are put in place to mitigate."); Ex. 16 Second Declaration of Joshua Colin ("Second Colin Dec.") ¶ 17 & Exs. 1, 2 (clarifying that the Cintron guidelines did not ban late/extra trips, and that USPS employees should follow updated, October 16, 2020 guidance). | Deny to the extent that the Cintron guidelines did not "set a firm limit on late and extra trips."  The Cintron guidelines explicitly list when late or extra trips are "Acceptable" and "Not Acceptable."  *See* ECF No. 59-46 (Pls.' Ex. 46).  The Cintron guidelines also use mandatory language.  *See, e.g.*, *id.* ("Must be fully utilized"; "Must be utilized, deviation first").  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 35.  The purpose of the Cintron guidelines was not to minimize late or extra trips, but was to avoid "occurrences where it doesn't make any sense" to have extra or late trips, because such a trip would not actually advance the mail any faster than simply following the schedule. Ex. 11 Cintron Dep. 65:2-10. | Deny.  *See* ECF No. 59-45 (Pls.' Ex. 45) ("Our focus is to eliminate unplanned extra transportation and fully utilize our assets."); *id.* ("Trips must depart on time.").<br><br>However, the purpose of the guidelines is not material to Plaintiffs' entitlement to summary judgment. |

| | |
|---|---|
| 36.  Late and extra trips may often contribute to mail delays, and thus the guidelines aimed to increase overall service performance scores. *See* Ex. 17 Third Declaration of Robert Cintron ("Third Cintron Dec.") ¶¶ 3-4. | Deny. The cited exhibit does not discuss whether late or extra trips "may often contribute to mail delays." *See* Defs.' Ex. 17.<br><br>Furthermore, evidence in the record shows that late and extra trips are used to *increase* service performance.  *See* ECF No. 59-4 (Pls.' Ex. 4) ("For postal workers, these are not "extra" trips or "late" trips—they are needed adjustments to adequately administer a system responsible for delivering over 470 million pieces of mail per day. They are features of the postal system, not bugs.").<br><br>However, the "aim" of the guidelines is not material to Plaintiffs' entitlement to summary judgment. |
| 37.  The decline in service scores in mid-July 2020 was likely caused by the initial failure of other mail processing network components to adjust to the decline in unnecessary late and extra trips. *See* Ex. 17 Third Cintron Dec. ¶ 26. | Deny. The cited exhibit does not contain a ¶ 26.  Nor does the cited exhibit discuss "other mail processing network components" or attribute the mid-July 2020 service decline to their "failure . . . to adjust." *See* Defs.' Ex. 17.<br><br>Furthermore, evidence in the record shows that Cintron Guidelines' new limitations on late and extra trips contributed to the mid-July 2020 decline in service performance.  *See* ECF No. 59-23 (Pls.' Ex. 23) ("I find that the policy limiting the number of Extra and Late trips resulted in first-class mail delays across all postal service Areas."). |
| 38.  Soon after the decline in service scores in mid-July 2020, USPS "began efforts to correct the decline through focusing on meeting mail processing and delivery schedules, conducting a root cause analysis of why some mail was not timely being loaded on trucks, and identifying corrective measures to improve these issues." Ex. 17 Third Cintron Dec. ¶ 27. | Deny. The cited exhibit contains neither a ¶ 27 nor the quoted language.  *See* Defs.' Ex. 17.<br><br>However, this dispute is not material to Plaintiffs' entitlement to summary judgment. |

