**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW YORK, et al.,

               Plaintiffs,

      v.                            Case No. 20 Civ. 2340

DONALD J. TRUMP, *in his official capacity as President of the United States*, et al.,

               Defendants.

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR CLARIFICATION OR MODIFICATION OF THE PRELIMINARY INJUNCTION AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION TO ENFORCE THE INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 1

LEGAL STANDARDS ...................................................................................................... 4

ARGUMENT .................................................................................................................... 6

     I.     The Postal Service is Violating this Court's Injunction. ............................................ 6

     II.    The Injunction Bars the Postal Service's Efforts to Further Reduce Extra Trips. ........ 8

     III.   The Postal Service Has Failed to Meet its Burden to Modify the Injunction. ............ 11

CONCLUSION ................................................................................................................ 13

# TABLE OF AUTHORITIES

**CASES**

*All. of Artists & Recording Cos. v. General Motors Co.*,
  306 F. Supp. 3d 413 (D.D.C. 2016) ...................................................................5

*Am. Council of the Blind v. Mnuchin*,
  977 F.3d 1 (D.C. Cir. 2020) ...........................................................................6

*Horne v. Flores*,
  557 U.S. 433 (2009)...............................................................................5, 6, 12

*Hutto v. Finney*,
  437 U.S. 678 (1978)......................................................................................4

*Kifafi v. Hilton Hotels Ret. Plan*,
  79 F. Supp. 3d 93 (D.D.C.) ...........................................................................5

*Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.*,
  496 F. Supp. 3d 1 (D.D.C. 2020) ...................................................................3

*New York v. Trump*,
  490 F. Supp. 3d 225 (D.D.C. 2020) ...................................................... passim

*Richardson v. Trump*,
  496 F. Supp. 3d 165 (D.D.C. 2020) ...............................................................3

*Rufo v. Inmates of Suffolk County Jail*,
  502 U.S. 367 (1992)......................................................................................5

*United States v. Phillip Morris USA, Inc.*,
  793 F. Supp. 2d 164 (D.D.C. 2011) ..........................................................5, 12

*Vote Forward v. DeJoy*,
  490 F. Supp. 3d 110 (D.D.C. 2020) ...............................................................3

**RULES**

Fed. R. Civ. P. 59(e) ...........................................................................................5

Fed. R. Civ. P. 60(b) ...........................................................................................5

**INTRODUCTION**

The U.S. Postal Service is a public service that Americans rely on to access basic necessities.  For nearly a year, however, the Postal Service has been paring back its services despite devastating consequences to the public.  As part of this strategy, the Postal Service began an effort in early July 2020 to eliminate extra trips and late trips that immediately prompted the most dramatic drop in timely service in recent memory.  Following three months of historic mail delays, this Court entered four different preliminary injunctions to enjoin the Postal Service, Postmaster General Louis DeJoy, and then-President Donald J. Trump (collectively, "Defendants" or "Postal Service") from implementing changes to extra trips and late trips without first following the requisite legal process through the Postal Regulatory Commission ("PRC").

Despite the injunctions issued in this case and others, the Postal Service continued to limit extra trips and late trips in the lead up to the November 2020 elections.  As a result, in related lawsuits, this Court specifically directed Defendants to revert to pre-July 2020 trip levels.  Today, however, extra trips remain at over 60 percent below pre-July 2020 levels.  That fact alone establishes a violation of this Court's injunction and subsequent orders.  But, worse still, Defendants now ask this Court to approve a program that allows the Postal Service to reduce extra trips even further.  This Court should not only deny Defendants' motion, but grant Plaintiffs' cross-motion to enforce, direct the Postal Service to return extra trips to pre-July 2020 levels, and require the Postal Service to file a report within 90 days of this Court's enforcement order that identifies trip levels and the steps taken to achieve pre-July 2020 levels.

