**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

STATE OF NEW YORK, *et al.*,

        Plaintiffs,

v.

JOSEPH R. BIDEN, JR., *in his
official capacity as President
of the United States*, *et al.*,

        Defendants.

No. 20-cv-2340(EGS)

---

## MEMORANDUM OPINION

Plaintiffs the States of New York, Hawaii, and New Jersey; the City of New York; and the City and County of San Francisco filed this lawsuit against Defendants Joseph R. Biden, Jr., in his official capacity as President of the United States; Louis DeJoy ("Mr. DeJoy"), in his official capacity as Postmaster General of the United States; and the United States Postal Service ("USPS") or ("Postal Service") alleging the following claims: (1) Ultra Vires Agency Action—Postal Accountability and Enhancement Act; (2) Ultra Vires Agency Action—Postal Reorganization Act; and (3) violation of the Elections Clause of the United States Constitution. *See* Compl., ECF No. 1 at 59-61.

Currently pending before the Court are the parties' cross-motions for summary judgment. *See* Pls.' Mot. Summ. J., ECF No.

58; Defs.' Cross Mot. Summ. J., ECF No. 66.[1] Upon consideration of the motions, the responses and replies thereto, the applicable law, the entire record, and for the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion for Summary Judgment and **GRANTS IN PART AND DENIES IN PART** Defendants' Cross-Motion for Summary Judgment.

**I. Background**

   **A. Statutory and Regulatory Framework**

   In the Postal Reorganization Act ("PRA"), Public Law 91-375, 84 Stat. 719 (Aug. 12, 1970), Congress replaced the Post Office Department with the Postal Service as "an independent establishment of the executive branch of the Government of the United States, under the direction of a Board of Governors, with the Postmaster General as its chief executive officer." 39 C.F.R. § 1.1. The PRA also created an independent oversight body for the USPS, the Postal Rate Commission. 39 U.S.C. § 501. Congress passed the PRA to "[i]nsulate" the management of the USPS "from partisan politics . . . by having the Postmaster General responsible to the [Postal Rate] Commission, which represents the public interest only, for his conduct of the affairs of the Postal Service." H.R. Rep. No. 91-1104, 3660-61 (1970).

---

[1]  When citing electronic filings throughout this Memorandum Opinion, the Court cites to the ECF page number, not the page number of the filed document.

The PRA defines the "postal polic[ies]" of the Postal Service. Section 101 of the Act provides that the USPS "shall provide prompt, reliable, and efficient services to patrons in all areas and shall render postal services to all communities," and "shall provide a maximum degree of effective and regular postal services to rural areas, communities, and small towns where post offices are not self-sustaining." 39 U.S.C. § 101(a)-(b). In addition, Section 101(e) directs that, "[i]n determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." *Id.* § 101(e). Section 403 further defines USPS's "[g]eneral duties." Section 403 provides:

> (a) The Postal Service shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees. The Postal Service shall receive, transmit, and deliver throughout the United States, its territories and possessions, and, pursuant to arrangements entered into under sections 406 and 411 of this title, throughout the world, written and printed matter, parcels, and like materials and provide such other services incidental thereto as it finds appropriate to its functions and in the public interest. The Postal Service shall serve as nearly as practicable the entire population of the United States.
>
> (b) It shall be the responsibility of the Postal Service—

> (1) to maintain an efficient system of collection, sorting, and delivery of the mail nationwide;
>
> (2) to provide types of mail service to meet the needs of different categories of mail and mail users; and
>
> (3) to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services.

*Id.* § 403(a)-(b).

In the Postal Accountability and Enhancement Act ("PAEA"), Pub. L. No. 109-435, 120 Stat. 3198 (Dec. 20, 2006) (codified at 39 U.S.C. § 3600 et seq.), Congress replaced the Postal Rate Commission with the Postal Regulatory Commission ("PRC" or "Commission") and "strengthened its role." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 340 (D.C. Cir. 2019).

The USPS is responsible for "develop[ing] and promot[ing] adequate and efficient postal services." 39 U.S.C. § 3661(a). "When the Postal Service determines that there should be a change in the nature of postal services [that] will generally affect service on a nationwide or substantially nationwide basis," it must "submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." *Id.* § 3661(b). This provision was enacted in the PRA, and the only change made in the PAEA was to replace the original

"Postal Rate Commission" with the "Postal Regulatory
Commission."

Following the submission of a proposal, "[t]he Commission
shall not issue its opinion on any proposal until an opportunity
for hearing on the record under [the Administrative Procedure
Act] has been accorded the Postal Service, users of the mail,
and an officer of the Commission who shall be required to
represent the interests of the general public. The opinion shall
be in writing and shall include a certification by each
Commissioner agreeing with the opinion that in his judgment the
opinion conforms to the policies established under this title."
39 U.S.C. § 3661(c).

### B. Factual Background

#### 1. The COVID-19 Pandemic

In response to the COVID-19 pandemic, Plaintiffs took
actions to mitigate the spread of the virus and promote social
distancing in 2020, and, as a result, increased their reliance
on the Postal Service to administer public benefits programs,
including "public assistance to low-income families, healthcare
assistance, child support enforcement, and drivers' licenses.
*See* Pls.' Mot., ECF No. 60 at 13 (citing *See* Adinaro Decl., ECF
No. 59-1 ¶ 12; Banks Decl., ECF No. 59-2 ¶¶ 3-5, 8, 10-12; Betts
Decl., ECF No. 59-3 ¶¶ 7-15; DiGiovanni-Abatto Decl., ECF No.
59-5 ¶¶ 3-5; Hein Decl., ECF No. 59-8 ¶¶ 2-3, 8, 13, 15; Jacobs

Decl., ECF No. 59-11 ¶¶ 4-10; Lau Decl., ECF No. 59-15 ¶¶ 3, 5-9; Poole Decl., ECF No. 59-17 ¶¶ 2, 6-11; Roye Decl., ECF No. 59-18 ¶¶ 4-5, 12-13; Roye Suppl. Decl., ECF No. 59-14 ¶¶ 18-20; Shah Decl., ECF No. 59-19 ¶¶ 3, 5-6, 10); *see also* N.Y. Exec. Order No. 202.8; Hawaii Sixth Supplementary Proclamation Relating to COVID-19; N.J. Exec. Order No. 107; San Francisco Third Supplement to Mayoral Proclamation Declaring the Existence of a Local Emergency dated Feb. 25, 2020; N.Y. City Emergency Executive Order No. 100. Plaintiffs also devoted resources to transforming their election processes to expand and encourage absentee and mail voting. Adinaro Decl., ECF No. 59-1 ¶ 9; Kellner Decl., ECF No. 59-13 ¶¶ 11, 16-17, 19; Ku Decl., ECF No. 59-14 ¶¶ 8-10.

### 2. USPS Postal Policy Changes

In June and July 2020, the Postal Service announced and implemented several changes and strategies to how it collected, processed, and delivered mail. At issue in this case are five actions, which the Court refers to as the "Postal Policy Changes." *See* Pls.' Mot., ECF No. 60 at 14.

First, on June 17, 2020, USPS announced that it would eliminate more than 600 sorting machines in the United States "over the next several months." *See* Pls.' Ex. 37, ECF No. 59-37. In total, USPS reduced 711 sorting machines by mid-August 2020, which was an approximately 14.7 percent reduction in the number

6

of machines across the country, as part of an initiative started in 2017 to determine the optimum number of machines by running computer models analyzing mail-flow volume. *See* DeChambeau Decl., ECF No. 59-33 ¶ 15. Excluding fiscal year 2016, the total number of letter and flat sorting machines USPS reduced exceeded the rates of elimination in previous years. *See id.* ¶ 21 (3.3 percent in FY2020; 1.9 percent in FY2019; 6.5 percent in FY2018; 3.5 percent in FY2017, and 0 percent in FY2015). On August 18, 2020, USPS suspended all removals of equipment until after the November 2020 election. *Id.* ¶ 22.

Second, on June 26, 2020, USPS held a teleconference with Area Vice Presidents regarding strategies to reduce, among other things, unearned overtime. *See* Pls.' Ex. 39, ECF No. 59-39. Unearned time is the "time that an employee takes to complete [his or her] duties over and above the earned time." Curtis Dep. Tr., ECF No. 66-14 at 14. Those attending the teleconference were asked to go "all in" on these strategies. *Id.;* June 26, 2020 Presentation, Pls.' Ex. 39, ECF No. 59-39 at 7. On September 21, 2020, USPS issued "Clarifying Operational Instructions" stating that "[o]vertime use has not been banned, nor have any caps been placed on overtime hours." USPS Clarifying Operational Instructions, Defs.' Ex. 12, ECF No. 66-16 at 2.

Third, on July 10, 2020, USPS held a teleconference with Area Vice Presidents during which the agency's chief operating officer gave a presentation regarding the elimination of late and extra trips.[2] *See* Cintron Suppl. Decl., ECF No. 66-19 at 2. The slides presented at the teleconference stated "NO EXTRA TRANSPORTATION" and "NO LATE TRANSPORTATION," advising that "[e]ffective July 13 all extra trips and Postal caused late trips are unauthorized contractual commitments." *See* July 10, 2020 Presentation, Pls.' Ex. 41, ECF No. 59-41 at 10-11. Some USPS employees distributed instructions the same day in line with the presentation's directives. *See* Email, Pls.' Ex. 42, ECF No. 59-42 at 2 ("[T]here is no more waiting on mail and there is no coming back for parcels. The excuses of why people can't get done with their routes is gone. We NEED to start capturing the downtime."). Another employee distributed a "Mandatory Stand-Up Talk: All Employees,"[3] stating that "[r]ight now, we are at a critical juncture in our organization and must make immediate, lasting, and impacting changes in our operations and in our culture." *See* Pls.' Ex. 43, ECF No. 59-43. According to the

---

[2] Late trips are trips that depart after their scheduled departure time, and extra trips are additional trips that were not originally scheduled to occur. *See* Coradi Decl., ECF No. 59-4 ¶¶ 13-14.