| | |
|---|---|
| 39.  After the *Washington* court issued the nationwide injunction, USPS issued instructions further clarifying that the "Postmaster General has not banned the use of late or extra trips; when operationally required, late or extra trips are permitted." Ex. 12, Clarifying Operational Instructions ("Instructions") (Sept. 21, 2020) ¶ 5. | Deny that the cited exhibit achieved clarity.  *See* Defs.' Ex. 12.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 40.  The Instructions provide that mail should not "be left behind," and "transportation, in the form of late or extra trips that are reasonably necessary to compete timely mail delivery, is not to be unreasonably restricted or prohibited. Ex. 12, Clarifying Operational Instructions (Sept. 21, 2020) ¶ 5. | Admit. |
| 41.  Pursuant to the Instructions, managers are authorized to use their best business judgment to meet [USPS] service commitments." Ex. 12, Clarifying Operational Instructions (Sept. 21, 2020) ¶ 5. | Admit. |
| **Expedited to Street Pilot Program** | |
| 42.  The ESAS pilot program was planned before Postmaster General DeJoy took office, and it has since been suspended. *See* Ex. 8 Colin Dec. ¶ 11. | Deny to the extent the cited exhibit does not provide a basis to admit the asserted fact.  *See* Defs.' Ex. 8.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 43.  The ESAS pilot program was scheduled for 30 days at 384 delivery units (out of approximately 18, 755 delivery units), *see* Ex. 8 Colin Dec. ¶ 7, and there is no evidence that it had any impact on service performance scores, *see id.* ¶ 11 | Deny to the extent that the cited exhibit does not support the assertion that "there is no evidence that it had any impact on service performance."  *See* Defs.' Ex. 8. The cited paragraph in full reads: "Postmaster General DeJoy ordered the test stopped on approximately August 21, 2020, and it will not resume, if at all, until after the November election. To my knowledge, the Postmaster General has not had any involvement in the ESAS Pilot Program test other than directing that it be stopped."  *Id.*<br><br>Otherwise, admit that the ESAS pilot program was scheduled for 30 days at 384 delivery units. |

| USPS's Handling of Election Mail | |
|---|---|
| 44.  "Election Mail" is defined by USPS as any item mailed to or from authorized election officials that enables citizens to participate in the voting process. *See* Ex. 18 Declaration of Robert Glass ("Glass Dec.") ¶ 3. | Admit. |
| 45.  Election Mail includes mail sent by election officials to voters (*e.g.*, voter registration materials, mail-in ballot applications, polling place notifications, blank ballots), and mail returned by voters to election officials (*e.g.*, completed ballots, completed registration or ballot applications). Ex. 18 Glass Dec. ¶ 3. | Admit. |
| 46.  State and local election officials must choose whether to send Election Mail to voters via either First-Class Mail, which is typically delivered in two to five days, or lower-cost Marketing Mail, which is typically delivered in three to ten days. Ex. 18 Glass Dec. ¶ 4. | Admit to the extent this assertion refers to the typical delivery speeds of First-Class Mail and Marketing Mail, not Election Mail advanced ahead of all other Marketing Mail.  *See* Defs.' Ex. 18. |
| 47.  Regardless of what class of mail election officials use to mail ballots out *to* voters, all ballots returned by mail to election officials *from* voters are First-Class Mail, unless a voter sends it using a premium service with faster delivery standards (*i.e.* Priority Mail or Priority Express Mail). Ex. 19 (USPS Office of Inspector General (OIG) Audit Report No. 20-225-R-20, "Processing Readiness of Election and Political Mail During the 2020 General Elections" (Aug. 31, 2020)) at 1. | Admit. |

| | |
|---|---|
| 48.  USPS has not altered, nor will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election. *See*, *e.g.*, Ex. 13 (Testimony of Postmaster General Louis DeJoy Before the Senate Homeland Security and Governmental Affairs Committee on USPS Operations During COVID-19 and the Elections) at 18. | Deny. The cited exhibit does not support the assertion that the U.S. Postal Service "has not altered, nor will it alter, any of its existing postal services, delivery standards, or rates applicable to the delivery of Election Mail in advance of the Election." *See* Defs.' Ex. 13.<br><br>*See* ECF No. 59-4 (Pls.' Ex. 4); ECF No. 59-22 (Pls.' Ex. 22); ECF No. 59-29, at 107 (Pls.' Ex. 29); ECF No. 59-35, at slide 8 (Pls.' Ex. 35) ("Election Mail sent as Marketing Mail is not upgraded to First Class service."); ECF No. 59-49 (Pls.' Ex. 49); ECF No. 59-56, at 12 (Pls.' Ex. 56). |
| 49.  When a mail bin identifiable as Election Mail enters the system, USPS personnel log that container at every step of processing, so that it can be easily located if necessary. Ex. 18 Glass Dec. ¶ 19. | Deny to the extent that no time period is specified.  *See* Defs.' Ex. 18.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 50.  USPS facilities deploy end-of-day "all clears," during which in-plant personnel use a checklist to search for all Election Mail within the facility and confirm that it is in the proper location (either already sent out for delivery or further processing, or at the front of the line for the next day). Ex. 18 Glass Dec. ¶ 19. | Deny to the extent that no time period is specified.  *See* Defs.' Ex. 18.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |

| | |
|---|---|
| 51.  USPS has never classified all Election Mail as "First-Class Mail." Ex. 18 Glass Dec. ¶ 18. | Deny to the extent that "classified" is vague.  *See* Defs.' Ex. 18 ("Although there is no formal policy to this effect, it is a longstanding practice to advance Election Mail entered as Marketing Mail ahead of all other Marketing Mail. As a result of this practice, the delivery timeframes for Election Mail entered as Marketing Mail often are comparable to those of Election Mail entered as First-Class Mail."); ECF No. 59-4 (Pls.' Ex. 4) ("Since I began as a letter carrier in 1984, it has been standard practice to treat election mail as First Class mail with delivery times of one to three days—or better—regardless of whether it was marked as Marketing Mail.").  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.<br><br>Otherwise, admit. |
| 52.  Although Election Mail sent by individual voters has traditionally been (and currently is) First-Class Mail, the Postal Service generally handles Election Mail sent by election officials as Marketing Mail according to established standards for that class of mail. *See* Ex. 18 Glass Dec. ¶¶ 17-18. | Deny.  *See* Defs.' Ex. 18 ("Although there is no formal policy to this effect, it is a longstanding practice to advance Election Mail entered as Marketing Mail ahead of all other Marketing Mail. As a result of this practice, the delivery timeframes for Election Mail entered as Marketing Mail often are comparable to those of Election Mail entered as First-Class Mail."); ECF No. 59-4 (Pls.' Ex. 4) ("Since I began as a letter carrier in 1984, it has been standard practice to treat election mail as First Class mail with delivery times of one to three days—or better—regardless of whether it was marked as Marketing Mail."). |
| 53.  USPS has several longstanding practices to expeditiously process and deliver of Election Mail entered as Marketing Mail, particularly ballots sent by election officials. Ex. 18 Glass Dec. ¶ 20. | Admit. |

| | |
|---|---|
| 54.  USPS devotes excess First-Class Mail processing capacity to Election Mail sent as Marketing Mail, and thereby advances it through the processing network ahead of other marketing mail. Ex. 18 Glass Dec. ¶ 21. | Admit. |
| 55.  Delivery timeframes for Election Mail entered as Marketing Mail are often comparable to those of Election Mail entered as First-Class Mail. Ex. 18 Glass Dec. ¶ 21. | Admit to the extent this statement of fact is intended to characterize delivery timeframes before the Postal Service changed its policies this summer to reduce delivery speeds for election mail. |
| 56.  When identifiable, USPS prioritizes placing ballots on outgoing trucks, whether sent using First-Class Mail or Marketing Mail. Ex. 18 Glass Dec. ¶ 22. | Admit. |
| 57.  USPS will continue its longstanding practices in support of mail-in voting for the Election. Ex. 18 Glass Dec. ¶ 28. | Deny. The statement mischaracterizes the cited exhibit, which discusses only expectations—not commitments—for the future.  *See* Defs.' Ex. 18.

These expectations have not been met in certain areas.  *See also* ECF No. 59-22 (Pls.' Ex. 22) ("Additional postal management email communications to the field essentially informed the reader to instruct postal clerks to not prioritize election ballots received via mail. The directive advises the reader to not separate ballots."). |
| 58.  USPS Headquarters has not issued any direction interfering with, discouraging, or prohibiting USPS personnel from taking appropriate measures to ensure the timely delivery of Election Mail, especially ballots. Ex. 18 Glass Dec. ¶¶ 1, 27. | Deny to the extent that cited exhibit states that declarant is not "aware" of such direction.  *See* Defs.' Ex. 18.  However, this dispute is not material to Plaintiffs' entitlement to summary judgment.

Otherwise, admit. |
| 59.  On September 21, 2020, USPS issued instructions clarifying that it will prioritize Election Mail that is entered as Marketing Mail, regardless of the paid class. *See* Ex. 12, Clarifying Operational Instructions (Sept. 21, 2020) ¶ 7. | Admit. |