**BACKGROUND**

On July 10, 2020, Postal Service leadership introduced a new initiative to eliminate extra

trips and late trips.  Exs. 41–43.[1]  Within a few days, the Postal Service circulated instructions "for Elimination of Extras and Lates" that dispensed with the majority of extra trips.  Exs. 45–46; *see also* ECF No. 66-27.  In the four weeks prior to July 10, the agency had been running an average of 2,269 extra trips per day.  Ex. 33.  Within a week, extra trips were down to an average of 1,300 per day.  *Id.*  By the end of the first week of August 2020, these trips were down to 560 per day—a nearly 76 percent reduction.  *Id*.

Practically overnight, timely delivery plummeted.  After having stayed above 89 percent for all of 2020, nationwide First Class mail service dropped from an average of 90.99 percent on time in the four weeks preceding the change to an average of 83.4 percent in the following four weeks—an unprecedented drop representing hundreds of millions of pieces of delayed mail.  Mail was not just late, but piling up at postal facilities for days and weeks.  Exs. 4, 22.  Delayed mail increased 21 percent at processing facilities and 143 percent at post offices—a self-reported increase of *over 400 million pieces* of delayed mail just for the week ending July 31, 2020.  ECF No. 66-27.  Although Postmaster General DeJoy acknowledged that the "transformative initiative" to reduce late and extra trips "had unintended consequences that impacted our overall service levels," he maintained that service would improve over time and, consequently, refused to reverse the initiative.  Ex. 52.

Delivery rates did not rebound.  Ex. 31.  Accordingly, Plaintiffs filed a motion for a preliminary injunction against the reduction in extra trips, amongst other operational changes, which this Court granted on September 27, 2020.  *See New York v. Trump*, 490 F. Supp. 3d 225 (D.D.C. 2020), *order clarified*, 2020 WL 6572675 (D.D.C. Oct. 22, 2020), *appeal voluntarily*

---

[1] Unless otherwise noted, all citations to exhibits refer to Plaintiffs' exhibits to their memorandum of law supporting summary judgment.  *See generally* ECF Nos. 59-1–59-61.

*dismissed*, No. 20-5352, 2021 WL 672390 (D.C. Cir. Feb. 10, 2021). Ultimately, the Court

issued four total injunctions against extra trip reductions. *See id.*; *Vote Forward v. DeJoy*, 490 F.

Supp. 3d 110 (D.D.C. 2020); *Richardson v. Trump*, 496 F. Supp. 3d 165 (D.D.C. 2020); *Nat'l*

*Ass'n for Advancement of Colored People v. United States Postal Serv.*, 496 F. Supp. 3d 1

(D.D.C. 2020).

Rejecting Defendants' argument that a reduction in trips—as opposed to an outright

ban—was not a change warranting relief, the Court reasoned that there was sufficient evidence to

establish that "reducing extra or late trips will necessarily cause delays in the delivery of mail."

*New York v. Trump*, 490 F. Supp. 3d at 237. At the time the Court issued the injunction, the

Postal Service had been averaging about 633 extra trips per day—about 72 percent below pre-

July 10, 2020 levels. Ex. 33. On-time delivery for First Class mail ranged between 84.03 and

88.7 percent. *See* ECF No. 156-1, *NAACP v. U.S. Postal Service*, No. 20-cv-2295 (May 20,

2021) (exhibit showing service scores through the week of May 7, 2021).

In response to this Court's injunctions, the Postal Service did nothing. *See* Ex. 28. As a

result, in related cases, this Court granted motions to enforce in October 2020. The Court

directed the Postal Service to rescind the instructions limiting extra trips and to inform its

personnel that "late and extra trips should be performed to the same or greater degree than they

were performed prior to July 2020 when doing so would increase on-time mail deliveries." *See*

Minute Order, *NAACP v. U.S. Postal Service*, No. 20-cv-2295 (Oct. 27, 2020); Minute Order,

*Vote Forward v. DeJoy*, No. 20-cv-2405 (Oct. 27, 2020). At the time, the Postal Service had

been averaging 759 extra trips per day—about 67 percent below the pre-July 10, 2020 levels.