[3] USPS considers a "Stand-Up Talk" as a document with talking points that local postal managers use to relay information to employees. *See* Curtis Dep. Tr., ECF No. 66-14.

document, such "changes" included that "[a]ll trips will depart on time (Network, Plant and Delivery); late trips are no longer authority or accepted" and "[e]xtra trips are no longer authorized or accepted." *Id.* The document further instructed that the transportation changes would be "implemented immediately (today)." *Id.* Following the teleconference and the Stand-Up Talk, some employees were confused about the parameters of the policy regarding late and extra trips. *See* 66-19 at 2-3 (postal workers contacting USPS officials to get clarification on whether late and extra trips were banned). On July 14, 2020, Robert Cintron, the USPS Vice President of Logistics, distributed via email a document entitled "Keys to Success for Elimination of Extras and Lates" (the "Cintron Guidelines"), stating that the "focus is to eliminate unplanned extra transportation, "[d]eviations to the extent possible should be utilized to eliminate extras," and "[t]rips must depart on time." *See* Pls.' Ex. 45, ECF No. 59-45 at 2; Pls.' Ex. 46, ECF No. 59-46 at 2-3. The Cintron Guidelines included examples of when a late or extra trip was acceptable or unacceptable. *See* Pls.' Ex. 46, ECF No. 59-46 at 2-3.

At least some USPS employees knew that the process of eliminating late and extra trips would result in delayed mail delivery: "One aspect of these changes that may be difficult for employees is that—temporarily—we may see mail left behind or

mail on the workroom floor or docks (in P&DCs), which is not typical." *See* Pls.' Ex. 43, ECF No. 59-43. Following the issuance of the above documents, the number of late and extra trips dropped significantly. Cintron Dep. Tr., ECF No. 59-28; Grimmer Decl., ECF No. 59-7 ¶ 19; Pls.' Ex. 32, ECF No. 59-32; Pls.' Ex. 33, ECF No. 59-33; Pls.' Ex. 53, ECF No. 59-53; Pls.' Ex. 59, ECF No. 59-59. On September 21, 2020, USPS issued "Clarifying Operational Instructions" that stated that "late or extra trips that are reasonably necessary to complete timely mail delivery, is not to be unreasonably restricted or prohibited. Managers are authorized to use their best business judgment to meet our service commitments." Clarifying Operational Instructions, Defs.' Ex. 12, ECF No. 66-16.

Fourth, in July 2020, USPS announced an initiative entitled "Expedited to Street/Afternoon Sortation" (or "ESAS") at 384 facilities, including facilities in Plaintiff States. *See* Stand-Up Talk, Expedited to Street/Afternoon Sortation, Pls.' Ex. 47, ECF No. 59-47. Pursuant to the initiative, city carriers were prohibited from spending time in the morning sorting mail so that they could leave for the street earlier. *See id.* After completing their routes, city carriers would then return to the office and stage mail for delivery the next scheduled day. Pls.' Ex. 47, ECF No. 59-47. In effect, this meant that carriers were being ordered to not deliver mail that had arrived overnight,

10

but rather sort it in the afternoon for delivery the next day. *Id.* The initiative is no longer in effect. *See* Curtis Dep. Tr., ECF No. 66-14 at 27.

Fifth, on or around July 30, 2020, the USPS General Counsel informed 46 states and the District of Columbia that if the States did not pay First Class postage on ballots sent to voters, there would be a risk that voters would not receive their ballots in time to return them by mail. *See* Second Glass Dep. Tr., ECF No. 59-30 at 9-10; Pls.' Ex. 49, ECF No. 59-49. USPS officials indicated that states should mail election mail as First Class Mail, not Marketing Mail. *See* Pls.' Ex. 38, ECF No. 59-38 at 2. On September 21, 2020, USPS issued instructions stating that it will prioritize Election Mail that is entered as Marketing Mail, regardless of the paid class. Clarifying Operational Instructions, Defs.' Ex. 12, ECF No. 66-16.

USPS did not seek an advisory opinion pursuant to Section 3661(b) from the PRC prior to taking the above actions. *See* Pls.' Ex. 58, ECF No. 59-58 at 6.

**C. Procedural History**

Plaintiffs filed this lawsuit on August 25, 2020. On September 2, 2020, they filed a motion for a preliminary injunction, which requests that the Court enjoin the defendants from enforcing the Postal Policy Changes. See Mot., ECF No. 12-1. On September 27, 2020, the Court granted Plaintiffs' motion

11

for a preliminary injunction. *See New York v. Trump*, 490 F. Supp. 3d 225, 231 (D.D.C. 2020) (EGS). The Court held that Plaintiffs were likely to succeed on the merits of their 29 U.S.C. § 3661(b) claim because (1) they had established a likelihood of standing; (2) the Court likely had subject-matter jurisdiction over the Section 3661(b) claim; (3) the claim was likely reviewable pursuant to the *ultra vires* doctrine; and (4) USPS decision to implement the Postal Policy Changes without receiving a prior opinion from the PRC likely violated Section 3661(b). *See id.* at 236-43. The Court also held that Plaintiffs faced irreparable harm in the absence of a preliminary injunction and that the balance of equities and public interest favored a preliminary injunction. *See id.* at 243-45. Accordingly, the Court preliminarily enjoined the Postal Policy Changes. *See* Order, ECF No. 51. The Court clarified its Order on August 23, 2021 to reflect that the preliminary injunction did not prohibit the Postal Service from declining approval for extra network trips pursuant to the following principles: (1) where an extra trip would not be service responsive, and (2) where not using an extra trip would delay a volume of mail that is no greater than 15% of the truck's total capacity. *See* Mem. Op. & Order, ECF No. 98 at 16.

Plaintiffs filed their motion for summary judgment on October 19, 2020, *see* Pls.' Mot., ECF No. 58, and Defendants

filed a cross-motion for summary judgment on October 26, 2020,
*see* Pls.' Mot., ECF No. 66. The motions are ripe for
adjudication.

## II. Legal Standard

### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, summary
judgment should be granted if the moving party has shown that
there are no genuine issues of material fact and that the moving
party is entitled to judgment as a matter of law. Fed. R. Civ.
P. 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986). In
determining whether a genuine issue of material fact exists, a
court must view all facts in the light most favorable to the
non-moving party. S*ee Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 587 (1986). In ruling on cross-motions
for summary judgment, a court shall grant summary judgment only
if one of the moving parties is entitled to judgment as a matter
of law upon material facts that are not genuinely disputed.
*Shays v. FEC*, 424 F. Supp. 2d 100, 109 (D.D.C. 2006); *Winston &
Strawn LLP v. F.D.I.C.*, No. 06-1120 (EGS), 2007 WL 2059769, at
*3 (D.D.C. July 13, 2007).

### B. Availability of Judicial Review

The Postal Service is "exempt from review under the
Administrative Procedure Act." *N. Air Cargo v. USPS*, 674 F.3d
852, 858 (D.C. Cir. 2012); *see also* 39 U.S.C § 410(a). "However,

the case law in this circuit is clear that judicial review is available when an agency acts ultra vires, or outside of the authority Congress granted." *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022) (quotation marks omitted) (citation omitted). *Ultra vires* is available where "(i) there is no express statutory preclusion of all judicial review; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up) (quoting *Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).

Such claims are "confined to 'extreme' agency error where the agency has 'stepped so plainly beyond the bounds of [its statutory authority], or acted so clearly in defiance of it, as to warrant the immediate intervention of an equity court.'" *Id.* at 764 (quoting *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)). Only error that is "patently a misconstruction of the Act," that "disregard[s] a specific and unambiguous statutory directive," or that "violate[s] some specific command of a statute" will support relief. *Id.* "[T]he Supreme Court and [District of Columbia Circuit ("D.C. Circuit")] have long required in *ultra vires* cases that the

agency action go beyond mere legal or factual error and amount to a clear departure by the agency from its statutory mandate or be blatantly lawless agency action." *Id.* (cleaned up) (citation omitted).

## III. Analysis

### A. Plaintiffs Have Standing

To establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 134 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.* "Now, on summary judgment, the plaintiffs must prove injury in fact with 'specific facts' in the record." *Humane Soc'y of the U.S. v. Perdue*, 935 F.3d 598, 602 (D.C. Cir. 2019) (quoting *Lujan*, 504 U.S. at 561).

Defendants contend that Plaintiffs lack standing for three reasons. First, Defendants argue that "Plaintiffs cannot establish that the alleged USPS policy changes at issue have caused any material mail delays." Defs.' Reply, ECF No. 74 at 10. They contend that "the lack of a causal relationship is shown by the numerous injunctions that have been issued against the Postal Service in this and related cases." Defs.' Mot., ECF No. 66-1 at 23. Further, Defendants argue that any mail delays could have been caused by several unrelated issues, such as the COVID-19 pandemic, wildfires, and inclement weather. *Id.* at 25.

Plaintiffs, however, have provided evidence establishing that the implementation of the Postal Policy Changes, and specifically the changes to and impacts on the USPS transportation schedule, in the summer of 2020 were a de facto cause of the decline in on-time delivery rates. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Article III 'requires no more than de facto causality . . . .'" (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986)); *see also* USPS Office of Inspector General, Operational Changes to Mail Delivery (October 19, 2020), ECF No. 63-1 at 5 ("The Postal Service's mail service performance significantly dropped beginning in July 2020, directly corresponding to implementation of the operational changes and initiatives."). Defendants themselves have stated that the initial drop in service scores

in late July 2020 was connected to USPS's efforts to mitigate late and extra trips nationwide. *See, e.g.*, Pls.' Ex. 43, July 10, 2020 Mandatory Stand-up Talk, ECF No. 59-43 at 2 (stating that because "late trips are no longer authorized or accepted" and "[e]xtra trips are no longer authorized or accepted," there would be "mail left behind or mail on the workroom floor or docks (in P&DCs), which is not typical"); Pls.' Ex. 52, Aug. 13, 2020 Message from the Postmaster General, ECF No. 59-52 at 2-3 (noting that USPS had "reduced extra trips by 71 percent" and that "this transformative initiative has had unintended consequences that impacted our overall service levels"); Defs.' Ex. 13, Transcript of Senate Homeland Security and Governmental Affairs Committee Hearing (Aug. 21, 2020), ECF No. 66-17 (explaining that delays in mail delivery were due to the mitigation of extra trips, the COVID-19 pandemic, and employee availability, and that USPS "all feel . . . bad about what the . . . dip in our service level has been"). Indeed, after the changes were implemented, the record shows that service scores precipitously declined in late July and had not fully rebounded by October 2020. *See, e.g.*, Grimmer Suppl. Decl., ECF No. 59-23.