| | |
|---|---|
| 60.  USPS will use standardized log sheets to track Election Mail through processing; conduct daily "all clears" to ensure that all Election Mail is accounted for in the system and mail scheduled or "committed" to go out is processed accordingly; advance Election Mail entered as Marketing Mail ahead of all other Marketing Mail and processing it expeditiously to the extent feasible so that it is generally delivered in line with the First-Class Mail Delivery standards; expand processing windows on letter and flat sorting equipment to ensure that all Election Mail received prior to the First-Class Mail Critical Entry Time is processed the same day; and prioritize Election Mail when loading trucks. *See* Ex. 12, Clarifying Operational Instructions (Sept. 21, 2020) ¶ 7. | Deny to the extent not all of the U.S. Postal Service is acting accordingly.  *See* ECF No. 59-22 (Pls.' Ex. 22) ("Additional postal management email communications to the field essentially informed the reader to instruct postal clerks to not prioritize election ballots received via mail. The directive advises the reader to not separate ballots."). |
| 61.  On October 20, 2020, USPS issued another guidance document—the Extraordinary Measures Memorandum—that emphasizes the additional resources USPS will commit to Election Mail. *See* Ex. 20, Extraordinary Resources Memo. | Admit. |
| 62.  USPS formed a special Command Center to address Election Mail-related issues, and reiterated that it would employ special measures, such as "expedited handling, extra deliveries, and special pickups . . . to connect blank ballots entered by election officials to voters, or completed ballots returned by voters entered close to or on Election Day to their intended destination." Ex. 20, Extraordinary Resources Memo., at 1-2. | Admit. |
| | **Plaintiffs' additional facts as permitted by ¶ 13(d) of the Court's Standing Order Governing Civil Cases (ECF No. 9).** |

| | |
|---|---|
| | 63. On October 19, 2020, the U.S. Postal Service's Office of Inspector General ("OIG") issued a report "to address specific concerns related to Postal Service changes put in place after the Postmaster General was sworn in on June 15, 2020." *See* Defs.' Ex. 23 (corrected) (ECF No. 70-1), at 1, 26 ("Our scope of this was a nationwide review of the impact of Postal Service operational changes made from June 15, 2020 to September 3, 2020 on mail delivery services."). |
| | 64.  For purposes of preparing its report, the OIG interviewed U.S. Postal Service officials and postal union representatives; obtained, reviewed, and analyzed data and documents related to the changes; analyzed service performance; conducted site visits; and conducted a test mailing.  Defs.' Ex. 23, at 26. |
| | 65.  As set forth in the OIG's report, in "June and July 2020, Postal Service operations executives initiated various significant cost reduction strategies on top of three initiatives the Postmaster General launched to achieve financial targets."  Defs.' Ex. 23, at 1. |

| | |
|---|---|
| | 66. The OIG's report concluded that, "[a]fter his appointment, the Postmaster General implemented the following three operational and organizational changes in July and August 2020: <br><br>• *Elimination of late and extra trips to transport mail*. Started July 10, 2020, this initiative was to eliminate all late and extra trips outside of regularly scheduled transportation service. <br><br>• *Organization Restructure*: On August 7, 2020, the Postmaster General announced a reorganization of field operations and headquarters functions to align functions based on core business operations. <br><br>• *Expedited Street Afternoon Sortation (ESAS)*: This initiative began as a pilot program at 384 facilities nationwide on July 25, 2020, and was designed to eliminate excessive pre- and post-tour overtime." <br><br>Defs.' Ex. 23, at 2. |
| | 67. The OIG's report concluded that "[i]n addition to these three changes, Postal Service operations executives outlined 57 initiatives" known as the "Do It Now FY Strategies" that, according to the agency's Chief Operating Officer, constituted "'transformational changes' in Postal Service operations." Defs.' Ex. 23, at 2. |

| | |
|---|---|
| | 68. The Do It Now FY Strategies "outlined changes from current operations in each function including mail processing, vehicle services, equipment maintenance, and post office operations (delivery and retail). They included strategies such as eliminating pre-tour overtime in city delivery operations, elimination of certain mail processing operations on Saturday, and alignment of clerk workhours to workload." Defs.' Ex. 23, at 10. |
| | 69. Some of the Do It Now FY Strategies are ongoing, including strategies to eliminate overtime. Defs.' Ex. 23, at 29-31; *see, e.g., id.* at 30 (listing "Eliminate Pre-Tour Overtime" as "Ongoing"). |
| | 70. The OIG's report concluded that "[n]o analysis of the service impacts of these various changes was conducted." Defs.' Ex. 23, at 1, 2, 8, 13, 24. |
| | 71. The OIG's report concluded that the U.S. Postal Service's "operational initiatives should have been analyzed and evaluated ahead of deployment to fully understand the impact of implementation." Defs.' Ex. 23, at 24 ("[G]iven the challenges resulting from the COVID-19 pandemic, including reduced employee availability, increased package volume, and a heightened focus on voting by mail, these operational initiatives should have been analyzed and evaluated ahead of deployment to fully understand the impact of implementation."). |
| | 72. The OIG's report concluded that the U.S. Postal Service implemented the changes "quickly" and "communicated primarily orally, which resulted in confusion and inconsistent application across the country." Defs.' Ex. 23, at 1–2, 8. |