*See* ECF No. 90-3 (if averaging extra trips from October 1 to October 27, 2020). Timely First

Class mail delivery ranged between 80.66 and 85.86 percent that month. *See* ECF No. 156-1,

*NAACP v. U.S. Postal Service*, No. 20-cv-2295 (May 20, 2021) (exhibit showing service scores through the week of May 7, 2021).

Despite the preliminary injunctions the Court issued in this case and related cases, multiple motions to enforce, and near-daily hearings leading up to and following the 2020 presidential election, extra trips have still not returned to their pre-July 2020 levels.  In April 2021, the Postal Service was averaging just 845 extra trips per day—about 63 percent below the pre-July 10, 2020 levels and lower than *any single day* prior to July 2020.  *See* ECF No. 90-3; Ex. 33.  At the same time, on-time delivery for First Class mail ranged between 86.36 to 88.24 percent—not even reaching the top delivery rates at the time the injunction was issued and lower than the on-time delivery rate of *any* week between January 1, 2020 and July 10, 2020.  *See supra*; Ex. 33.

Astonishingly, Defendants now seek this Court's approval to reduce extra trips even further.  Defs. Mem. of Law Supp. Mot. for Clarification, at 3, ECF No. 90-1 ("Defs. Mot.").  By motion to clarify, or, in the alternative, modify the preliminary injunction, Defendants ask this Court to permit them to deny (1) any extra trip for mail that is already running late, and (2) any extra trip where denial would delay less than 15 percent of the truck's capacity.  *See id*. at 1. Defendants do not specify how many trips could be denied under this new regime, much less how much mail constitutes 15 percent of a truck's capacity.  Nor do Defendants explain how this new regime accounts for election mail, which, if delayed, could disrupt state and local election plans and result in voter disenfranchisement.

## LEGAL STANDARDS

"[F]ederal courts are not reduced to issuing injunctions against state officers and hoping for compliance.  Once issued, an injunction may be enforced."  *Hutto v. Finney*, 437 U.S. 678,

690 (1978).  "A court's powers to enforce its own injunction by issuing additional orders is

broad, particularly where the enjoined party has not fully complied with the court's earlier

orders."  *Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93, 100 (D.D.C.) (quotation marks

omitted), *on reconsideration in part*, 107 F. Supp. 3d 154 (D.D.C. 2015), *modified*, 124 F. Supp.

3d 27 (D.D.C. 2015), *aff'd*, 752 F. App'x 8 (D.C. Cir. 2019).

      "A 'motion for clarification' is not a formal creature of civil procedure; it appears

nowhere in the Federal Rules.  Nevertheless, federal courts permit parties to tender motions that

beseech the court 'to explain or clarify something ambiguous or vague' about a ruling, but not to

'alter or amend' it."  *All. of Artists & Recording Cos. v. General Motors Co.*, 306 F. Supp. 3d

413, 418 (D.D.C. 2016) (quoting *United States v. Phillip Morris USA, Inc.*, 793 F. Supp. 2d 164,

168 (D.D.C. 2011)).  A party meets the "threshold requirements for seeking clarification" where

a court's order "is reasonably susceptible to differing interpretations."  *Id.* at 419.  A party fails

to meet this standard if its motion does "not seek clarification of any vague or ambiguous

portion" of an order, but rather seeks to "substantially restrict enforcement" of said order.  *Philip*

*Morris USA Inc.*, 793 F. Supp. 2d at 168 (considering motion under FRCP 60(b) instead); *see*

*also Jones v. USPS*, No. 20 Civ. 6516, ECF No. 66, slip op. at 22 (S.D.N.Y. Sept. 29, 2020)

(considering motion under FRCP 59(e) instead).

      A motion to modify a preliminary injunction must meet an even higher standard.  "[A]

party can ask a court to modify or vacate a judgment or order if 'a significant change either in

factual conditions or in law' renders continued enforcement 'detrimental to the public interest.'"

*Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk County Jail*, 502

U.S. 367, 384 (1992)).  The party seeking modification bears the burden of establishing that

changed circumstances warrant relief.  *Am. Council of the Blind v. Mnuchin*, 977 F.3d 1, 7 (D.C. Cir. 2020) (citing *Horne*, 557 U.S. at 447).

## ARGUMENT

**I.   The Postal Service is Violating this Court's Injunction.**

The Postal Service's current level of extra trips violates this Court's preliminary injunction and subsequent orders to enforce.  Although Defendants still insist that "a ban on late and extra trips . . . is the purported USPS policy that this Court has enjoined," Defs. Mot. at 11, this claim is spurious.  The Court's decision acknowledged that Defendants had "clarified that late or extra trips [we]re not 'banned,'" but, instead, "continue[d] 'at a reduced level.'"  *New York v. Trump*, 490 F. Supp. 3d at 233.  And recognizing that the reduction of extra trips, not staffing shortages, was contributing to mail delays, *id.* at 236 ("Plaintiffs have provided evidence that reducing extra or late trips will necessarily cause delays in the delivery of mail."); *id.* at 237 ("Plaintiffs have rebutted Defendants' argument that the decline was due to . . . staffing shortages due to COVID-19 by pointing out that the sharp decline in on-time deliveries occurred in July and August 2020, months after COVID-19 infections began to spike in the United States in March 2020."), the Court held that the reduction of extra trips required the Postal Service "to comply with the statutory requirement that it obtain an advisory opinion from the PRC and provide for notice and comment prior to implement[ation]," *id*. at 243.

That the Court's decision enjoined reduction of extra trips, not just bans, is confirmed in two subsequent orders necessitated by the Postal Service's failure to comply with the Court's injunctions in related cases.  *See* Minute Order, *NAACP v. U.S. Postal Service*, No. 20-cv-2295 (Oct. 27, 2020); Minute Order, *Vote Forward v. DeJoy*, No. 20-cv-2405 (Oct. 27, 2020).  In order to remove all doubt, this Court ordered the Postal Service to rescind all prior instructions

6

and inform postal personnel that "late and extra trips should be performed to the same or greater degree than they were performed prior to July 2020 when doing so would increase on-time mail deliveries." *Id.*

When the Court issued these orders, the Postal Service was averaging 759 extra trips per day—about 67 percent below the pre-July 10, 2020 levels and only 4 percent worse than its current average of 63 percent below. *See* ECF No. 90-3. An increase of 4 percent cannot be said to be compliant with this Court's injunction against reducing extra trips, especially when on-time First Class mail delivery remains at historic lows. *See* ECF No. 156-1, *NAACP v. U.S. Postal Service*, No. 20-cv-2295 (May 20, 2021) (exhibit showing service scores through the week of May 7, 2021). Indeed, "[r]oughly 78% of first-class mail was delivered on time in the first quarter [of 2021], down from more than 92% of first-class mail delivered on time in the year-ago period"—despite the fact that mail volume was down "sharply" following the end of the holiday season.[2] In other words, hundreds of millions of mail pieces continue to arrive late each week.

Given the low extra trip rates, that on-time delivery rates remain low is no surprise. As the Court acknowledged in its decision, "extra trips are 'needed adjustments to adequately administer a system responsible for delivering over 470 million pieces of mail per day. They are features of the postal system, not bugs.'" *New York v. Trump*, 490 F. Supp. 3d at 233 (quoting Coradi Decl. ¶ 14). Keeping extra trip levels low "*necessarily* cause[s] delays in the delivery of mail," and, accordingly, violates this Court's injunction. *Id.* at 237 (emphasis added). This Court should order the Postal Service to comply and require the agency to file a report within 90 days of the Court's order identifying trip levels and steps taken to achieve pre-July 2020 levels.

---

[2] Aimee Picchi, *On-time delivery plunges at U.S. Postal Service, with 1 in 5 pieces of mail arriving late*, CBS News (May 10, 2021), https://www.cbsnews.com/news/postal-service-louis-dejoy-delivery-10-year-plan.