And though Defendants argue that "the historical evidence demonstrates that these USPS policy changes cannot be causing the mail delays," Defs.' Reply, ECF No. 74 at 10, the Court disagrees. Though mail delays continued after multiple courts,

17

including this Court, enjoined the alleged policy changes, as Plaintiffs point out, the record also demonstrates confusion following USPS's conflicting messaging regarding whether late and extra trips were authorized. *See* USPS Office of Inspector General, Operational Changes to Mail Delivery (October 19, 2020), ECF No. 63-1 at 4 (concluding that the USPS initiative to "[e]liminat[e] . . . late and extra trips to transport mail," among other initiatives, was "implemented quickly and [was] communicated primarily orally, which resulted in confusion and inconsistent application across the country"); *see also Jones*, 488 F. Supp. 3d at 122 (noting, in granting plaintiffs' preliminary injunction, that "there is sufficient evidence suggesting that . . . the rollback of policies has not been fully implemented or adequately communicated throughout the entire Postal Service organization, which is tiered in multiple national, regional, and local levels"). For example, though Defendants claim that "USPS never prohibited or set a firm limit on late and extra trips" at the July 10, 2020 teleconference with USPS Area Vice Presidents, Defs.' Mot., ECF No. 66-1 at 17, the message that trickled down to several Postal Service employees in the aftermath of that presentation was that all late and extra trips were unauthorized. Among other things, at least one Area Vice President distributed a "Mandatory Stand-Up Talk" directing that late trips and extra trips "are no longer

18

authorized and accepted," Pls.' Ex. 41, ECF No. 59-41, and others contacted USPS officials to get clarification on whether late and extra trips were banned, *see* Cintron Suppl. Decl., ECF No. 39-1. Likewise, though Defendants describe the Cintron Guidelines as "simply identify[ing] when late and extra trips may improve overall efficiency," Defs.' Mot., ECF No. 66-1 at 24, at the same time, Mr. Cintron also stated that the "focus is to eliminate unplanned extra transportation," "[d]eviations to the extent possible should be utilized to eliminate extras," and "[t]rips must depart on time," Email Re: Cintron Guidelines, Ex. 45, ECF No. 59-45 at 2. The Cintron Guidelines were not explicitly rescinded until October 27, 2020. *See* Min. Order (Oct. 27, 2020), *NAACP v. USPS*, No. 20-cv-2295 (D.D.C. 2020) (EGS). Furthermore, the Court does not disagree with Defendants that USPS service scores could have been negatively impacted by multiple sources. However, the possibility that other events may have also contributed to any delays in mail delivery does not suggest that the Postal Policy Changes had no impact. Traceability "does not require that the [challenged action] be the most immediate cause, or even a proximate cause, of the plaintiffs' injuries." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 629 (D.C. Cir. 2017); *see also Massachusetts v. EPA*, 549 U.S. 497, 523 (2007) (finding plaintiff had standing where EPA's refusal to regulate manmade greenhouse gas emissions

19

"contribute[d]" to injuries). The Court therefore concludes that Plaintiffs' injuries are fairly traceable to the Postal Policy Changes.

Second, Defendants argue that, "because Plaintiffs cannot show that these policy changes are causing the current delays, they also cannot show that an injunction against these policy changes will redress the delays." Defs.' Reply, ECF No. 74 at 10. However, as described above, the Plaintiffs have established that the Postal Policy Changes are fairly traceable to the delays in mail delivery. Therefore, a decision in favor of Plaintiffs would redress their alleged injuries.

Third, Defendants argue that, "even if Plaintiffs could establish causation or redressability, they cannot establish that the alleged USPS policy changes will cause material mail delays that will inflict any injury upon Plaintiffs in particular." Defs.' Reply, ECF No. 74 at 11. Though Defendants do not provide any clarification on what would constitute a "material" mail delay or offer any case law supporting their contention, the Court concludes that the record evidence demonstrating a significant decline in service scores in Plaintiffs' jurisdictions beginning in July 2020, as well as testimony that mail delays were indeed causing issues with voting procedures in the relevant jurisdictions, suffice. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019)

("Several state respondents here have shown that if noncitizen households are undercounted by as little as 2% . . . they will lose out on federal funds that are distributed on the basis of state population. That is a sufficiently concrete and imminent injury to satisfy Article III, and there is no dispute that a ruling in favor of respondents would redress that harm."). Moreover, Plaintiffs have provided evidence that mail delays impeded their ability to combat the spread COVID-19, impeded their ability to provide safe alternatives to in-person voting, imposed "direct financial costs to state and local agencies," and imposed "administrative burdens . . . on state and local agencies." *See* Adinaro Decl., ECF No. 59-1 ¶ 9; Banks Decl., ECF No. 59-2 ¶¶ 7-9; Kellner Decl., ECF No. 59-13 ¶¶ 11, 16-17, 19; Ku Decl., ECF No. 59-14 ¶¶ 8-10, 13; Newton Decl., ECF No. ECF No. 59-16 ¶¶ 13-16; Roye Decl., ECF No. 59-18 ¶¶ 5, 11-13; Shah Decl., ECF No. 59-19 ¶¶ 3, 5-6, 10; Roye Suppl. Decl., ECF No. 59-24 ¶¶ 13, 18-20. And though Defendants claim that these injuries were "self-inflicted" and therefore "insufficient to confer standing," Defs.' Mot., ECF No. 66-1 at 26, Plaintiffs here are not attempting to "manufacture standing merely by inflicting harm on themselves," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *see also District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 35 (D.D.C. 2020) ("[S]elf-inflicted generally means curable by the moving party without an

21

injunction."). Rather, Plaintiffs suffered injuries in response to the effects of the significant USPS changes; in other words, "Plaintiffs could not otherwise avoid these injuries absent the relief sought through this litigation," Pls.' Opp'n, ECF No. 71 at 17.

Finally, this Court has also already rejected Defendants' argument that States cannot bring *parens patriae* claims against the federal government. *See New York*, 490 F. Supp. 3d at 244. The evidence before the Court demonstrates that Plaintiffs' efforts to mitigate the spread of COVID-19 are aimed at protecting the public health of their respective jurisdictions as a whole. *See* Banks Decl., ECF No. 59-2 ¶¶ 7-9; Newton Decl., ECF No. ECF No. 59-16 ¶¶ 13-16; Roye Decl., ECF No. 59-18 ¶¶ 5, 11-13; Roye Suppl. Decl., ECF No. 59-24 ¶¶ 13, 18-20; Ku Decl., ECF No. 59-14 ¶¶ 8-10, 13; Shah Decl., ECF No. 59-19 ¶¶ 3, 5-6, 10; Adinaro Decl., ECF No. 59-1 ¶ 9; Kellner Decl., ECF No. 59-13 ¶¶ 11, 16-17, 19. Impeding these mitigation efforts results in harm to Plaintiffs as well as the residents of the states. *See Air All. Houston v. EPA*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) (holding that State petitioners had "demonstrated their independent proprietary interests in avoiding chemical releases in their territory sufficient to support standing"); *cf. New York v. U.S. Dep't of Homeland Sec.*, 475 F. Supp. 3d 208, 226-27 (S.D.N.Y. 2020) (finding that the State plaintiffs adequately

demonstrated irreparable harm where the governmental "Plaintiffs provide[d] ample evidence that the [challenged conduct] deters immigrants from seeking testing and treatment for COVID-19, which in turn impedes public efforts in the Governmental Plaintiffs jurisdictions to stem the spread of the disease"), *stayed on other grounds*, No. 20-2537, 974 F.3d 210, (2d Cir. Sept. 11, 2020).

In view of the above, the Court concludes that Plaintiffs have standing.

## B. 39 U.S.C. § 3661(b)

Plaintiffs first argue that the Court should grant them summary judgment on their claim that Defendants violated 39 U.S.C. § 3661(b) by failing to ask the PRC for an advisory opinion prior to implementing the Postal Policy Changes. *See* Pls.' Mot., ECF No. 60 at 27. Section 3661(b) provides that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal," to the PRC "requesting an advisory opinion on the change."

For the reasons discussed below, the Court grants Plaintiffs' motion for summary judgment on this claim.

### 1. The Court Has Subject-Matter Jurisdiction Over Plaintiffs' Section 3661 Claim

Defendants argue that this Court lacks subject-matter jurisdiction over Plaintiffs' Section 3661 claim because complaints regarding Section 3661 must first be lodged with the PRC, with any appeals directed to the United States Court of Appeals for the D.C. Circuit. *See* Defs.' Mot., ECF No. 66-1 at 27. The Court disagrees.

Pursuant to 39 U.S.C. § 409(a), "[e]xcept as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service." 39 U.S.C. § 409(a); *see also* 28 U.S.C. § 1339 ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the postal service."). As is relevant here, Section 3661, entitled "Postal services," provides:

> (a) The Postal Service shall develop and promote adequate and efficient postal services.
>
> (b) When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change.
>
> (c) The Commission shall not issue its opinion on any proposal until an opportunity

24

> for hearing on the record under sections 556
> and 557 of title 5 has been accorded to the
> Postal Service, users of the mail, and an
> officer of the Commission who shall be
> required to represent the interests of the
> general public. The opinion shall be in
> writing and shall include a certification by
> each Commissioner agreeing with the opinion
> that in his judgment the opinion conforms to
> the policies established under this title.