| | |
|---|---|
| | 73. The OIG's report concluded that the U.S. Postal Service executed the changes with higher "velocity and consistency" than it did with different prior year initiatives.  Defs.' Ex. 23, at 13, 24. |
| | 74. The OIG's report concluded that the "collective results" of the U.S. Postal Service's changes "negatively impacted the quality and timeliness of mail delivery nationally," with "mail service performance significantly dropped beginning in July 2020, directly corresponding to implementation of the operational changes and initiatives." Defs.' Ex. 23, at 1, 3, 14. |
| | 75. The OIG's report concluded that the U.S. Postal Service's changes "[d]elayed mail in post offices, stations, and other facilities," reaching levels "higher than [prior year] values and even exceed[ing] the average of peak values." Defs.' Ex. 23, at 14–15. |
| | 76. The Postal Service recently directed postal employees to cease the long-standing practice of providing a cautionary notice to business customers regarding political and election mail. *See* ECF No. 59-22 (Pls.' Ex. 22) ("One communication put forth a directive to immediately cease the long-standing practice of providing a cautionary notice to business customers regarding political mail and election mail"). |
| | 77. Postal clerks have been directed by Postal Service management not to prioritize election ballots received by mail. *See* ECF No. 59-22 (Pls.' Ex. 22) ("Additional postal management email communications to the field essentially informed the reader to instruct postal clerks to not prioritize election ballots received via mail. The directive advises the reader to not separate ballots."). |

| | |
|---|---|
| | 78. The voter hotline maintained by the New York State Office of the Attorney General "has received over 25 complaints as of October 27 from voters who did not receive their absentee ballots in the mail in a timely manner."  ECF No. 71-4 (Pls.' Ex. 62) (Clarke Decl. ¶ 12). |
| | 79. The voter hotline maintained by the New York State Office of the Attorney General "received a complaint from a voter who reported that although they requested their absentee ballot several weeks ago, and that they received an email from the Postal Service on October 10, 2020 indicating that their ballot would be 'arriving soon,' they still had not received their absentee ballot on October 22, 2020."  ECF No. 71-4 (Pls.' Ex. 62) (Clarke Decl. ¶ 13). |
| | 80. The voter hotline maintained by the New York State Office of the Attorney General has "received a complaint from another voter who reported that they received a notification from the Postal Service on October 5, 2020 indicating that their ballot would be arriving soon, yet, as of October 21, 2020, they had not received their ballot. This complainant contacted the Postal Service many times regarding the status of the absentee ballots, but did not receive any further communications from the Postal Service. In their complaint, this voter reported they now planned to vote at the polls due to the Postal Service's failure to timely deliver their absentee ballot."  ECF No. 71-4 (Pls.' Ex. 62) (Clarke Decl. ¶ 14). |
| | 81. The voter hotline maintained by the New York State Office of the Attorney General "has also received over 20 complaints as of October 20 about incredibly long lines at voting sites." ECF No. 71-4 (Pls.' Ex. 62) (Clarke Decl. ¶ 15). |

| | |
|---|---|
| | 82. The voter hotline maintained by the New York State Office of the Attorney General has received complaints from multiple voters who have waited over five hours in line to vote.  ECF No. 71-4 (Pls.' Ex. 62) (Clarke Decl. ¶¶ 16-17). |
| | 83. The New York State Board of Elections has found that "many of the issues we saw in the June primary and anticipated for the November general election are occurring."  ECF No. 71-5 (Pls.' Ex. 63) (Kellner Suppl. Decl. ¶ 7). |
| | 84. Despite new guidance documents issued to U.S. Postal Service employees in September and October 2020, *see* ECF Nos. 59-60, 64-1, the number of late trips and extra trips did not return to pre-July 2020 levels, *see* ECF No. 71-7 (Pls.' Ex. 65) (Defs.' October 29, 2020 Late Trip and Extra Trip Data). |
| | 85. Despite new guidance documents issued to U.S. Postal Service employees in September and October 2020, *see* ECF No. 59-60, 64-1, service performance in October has not returned to pre-July 2020 levels, *see* ECF No. 71-8 (Pls.' Ex. 66) (Defs.' October 29, 2020 Service Performance Data). |
| | 86. Nationally, on-time delivery of First Class Mail declined from 88.76 percent for the week of October 3, 2020 to 83.26 percent for the week of October 17, 2020.  ECF No. 71-8 (Pls.' Ex. 66) (Defs.' October 29, 2020 Service Performance Data). |
| | 87. Nationally, on-time delivery of Marketing Mail declined from 91.36 percent for the week of October 3, 2020 to 88.58 percent for the week of October 17, 2020.  ECF No. 71-8 (Pls.' Ex. 66) (Defs.' October 29, 2020 Service Performance Data). |