**II.  The Injunction Bars the Postal Service's Efforts to Further Reduce Extra Trips.**

      Beyond violating the injunction, the Postal Service has failed to meet its burden to clarify it.  As explained above, this Court's injunction is clear and prohibits the Postal Service from not only banning extra trips outright, but also reducing them.  Nevertheless, Defendants assert that the injunction should not apply to their new policy to decline extra trips when they "would not be service responsive" and when declining them "would result in delay of only a small volume of mail."  Defs. Mot. at 1.  But in either case, the reduced extra trips will cause delays in mail delivery.

      That conclusion is evident from a review of the Postal Service's proposed changes.  First, the Postal Service seeks to deny extra trips that will not result in the mail being delivered on time, *i.e.* by its "service performance target."  In practical terms, this means that if mail is running late, the Postal Service will not arrange an extra trip to deliver it any faster.  Mail that is already delayed will be permitted to be delayed even later.  The Postal Service claims that "the same level of service can be achieved if the mail travels on an extra trip or is loaded onto the next regularly scheduled trip," Defs. Mot. at 7, but this assumes that the next regularly scheduled trip is running on time and has capacity for the delayed mail, which is not always the case.  In any event, on its face, this new policy would allow the Postal Service to decline an extra trip even if that extra trip would cause the delayed mail to be delivered faster than waiting for the next regularly scheduled trip that has capacity.

      The Postal Service claims that "there would be no benefit, but real and unnecessary costs, to the Postal Service in authorizing such trips."  *Id*. at 7.  But the extra trips would certainly benefit the customers who rely on the Postal Service for delivery of important mail, including ballots, bills, checks, and medications—many of which need to be received by specific deadlines

8

in order to avoid disenfranchisement, late fees, health issues, and more.[3]  This is especially true given that on-time delivery has not materially improved since the Court issued the injunction, meaning that *more* extra trips, rather than less, are needed to address the large quantity of mail that is not meeting service performance targets.  The Postal Service has an obligation under the Court's injunction to ensure that delayed mail is delivered in an expedient fashion via extra trips.

Second, the Postal Service seeks to deny extra trips "where utilization of an extra trip would cause significant expenses and only a small volume of mail would be delayed if an extra trip is not used."  Second Randel Decl. ¶ 12, ECF No. 90-2.  As an initial matter, this request necessarily violates the Court's injunction (and subsequent orders) against reducing extra trips.  Essentially, the Postal Service asks that the Court bless a "cost" exception to its injunction regardless of the impact on service.

Beyond being a clear violation, the Postal Service only defines "small volume" as 15 percent of the load capacity of the truck transporting the mail.  *Id.* ¶ 14.  This vague standard does not provide any specifics as to how much mail will actually be delayed by this policy.  Nor does the Postal Service define "significant expenses," claiming only that running an extra trip at 15 percent capacity or less will necessarily cause significant expenses because "the cost of the extra trip is extraordinarily high in relation to the usual costs of transportation for trucks that are fully loaded or loaded with a substantial volume of mail."  *Id*. ¶ 13.  Thus, under the new policy, the Postal Service will be able to deny *any* extra trip that contains less than 15 percent of the

---

[3] *See* Picchi, *supra* note 2 ("Slower mail delivery means individuals and businesses can face delays in both outgoing and incoming mail—a particular issue for people mailing rent checks, making or awaiting payments, and awaiting important documents to arrive in their post boxes.").

truck's full capacity, regardless of the actual cost of the extra trip, because compared to a full truck, the cost of transportation per piece of mail is high.

Even more concerning, the Postal Service asserts that certain circumstances may "lead" it to deny extra trips involving larger percentages of a truck's capacity. *Id*. Specifically, the Postal Service states that even if a truck was filled beyond 15 percent capacity, an extra trip could be denied under the new policy:

> For example, if an extra trip is requested to move a volume of a particular mail product that would constitute less than 15% of a truck's capacity but the requester suggests filling the truck with other items or products that are subject to a longer service standard, such as Marketing Mail, the Surface Planner Group may decline approval of an extra trip because other alternatives that will timely deliver the mail product are located or there is capacity on the next scheduled trip.