Next, Section 3662, entitled "Rate and service complaints," provides that "[a]ny interested person . . . who believe[s] the Postal Service is not operating in conformance with the requirements of a provision of . . . this chapter (or regulations promulgated under any of these provisions) may lodge a complaint with the Postal Regulatory Commission." If such a complaint is lodged with the PRC, Section 3662(b) requires that the PRC respond within 90 days by either "begin[ning] proceedings" or "issu[ing] an order dismissing the complaint." 39 U.S.C. § 3662(b). Section 3663 provides that a petition for review may be filed with the D.C. Circuit by any "adversely affected or aggrieved by a final order or decision" of the PRC. 39 U.S.C. § 3663.

"Whether a statute is intended to preclude initial judicial review is determined by the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (internal citation omitted). Here,

Section 3662's use of the word "may" in describing the right to file a complaint with the PRC suggests that the avenue for PRC review of certain claims is permissive. *See Bennett v. Panama Canal Co.*, 475 F.2d 1280, 1282 (D.C. Cir. 1973) ("Ordinarily 'may' is a permissive not a mandatory term."). Indeed, the statute consistently uses the word "may" when setting forth the procedure for filing complaints and for seeking appellate review of the PRC's determination (or failure to make a determination): any interested person "may" lodge a complaint with the PRC, and if the interested person is unsatisfied with the response or does not receive a timely response, they "may" file a petition with the D.C. Circuit. 39 U.S.C. §§ 3662(a), 3663; *see also id.* § 3662(a) (stating the PRC "may" prescribe the "form and manner" of complaints); *id.* § 3662(d) ("[T]he Postal Regulatory Commission *may* order, based on the nature, circumstances, extent, and seriousness of the noncompliance, a fine (in the amount specified by the Commission in its order) for each incidence of noncompliance." (emphasis added)). Moreover, the use of the permissive "may" coupled with the use of the mandatory "shall" elsewhere in the statute further suggests that Sections 3662(a) and 3663 were not intended to be the exclusive avenue for bringing a procedural challenge to the USPS's failure to comply with Section 3661. *See Bennett*, 475 F.2d at 1282 ("[T]he permissive interpretation is conclusively proven to be

correct [together with the particular legislative history] by the fact that when in the same statute Congress intended a mandatory direction it used the auxiliary 'shall' not 'may'-a contrast which is generally significant . . . ."); *see, e.g.*, 39 U.S.C. § 3662(b) (stating that the PRC "shall" respond to complaints within 90 days). This interpretation is strengthened because the statute also expressly provides that this Court has original jurisdiction "over all actions brought by or against the Postal Service" unless "otherwise provided in [title 39]." 39 U.S.C. § 409(a).

Defendants argue, however, that "[g]enerally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive." Defs.' Mot., ECF No. 66-1 at 28 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 589 (2010)). According to Defendants, "numerous courts of appeals have held that 39 U.S.C. §§ 3662 through 3664 constitute the exclusive jurisdictional remedy for complaints about postal services that fall within the statutory provisions identified in [S]ection 3662, which includes a claim that the Postal Service is not complying with [S]ection 3661." Defs.' Mot., ECF No. 66-1 at 27.

But, as stated above, the text of the statute itself does not indicate that Congress intended the PRA to be the exclusive

avenue for bringing complaints of alleged *ultra vires* action. *See Kaufman v. Nielsen*, 896 F.3d 475, 485 (D.C. Cir. 2018) (presuming an undefined term "carries its ordinary meaning at the time the provision was enacted"); *cf. Am. Postal Workers Union, AFL-CIO v. USPS*, No. 06-cv-726 (CKK), 2007 WL 2007578, at *7 (D.D.C. July 6, 2007) (noting that plaintiff's Section 3661(b) claim that USPS failed to ask for an advisory opinion from the PRC "appears to be properly brought before this Court pursuant to 39 U.S.C. § 409"). The statute's legislative history also does not suggest such a reading. Rather, in the discussion of the section of the PRA that established the "procedures for changes in postal service," the House Committee Report states the "[t]he postal service is—first, last, and always—a public service" and that the PRA "require[s] [Postal Services management] to seek out the needs and desires of its present and potential customers—the American public." H.R. Rep. No. 91-1104 at 3668. The Committee Report describes provisions in the Act that "contain[] specific provisions requiring justification and review of changes in service." *Id.*; *see also Buchanan v. U.S. Postal Serv.*, 508 F.2d 259, 263 n.6 (5th Cir. 1975) ("[T]he procedures mandated by [Section] 3661 are sufficiently elaborate to amount to a significant impediment in the path of the decision-making process of the Postal Service.").

Moreover, as this Court previously explained in its
September 27, 2020 Memorandum Opinion, none of the case law
Defendants cite as support for their arguments are binding on
this Court. Neither did any of the cases "involve[] a claim that
the USPS circumvented the process required when making a 'change
in the nature of postal services which will generally affect
service on a nationwide or substantially nationwide basis.'"
*Pennsylvania v. DeJoy*, 490 F. Supp. 3d 833, 861 (E.D. Penn.
2020) (analyzing similar case law and finding that "[a]lthough
these lawsuits were largely filed by pro se plaintiffs who were
likely without the legal background to ground their claims in a
specific statutory provision, the overwhelming majority of the
claims at issue are precisely captured by section 3661(a), which
requires the Postal Service to provide adequate and efficient
service to the public."). The Court finds this distinction to be
significant, given that the "claims in the cases cited by
Defendants" largely deal with "the adequacy and efficiency of
service under [S]ection 3661(a)," which "can most properly be
characterized as localized service-related disputes,"[4] while

---

[4] *See Foster v. Pitney Bowes Corp.*, 549 F. App'x 982, 986 (Fed.
Cir. 2013) (alleged "fraud, conversion, unjust enrichment, and
misappropriation of trade secrets"); *LeMay v. U.S. Postal Serv.*,
450 F.3d 797, 799-800 (8th Cir. 2006) (alleged breach of
contract); *Bovard v. U.S. Post Office*, 47 F.3d 1178 (10th Cir.
1995) (alleged discrimination, libel, and slander); *Pep-Wku, LLC
v. USPS*, No. 20-cv-0009-GNS, 2020 WL 2090514, at *3 (W.D. Ky.
Apr. 30, 2020) (alleged refusal to properly deliver mail);

"Plaintiffs' core challenge is that the Postal Service acted outside of its authority in making changes without consulting first with the Commission in violation of section 3661(b)," which is "a wholly separate provision" that "focuses on the *process* to which the Postal Service must adhere." *Id.* at 861-62.

Defendants argue, however, that despite the above, "[a] number of considerations militate against allowing courts to short-circuit an established administrative review process, including respect for Congress's conferral of administrative autonomy; administrative expertise and discretion as to specialized, complex problems; development of an initial factual record; conservation of judicial resources; and avoidance of

---

*McClintock v. United States*, No. 3:18-CV-01937-SB, 2020 WL 1868264, at *2 (D. Or. Mar. 18, 2020) (alleged improper mail delivery); *McDermott v. Potter*, No. C09-0776RSL, 2009 WL 2971585, at *3 (W.D. Wash. Sept. 11, 2009) (Freedom of Information Act, the Employee Retirement Income Security Act of 1974, and the Postal Accountability and Enforcement Act of 2006 claims relating to closure of mail center and alleged job outsourcing); *Rodriguez v. Hemit*, No. C16-778 RAJ, 2018 WL 3618260, at *2 (W.D. Wash. July 30, 2018) (alleged harassment); *Striley v. U. S. Postal Serv.*, No. 16-CV-07233-HRL, 2017 WL 513166, at *3 (N.D. Cal. Feb. 8, 2017) (alleged unlawful increase of the rates for post office box, crammed box full of advertising materials, and failed to deliver an article of mail); *Murphy v. U.S. Postal Serv.*, No. C 14-02156 SI, 2014 WL 4437731, at *3 (N.D. Cal. Sept. 9, 2014) (alleged improper denial of services; *Powell v. U.S. Postal Serv.*, No. CV 15-12913-FDS, 2016 WL 409672, at *1-2 (D. Mass. Feb. 2, 2016) (alleged refusal to deliver mail); *see also Sears, Roebuck & Co. v. U.S. Postal Serv.*, 134 F. Supp. 3d 365, 382 (D.D.C. 2015) (alleged unreasonable interpretation of the Domestic Mail Manual).

conflicting litigation." Defs.' Mot., ECF No. 66-1 at 28-29
(citing *Nader v. Volpe*, 466 F.2d 261, 265-68 (D.C. Cir. 1972)).
But while the concerns listed in *Nader* may generally apply in
such situations, the D.C. Circuit in *Nader* also explained that
"when Congress has specified a procedure for judicial review of
administrative action, courts will not make nonstatutory
remedies available without a showing of patent violation of
agency authority or manifest infringement of substantial rights
irremediable by the statutorily-prescribed method of review."
466 F.2d at 266. As Plaintiffs point out, their "*ultra vires*
claim involves the very type of 'violation of agency authority'
contemplated by the court in *Nader*." Pls.' Reply, ECF No. 71 at
22.

Finally, the Court considers whether the claim may be
reviewed because there is no other meaningful or adequate avenue
for judicial review. *See Thunder Basin Coal Co.*, 510 U.S. at
307. District court jurisdiction may not be implicitly precluded
based on consideration of the following factors: (1) if "a
finding of preclusion could foreclose all meaningful judicial
review"; (2) if the claim is "wholly collateral to a statute's
review provisions"; and (3) if the claims are "outside the
agency's expertise" to discern "whether the particular claims at
issue fall outside an overarching congressional design." *Jarkesy*

*v. SEC*, 803 F.3d 9, 17 (D.D.C. 2015) (quoting *Free Enter. Fund*, 561 U.S. at 489-90).