| | |
|---|---|
| | 88. Between October 24 and October 28, 2020, processing scores for outbound non-ballot election mail, which can include items like voter registrations, ranged between 29.88 and 95.930 percent.  ECF No. 71-9 (Pls.' Ex. 67) (Defs.' October 29, 2020 Ballot Delivery Data). |
| | 89. Between October 24 and October 28, 2020, processing scores for inbound and outbound ballots ranged between 91.30 and 97.60 percent.  ECF No. 71-9 (Pls.' Ex. 67) (Defs.' October 29, 2020 Ballot Delivery Data). |
| | 90. October 28, 2020, service performance scores reflected on-time delivery of 88.87% of first class mail around Sacramento, but 81.86% in Southern New Jersey and 61.57% in the Philadelphia metropolitan region.  ECF No. 71-8 (Pls.' Ex. 66) (Defs.' October 29, 2020 Service Performance Data). |
| | 91. On October 27, 2020, Defendants—for the first time—formally rescinded the Cintron Guidelines via email to Postal Service management.  ECF No. 71-6 (Pls.' Ex. 64) (Defs.' October 28, 2020 Notice of Data). |

In sum, Plaintiffs dispute in part Defendants' assertions of fact at ¶¶ 3, 5-6, 8-9, 13, 15-16, 22, 26-27, 29-31, 33-34, 39, 42-43, 49-51, 58, and 60.  Plaintiffs also dispute in full Defendants' assertions of fact at ¶¶ 14, 28, 32, 35-38, 48, 52, and 57.  For the reasons identified *supra* and in the accompanying memorandum of law, none of these disputes present genuine issues of material fact that require a trial or undermine Plaintiffs' entitlement to summary judgment under Rule 56.

DATED:  October 29, 2020

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Daniela L. Nogueira*
Daniela L. Nogueira, *Assistant Attorney General*
Matthew Colangelo
   *Chief Counsel for Federal Initiatives*
Morenike Fajana, *Special Counsel*
Elena Goldstein, *Deputy Chief, Civil Rights Bureau*
Eric R. Haren, *Special Counsel*
Lindsay McKenzie, *Assistant Attorney General*
Laura Mirman-Heslin, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6544
Daniela.Nogueira@ag.ny.gov

Joshua Tallent, *Assistant Attorney General*
Office of the New York State Attorney General
The Capitol
Albany, NY 12224

*Attorneys for the State of New York*

CLARE E. CONNORS
*Attorney General of the State of Hawaii*

By: */s/ Lori N. Tanigawa*
Lori N. Tanigawa
  *Deputy Attorney General*
Department of the Attorney General
State of Hawaii
425 Queen Street
Honolulu, HI 96813
Phone: (808) 586-0618
lori.n.tanigawa@hawaii.gov

*Attorneys for the State of Hawaii*

GURBIR S. GREWAL
*Attorney General of New Jersey*

MAYUR P. SAXENA
Assistant Attorney General

By: */s/ Tim Sheehan*
Tim Sheehan, *Deputy Attorney General*
Estelle Bronstein, *Deputy Attorney General*
Melissa Medoway, *Deputy Attorney General*
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08625
Phone: (609) 815-2604
Tim.Sheehan@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

JAMES E. JOHNSON
*Corporation Counsel of the City of New York*

By: */s/ Aaron Bloom*
Aaron Bloom
Joseph Pepe
Tonya Jenerette
100 Church Street
New York, NY 10007
Phone: (212) 356-2274
abloom@law.nyc.gov

*Attorneys for the City of New York*

DENNIS J. HERRERA
*City Attorney for the City and County of San Francisco*

By: */s/ Dennis J. Herrera*
Dennis J. Herrera, *City Attorney*
Kevin Yeh, *Deputy City Attorney*
San Francisco City Attorney's Office
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102
Phone: (415) 554-3856
Kevin.Yeh@sfcityatty.org

*Attorneys for the City and County of San Francisco*