Second Randel Decl. ¶ 21.

Despite the above, the Postal Service "believes" that "there would be minimal, if any, effect on timeliness of overall service performance." *Id*. ¶ 15. But the Postal Service did not believe its July 2020 initiative to reduce extra trips would affect service performance either—a belief that later proved so misguided that Postmaster General DeJoy sent a letter to all Postal Service employees admitting that the changes to extra trips and late trips "had unintended consequences that impacted our overall service levels." Ex. 52.

Now, as then, the Postal Service has failed to support its belief that its changes will not increase delays. The only data it offers is from a ten-day period in April 2021, during which it tracked 736 extra trip requests, which represents only a small portion of extra trips. *See* ECF No. 90-3 (showing over 8,000 extra trips conducted over the program period). Although only one of the tracked trip requests was denied on the grounds of low volume of mail, even that one denial led to approximately 1,530 packages being delayed. Second Randel Decl. ¶ 17.

At the same time, the Postal Service's requested exceptions do not exempt election and other important mail from either aspect of the new policy to decline extra trips. This risks significant harm to Plaintiffs and their residents, as they rely on the Postal Service to carry out a vast array of governmental functions, including administration of elections, provision of public assistance to low-income families, and distribution of life-saving medications. *See* Exs. 1–3, 5, 8–9, 11–13, 15, 17–21, 24–25.

As Plaintiffs showed in their preliminary injunction motion, reducing extra trips "will necessarily cause delays in the delivery of mail" and "puts the timely delivery of election mail at risk." *New York v. Trump*, 490 F.Supp.3d at 237, 242. Especially given the fact that extra trips and service scores remain reduced compared to pre-July 2020 levels, *see supra*, at 3,[4] the requested changes will further reduce extra trips and thereby cause additional mail delays. Such reduction is barred by the Court's injunction.

### III. The Postal Service Has Failed to Meet its Burden to Modify the Injunction.

As the Court's injunction clearly bars Defendants' requests, it is evident that what Defendants actually seek is to carve out exceptions to the Court's prohibition on the reduction of late and extra trips. Their motion can therefore only sensibly be understood as one to modify the Court's preliminary injunction, an application which requires "a significant change" in fact or

---

[4] *See also Plaintiff's Opposition to Defendants' Motion to Clarify or Modify the Preliminary Injunction*, in *NAACP v. U.S. Postal Service*, Case No. 20-cv-2295 (EGS), Docket No. 156 (May 20, 2021) at 4 ("The data generally show between 1,500 and 3,000 extra trips every day between April 1, 2020 and July 10, 2020; the lowest number in any single day was 1,285. *See* Ex. 35-8. Extra trips dropped off sharply beginning July 11, 2020, *see id.*, and remain depressed today. Indeed, between April 1, 2021, and May 5, 2021, the highest number of extra trips in any single day was 926. *See* ECF 154-3 at 7–8. A comparison of March 2020 and March 2021 similarly reveals a steep decline in the number of extra trips. *Compare* ECF 35-8 at 2 *with* ECF 154-3 at 6.") and 6 ("from January 10, 2020, to July 10, 2020, the lowest service score was 89.62 percent; since then, service scores have not reached that number even once.")).

law that renders continued enforcement "detrimental to the public interest." *Horne*, 557 U.S. at

447.  Because the Postal Service cannot meet this standard, its request should be denied.

As an initial matter, Defendants have not identified a "significant change"—indeed,

Defendants have not pointed to *any* change, whether in fact or law—that warrants modification

of the injunction.  Nor could they.  Service delivery rates remain below 89 percent and extra trips

are still over 60 percent below pre-July 2020 levels—the same circumstances that prompted this

Court to issue the preliminary injunction and subsequent enforcement orders.  *See supra* at 3.