The Court previously held in its September 27, 2020 Memorandum Opinion that precluding district court jurisdiction here would deny Plaintiffs meaningful review because: (1) "Plaintiffs have shown that the USPS implemented dramatic operational changes that have resulted in delayed mail that 'have negatively affected and will continue to negatively affect Plaintiffs' ability not only to provide necessary services to residents in need and administer their own laws and regulations, but also to protect public health by providing safe and effective means to vote by mail in the upcoming general election,'" 490 F. Supp. 3d at 239-40 (citing *Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 631 (4th Cir. 2018); *Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996)); (2) "the relief Plaintiffs seek cannot be meaningfully redressed through filing a Section 3662 complaint," *id.* at 240; and (3) "Plaintiffs' procedural claim does not require the "agency expertise" the statutory procedures contemplate," *id.*

Defendants now contend that "even if Plaintiffs could have established these elements when they moved for a preliminary injunction, they certainly cannot do so now" because "any alleged election-related injuries will be moot at or immediately

after the time the Court issues a decision," and "Plaintiffs identify no reason why the PRC could not provide meaningful relief as to any non-election injuries that Plaintiffs allege are ongoing." Defs.' Mot., ECF No. 66-1 at 32. However, the Court's conclusion in its September 27, 2020 Memorandum Opinion was not limited to election-related injuries—the Court also noted that the Postal Policy Changes negatively affected and would continue to be negatively affect Plaintiffs' ability to provide necessary services to residents in need and administer their own laws and regulations. 490 F. Supp. 3d at 239-40. Thus, the Court disagrees that Plaintiffs' injuries are moot.

In view of the above, the Court concludes it has subject-matter jurisdiction over Plaintiffs' claim. *See Buchanan v. USPS*, 375 F. Supp. 1014, 1017 (N.D. Ala. 1974), *aff'd in part, vacated in part*, 508 F.2d 259 (5th Cir. 1975); *Washington v. Trump*, 487 F. Supp. 3d 976, 981 n.1 (E.D. Wash. 2020) (finding it likely that "39 U.S.C. § 3662 does not limit this Court's jurisdiction" because (1) "[b]y its terms, § 3662 is discretionary, not mandatory"; (2) "Section 3662 does not divest district courts of the broad jurisdiction granted to them under 28 U.S.C. § 1339 over 'any civil action arising under any Act of Congress relating to the postal service,' nor the grant of 'jurisdiction over all actions brought by or against the Postal Service' in 39 U.S.C. § 409(a)"; and (3) "[Section] 3662

encompasses claims that the Postal Service has failed to adhere to its rate and service standards or that those standards are inadequate," which "is not the case here").

### 2. Plaintiffs' Section 3661 Claim Is Reviewable Pursuant to the *Ultra Vires* Doctrine

Defendants also argue that Plaintiffs' Section 3661 claim is not subject to judicial review. Defs.' Mot., ECF No. 66-1 at 32. Defendants argue that (1) Section 3661 expressly precludes judicial review, and (2) Plaintiffs have not demonstrated that USPS is acting "in excess of its delegated powers and contrary to a specific prohibition." *Id.* (quoting *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019)).

"Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction," *Griffith v. FLRA*, 842 F.2d 487, 492 (D.C. Cir. 1988), and, as the Court explained above, the right to file a complaint with the PRC is not exclusive. Moreover, Section 3661 is a "clear and specific statutory mandate" involving "positive statutory commands." *Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel*, 437 F.3d 1256, 1263 (D.C. Cir. 2006). Because the statutory provision "plainly delineates the outer limits of agency authority," the claim is subject to review for

34

*ultra vires* acts. *Nat'l Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 972 (D.C. Cir. 2022).

### 3. USPS Failed to Comply with Section 3661(b)

The scope of non-APA review includes, among other things, "a straightforward question of statutory interpretation." *Nat'l Ass'n*, 602 F.2d at 432. In conducting this review, "[t]he judicial role is to determine the extent of the agency's delegated authority and then determine whether the agency has acted within that authority. In this as in other settings, courts owe a measure of deference to the agency's own construction of its organic statute, but the ultimate responsibility for determining the bounds of administrative discretion is judicial." *Id.* at 432-33 (internal citations omitted).

Section 3661(b) provides that "[w]hen the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Regulatory Commission requesting an advisory opinion on the change." There is no dispute that the USPS did not submit a proposal to the PRC prior to implementing the Postal Policy Changes at issue in this case.

Persuasive authority has construed Section 3661(b) as follows:

> The language of the statute . . . indicates that three factors must coexist before 3661 applies. First, there must be a 'change.' This implies that a quantitative determination is necessary. There must be some meaningful impact on service. Minor alterations which have a minimal effect on the general class of postal users do not fall within 3661. Second, the change must be 'in the nature of postal services.' This involves a qualitative examination of the manner in which postal services available to the user will be altered. Third, the change must affect service 'on a nationwide or substantially nationwide basis.' A broad geographical area must be involved. These three factors combine to demonstrate that Congress intended the safeguards of 3661 to apply only when changes of significance were contemplated.

*Buchanan*, 508 F.2d at 263.

The Court concludes that Defendants violated Section 3661(b) by failing to submit a proposal to the PRC prior to implementing its changes.

First, the record demonstrates that there was a "change" that had a "meaningful impact on service." *Buchanan*, 508 F.2d at 263. As the Court explained in Section III.A, there was a meaningful drop in service performance immediately following the implementation of the Postal Policy Changes. In particular, the changes to and impacts on the USPS transportation schedule contributed to the decline in on-time delivery rates in July

36

2020. *See* Grimmer Suppl. Decl., ECF No. 59-23; Pls.' Ex. 52,
Aug. 13, 2020 Message from the Postmaster General, ECF No. 59-52
at 2-3 (noting that USPS had "reduced extra trips by 71 percent"
and that "this transformative initiative . . . impacted our
overall service levels"); Defs.' Ex. 13, Transcript of Senate
Homeland Security and Governmental Affairs Committee Hearing
(Aug. 21, 2020), ECF No. 66-17 (explaining that the "dip in our
service level" was due to the mitigation of extra trips, the
COVID-19 pandemic, and employee availability); USPS Office of
Inspector General, Operational Changes to Mail Delivery (October
19, 2020), ECF No. 63-1 at 5 ("The Postal Service's mail service
performance significantly dropped beginning in July 2020,
directly corresponding to implementation of the operational
changes and initiatives."). For example, Defendants concede that
"[t]he drop in on-time delivery during the week of August 8,
2020 meant that approximately 85 million more deliveries were
late that week than they would have been prior to the challenged
changes." Defs.' Counter-Statement of Disputed Facts, ECF No.
67-1 at 33. USPS has also acknowledged the connection between
the decrease in service performance and its efforts to mitigate
late and extra trips nationwide, and further data demonstrates
that service scores had not fully rebounded by October 2020.
*See, e.g.*, Grimmer Suppl. Decl., ECF No. 59-23; Pls.' Ex. 43,
July 10, 2020 Mandatory Stand-up Talk, ECF No. 59-43 at 2

(stating that because "late trips are no longer authorized or accepted" and "[e]xtra trips are no longer authorized or accepted," there would be "mail left behind or mail on the workroom floor or docks (in P&DCs), which is not typical"). In addition, the pace of the removal of high-speed sorting machines was accelerated in 2020. In fiscal year 2020, USPS reduced 711 high-speed sorting machines—600 of which were announced on June 17, 2020—representing an approximately 14.7 percent reduction in the number of machines nationwide. *See* DeChambeau Decl., ECF No. 30-2 ¶ 21; Pls.' Ex. 37, ECF No. 59-37.

Defendants, however, argue that because it "never prohibited extra or late trips" and only developed "written guidance clarifying the circumstances under which late and extra trips were acceptable," USPS did not initiate a "change" within the meaning of Section 3661. Defs.' Mot., ECF No. 66-1. However, the evidence on this point is conflicting. *Compare* Pls.' Ex. 41, ECF No. 59-41 (Area Vice President distributed a "Mandatory Stand-Up Talk" directing that late trips and extra trips "are no longer authorized and accepted"), *and* Cintron Suppl. Decl., ECF No. 39-1 (postal workers contacting USPS officials to get clarification on whether late and extra trips were banned), *and* Email Re: Cintron Guidelines, Ex. 45, ECF No. 59-45 at 2 ("focus is to eliminate unplanned extra transportation," "[d]eviations to the extent possible should be utilized to eliminate extras,"

and "[t]rips must depart on time"), *with* Defs.' Mot., ECF No. 66-1 at 24 (describing the Cintron Guidelines as "simply identify[ing] when late and extra trips may improve overall efficiency"). And even if the official policy was never to "ban" such trips, the "focus" was to eliminate them. *See* Pls.' Ex. 45, ECF No. 59-45 (stating that the "focus is to eliminate unplanned extra transportation," "[d]eviations to the extent possible should be utilized to eliminate extras," and "[t]rips must depart on time"). In addition, though Defendants now take the position that their actions in June and July 2020 did not constitute "changes," their position is not supported based on USPS's own statements. *See* Email from Mr. DeJoy to All Employees, August 13, 2020, ECF No. 12-22 at 2 ("In order to transform . . . we must make a significant number of changes that will not be easy . . . ."); *id.* ("Unfortunately, this transformative initiative has had unintended consequences that impacted our overall service levels. However, recent changes are not the only contributing factors."); *id.* at 3 ("I ask that you bear with me while we work through these changes to transform for the better . . . .").

The Court is also unpersuaded by Defendants' argument that a "change" only encompasses "new" policies, and as such the agency's removal of sorting machines is not a change because it was part of a years-long process. *See* Defs.' Mot., ECF No. 66-1

at 35. Although the Postal Service may have been removing excess machines from its facilities since 2017, "the pace of removals was accelerated beginning in June 2020." USPS Office of Inspector General, Operational Changes to Mail Delivery (October 19, 2020), ECF No. 63-1 at 4; *see also* DeChambeau Decl., ECF No. 30-2 ¶ 21 (noting rate of reductions of sorting machines).

Second, the changes were "in the nature of postal services," 39 U.S.C. § 3661(b), because they qualitatively altered "the manner in which postal services [are] available to the user," *Buchanan*, 508 F.2d at 263. As stated above, the record evidence shows that changes in transportation policies resulted in nationwide delays.