Nothing about the Postal Service's request reflects a need to respond to new

circumstances.  Rather, what it reflects is the Postal Service's interest in further *changing its*

*operations* to "substantially restrict enforcement" of the Court's injunction.  *Philip Morris USA*

*Inc.*, 793 F. Supp. 2d at 168.  The declaration submitted by Defendants addresses only the

mechanics and process of the new policy, with no indication of changed circumstances that could

form the basis of an order to modify the injunction.  *See generally* Second Randel Decl.  And

Defendants do not appear to argue otherwise.  *See* Defs. Mot. at 13.  The Court should deny

Defendants' motion on this basis alone.

Even assuming Defendants could show a change in circumstances, they have failed to

show that the injunction's continued enforcement is "detrimental to the public interest." *Horne*,

557 U.S. at 447.  Defendants argue that the Postal Service's new policy promotes its interests of

efficiency and minimizing costs.  *See* Second Randel Decl. ¶¶ 11, 13, 15.  These statements echo

remarks from Postal Service leadership last year regarding the agency's bold new leadership and

direction, which then had to be corrected after the changes led to, in Postmaster General DeJoy's

own words, "unintended consequences."  Ex. 52.  Even if these interests had a legitimate basis

now, which Defendants have not demonstrated, such interests are dwarfed by the public's critical

need for the timely delivery of mail.  *See, e.g.*, Banks Decl. ¶¶ 5, 7–8; Kellner Decl. ¶ 13; Newton Decl. ¶¶ 8, 12–13; Roye Decl. ¶¶ 5–7.

In addition, while Defendants blithely assert that "the election has come and gone," Defs. Mot. at 13, several Plaintiffs will be holding primary elections this year, which will rely significantly on the timely delivery of election mail.[5]  Many voters in Plaintiff jurisdictions will continue to avail themselves of expanded absentee ballot rules, which, in New York, do not expire until the end of 2021.[6]  As the Court noted in granting Plaintiffs' motion for preliminary injunction, "[i]t is clearly in the public interest to . . . ensure safe alternatives to in-person voting."  *New York v. Trump*, 490 F. Supp. 3d 225, 245 (D.D.C. 2020).  Defendants' motion should be denied.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court (i) deny Defendants' motion for clarification, or, in the alternative, modification of the preliminary injunction, and (ii) grant Plaintiffs' cross-motion motion to enforce, direct the Postal Service to return extra trips to pre-July 2020 levels, and require the Postal Service to file a report with the Court within 90 days of the Court's order identifying trip levels and steps taken to achieve pre-July 2020 levels.

---

[5] For example, New Jersey is holding elections for various state and local offices including the Governor this year, and the primary election will be held on June 8, 2021.  *See generally* New Jersey Div. of Elections, *2021 Election Information*, New Jersey Dep't of State, https://www.state.nj.us/state/elections/election-information-2021.shtml.  Similarly, New York City is holding elections for various offices, including Mayor, this year.  The primary election will be held on June 22, 2021 and the general election will be held on November 2, 2021.  *See generally Elections Calendar*, New York City Campaign Fin. Bd., https://www.voting.nyc/how-to-vote/elections-calendar; *Meet the Candidates*, New York City Campaign Fin. Bd., https://www.voting.nyc/meet-the-candidates.

[6] S.8015D, 2020 Leg. Sess. (N.Y. 2020), (enacted Aug. 20, 2020), https://www.nysenate.gov/legislation/bills/2019/s8015 (expires Jan. 1, 2022).

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: */s/ Daniela L. Nogueira*
Daniela L. Nogueira, *Assistant Attorney General*
Michael J. Myers, *Senior Counsel*
Lindsay McKenzie, *Assistant Attorney General*
Laura Mirman-Heslin, *Assistant Attorney General*

Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-6544
michael.myers@ag.ny.gov

*Attorneys for Plaintiffs in 20 Civ. 2340*