Third, the changes affected service "on a nationwide or substantially nationwide basis," 39 U.S.C. § 3661(b), because "[a] broad geographical area [was] involved," *Buchanan*, 508 F.2d at 263. As stated above, the record demonstrates that the changes resulted in delays on a nationwide basis.

Despite the above, Defendants argue that the PRC's interpretations of Section 3661(b) are entitled to deference. Defs.' Mot., ECF No. 66-1 at 34-35. According to Defendants, the PRC has interpreted the section to require USPS to submit a proposal only when an action or program "has *as its goal*, or will have as a *reasonably foreseeable* effect, an appreciable alteration in the accessibility of postal services to the public

40

or in the type and quality of postal services offered to the public which is substantial and extends over a broad geographical area." *Id.* at 34 (citations omitted). Put another way, USPS is required to seek an advisory opinion "only if the complainant can show (1) 'that the Postal Service has already, or [plans] to implement, new service standards' or (2) 'that the Postal Service is knowingly and/or intentionally denigrating service.'" *Id.* (citations omitted). Defendants argue that they did not violate Section 3661(b) because they did not knowingly or intentionally denigrate service. *Id.* at 36-37.

However, there is no evidence that Defendants analyzed the impacts its changes would have on overall service standards prior to implementing multiple changes at the same time. *See, e.g.*, USPS Office of Inspector General, Operational Changes to Mail Delivery (October 19, 2020), ECF No. 63-1 at 4 ("While the Postal Service estimated workhour savings for many of the initiatives, it did not complete a study or analysis of the impact the changes would make on mail service prior to implementation."). Permitting USPS to avoid the requirements of Section 3661(b) because it refused to study the consequences of its changes prior to implementation would stand in conflict with the purpose of Section 3661(b). As the Court stated in its September 27, 2020 Memorandum Opinion, "Congress clearly intended Section 3661 to require an opportunity for public

participation and for independent review before the USPS implements service changes that will have a broad effect," and "[t]he broad scope of the Postal Policy Changes demonstrates on its face that it is precisely the kind of change that is to be the subject of the public-participation and independent review safeguards provided by Section 3661." *New York*, 490 F. Supp. 3d at 243.

The Court also is not persuaded that it was not "foreseeable" that the simultaneous implementation of multiple policy changes during the height of the pandemic would negatively impact service. *See, e.g.*, Pls.' Ex. 43, July 10, 2020 Mandatory Stand-up Talk, ECF No. 59-43 at 2 (stating that because "late trips are no longer authorized or accepted" and "[e]xtra trips are no longer authorized or accepted," there would be "mail left behind or mail on the workroom floor or docks (in P&DCs), which is not typical"); *see also* USPS Office of Inspector General, Operational Changes to Mail Delivery (October 19, 2020), ECF No. 63-1 at 4 ("These initiatives undertaken individually may not have been significant. However, launching all of these efforts at once, in addition to the changes instituted by the Postmaster General, had a significant impact on the Postal Service.").

Finally, Defendants argue that Plaintiffs' *ultra vires* claim should fail because they have a "meaningful and adequate

means of vindicating [their] statutory rights" by filing a complaint with the PRC. Defs.' Mot., ECF No. 66-1 at 38-39. However, because of the nature of Plaintiffs' claims and because of the impending general election at the time Plaintiffs filed suit, forcing Plaintiffs to raise their claims administratively would not have afforded them meaningful vindication of their right to notice and opportunity to participate as required under Section 3661(b) in a timely manner. *See New York*, 490 F. Supp. 3d at 243.

### C. 39 U.S.C. §§ 101 and 403

Plaintiffs next argue that the implementation of certain Postal Policy Changes constituted *ultra vires* action in violation of 39 U.S.C. §§ 101 and 403. For the reasons below, the Court disagrees.

#### 1. Sections 101 and 403 Claims Are Reviewable Pursuant to the *Ultra Vires* Doctrine

Defendants first argue that Plaintiffs' 39 U.S.C. §§ 101 and 403 claims are not subject to judicial review under the *ultra vires* doctrine. The parties do not contest that there is no express statutory preclusion of all judicial review and that there is no alternative procedure for review of the statutory claim. Rather, Defendants contend that "*[u]ltra vires* review is *not* available where a statute leaves an agency with discretion in how to comply with broadly articulated aims or goals," and here, the provisions in Sections 101 and 403 are "statements of

broad policies that the Postal Service strives toward in exercising its 'significant' discretion that the PRA gives the Postal Service over its operations pertaining to the handling, collection, transportation, and delivery of mail." Defs.' Mot., ECF No., 66-1 at 40-41.

Defendants' arguments, however, rely on a district court case—*Nat'l Ass'n of Postal Supervisors v. USPS*, No. 19-2236, 2020 WL 4039177 (D.D.C. July 17,2020)—that the D.C. Circuit has since reversed in *Nat'l Ass'n of Postal Supervisors v. USPS ("NAPS")*, 26 F.4th 960 (D.C. Cir. 2022). In *NAPS*, the circuit court considered whether 39 U.S.C. §§ 101(c), 1003(a), and 1004 were subject to judicial review. 26 F.4th at 970. These provisions—found in the same Act as those at issue in this case—provided that the Postal Service "'shall' consult with recognized organizations, maintain 'adequate and reasonable differentials in rates of pay' between supervisors and clerks and carriers, and 'achieve and maintain compensation for its officers and employees comparable to the rates and types of compensation paid in the private sector.'" *Id.* at 972 (quoting 39 U.S.C. §§ 101(c), 1003(a), 1004(a), (b)). The court held that the provisions were subject to judicial review pursuant to the *ultra vires* doctrine because, among other things, they contained "explicit language stating what the Postal Service 'shall' do," which was "undoubtedly mandatory" language. *Id.* at 971 (citing

44

*Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172
(2016)). Notably, in reaching its decision, the circuit court
took no issue with discretionary language used in 39 U.S.C. §
1004(a), which granted USPS the authority to decide whether the
required pay differential was "adequate and reasonable." *Id.* at
971-72. The D.C. Circuit also explained that the mere use of the
word "policy" in a statute "does not presumptively make a
directive voluntary." *Id.* at 971. Rather, in view of the
"mandatory" language of the provisions at issue, Congress had
"*expressly removed* certain policy choices" from USPS. *Id.*

In view of the *NAPS* decision, the Court rejects Defendants'
arguments that any statute that leaves an agency with discretion
is not subject to judicial review, or that the directives
contained in Sections 101 or 403 are unenforceable policy goals.
*See id.* at 970 ("While a court 'can defer to the exercise of
administrative discretion on internal management matters, . . .
[we] cannot abdicate [our] responsibility to insure compliance
with congressional directives setting the limits on that
discretion.'" (quoting *Nat'l Ass'n of Postal Supervisors v.
USPS*, 602 F.2d 420, 432 (D.C. Cir. 1979))). Sections 101(a)-(b),
(e), and 403(a)-(b) each incorporate either the mandatory term
"shall" or the mandatory phrase "[i]t shall be the
responsibility of" in requiring USPS to take certain actions.
*Compare Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,

523 U.S. 26, 35 (1998) (stating that "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion"), *with United States v. Rodgers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."). In addition, despite the use of the term "policy" in Section 101, "Congress effectively mandated certain policies to be followed by the Postal Service, leaving no discretion for the agency to do otherwise." *NAPS*, 26 F.4th 971.

The Court therefore turns to Plaintiffs' claims.

### 2. The Postal Service Did Not Act *Ultra Vires* In Violation of Sections 101 and 403

In analyzing Plaintiffs' Sections 101 and 403 claims, the Court is "mindful that '[r]eviewability and the scope of review are two separate questions.'" *NAPS*, 26 F.4th at 972 (quoting *Nat'l Ass'n*, 602 F.2d at 432). While the Postal Service may have "broad discretion" in running its operations, "this does not mean that its decisions are entirely insulated from judicial surveillance." *Id.* (citation omitted). "The judicial role is to determine the extent of the agency's delegated authority and then determine whether the agency has acted within that authority." *Nat'l Ass'n*, 602 F.2d at 432.

### a.    Section 101(a)

Section 101(a) of the Act provides that the USPS "shall provide prompt, reliable, and efficient services to patrons in

46

all areas and shall render postal services to all communities."
39 U.S.C. § 101(a). Plaintiffs allege that because the Postal
Policy Changes—specifically that Defendants "require[ed] manual
sorting, remov[ed] sorting machines, and eliminat[ed]
commonsense measures to alleviate backlogs"—caused "substantial
delays in mail delivery," implementation of these changes
violated the text of the section or unreasonably interpreted its
terms. Pls.' Mot., ECF No. 60 at 39.

Plaintiffs have not shown that Defendants have "patently"
misinterpreted the provision or "clear[ly] departed" from its
mandate. *See Fed. Express Corp.*, 39 F.4th at 762. As the D.C.
Circuit has explained, "vague statutory provisions, such as one
that requires an agency to use 'appropriate data' to calculate a
payment amount, are not sufficiently clear and mandatory to
warrant non-APA review." *NAPS*, 26 F.4th at 971-72 (citing *DCH
Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509-10 (D.C. Cir. 2019);
*see also Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449
(D.C. Cir. 2009) (holding that a statutory provision requiring
an agency to hire "suitably qualified" U.S. citizens was not
subject to *ultra vires* review). Although the terms included in
Section 101(a) may be more definite in nature than "appropriate"
or "suitably," the provision still "lack[s] discernible
standards by which a court can identify a limit to agency
authority." *NAPS*, 26 F.4th at 971-72.

Significantly, the statute does not define "prompt, reliable, and efficient." In the absence of statutory definitions, the Court "must presume that Congress intended to give the term[s] [their] ordinary meaning." *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166, 1176 (D.C. Cir. 2003). As defined by the Merriam-Webster dictionary, "prompt" means "being ready and quick to act as occasion demands" or "performed readily or immediately"; "reliable" means "suitable or fit to be relied on" or "giving the same result on successive trials"; and "efficient" means "capable of producing desired results with little or no waste (as of time or materials)." *See Prompt* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/prompt; *Reliable*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/reliable; *Efficient*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/efficient. While there are certainly potentially egregious actions USPS could take that would fall outside of these definitions, the terms are largely subjective and involve a question of degree. Moreover, the terms may at times conflict with each other—for example, one could imagine a situation in which the most "reliable" method of mail delivery is not the most "efficient" or "prompt" method—and are thus heavily dependent on how the agency decides to weigh its operational considerations. Ultimately, "it is for the Postal

48

Service and the Postal Service alone to resolve those conflicts," *Nat'l Ass'n*, 602 F.2d at 435, and a claim that "the agency reached the wrong result" when "validly exercising its judgment" is not appropriate under the *ultra vires* doctrine, *Eagle Trust Fund v. USPS*, 365 F. Supp. 3d 57, 67 (D.D.C. 2019) (KBJ). Even if the Court may agree with Plaintiffs that the Postal Policy Changes resulted in mail delays across the country, the Court cannot substitute its own judgment of what is prompt, reliable, and efficient for that of the Postal Service. *See Nat'l Ass'n*, 602 F.2d at 433, 435 (stating that courts "cannot through statutory construction create more precise standards and rights than Congress elected to create").

Thus, because Plaintiffs have not shown that Defendants patently misconstrued Section 101(a) or violated its terms, Plaintiffs' claim fails.

### b.    Section 101(b)

Plaintiffs' Section 101(b) claim fails for similar reasons. Section 101(b) provides:

> The Postal Service shall provide a maximum degree of effective and regular postal services to rural areas, communities, and small towns where post offices are not self-sustaining. No small post office shall be closed solely for operating at a deficit, it being the specific intent of the Congress that effective postal services be insured to residents of both urban and rural communities.

39 U.S.C. § 101(b). Plaintiffs argue that "[u]nexplained reductions in service and removals of equipment, and the imposition of oddly technical roadblocks to efficient services not previously in place—all implemented at the same time— necessarily are less that the 'maximum degree of effective and regular postal services.'" Pls.' Mot., ECF No. 60 at 39.

   As an initial matter, Plaintiffs do not include any allegations or evidence that the Postal Policy Changes negatively impacted "rural areas, communities, and small towns where post offices are not self-sustaining" specifically. *See* Pls.' Mot., ECF No. 60 at 39; Pls.' Reply, ECF No. 71 at 34-35. Because Section 101(b) refers to effective and regular postal services only with regard to those types of areas, Plaintiffs' arguments lack any support.

   In addition, though "maximum degree" may have a common-sense meaning, the terms "effective and regular" are not defined in the statute. Looking to the dictionary, Merriam-Webster defines "effective" as "producing a decided, decisive, or desired effect." *Effective*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/effective. "Regular" is defined as "constituted, conducted, scheduled, or done in conformity with established or prescribed usages, rules, or discipline" or "recurring, attending, or functioning at fixed, uniform, or normal intervals." *Regular*, Merriam-Webster

50

Dictionary, https://www.merriam-webster.com/dictionary/regular.
Again, the definitions of these terms do not provide clear
limits on what the agency must provide to the "maximum degree,"
but rather place considerable discretion in USPS's hands to
determine its goals and schedules. Moreover, Congress recently
amended Section 101(b) to insert the following language:

> The Postal Service shall maintain an
> integrated network for the delivery of market-
> dominant and competitive products (as defined
> in chapter 36 of this title). Delivery shall
> occur at least six days a week, except during
> weeks that include a Federal holiday, in
> emergency situations, such as natural
> disasters, or in geographic areas where the
> Postal Service has established a policy of
> delivering mail fewer than six days a week as
> of the date of enactment of the Postal Service
> Reform Act of 2022.

39 U.S.C. § 101(b). Reading the entire provision in context thus
strongly suggests that "regular" and "effective" postal services
refers to Congress's explicit direction that mail delivery occur
six days a week in most circumstances. *FDA v. Brown & Williamson
Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("It is a fundamental
canon of statutory construction that the words of a statute must
be read in their context and with a view to their place in the
overall statutory scheme." (internal quotation marks omitted)).
Here, there is no claim that the Postal Policy Changes resulted
in mail deliveries occurring fewer than six days a week.

Plaintiffs therefore have not demonstrated that the Postal Service acted *ultra vires* with respect to Section 101(b).

### c.    Section 101(e)

Plaintiffs next challenge Defendants' actions under Section 101(e). This provision provides that: "In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail." 39 U.S.C. § 101(e). Plaintiffs argue that "there is no indication the Postal Service gave *any* consideration, let alone *highest* consideration, to the expeditious delivery of important letter mail," when the agency decided to remove of "hundreds of sorting machines," prohibit or drastically curtail late and extra trips, and prevent postal workers "at nearly 400 facilities from sorting any mail in the morning before leaving to deliver the mail." Pls.' Mot., ECF No. 60 at 38.

Section 101(e) requires that the Postal Service consider "the requirement for the most expeditious . . . delivery of important letter mail." Accordingly, the Court "can compel the Postal Service to *consider*" that factor. *NAPS*, 26 F.4th at 973. Because Congress did not define "expeditious" within the statutory scheme, the Court presumes that its ordinary meaning applies, which is "marked by or acting with prompt efficiency."

52

*Expeditious*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/expeditious; *see also Aid Ass'n for Lutherans*, 321 F.3d at 1176. This definition includes two further terms not subject to precise definition—"prompt" and "efficiency"—and necessarily requires a balancing of speed versus resource management. Thus, though the Court may review the record for evidence of consideration, the Court "cannot substitute its own judgment of what is" expeditious "for that of the Postal Service." *NAPS*, 26 F.4th at 973 (determining, with regard to provision that required USPS to "provide adequate and reasonable differentials in rates of pay," that a court "can compel the Postal Service to consider and fulfill the differential requirement, but . . . cannot substitute its own judgment of what is adequate and reasonable for that of the Postal Service"). And contrary to Plaintiffs' assertion, Section 101(e) does not require the Postal Service to seek guidance from the PRC, nor does it require the agency to perform its analyses in any specific form or manner.

With regard to the removal of unnecessary processing machines, Defendants explained that between 2017 and April 2020, USPS created and ran a computer model "to determine the optimum number of machines required for efficient mail processing at facilities across the nation and monitored the reductions on an ongoing basis." DeChambeau Decl., ECF No. 59-33 at 6. The

reduction of the number of machines depended upon an "ongoing analysis of mail volume and mail processing needs nationwide." *Id.* at 8. In May 2020, USPS concluded that based upon its data monitoring and analysis, it "needed fewer letter and flat sorting machines and more package machines and/or more workroom floor space for nonautomated package processing" so that the agency could "operate more efficiently." *Id.* at 6-7. USPS explained that, in its estimation, "removing unnecessary machines frees up space for other package-processing machines, which may be staffed with employees who are no longer needed for running additional letter or flat mail sorting machines," and the greater floor space "accommodate[s] [an] increased volume of packages." *Id.* at 7; *see also* Barber Decl., ECF No. 66-9 at 3. And with regard to the prohibition or reduction in late and extra trips, on June 16, 2020, the USPS Office of the Inspector General released a report analyzing whether the processing network was "operating at optimal efficiency and meeting service standards." Ex. 14, ECF No. 70-2 at 4. The report noted that in fiscal year 2019 the Postal Service had spent $280 million in late and extra transportation, yet the agency "only met service performance targets for five . . . or 15 percent of the 33 mail products" that fiscal year. *Id.* at 5. In view of the decreases in "operational efficiency," the Postal Service stated that two "best practices" to "increase efficiency" included: (1) front-

line managers implementing actions "to complete processing operations early and transport mail on a trip prior to the last scheduled transportation trip"; and (2) employees "took sorted packages to the dock, while the processing operations were still ongoing, in order to have as many mailpieces as possible on the last scheduled transportation trip rather than having them go later on extra trips." *Id.* In addition, Robert Cintron testified that prior to July 2020, trainings and meetings were provided to "management about the need to adhere to transportation schedules." Cintron Dep. Tr., ECF No. 66-35 at 20-21.

In view of the record evidence above and because the statute does not define the term "expeditious," the Court cannot hold that USPS clearly acted outside of its statutory authority. *See Eagle Trust Fund*, 365 F. Supp. 3d at 67.

### d.   Section 403(a)

Section 403(a) provides:

> The Postal Service shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees. The Postal Service shall receive, transmit, and deliver throughout the United States, its territories and possessions, and, pursuant to arrangements entered into under sections 406 and 411 of this title, throughout the world, written and printed matter, parcels, and like materials and provide such other services incidental thereto as it finds appropriate to its functions and in the public interest. The Postal Service shall serve as nearly as practicable the entire population of the United States.

39 U.S.C. § 403(a). Plaintiffs argue that Defendants acted *ultra vires* by implementing inadequate and inefficient services. Pls. Mot., ECF No. 60 at 40.

Plaintiffs first contend the Postal Policy Changes are inefficient because "[b]y removing sorting machines . . . and by restricting or banning policies that enabled faster processing and delivery of mail, the Postal Policy Changes both increase the amount of effort expended by postal workers *and* reduce the Postal Service's output." Pls.' Mot., ECF No. 60 at 41. However, as explained above, USPS has the discretion to interpret the term "efficient," and USPS reached the conclusion that the removal of machines and reduction of extra and late trips would create a more efficient system. *See, e.g.*, DeChambeau Decl., ECF No. 59-33 at 6-8 (sorting machines); OIG Report, Ex. 14, ECF No. 70-2 at 4 (late and extra trips). Whether USPS made a reasonable judgment regarding efficiency is not an appropriate inquiry under *ultra vires* review. *See Eagle Trust Fund*, 365 F. Supp. 3d at 67.

Plaintiffs also contend that the Postal Policy Changes undermined the adequacy of postal services by delaying mail, disrupting Plaintiffs' plans to administer the 2020 general election, and threatening the timely delivery of election mail and public benefits mail. Pls.' Mot., ECF No. 60 at 42-43. Plaintiffs argue that "adequate" means, "at minimum, that which

is *necessary* to provide the postal services envisioned by the PRA." *Id.* at 41 (quoting *Glob. Tel\*Link v. FCC*, 866 F.3d 397, 420-21 (D.C. Cir. 2017)). Even if the Court accepts Plaintiffs' definition of "adequate," however, the definition still does not establish clear limits on USPS's delegated authority. Indeed, the D.C. Circuit in *NAPS* held that the word "adequate" is subject to the Postal Service's interpretation and that courts "cannot substitute its own judgment of what is adequate . . . for that of the Postal Service." 460 F.4th at 972-73. Though the circuit court was analyzing a different provision than the one at issue here, the same reasoning applies.

### e.    Section 403(b)

Finally, Plaintiffs allege that USPS acted *ultra vires* in violation of Section 403(b). The provision states:

> It shall be the responsibility of the Postal Service—
> (1) to maintain an efficient system of collection, sorting, and delivery of the mail nationwide;
> (2) to provide types of mail service to meet the needs of different categories of mail and mail users; and
> (3) to establish and maintain postal facilities of such character and in such locations, that postal patrons throughout the Nation will, consistent with reasonable economies of postal operations, have ready access to essential postal services.

39 U.S.C. § 403(b).

Plaintiffs have failed to show that USPS has "plainly" stepped "beyond the bounds" of its statutory authority

enumerated in Section 403(b). *Griffith*, 842 F.2d at 493 (citation omitted). Undefined terms and phrases such as "efficient," "meet the needs of," and "ready access to essential postal services" are not sufficiently specific or unambiguous as to be susceptible to *ultra vires* review. *Id.* (citation omitted). Because *ultra vires* claims are "confined to *extreme* agency error," *Fed. Express Corp.*, 39 F.4th at 764 (quoting *Griffith*, 842 F.2d at 493), the Postal Service's actions are not *ultra vires*.

### D. The Postal Policy Changes Did Not Violate the Elections Clause

Next, Plaintiffs contend that "the Postal Policy Changes violate the Elections Clause of the United States Constitution because they impair—and were *intended* to impair—Plaintiffs' administration of the elections process in their states." Pls.' Mot., ECF No. 60 at 44.[5]

The Elections Clause of the Constitution, Art. I, § 4, cl. 1, provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const.,

---

[5] The Court finds that Plaintiffs' claim is not moot, as Defendants' actions in this case "fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review." *FEC v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 450 (2007).

Art. I, § 4, cl. 1. "In practice, the Clause functions as 'a
default provision; it invests the States with responsibility for
the mechanics of congressional elections, but only so far as
Congress declines to pre-empt state legislative choices.'"
*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9
(2013) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)); *see
also Cook v. Gralike*, 531 U.S. 510, 523 (2001) ("[T]he Elections
Clause grants to the States 'broad power' to prescribe the
procedural mechanisms for holding congressional
elections."(quoting *Tashjian v. Republican Party of Conn.*, 479
U.S. 208, 217 (1986))); *U.S. Term Limits, Inc. v. Thornton*, 514
U.S. 779, 832 (1995) ("The Framers intended the Elections Clause
to grant States authority to create procedural regulations . . .
.").

The Postal Service, in implementing the Postal Policy
Changes, has not violated the Elections Clause. As the Supreme
Court has explained, the "function contemplated by [the
Elections Clause] is that of making laws." *Smiley v. Holm*, 285
U.S. 355, 366 (1932). Though the implementation of the Postal
Policy Changes contributed to the delay in mail deliveries
nationwide, *see generally* Grimmer Suppl. Decl., ECF No. 59-23,
which in turn risked a delay in the delivery of mail-in ballots
during an election season, USPS's actions do not amount to
voting regulations that override the States' existing

regulations, nor do they alter the States' existing regulations, *see Foster*, 522 U.S. at 69 (calling it "well settled" that Congress has the authority to "override state regulations by establishing uniform rules for federal elections" (internal quotation marks omitted) (citation omitted)). It is undisputed that Plaintiffs' regulations remain intact.

Neither do Plaintiffs cite to any case law supporting their position that the Elections Clause grants protection to State legislatures from federal policies that do not "make or alter" voting regulations. U.S. Const., Art. I, § 4, cl. 1; *see Smiley*, 285 U.S. at 366, 368 (explaining that the Elections Clause "involves lawmaking in its essential features" and that "limitation[s]" to State legislatures are not "incongruous with the grant of legislative authority to regulate congressional elections"). The Court therefore declines to read the Elections Clause more expansively than either its language or precedent dictates. *See Inter Tribal Council of Ariz.*, 570 U.S. at 8 (stating that the Elections Clause has only "two functions": granting the States the duty to "prescribe the time, place, and manner" of elections, and granting Congress the "power to alter those regulations or supplant them altogether").

## E. Scope of Relief

"In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their

jurisdiction yields to considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995). "There are no dispositive factors a district court should consider in determining whether it should entertain an action brought under the Declaratory Judgment Act." *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012) (quoting *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 95 (D.D.C. 2008)) (internal quotation marks omitted). The D.C. Circuit has found the following to be useful considerations: (1) "whether [declaratory relief] would finally settle the controversy between the parties"; (2) "whether other remedies are available or other proceedings pending"; (3) "the convenience of the parties"; (4) "the equity of the conduct of the declaratory judgment plaintiff"; (5) "prevention of procedural fencing"; (6) "the state of the record"; (6) "the degree of adverseness between the parties"; and "the public importance of the question to be decided." *Id.* (quoting *Hanes Corp. v. Millard*, 531 F.2d 585, 592 n.4 (D.C. Cir. 1976)); *see also Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 35 (D.D.C. 2016) ("[D]eclaratory relief requires a determination of 1) an actual, substantial controversy, 2) involving an interested party, 3) that warrants the immediate issuance of a declaratory judgment."). Moreover, "[i]n the D.C. Circuit, two criteria are ordinarily relied upon: 1) whether the judgment will serve a

useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn*, 222 F. Supp. 3d at 36.

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). A plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.* Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[6]

Defendants do not contest that the Postal Policy Changes caused irreparable harm, that no other remedies are available at law, or that the balance of the equities and public interest weigh in favor of Plaintiffs. *See* Defs.' Mot., ECF No. 66-1 at 52-54. Defendants also do not contest that Plaintiffs meet the

---

[6] Plaintiffs do not seek injunctive or declaratory relief against the President, *see* Pls.' Reply, ECF No. 71 at 42 n.20, and the Court grants relief against all Defendants other than the President.

test for granting declaratory relief. *Id.* Indeed, the evidence demonstrates that Plaintiffs suffered harm by impeding their ability to combat the spread COVID-19, impeding their ability to provide safe alternatives to in-person voting, imposing "direct financial costs to state and local agencies," and imposing "administrative burdens . . . on state and local agencies." *See* Banks Decl., ECF No. 59-2 ¶¶ 7–9; Newton Decl., ECF No. ECF No. 59-16 ¶¶ 13–16; Roye Decl., ECF No. 59-18 ¶¶ 5, 11–13; Roye Suppl. Decl., ECF No. 59-24 ¶¶ 13, 18–20; Ku Decl., ECF No. 59-14 ¶¶ 8-10, 13; Shah Decl., ECF No. 59-19 ¶¶ 3, 5-6, 10; Adinaro Decl., ECF No. 59-1 ¶ 9; Kellner Decl., ECF No. 59-13 ¶¶ 11, 16–17, 19. In addition, "[i]t is clearly in the public interest to mitigate the spread of COVID-19, to ensure safe alternatives to in-person voting, and to require that the USPS comply with the law." *New York*, 490 F. Supp. 3d at 245. Further, there is no dispute that declaratory relief would settle the issues before the parties and that there are no other remedies or proceedings pending. *See Glenn*, 222 F. Supp. 3d at 35 ("This inquiry should focus on whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (internal quotation marks omitted)).

Instead, Defendants argue that the declaratory and injunctive relief Plaintiffs request is overly vague. However, the Court has the power to modify the terms of a proposed injunction, and it shall do so here. Although the simultaneous implementation of multiple policy changes in June and July 2020 contributed to the decline in mail service and the overall confusion by postal workers, the record evidence demonstrates that changes to and impacts on the USPS transportation schedule regarding late and extra trips were the primary factor in affecting service on a nationwide or substantially nationwide basis. *See* Pls.' Statement of Facts, ECF No. 60-1 at 16 ("The decline in Service Scores has persisted even after the Postal Service has suspended all other new initiatives other than the policy limiting the number of Extra or Late Trips. Therefore, the observed declines in Service Scores are not attributable to other initiatives at the Postal Service."); Aug. 13, 2020 Message from the Postmaster General, Pls.' Ex. 52, ECF No. 59-52 at 2-3; Transcript of Senate Homeland Security and Governmental Affairs Committee Hearing (Aug. 21, 2020), Defs.' Ex. 13, ECF No. 66-17; Grimmer Suppl. Decl., ECF No. 59-23. The Court shall therefore enjoin the Postal Service from prohibiting such trips in total or from curtailing such trips to the extent that nationwide service scores decline on average by more than 10 percentage points for a period of at least two-weeks, without

first seeking an advisory opinion from the PRC pursuant to 39 U.S.C. § 3661(b). The Court also, in its discretion, grants declaratory relief to Plaintiffs because USPS's steep reduction in late and extra trips in July 2020 violated Section 3661(b) when the agency failed to first seek an advisory opinion from the PRC. The Court declines Plaintiffs' request to appoint an independent monitor in this case. *See* Fed. R. Civ. P. 53(a)(1)(B).

**IV. Conclusion**

For the reasons stated above, the Court hereby orders that Plaintiffs' motion for summary judgment, ECF No. 58, is granted in part and denied in part, and Defendants' cross-motion for summary judgment, ECF No. 66, is granted in part and denied in part. The Order issued on September 30, 2022 accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan
            United States District Judge
            October 6, 2022**